# Exhibit A

1    DROR LADIN*
     NOOR ZAFAR*
2    HINA SHAMSI*
     OMAR C. JADWAT*
3    AMERICAN CIVIL LIBERTIES UNION FOUNDATION
     125 Broad Street, 18th Floor
4    New York, NY 10004
     Tel: (212) 549-2660
5    dladin@aclu.org
     nzafar@aclu.org
6    hshamsi@aclu.org
     ojadwat@aclu.org
7    *Application for admission* pro hac vice *forthcoming*

8    CECILLIA D. WANG (SBN 187782)
     AMERICAN CIVIL LIBERTIES UNION FOUNDATION
9    39 Drumm Street
     San Francisco, CA 94111
10   Tel: (415) 343-0770
     cwang@aclu.org

11

12   SANJAY NARAYAN (SBN 183227)**
     GLORIA D. SMITH (SBN 200824)**
13   SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
     2101 Webster Street, Suite 1300
14   Oakland, CA 94612
     Tel: (415) 977-5772
15   sanjay.narayan@sierraclub.org
     gloria.smith@sierraclub.org
16   **Counsel for Plaintiff SIERRA CLUB

     *Attorneys for Plaintiffs* (Additional counsel listed on following page)
17

18           **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
19         **SAN FRANCISCO-OAKLAND DIVISION**

20   SIERRA CLUB and SOUTHERN BORDER
     COMMUNITIES COALITION,

21           *Plaintiffs*,                 Case No.:

22           v.

23   DONALD J. TRUMP, President of the United     **COMPLAINT FOR DECLARATORY**
     States, in his official capacity; PATRICK M.       **AND INJUNCTIVE RELIEF**
24   SHANAHAN, Acting Secretary of Defense, in his
     official capacity; KIRSTJEN M. NIELSEN,
25   Secretary of Homeland Security, in her official
     capacity; and STEVEN MNUCHIN, Secretary of
26   the Treasury, in his official capacity,

27           *Defendants.*

28

Additional counsel for Plaintiffs:

MOLLIE M. LEE (SBN 251404)
CHRISTINE P. SUN (SBN 218701)
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 621-2493
Fax: (415) 255-8437
mlee@aclunc.org
csun@aclunc.org

DAVID DONATTI*
ANDRE I. SEGURA (SBN 247681)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
   OF TEXAS
P.O. Box 8306
Houston, TX 77288
Tel: (713) 325-7011
Fax: (713) 942-8966
ddonatti@aclutx.org
asegura@aclutx.org
*Application for admission pro hac vice forthcoming

1

**INTRODUCTION**

2  1.  On February 15, 2019, President Donald Trump invoked his authority under the

3 National Emergencies Act, 50 U.S.C. §§ 1601–1651, to declare a national emergency and divert

4 billions of dollars appropriated for other purposes to carry out his campaign promise to build a wall

5 along the U.S.-Mexico border.

6  2.  The President's declaration was made solely out of disagreement with Congress's

7 decision about the proper funding level, location, and timetable for constructing a border wall. On

8 the same day that President Trump signed his declaration, he also signed an act of Congress

9 appropriating only $1.375 billion for the border wall. The law Congress passed not only denied the

10 President the additional billions he had demanded, but also imposed substantial restrictions on the

11 location and timing of border wall construction.

12  3.  In announcing his declaration of a national emergency, the President stated, "I don't

13 need to do this," but explained that he preferred to build the border wall faster than Congress's

14 appropriation would allow.

15  4.  The President's declaration plainly states that the invocation of an emergency is to

16 address a "long-standing" problem of "large-scale unlawful migration through the southern border"

17 and the President's opinion that the number of families seeking asylum at the U.S.-Mexico border

18 presents an "emergency." In fact, there was and is no national emergency to justify the President's

19 action, only his disagreement with Congress's duly enacted decisions on the extent and pace of

20 spending on the border wall.

21  5.  On its face, the declaration does not meet the requirements of the statutory

22 authorization that the President invokes, 10 U.S.C. § 2808. That law, duly enacted by Congress,

23 provides that the President may declare an emergency to deploy military construction funds "that are

24 necessary to support such [emergency] use of the armed forces." The declaration does not set forth

25 any actual emergency, any use of the armed forces required to address such an emergency, or how a

26 diversion of military construction funds is necessary to support the use of the armed forces of the

27 United States. The President has also instructed his subordinates to divert additional sources of

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO: _____

Departments of Defense and Treasury funds that Congress restricted for other purposes, in an effort to secure the appropriations that Congress denied him for the border wall.

6. Neither a declaration of emergency nor the Defense and Treasury funding statutes the administration has invoked permit the President to disregard Congress's enacted appropriations legislation. The President's actions violate both those statutes and the Constitution.

7. Plaintiffs Sierra Club and Southern Border Communities Coalition are harmed by the President's unlawful declaration of a national emergency and bring this action seeking declaratory and injunctive relief and other remedies as set forth below.

## JURISDICTION AND VENUE

8. This case arises under the Consolidated Appropriations Act of 2019, Pub. Law No. 116-6; Article I, section 9, clause 7 of the U.S. Constitution; Article I, section 7 of the U.S. Constitution; the National Environmental Policy Act, 42 U.S.C. § 4332; the Administrative Procedures Act, 5 U.S.C. §§ 701–706, and other acts of Congress. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1361 (mandamus), 1651 (All Writs Act) and 2201 (declaratory relief).

9. Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendants are agencies of the United States and officers of the United States acting in their official capacity and (1) at least one plaintiff resides in this district; and/or (2) a substantial part of the events or omissions giving rise to the claims occurred in this district.

10. In addition to the harm caused to Plaintiff Sierra Club described below, the challenged action will have an impact throughout the Northern District of California, including in Contra Costa County and Monterey County, where the Department of Defense maintains several bases and facilities. The challenged action jeopardizes millions of dollars of Department of Defense funding for constructions projects at military bases in this District.

## PARTIES

11. Plaintiff Sierra Club is incorporated in the State of California as a nonprofit public benefit corporation with headquarters in Oakland, California. Sierra Club is a national organization with 67 chapters and more than 825,000 members dedicated to exploring, enjoying, and protecting

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO: _____

the wild places of the earth; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Many of Sierra Club's members reside, work, recreate, and/or enjoy areas along the border of the United States and Mexico. Sierra Club has more than 400,000 members in California, over 9,700 of whom belong to its San Diego Chapter. Sierra Club's Grand Canyon Chapter, which covers the State of Arizona, has more than 16,000 members. Sierra Club's Rio Grande Chapter includes over 10,000 members in New Mexico and West Texas. Sierra Club's Lone Star Chapter, which covers the State of Texas, has more than 26,100 members, more than 440 of whom live in the Lower Rio Grande Valley.

12.     Sierra Club's nationwide advocacy includes educating and mobilizing the public on issues of habitat destruction, divided local communities, land use, and myriad other human and environmental impacts associated with border wall construction activities. Sierra Club is committed to the protection of threatened and endangered species that inhabit the areas surrounding the proposed border walls as well as their habitat. Sierra Club has been actively involved in protecting habitat along the southern border for many years, including work to promote conservation on state, federal, and private lands along and adjacent to the border, and its members regularly use and enjoy areas along the border. Sierra Club members live near and regularly visit the California-Mexico border around San Diego for hiking, birdwatching, photography, and other recreational and aesthetic uses, and have worked to promote conservation of wildlife and habitat along the border.

13.     Sierra Club brings this action on its own behalf and on behalf of its members. Sierra Club members live near and frequently visit the parks, refuges, and other public lands along the United States-Mexico border for hiking, birdwatching, photography and other professional, scientific, recreational, and aesthetic uses. Among the areas visited by Sierra Club members are: the Tijuana Estuary (California), the Otay Mountain Wilderness (California), the Jacumba Wilderness Area (California), the Sonoran Desert (Arizona), Cabeza Prieta National Wildlife Refuge (Arizona), the Chihuahan Desert (New Mexico), Santa Ana National Wildlife Refuge (Texas), the Lower Rio Grande Valley National Wildlife Refuge (Texas), Bentsen-Rio Grande Valley State Park (Texas), La Lomita Historical Park (Texas), and the National Butterfly Center (Texas). Sierra Club members

also reside, work, and recreate in and around cities and towns affected by the border wall, including but not limited to Santa Teresa, New Mexico; San Ysidro and Imperial Beach, California; Roma, Texas; Rio Grande City, Texas; Escobares, Texas; La Grulla, Texas; and Salineño, Texas.

14.     Sierra Club's members obtain recreational, professional, scientific, educational, and aesthetic benefits from their activities in these areas, and from wildlife dependent upon habitat that includes these areas. Sierra Club and its members have been and will continue to be injured by the construction of a border wall and related infrastructure. Such injuries are particularly significant because the U.S. Department of Homeland Security is proceeding with border work without first complying with decades-old environmental and public safety laws and regulations that were enacted for the very purpose of protecting the places, species, and values Sierra Club members work to protect. The requested relief will redress these injuries.

15.     Sierra Club has devoted and continues to devote substantial resources to advocacy opposing the Department of Homeland Security's border wall construction, intended to avoid the injuries to Sierra Club's interests described above. Those efforts include formation of Sierra Club Borderlands, a coalition intended to investigate the environmental and social impacts of the border wall, and educate the public regarding those impacts. Sierra Club also devoted substantial staff and other resources towards legislative advocacy leading up to the appropriations bill passed by Congress in February 2019, specifically directed towards securing Congress's denial of substantial funding to the border wall. Because of President Trump's emergency declaration, Sierra Club has been forced to redirect resources to continue and amplify its advocacy—despite Congress's decision to limit funding for near-term construction. For example, Sierra Club has allocated staff and volunteers within its national headquarters in Oakland to support veterans who intend to travel to Texas to oppose continued wall construction. As a result of the President's emergency declaration, Sierra Club has also redirected staff and volunteers within its California offices to investigate and assess the extent of construction activities along the border in those areas outside those delineated by congressional appropriations, and the impacts of those activities.

16.     Plaintiff Southern Border Communities Coalition ("SBCC") is a program of Alliance San Diego, a nonprofit public benefit corporation with headquarters in San Diego, California. SBCC

brings together 60 organizations from California, Arizona, New Mexico, and Texas to promote policies and solutions that improve quality of life in border communities, including fair border enforcement policies that respect human dignity and human rights and prevent loss of life, as well as rational and humane immigration-reform policies affecting the border region. Additionally, SBCC engages in oversight of U.S. Customs and Border Protection and its components, including Border Patrol, and advocates for accountability and transparency in the government policies and practices that impact border communities.

17. SBCC brings this action on behalf of its members and on its own behalf. SBCC's members live in and around the border lands impacted by the President's declaration of a national emergency, in California, Arizona, New Mexico, and Texas. They recreate in and derive other benefits from public lands, including areas for which border barrier funding has not been appropriated or for which the deployment of funds has been prohibited. The ongoing and imminent construction of border infrastructure, including the border wall and fencing, will restrict members' access to these and other lands, degrading their quality of life. It has additional negative consequences: dividing and fragmenting the communities in which SBCC members live; dividing the binational character of these communities by increasing members' fears about traveling back-and-forth across the border; heightening racial division and promoting hostility towards immigrants and communities of color in border communities; and decreasing eco- and other forms of tourism that generate significant revenue.

18. President Trump's declaration also exposes SBCC's membership to heightened risk from flooding, as well as risks to clean water, clean air and other natural resources. These threats are magnified by the government's refusal to comply with constitutional and statutory limits on construction. The border wall directly harms members economically, culturally, recreationally, aesthetically, and religiously. The requested relief would redress these injuries.

19. Further, the declaration of a national emergency and the improper diversion of funds has already and will continue to impair SBCC's mission and divert SBCC's resources. SBCC has mobilized its staff and its affiliates to monitor and respond to the diversion of funds and the construction caused by and accompanying the national emergency declaration. It has organized,

supported, or participated in grassroots advocacy to respond to ongoing and imminent construction throughout the border lands, including in San Diego, Tucson, Las Cruces, El Paso, and the Rio Grande Valley, and will continue to do so in response to new construction caused by the President's declaration. SBCC has responded locally and nationally to the President's declaration to highlight the impacts it will have on border communities. It has engaged in rapid-response political outreach and advocacy. And it has responded to several calls from local officials, congressional representatives, and the public about the President's national emergency declaration and the impacts it will have on the border lands and on border communities, providing information, guidance, and support to organizations and individuals that depend on SBCC. The time and cost associated with these activities has interfered with SBCC's core advocacy regarding border militarization, Border Patrol law-enforcement activities, and immigration reform. SBCC must take these actions in furtherance of its mission to improve the quality of life in border communities.

20.     Defendant DONALD J. TRUMP is the President of the United States, and is sued in his official capacity.

21.     Defendant PATRICK M. SHANAHAN, Acting Secretary of Defense, is sued in his official capacity. Acting Secretary Shanahan is responsible for ensuring that Department of Defense actions comply with applicable laws. Acting Secretary Shanahan is responsible for carrying out the diversion of military construction funds for the construction of the border wall under President Trump's declaration of national emergency.

22.     Defendant KIRSTJEN M. NIELSEN, Secretary of Homeland Security, is sued in her official capacity. Secretary Nielsen is responsible for ensuring that Department of Homeland Security actions comply with applicable laws. Secretary Nielsen is responsible for carrying out the construction of the border wall and otherwise implementing President Trump's declaration of national emergency.

23.     Defendant STEVEN MNUCHIN, Secretary of the Treasury, is sued in his official capacity. Secretary Mnuchin is responsible for carrying out the diversion of Treasury funds for the construction of the border wall under President Trump's declaration of national emergency.

# FACTUAL ALLEGATIONS

24.     On February 15, 2019, President Trump declared a national emergency in order to secure funding for his border wall. The President's declaration came after a weeks-long stalemate between the President and Congress, during which the President repeatedly threatened to declare a national emergency if Congress did not fund the construction of the border wall to the extent and at the pace the President preferred.

25.     Contrary to the appropriations bills duly enacted by Congress for construction of border barriers, which included specific limitations and "carve-out" areas, President Trump has repeatedly stated that he will build a "big, beautiful" 1,000 mile-long wall along the U.S.-Mexico border.

26.     Congress's latest appropriation for the border wall—enacted specifically in response to the President's call for action to end an impasse that included a six-week government shutdown—included only $1.375 billion. In announcing his declaration of national emergency, however, President Trump expressly disagreed with Congress's appropriation decision and instead called for more than $8 billion for border wall construction.

**President Trump Has Repeatedly Failed to Secure from Congress his Desired Level of Appropriations for Wall Construction.**

27.     Since taking office in 2017, President Trump and his executive branch officials have sought appropriations to fund construction of the border wall. In its repeated appropriation requests, the Trump administration has acknowledged that it cannot build a border wall without congressional authorization.

28.     In March 2017, the President asked Congress for $1.4 billion for the border wall for the remainder of fiscal year 2017, and an additional $2.6 billion for fiscal year 2018. On May 1, 2017, Congress agreed on a bipartisan bill to fund the government through September 30, 2017. Congress rejected the President's request for wall funding, but increased spending on border security by $1.5 billion. Three days after tweeting that the country "needs a good 'shutdown' in September," the President signed the bill on May 5, 2017.

29.     On March 23, 2018, Congress rejected the President's request for $1.6 billion to build a border wall in the Rio Grande Valley in South Texas. Congress instead allocated $1.6 billion for border security including new technology and repairs to existing barriers, as well as $641 million for about 33 miles of new fencing that had been authorized by the Secure Fence Act of 2006, Public Law 109–367.

30.     Congress did not accede to the President's requests for more border wall funding throughout the remainder of 2018.

**President Trump Refuses to Sign a Congressional Appropriations Package that Does Not Include his Desired Amount of Border Wall Funding and Threatens to Declare a National Emergency.**

31.     On December 11, 2018, during his latest round of budget negotiations with Congress, the President announced that he would be "proud" to shut down the government if he did not receive his requested $5.7 billion in wall funding. When it was clear that both chambers of Congress would pass funding legislation necessary to keep the federal government open, President Trump declared that he would not sign any funding legislation—including legislation unanimously approved by the Senate to keep the government funded through February 8, 2019—without $5 billion to build his proposed border wall.

32.     On December 21, 2018, the United States entered into a partial government shutdown. The shutdown would last 35 days, making it the longest in the nation's history. President Trump threatened to draw the shutdown out for "a very long period of time—months or even years"—unless Congress gave him the money he was demanding for the border wall.

33.     As the shutdown ground on, President Trump attempted to strike a compromise. He announced on January 19, 2019, that he was willing to temporarily extend the Deferred Action for Childhood Arrivals and Temporary Protected Status programs in exchange for $5.7 billion for a border wall. Democratic leaders rejected the proposal as a "non-starter" that merely put forth previously rejected offers. They urged the President to open the government before beginning negotiations over border security.

34.     Frustrated by Congress's consistent rejection of his demand for funding, President Trump threatened to declare a national emergency and build a wall without congressional approval. According to the President, he could "call a national emergency and build it very quickly."

35.     For several weeks, President Trump repeated his threat to invoke a national emergency to circumvent Congress's funding authority. On January 9, 2019, he stated that "I have an absolute right to do national emergency if I want," and revealed that his "threshold" for invoking the emergency would be if he "can't make a deal with people that are unreasonable."

36.     On January 10, 2019, the President referred to ongoing negotiations with the House and the Senate and said "If this doesn't work out, probably I will [declare a national emergency]. I would almost say definitely." He explained that "[i]f we don't make a deal, I would say 100 percent, but I don't want to say 100 percent," and that "[i]f we don't make a deal, I would say it would be very surprising to me that I would not declare a national emergency and just fund it through the various mechanisms."

37.     Despite encouragement from Senate Republicans to agree to reopen the government for a short period to negotiate with Democrats, President Trump promised to remain steadfast in his demands for a wall along the United States-Mexico border. He would not declare a national emergency "so fast," he said, because, although "[i]t's the easy way out, . . . Congress should do it."

38.     On January 25, 2019, faced with worsening national gridlock as a result of the 35-day shutdown, President Trump agreed to sign legislation that would keep the government open until February 15, 2019. This stopgap legislation did not include any funding for a border wall and had previously been rejected by the President.

39.     In ending the government shutdown, the President stated that if he were unable to "work with the Democrats and negotiate," then "obviously we'll do the emergency because that's what it is. It's a national emergency."

40.     After the shutdown ended, a bipartisan committee of negotiators from the House and Senate began work on a compromise appropriations bill that would include some funding for border security. President Trump publicly expressed his skepticism that negotiations would be fruitful,

declaring that the negotiators were "wasting their time" and that he would "get [the wall] built one way or the other."

41.     On January 31, 2019, President Trump stated that "we've set the stage for what's going to happen on February 15 if a deal is not made." The next day, he said "I think there's a good chance that we'll have to do" an emergency proclamation.

42.     As House and Senate negotiators deliberated over a deal to avert another government shutdown, Trump administration officials started laying the groundwork for a possible national emergency declaration. Acting White House Chief of Staff Mick Mulvaney stated that "[w]e'll take as much money as [Congress] can give us and then we'll go off and find the money someplace else…but [the wall] is going to get built with or without Congress."

43.     On February 11, 2019, congressional negotiators finalized a funding deal. The agreement included $1.375 billion for fencing and other physical barriers along 55 miles of the U.S.-Mexico border and included numerous restrictions on the timing and location of construction.

44.     President Trump stated that he was "not happy" with Congress's compromise deal and would find "other methods" to finance a wall without explicit approval form Congress.

**Congress Considered and Specifically Rejected the President's Wall Funding Demands in Enacting the Consolidated Appropriations Act of 2019.**

45.     On February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019.

46.     Congress's enactment of the Consolidated Appropriations Act of 2019 occurred against a backdrop of its consideration and rejection of the President's $5.7 billion border wall demand. On December 20, 2018, the House of Representatives had passed a continuing resolution that met the President's request for $5.7 billion in border wall funding. The Senate did not pass the same legislation. When both houses of Congress came to an agreement and enacted the Consolidated Appropriations Act of 2019, they elected to exclude the President's requested $5.7 billion in wall funds.

47.     The House Appropriations Committee Chair, Representative Nita Lowey, confirmed that congressional negotiators considered, and "frankly, . . . denie[d] the President billions of dollars

in funding for the concrete wall that he demanded." Senator Patrick Leahy, Vice Chairman of the Senate Appropriations Committee, who was actively involved in negotiations on the 2019 Consolidated Appropriations Act, stated "[t]he agreement does not fund President Trump's wasteful wall." 165 Cong. Rec. S1362 (daily ed. Feb 14, 2019).

48.     Congress's appropriations judgment, as expressed in the law that passed both chambers, is that only $1.375 billion should be used to construct a border wall, and that such a wall must be limited geographically to the Rio Grande Valley Sector. The bill provided only a fraction of the $5.7 billion that the President demanded for the border wall, allocating $1.375 billion for roughly 55 miles of pedestrian fencing in the Rio Grande Valley Sector of the southern border. The appropriations act includes numerous carve-outs that prevent wall construction in parks and wildlife areas, and requires the approval of local officials and a public comment period before initiating construction in cities situated along the border.

49.     Congress specifically prohibited the use of any appropriated funds in specific sections of the Rio Grande Valley, forbidding the use of any funds to construct a barrier "(1) within the Santa Ana Wildlife Refuge; (2) within the Bentsen-Rio Grande Valley State Park; (3) within La Lomita Historical Park; (4) within the National Butterfly Center; or (5) within or east of the Vista del Mar Ranch tract of the Lower Rio Grande Valley National Wildlife Refuge." Pub. Law No. 116-6 § 231.

50.     In addition, Congress forbade the use of appropriated funds for construction within the city limits of Roma, Texas; Rio Grande City, Texas; Escobares, Texas; La Grulla, Texas; and within Salineño, Texas, until local elected officials and the public have had an opportunity to comment on any plans for construction. Pub. Law No. 116-6 § 232.

**President Trump Declares a National Emergency, Instructing his Secretaries of Defense and Homeland Security to Construct his Wall in the Absence of Congressional Authorization.**

51.     President Trump stated that he would sign the appropriations bill and simultaneously declare a national emergency. According to the President, $1.375 billion from Congress is "not so much" for a border wall and the emergency declaration would allow him to supplement what Congress has authorized "[s]o we have a chance of getting close to $8 billion [and] . . . build a lot of wall."

52.     On February 15, 2019, President Trump declared a national emergency in order to secure his preferred level of funding for his border wall. *See* "Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States" ("the Proclamation").

53.     In announcing his declaration of national emergency, President Trump stated that he decided to declare an emergency because he was dissatisfied with the pace of Congress's spending. "I wanted to do it faster. I could do the wall over a longer period of time. I didn't need to do this, but I'd rather do it much faster."

54.     While admitting that the appropriations bill provided him with a substantial amount of border wall funding, the President declared that he was still "not happy with it" because "on the wall, [Congress] skimped."

55.     The President also expressed his disdain for Congress's decision to include carve-out areas where wall construction is prohibited, and emphasized the importance of a contiguous wall. "The only weakness is they [individuals crossing the southern border] go to a wall and then they go around the wall. They go around the wall and in . . . . They go through areas where you have no wall."

56.     The President acknowledged that he "went through Congress . . . made a deal . . . got almost $1.4 billion" and was "successful, in that sense." Explaining his declaration of national emergency, he stated that he "could do the wall over a longer period of time" using congressionally authorized funds but that he'd "rather do it much faster."

57.     The President's senior policy advisor, Stephen Miller, confirmed that emergency and supplemental funding would allow for the construction of "hundreds of miles" of border wall by September 2020—much faster than congressionally authorized funding would allow.

58.     In describing the nature of the purported national emergency, the text of the Proclamation (attached and incorporated herein as Exhibit A) refers to a "long-standing" problem of "large-scale unlawful migration through the southern border" that has "worsened" in recent years due to "sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space" for them. It further states that these family units "are

often released into the country and are often difficult to remove from the United States because they fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate."

59.     The Proclamation states that "[b]ecause of the gravity of the current emergency situation, it is necessary for the Armed Forces to provide additional support to address the crisis." The Proclamation further states "that this emergency requires use of the Armed Forces and, in accordance with section 301 of the National Emergencies Act (50 U.S.C. § 1631), that the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense."

60.     The Proclamation directs the Secretary of Defense, pursuant to 10 U.S.C. § 2808, to order members of the Ready Reserve to "assist and support the activities of the Secretary of Homeland Security at the southern border" and orders the Secretaries of Defense and Homeland Security, "if necessary," to take action for "transfer and acceptance of jurisdiction over border lands."

61.     According to a "fact sheet" issued by the White House, entitled "President Donald J. Trump's Border Security Victory," the President has identified $3.6 billion to be reallocated from Department of Defense military construction projects pursuant to 10 U.S.C. § 2808, $601 million to be reallocated from the Treasure Forfeiture Fund, and $2.5 billion to be reallocated from Department of Defense funds for counterdrug activities. The use of such funds was duly limited by Congress to specific purposes pursuant to its authority under the Constitution.

62.     The President intends to spend approximately $8.1 billion for construction of the border wall, many times the $1.375 billion appropriated by Congress.

63.     The President's unlawful reallocation of military construction funds will jeopardize construction projects at military bases and sites across the country, including in this District and throughout California.

64.     The Trump administration has explained that the President's previous $5.7 billion request for border wall construction will "fund construction of a total of approximately 234 miles of new physical barrier and fully fund the top 10 priorities in CBP's Border Security Improvement

Plan." *See* Jan. 6, 2019 letter from Russell T. Vought, OMB Acting Director, to Senator Richard Shelby, Appropriations Committee Chairman.

**Construction of President Trump's Wall Will Have Devastating Effects on the Environment.**

65. Through the expenditure of diverted emergency funds in 2019, the administration expects to continue with construction of "more than 330 miles of border wall in the U.S. Border Patrol's highest priority locations across the Southwest border." This includes areas all along the U.S.-Mexico border in which construction is ongoing. It also includes areas for which the Department of Homeland Security plans have been announced, contracts have been awarded, resources have been mobilized, or waivers have been issued.

66. According to the Department of Homeland Security, in 2019 it will commence construction of 215 miles of border wall. This construction will occur in ecologically sensitive habitats and other border lands known for their outstanding hiking, wildlife viewing, photography, and wilderness values. For example, the Department of Homeland Security has notified the public it intends to commence wall construction in California's San Diego and El Centro Sectors; Arizona's Yuma Sector; New Mexico's El Paso Sector; and, Texas's Laredo and Rio Grande Valley Sectors.

67. Examples of the environmental consequences can be seen in California's San Diego and El Centro Sectors, where border wall construction would be devastating. Any new wall construction in these areas would be in or near the Otay Mountain Wilderness Area and the Jacumba Wilderness Area. These areas are habitat to more than 100 sensitive plant and animal species that are listed as "endangered," "threatened," or "rare" under the federal Endangered Species Act of 1973, 16 U.S.C. § 1531 *et seq.*, and/or the California Endangered Species Act, Cal. Fish & Game Code § 2050 *et seq*. For example, the federally and state-endangered Peninsular Desert Bighorn sheep has a range that includes mountainous terrain in Mexico near the United States-Mexico border and extends north across the border through the Jacumba Wilderness to California's Anza-Borrego State Park.

68. Likewise, construction is imminent in the Rio Grande Valley in Texas, notwithstanding Congress's decision to prevent the Trump administration from building a wall in five areas nationally recognized for their ecological and recreational value. The administration's

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO: _____

commitment to construct border walls in the Rio Grande Valley Sector means these areas are threatened with irreversible damage despite express Congressional direction to preserve them. Initial construction activities include accessing the project area with heavy equipment, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors. As a result of border wall construction, local communities would be more vulnerable to flooding, divided by border wall infrastructure, and suffer irreparable damage to cultural, historic, and recreational sites.

69. In addition to ongoing and imminent construction, the President's diversion of funds not appropriated by Congress to expand and expedite the border wall has injured the Sierra Club and SBCC. Both organizations have been compelled to respond to the declared emergency to safeguard their and their members' interests, including by diverting resources from the organizations' campaigns to unveil ongoing and imminent construction, educate their members, and respond to threats to their organizational missions. Staff and affiliates have participated in grassroots advocacy, engaged in rapid-response political outreach and advocacy with congressional and local elected officials, and responded to requests from their members, the public, and elected officials about the threat and implementation of unlawful expedited construction. The circumvention of legal processes, lack of transparency, notice, and consultation, have frustrated the organizations' efforts to work towards their missions on behalf of their members.

70. Defendants have not conducted a public review of these activities' impacts on the environment and local communities that complies with NEPA.

## LEGAL BACKGROUND

**The Constitution Vests Congress with Exclusive Authority to Determine the Appropriation of Public Funds.**

71. The Constitution bans the expenditure of any public funds by any branch of the federal government, including the Executive Branch, absent enactment of a law appropriating such funds: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. Const. art. I, § 9, cl. 7. The Constitution thus vests Congress, and only Congress,

with the power to spend public funds, and it must do so by passing identical appropriations bills in both the House and the Senate. Public funds may only be expended as specified in such duly enacted appropriations laws. Except as specifically authorized by Congress, the Executive Branch has no authority to expend public funds that have not been thus appropriated.

72.     The Appropriations Clause, in Article I, section 9, clause 7 of the Constitution, provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

73.     The Appropriations Clause "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990).

74.     Congress also may enact authorization legislation to establish, continue, or modify an agency, program, or government function. Congressional authorization of a program, however, does not confer power on the Executive Branch to expend public funds. Only a specific appropriations law can do that.

75.     Although Congress may combine an authorization and an appropriation in a single bill, it may (and most often does) enact them separately. In keeping with its broad constitutional authority, Congress may choose not to appropriate funds for an authorized program, or Congress may appropriate a different amount of money than the amount (if any) provided for in an authorization. Congress also may limit the purposes for which appropriated funds may be used.

76.     Appropriations laws generally take one of two forms: (a) temporary appropriations, which typically are enacted on an annual basis, and (b) permanent appropriations, which are few in number and which (i) remain in effect until Congress repeals or modifies them, and (ii) permit federal agencies to expend public funds without the need for passage of a temporary appropriations bill in the current Congress. For an appropriation to be considered permanent, the law must clearly and expressly so provide.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO: _____

77.     By providing funding to the Executive Branch through temporary (typically annual) appropriations, Congress ensures Executive Branch accountability by forcing the Executive Branch to return to Congress each year to seek continued funding for authorized agencies, programs, and government functions. This process provides Congress the opportunity to determine a suitable amount of funding after careful consideration.

78.     Temporary appropriations also reinforce and further Congress' constitutional responsibility to oversee the Executive Branch, and thereby act as a check upon the Executive Branch, as the Framers intended.

**The Constitution Does Not Allow Appropriations to be Made by Executive Fiat, Rather than By Law.**

79.     "It is for Congress, proceeding under the Constitution, to say what amount may be drawn from the Treasury in pursuance of an appropriation." *Hoe v. United States*, 218 U.S. 322, 333 (1910). If the Executive Branch spends money in violation of an appropriation law, "it would be drawing funds from the Treasury without authorization by statute and thus violating the Appropriations Clause." *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

80.     No statute can provide the President with authority to spend in excess of congressional limitations, or to draw money from the Treasury by executive declaration in a manner that contravenes the appropriations that have been made by law. "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Office of Pers. Mgmt.*, 496 U.S. at 425.

81.     Nor can Congress endow the President with the power to reallocate money within the federal budget by executive emergency declaration. "The Constitution is a compact enduring for more than our time, and one Congress cannot yield up its own powers, much less those of other Congresses to follow." *Clinton v. City of New York*, 524 U.S. at 452 (Kennedy, J., concurring).

**The Constitution's Presentment Clause Requires that the President Either Approve a Bill or Return it to Congress with Objections.**

82.     The Presentment Clause, Article I, Section 7, Clause 2, provides that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law,

be presented to the President of the United States: If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it."

83. The President has no constitutional authority to modify the appropriations bills passed by Congress. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. at 438. This restriction dates back to the founding: "Our first President understood the text of the Presentment Clause as requiring that he either approve all the parts of a Bill, or reject it in toto." *Id.* at 440 (quotation marks omitted).

84. "Where the President does not approve a bill, the plan of the Constitution is to give to the Congress the opportunity to consider his objections and to pass the bill despite his disapproval." *Wright v. United States*, 302 U.S. 583, 596 (1938).

**Congress Has Strictly Restricted the Use of Appropriated Funds for Emergency Military Construction Authority Under 10 U.S.C. § 2808.**

85. Congress imposed binding restrictions on the President's emergency powers to use military construction funds for non-appropriated projects. Specifically, Congress limited the use of emergency military construction funds only for projects (a) undertaken during a national emergency "that requires use of the armed forces," and (b) that "are necessary to support such use of the armed forces." 10 U.S.C. § 2808.

86. For purposes of Section 2808, Congress defines the term "military construction" as including "any construction, development, conversion, or extension or any kind carried out with respect to a military installation . . . or any acquisition of land or construction of a defense access road." Congress defined "military installation" as a "base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department . . . ." 10 U.S.C. § 2801(a).

87. The emergency construction authority under 10 U.S.C. § 2808 has been used in the past only for military construction directly linked to a military installation connected to war efforts abroad and for protection of weapons of mass destruction.

**Congress Has Expressly Restricted the Use of Appropriated Funds for Military Construction of Border Fencing Under 10 U.S.C. § 284.**

88.     Congress imposed binding restrictions on the Secretary of Defense's authority to provide support for construction of border fences. Specifically, Congress authorized the use of Department of Defense support only for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States," rather than across an entire international border. 10 U.S.C. § 284(b)(7).

89.     In addition, Congress blocked the Secretary of Defense from redetermining the funding balance struck by Congress, by permanently reallocating funding levels between the Department of Defense and other agencies. Accordingly, 10 U.S.C. § 277 provides that "to the extent otherwise required by section 1535 of title 31 (popularly known as the "Economy Act") or other applicable law, the Secretary of Defense shall require a civilian law enforcement agency to which support is provided under this chapter to reimburse the Department of Defense for that support."

**Congress Did Not Permit the President to Use the Treasury Forfeiture Fund as an Unrestricted Slush Fund.**

90.     Congress established the Department of the Treasury Forfeiture Fund to permit the use of forfeited funds for specifically delineated law enforcement purposes. *See* 31 U.S.C. § 9705.

91.     These purposes range from the payment of "compensation to informers," "payment for services of experts and consultants needed by a Department of Treasury law enforcement organization to carry out the organization's duties relating to seizure and forfeiture," and similar expenditures relating to the seizure and forfeiture program. 31 U.S.C § 9705(a).

92.     Congress did not authorize use of the Treasury Forfeiture Fund to pay for construction of a border wall.

**The National Environmental Policy Act Requires Agencies to Consider and Make Public the Environmental Impact of Their Actions.**

93.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (1978). It was enacted with the ambitious objectives of "encourag[ing] productive and enjoyable harmony between man and his environment . . . to promote efforts which will prevent or

eliminate damage to the environment and biosphere and stimulating the health and welfare of man; and to enrich the understanding of the ecological systems and natural resources important to the Nation . . . ." 42 U.S.C. § 4321.

94.     In order to achieve these goals, NEPA contains several "action forcing" procedures, most significantly the mandate to prepare an environmental impact statement ("EIS") on major federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332(2)(C).

95.     The Council on Environmental Quality ("CEQ") was created to administer NEPA and has promulgated NEPA regulations, which are binding on all federal agencies. See 42 U.S.C. §§ 4342, 4344; 40 C.F.R. §§ 1500–1508 (1978).

96.     When a federal agency is not certain whether an EIS is required, it must prepare a briefer document, known as an environmental assessment ("EA"). 40 C.F.R. § 1508.9 (1978). If the agency concludes in an EA that an action may have significant impacts on the environment, then an EIS must be prepared. *Id.* § 1501.4. If an EA concludes that there are no significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the action's impacts are insignificant and issue a Finding of No Significant Impact ("FONSI"). *Id.* § 1508.13.

97.     The Supreme Court has found that the preparation and public circulation of EISs and EAs promotes NEPA's broad environmental objectives in two primary ways: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Methow Valley Citizens Council*, 490 U.S. at 349.

98.     NEPA requires that "agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2 (1978); id. § 1502.5 ("An agency shall commence preparation of an [EIS] as close as possible to the time the agency is developing or is presented with a proposal . . . ."). The Ninth Circuit has interpreted these

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO: _____

regulations as requiring the NEPA process to be conducted "before any irreversible and irretrievable commitment of resources." *Connor v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1998).

99.     A "[p]roposal exists at that stage in the development of an action when an agency . . . has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated." 40 C.F.R. § 1508.23. Actions are defined to "include new and continuing activities including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies," and include "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area," as well as "actions approved by permit or other regulatory decision as well as federal and federally assisted activities." *Id.* §§ 1508.18(a) & (b)(4).

100.     For activities covering multiple landscape types and jurisdictions, agencies may prepare a programmatic EIS ("PEIS"). A PEIS evaluates the effects of broad proposals or planning-level decisions that may include any or all of the following: a wide range of individual actions; implementation over a long timeframe; and/or implementation across a large geographic area.

101.     The Department of Homeland Security has not promulgated regulations to implement NEPA, but has issued an Instruction Manual. Instruction Manual 023-01-001-01, Revision 01, Implementation of NEPA (Nov. 6, 2014) ("DHS NEPA Manual"). The Manual specifically includes "proposed construction, land use, activity, or operation that has the potential to significantly affect environmentally sensitive areas" as an action "normally requiring" the preparation of at least an EA.

102.     Echoing the general NEPA requirements regarding the need to conduct NEPA early in the process, the DHS NEPA Manual directs the Department of Homeland Security to "integrate[] the NEPA process with other planning efforts at the earliest possible stage so that environmental factors are considered with sufficient time to have a practical influence on the decision-making process before decisions are made." DHS NEPA Manual, at p. IV-1. The Manual directs that agency components that process applications for Department of Homeland Security funding or approval, "have a responsibility to integrate NEPA requirements early in the application process," and to ensure that "completion of the NEPA process occurs before making a decision to approve" the proposal.

103.    NEPA requires that the Agencies involve the public in preparing and considering environmental documents that implement the Act. 40 C.F.R. § 1506.6; *id.* § 1506.6(b)(1) (requiring federal agencies to "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected").

104.    The CEQ regulations further direct federal agencies to "insure that environmental information is available to public officials and citizens before decisions are made," and mandate that "public scrutiny [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b).

105.    In analyzing an action's environmental effects, an agency must also consider the effects of both: "connected actions," meaning those that are "[c]losely related," including actions that "[c]annot or will not proceed unless other actions are taken previously or simultaneously," and actions that are "interdependent parts of a larger action and depend on the larger action for their justification"; and "cumulative actions," meaning those that "when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25.

106.    The Ninth Circuit has held that a "complete failure to involve or even inform the public" about the agency's preparation of a NEPA document violates the statute's public participation requirements. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003).

107.    Underlying all of NEPA's procedural requirements is the mandate that agencies take a "hard look" at all of the environmental impacts and risks of a proposed action. As stated by the Ninth Circuit, "general statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (internal citations omitted).

## DECLARATORY AND INJUNCTIVE RELIEF

108.    Plaintiffs will suffer irreparable injury if Defendants take action to build a wall in reliance on the Proclamation, or in implementing the President's direction to use funds pursuant to 10 U.S.C. §§ 284, 2808 and 31 U.S.C § 9705, and Plaintiffs have no adequate remedy at law.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO: _____

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### (The Consolidated Appropriations Act of 2019, Pub. Law No. 116-6)

109.    Neither the President nor any other federal official can take an action that exceeds the scope of their constitutional and/or statutory authority.

110.    Congress has explicitly limited Defendants' authority to construct a border wall through exercise of its constitutional appropriations power in the Consolidated Appropriations Act of 2019. Congress's appropriations judgment is that only $1.375 billion should be used to construct a border wall, that such a wall must be limited geographically to 55 miles within the Rio Grande Valley Sector, and that construction of a border wall should not proceed at this time with respect to numerous areas specifically described in the law.

111.    Congress enacted the Consolidated Appropriations Act of 2019 against the backdrop of the President's continued demand for $5.7 billion in unrestricted border wall funding for construction of a contiguous barrier between the United States and Mexico. "Congress has expressed its will to withhold this power from the President as though it had said so in so many words." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 602 (1952) (Frankfurter, J., concurring).

112.    The President has nonetheless instructed the Secretaries of Homeland Security and Defense to act beyond the limitations imposed by Congress by spending approximately $8.1 billion to build a wall across the border, in purported reliance on a patchwork of older, more general statutes that are silent on wall construction.

113.    The statutes the President purports to rely on, 10 U.S.C. §§ 284, 2808 and 31 U.S.C § 9705, do not authorize wall construction outside of the limited geographic, monetary, and scheduling bounds set by Congress in the Consolidated Appropriations Act of 2019.

114.    "[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). "This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." *Id.* at 143. Therefore, "a specific policy embodied in a later . . . statute should control [judicial]

construction of the [earlier broad] statute, even though it ha[s] not been expressly amended." *Id.* (quotations and citations omitted; brackets in original).

115.    Use of funds under 10 U.S.C. § 2808 in accordance with the President's Proclamation to construct the border wall violates the Consolidated Appropriations Act of 2019. It funds the wall in excess of the amount established by Congress and it denies funds from other projects that Congress chose to fund.

116.    The President's Proclamation does not meet the conditions required for invocation of 10 U.S.C. § 2808 because it does not identify an emergency requiring use of the armed forces.

117.    The President's Proclamation additionally does not meet the conditions required for invocation of 10 U.S.C. § 2808 because construction of a border wall is not a military construction project supporting the armed forces.

118.    Use of funds under 10 U.S.C. § 284 to construct the border wall violates the Consolidated Appropriations Act of 2019.

119.    The Department of Defense's use of funds under 10 U.S.C. § 284 to construct a contiguous fence across the international boundaries of the United States is contrary to Congress's requirement that construction under that statute must be limited to drug smuggling corridors.

120.    Congress did not delegate to the Secretary of Defense the decision to construct a contiguous fence across the southern border through a bill providing for military support of law enforcement activities. Interpretation of statutes "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude . . . ." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133.

121.    In addition, use of funds under 10 U.S.C. § 284 to construct the border wall is contrary to Congress's judgment in the Consolidated Appropriations Act of 2019 because funds not appropriated for wall construction cannot be reimbursed to the Department of Defense under 10 U.S.C. § 277.

122.    Use of the Treasury Forfeiture Fund under 31 U.S.C. § 9705 to construct the border wall violates the Consolidated Appropriations Act of 2019. Congress did not authorize use of the Treasury Forfeiture Fund to pay for construction of a border wall, and any general authorization for

1   use of funds in that statute must be interpreted against Congress's more specific passage of the

2   Consolidated Appropriations Act of 2019.

3       123.    Defendants are acting ultra vires in using funds to construct the border wall beyond

4   the restrictions Congress imposed in the Consolidated Appropriations Act of 2019.

6   **SECOND CLAIM FOR RELIEF**
    **(Separation of Powers, Article I, Section 9, Clause 7 of the Constitution)**

7       124.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

8       125.    Defendants may not "draw[] [Money] from the Treasury, but in Consequence of

9   Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

10      126.    Congress has explicitly limited Defendants' authority to construct a border wall

11  through exercise of its constitutional appropriations power in the Consolidated Appropriations Act of

12  2019.

13      127.    The President has nonetheless instructed the Secretaries of Defense and Homeland

14  Security to act beyond the limitations imposed by Congress by spending approximately $8.1 billion

15  to build a wall across the border.

16      128.    "It is one thing to draw an intention of Congress from general language and to say

17  that Congress would have explicitly written what is inferred, where Congress has not addressed itself

18  to a specific situation. It is quite impossible, however, when Congress did specifically address itself

19  to a problem . . . to find secreted in the interstices of legislation the very grant of power which

20  Congress consciously withheld. To find authority so explicitly withheld is not merely to disregard in

21  a particular instance the clear will of Congress. It is to disrespect the whole legislative process and

22  the constitutional division of authority between President and Congress." *Youngstown*, 343 U.S. at

23  609 (Frankfurter, J., concurring).

24      129.    Because the statutes the President purports to rely on, 10 U.S.C. §§ 284, 2808 and 31

25  U.S.C § 9705, do not authorize wall construction outside of the limited geographic, monetary, and

26  scheduling bounds set by Congress in the Consolidated Appropriations Act of 2019, the use of those

27  statutes to fund border wall construction usurps Congress's legislative authority and violates the

28  Constitution's separation of powers.

**THIRD CLAIM FOR RELIEF**
**(Appropriations Clause, Article I, Section 9, Clause 7 of the Constitution)**

130. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

131. The Constitution only permits money to be withdrawn from the Treasury by an appropriation made by law. U.S. Const. art. I, § 9, cl. 7.

132. In the Consolidated Appropriations Act of 2019, Congress has appropriated only $1.375 billion for border wall construction.

133. The President asserts that he has independent authority under 10 U.S.C. §§ 284 and 2808 and 31 U.S.C § 9705 to order that billions more be spent on the wall than provided in those legislative appropriations. The President has ordered the Secretaries of Defense and Homeland Security to implement his determination that additional billions be spent on construction of the border wall.

134. Congress cannot give the President the authority to make an appropriation, including by statutes that provide authority for emergency proclamations.

135. Congress cannot give the President authority to contravene restrictions on the use of Treasury funds for construction of a border wall, contained within an appropriations law that Congress has passed and the President has signed.

136. To the extent that 10 U.S.C. §§ 284 and 2808 and 31 U.S.C § 9705 authorize the President to allocate money from the Department of the Treasury by executive proclamation, rather than by law, and in contravention of restrictions contained in Congress's appropriations' laws, they violate the Constitution.

**FOURTH CLAIM FOR RELIEF**
**(Presentment Clause, Article I, Section 7, Clause 2)**

137. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

138. The Presentment Clause requires that when Congress passes an appropriations bill, the President has only two options: he must sign it, or return it with his objections so that Congress may consider them.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO: _____

139.     Instead of following this mandatory requirement, the President signed a bill to which he objected, and announced that he would use the National Emergencies Act to reallocate funds to his liking.

140.     Because the President has purported to modify or repeal the appropriations bill passed by Congress, including by improperly relying on an emergency proclamation to lift restrictions Congress imposed on border wall funding in the appropriations bill, his actions violate the Presentment Clause.

141.     To the extent that 10 U.S.C. §§ 284 and 2808 and 31 U.S.C § 9705 authorize the President to modify or repeal Congress's appropriations legislation by executive proclamation, rather than by law, they violate the Constitution.

### FIFTH CLAIM FOR RELIEF
### (National Environmental Policy Act, 42 U.S.C. § 4332)

142.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

143.     The Secretaries of Defense, Homeland Security, and the Treasury must ensure that their agencies prepare an environmental impact statement on major Federal actions "significantly affecting the quality of the human environment," and prepare an environmental assessment to determine whether any such significant effects exist. *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 348 (1989); *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000); 42 U.S.C. § 4332(2)(C). A federal agency "bears the primary responsibility to ensure that it complies with NEPA." *'Ilio'Ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006). "When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999).

144.     NEPA requires that the Defendants involve the public in preparing and considering environmental documents that implement the Act. 40 C.F.R. § 1506.6 (1978); id. § 1506.6(b)(1) (requiring federal agencies to "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected").

145. Border wall construction is a final agency action, for purposes of the Defendants' obligations under NEPA.

146. As directed by Defendant Trump's Proclamation, Defendants Shanahan, Nielsen, and Mnuchin violate NEPA and NEPA's implementing regulations by authorizing border wall construction without first conducting the necessary environmental analysis of the impacts of the actions in an EA or EIS, or a programmatic EIS, in light of the potentially significant impacts that the action will have, including both cumulative effects and the effects of connected actions.

147. As directed by Defendant Trump's Proclamation, Defendants Shanahan, Nielsen, and Mnuchin further violate NEPA and NEPA's implementing regulations by failing to initiate and complete NEPA at the earliest possible time in the planning process.

148. As directed by Defendant Trump's Proclamation, Defendants Shanahan, Nielsen, and Mnuchin have utterly failed and/or refused to involve the public in its decision-making processes for border construction. This failure to provide for any public participation in relation to their approval of border wall construction violates NEPA and its implementing regulations.

## SIXTH CLAIM FOR RELIEF
### (Ultra Vires)

149. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

150. Defendants are acting ultra vires in seeking to divert funding pursuant to 10 U.S.C. § 2808 for failure to meet the criteria required under that statute. There is no emergency requiring the use of the armed forces along the U.S.-Mexico border, construction of a border wall is not a "military construction project," and construction of a border wall is not "necessary to support such use of the armed forces."

151. Defendants are acting ultra vires in seeking to divert funding pursuant to 10 U.S.C. § 284 for failure to meet the criteria required under that statute. Construction of the border wall does not constitute the construction of a road or fence to block "drug smuggling corridors." In addition, use of funds under 10 U.S.C. § 284 to construct the border wall in the face of Congress's judgment that additional money should not be spent on the wall would violate the Consolidated Appropriations

Act of 2019 because such money, having not been appropriated for wall construction, cannot be reimbursed to the Department of Defense under 10 U.S.C. § 277.

152.    Defendants are acting ultra vires in seeking to divert funding pursuant to 31 U.S.C. § 9705 because they fail to meet the criteria required under that statute. Congress did not authorize use of the Treasury Forfeiture Fund to pay for construction of a border wall, and the general authorization for use of funds in that statute is controlled by Congress's more specific passage of the Consolidated Appropriations Act of 2019.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A)    Declare the President's direction that the Defense Department reallocate funds to support construction of a border wall under 10 U.S.C. § 2808 to be ultra vires, in excess of presidential authority under Article II of the Constitution, an infringement on legislative authority, a violation of the Presentment Clause, and invalid;

(B)    Enjoin Defendants Shanahan, Nielsen, and Mnuchin from taking action to build a border wall using funds from the Defense Department or Treasury Asset Forfeiture Fund, or on any basis that depends on the President's unlawful emergency declaration;

(C)    Declare that Defendants Shanahan, Nielsen, and Nielsen have violated NEPA and its implementing regulations with respect to the border wall project by, inter alia, failing to conduct any NEPA analysis, failing to provide any opportunity for public participation, and failing to take a "hard look" at the potential environmental impacts of the border wall project;

(D)    Enjoin Defendants Shanahan, Nielsen, and Mnuchin from implementing the border wall project until and unless Defendants comply with NEPA, the Endangered Species Act, and the implementing regulations for those laws;

(E)    Award Plaintiffs their reasonable costs of litigation, including reasonable attorneys' fees and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and/or other authority; and

(F)    Grant such other and further relief as the Court may deem just and proper.

Dated:  February 19, 2019

Respectfully submitted,

/s/ *Cecilia D. Wang*

Dror Ladin*
Noor Zafar*
Hina Shamsi*
Omar C. Jadwat*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
Fax: (212) 549-2564
dladin@aclu.org
nzafar@aclu.org
hshamsi@aclu.org
ojadwat@aclu.org

Cecilia D. Wang (SBN 187782)
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
Fax: (415) 395-0950
cwang@aclu.org

Sanjay  Narayan (SBN 183227)**
Gloria D. Smith (SBN 200824)**
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
Tel: (415) 977-5772
sanjay.narayan@sierraclub.org
gloria.smith@sierraclub.org

Mollie M. Lee (SBN 251404)
Christine P. Sun (SBN 218701)
American Civil Liberties Union Foundation of
    Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 621-2493
Fax: (415) 255-8437
mlee@aclunc.org
csun@aclunc.org

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO: _____

David Donatti*
Andre I. Segura (SBN 247681)_
American Civil Liberties Union Foundation
   of Texas
P.O. Box 8306
Houston, TX 77288
Tel: (713) 325-7011
Fax: (713) 942-8966
ddonatti@aclutx.org
asegura@aclutx.org

Counsel for Plaintiffs

*Application for admission pro hac vice
   forthcoming
**Counsel for Plaintiff Sierra Club