DROR LADIN*
NOOR ZAFAR*
JONATHAN HAFETZ**
HINA SHAMSI*
OMAR C. JADWAT*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2660
dladin@aclu.org
nzafar@aclu.org
jhafetz@aclu.org
hshamsi@aclu.org
ojadwat@aclu.org
*Admitted pro hac vice
** Pro hac vice application pending

CECILLIA D. WANG (SBN 187782)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 343-0770
cwang@aclu.org

Attorneys for Plaintiffs (Additional counsel listed on following page)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO-OAKLAND DIVISION**

| | |
|---|---|
| SIERRA CLUB and SOUTHERN BORDER COMMUNITIES COALITION,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity; PATRICK M. SHANAHAN, Acting Secretary of Defense, in his official capacity; KIRSTJEN M. NIELSEN, Secretary of Homeland Security, in her official capacity; and STEVEN MNUCHIN, Secretary of the Treasury, in his official capacity,<br><br>*Defendants*. | Case No.: 4:19-cv-00892-HSG<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: May 9, 2019<br>Time: 2:00 PM<br>Judge: Honorable Haywood S. Gilliam<br>Dept: Oakland<br>Date Filed: April 4, 2019<br>Trial Date: Not set |

Additional counsel for Plaintiffs:

SANJAY NARAYAN (SBN 183227)***
GLORIA D. SMITH (SBN 200824)***
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
2101 Webster Street, Suite 1300
Oakland, CA 94612
Tel.: (415) 977-5772
sanjay.narayan@sierraclub.org
gloria.smith@sierraclub.org
***Counsel for Plaintiff SIERRA CLUB

MOLLIE M. LEE (SBN 251404)
CHRISTINE P. SUN (SBN 218701)
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 621-2493
Fax: (415) 255-8437
mlee@aclunc.org
csun@aclunc.org

DAVID DONATTI*
ANDRE I. SEGURA (SBN 247681)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
  OF TEXAS
P.O. Box 8306
Houston, TX 77288
Tel.: (713) 325-7011
Fax: (713) 942-8966
ddonatti@aclutx.org
asegura@aclutx.org
*Admitted pro hac vice

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION .......................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 1

   INTRODUCTION ............................................................................................. 1

   FACTS ............................................................................................................ 2

     I.   Congress has reviewed and rejected President Trump's requested appropriations for wall construction. ................................................................................. 2

     II.  President Trump has acted to circumvent Congress's enacted decisions. .................... 3

     III. Defendants have begun diverting funds to build President Trump's border wall. ....... 4

     IV. Plaintiffs have been harmed and face imminent injuries. ................................. 5

   LEGAL STANDARD .......................................................................................... 6

   ARGUMENT ..................................................................................................... 6

     I.   Plaintiffs Are Likely To Succeed On The Merits Of Their Claims. ........................... 6

       A. Defendants' diversion of funds violates the CAA. ................................. 6

       B. Defendants' efforts to usurp Congress's role are unconstitutional. ....................... 8

          1.   Defendants' actions violate the Appropriations Clause. .................................. 8

          2.   Defendants' actions violate the Separation of Powers. ................................. 10

          3.   Defendants' actions violate the Presentment Clause. ..................................... 12

       C. Defendants' diversion of funds is not authorized by the statutes on which they purport to rely. ................................................................................. 12

          1.   Defendants cannot use emergency military construction funds to construct President Trump's border wall. ...................................................... 13

          2.   Defendants cannot divert military pay and pension funds to the Counter-Drug account to fund President Trump's wall. ................................. 15

          3.   Defendants cannot use DOD's authorization to provide support to law enforcement to build President Trump's wall. .................................... 16

       D. Defendants' final decision to construct a wall in Yuma Sector Projects 1 and 2 and El Paso Sector Project 1 violates NEPA. .................................... 20

     II.  Plaintiffs are suffering irreparable harm and will suffer further harm in the absence of a preliminary injunction. .......................................................... 22

       A. Sierra Club and SBCC members face irreparable harm if construction proceeds in Yuma Sector Projects 1 and 2 and El Paso Sector Project 1. ............. 22

B.   Plaintiffs face irreparable harm from frustration of their missions.......................23

C.   Defendants' constitutional violations impose irreparable harm. ..........................25

III. The Balance of Equities and Public Interest Favor a Preliminary Injunction.............25

CONCLUSION....................................................................................................................25

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO: 4:19-cv-00892-HSG

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ...................................................................... 6, 22, 25

4

*Am. Trucking Assn's. v. City of Los Angeles*,
5
  559 F.3d 1046 (9th Cir. 2009) .............................................................................. 25

6

*Andrus v. Sierra Club*,
  442 U.S. 347 (1979).............................................................................................. 21

7

*Bob Marshall All. v. Hodel*,
8
  852 F.2d 1223 (9th Cir. 1988) .............................................................................. 21

9

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
  631 F.3d 1072 (9th Cir. 2011) .............................................................................. 21

10

*City & Cty. of San Francisco v. Trump*,
11
  897 F.3d 1225 (9th Cir. 2018) ....................................................................... passim

12

*City of Indianapolis v. Edmond*,
  531 U.S. 32 (2000)................................................................................................ 14

13

*Clinton v. City of New York*,
14
  524 U.S. 417 (1998)................................................................................... 11, 12, 13

15

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
  789 F.3d 1075 (9th Cir. 2015) .............................................................................. 23

16

*Cty. of Santa Clara v. Trump*,
17
  250 F. Supp. 3d 497 (N.D. Cal. 2017) .................................................................. 25

18

*Delta Data Sys. Corp. v. Webster*,
  744 F.2d 197 (D.C. Cir. 1984)............................................................................... 19

19

*E. Bay Sanctuary Covenant v. Trump*,
20
  354 F. Supp. 3d 1094 (N.D. Cal. 2018) ................................................................ 24

21

*E. Bay Sanctuary Covenant v. Trump*,
  909 F.3d 1219 (9th Cir. 2018) .............................................................................. 25

22

*Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army*,
23
  331 F. Supp. 925 (D.D.C. 1971)........................................................................... 20

24

*F.D.A. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000).............................................................................................. 17

25

*Gartner v. United States*,
26
  166 F.2d 728 (9th Cir. 1948) .................................................................................. 7

27

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006).............................................................................................. 10

28

*High Sierra Hikers Ass'n v. Blackwell*,
   390 F.3d 630 (9th Cir. 2004) ............................................................................ 23

*Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States*,
   48 F.3d 1166 (Fed. Cir. 1995) ......................................................................... 20

*I.N.S. v. Chadha*,
   462 U.S. 919 (1983) .......................................................................................... 11

*In re Border Infrastructure Envtl. Litig.*,
   915 F.3d 1213 (9th Cir. 2019) .......................................................................... 22

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .............................................................................. 24

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) .......................................................................................... 21

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ............................................................................ 25

*Metcalf v. Daley*,
   214 F.3d 1135 (9th Cir. 2000) .......................................................................... 21

*Multnomah Cty. v. Azar*,
   340 F. Supp. 3d 1046 (D. Or. 2018) ................................................................ 20

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   886 F.3d 803 (9th Cir. 2018) ............................................................................ 22

*Native Ecosystems Council v. U.S. Forest Serv.*,
   428 F.3d 1233 (9th Cir. 2005) .......................................................................... 21

*Nevada v. Dep't of Energy*,
   400 F.3d 9 (D.C. Cir. 2005) ........................................................................ 19, 20

*Nken v. Holder*,
   556 U.S. 418 (2009) .......................................................................................... 25

*Ocean Advocates v. U.S. Army Corps of Engr's*,
   402 F.3d 846 (9th Cir. 2005) ............................................................................ 21

*Reeside v. Walker*,
   52 U.S. 272 (1850) ............................................................................................ 10

*Saravia for A.H. v. Sessions*,
   905 F.3d 1137 (9th Cir. 2018) ............................................................................ 6

*Sierra Club v. Bosworth*,
   510 F.3d 1016 (9th Cir. 2007) .......................................................................... 25

*U.S. Dep't of Navy v. Fed. Labor Relations Auth.*,
   665 F.3d 1339 (D.C. Cir. 2012) .................................................................. 11, 19

*U.S. House of Representatives v. Burwell*,
   185 F. Supp. 3d 165 (D.D.C. 2016) ................................................................... 8

*UAW v. Donovan*,
  746 F.2d 855 (D.C. Cir. 1984) ........................................................................... 19

*United States v. MacCollom*,
  426 U.S. 317 (1976) ................................................................................... 7, 10

*United States v. McIntosh*,
  833 F.3d 1163 (9th Cir. 2016) ............................................................................ 9

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ......................................................................... 24

*W. Watersheds Project v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2011) .......................................................................... 23

*Whitman v. Am. Trucking Ass'ns.*,
  531 U.S. 457 (2001) ...................................................................................... 17

*WildEarth Guardians v. Provencio*,
  918 F.3d 620 (9th Cir. 2019) .......................................................................... 21

*Wright v. United States*,
  302 U.S. 583 (1938) ...................................................................................... 12

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................................................. 10, 12

## Statutes

1 U.S.C. § 105 ...................................................................................................... 8

6 U.S.C. § 202 .............................................................................................. 13, 14

6 U.S.C. § 251 .................................................................................................... 14

8 U.S.C. § 1103 .................................................................................................. 14

10 U.S.C. § 277 ............................................................................................ 16, 18

10 U.S.C. § 284 ........................................................................... 8, 13, 16, 17, 18

10 U.S.C § 2214 ........................................................................................... 15, 16

10 U.S.C. § 2801 ................................................................................................ 14

10 U.S.C. § 2808 ............................................................................................. 8, 13

31 U.S.C. § 1532 ................................................................................................ 19

42 U.S.C. § 4332 ................................................................................................ 21

2019 Department of Defense Appropriations Act, Pub. Law No. 115-245 .................. 15, 16

Consolidated Appropriations Act of 2019, Pub. Law No. 116-6 ............................ 2, 3, 6, 7

## Other Authorities

50 Votes for the Wall Act, H.R. 7073, 115th Cong. (2018) .................................................... 11

American Border Act, H.R. 6415, 115th Cong. (2018) ....................................................... 11

Availability of Receipts from Synthetic Fuels Projects for Contract Admin. Expenses
  of the Dep't of Treasury, Office of Synthetic Fuels Projects, B-247644, 72 Comp.
  Gen. 164 (Apr. 9, 1993) ................................................................................................ 19

Border Security and Deferred Action Recipient Relief Act, S. 2199, 115th Cong. (2017)............... 11

Border Security and Immigration Reform Act of 2018, H.R. 6136, 115th Cong. (2018) ................. 11

Build the Wall, Enforce the Law Act of 2018, H.R. 7059, 115th Cong. (2018) .............................. 11

Department of Defense Appropriations Act of 2018, H.R. 695, 115th Cong. (2018)........................ 11

Fund and Complete the Border Wall Act, H.R. 6657, 115th Cong. (2018) ....................................... 11

H.J. Res. 46, 116th Cong. (2019)........................................................................................ 4, 10

Make America Secure Appropriations Act, H.R. 3219, 115th Cong. (2017)..................................... 11

Michael J. Vassalotti & Brendan W. McGarry, Cong. Research Serv., IN11017,
  Military Construction Funding in the Event of a National Emergency (Jan. 11, 2019) ................. 15

SBA's Imposition of Oversight Review Fees on PLP Lenders, B-300248 (Comp. Gen.
  Jan. 15, 2004) ...................................................................................................................... 19

Securing America's Future Act of 2018, H.R. 4760, 115th Cong. (2018) ........................................ 11

U.S. Const. art. I, § 9, cl. 7.................................................................................................... 8

WALL Act of 2018, S. 3713, 115th Cong. (2018) ............................................................... 11

## Regulations

40 C.F.R. § 1501.3 ................................................................................................................ 21

40 C.F.R. § 1501.4 ................................................................................................................ 21

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that Plaintiffs Sierra Club and Southern Border Communities Coalition hereby move the Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction against Defendants Donald J. Trump, President of the United States of America; Patrick M. Shanahan, in his official capacity as Acting Secretary of Defense; and Kirstjen M. Nielsen, in her official capacity as Secretary of the United States Department of Homeland Security (collectively, "Defendants"). Plaintiffs request that this motion be heard on May 9, 2019, at 2:00 PM before the Honorable Haywood S. Gilliam in Courtroom 2 of the United States District Court for the Northern District of California, 1301 Clay Street, Oakland, CA, 94612.

Plaintiffs respectfully move the Court to enter a nationwide preliminary injunction prohibiting Defendants and all persons associated with them from taking action to build a border wall using funds or resources from the Defense Department; and specifically enjoining construction of the wall segments in the areas Defendants have identified as "Yuma Sector Projects 1 and 2 and El Paso Sector Project 1." This motion is based on this Notice of Motion and Motion, the accompanying supporting Memorandum of Points and Authorities, and any other written or oral evidence or argument that may be presented at or before the time this motion is heard by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES
### INTRODUCTION

Plaintiffs Sierra Club and Southern Border Communities Coalition seek a preliminary injunction to halt the irreversible damage threatened by the President's unilateral pursuit of a border wall that Congress has refused to fund. The President has repeatedly sought billions of taxpayer dollars to construct hundreds of miles of barriers along the border. Congress has repeatedly denied the President this authority, most recently through an appropriations act that imposed substantial restrictions on the scope, location and timing of border wall construction. The President has nonetheless announced his intention to disregard Congress's considered judgment, including by declaring a national emergency and instructing the Secretaries of Defense, Treasury, and Homeland Security to fund and build a wall in excess of Congress's appropriations. In recent weeks, Defendants Shanahan and Nielsen have taken concrete steps to proceed with imminent and

unauthorized wall construction in areas that Plaintiffs' members use and treasure. These actions include the unlawful transfer of hundreds of millions of dollars that Congress appropriated for military pay and pensions.

Neither a declaration of emergency nor the statutes that Defendants have invoked permit the President to disregard Congress's enacted appropriations legislation. Nor have Defendants even attempted to comply with the environmental protections Congress required in the National Environmental Policy Act. An injunction is necessary to prevent Defendants' disregard for the statutes enacted by a coordinate branch of government, and their attempt to usurp its powers.

## FACTS

**I.      Congress has reviewed and rejected President Trump's requested appropriations for wall construction.**

Since taking office in 2017, President Trump and his administration have repeatedly sought appropriations to fund construction of a border wall. *See* Pls.' Am. Compl. ¶¶ 27–29, ECF No. 26. Congress has reviewed, responded to, and rejected these requests. *See id.* ¶¶ 28–30.

On January 6, 2019, during what would become the longest partial government shutdown in American history to date, the Acting Director of the Office of Management and Budget communicated to congressional Committees on Appropriation that "[t]he President requests $5.7 billion for construction of a steel barrier for the Southwest border," which would "fund construction of a total of approximately 234 miles of new physical barrier and fully fund the top 10 priorities in CBP's Border Security Improvement Plan." Request for Judicial Notice ("RJN") ¶ 1, Ex. A at 1. After the shutdown ended, a bipartisan committee of negotiators from the House and Senate began work on a compromise appropriations bill that would include some funding for border security. President Trump publicly expressed his skepticism that negotiations would be fruitful, declaring that the negotiators were "[w]asting their time" and that he would "get [the wall] built one way or the other." *Id.* ¶¶ 2, 3, Exs. B, C. The House and Senate nonetheless negotiated a bipartisan agreement, and on February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019 ("CAA").

The CAA accorded $1.375 billion for the construction of a border wall, a fraction of the $5.7 billion that the President requested. It geographically restricted the funding to Border Patrol's Rio Grande Valley Sector, which consists entirely of lands in Texas and is the eastern-most Sector in a

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO: 4:19-cv-00892-HSG

state with five Border-Patrol Sectors. And the CAA expressly protected areas that the administration had claimed to be priorities, Pub. Law No. 116-6, Division A § 231,[1] and imposed consultation and approval requirements before initiating construction in cities situated along the border, *id.* §§ 231–2.[2]

## II.     President Trump has acted to circumvent Congress's enacted decisions.

On February 15, 2019, President Trump virtually simultaneously signed the appropriations bill and declared a national emergency. *See* RJN ¶ 4, Ex. D. In announcing his declaration of national emergency, President Trump acknowledged that he "went through Congress . . . made a deal," and, though he "didn't need to do this, . . . [he]'d rather do it much faster." *Id.* ¶ 5, Ex. E. Although he signed the CAA into law, President Trump stated that he was "not happy" with Congress's compromise deal and would use "other methods" to finance a wall without explicit approval form Congress. *Id.* ¶ 5,6, Exs. E, F. The $1.375 billion appropriated from Congress, said the President, is "not so much" for a border wall. *Id.* ¶ 5, Ex. E. Accordingly, the President announced he would circumvent the CAA's limit through the use of "other methods" to "get[] close to $8 billion [and] . . . build a lot of wall." *Id.*

In a contemporaneous "fact sheet" entitled "President Donald J. Trump's Border Security Victory," the White House identified approximately $8.1 billion to be diverted to build a border wall from funds Congress appropriated for other purposes. *See* RJN ¶ 7, Ex. G. These included $3.6 billion to be reallocated from Department of Defense military construction projects in purported reliance on emergency military construction authority set out in 10 U.S.C. § 2808, $2.5 billion to be diverted from Department of Defense funds in purported reliance on authority for the military to support for counterdrug activities under 10 U.S.C. § 284, and $601 million to be reallocated from the Treasure Forfeiture Fund. *Id.*

Congress swiftly rebuked the President's diversion of funds. On February 26, 2019, the

---

[1] Congress prohibited the use of any appropriated funds to construct a barrier "(1) within the Santa Ana Wildlife Refuge; (2) within the Bentsen-Rio Grande Valley State Park; (3) within La Lomita Historical Park; (4) within the National Butterfly Center; or (5) within or east of the Vista del Mar Ranch tract of the Lower Rio Grande Valley National Wildlife Refuge."

[2] Congress forbade the use of appropriated funds for construction within the city limits of Roma, Texas; Rio Grande City, Texas; Escobares, Texas; La Grulla, Texas; and within Salineño, Texas, until local elected officials and the public have had an opportunity to comment.

House of Representatives overwhelmingly passed an unprecedented resolution pursuant to the National Emergencies Act to terminate the President's declaration of emergency. H.J. Res. 46, 116th Cong. (2019). The Senate followed shortly thereafter, with a bipartisan majority passing the disapproval resolution 59-41 to terminate the President's declaration of emergency. On March 15, 2019, President Trump vetoed the disapproval resolution.

### III.   Defendants have begun diverting funds to build President Trump's border wall.

Defendants quickly initiated the process of diverting funds to build President Trump's border wall. On February 15, 2019, the Department of Treasury notified Congress that it would transfer $242 million from the Treasury Forfeiture Fund to the Department of Homeland Security ("DHS") to support law enforcement border security efforts conducted by CBP. *See* RJN ¶ 8, Ex. H. On February 25, 2019, DHS officially requested that the Department of Defense ("DOD") supply it with military funds to construct approximately 200 miles of barriers along the border, in areas located outside of the Rio Grande Valley. *Id*. ¶ 9, Ex. I. On March 8, 2019, President Trump wrote on Twitter: "The Wall is being built and is well under construction. Big impact will be made. Many additional contracts are close to being signed. Far ahead of schedule despite all of the Democrat Obstruction and Fake News!" *Id*. ¶ 10, Ex. J. The next day, the President wrote that "Major sections of Wall are being built" and that "MUCH MORE" would "follow shortly." *Id*. ¶¶ 11, 12 Exs. K, L.

By March 11, 2019, Defendants informed members of Congress that they were preparing a transfer of funds into the Drug Interdiction and Counter-Narcotics Activities account for diversion to border barrier construction. *See* RJN ¶ 13, Ex. M at 1. This was necessary because DOD had already spent more than 90 percent of the $881.5 million appropriated for that account in fiscal year 2019, while the administration had announced its intention to funnel $2.5 billion to the wall through the account. *Id.* On March 12, the President confirmed his plan to divert $3.6 billion in military construction funds to his wall by submitting to Congress a budget request for $3.6 billion to "backfill funding reallocated in FY 2019 to build border barriers *Id*. ¶ 14, Ex. N at 6-9.

On March 25, 2019. the Department of Defense confirmed the transfer of $1 billion from previously appropriated Military Personnel accounts—including military pay and pension funds—to the depleted Drug Interdiction and Counter-Drug Activities account for further diversion to DHS

wall construction. RJN ¶ 21, Ex. U That same day, Defendant Shanahan confirmed in a letter to Defendant Nielsen that he "ha[d] decided to undertake Yuma Sector Projects 1 and 2 and El Paso Sector Project 1 by constructing 57 miles of 18-foot-high pedestrian fencing." *Id.* ¶ 15, Ex. O. Yuma Projects 1 and 2 provide for the construction of 11 miles of new or replacement border walls near Yuma, Arizona, and along the Colorado River; El Paso Project 1 entails the construction of 46 miles of new or replacement border walls in southern New Mexico. *Id.* ¶ 16, Ex. P. By the letter, Acting Secretary Shanahan authorized the Commander of the U.S. Army Corps of Engineers to "coordinate directly with DHS/CBP and immediately begin planning and executing up to $1B in support of DHS/CBP." *Id.* ¶ 15, Ex. O. The letter stated that "DHS will accept custody of the completed infrastructure, account for that infrastructure in its real property records, and operate and maintain the completed infrastructure." *Id.* According to a spokesperson for the Army Corps of Engineers, contracts for construction in these areas will be sent to builders in April. *See id.* ¶ 16, Ex. P. Construction could begin in May 2019. *Id.*

### IV.   Plaintiffs have been harmed and face imminent injuries.

President Trump's decision to disregard the limitations Congress imposed on wall construction "shattered the security [Plaintiffs] obtained through the democratic appropriations process." Declaration of Vicki Gaubeca ¶ 6. As a result, SBCC and its member organizations have been forced to set aside their existing priorities and respond to the new threat the President's wall poses to their communities and the unique environment they treasure. *See* Gaubeca Decl. ¶¶ 7–8, 10; Declaration of Christina Patiño Houle. ¶¶ 8–12; Declaration of Kevin Bixby ¶¶ 10-11.

Plaintiffs also face imminent harm to their use and enjoyment of the areas Defendants have slated for wall construction in May. These borderlands are biologically diverse areas known for their outstanding hiking, wildlife viewing, and wilderness values. *See* Bixby Decl. ¶ 6. They are ecologically sensitive and home to a wide variety of wildlife, including endangered species. *Id.* ¶ 9. Border infrastructure construction would disrupt these ecosystems and cause irreversible damage. *See* Declaration of Elizabeth J. Walsh. ¶¶ 10-13; Houle Decl. ¶ 6.

**LEGAL STANDARD**

On a motion for a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1142 (9th Cir. 2018). A preliminary injunction may issue where "serious questions going to the merits [are] raised and the balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citation and quotation marks omitted).

**ARGUMENT**

**I.      Plaintiffs Are Likely To Succeed On The Merits Of Their Claims.**

Because the Defendants' actions encroach on Congress's exclusive power to appropriate funds as enacted in the Consolidated Appropriations Act of 2019, Pub. Law No. 116-6 ("CAA"), Plaintiffs are likely to succeed on the merits of their claims. Defendants' refusal to abide by the restrictions Congress imposed on wall construction violates the CAA and the Constitution, and is contrary to the statutes Defendants purport to rely on. Neither the President's declaration of an emergency nor his invocation of a statute regarding military support for law enforcement agencies permits him to disregard Congress's enacted appropriations decisions.

**A.  Defendants' diversion of funds violates the CAA.**

Defendants' actions to divert funds committed to other purposes for the construction of the border wall directly violates the CAA. In enacting the CAA, Congress specifically considered and rejected the administration's plan to spend billions of taxpayer dollars to quickly build a wall along the length of the Southwest Border. Congress's appropriations judgment, as expressed in the bill that passed both chambers and was signed into law by the President, is that only $1.375 billion should be used in this fiscal year to construct border barriers, that such barriers must be limited geographically to the Rio Grande Valley Sector, that certain sections be subject to consultation with local stakeholders, and that these new sections should be limited in design to pedestrian fencing. Defendants' actions to exceed these appropriations limitations violate the CAA.

Through the CAA, Congress reached a directly contrary decision from the President on

several issues. First, Congress acted clearly to constrain the size and scope of the President's wall project for the present fiscal year. The White House requested $5.7 billion for 234 miles of wall in a letter dated January 6, 2019, but Congress decided on the far lower amount of $1.375 billion. *See* RJN ¶ 1, Ex. A at 1. As the President conceded on the day he signed the CAA, when it came to the legislation the "primary fight was on the wall," and although the CAA gave the administration "so much money, we don't know what to do with it . . . . [t]he only place they don't want to give as much money — $1,375,000,000" was for his wall. *Id.* ¶ 5, Ex. E. When it came to this disagreement, "Congress, as holder of the purse strings, was free to deal with the subject on whatever basis it saw fit." *Gartner v. United States*, 166 F.2d 728, 729 (9th Cir. 1948). Although the President maintained that $1.375 billion was insufficient for his plan, "beyond this Congress did not go, and there can be no fair doubt that its restraint was deliberate and purposeful." *Id.* at 730.

Second, Congress disagreed with the President on the particulars of the border wall funding by restricting the pace, location, permissible designs, and funding for border barrier construction. *See* CAA, Division A §§ 230–32. "Where Congress has addressed the subject as it has here, and authorized expenditures where a condition is met, the clear implication is that where the condition is not met, the expenditure is not authorized." *United States v. MacCollom*, 426 U.S. 317, 321 (1976). The President cannot override Congress's deliberate and specific plan for funding border barriers.

Third, Congress ensured that the President could not unilaterally increase funding to projects before Congress acts to approve such actions. The CAA prohibits the use of any appropriated funds to "increase . . . funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act" or authorized by provisions in other appropriations legislation. CAA, Division D § 739. Defendants cannot dispute that the President has proposed an increase of funding for wall construction by several billion dollars in his budget request for fiscal year 2020. *See* RJN ¶ 17, Ex. Q at 50 ("Budget requests $5 billion to construct approximately 200 miles of border wall along the U.S. Southwest border."); *id.* ¶ 14, Ex. N at 6–9 (requesting $3.6 billion "to build border barriers," and an additional $3.6 billion to "backfill funding reallocated in FY 2019 to build border barriers"). President Trump's sole lawful option after signing the CAA into law was to make his appropriation request to Congress

another time, not to usurp Congress's power of the purse and the legislative process by diverting funds that were previously committed for other purposes.[3]

Defendants' actions to evade Congress's enacted decisions therefore directly interfere with a primary function of appropriations legislation—to limit the size and scope of particular projects and keep the executive branch accountable to the legislature through the mechanism of annual budgeting. Congress often makes use of appropriations law to "give a particular agency, program, or function its spending cap and thus constrain what that agency, program, or function may do in the relevant year(s). . . . Such appropriations are an integral part of our constitutional checks and balances, insofar as they tie the Executive Branch to the Legislative Branch via purse strings." *U.S. House of Representatives v. Burwell*, 185 F. Supp. 3d 165, 169–70 (D.D.C. 2016).

### B. Defendants' efforts to usurp Congress's role are unconstitutional.

#### 1. Defendants' actions violate the Appropriations Clause.

In the CAA, Congress provided that only $1.375 billion may be spent on border wall construction, and that such construction is restricted to the Rio Grande Valley. That decision is reserved exclusively for Congress in the Constitution's Appropriations Clause, which unequivocally provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. Const. art. I, § 9, cl. 7; *see also City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) ("The United States Constitution exclusively grants the power of the purse to Congress, not the President."). "James Madison underscored the significance of that exclusive congressional power, stating, '[t]he power over the purse may [be] the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people.'" *Id.* at 1231 (quoting The Federalist No. 58) (James Madison)). "The Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual

---

[3] The only exception to the Section 739 prohibition on increases in funding is for increases "made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act." Neither 10 U.S.C. § 2808 nor 10 U.S.C. § 284 is an appropriations act, therefore neither can be used to increase border barrier funding beyond the $1.375 billion provided for in the CAA. *See* 1 U.S.C. § 105 (defining appropriations acts).

favor of Government agents.'" *Id.* at 1174–75 (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–8 (1990) (alterations in original)).

Courts have an essential role to play in protecting litigants from government efforts to evade the restrictions Congress imposes through its appropriations judgments. In *United States v. McIntosh*, for example, the Ninth Circuit emphasized that the government could not disregard Congress's enactment of an appropriations law that "specifically restricts DOJ from spending money to pursue certain activities." 833 F.3d 1163, 1172 (9th Cir. 2016). The court observed that "it is emphatically . . . the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for . . . the courts to enforce them when enforcement is sought." *Id.* (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).

As in *McIntosh*, Defendants' efforts to spend money in violation of the restrictions imposed in the CAA amount to "drawing funds from the Treasury without authorization by statute and thus violating the Appropriations Clause." *Id.* at 1175. The violation—and Defendants' disdain for the considered decision of a coordinate branch of government—is all the more clear in light of Defendants' public statements acknowledging their disagreement with Congress's appropriations judgment. On the morning that President Trump signed the CAA and declared an emergency, he acknowledged that Congress's judgment was that "they don't want to give as much money — $1,375,000,000" for his wall. RJN ¶ 5, Ex. E. Nonetheless, President Trump declared his intention to use up to $8 billion because "I think that I just want to get it done faster, that's all." *Id.* He explained that "I could do the wall over a longer period of time. I didn't need to do this. But I'd rather do it much faster." *Id.* President Trump's words tracked the White House's previous statements, including his January 10, 2019 statement that "if we don't make a deal, I would say it would be very surprising to me that I would not declare a national emergency and just fund it through the various mechanisms," and Acting White House Chief of Staff Mick Mulvaney's statement that "[w]e'll take as much money as [Congress] can give us and then we'll go off and find the money someplace else . . . but [the wall] is going to get built with or without Congress." *Id.* ¶ 20, Ex. T (video at 00:55–

01:12). "[T]he Administration's public statements are indicative of both the object of and policy supporting" the President's effort to override Congress's appropriations decision. *San Francisco*, 897 F.3d at 1243. Defendants' efforts to build the wall "with or without Congress" violate the Appropriations Clause. *See MacCollom*, 426 U.S. at 321 ("The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.").[4]

## 2. Defendants' actions violate the Separation of Powers.

Because Congress has clearly expressed its will that border barrier construction be limited to $1.375 billion in the Rio Grande Valley, the Constitution's separation of powers forbids Defendants' actions. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (Jackson, J., concurring); *Hamdan v. Rumsfeld*, 548 U.S. 557, 593 n.23 (2006) (even in war, a president "may not disregard limitations that Congress has, in proper exercise of its own [ ] powers, placed on his powers" (citing *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). If there were any doubt about whether Congress approved of President Trump's effort to claim additional funds, Congress explicitly rejected the President's invocation of emergency powers to build the wall through the unprecedented passage of a disapproval resolution, which was vetoed by the President on March 15, 2019. *See* H.J. Res. 46. "It is quite impossible . . . when Congress did specifically address itself to a problem," as Congress has unmistakably done here, "to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld." *Youngstown*, 343 U.S. at 609 (Frankfurter, J., concurring).

As the Ninth Circuit recently instructed, "Justice Jackson's *Youngstown* concurrence provides the operative test in this context: When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *San Francisco*, 897 F.3d at 1233–34 (citing *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring)).

---

[4] Defendants' Appropriations Clause violation is not lessened by their attempt to draw on unobligated funds remaining in accounts that Congress chose to fund for other purposes. "However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned. Any other course would give to the fiscal officers a most dangerous discretion." *Reeside v. Walker*, 52 U.S. 272, 291 (1850).

Justice Jackson's canonical separation-of-powers opinion has particular force in the appropriations context. The Appropriations Clause "is a bulwark of the Constitution's separation of powers," one that "is particularly important as a restraint on Executive Branch officers: If not for the Appropriations Clause, "the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure." *U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1342, at 213–14 (1833)). If "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened.'" *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring)).

"To . . . maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded." *I.N.S. v. Chadha*, 462 U.S. 919, 957–58 (1983). Here, "Congress has frequently considered and thus far rejected legislation accomplishing the goals" of the President's unilateral funding diversion. *San Francisco*, 897 F.3d at 1234.[5] "The sheer amount of failed legislation on this issue demonstrates the importance and divisiveness of the policies in play, reinforcing the Constitution's 'unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process.'" *Id.* (quoting *Chadha*, 462 U.S. at 959).

In short, through the CAA and other legislation, Congress "expressed its will to withhold this

---

[5] The current Congress rejected the administration's January 6, 2019 request for $5.7 billion in wall funding, while the 115th Congress rejected the Department of Defense Appropriations Act of 2018, H.R. 695, 115th Cong. (2018) ($5.7 billion for CBP construction; passed by the House but not the Senate); the WALL Act of 2018, S. 3713, 115th Cong. (2018) ($25 billion appropriation for border wall; no committee action); the 50 Votes for the Wall Act, H.R. 7073, 115th Cong. (2018) ($25 billion appropriation for funding for border wall; no committee action), the Build the Wall, Enforce the Law Act of 2018, H.R. 7059, 115th Cong. (2018) ($16.6 billion appropriation for border wall; no committee action); the Fund and Complete the Border Wall Act, H.R. 6657, 115th Cong. (2018) (authorization of funding for border wall; no committee action); American Border Act, H.R. 6415, 115th Cong. (2018) ($16.6 billion appropriation for border wall; no committee action); Border Security and Immigration Reform Act of 2018, H.R. 6136, 115th Cong. (2018) ($16.6 billion appropriation for border wall; voted down by House 301 to 121); Securing America's Future Act of 2018, H.R. 4760, 115th Cong. (2018) (construction of border wall; voted down by House 231 to 193); Border Security and Deferred Action Recipient Relief Act, S. 2199, 115th Cong. (2017) ($38.2 million for planning for border wall construction; no action in Senate); Make America Secure Appropriations Act, H.R. 3219, 115th Cong. (2017) ($38.2 million appropriation for border wall; passed by House, no action by Senate).

power from the President as though it had said so in so many words," *Youngstown*, 343 U.S. at 602 (Frankfurter, J., concurring). "[B]ecause Congress has the exclusive power to spend," and because Congress has refused to grant the President the authority to spend more than $1.375 billion on the wall—as well as restricted construction to the Rio Grande Valley—"the President's 'power is at its lowest ebb.'" *San Francisco*, 897 F.3d at 1234 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). The President, accordingly, is entirely without authority to spend additional taxpayer money on the wall or to construct any portion of it outside of Texas. *Id.* at 1233–34. ("[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." (citation omitted)). The President's continuing attempt to circumvent the legislative process and spend this additional taxpayer money flouts the Constitution's separation-of-powers.

### 3. Defendants' actions violate the Presentment Clause.

Defendants' actions also violate the Presentment Clause, Article I, Section 7, Clause 2, which provides the President with only two options when Congress passes an appropriations act: he must sign it, or return it with his objections so that Congress may consider them. "Where the President does not approve a bill, the plan of the Constitution is to give to the Congress the opportunity to consider his objections and to pass the bill despite his disapproval." *Wright v. United States*, 302 U.S. 583, 596 (1938). "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton*, 524 U.S. at 438. This restriction dates back to the founding: "Our first President understood the text of the Presentment Clause as requiring that he either approve all the parts of a Bill, or reject it in toto." *Id.* at 440 (quotation omitted).

Instead of following this mandatory requirement, the President signed a bill to which he objected, and simultaneously announced that he would nonetheless disregard the limitations Congress imposed in the CAA by increasing funds to his liking. Because the President has purported to modify or repeal the appropriations bill passed by Congress, his actions violate the Presentment Clause. *See id.* at 445–47 (the President may not "effect the repeal of laws, for his own policy reasons, without observing the procedures set out in Article I, § 7," nor may the President claim "the unilateral power to change the text of duly enacted statute").

### C.  Defendants' diversion of funds is not authorized by the statutes on which they purport to rely.

To avoid Congress's funding restrictions on border barrier construction, Defendants seek to divert billions of dollars that Congress appropriated for military construction, pensions, and pay. In support of this extraordinary action, Defendants muster three inapplicable statutes in an effort to cobble together the massive wall project that Congress denied them. But neither the emergency military construction authority set forth in 10 U.S.C. § 2808, the restricted transfer authority provided in the 2019 Department of Defense Appropriations Act, nor the authorization for military support for counterdrug activities in 10 U.S.C. § 284 authorizes construction of the President's wall.[6]

### 1. Defendants cannot use emergency military construction funds to construct President Trump's border wall.

The President has invoked 10 U.S.C. § 2808 as the source of his authority to take money away from appropriated military construction projects, but Congress expressly limited that statute to undertakings that (1) respond to a national emergency "that requires use of the armed forces," and (2) are "military construction projects" that "are necessary to support such use of the armed forces." 10 U.S.C. § 2808. Defendants' actions to build the President's border wall fail both requirements.

By its own terms, the President's Emergency Proclamation fails to identify an emergency requiring use of the armed forces. In describing the nature of the purported national emergency, the text of the Proclamation refers to a "long-standing" problem of "large-scale unlawful migration through the southern border" that has "worsened" in recent years due to "sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space" for them. RJN ¶ 4, Ex. D. It further states that these family units "are often released into the country and are often difficult to remove from the United States because they fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate." *Id.*

Even if true, none of these emergency conditions inherently "requires use of the armed forces." Instead, Congress has made clear that response to any such condition is a core function of the *civilian* components of the Department of Homeland Security. *See* 6 U.S.C. § 202 (assigning

---

[6] For the reasons stated in Section I.B, any statute that provided the President with authority to set aside Congress's enacted appropriations decisions would be unconstitutional. "The Constitution is a compact enduring for more than our time, and one Congress cannot yield up its own powers, much less those of other Congresses to follow." *Clinton*, 524 U.S. at 452 (Kennedy, J., concurring).

DHS responsibility for "[s]ecuring the borders" and "immigration enforcement functions"); *id.* § 251 (assigning DHS responsibility for "Border Patrol," "detention and removal," and "inspections"); 8 U.S.C. § 1103(a)(5) (Secretary of DHS has "duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens"). Congress has specifically provided for a civilian, rather than military response if "an actual or imminent mass influx of aliens . . . near a land border[] presents urgent circumstances requiring an immediate Federal response. . . ." 8 U.S.C. § 1103(a)(10). Should the Attorney General determine that such "urgent circumstances" exist, the "immediate Federal response" Congress provided for is that the Attorney General may authorize civilian "law enforcement officer[s]" to perform immigration functions. *Id.* In the United States, these tasks are reserved for civilian law enforcement—not the armed forces. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000) ("Securing the border and apprehending drunk drivers are, of course, law enforcement activities . . . ."). Congressional testimony by Defendant Shanahan and General Dunford, the Chairman of the Joint Chiefs of Staff, further confirms that the situation on the border is "not a military threat." RJN ¶ 19, Ex. S at 50–52.

Defendants' efforts to use Section 2808 to construct a border wall also fail because construction of a border wall is not a military construction project. Congress limited "military construction" for the purposes of Section 2808 to construction associated with a "military installation" or "defense access road." 10 U.S.C. § 2801(a). Congress defined "military installation," in turn, as a "base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department . . . ." 10 U.S.C. § 2801(c)(4). Plainly, the hundreds of miles along the Mexico border on which Defendants are determined to construct a wall do not constitute a military "base, camp, post, station, yard, [or] center" or "defense access road." Nor is securing the border region an "activity under the jurisdiction of the Secretary of a military department." Instead, Congress assigned to the Secretary of Homeland Security jurisdiction over "[s]ecuring the borders." 6 U.S.C. § 202. Defendants themselves acknowledge that DHS is "the government department tasked with border security." RJN ¶ 9, Ex. I at 1.

Finally, the border wall project cannot quality for diversion of funds under 10 U.S.C. § 2808 because it is not "necessary to support" the "use of the armed forces." Construction projects that are

"necessary to support" the armed forces are structures that enable the military to conduct required operations. For example, Section 2808 authority has been used to build military hangars and runways, logistics hubs, and facilities for storing ammunition. *See* Michael J. Vassalotti & Brendan W. McGarry, Cong. Research Serv., IN11017, Military Construction Funding in the Event of a National Emergency (Jan. 11, 2019). Because the military is not charged with border security, the armed forces would not be supported in conducting operations by a permanent border wall; at most such a barrier would support DHS. President Trump confirmed this basic flaw on the very same day he proclaimed the emergency, declaring that his border wall would obviate, rather than support, the presence of the armed forces: "If we had a wall, we don't need the military because we'd have a wall." RJN ¶ 5, Ex. E. Under the President's logic, the armed forces could not possibly make use of the wall because their presence would end with the wall's completion.

### 2. Defendants cannot divert military pay and pension funds to the Counter-Drug account to fund President Trump's wall.

Defendants have stated that they will divert $2.5 billion to border wall construction from Department of Defense funds through the Drug Interdiction and Counter-Drug Activities account. There is a significant obstacle to the President's scheme, however, as the Counter-Drug Activities account contains substantially less money than this sum. Accordingly, Defendants have announced that they will rely on the limited transfer authority provided by Section 8005 of the 2019 Department of Defense Appropriations Act, Pub. Law No. 115-245, to funnel $1 billion in military pay and pension funds into the Counter-Drug Activities account. *See* RJN ¶ 21, Ex. U (purporting to authorize transfer of funds to Counter-Drug account for further transfer to DHS for "construction of additional physical barriers" along the border). This transfer is an essential step in Defendants' efforts to evade Congress's restrictions on border barrier construction, and violates both Congress's specific restrictions on military funds transfers as well as basic principles of fiscal law.

Defendants' transfer of military pay and pension funds for diversion to border barrier construction violates the restrictions Congress imposed for military funds transfers in Section 8005 and 10 U.S.C § 2214(b). Both of these statutes ensure that the Secretary of Defense cannot use transfers as an end run around Congress's role in determining funding levels. By its plain language, Section 8005 mandates that transfers between funds "may not be used unless for higher priority

items, based on unforeseen military requirements, than those for which originally appropriated and *in no case where the item for which funds are requested has been denied by the Congress*" (emphasis added). In 10 U.S.C § 2214(b), Congress likewise limited the transfer of Department of Defense funds, other than military construction funds, to circumstances where the transfer will "provide funds for a higher priority item, based on unforeseen military requirements, than the items for which the funds were originally appropriated;" *and* are not for "*an item for which Congress has denied funds*" (emphasis added). Defendants' reliance on these statutes violates these restrictions.

First, as set forth in Section I.A above, Congress has in fact "denied funds" for the purposes the President desires here. Defendant Shanahan is therefore barred from transferring money into the Counter-Drug account to fund construction of barriers beyond these restrictions. *See* Pub. Law No. 115-245 § 8005 (prohibiting transfers when "item for which funds are requested has been denied by the Congress"); 10 U.S.C § 2214(b) (same).

Second, the asserted purpose of constructing a border barrier "to impede and deny drug smuggling activities," is not "unforeseen." Indeed, the President specifically supported his Fiscal Year 2019 budget request for $18 billion to fund the border wall with a statement that "since most of the illegal drugs that enter the United States come through the Southwest border, a border wall is critical to combating the scourge of drug addiction that leads to thousands of unnecessary deaths." RJN ¶ 18, Ex. R at 16. Congress disagrees. This longstanding disagreement is not "unforeseen."

Third, the building of a permanent border wall on behalf of DHS is not a "military requirement." It is not a project to be carried out for any military or Defense Department purpose, but instead for DHS's purposes, as Defendant Shanahan's letter to Defendant Nielsen confirms. *See* RJN ¶ 15, Ex. O at 1 ("DHS will accept custody of the completed infrastructure, account for that infrastructure in its real property records, and operate and maintain the completed infrastructure."); *see also* Section I.C.1, *supra* (Congress assigned "securing the border" to law enforcement).

### 3. Defendants cannot use DOD's authorization to provide support to law enforcement to build President Trump's wall.

In enacting 10 U.S.C. § 284, Congress authorized the Secretary of Defense to provide various forms of small-scale support to other law enforcement agencies, generally on a reimbursable basis. *See* 10 U.S.C. §§ 277, 284. One such form of support is the "construction of roads and fences and

installation of lighting to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(b)(7).

Section 284(b)(7) is not a broad delegation to the Secretary of Defense of power to override Congress's specific decisions about funding of the border wall. *See F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (interpretation of statutes "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude"). Other sections of the statute reinforce this commonsense reading. For example, Subsection (h)(1)(B) requires the Defense Secretary to give Congress 15 days' written notice before providing such support, including "a description of any small scale construction project for which support is provided." The statute defines "small scale construction" as "construction at a cost not to exceed $750,000 for any project." 10 U.S.C. § 284(i)(3). Congress would not have required a description of "any small scale construction" projects if it was, at the same time, authorizing massive, multibillion-dollar expenditures under this provision. Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns.*, 531 U.S. 457, 468 (2001). Moreover, any general DOD authority to provide support to law enforcement agencies cannot be read to extend to billions of dollars for border barrier construction when interpreted against the more specific and more recent judgment by Congress embodied in the CAA. "[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Brown & Williamson Tobacco*, 529 U.S. at 133. "This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." *Id.* at 143. Therefore, "a specific policy embodied in a later . . . statute should control [judicial] construction of the [earlier broad] statute, even though it ha[s] not been expressly amended." *Id.* (quotations and citations omitted; brackets in original). Here, the CAA's specific policy limitation on border barrier construction must control, and bar, Defendants' attempt to use Section 284 to evade Congress's funding restrictions.

Even if these sorts of expenditures were within the general ambit of Section 284, however, another provision prohibits the particular actions Defendants plan to undertake. Within the same Chapter addressing "Military Support for Civilian Law Enforcement Agencies," Congress has

enacted restrictions precisely to prevent the shifting of Defense Department funds to other purposes without reimbursement or benefit to the Defense Department, so that the Secretary of Defense may not disregard the balance that Congress struck as to the money needed for national defense. Thus, section 277 provides: "to the extent otherwise required by section 1535 of title 31 (popularly known as the 'Economy Act') or other applicable law, the Secretary of Defense *shall require* a civilian law enforcement agency to which support is provided under this chapter to reimburse the Department of Defense for that support" (emphasis added).

Because the very purpose of Defendants' actions is to exceed the amount Congress appropriated for DHS to construct border barriers, Defendant Shanahan cannot comply with Congress's requirement that he seek reimbursement. Reflecting Congress's appropriation decision, DHS lacks any funds to reimburse DOD for the planned wall construction in Arizona and New Mexico. DHS has accordingly requested support on a "non-reimbursable basis." RJN ¶ 9, Ex. I at 10. But Congress permitted the Secretary of Defense to waive reimbursement under 10 U.S.C. § 277(c) only if the support is either "(1) provided in the normal course of military training or operations; or (2) results in a benefit to the element of the Department of Defense or personnel of the National Guard providing the support that is substantially equivalent to that which would otherwise be obtained from military operations or training." Plainly neither of these conditions holds.

In addition, Section 284 authorizes only limited construction "to block drug smuggling corridors," rather than permitting DOD to take part in a massive, multibillion dollar effort to block the U.S.–Mexico border generally. 10 U.S.C. §284(b)(7). Defendants cannot dispute that Section 284 is being used as a tool to create a contiguous border wall, not to address specific corridors. For example, On March 6, 2019, Defendant Nielsen testified before the House of Representatives' Homeland Security Committee that the border wall that was discussed in the previous months would involve constructing a "little more than 700" miles of barriers. RJN ¶ 23 at 01:08:30–01:09:00. On March 8, 2019, Defendant Trump wrote on Twitter: "The Wall is being built and is well under construction. Big impact will be made. Many additional contracts are close to being signed." *Id.* ¶ 10, Ex. J.  On March 9, 2019, Defendant Trump wrote on Twitter that "Major sections of Wall are being built" and that "MUCH MORE" would "follow shortly." *Id.* ¶¶ 11, 12, Exs. K, L. These

statements all reflect the simple truth that Defendants' efforts to funnel military pension funds to the wall are part of a project aimed at subverting Congress's appropriations decisions.

In addition to violating the specific textual requirements section 284, Defendants' transfer-and-spend plan violates the core principle that executive branch agencies may not mix and match funds from different accounts to exceed the funding limits Congress imposed. Numerous "[f]ederal statutes reinforce Congress's control over appropriated funds." *U.S. Dep't of Navy*, 665 F.3d at 1347 (citing 31 U.S.C. § 1301 *et seq.*). These statutes include "Section 1301, known as the 'Purpose Statute,' [which] provides that appropriated funds may be applied only 'to the objects for which the appropriations were made,'" and the Transfer Statute, Section 1532, which prohibits unauthorized transfer of funds from one account to another. *See* 31 U.S.C. § 1532.

The General Accountability Office ("GAO"), which guides the executive branch's use of appropriated funds by providing expert interpretations of appropriations law, confirms these core principles.[7] Many of the GAO's rules protect a key function of congressional appropriations judgment: setting a "maximum authorized program level" by specifically appropriating a finite set of funds for a particular project. SBA's Imposition of Oversight Review Fees on PLP Lenders, B-300248 (Comp. Gen. Jan. 15, 2004). "Allowing an agency to exceed this level with funds derived from some other source would usurp congressional prerogative and undercut the congressional power of the purse." Availability of Receipts from Synthetic Fuels Projects for Contract Admin. Expenses of the Dep't of Treasury, Office of Synthetic Fuels Projects, B-247644, 72 Comp. Gen. 164, 165 (Apr. 9, 1993).

Courts have struck down similar mix-and-match funding plans as an end-run around Congress's limits on appropriations. In *Nevada v. Dep't of Energy*, for example, the D.C. Circuit applied the GAO's rule that "specific appropriations preclude the use of general ones even when the two appropriations come from different accounts." 400 F.3d 9, 16 (D.C. Cir. 2005) (citing 4 Comp.

---

[7] Courts frequently give "special weight to [GAO's] opinions" due to its "accumulated experience and expertise in the field of government appropriations." *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005); *see also Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 (D.C. Cir. 1984) (court "regard[s] the assessment of the GAO as an expert opinion, which [courts] should prudently consider"); *UAW v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (noting that GAO's "accumulated experience and expertise" in the field of government appropriations give special weight to its opinions (quotation marks omitted)).

Gen. 476 (1924)). Observing that the GAO rule "seems exactly right," the court rejected the use of funds from a general account to buttress a more specific and limited appropriation that Congress intended for the same purpose. *Id.*; *see id.* ("[T]he fact that Congress appropriated $1 million expressly for Nevada indicates that is all Congress intended Nevada to get in FY04 from whatever source.").

Here, as in *Nevada v. Department of Energy*, Congress has allocated a specific amount of funding for an activity and the government cannot cobble together other, more general sources of money to increase funding levels for that same goal. Congress has set a maximum authorized program level for border barrier construction: $1.375 billion in Fiscal Year 2019. Defendants' actions to transfer and spend funds above this limit are unlawful. *See, e.g.*, *Multnomah Cty. v. Azar*, 340 F. Supp. 3d 1046, 1068 (D. Or. 2018) (finding violation of the Purpose Statute); *Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States*, 48 F.3d 1166, 1171 (Fed. Cir. 1995) (government cannot "'raid[]' one appropriation account . . . to credit another").

### D.  Defendants' final decision to construct a wall in Yuma Sector Projects 1 and 2 and El Paso Sector Project 1 violates NEPA.

Construction of a border wall will significantly impact the surrounding environment and triggers the requirements of the National Environmental Policy Act (NEPA). Border infrastructure will fragment the biologically diverse ecosystems along the El Paso and Yuma Sectors and bisect the natural habitats of wildlife species, threatening them with regional extirpation. *See* Walsh Decl. ¶¶ 10-11, 13; Bixby Decl. ¶ 9 (fragmentation of wildlife populations will make them more vulnerable to disease and loss of genetic variability). Even preparatory construction activities involving heavy machinery, such as road construction, installation of light fixtures, and removal of vegetation, cause significant environmental degradation and adversely impact wildlife populations. *See* Walsh Decl. ¶ 12; Munro Decl. ¶ 9; s*ee also Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 331 F. Supp. 925, 927 (D.D.C. 1971) (preliminarily enjoining government from awarding contracts for public works project because their execution would involve clearing, grubbing, excavation, and other actions). Defendants' failure to make any public assessment of the impact of border wall construction violates the most basic requirement of NEPA.

NEPA mandates that a public review of a project's potential environmental impacts occur at

the "earliest possible time" in the planning process. *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (citation omitted); 40 C.F.R. § 1501.2; *see also Andrus v. Sierra Club*, 442 U.S. 347, 351 n.3 (1979) (requiring environmental review at the "go-no go" stage). This promotes NEPA's two primary goals. First, it ensures that federal agencies take a "hard look" at the environmental consequences of their actions. *Metcalf*, 214 F.3d at 1141. Through this review, NEPA ensures agencies make informed decisions before taking action. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989) ("By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." (citation omitted)). Second, it provides a mechanism for the public to learn about and comment on the impacts of a proposed action. *Id.*

NEPA is triggered when federal agencies undertake actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). It mandates preparation of an Environmental Impact Statement (EIS) when there are substantial questions about whether a project "*may*" harm the environment. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (emphasis in original). "[T]his is a low standard." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011) (citation omitted). "A plaintiff need not show that significant effects will in fact occur. It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment." *WildEarth Guardians v. Provencio*, 918 F.3d 620, 633 (9th Cir. 2019) (quotation marks and citations omitted). Where an EIS is not categorically required, federal agencies must prepare an Environmental Assessment (EA) to determine the extent of the environmental impacts and whether an EIS is needed. *See Ocean Advocates v. U.S. Army Corps of Engr's*, 402 F.3d 846, 864 (9th Cir. 2005); *see also* 40 C.F.R. §§ 1501.3, 1501.4(c). If the project will have only an insignificant effect, agencies issue a finding of no significant impact. *See* 40 C.F.R. § 1501.4(e). As part of their NEPA assessment, agencies must consider reasonable alternatives to the proposed action, including a "no action" option. See 42 U.S.C. § 4332(2)(E); *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988).

Defendants' actions violate NEPA because DHS and DOD have conducted *no* public assessment whatsoever of the environmental effects of their decision to begin construction in

Arizona and New Mexico next month, despite advancing their specific construction plans. DOD and DHS have issued notices stating exactly where border infrastructure will be built, and DOD has transferred money to fund it. *See* RJN ¶ 15, 21 Exs. O, U. Teams of experts and engineers are surveying sites. *Id.* ¶ 16, Ex. P. Yet, DOD and DHS have not engaged in interagency consultations, invited public comment, prepared an EIS or an EA, or issued a finding of no significant impact. Their failure to do so violates NEPA. *Cf. In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1219, 1225–26 (9th Cir. 2019) (not reaching NEPA challenge to border wall construction because project was "still in the preliminary planning stage" and no final agency action had been taken).

## II.     Plaintiffs are suffering irreparable harm and will suffer further harm in the absence of a preliminary injunction.

Plaintiffs have suffered and will suffer irreparable harm if a border wall is constructed pursuant to the President's emergency declaration. As a result of the declaration, Sierra Club and SBCC have been forced to continuously divert resources and efforts away from other core organizational priorities. In addition, Plaintiffs' members who live, work, or recreate in the specified Yuma and El Paso sectors will suffer irreparable harm to their interests as a result of Defendants' construction of 18-foot-high barriers across the land they treasure. Finally, the emergency declaration causes constitutional injury to Plaintiffs by usurping Congress's appropriations authority and violating the Constitution's separation of powers.

### A. Sierra Club and SBCC members face irreparable harm if construction proceeds in Yuma Sector Projects 1 and 2 and El Paso Sector Project 1.

Construction of a border wall in Yuma Sector Projects 1 and 2 and El Paso Sector Project 1 will have devastating effects on the environment and cause irreparable harm to Plaintiffs' members who reside or recreate in these areas. *See All. for the Wild Rockies*, 632 F.3d at 1135 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable.") (quotation marks and citation omitted). A plaintiffs who can establish that a project will "harm [their] members' ability to 'view, experience, and utilize' . . . areas in their undisturbed state" has demonstrated a likelihood of irreparable harm. *Id. See also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) (finding irreparable harm to plaintiffs' aesthetic and recreational pursuits stemming from irreparable harm to endangered species). A plaintiff can also establish irreparable

harm if construction proceeds prior to NEPA compliance. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004) ("In the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action." (citation omitted)). Plaintiffs Sierra Club and SBCC face irreparable harm for these reasons.

Wall construction will diminish Plaintiffs' members' recreational, aesthetic, and professional interests in the wilderness areas along the U.S.–Mexico border. For example, Albert Del Val has been fishing striped bass in the canals along the border in Yuma, Arizona for more than fifty years. *See* Del Val Decl. ¶¶ 6. He fears that installation of an 18-foot-high border wall in this area will cut off his access to the canals and detract from the natural environment that he has cherished since he was a young boy. *Id*. ¶¶ 6, 7, 9-10. Sierra Club member Elizabeth Walsh routinely visits the El Paso Sector 1 area for hiking and birdwatching. *See* Walsh Decl. ¶ 8. As part of her professional and academic work, Dr. Walsh supervises several ongoing and long-term biology studies in the area with graduate students. *Id*. ¶ 7. Construction of a border wall will not only impede her aesthetic enjoyment of the borderlands, but will also negatively impact her ability to continue the scientific studies she has been conducting for years. *Id*. ¶¶ 10-11, 15. *See also* Munro Decl. ¶ 7–9.

The agencies' failure to comply with NEPA also increases the risk of irreparable harm. A preliminary injunction is appropriate where a Plaintiff can show that irreparable harm is likely to flow from a procedural violation of an environmental statute. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 492–93 (9th Cir. 2011) (finding irreparable harm for procedural violation of NEPA); *see also Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015) (procedural violation supports injunctive relief). By neglecting to even consider the environmental harms of construction, as they are required to under NEPA, Defendants threaten irreparable harm to Plaintiffs. *See, e.g.,* Bixby Decl. ¶¶ 6–7, 9; Walsh Decl. ¶ 15; Del Val Decl. ¶¶ 8–10. For SBCC community members who live along the border, Defendants' failure to adhere to NEPA is especially harmful because a wall and its underground foundation can increase lands' susceptibility to flooding and cause the displacement of entire communities. *See* Houle Decl. ¶¶ 4, 6.

**B.  Plaintiffs face irreparable harm from frustration of their missions.**

Plaintiffs will suffer irreparable harm unless the President's plan to use military funds under

10 U.S.C. sections 2808 and 284 is enjoined, because they are forced to continue to divert organizational resources to address the detrimental impact of a border wall. Such injuries are sufficient to demonstrate a likelihood of irreparable harm and justify preliminary injunctive relief. *See, e.g.*, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (plaintiffs who have shown "ongoing harms to their organizational missions . . . have established a likelihood of irreparable harm"); *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D. Cal. 2018); *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (obstacles that "make it more difficult for [organizations] to accomplish their primary mission" impose "irreparable harm").

Plaintiff SBCC has expended significant staff time and resources to monitor and respond to the diversion of funds and threatened construction caused by the emergency declaration. Since the President declared a national emergency, several senior SBCC staff have devoted a "*majority*" of their time to analyzing and responding to it. *See* Gaubeca Decl. ¶ 7 (emphasis in original). They have fielded inquiries from members, journalists, and elected officials; created new educational materials, media toolkits, and multimedia content; and hosted trainings for staff and partners, all in order to respond to the national emergency declaration. *Id.* ¶¶ 8-9. Prioritizing these activities has taken time away from and frustrated SBCC's core organizational mission of advocating for Border Patrol accountability and immigration reform, through activities such as policy initiatives that increase law-enforcement accountability. *Id.* ¶ 10. SBCC member organizations Southwest Environmental Center (SEC) and Equal Voice Network (EVN) have similarly diverted scarce organizational resources to address the emergency declaration. *See* Houle Decl. ¶¶ 8-10 (organizing site-specific protests, educating community members, providing group tours to border areas affected by "emergency," mapping out anticipated construction areas, creating new media campaign); Bixby Decl. ¶¶ 10-11 (identifying timing and location of construction, responding to stakeholder concerns, designing media kits about impact of construction). Responding to the emergency declaration has frustrated the core missions of both organizations, causing them irreparable harm. *See* Houle Decl. ¶¶ 4-5 (organization developed "additional arm" to deal with emergency, detracting from core organizational priorities such as "Jobs and Economic Security," "Education," "Housing," and "Healthcare"); Bixby Decl. ¶¶ 3, 10-11 (core mission of "protection and restoration of native

wildlife and their habitats in the southwest" is frustrated). Plaintiffs are suffering present, ongoing, and concrete harms and will continue to do so absent judicial intervention.

### C.  Defendants' constitutional violations impose irreparable harm.

"[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted). This principle applies even where the government's constitutional violation is structural, rather than a deprivation of individual constitutional rights. *See Am. Trucking Assn's. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (finding with respect to Supremacy Clause that "constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm"); *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 538 (N.D. Cal. 2017) (rejecting distinction between violations of structural and personal constitutional rights, and finding irreparable harm arising from Separation of Powers and Spending Clause violations). Plaintiffs are experiencing and will continue to experience irreparable harm stemming from the President's usurpation of Congressional authority. Defendants efforts to construct a border wall at a speed and manner not authorized by Congress through the unlawful diversion of military funds to construct walls in Arizona and New Mexico directly impairs Sierra Club members' and SBCC members' ability to enjoy protected parks and wildlife areas. This harm is irreparable.

### III.    The Balance of Equities and Public Interest Favor a Preliminary Injunction.

The balance of the equities and public interest support issuance of injunctive relief. In cases against the government, the government's interest and public interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the public "has an interest in ensuring that 'statutes enacted by [their] representatives' are not imperiled by executive fiat. *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1255 (9th Cir. 2018) (quoting *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers)). In addition, there is a "well-established public interest in preserving nature and avoiding irreparable environmental injury." *All. for the Wild Rockies*, 632 F.3d at 1138 (citation omitted); *see also Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007).

### CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs a Preliminary Injunction.

Dated: April 4, 2019

Mollie M. Lee (SBN 251404)
Christine P. Sun (SBN 218701)
American Civil Liberties Union Foundation of
    Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 621-2493
Fax: (415) 255-8437
mlee@aclunc.org
csun@aclunc.org

David Donatti*
Andre I. Segura (SBN 247681)
American Civil Liberties Union Foundation
    of Texas
P.O. Box 8306
Houston, TX 77288
Tel.: (713) 325-7011
Fax: (713) 942-8966
ddonatti@aclutx.org
asegura@aclutx.org

Counsel for Plaintiffs

*Admitted pro hac vice
**Pro hac vice application pending
***Counsel for Plaintiff Sierra Club

Respectfully submitted,

/s/ Dror Ladin_____

Dror Ladin*
Noor Zafar*
Jonathan Hafetz**
Hina Shamsi*
Omar C. Jadwat*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2660
Fax: (212) 549-2564
dladin@aclu.org
nzafar@aclu.org
jhafetz@aclu.org
hshamsi@aclu.org
ojadwat@aclu.org

Cecillia D. Wang (SBN 187782)
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 343-0770
Fax: (415) 395-0950
cwang@aclu.org

Sanjay Narayan (SBN 183227)***
Gloria D. Smith (SBN 200824)***
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
Tel.: (415) 977-5772
sanjay.narayan@sierraclub.org
gloria.smith@sierraclub.org