JAMES M. BURNHAM
Deputy Assistant Attorney General
JOHN R. GRIFFITHS
Director, Federal Programs Branch
ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel
KATHRYN C. DAVIS
MICHAEL J. GERARDI
LESLIE COOPER VIGEN
RACHAEL WESTMORELAND
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:     (202) 616-5084
Fax:      (202) 616-8470

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

|  |  |
|---|---|
| SIERRA CLUB, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | No. 4:19-cv-00892-HSG<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:  May 17, 2019<br>Time:  10:00 a.m.<br>Place:  Oakland Courthouse<br>         Courtroom 2, 4th Floor |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................3

I.     Congress's Express Authorization of Border Barrier Construction ...............................3

II.    DHS's Recent Efforts to Expedite Border Barrier Construction ..................................4

III.   Congress's Authorization for DoD Support of DHS's Border Security Efforts.........4

IV.    DoD's Current Support for DHS's Efforts to Secure the Southern Border...............5

V.     The President's Proclamation Declaring a National Emergency at the Southern Border.........6

VI.    The Use of Spending Authorities for Barrier Construction.........................................7

       A.   10 U.S.C. § 284..................................................................................................8

       B.   10 U.S.C. § 2808 .............................................................................................. 10

LEGAL STANDARD ......................................................................................................... 11

ARGUMENT ....................................................................................................................... 11

I.     Plaintiffs Have Not Shown a Likelihood of Success on the Merits............................ 11

       A.   Plaintiffs Fail to Identify a Cause of Action. ................................................ 12

       B.   The Court lacks jurisdiction over Plaintiffs' § 8005 claim and, in any event,
            the claim fails on the merits ........................................................................... 13

            1. Plaintiffs Lack Article III Standing To Challenge a Transfer of DoD Funds
               Pursuant to § 8005 .................................................................................... 13

            2. Plaintiffs Do Not Fall Within Section 8005's "Zone Of Interests."................... 14

            3. Plaintiffs' § 8005 Claims Cannot Survive Ultra Vires Review.......................... 16

       C.   Plaintiffs' Cannot Establish that DoD Violated a Clear and Mandatory
            Provision of § 284........................................................................................... 17

       D.   Plaintiffs Cannot Establish Article III Standing to Challenge Future
            Border Barrier Construction Under § 2808 and Their Ultra Vires Claim
            Fails On The Merits......................................................................................... 21

       E.   Plaintiffs Cannot Establish a Violation of a Clear and Mandatory Provision
            of the Consolidated Appropriations Act......................................................... 23

       F.   The Secretary of Homeland Security Has Waived NEPA's Application to
            the Section 284 Projects Pursuant to IIRIRA ................................................ 25

       G.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Constitutional
            Claims .............................................................................................................. 26

II.    Plaintiffs Will Not Be Irreparably Harmed in the Absence of an Injunction............................ 29

       A.   Plaintiffs Have Not Demonstrated Irreparable Environmental Harm.......................... 29

       B.   Plaintiffs Have Not Demonstrated Irreparable Constitutional Harm .............................. 32

i

        C.   Plaintiffs Have Not Demonstrated Irreparable Harm to their Mission ............................ 33

III.  The Balance of the Equities and Public Interest Weigh in Favor of Denying
      Plaintiffs' Motion ...................................................................................................................... 34

IV.  A Nationwide Injunction is Inappropriate and Any Injunctive Relief Should be
      Narrowly Drawn ......................................................................................................................... 35

CONCLUSION .................................................................................................................................... 35

*Sierra Club et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Kahn,*
    618 F.2d 784 (D.C. Cir. 1979) ......................................................................... 28

*All. for the Wild Rockies v. Bradford,*
    979 F. Supp. 2d 1139 (D. Mont. 2013) ............................................................ 32

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ............................................................. 11, 30, 31

*All. for the Wild Rockies v. Kruger,*
    35 F. Supp. 3d 1259 (D. Mont. 2014) ....................................................... 30, 32

*All. for the Wild Rockies v. U.S. Forest Serv.,*
    No. 1:15-cv-00193-EJL, 2016 WL 3349221 (D. Idaho June 14, 2016) ............................................. 30

*Armstrong v. Exceptional Child Ctr., Inc.,*
    135 S. Ct. 1378 (2015) .................................................................................... 15

*ASARCO, LLC v. Celanese Chem. Co.,*
    792 F.3d 1203 (9th Cir. 2015) ......................................................................... 16

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,*
    502 U.S. 32 (1991) .......................................................................................... 12

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ............................................................... 11, 34, 35

*City & Cty. of San Francisco v. Trump,*
    897 F.3d 1225 (2018) ...................................................................................... 27

*Clapper v. Amnesty Int'l,*
    568 U.S. 398 (2013) ................................................................................... 21, 34

*Clinton v. City of New York,*
    524 U.S. 417 (1998) ................................................................................... 28, 29

*Ctr. for Biological Diversity v. Hays,*
    No. 2:15-cv-01627-TLN-CMK, 2015 WL 5916739 (E.D. Cal. Oct. 8, 2015) ................................. 31

*Dalton v. Specter,*
    511 U.S. 462 (1994), *rehearing denied*, 512 U.S. 1247 (1994) ......................................... *passim*

*DISH Network Corp. v. FCC,*
    653 F.3d 771 (9th Cir. 2011) ........................................................................... 11

*E. Bay Sanctuary Covenant v. Trump*,
  909 F.3d 1219 (9th Cir. 2018) ............................................................................... 33

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
  528 U.S. 167 (2000) ..................................................................................... 14, 21

*Gilligan v. Morgan*,
  413 U.S. 1 (1973) .............................................................................................. 15

*Gringo Pass, Inc. v. Kiewit Sw. Co.*,
  No. CV-09-251-TUC-DCB, 2012 WL 12905166 (D. Ariz. Jan. 11, 2012) ....................... 5

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ........................................................................................... 33

*Hein v. Freedom From Religion Found., Inc.*,
  551 U.S. 587 (2007) ........................................................................................... 14

*Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States*,
  48 F.3d 1166 (Fed. Cir. 1995) .............................................................................. 20

*Horizon Air Indus., Inc. v. Nat'l Mediation Bd.*,
  232 F.3d 1126 (9th Cir. 2000) .............................................................................. 13

*Idaho Rivers United v. U.S. Army Corps of Eng'rs*,
  156 F. Supp. 3d 1252 (W.D. Wash. 2015) ........................................................ 30, 31

*Immigration & Naturalization Serv. v. Chadha*,
  462 U.S. 919 (1983) ........................................................................................... 28

*In re Border Infrastructure Envtl. Litig.*,
  915 F.3d 1213 (9th Cir. 2019) ......................................................................... 4, 26

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
  534 U.S. 124 (2001) ........................................................................................... 21

*Kater v. Churchill Downs Inc.*,
  886 F.3d 784 (9th Cir. 2018) .................................................................................7

*Khalsa v. Weinberger*,
  779 F.2d 1393 (9th Cir. 1985) .............................................................................. 22

*Landon v. Plasencia*,
  459 U.S. 21 (1982) ............................................................................................. 34

*Leedom v. Kyne*,
  358 U.S. 184 (1958) ........................................................................................... 12

*Sierra Club et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

*Lexmark Intern., Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ............................................................................................. 15, 16

*Lopez v. Brewer,*
    680 F.3d 1068 (9th Cir. 2012) ..................................................................................... 11

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ..................................................................................................... 14

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ..................................................................................................... 15

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ............................................................................................. 15, 16

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ....................................................................................... 32

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) ..................................................................................................... 33

*Nat'l Wildlife Fed'n v. Burlington N. R.R.,*
    23 F.3d 1508 (9th Cir. 1994) ....................................................................................... 30

*Navarro v. Encino Motorcars, LLC,*
    780 F.3d 1267 (9th Cir. 2015), *overruled on other grounds by* 136 S. Ct. 2117 (2016) ............................ 24

*Nevada v. Dep't of Energy,*
    400 F.3d 9 (D.C. Cir. 2005) ......................................................................................... 20

*North Dakota v. United States,*
    495 U.S. 423 (1990) ..................................................................................................... 22

*Olive v. Comm'r of Internal Revenue,*
    792 F.3d 1146 (9th Cir. 2015) ..................................................................................... 24

*Pac. Mar. Ass'n v. Nat'l Labor Relations Bd.,*
    827 F.3d 1203 (9th Cir. 2016) ....................................................................... 13, 16, 22, 23

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.,*
    636 F.3d 1150 (9th Cir. 2011) ..................................................................................... 30

*People With Disabilities Found. v. Colvin,*
    No. 15-CV-02570-HSG, 2016 WL 2984898 (N.D. Cal. May 24, 2016) ..................... 7

*Puerto Rico v. United States,*
    490 F.3d 50 (1st Cir. 2007) ......................................................................................... 12

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*,
   415 F.3d 1078 (9th Cir. 2005) .................................................................................. 15

*Russello v. United States*,
   464 U.S. 16 (1983) .................................................................................................. 19

*S. Yuba River Citizens League v. NMFS*,
   No. 2:13-cv-00059-MCE, 2013 WL 4094777 (E.D. Cal. Aug. 13, 2013) ................ 30

*Salazar v. Ramah Navajo Chapter*,
   567 U.S. 182 (2012) ................................................................................................ 24

*Sierra Club v. Ashcroft*,
   No. 04-cv-0272-LAB, 2005 WL 8153059 (S.D. Cal. Dec. 13, 2005) ........................ 4

*Sierra Forest Legacy v. Sherman*,
   951 F. Supp. 2d 1100 (E.D. Cal. 2013) ................................................................... 30

*Staacke v. U.S. Sec'y of Labor*,
   841 F.2d 278 (9th Cir. 1988) ...................................................................... 13, 18, 22

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ................................................................................................ 21

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ............................................................................................ 35

*United States v. Amirnazmi*,
   645 F.3d 564 (3d Cir. 2011) .................................................................................... 22

*United States v. McIntosh*,
   833 F.3d 1163 (9th Cir. 2016) ........................................................................... 24, 28

*United States v. Spawr Optical Research, Inc.*,
   685 F.2d 1076 (9th Cir. 1982) ................................................................................. 22

*United States v. W. Radio Servs. Co.*,
   869 F. Supp. 2d 1282 (D. Or. 2012) ........................................................................ 31

*United States v. Will*,
   449 U.S. 200 (1980) ................................................................................................ 21

*Va. Ry. Co. v. Sys. Fed'n No. 40*,
   300 U.S. 515 (1937) ................................................................................................ 35

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ................................................................................. 33

*Washington v. Trump,*
   847 F.3d 1151 (9th Cir. 2017) ............................................................ 33

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................... 11

*Wise v. Glickman,*
   257 F. Supp. 2d 123 (D.D.C. 2003) ................................................... 13

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ........................................................................... 27

**Constitutional Provisions**

U.S. Const., art I, § 8, cl. 12 ................................................................ 15

U.S. Const., art I, § 7 ........................................................................... 28

**Statutes**

8 U.S.C. § 1103 ...................................................................................... 3

10 U.S.C. § 101(f)(4) ........................................................................... 23

10 U.S.C. §§ 271-74 ............................................................................... 4

10 U.S.C. § 277(a) ............................................................................... 19

10 U.S.C. § 284 ........................................................................... *passim*

10 U.S.C. § 284(b)(4) ........................................................................... 18

10 U.S.C. § 284(g)(1) ........................................................................... 19

10 U.S.C. § 284(h)(1)(B) ..................................................................... 18

10 U.S.C. § 2801(a) ....................................................................... 10, 23

10 U.S.C. § 2801(b) ............................................................................. 23

10 U.S.C. § 2801(c)(4) ................................................................... 10, 23

10 U.S.C. §§ 2801-08 ........................................................................... 10

10 U.S.C. § 2808 .......................................................................... *passim*

10 U.S.C. § 2808(a) ...................................................................... *passim*

31 U.S.C. § 1301 ................................................................................. 20

vii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

31 U.S.C. § 1532 ............................................................................................. 20

31 U.S.C. § 9705 ............................................................................................... 2

50 U.S.C. § 1601 ............................................................................................. 10

Pub. L. No. 97-99, 95 Stat. 1359 (1981) ...................................................... 10

Pub. L. No. 97-214, 96 Stat. 153 (1982) ...................................................... 10

Pub. L. No. 101-510, 104 Stat. 1485 (1990) .................................................. 8

Pub. L. No. 104-208, 110 Stat. 3009 (1996) ...................................................3

Pub. L. No. 109-13, 119 Stat. 231 (2005) .......................................................3

Pub. L. No. 109-367, 120 Stat. 2638 (2006) ...................................................3

Pub. L. No. 110-161, 121 Stat. 1844 (2007) ...................................................3

Pub. L. No. 115-232, 132 Stat. 1636 (2018) ...................................................2

Pub. L. No. 115-245, 132 Stat. 2981 (2018) ........................................... 17, 20

Pub. L. No. 116-6, 133 Stat. 13 (2019) ................................................. *passim*

**Regulations**

83 Fed. Reg. 3012 (Jan. 22, 2018) .................................................................. 4

83 Fed. Reg. 46067 (Sept. 10, 2018) ............................................................ 11

83 Fed. Reg. 50949-03 (Oct. 10, 2018) ..........................................................4

84 Fed. Reg. 17185 (Apr. 24, 2019) ............................................................. 26

**Executive Orders and Proclamations**

Exec. Order No. 12722, 55 Fed. Reg. 31803 (Aug. 2, 1990) ....................... 10

Exec. Order No. 12734, 55 Fed. Reg. 48099 (Nov. 14, 1990) ..................... 10

Exec. Order No. 13235, 66 Fed. Reg. 58343 (Nov. 16, 2001) ..................... 10

Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017) ...........................4

Pres. Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001) ........................ 10

Pres. Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) .......................... 1, 6

viii

1

**Legislative Materials**

2

H.R. Rep. No. 93-662 (1973) ................................................................................................. 15

3

H.R. Rep. No. 97-44 (1981)................................................................................................... 10

4

H.R. Rep. No. 103-200 (1993) ..................................................................................... 5, 8, 18

5

H.R. Rep. No. 109-72 (2005) .................................................................................................. 3

6

H.R. Rep. No. 109-452 (2006) .............................................................................................. 18

7

H.R. Rep. No. 110-652 (2008) ................................................................................................ 8

8

H.R. Rep. No. 114-840 (2016) .......................................................................................... 8, 17

9

H. Armed Servs. Comm. Hr'g on S. Border Defense Support,
10
    (Jan. 29, 2019).....................................................................................................................4

11

Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities,
12
    1999 WL 258030 (Apr. 27, 1999) .................................................................................... 5, 8

13

Hr'g on the Fiscal Year 2008 DHS Budget,
14
    2007 WL 431584 (Feb. 9, 2007) ...........................................................................................9

15

S. Approps. Hr'g on the DHS FY 2018 Budget,
16
2017 WL 2311065 (May 25, 2017)............................................................................................3

17

Veto Message for H.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019) ..........................................6

18

**Other Authorities**

19

Barry M. Goldwater Range Celebrates 75 Years, at www.luke.af.mil/News/Article-
20
    Display/Article/1003697/barry-m-goldwater-range-celebrates-75-years............................9

21

Presidential Memorandum for the Secretary of Defense, Secretary of Homeland Security, and the
22
    Attorney General titled, "Securing the Southern Border of the United States,"
    2018 WL 1633761 (Apr. 4, 2018)........................................................................................5

23

24

25

26

27

28

*Sierra Club et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiffs seek a "nationwide" preliminary injunction prohibiting the Department of Defense from using its funds or resources to build border barriers at any location along the southern border, as well as an order enjoining three specific ongoing construction projects in Arizona and New Mexico. But Plaintiffs' claims are unlikely to succeed on the merits and their purported injuries are non-existent as to alleged constitutional harm; entirely speculative as to alleged environmental harms; and self-inflicted as to their organizational interests.  Plaintiffs cannot show any injury from the internal government funding decisions they challenge, let alone the irreparable harm required to obtain extraordinary equitable relief.  And even apart from the absence of any injury, the statutory authorities that Plaintiffs invoke support the Government's funding decisions on their merits, fail to create any rights for the Plaintiffs, and do not provide any basis for a justiciable controversy.  The invocation of those statutory authorities is consistent with decades-long practice, and is amply supported.  Plaintiffs thus are unlikely to prevail on the merits of their claims, and the balance of harms supports the Government.  The motion therefore should be denied.

There is no serious dispute that the southern border is "a major entry point for criminals, gang members, and illicit narcotics."  Declaring a Nat'l Emergency Concerning the S. Border of the United States, Pres. Proc. No 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) (Proclamation).  The increasing surge of migrants, the highest in over a decade, has placed a tremendous strain on the limited resources of the Department of Homeland Security (DHS), and exacerbated the risks to border security, public safety, and the safety of the migrants themselves.  *See* Letter from Secretary of Homeland Security Kirstjen M. Nielsen to Members of Congress (Mar. 28, 2019) (Exhibit 1).  Facilities are overcrowded, officers are stretched too thin, and resources are being redirected away from law enforcement to address this humanitarian and security crisis.   *Id.*

Border barriers have historically proven to be an extremely effective tool for deterring and impeding illegal crossings into the United States.  *See* Declaration of Jerry B. Martin, Chief of U.S. Border Patrol Strategic Planning and Analysis Directorate (Exhibit 2).  Indeed, the Government has been building barriers along the southern border since the 1990s pursuant to congressional authorization.  Accordingly, the Government has identified three statutory authorities to continue the

construction of border barriers, in addition to the $1.375 billion recently appropriated by Congress to DHS specifically for such construction: (1) the Treasury Forfeiture Fund (TFF) (31 U.S.C. § 9705); (2) the Department of Defense's (DoD) counter-drug support authority (10 U.S.C. § 284); and (3) the authority to reallocate funding from military construction projects, made available through the national emergency declaration (10 U.S.C. § 2808). Only the latter two funding sources are at issue in this case.

At the threshold, Plaintiffs lack standing to bring certain claims. They cannot show actual or imminent harm from DoD's transfer of funds under § 8005 of the FY 19 DoD Appropriations Act and Section 1001 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232, § 1001, 132 Stat. 1636 (Aug. 13, 2018), where they have no entitlement to the funds, and the mere transfer of funds, without more, does not affect Plaintiffs. Nor can Plaintiffs satisfy the requirement that they fall within the zone of interests protected by § 8005. Additionally, Plaintiffs lack standing to bring a claim under § 2808 because the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier projects under this authority. In the absence of such harm, the balance of equities tips strongly in favor of the Government because an injunction preventing the construction of border barriers would harm the Government's strong interest in border security and enforcement of immigration laws.

Plaintiffs' claims are also unlikely to succeed on the merits. Plaintiffs' NEPA claim fails because the Acting Secretary of Homeland Security has exercised his statutory authority to waive NEPA. Plaintiffs identify no cause of action to bring their other statutory claims under § 8005, § 284, and § 2808, and, therefore, they cannot carry their heavy burden under the extraordinarily deferential standard of ultra vires review. DoD has complied with the requirements of both § 8005 and § 284 in authorizing funding and construction of the Arizona and New Mexico projects, and the recent appropriations for barrier construction to DHS in the Consolidated Appropriations Act do not prevent DoD from undertaking barrier construction pursuant to these separate statutory authorities. Finally, Plaintiffs' constitutional claims are unlikely to succeed because they contravene the principle that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

1    For these reasons, Plaintiffs' motion for a preliminary injunction should be denied.

2                                    **BACKGROUND**

3    **I.    Congress's Express Authorization of Border Barrier Construction**

4          In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act

5    (IIRIRA), which authorizes the Secretary of Homeland Security to "take such actions as may be

6    necessary to install additional physical barriers and roads (including the removal of obstacles to

7    detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas

8    of high illegal entry into the United States." Pub. L. No. 104-208, Div. C., Title I § 102(a), 110 Stat.

9    3009 (1996) (codified at 8 U.S.C. § 1103 note). Since then, Congress has amended IIRIRA three times

10   to expand the Government's authority to construct barriers along the southern border. In 2005,

11   Congress grew frustrated by "[c]ontinued delays caused by litigation" preventing border barrier

12   construction and thus granted the Secretary of Homeland Security authority to waive any "laws that

13   might impede the expeditious construction of security infrastructure along the border." *See* H.R. Rep.

14   109-72, at 171 (May 3, 2005). The REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Title I § 102,

15   119 Stat. 231, 302, 306, empowers the Secretary of Homeland Security "to waive all legal requirements

16   such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious

17   construction of the barriers and roads under this section."

18          Congress amended IIRIRA again as part of the Secure Fence Act of 2006, requiring

19   construction of "physical barriers, roads, lights, cameras, and sensors" across hundreds of miles of the

20   southern border in five specified locations. Pub. L. No. 109-367, § 3, 120 Stat. 2638. In 2007,

21   Congress expanded this requirement and directed "construct[ion of] reinforced fencing along not less

22   than 700 miles of the southwest border." Consolidated Appropriations Act, 2008, Pub. L. No. 110-

23   161, Div. E, Title V § 564, 121 Stat. 1844 (2007) (IIRIRA § 102(b)).

24          Relying on these authorities, DHS has installed approximately 650 miles of barriers along the

25   southern border. *See* Senate Approps. Hearing on the DHS FY 2018 Budget, 2017 WL 2311065 (May

26   25, 2017) (Testimony of Secretary of Homeland Security John Kelly). Courts have consistently denied

27   relief in lawsuits challenging DHS's construction of border barriers under IIRIRA. *See, e.g., In re Border

28   Infrastructure Envtl. Litig.*, 915 F.3d 1213 (9th Cir. 2019); *Sierra Club v. Ashcroft*, 2005 WL 8153059 (S.D.

1    Cal. Dec. 13, 2005).

2         **II.    DHS's Recent Efforts to Expedite Border Barrier Construction**

3              On January 25, 2017, the President issued an Executive Order directing federal agencies "to

4    deploy all lawful means to secure the Nation's southern border."  Border Security and Immigration

5    Enforcement Improvements, Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017).  In order to

6    "prevent illegal immigration, drug and human trafficking, and acts of terrorism," *id.*, the Order

7    required agencies to "take all appropriate steps to immediately plan, design and construct a physical

8    wall along the southern border," including "[i]dentify and, to the extent permitted by law, allocate all

9    sources of Federal funds" to that effort.  *Id.* at 8794.  In furtherance of this directive, DHS has issued

10   waivers pursuant to IIRIRA to expedite construction of border barrier projects over the past two

11   years.  *See, e.g.*, Determinations Pursuant to Section 102 of the Illegal Immigration Reform and

12   Immigrant Responsibility Act of 1996, as Amended, 83 Fed. Reg. 3012 (Jan. 22, 2018) (New Mexico);

13   83 Fed. Reg. 50949 (Oct. 10, 2018) (Texas).

14        **III.    Congress's Authorization for DoD Support of DHS's Border Security Efforts**

15             Congress also has expressly authorized DoD to provide a wide range of support to DHS at

16   the southern border, including the "construction of roads and fences and installation of lighting to

17   block drug smuggling corridors across international boundaries of the United States."  10 U.S.C. §

18   284(b)(7); *see id.* §§ 271–74.  Since the early 1990s, military personnel have supported civilian law-

19   enforcement agency activities to secure the border, counter the spread of illegal drugs, and respond to

20   transnational threats.  *See* H. Armed Servs. Comm. Hr'g on S. Border Defense Support (Jan. 29, 2019)

21   (Joint Statement of John Rood, Under Secretary of Defense for Policy, and Vice Admiral Michael

22   Gilday, Director of Operations for the Joint Chiefs of Staff) (Exhibit 3).   More recently, Presidents

23   George W. Bush and Barack Obama deployed military personnel to the southern border to support

24   DHS's border security efforts.  *Id.*

25             For decades, U.S. military forces have played an active role in barrier construction and

26   reinforcement on the southern border.  Military personnel were critical to construction of the first

27   modern border barrier near San Diego, CA in the early 1990s as well as other border fence projects.

28   *See* H.R. Rep. No. 103-200, at 330–31, 1993 WL 298896 (1993) (commending DoD for its role in

-4-

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

construction of the San Diego primary fence); Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Test. of Barry R. McCaffrey, Dir. of the Office of Nat'l Drug Control Policy) (military personnel constructed over 65 miles of barrier fencing).  In 2006, the National Guard improved the southern border security infrastructure by building more than 38 miles of fence, 96 miles of vehicle barrier, and more than 19 miles of new all-weather road, and by performing road repairs exceeding 700 miles.  *See* Joint Statement of Rood and Gilday.  More recently, the U.S. Army Corps of Engineers has assisted DHS by providing planning, engineering, and barrier construction support.  *See, e.g.*, *Gringo Pass, Inc. v. Kiewit Sw. Co.*, 2012 WL 12905166, at *1 (D. Ariz. Jan. 11, 2012).

## IV.   DoD's Current Support for DHS's Efforts to Secure the Southern Border

On April 4, 2018, the President issued a memorandum to the Secretary of Defense, Secretary of Homeland Security, and the Attorney General titled, "Securing the Southern Border of the United States."  Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018).  The President stated "[t]he security of the United States is imperiled by a drastic surge of illegal activity on the southern border" and pointed to the "anticipated rapid rise in illegal crossings," as well as "[t]he combination of illegal drugs, dangerous gang activity, and extensive illegal immigration." *Id.* at *1.  The President determined the situation at the border had "reached a point of crisis" that "once again calls for the National Guard to help secure our border and protect our homeland." *Id.*  To address this crisis, the President directed the Secretary of Defense to support DHS in "securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into this country."  *Id.* at *2.  The President also directed the Secretary of Defense to request the use of National Guard personnel to assist in fulfilling this mission.  *Id.*  In October 2018, the President expanded the military's support to DHS to include active duty military personnel. *See* Joint Statement of Rood and Gilday.  Military personnel have been providing a wide range of border security support to DHS, including hardening U.S. ports of entry, erecting temporary barriers, and emplacing concertina wire.  *See id.*

## V.   The President's Proclamation Declaring a National Emergency at the Southern Border

On February 15, 2019, the President issued a proclamation declaring that "a national emergency exists at the southern border of the United States."  *See* Proclamation, 84 Fed. Reg. 4949. The President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency."  *Id.*  The President explained:

> The southern border is a major entry point for criminals, gang members, and illicit narcotics.  The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years.

*Id.*  Because of the gravity of the current emergency situation," the President determined that "this emergency requires use of the Armed Forces" and "it is necessary for the Armed Forces to provide additional support to address the crisis."  *Id.*

To achieve its purpose, the Proclamation makes available to the Acting Secretary of Defense the authority under 10 U.S.C. § 2808, which provides that, "without regard to any other provision of law," the Secretary of Defense "may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces."  *See id.*; 10 U.S.C. § 2808(a).

On March 15, 2019, the President vetoed a joint resolution passed by Congress that would have terminated the President's national emergency declaration.  *See* Veto Message for H.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019).  The President relied upon statistics published by CBP as well as recent congressional testimony by the Secretary of Homeland Security to reaffirm that a national emergency exists along the southern border.  *See id.* at 1.  The President highlighted (1) the recent increase in the number of apprehensions along the southern border, including 76,000 CBP apprehensions in February 2019; (2) CBP's seizure of more than 820,000 pounds of drugs in 2018; and (3) arrests of 266,000 aliens previously charged with or convicted of crimes in 2017 and 2018.  *See id.*  The President also emphasized that migration trends along the southern border have changed from primarily single adults from Mexico, who could be easily removed upon apprehension, to caravans that include record numbers of families and unaccompanied children from Central America.

-6-

*See id.* The President explained that this shift requires frontline border enforcement personnel to divert resources away from border security to humanitarian efforts and medical care. *See id.* Further, the President stated that criminal organizations are taking advantage of the large flows of families and unaccompanied minors to conduct a range of illegal activity. *See id.* With additional surges of migrants expected in the coming months, the President stated that border enforcement personnel and resources are strained "to the breaking point." *See id.* at *2. The President concluded that the "situation on our border cannot be described as anything other than a national emergency, and our Armed Forces are needed to help confront it." *See id.*

The situation at the southern border has continued to deteriorate in recent weeks and DHS is facing "a system-wide meltdown." *See* Letter to the United States Senate and House of Representatives from the Secretary of Homeland Security (March 28, 2019). "DHS facilities are overflowing, agents and officers are stretched too thin, and the magnitude of arriving and detained aliens has increased the risk of life threatening incidents." *Id.* In March 2019, there were over 103,000 apprehensions of undocumented migrants along the southern border, the highest one-month total in over a decade. *See* DHS Southwest Border Migration Statistics FY 2019 (Exhibit 4); U.S. Border Patrol Apprehension Statistics Since FY 2000 (Exhibit 5). Over 92,000 of these apprehensions were between ports of entry, compared with 66,884 in February and 47,984 in January. *Id.*; *see* CBP Transcript March FY19 Year to Date Statistics (April 10, 2019) (Exhibit 6).[1]

## VI.   The Use of Spending Authorities for Barrier Construction

On the same day the President issued the Proclamation, the White House publicly released a fact sheet announcing the sources of funding to be used to construct additional barriers along the southern border. In addition to the $1.375 billion appropriation in the DHS Appropriations Act for Fiscal Year 2019, *see* Pub. L. No. 116-6, § 230, 133 Stat. 13, 28, the fact sheet identifies three additional sources of funding, which it explains will be used sequentially and as needed: (1) About $601 million from the Treasury Forfeiture Fund; (2) Up to $2.5 billion of DoD funds transferred for Support for

---

[1] The Court may take judicial notice of the official Government documents and the publicly available information on Government websites cited herein and attached. *See Kater v. Churchill Downs Inc.*, 886 F.3d 784, 788 n.2 (9th Cir. 2018); *People With Disabilities Found. v. Colvin*, 2016 WL 2984898, at *3 (N.D. Cal. May 24, 2016).

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

1   Counterdrug Activities (10 U.S.C. § 284); and (3) Up to $3.6 billion reallocated from Department of
2   Defense military construction projects pursuant to 10 U.S.C. § 2808, a construction authority made
3   available by the President's declaration of a national emergency.  *See* President Donald J. Trump's
4   Border Security Victory (Feb. 15, 2019) (Exhibit 7).   Plaintiffs' motion challenges only the
5   Government's reliance on § 284 and § 2808, not the Treasury Forfeiture Fund.

6                                    **A.    10 U.S.C. § 284**

7          10 U.S.C. § 284 authorizes DoD to provide "support for the counterdrug activities . . . of any
8   other department or agency of the Federal Government," including for "[c]onstruction of roads and
9   fences and installation of lighting to block drug smuggling corridors across international boundaries
10  of the United States."  *Id.* § 284(a); (b)(7).  Congress first provided DoD this authority in the National
11  Defense Authorization Act for Fiscal Year 1991.  Pub. L. No. 101-510, § 1004, 104 Stat. 1485 (1990).
12  Congress regularly renewed § 1004 and praised DoD's involvement in building barrier fences along
13  the southern border.  For example, in 1993, Congress "commend[ed]" DoD's efforts to reinforce the
14  border fence along a 14-mile drug smuggling corridor in the "San Diego-Tijuana border area"  H.R.
15  Rep. No. 103-200, at 330–31, 1993 WL 298896 (1993).  Executive Branch officials and Congress have
16  also noted the importance of DoD's involvement in border security projects to prevent drug
17  smuggling.  *See* Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and
18  Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Testimony of Barry R. McCaffrey) (testifying about the
19  "vital contributions" made by DoD to construct 65 miles of barrier fencings, 111 miles of roads, and
20  17 miles of lighting "to support the efforts of law enforcement agencies operating along the Southwest
21  Border"); H.R. Rep. No. 110-652, 420 (2008) (describing border fencing as an "invaluable counter-
22  narcotics resource" and recommending a $5 million increase to DoD's budget to continue
23  construction).  In light of the threat posed by illegal drug trafficking, Congress permanently codified
24  § 1004 at 10 U.S.C. § 284 in December 2016, directing DoD "to ensure appropriate resources are
25  allocated to efforts to combat this threat."  H.R. Rep. No. 114-840, 1147 (2016).

26         In accordance with § 284, on February 25, 2019, DHS requested DoD's assistance in blocking
27  11 specific drug-smuggling corridors on Federal land along certain portions of the southern border.
28  *See* Declaration of Kenneth Rapuano ¶ 3 (Exhibit 8).  The request sought the replacement of existing

-8-

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

vehicle barricades or dilapidated pedestrian fencing with new pedestrian fencing, the construction of new and improvement of existing patrol roads, and the installation of lighting.  *Id.*  On March 25, 2019, the Acting Secretary of Defense approved two projects in Arizona and one in New Mexico.  *Id.* The current plans for the three projects are as follows:

> 1) Yuma Sector Project 1:
>     - Location:  Yuma County, AZ, near the Andrade Port of Entry
>     - Project Description:  Replace existing vehicle barriers with pedestrian fencing (5 miles/30-foot fence)
>
> 2) Yuma Sector Project 2
>     - Location:  Yuma County, AZ, in the Barry M. Goldwater Air Force Range[2]
>     - Project Description:  Replace existing dilapidated pedestrian fencing with new pedestrian fencing (1.5 miles/18-foot fence)
>
> 3) El Paso Sector Project 2:
>     - Location:  Luna County and Doña Ana County, NM
>     - Project Description:  Replace existing vehicle barriers with new pedestrian fencing (46 miles/30-foot fence)

*Id.*; Declaration of Paul Enriquez ¶¶ 11, 14, 17 (Exhibit 9) (describing project locations in detail and attaching maps).

    In order to devote additional resources to border barrier construction, on March 25, 2019, the Acting Secretary of Defense authorized the transfer of $1 billion to the counter-narcotics support appropriation from Army personnel funds that had been identified as excess to current requirements. *See* Rapuano Decl. ¶¶ 5,6.  The Acting Secretary of Defense directed the transfer of funds pursuant to DoD's general transfer authority under § 8005.  *Id.*  The Acting Secretary found the requirements of those statutes satisfied because the transfer was "for higher priority items, based on unforeseen military requirements, than those for which originally appropriated" and "the item for which funds are requested" had not "been denied by the Congress."  *Id.*

**B.    10 U.S.C. § 2808**

---

[2] The Goldwater Range is a military installation used for air-to-ground bombing practice by U.S. Air Force pilots.  *See* Barry M. Goldwater Range Celebrates 75 Years, at www.luke.af.mil/News/Article-Display/Article/1003697/barry-m-goldwater-range-celebrates-75-years.  The barriers in this area were constructed to keep people and vehicles from entering "an ordnance testing range for the military."  Hearing on the Fiscal Year 2008 DHS Budget, 2007 WL 431584 (Feb. 9, 2007) (Testimony of Secretary of Homeland Security Michael Chertoff).

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

First enacted as part of the 1982 Military Construction Authorization Act, Pub. L. No. 97-99, § 903, 95 Stat. 1359 (1981), and later amended by the Military Construction Codification Act of 1982, Pub. L. No. 97-214, § 2, 96 Stat. 153 (codifying 10 U.S.C. §§ 2801–08), 10 U.S.C. § 2808(a) provides:

> In the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces.  Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.

In enacting this provision, Congress recognized that "it is impossible to provide in advance for all conceivable emergency situations" and wanted to fill "a gap that now exists with respect to restructuring construction priorities in the event of a declaration of war or national emergency."  H.R. Rep. No. 97-44, at 72 (1981).

The term "military construction" as used in § 2808 "includes any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land or construction of a defense access road (as described in section 210 of title 23)."  10 U.S.C. § 2801(a).  Congress in turn defined the term "military installation" as "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department."  *Id.* § 2801(c)(4); *see also id.* § 2801(a) (defining "military construction project").

Presidents have invoked the military construction authority under § 2808 on two prior occasions.  First, President George H.W. Bush authorized the use of § 2808 in 1990 following the Government of Iraq's invasion of Kuwait.  *See* Exec. Order No. 12722, 55 Fed. Reg. 31803 (Aug. 2, 1990); Exec. Order No. 12734, 55 Fed. Reg. 48099 (Nov. 14, 1990).  Second, President George W. Bush invoked § 2808 in response to the terrorist attacks against the United States on September 11, 2001.  *See* Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001); Exec. Order No. 13235, 66 Fed. Reg. 58343 (Nov. 16, 2001).  The national emergency declaration stemming from the terrorist attacks of September 11, 2001, remains in effect today, *see* 83 Fed. Reg. 46067 (Sept. 10, 2018), and DoD has used its § 2808 authority to build a wide variety of military construction projects, both domestically

and abroad, over the past 17 years, *see* Cong. Research Serv., Military Construction Funding in the Event of a National Emergency at 1–3 & tbl. 1 (updated Jan. 11, 2019) (listing projects worth $1.4 billion between 2001 and 2014).

Here, the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under § 2808.  *See* Rapuano Decl.  ¶¶ 14, 15.  DoD is currently undertaking an internal review process to inform any future decisions by the Acting Secretary regarding the use of § 2808 to fund border barriers, but that process remains ongoing and the Acting Secretary has not made any decisions at this time.  *See id.*

**LEGAL STANDARD**

A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless the movant, by a clear showing, carries the burden of persuasion.'"  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).  A plaintiff must show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).  "Likelihood of success on the merits is the most important factor" and if a plaintiff fails to meet this "threshold inquiry," the court "need not consider the other factors."  *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).  Alternatively, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citation omitted).  Plaintiffs bear the burden of demonstrating that each of these four factors is met.  *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

**ARGUMENT**

**I.      Plaintiffs Have Not Shown a Likelihood of Success on the Merits.**

Plaintiffs' claims fall broadly into two categories—statutory claims and constitutional claims. Neither set of claims is likely to succeed on the merits.  Plaintiffs' statutory claims allege that Defendants failed to comply with the requirements of § 8005 of the DoD Appropriations Act, 2019; 10 U.S.C. § 284; 10 U.S.C. § 2808; the DHS Appropriations Act, and the National Environmental

-11-

Policy Act (NEPA).  Plaintiffs' challenges to § 8005 fail at the outset, as Plaintiffs are neither injured by the transfer of funds nor within the zone of interests protected by § 8005, and thus lack both Article III standing and any right to bring suit under the statutes.  Similarly, Plaintiffs' cannot bring a claim under § 2808 because the Acting Secretary of Defense has yet to decide to undertake or authorize any barrier construction projects under that statute.   Plaintiffs' NEPA claims fail because DHS issued a valid waiver of NEPA's requirements.  And with respect to the three barrier projects in Arizona and New Mexico that DoD has decided to construct, Plaintiffs' claims cannot survive the high scrutiny of ultra vires review because DoD has complied with the requirements of both § 8005 and § 284, and the DHS Appropriations Act does not prevent barrier construction undertaken pursuant to these separate statutory authorities.

Plaintiffs' constitutional claims fare no better.  Plaintiffs argue that Defendants' actions violate the Appropriations Clause, the Presentment Clause, and Separation of Powers principles.  But these claims are no more than restatements of Plaintiffs' statutory claims and are mistaken for the same reasons.

## A.    Plaintiffs Fail to Identify a Cause of Action.

At the outset, Plaintiffs do not identify any private right of action in the statutes they challenge. Indeed, Plaintiffs do not identify a cause of action in their motion at all.  Plaintiffs' Complaint frames their claims as arising under an independent ultra vires cause of action,  but nonstatutory review of ultra vires action is a limited doctrine that may only be invoked when the plaintiff would otherwise be "wholly deprive[d]" of a "meaningful and adequate means of vindicating its statutory rights" and when Congress has not precluded judicial review.  *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)).  Plaintiffs have not been "wholly deprive[d]" of a means for review of their claims because review under the Administrative Procedure Act review would have been available.  *See Puerto Rico v. United States*, 490 F.3d 50, 59–60 (1st Cir. 2007); *Wise v. Glickman*, 257 F. Supp. 2d 123, 127 n.1 (D.D.C. 2003).[3]

Assuming, however, that Plaintiffs are allowed to proceed on their ultra vires claims, Plaintiffs'

---

[3] Even under the Administrative Procedure Act framework, Plaintiffs' statutory claims would fail for the same reasons set forth in Defendants' Opposition to Motion for Preliminary Injunction in *State of California, et al. v. Trump, et al.*, 4:19-cv-00872-HSG.

claims do not meet the high standard required.  Ultra vires review requires Plaintiffs to show that the challenged action "contravene[s] clear and mandatory statutory language." *Pac. Maritime Ass'n v. Nat'l Labor Relations Bd*, 827 F.3d 1203, 1208 (9th Cir. 2016) (quoting *Leedom*, 358 U.S. at 188).  In other words, the agency must be "charged with violating a clear statutory mandate or prohibition." *Staacke v. U.S. Sec'y of Labor*, 841 F.2d 278, 281 (9th Cir. 1988).  Accordingly, ultra vires review is "one of the narrowest known to the law." *Horizon Air Indus., Inc. v. Nat'l Mediation Bd.*, 232 F.3d 1126, 1131 (9th Cir. 2000) (quotation omitted).  Plaintiffs have not even attempted to show that their claims meet this high standard.

## B.   The Court lacks jurisdiction over Plaintiffs' § 8005 claim and, in any event, the claim fails on the merits.

Plaintiffs' challenge to DoD's use of § 8005 fails for three reasons.  First, Plaintiffs lack standing to challenge the mere transfer of funds from one DoD-controlled account to another.  Second, Plaintiffs fall outside the zone of interests of § 8005—a provision that exists to govern the relationship between Congress and DoD with respect to military spending, not to protect endangered species.  Third, Plaintiffs' statutory claim does not survive ultra vires review because DHS's request for assistance with border barrier construction under § 284 is an "unforeseen military requirement" that Congress has never denied to DoD, while using money for border barriers is a "higher priority" than simply retaining unused surplus Army personnel funds.

### 1.   Plaintiffs Lack Article III Standing To Challenge a Transfer of DoD Funds Pursuant to § 8005.

To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).

Plaintiffs are not injured by DoD's invocation of § 8005.  DoD transferred funds from its "Military Personnel, Army" and "Reserve Personnel, Army" appropriations to its "Drug Interdiction and Counter-Drug Activities" appropriation because of a projected surplus of Army personnel funds.

Rapuano Decl. ¶ 6.  Because Plaintiffs have no entitlement to the money transferred, their standing to challenge that transfer of funding from one DoD appropriation to another is no greater than that of an ordinary taxpayer to challenge any expenditure of taxpayer money from a particular budget account.  Outside extremely limited situations not presented here, such taxpayer injury cannot supply standing.  As the Supreme Court has explained, "federal courts would cease to function as courts of law and would be cast in the role of general complaint bureaus" if "every federal taxpayer could sue to challenge any Government expenditure."  *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007).  And indeed, even if taxpayer standing were available here—which it clearly is not— Plaintiffs' claim to standing would be even weaker than that of a taxpayer challenging a particular expenditure because DoD's transfer under § 8005 is not even an expenditure; it is simply a transfer of already-appropriated funds.

Plaintiffs attempt to finesse the standing question by asserting that they will be harmed by construction of fencing pursuant to § 284 using funds transferred to the "drug interdiction and counter-drug activities" appropriation under the authority of § 8005.  But that improperly conflates the transfer action with the decision to engage in construction under § 284.  Plaintiffs are not the "object" of the § 8005 transfer, which simply moved funds among DoD's accounts.  *Lujan*, 504 U.S. at 562.  DoD could permissibly use these funds on a variety of projects that Plaintiffs would have no basis to challenge.  Plaintiffs have this not established any injury-in-fact arising from the transfer of funds, which is the action targeted in their motion.  Plaintiffs cannot bootstrap their alleged harm from the separate act of constructing barriers under § 284 to establish standing for their distinct § 8005 claim.

### 2.  Plaintiffs Do Not Fall Within Section 8005's "Zone Of Interests."

Plaintiffs are also unlikely to prevail on the merits of their challenge pertaining to § 8005 because the statute does not confer on Plaintiffs any right to sue to enforce its provisions.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014).   The "zone of interests" test forecloses suit "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)

1    (quotation omitted).  The plaintiff bears the burden of establishing that the injury he complains of

2    "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation

3    forms the legal basis for his complaint."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990).

4           Here, Plaintiffs' interest in wildlife and environmental preservation that they seek to protect

5    in this lawsuit has absolutely no connection to the fiscal interests protected by § 8005.  *Ranchers*

6    *Cattlemen Action Legal Fund United Stockgrowers of Am. v. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir.

7    2005).  Plaintiffs' purported injuries are entirely unrelated to § 8005 and nothing in § 8005 purports to

8    protect animal wildlife habitats or the natural landscape.  *See* Pls.' Notice of Mot. & Mot. for Prelim.

9    Inj., at 5, ECF No. 29 ("Pls.' Mot.).  Indeed, there is no indication in the text that Congress intended

10   § 8005 to be a vehicle for membership organizations (or anyone else) to sue on the basis of alleged

11   environmental harms.

12          DoD's transfer authority for appropriated funds comes with certain limitations that Plaintiffs

13   now seek to have judicially enforced.  But Congress never contemplated third parties inserting

14   themselves into the DoD funding process through litigation.  The Constitution puts Congress and the

15   Executive at the center of military policy.  *See* U.S. Const., art. I, § 8, cl. 12.  "The ultimate responsibility

16   for these decisions" about the allocation of limited resources appropriated to DoD "is appropriately

17   vested in branches of the government which are periodically subject to electoral accountability," not

18   the courts.  *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).  Section 8005 was designed to "tighten

19   congressional control of the re-programming process," H. Rep. 93-662 at 16-17 (9174), but it was

20   "phrased as a directive to" DoD, "not as a conferral of the right to sue upon" those who disagree with

21   DoD's decision to reprogram funds.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1387

22   (2015).  The notice provisions of § 8005 allow DoD and Congress to resolve reprogramming

23   disagreements as a matter of comity, or via legislation and oversight.  Plaintiffs' interest in the

24   reprogramming process is "'so marginally related to … the purposes implicit in'" § 8005 "that it cannot

25   reasonably be assumed that Congress authorized" suit when it enacted that provision.  *Lexmark Int'l*

26   *Inc. v. Static Control Components, Inc.*, 527 U.S. 118, 130 (2014) (quoting *Patchak*, 567 U.S. at 225).

27

28

3.      **Plaintiffs' § 8005 Claims Cannot Survive Ultra Vires Review.**

Even if the Court reaches the merits of Plaintiffs' arguments under § 8005, Plaintiffs are not likely to succeed in showing that Defendants acted contrary to "clear and mandatory" statutory language. *See Pac. Maritime Ass'n*, 827 F.3d at 1208.

First, the provision restricts transfers only "where the item for which funds are requested has been denied by the Congress." Congress has not "denied" any request by DoD to fund "the item" referenced in the transfer, namely counter-drug activities funding, including fence construction, under § 284. Plaintiffs mistakenly assume that § 8005 should be read to refer to a legislative judgment concerning the appropriation of funds for a different agency under different statutory authorities. But Congress's affirmative appropriation of $1.375 billion to CBP for the construction of "primary pedestrian fencing" in the Rio Grande Valley Sector in furtherance of CBP's mission under IIRIRA § 230 does not constitute a "denial" of appropriations to DoD for its counter-drug activities in furtherance of DoD's mission under § 284. The statutory language of § 8005 is focused on DoD funding, and nothing in the DHS appropriations statute indicates that Congress "denied" a request to fund DoD's statutorily authorized counter-drug activities, which expressly include fence construction. 10 U.S.C. § 284(b)(7). Nor did Congress otherwise restrict the use of available appropriations for that purpose. *See* Pub. L. No. 116-6. Because Congress never denied DoD funding to undertake the § 284 projects at issue, Plaintiffs' claim fails.

Second, Plaintiffs urge that barrier construction under § 284 was not "based on unforeseen military requirements" because the President requested funds for border barrier construction in his fiscal year 2019 budget. Pls.' Mot. at 16. But this misses the relevant context of § 8005, which is specifically directed toward DoD's ability to transfer funds to items that Congress affirmatively decided to deny to DoD. *See ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1210 (9th Cir. 2015) ("[T]he plain language of [a statute] should be enforced according to its terms, in light of its context."). The President's 2019 budget request did not propose additional funding for DoD's counter-drug activities under § 284. The need for DoD to exercise its § 284 authority to provide support for counter-drug activities did not arise until February 2019, when DHS requested support from DoD to construct fencing in drug trafficking corridors. *See* 10 U.S.C. § 284(a)(1) (authorizing

-16-

DoD to support counter-drug activities only once "such support is requested").  Accordingly, the need to provide support for these projects was an unforeseen military requirement at the time of the President's fiscal year 2019 budget request.  *See* Rapuano Decl., ¶ 3.  And it remained an unforeseen military requirement through Congress's passage of DoD's fiscal year 2019 budget in September 2018, which was five months before DHS's request.  *See* Pub. L. No. 145-245.  Accordingly, DoD's need to provide counter-drug assistance under § 284 in response to DHS's request was not previously accounted for in DoD's fiscal year 2019 budget and is therefore "based on unforeseen military requirements" for purposes of § 8005.

Third, Plaintiffs assert that construction under § 284, even if "unforeseen" is not a "military requirement" because custody of the infrastructure will eventually be turned over to DHS.  Pl.'s Mot. 16.  But that argument misses the entire point of § 284, which directs DoD to use its skills and resources to assist law enforcement agencies with counter-drug efforts.  DoD's support of CBP's law enforcement efforts by building fences and roads and installing lighting is precisely the sort of support the statute contemplates.  *See* 10 U.S.C. § 284(b)(7); Rapuano Decl. ¶ 3.  Indeed, DoD has been providing support to border wall fencing efforts since the 1990s with Congress's approval and encouragement.  *See supra* at Background III.  In passing § 284, Congress expressed its concerns about the threat posed by illegal drugs, authorized DoD to construct fences along the southern border, and specifically "direct[ed] the Department [of Defense] to ensure appropriate resources are allocated to efforts to combat this threat."  H.R. Rep. 114-840, 1147 (Nov. 30, 2016).  To conclude that such support for counter-drug activities is not a "military requirement" is to disagree with Congress's assignment of that function to the military in § 284.  DoD's effort to build barriers in New Mexico easily satisfies the "military requirement" prong of § 8005 based on Congress's express provision for such a military effort.

### C.    Plaintiffs' Cannot Establish that DoD Violated a Clear and Mandatory Provision of § 284.

Plaintiffs are also unlikely to succeed in showing that Defendants violated any "clear and mandatory" requirement of § 284.  *Staacke*, 841 F.2d at 282  (in conducting ultra vires review, "[o]ur task is limited to determining whether the statute in question contains a clear command that the Secretary has transgressed").

The text and history of § 284 contradict Plaintiffs' claim that the construction allowed under the statute to support counterdrug activities of other agencies is limited only to "small-scale support" for construction that costs under $750,000. Pls.' Mot. at 16. No such monetary restriction appears in the types of support permitted under § 284. *See* 10 U.S.C. § 284(b)-(c). To the contrary, the statute broadly approves "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States" without regard to the size, scale, or budget of the project. *Id.* § 284(b)(7). And since Congress first provided this authority in 1990, DoD has repeatedly used it, with Congress's explicit approval, to complete large-scale fencing projects along the southern border in support of DHS's counter-drug activities. *Se* H.R. Rep. No. 103-200, at 330-31. As of 2006, Congress reported with approval that, since 1990, DoD's use of its authority to support counterdrug activities through "construction and rehabilitation" along the southern border "resulted in 7.6 miles of double-layer fencing, 59 miles of single fencing, and 169.5 miles of road." H.R. Rep. No. 109-452, at 368 (2006). And in determining appropriations for these construction activities, Congress has recommended that DoD spend millions of dollars on specific border projects. *See, e.g., id.* at 369 (recommending a $10 million increase in DoD's budget for fence and road-building activity on the southern border) *see also* Background I, *supra*.

Likewise, the scope of "support" authorized under § 284 is not restricted by the types of congressional notification the statute requires in § 284(h), which provides that the Secretary of Defense must give Congress "a description of any small scale construction project for which support is provided" under § 284(b) or § 284(c) at least 15 days in advance of providing such support. 10 U.S.C. § 284(h)(1)(B), (i)(3). Contrary to Plaintiffs' argument, *see* Pls.' Mot. at 17, there is nothing inherently implausible about Congress choosing to require notice for some, but not all, projects that DoD could construct under § 284. Certain types of support authorized under § 284 explicitly refer to—*but are not limited to*— "small scale" or "minor" construction. *See* 10 U.S.C. § 284(b)(4), (c)(1)(B). Accordingly, if Congress wanted to limit all construction authorized by § 284 to "small scale construction," it "presumably would have done so expressly." *Russello v. United States*, 464 U.S. 16, 23 (1983). Regardless of whether Plaintiffs think the scope of permissible construction activities under § 284 should be coextensive with the scope of the congressional notification requirement, "[t]he short

-18-

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

1   answer is that Congress did not write the statute that way." *Id.* (citation omitted).

2       Plaintiffs also incorrectly claim that support under § 284 is subject to the reimbursement

3   requirement provided in § 277.  Pls.' Mot. at 18.  Section 277 provides, with certain exceptions, that

4   the Secretary of Defense must "require a civilian law enforcement agency to which support is provided

5   under this chapter to reimburse [DoD] for that support" "to the extent otherwise required by section

6   1535 of title 31 (popularly known as the 'Economy Act')."  10 U.S.C. § 277(a).  Section 284(g),

7   however, expressly exempts support for counter-drug activities from this reimbursement requirement.

8   *See id.* § 284(g)(1) ("[t]he authority provided in this section for the support of counterdrug activities .

9   . . by [DoD] is in addition to, and except as provided in paragraph (2), not subject to the other

10  requirements of this chapter").

11      Plaintiffs are also unlikely to succeed on their claim that Defendants have violated § 284 by

12  constructing border barriers outside of "drug smuggling corridors" permitted by the statute.  Pls.' Mot.

13  at 18.  Although Plaintiffs attempt to lump DoD's use of § 284 authority into a larger "effort to block

14  the U.S.-Mexico border generally," *id.*, the Court's review of agency action must be focused on the

15  particular decisions of the Acting Secretary of Defense to exercise his § 284 authority—here, his

16  approval to install replacement fencing along approximately 50 miles of the border in Yuma Projects

17  1 & 2 and El Paso Project 1.  Despite their efforts to obfuscate, Plaintiffs' do not dispute that these

18  particular projects satisfy the "drug smuggling corridor[]"  requirement.  Nor could they.  Congress

19  did not define the phrase "drug smuggling corridors" in § 284 or anywhere else, nor has any court

20  ever been called upon to address that phrase's meaning.

21      In any event, the border barrier projects that DoD intends to undertake using its § 284

22  authority are located in the Yuma and El Paso Sectors, which are known to have high rates of drug

23  smuggling between ports of entry.  DHS has set forth extensive evidence to support recent drug-

24  smuggling activities in these locations, and it has explained why new construction of border barriers

25  or replacement of existing border barriers in the Yuma and El Paso Sectors is necessary to impede

26  and deny illegal activities of transnational criminal organizations.  *See* Rapuano Decl. ¶ 3.

27      Plaintiffs' claim that DoD's use of § 284 authority is "an end-run around" Congress's limits

28  on CBP's appropriation for border barrier construction is equally without merit.  *See* Pls.' Mot. at 17,

-19-

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

19-20. They rely primarily on the principle that, where two appropriations are available to an agency—one for a "specific purpose" and another that "in general terms . . . might be applicable in the absence of the specific appropriation,"—the agency must use the specific appropriation to the exclusion of the general appropriation. *See Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005). Plaintiffs have not provided any authority that extends that principle beyond the circumstance of a *single* agency determining which of two appropriations *to that agency* should be used for a particular object or purpose.[4] That is not the case here. DHS is using its $1.375 billion fiscal year 2019 appropriation to construct barriers in the Rio Grande Valley Sector in southern Texas, in accordance with Congress's specific limitations. *See* Pub. L. No. 116-6, §§ 230-32. Separately, DoD is acting under its § 284 authority, which is funded by its own fiscal year 2019 appropriation, Pub. L. No. 115-245, title VI (appropriating over $571 million to DoD for counter-narcotics support), and through an authorized transfer of funds under § 8005 to construct barrier projects in the Yuma and El Paso Sectors.[5] Congress did not address or limit in either DHS's or DoD's fiscal year 2019 appropriations the use of DoD's authority to provide support to DHS through barrier construction activities pursuant to § 284. Indeed, the purpose of § 284 (and its predecessors) is to permit DoD to use its own appropriated funds to support DHS through, among other things, construction of barriers to block drug-smuggling corridors. *See supra* at Background III. If the Court were to accept Plaintiffs' argument, DoD would be prohibited from providing such authorized support under § 284 in any year in which Congress appropriates funds to DHS specifically for border fence construction. Inferring such a restriction—

---

[4] Indeed, the only authorities Plaintiffs cite involve that very scenario—one agency spending appropriations from Congress to that agency in a situation where two appropriations for the same item were allegedly applicable. *See, e.g.*, *Nevada*, 400 F.3d at 16 (holding that the Department of Energy could properly limit payment to Nevada for certain nuclear waste activities of the state to the $1 million appropriation made to DOE specifically for that purpose; payments in excess of appropriation from a fund created under a general provision of the Nuclear Waste Policy Act was not allowed); *Highland Falls-Fort Montgomery Central Sch. Dist. v. United States*, 48 F.3d 1166, 1171 (Fed. Cir. 1995) (holding that the Department of Education properly limited payment to school districts under Impact Aid Act to the amount specifically appropriated to the department for that entitlement, rather than applying a more generous allocation formula provided in another provision of the Act).

[5] For the same reason, DHS and DoD have not violated the Purpose Statute. *See* 31 U.S.C. § 1301. Both agencies are applying their appropriations "only to the objects for which the appropriations were made." *Id.* § 1301(a). And, as explained above, because DoD is using its transfer authority conferred in § 8005, it likewise does not violate the Transfer Statute. *See* 31 U.S.C. § 1532 (prohibiting transfer of funds from one appropriation account to another unless "authorized by law.").

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

1    without Congress's express intention and contrary to the purpose of § 284—would be tantamount to

2    a repeal by implication, a disfavored rule that "applies with special force when the provision advanced

3    as the repealing measure was enacted in an appropriations bill."  *United States v. Will*, 449 U.S. 200,

4    221-22 (1980)); *see J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143–44 (2001) ("when

5    two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed

6    congressional intention to the contrary, to regard each as effective.") (quotation omitted).

7            **D.      Plaintiffs Cannot Establish Article III Standing to Challenge Future
                       Border Barrier Construction Under § 2808 and Their Ultra Vires Claim**
8                      **Fails On The Merits.**

9            Plaintiffs are also unlikely to succeed on their claim that Defendants acted ultra vires in

10   violation of 10 U.S.C. § 2808.  At the threshold, Plaintiffs lack standing to bring their § 2808 claim.

11   *See Friends of the Earth, Inc.*, 528 U.S. at 180–81.  As is relevant here, allegations of future injury suffice

12   for standing only where "the threatened injury is 'certainly impending,' or there is a 'substantial risk'

13   that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting

14   *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 414 n.5 (2013)).  "[A]llegations of *possible* future injury are

15   not sufficient." *Clapper*, 568 U.S. at 409 (citation omitted).

16           With respect to § 2808, Plaintiffs cannot demonstrate an "actual or imminent" injury in fact

17   because the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier

18   construction projects under § 2808.  Rapuano Decl. ¶ 14.  Nor has the Acting Secretary made decisions

19   on which the use of § 2808 depends, such as whether certain projects are "necessary to support such

20   use of the armed forces."  10 U.S.C. § 2808(a).  Indeed, he could make such determinations only in

21   the context of specific military projects being presented for his approval, and that internal evaluation

22   process is ongoing.  Rapuano Decl. ¶¶ 14, 15.  Given the absence of a decision at this time, Plaintiffs

23   cannot establish that they have suffered a legally cognizable injury traceable to any decisions related

24   to § 2808.  Article III jurisdiction cannot rest on speculation that DoD *may* use § 2808 at some point

25   in the future and *might* do so in a way that injures Plaintiffs.  It is entirely possible that no barrier

26   projects will be constructed pursuant to § 2808, and that, if they are, they will be built in any location

27   where Plaintiffs would have a claim to a cognizable injury.  Given the absence of any concrete harm,

28   Plaintiffs lack standing to pursue their § 2808 claim.

1    In the same vein, without a decision by the Acting Secretary to undertake or authorize barrier

2    construction projects pursuant to § 2808, there has been no violation of § 2808 whatsoever—much

3    less a violation of a "clear statutory mandate or prohibition." *See Staacke*, 841 F.2d at 281. For this

4    reason, Plaintiffs' § 2808 ultra vires claim would fail at the outset even if Plaintiffs did have standing.

5    But even putting aside these threshold issues, Plaintiffs have not alleged a violation of any

6    "clear and mandatory statutory language" in § 2808. *See Pac. Maritime Ass'n*, 827 F.3d at 1208. They

7    assert that the national emergency does not require the use of the armed forces, that border

8    construction is not necessary to support the use of the armed forces, and that border construction is

9    not a military construction project. Mot. at 13–15. But none of these alleged defects "contravene[s]

10   clear and mandatory statutory language." *See  Pac. Maritime Ass'n*, 827 F.3d at 1208. The statute does

11   not include such language. Instead, the use of § 2808 is predicated on *a Presidential declaration of* a

12   national emergency "that requires the use of the armed forces," and provides the Secretary of Defense

13   with authority to "undertake military construction projects" that are "necessary to support such use

14   of the armed forces." 10 U.S.C. § 2808(a). The statutory scheme leaves to the President the

15   determination of whether a national emergency "requires the use of the armed forces," and courts

16   have uniformly concluded that a Presidential declaration of a national emergency is a nonjusticiable

17   political question. *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1081 (9th Cir. 1982) ("[W]e

18   will not address these essentially-political questions."); *United States v. Amirnazmi*, 645 F.3d 564, 581

19   (3d Cir. 2011) ("[F]ederal courts have historically declined to review the essentially political questions

20   surrounding the declaration or continuance of a national emergency.") (quotation omitted). Similarly,

21   determinations about whether specific construction projects would be "necessary to support such use

22   of the armed forces" are vested in the expertise of the Secretary of Defense, and courts are "not free

23   to substitute [their] judgment in matters of military expertise." *Khalsa v. Weinberger*, 779 F.2d 1393,

24   1400 n.4 (9th Cir. 1985); *see North Dakota v. United States*, 495 U.S. 423, 443 (1990) ("we properly defer

25   to the judgment of those who must lead our Armed Forces in battle.").

26   Further, although "military construction project" is a statutorily defined term, its definition is

27   broad and illustrative, not specific or exclusive. *See* 10 U.S.C. § 2801(b). The term "military

28   construction" is broadly defined to "*include*[] any construction . . . of any kind carried out with respect

-22-

to a military installation." *Id.* § 2801(a) (emphasis added).  A "military installation," in turn, "means a base, camp, post, station, yard, center, *or other activity* under the jurisdiction of the Secretary of a military department."  *Id.* § 2801(c)(4) (emphasis added).  Broad terms defining military construction as "includ[ing]" (but not limited to, *see* 10 U.S.C. § 101(f)(4)) construction with respect to a military installation, and defining a military installation to include non-specified "other activity," are not the kind of clear and mandatory statutory language that is a necessary predicate to an ultra vires claim.  In any event, the Court has no concrete record upon which to assess whether these statutory requirements have been satisfied with respect to particular construction projects because no decisions have been made regarding § 2808, thus Plaintiffs have not shown that DoD has violated the statute.  Because Plaintiffs have not met the strict standard to state an ultra vires cause of action, Plaintiffs' § 2808 claim is likely to fail.

## E. Plaintiffs Cannot Establish a Violation of a Clear and Mandatory Provision of the Consolidated Appropriations Act.

Plaintiffs also fail to show that Defendants' actions violate a "clear and mandatory" provision of the Consolidated Appropriations Act, 2019 (CAA).  *See Pac. Maritime Ass'n*, 827 F.3d at 1208.  Although one component of the CAA—the Department of Homeland Security Appropriations Act, 2019—places restrictions on border-barrier construction funded with DHS appropriations, the statute nowhere expressly or implicitly limits the ability of the Government to rely upon other statutory authorities to fund additional border-barrier construction.  And the use of such statutory authorities does not violate any other provision of the CAA.

Contrary to Plaintiffs' contentions, Congress's decision not to appropriate to DHS the full amount of funds requested by the President for fiscal year 2019 border-barrier construction does not limit the Acting Secretary of Defense's ability to utilize other available statutory authorities for such construction.  Plaintiffs posit that Congress's specific appropriation to DHS to fund, with restrictions, certain border-barrier construction is tantamount to a prohibition of expenditures on any other statutorily-authorized border-barrier construction.[6]  *See* Pls.' Mot. at 6–7.  Not so.  "It is a fundamental

---

[6] The DHS Appropriations Act restricts the location and manner of border-barrier construction funded by Congress's 2019 $1.375 billion appropriation to DHS.  *See* Pub. L. No. 116-6, div. A, §§

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

principle of appropriations law that [courts] may only consider the text of an appropriations rider." *United States v. McIntosh*, 833 F.3d 1163, 1178 (9th Cir. 2016).  "An agency's discretion to spend appropriated funds is cabined only by the text of the appropriation."  *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012) (quotation omitted).  Plaintiffs have identified no restriction in the CAA on the funding of border-barrier construction pursuant to other statutory authorities, nor does its plain text include one.  *See* Pls.' Mot. at 6–7; *see generally* Pub. L. No. 116-6 (2019).  Congress did not modify any of the statutes at issue here in the CAA.  *See id.*  And the CAA's funding provisions do not otherwise alter the meaning or availability of permanent statutes already in effect.  *See Navarro v. Encino Motorcars, LLC*, 780 F.3d 1267, 1276 n.5 (9th Cir. 2015), *overruled on other grounds by* 136 S. Ct. 2117 (2016); *see also Olive v. Comm'r of Internal Revenue*, 792 F.3d 1146, 1150 (9th Cir. 2015) (finding that a new appropriations act rider did not inform the interpretation of a previously enacted statute).  In the absence of language to the contrary, the grant of a specific appropriation cannot be read to restrict the use of other appropriated funds for similar purposes pursuant to other statutory authority.

Because the court "must consider only the text of the rider" in interpreting the CAA, the history of negotiations between the President and Congress regarding fiscal year 2019 appropriations for border-barrier construction is irrelevant to its meaning.  *McIntosh*, 833 F.3d at 1179; *see also Salazar*, 567 U.S. at 200.  Had Congress wished to restrict all other border-barrier construction—including construction authorized to be funded under other statutory authorities—it could have plainly so stated.  *See McIntosh*, 833 F.3d at 1179.  Because the CAA's text includes no such restrictions, neither its limits on border-barrier construction funded by specific DHS appropriations, nor the history of negotiations regarding border barrier construction funding constrains the Acting Secretary of Defense's ability to expend funds pursuant to other statutory authorities.  *See Salazar*, 567 U.S. at 200.

In the absence of language specifically restricting the Acting Secretary of Defense's actions, Plaintiffs' claim that those actions are nonetheless prohibited by § 739 of the Financial Services and General Government Appropriations Act, 2019 (a component of the CAA).  That provision states:

> None of the funds made available in this or any other appropriations Act may
> be used to increase, eliminate, or reduce funding for a program, project, or

230–32.  Most of these restrictions apply to the use of those funds only.  *See id.*  Plaintiffs do not allege that Defendants have violated the few restrictions that apply generally to all appropriated funds.

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or *unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.*

Pub. L. No. 116-6, div. D, § 739 (emphasis added). Plaintiffs claim that, because the President has requested border-barrier funding for fiscal year 2020, no funds in excess of the $1.375 billion specifically appropriated to DHS for border-barrier construction may be used for that purpose. Plaintiffs misapprehend the situation. Any funds utilized for border-barrier construction pursuant to §§ 284 and 2808 will be used for the purpose for which they were appropriated, not to increase funding for an item in the President's 2020 budget request. Thus, the use of funds at issue here comply with the requirements of § 739.

* * *

Because Plaintiffs have not identified a violation of a "clear and mandatory" provision of the challenged statutes, and because this Court does not have jurisdiction over Plaintiffs' § 8005 and § 2808 claims, Plaintiffs are unlikely to succeed on the merits of their statutory claims.

### F.    The Secretary of Homeland Security Has Waived NEPA's Application to the Section 284 Projects Pursuant to IIRIRA.

Plaintiffs' NEPA claim has no likelihood of success on the merits because the Secretary of Homeland Security waived NEPA's requirements for El Paso Sector Project 1 and Yuma Sector Projects 1 and 2. Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 84 Fed. Reg. 17185-87 (Apr. 24, 2019). IIRIRA authorizes such a waiver in conjunction with the statutory directive that the Secretary of Homeland Security "take such actions as may be necessary" to install "physical barriers" on the "United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a). That statutory mandate include a directive requiring DHS to "construct reinforced fencing along not less than 700 miles of the southwest border." *Id.* § 102(b)(1)(A). IIRIRA seeks to ensure expeditious construction pursuant to these mandates by waiving a broad array of legal impediments: "Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines

-25-

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

1    necessary to ensure expeditious construction of the barriers and roads under this section." *Id.* at §

2    102(c)(1).

3        Acting under § 102 of IIRIRA to take "such actions as may be necessary" to install border

4    barriers, DHS requested that DoD use its authority pursuant to § 284 to assist with constructing

5    border barriers.  Rapuano Decl., ¶ 3.  DoD agreed to provide the requested support, and authorized

6    support for two projects in Arizona, Yuma Sector Projects 1 and 2, and one project in New Mexico,

7    El Paso Sector Project 1.  *Id.*, ¶¶ 4, 7.  On April 24, 2019, the Acting Secretary of Homeland Security

8    exercised his authority under Section 102(c)(1) to issue waivers for these projects.  *See* Determination

9    Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996,

10   as Amended, 84 Fed. Reg. 17185-87 (Apr. 24, 2019).  As relevant here, the waived laws include NEPA

11   along with "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or

12   related to the subject of, the [listed] statutes." *Id.* at 17187.  The law of this circuit is clear that "waiver

13   of the relevant environmental laws under section 102(c) is an affirmative defense to all the

14   environmental claims." *In re Border Infrastructure Envtl. Lit.*, 915 F.3d 1213, 1221, 1225 (9th Cir. 2019)

15   (affirming dismissal of NEPA claim).  Accordingly, Plaintiffs' NEPA claim is not likely to succeed.

16       **G.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Constitutional**
17              **Claims.**

18       Plaintiffs' purported constitutional claims fare no better than their statutory claims.  These

19   counts merely recast Plaintiffs' statutory claims in constitutional terms, and "claims simply alleging

20   that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton*, 511

21   U.S. at 473.  The Government is not relying on independent Article II authority to undertake border

22   construction; rather, the actions alleged are being undertaken pursuant to express statutory authority.

23   The outcome of this case thus turns on what those statutes mean—a purely statutory dispute with no

24   constitutional dimension.  Plaintiffs are thus unlikely to succeed on the merits of their constitutional

25   claims.

26       The Supreme Court's decision *Dalton* makes this clear.  In *Dalton*, the Court specifically rejected

27   the proposition that "whenever the President acts in excess of his statutory authority, he also violates

28   the constitutional separation-of-powers doctrine." *Id.* at 471.  The Court instead recognized that the

-26-

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

1   "distinction between claims that an official exceeded his statutory authority, on the one hand, and

2   claims that he acted in violation of the Constitution, on the other, is too well established to permit

3   this sort of evisceration." *Id.* at 474.

4          By asserting that actions that allegedly exceed statutory authority are, for that reason alone,

5   constitutional violations, Plaintiffs make precisely the argument that the Court disapproved in *Dalton*.

6   Plaintiffs assert no constitutional violation separate from the alleged statutory violations.  They do not

7   allege that the Government's compliance with any of the statutes at issue would be unconstitutional.

8   Instead, Plaintiffs assert, in various ways, that Defendants violated the appropriations to DHS in the

9   CAA.  Plaintiffs' Appropriations Clause claim hinges on the allegation that Defendants acted "in

10  violation of the restrictions imposed in the CAA."  Pls.' Mot. at 9.  Plaintiffs' separation-of-powers

11  claim likewise turns on the allegation that Defendants acted contrary to the will of Congress because

12  they took actions outside the CAA's restrictions.  *See id.* at 10–12.  And Plaintiffs' Presentment Clause

13  claim amounts to nothing more than an assertion that, by directing the funding of border barrier

14  construction pursuant to statutory authorities that Plaintiffs allege do not apply, the President not only

15  violated, but somehow modified or repealed the CAA.  *See id.* at 12.  Again, these allegations of ultra

16  vires statutory actions do not state independent constitutional claims.  *See Dalton*, 511 U.S. at 473–74.

17         Plaintiffs' separation-of-powers claim also fails because for the President has not purported to

18  exercise his inherent authority under Article II of the Constitution.  Contrary to Plaintiffs' contentions,

19  *see* Pls.' Mot. at 10–11, this case presents a sharp contrast to *Youngstown Sheet & Tube Co. v. Sawyer*, 343

20  U.S. 579 (1952), in which the President directed the Secretary of Commerce to seize the nation's steel

21  mills relying solely upon "the aggregate of his powers under the Constitution," and conceding of the

22  absence of statutory authority.  *Id.* at 585–87.  The situation here is entirely different, for the actions

23  at issue are all "pursuant to an express . . . authorization of Congress," such that the agencies'

24  "authority is at its maximum."  *Id.* at 635 (Jackson, J. concurring).

25         Plaintiffs' arguments suggesting otherwise fail.  *First*, this situation is unlike that in *City and

26  *County of San Francisco v. Trump*, 897 F.3d 1225 (2018), in which the court's holding that an Executive

27  Order violated the separation of powers hinged on the fact that the Order was issued without

28  congressional authorization.  *See id.* at 1234–35.  Instead, each action here was taken pursuant to

statutory authority. *Second*, the fact that Congress authorized funding for certain border-barrier construction in the CAA does not mean that it prohibited the use of other available statutory sources to provide additional funding for such construction. *See supra*, at I.E.  Had Congress wished to do so, it could have explicitly so stated. *See McIntosh*, 833 F.3d at 1179. *Third*, Congress's failed attempt to override the President's veto of its disapproval of the national emergency declaration does not have the force of law or in any way restrict authority Congress previously granted to the Executive. *See* U.S. Const., art. 1, § 7; *see also Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983). The President is therefore acting pursuant to authority granted by Congress, and *Youngstown* is inapposite. *See Am. Fed'n of Labor & Congress of Industrial Orgs. v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979) (en banc); *see also Dalton*, 511 U.S. at 473.

Plaintiffs are also unlikely to succeed on their Appropriations Clause claim because all actions by the President and agency defendants alleged here are statutorily authorized.  As such, this case is distinguishable from *United States v. McIntosh*.  The court in *McIntosh* held that, were the Department of Justice spending funds in a manner expressly prohibited by the text of an appropriations bill, and without any other source of congressional authorization, such expenditures could violate the Appropriations Clause. *See* 833 F.3d at 1175.  In contrast, here, the border barrier construction at issue will be funded under statutes authorizing such action.  The CAA does not prohibit the expenditure of funds pursuant to these statutes. *See supra*, at I.E.  Accordingly, unlike in *McIntosh*, the Executive has not expended funds without the authorization of Congress, and Plaintiffs' claims amount to allegations of statutory—not constitutional—violations.

Finally, Plaintiffs have not alleged an actual Presentment Clause violation.  Plaintiffs cannot dispute that the President signed the CAA into law according to constitutionally the mandated procedure. *See* Pls.' Mot. at 12; U.S. Const., art. 1, § 7.  And their claim that the President has attempted to modify or repeal that law is baseless.  This case is in no way comparable to *Clinton v. City of New York*, 524 U.S. 417 (1998), wherein the Supreme Court held that the President's action explicitly "cancel[ing] in whole" portions of enacted statutes violated the Constitution. *Id.* at 436; *see also id.* at 439.  Instead, the CAA remains in full effect, and the President and his agents have acted pursuant to other duly enacted statutes to fund border-barrier construction in addition to that authorized in the

CAA.  The Executive's use of these statutory authorities does not render the CAA moot.  Nor does any Presidential expression of views regarding the CAA effectively repeal or modify that law. Expressions of opinion about legislation—particularly appropriations bills, which Congress considers periodically—are consistent with the President's constitutional role, which includes the power to "initiate and influence legislative proposals." *Id.* at 438.

At bottom, the thrust of Plaintiffs' constitutional claims is that the President did not comply with the CAA.  If such claims established constitutional issues, then *every* allegation that the President or his agents exceeded their statutory authority in some way would as also constitute a constitutional claim.  The Supreme Court has foreclosed such tactics, recognizing their inconsistency with well-established precedent "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Dalton*, 511 U.S. at 472.  Plaintiffs are thus unlikely to succeed on the merits of their constitutional claims.

## II.   Plaintiffs Will Not Be Irreparably Harmed in the Absence of an Injunction.

### A.   Plaintiffs Have Not Demonstrated Irreparable Environmental Harm.

Plaintiffs press two related theories of irreparable environmental harm: (1) alleged injuries to their members' aesthetic interests in recreating near the southern border and (2) alleged injuries to their members' aesthetic and recreational interests in several animal species.[7]  But Plaintiffs have failed to show that the proposed border barrier replacement projects in Arizona and New Mexico will interfere with their use of surrounding areas, or that any species-level impacts are likely as a result of border wall construction.  Plaintiffs have thus failed to demonstrate that they face likely irreparable environmental harm before the final disposition of their case.

A plaintiff seeking a preliminary injunction bears the burden of demonstrating that irreparable harm is *likely*, not just possible, prior to a final disposition of the case. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  "An injunction will not issue if the person or entity seeking injunctive relief shows a mere possibility of some remote future injury, or a conjectural or hypothetical

---

[7] Plaintiffs also allege injuries to their procedural interests under NEPA, averring that construction, absent NEPA analysis, is itself an irreparable harm.  Pls.' Mot. 22-23.  However, because Acting Secretary McAleenan has issued an IIRIRA waiver for this construction, Plaintiffs' NEPA claims have been extinguished.  *See supra*, I.F.

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

injury." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) (citation omitted).

A plaintiff organization may attempt to demonstrate an irreparable harm by showing that a challenged federal action will prevent its members from using and enjoying a public area. *All. for the Wild Rockies*, 632 F.3d at 1135. Or a plaintiff organization may assert a derivative harm to their member's aesthetic interests in a given species by demonstrating that (1) plaintiffs' members use and enjoy areas where the species is present and (2) the challenged activity will result in significant, population-level impacts. *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1261-62 (W.D. Wash. 2015); *see also S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, No. 2:13-cv-00059-MCE, 2013 WL 4094777, at *7 (E.D. Cal. Aug. 13, 2013) ("[I]rreparable harm to ESA listed species has to be measured at the species level, and a plaintiff must present a concrete showing of probable deaths during the interim period and of how these deaths may impact the species.") (quotation omitted).

Where plaintiffs choose this latter route, they must show a "definitive threat" of future harm "to protected *species*, not mere speculation." *Nat'l Wildlife Fed'n v. Burlington N.R.R., Inc.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) (emphasis added); *accord All. for the Wild Rockies v. Kruger*, 35 F. Supp. 3d 1259, 1269 (D. Idaho 2014) ("Any alleged harm to the plaintiff must be anchored in a specific and detailed allegation of harm to a particular species or critical habitat." (citing *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1111 (E.D. Cal. 2013))). Specificity is required to allow a court—if necessary—to craft a narrowly tailored injunction, *Kruger*, 35 F. Supp. 3d at 1269, and "generalized allegations of an abstract environmental injury" will not suffice. *All. for the Wild Rockies v. U.S. Forest Serv.*, 2016 WL 3349221, at *4 (D. Mt. June 14, 2016) (citing *Sierra Forest Legacy*, 951 F. Supp. 2d at 1111).

Plaintiffs' declarations fail to establish that a likely irreparable harm will occur before a final disposition of their case. To support their assertion of harm for the two Yuma projects, Plaintiffs submit the declaration of Albert Del Val, who alleges that he regularly fishes in the West Main Canal in Yuma, and is concerned that the planned border infrastructure improvements could diminish his enjoyment of that activity. Del Val Decl. ¶¶ 6-7. But the only construction challenged is the replacement of existing pedestrian border infrastructure that will not change conditions where Mr.

-30-

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

1    Del Val fishes.  Enriquez Decl. ¶¶ 10-12, 63-64; *see also United States v. W. Radio Servs. Co.*, 869 F. Supp.

2    2d 1282, 1286 (D. Or. 2012) (discussing lack of credible aesthetic harm from communications tower

3    where "[t]he alleged aesthetic harm was caused by . . . past actions" and "the approved project would

4    result in no net increase in the number of communications towers or buildings. . . because the project

5    also involved the removal of five towers and a building.").  Unlike *Cottrell*—where post-fire salvage

6    logging would have "prevent[ed] the use and enjoyment by [plaintiffs'] members of 1,652 acres of the

7    forest"—replacement of existing pedestrian border fencing will not cut Plaintiffs' members off from

8    publically accessible lands near the southern Border.[8]  *See Cottrell*, 632 F.3d at 1135; *see also Ctr. for*

9    *Biological Diversity v. Hays*, No. 2:15-cv-01627-TLN-CMK, 2015 WL 5916739, at *10 (E.D. Cal. Oct. 8,

10   2015) (rejecting an "aesthetic opinion that post-fire logging is 'ugly'" as sufficient to establish an

11   irreparable harm).

12        Plaintiffs' attempt to assert an aesthetic interest in animal species near the southern border

13   also fails because Plaintiffs cannot show a likely harm to a specific population or species.  Declarant

14   Munro lists several species that she alleges may face impacts from border infrastructure, *see* Munro

15   Decl. ¶ 7, but fails to posit any concrete facts showing species-level impacts.  *See Idaho Rivers United*,

16   156 F. Supp. 3d at 1261-62.  Professor Walsh's declaration comes no closer, as she merely posits that

17   a border wall "could impede" ephemeral wetlands studies, Walsh Decl. ¶ 10, or that lizard species

18   habitat could be degraded or fragmented by the border wall.  *Id.* at ¶ 11.  Plaintiffs' declarants' bare

19   speculation is insufficient to demonstrate a "likely" irreparable harm to Plaintiffs' members' interests.[9]

20        In fact, replacement of the current mesh pedestrian fencing in the Yuma project areas with a

21   bollard wall could benefit certain species, including the flat-tailed horned lizard, which cannot fit

22   through the current mesh fencing but can fit through the gaps between bollards.  Enriquez Decl. ¶

23   61; *see also All. for the Wild Rockies v. Kruger*, 35 F. Supp. 3d 1259, 1267 (D. Mt. 2014) ("this case presents

---

[8] Some of the challenged construction will take place on the Barry M. Goldwater Range, a military base where Plaintiffs' members are not permitted to recreate.  Enriquez Decl. ¶¶ 13-15.  That so little of the construction will take place on lands where Plaintiffs' members even attempt to claim an interest cuts sharply against Plaintiffs' overbroad request for "a nationwide preliminary injunction."  Pls.' Mot. 1.

[9] Both Mr. Del Val and Ms. Munro also complain about past interactions with CBP agents near the southern border.  Del Val Decl. ¶ 7; Munro Decl. ¶ 12.  Those interactions have nothing to do with the challenged border wall construction.

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

a situation where the species in question would perhaps best be served by the absence of an injunction, thus tipping the balance of the equities and public interest prongs in the Defendants' favor."); *All. for the Wild Rockies v. Bradford*, 979 F. Supp. 2d 1139, 1141 (D. Mt. 2013) (denying motion for injunction pending appeal where the challenged project would "improve on the *status quo*" for grizzly bears).  And though Plaintiffs suggest otherwise, the 2017 Recovery Plan for the Mexican wolf makes plain that migrations of wolves from Mexico into the United States are not required for the species' recovery. *United States Fish and Wildlife Service, Mexican Wolf Recovery Plan, First Revision* (November 2017) at 8 (discussing how only two Mexican wolves are known to have crossed the southern border into the United states since reintroduction) (Exhibit 10); *id.* at 15 (discussing how "connectivity or successful migrants are not required to achieve recovery."); Enriquez Decl. ¶ 55.  Moreover, despite the single cited example of a wolf moving through the project area, there is an abundance of high-quality wolf habitat in central Arizona stretching into west central New Mexico, areas not at issue in the instant litigation.  Enriquez Decl. ¶ 57.  For these reasons, Plaintiffs cannot show a likely irreparable harm to their interests in the Mexican wolf.

Plaintiffs have failed to show any likely, irreparable harm to their members' aesthetic or recreational interests from the planned construction in the Yuma and El Paso sectors.  For this reason, this Court should deny Plaintiffs' motion.

## B. Plaintiffs Have Not Demonstrated Irreparable Constitutional Harm.

Plaintiffs also claim that Defendants' alleged constitutional violations have caused and will continue to cause them irreparable harm. Pls.' Mot. at 25.  This argument fails at the threshold because, as demonstrated, Plaintiffs' constitutional claims are nothing more than dressed-up allegations of statutory violations.  Thus, Plaintiffs have not suffered, nor will they suffer, constitutional injury.

Even were this not so, Plaintiffs' constitutional claims are not the sort that warrant a presumption of irreparable harm.  To be sure, deprivation of *personal* constitutional rights has been held to constitute irreparable injury.  *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Irreparable constitutional injury may also result "[w]hen enforcement actions are imminent—and at least when repetitive penalties attach to continuing or repeated violations." *Morales v. Trans World*

-32-

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-892 (HSG)- Defs.' Mot. to Dismiss

*Airlines, Inc.*, 504 U.S. 374, 381 (1992).  But structural constitutional violations do not, in and of themselves, cause irreparable harm.  *See E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1254 (9th Cir. 2018) (""[C]laims that [the Government] has suffered an institutional injury by erosion of the separation of powers' do not alone amount to an injury that is 'irreparable' . . . ." (quoting *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017)).

Here, Plaintiffs claim no deprivation of personal constitutional rights.  They are not subject to any impending enforcement action or being required to comply with an allegedly unconstitutional law.  And the denial of a preliminary injunction would create no barrier to Plaintiffs' ability to pursue the merits of their constitutional claims.  *See id.*  For these reasons, Plaintiffs have not demonstrated irreparable harm from any alleged constitutional injury.

### C.  Plaintiffs Have Not Demonstrated Irreparable Harm to their Mission.

Additionally, Plaintiffs assert that they will be irreparably harmed "because they are forced to continue to divert organizational resources to address the detrimental impact of a border wall."  Pls.' Mot. 23-25.  But Plaintiffs' assertions of organizational harm go beyond *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and cases applying it that Plaintiffs rely upon.  *Havens* held that a fair housing organization had standing to challenge a real estate company's racial steering practices because the policy made it more difficult for its members to obtain equal access to housing, and the organization diverted resources to identifying and counteracting the unlawful practice.  *See id.* 379; *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (plaintiff organizations whose mission included providing transportation and shelter to unauthorized aliens had standing to challenge state law prohibiting such transportation).  Under these limited circumstances, a "drain on the organization's resources" can give rise to standing because it is more than just a "setback to the organization's abstract social interests."  *Havens*, 455 U.S. at 379.

Plaintiffs' allegations fall short for two reasons.  First, SBCC and its affiliate organizations are public advocacy groups, and the asserted harms to their interest arise almost entirely from First Amendment protected activity in support of their policy goals.  Pls.' Mot. at 24 (summarizing these activities).  The relevant analysis under *Havens* and *Valle del Sol* is whether the border barrier construction at issue interferes with the organizations' ability to carry out these activities.  It does not.

-33-

1    The tactical decision to focus organizational resources on advocacy against the Government's border

2    security policies, as opposed to other issues, does not change this analysis because the change in

3    emphasis is voluntary and the decision to construct border barriers does not impede Plaintiffs' ability

4    to engage in advocacy.  *See Clapper*, 568 U.S. at 416.  Second, the injunction sought would not actually

5    redress the organizational harm alleged.  Plaintiffs assert their organizational harm stems from the

6    national emergency declaration, but this elides the distinction between the declaration and the use of

7    § 284 or § 2808.  Section 284 has no connection to the declaration, and the Acting Secretary of Defense

8    has not yet decided to undertake or authorize any barrier construction projects under § 2808.

9    Accordingly, Plaintiffs have failed to show that a preliminary injunction would prevent irreparable

10   harm to their organizational interests.

11   **III.    The Balance of the Equities and Public Interest Weigh in Favor of Denying**
         **Plaintiffs' Motion.**

12

13          The final two preliminary injunction factors, the public interest and the balance of the equities,

14   also weigh against granting Plaintiffs' motion.  These factors merge when the government is a party.

15   *Azar*, 911 F.3d at 575.  Plaintiffs have not carried the burden of persuasion on these elements because

16   they have not adequately established harm that would outweigh the public interest.  As explained

17   above, Plaintiffs' alleged injuries are speculative at best.  In contrast, preventing the construction of

18   border barriers would harm to the Government's "weighty" interest in border security and

19   enforcement of immigration laws.  *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982).  Here, the President

20   has declared a national emergency along the southern border and the situation is continuing to worsen

21   due to the increasing numbers of migrants that are overwhelming DHS's resources, thereby

22   constraining the resources available for drug interdiction and law enforcement priorities at the border.

23   *See* Proclamation; Veto Message; Ex. 1.  Border walls have proven to be extremely effective at stopping

24   drugs and migrants from unlawfully crossing the southern border.   *See* Martin Decl.  An injunction

25   prohibiting the construction of additional barriers would therefore harm the public's interest in border

26   security and public safety.

27          Moreover, Congress has specifically authorized the construction of border barriers and made

28   a determination through passage of the broad waiver authority in IIRIRA that "expeditious

-34-

construction" should take precedence over all competing legal requirements. *Va. Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 551-52 (1937) (courts "cannot ignore the judgment of Congress, deliberately expressed in legislation," which is "a declaration of public interest and policy which should be persuasive").

### IV.   A Nationwide Injunction is Inappropriate and Any Injunctive Relief Should be Narrowly Drawn.

For the reasons discussed above, the Court should deny Plaintiffs' motion in its entirety.  If, however, the Court were to disagree, it nevertheless should reject Plaintiffs' sweeping request for a "nationwide preliminary injunction" prohibiting Defendants from "taking action to build a border wall using funds or resources from the Defense Department."  *See* Pls.' Mot. at 1.   In *Azar*, the Court of Appeals recently concluded a district court abused its discretion in granting a nationwide injunction and explained the many "detrimental consequences" of granting such overbroad relief.  911 F.3d at 582-84; *see Trump v. Hawaii*, 138 S. Ct. 2392, 2425, 2429 (2018) (Thomas, J., concurring) (explaining that nationwide injunctions are "legally and historically dubious" and "take a toll on the federal court system preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."). Nationwide relief would be overbroad here because Plaintiffs' arguments regarding irreparable harm focus exclusively on the specific circumstances of the three ongoing construction projects in Arizona and New Mexico.  Any injunctive relief granted in this case should be limited to those specific projects and would be sufficient to provide Plaintiffs with complete relief for their alleged injuries.  *See Azar*, 911 F.3d at 582-83.  There is no basis to enjoin other projects in other locations that are not before the Court.  Moreover, as here, where there are multiple cases pending in different circuits that challenge substantially similar activity, a nationwide injunction could "deprive[] non parties" the "right to litigate in other forums" and "deprive appellate courts of a wider range of perspectives."  *Id.* at 583.

### CONCLUSION

For the reasons explained above, the motion for preliminary injunction should be denied.

DATE:  April 25, 2019                          Respectfully submitted,

JAMES M. BURNHAM
Deputy Assistant Attorney General

JOHN G. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

*/s/ Andrew I. Warden*
ANDREW I. WARDEN
Senior Trial Counsel (IN Bar No. 23840-49)

*/s/ Rachael L. Westmoreland*
RACHAEL L. WESTMORELAND
(GA Bar No. 539498)

KATHRYN C. DAVIS
MICHAEL J. GERARDI
LESLIE COOPER VIGEN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 616-5084
Fax:    (202) 616-8470
*Attorneys for Defendants*


JEFFREY BOSSERT CLARK
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ Tyler M. Alexander*
TYLER M. ALEXANDER
(CA Bar No. 313188)
Natural Resources Section
Trial Attorney
PO Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0238
Fax: (202) 305-0506
tyler.alexander@usdoj.gov