1  DROR LADIN*
   NOOR ZAFAR*
2  JONATHAN HAFETZ*
   HINA SHAMSI*
3  OMAR C. JADWAT*
   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
4  125 Broad Street, 18th Floor
   New York, NY 10004
5  Tel: (212) 549-2660
   dladin@aclu.org
6  nzafar@aclu.org
   jhafetz@aclu.org
7  hshamsi@aclu.org
   ojadwat@aclu.org
8  *Admitted pro hac vice

9  CECILLIA D. WANG (SBN 187782)
   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
10 39 Drumm Street
   San Francisco, CA 94111
11 Tel: (415) 343-0770
   cwang@aclu.org
12
   Attorneys for Plaintiffs (Additional counsel listed on following page)
13

14                    **UNITED STATES DISTRICT COURT**
                      **NORTHERN DISTRICT OF CALIFORNIA**
15                    **SAN FRANCISCO-OAKLAND DIVISION**

16 SIERRA CLUB and SOUTHERN BORDER
   COMMUNITIES COALITION,                      Case No.: 4:19-cv-00892-HSG
17
              *Plaintiffs,*
18                                             **PLAINTIFFS' REPLY**
        v.                                     **MEMORANDUM IN SUPPORT OF**
19                                             **PRELIMINARY INJUNCTION**
   DONALD J. TRUMP, President of the United
20 States, in his official capacity; PATRICK M.   Date: May 17, 2019
   SHANAHAN, Acting Secretary of Defense, in his  Time: 10:00 AM
21 official capacity; KIRSTJEN M. NIELSEN,         Judge: Honorable Haywood S. Gilliam, Jr.
   Secretary of Homeland Security, in her official Dept: Oakland
22 capacity; and STEVEN MNUCHIN, Secretary of      Date Filed: April 4, 2019
   the Treasury, in his official capacity,         Trial Date: Not set
23
              *Defendants.*
24

25

26

27

28

Additional counsel for Plaintiffs:

SANJAY NARAYAN (SBN 183227)**
GLORIA D. SMITH (SBN 200824)**
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
2101 Webster Street, Suite 1300
Oakland, CA 94612
Tel: (415) 977-5772
sanjay.narayan@sierraclub.org
gloria.smith@sierraclub.org
**Counsel for Plaintiff SIERRA CLUB

MOLLIE M. LEE (SBN 251404)
CHRISTINE P. SUN (SBN 218701)
AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 621-2493
Fax: (415) 255-8437
mlee@aclunc.org
csun@aclunc.org

DAVID DONATTI*
ANDRE I. SEGURA (SBN 247681)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
 OF TEXAS
P.O. Box 8306
Houston, TX 77288
Tel: (713) 325-7011
Fax: (713) 942-8966
ddonatti@aclutx.org
asegura@aclutx.org
*Admitted pro hac vice

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims ............................. 2

    A.   Plaintiffs have properly sought review of Defendants' constitutional
violations and *ultra vires* actions ................................................................ 2

       1.   Plaintiffs were not required to seek review of Defendants' wall-
building scheme under the APA ....................................................... 2

       2.   The government mischaracterizes the scope and standard of *ultra
vires* review ..................................................................................... 4

    B.   Plaintiffs have standing ................................................................................ 5

       1.   Plaintiffs have standing to challenge Defendants' transfer of military
personnel funds to build the wall in purported reliance on Section 8005 ......... 5

       2.   Plaintiffs have standing to challenge Defendants' unlawful use of
10 U.S.C. § 2808 .............................................................................. 7

    C.   Defendants' proposed construction of Sections 284, 2808, and 8005
violates the Constitution, or at least raises serious constitutional concerns ....... 9

    D.   Defendants' statutory arguments are implausible and unavailing .................... 11

       1.   Section 8005 and 10 U.S.C. § 2214(b) ........................................... 11

       2.   Section 284 ...................................................................................... 13

       3.   Section 2808 .................................................................................... 15

       4.   The Consolidated Appropriations Act (CAA) ................................ 17

    E.   DHS cannot waive DOD's obligation to comply with NEPA when DOD
acts under Section 284 authority .................................................................... 18

II.   Plaintiffs Have Shown Irreparable Harm ............................................................... 19

    A.   Plaintiffs have demonstrated irreparable harm to their members'
recreational and aesthetic interests ............................................................... 19

    B.   Plaintiffs have established irreparable constitutional harm ............................ 21

    C.   SBCC and its member organizations have demonstrated irreparable
harm to their missions ................................................................................... 21

III.   The Balance of Harms and Public Interest Overwhelmingly Favor Plaintiffs ......... 24

IV.  The Court Should Issue an Injunction Providing for Full Relief ...................................... 24

CONCLUSION ............................................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*All. for Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)................................................................................................20

*All. for Wild Rockies v. Marten*,
  253 F. Supp. 3d 1108 (D. Mont. 2017) ..................................................................................20

*Alto v. Black*,
  738 F.3d 1111 (9th Cir. 2013)..................................................................................................4

*Am. Int'l Grp., Inc. v. Islamic Republic of Iran*,
  657 F.2d 430 (D.C. Cir. 1981) ...............................................................................................15

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..................................................................................................................6

*Brown v. Valoff*,
  422 F.3d 926 (9th Cir. 2005) ....................................................................................................8

*Cal. Wilderness Coal. v. Dep't of Energy*,
  631 F.3d 1072 (9th Cir. 2011)................................................................................................18

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ................................................................................................................25

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ..................................................................................................25

*Cent. Delta Water Agency v. United States*,
  306 F.3d 938 (9th Cir. 2002) ....................................................................................................8

*Chamber of Commerce v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ..........................................................................................3, 10

*Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*,
  651 F.2d 800 (1st Cir. 1981) ..................................................................................................15

*City & Cty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) .............................................................................................8, 11

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ..................................................................................................................8

*Clark v. Martinez*,
  543 U.S. 371 (2005) ..................................................................................................................9

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ................................................................................................................10

*Clouser v. Espy*,
  42 F.3d 1522 (9th Cir. 1994) ....................................................................................................4

*Ctr. for Biological Diversity v. Mattis*,
   868 F.3d 803 (9th Cir. 2017) .................................................................................. 16, 17

*Cty. of Santa Clara v. Trump*,
   250 F. Supp. 3d 497 (N.D. Cal. 2017) .................................................................... 21

*Cty. of Santa Clara v. Trump*,
   267 F. Supp. 3d 1201 (N.D. Cal. 2017) .................................................................... 8

*Dalton v. Specter*,
   511 U.S. 462 (1994) ................................................................................................ 10

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ...................................................................................... 5, 15, 16

*E. Bay Sanctuary Covenant v. Trump*,
   349 F. Supp. 3d 838 (N.D. Cal. 2018) ...................................................................... 9

*E. Bay Sanctuary Covenant v. Trump*,
   354 F. Supp. 3d 1094 (N.D. Cal. 2018) .................................................................. 25

*E. Bay Sanctuary Covenant v. Trump*,
   909 F.3d 1219 (9th Cir. 2018) ...................................................................... 21, 22, 25

*Elec. Data Sys. Corp. v. Soc. Sec. Org. of Iran*,
   508 F. Supp. 1350 (N.D. Tex. 1981) ...................................................................... 16

*F.D.A. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ................................................................................................ 14

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*,
   666 F.3d 1216 (9th Cir. 2012) ................................................................................ 22

*Fair Hous. of Marin v. Combs*,
   285 F.3d 899 (9th Cir. 2002) .................................................................................. 23

*Haitian Refugee Ctr. v. Gracey*,
   809 F.2d 794 (D.C. Cir. 1987) .................................................................................. 6

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006) ................................................................................................ 16

*Harmon v. Brucker*,
   355 U.S. 579 (1958) .................................................................................................. 5

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................................................ 22

*Hawaii v. Trump*,
   878 F.3d 662 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018) ................................. 3

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) .................................................................................. 24

*Horizon Air Indus., Inc. v. Nat'l Mediation Bd.*,
   232 F.3d 1126 (9th Cir. 2000) ........................................................................... 2, 4

*Idaho Conservation League v. Mumma*,
   956 F.2d 1508 (9th Cir. 1992) ................................................................................. 6

*Japan Whaling Ass'n. v. Am. Cetacean Soc.*,
   478 U.S. 221 (1986) ................................................................................................ 4

*Juliana v. United States*,
   339 F. Supp. 3d 1062 (D. Or. 2018) .................................................................... 2, 3

*Koohi v. United States*,
   976 F.2d 1328 (9th Cir. 1992) ............................................................................... 16

*Landwatch v. Connaughton*,
   905 F. Supp. 2d 1192 (D. Or. 2012) ..................................................................... 20

*Leedom v. Kyne*,
   358 U.S. 184 (1958) ................................................................................................ 3

*Marschalk Co. v. Iran Nat'l Airlines Corp.*,
   518 F. Supp. 69 (S.D.N.Y. 1981) ......................................................................... 15

*McDonnell v. United States*,
   136 S. Ct. 2355 (2016) .......................................................................................... 13

*Mendia v. Garcia*,
   768 F.3d 1009 (9th Cir. 2014) ................................................................................. 6

*Nat'l Council of La Raza v. Cegavske*,
   800 F.3d 1032 (9th Cir. 2015) ............................................................................... 22

*Navajo Nation v. Dep't of the Interior*,
   876 F.3d 1144 (9th Cir. 2017) ............................................................................. 2, 3

*Nevada v. Dep't of Energy*,
   400 F.3d 9 (D.C. Cir. 2005) ............................................................................. 15, 17

*Pac. Mar. Ass'n v. Nat'l Labor Relations Bd.*,
   827 F.3d 1203 (9th Cir. 2016) ................................................................................. 4

*Presbyterian Church (U.S.A.) v. United States*,
   870 F.2d 518 (9th Cir. 1989) ................................................................................... 2

*Sale v. Haitian Ctrs. Council, Inc.*,
   509 U.S. 155 (1993) ............................................................................................. 3, 4

*Scott v. Rosenberg*,
   702 F.2d 1263 (9th Cir. 1983) ................................................................................. 6

*Serv. Women's Action Network v. Mattis*,
   352 F. Supp. 3d 977 (N.D. Cal. 2018) .................................................................. 22

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
CASE NO: 4:19-cv-00892-HSG

*Sierra Club v. Watt*,
    608 F. Supp. 305 (E.D. Cal. 1985) ........................................................................ 6

*Skinner v. Switzer*,
    562 U.S. 521 (2011) ................................................................................................ 4

*Smith v. Pac. Props. & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) ......................................................................... 22, 23

*Staacke v. U.S. Sec'y of Labor*,
    841 F.2d 278 (9th Cir. 1988) .................................................................................. 4

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014) ............................................................................................ 7

*TVA v. Hill*,
    437 U.S. 153 (1978) .............................................................................................. 24

*United States v. McIntosh*,
    833 F.3d 1163 (9th Cir. 2016) .............................................................................. 10

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) .............................................................................................. 24

*United States v. Spawr Optical Research, Inc.*,
    685 F.2d 1076 (9th Cir. 1982) ......................................................................... 16, 17

*Util. Air Regulatory Grp. v. E.P.A.*,
    573 U.S. 302 (2014) .............................................................................................. 14

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) .............................................................................. 23

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
    300 U.S. 515 (1937) .............................................................................................. 24

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) .............................................................................. 21

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .............................................................................................. 11

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ................................................................................................ 9


**Statutes**

10 U.S.C. § 284 ............................................................................................... passim

10 U.S.C § 2214 ................................................................................................ 11, 12

10 U.S.C. § 2808 .............................................................................................. passim

2019 Department of Defense Appropriations Act, Pub. L. No. 115-145 .................................... passim

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L.
No. 104-208, Div. C ......................................................................................................... 18, 19

National Environmental Policy Act, 42 U.S.C. § 4332 ...................................................... 18

### Other Authorities

Availability of Receipts from Synthetic Fuels Projects for Contract Admin. Expenses of
the Dep't of Treasury, Office of Synthetic Fuels Projects, B-247644, 72 Comp. Gen. 164
(Apr. 9, 1993) ..................................................................................................................... 14

GAO, Office of the General Counsel, Principles of Federal Appropriations Law (4th Ed. 2017) ..... 18

Remarks by President Trump on the National Security and Humanitarian Crisis on our
Southern Border (Mar. 15, 2019) ........................................................................................ 8

TRANSCRIPT: ABC News Anchor David Muir Interviews President Trump, ABC News
(Jan. 25, 2017) ................................................................................................................... 17

Video interview of Kevin McAleenan, Acting Department of Homeland Security Secretary,
Fox News (Apr. 23, 2019) .................................................................................................. 14

**INTRODUCTION**

On February 15, 2019, having tried and failed to secure Congressional approval for his border wall, the President announced that he would nonetheless construct it by diverting billions of dollars that Congress had appropriated for the military. Defendants have proceeded according to this unlawful and unconstitutional plan, and are preparing to begin construction as early as May 25.

In an effort to avoid this Court's scrutiny, Defendants urge a radical revision of standing law. They maintain that their unlawful transfer of military pay and pension funds may not be challenged, despite its undisputed causal link to Defendants' wall construction in Arizona and New Mexico. And they speculate that the President's declaration of emergency might be an empty act, because Defendants could abort their announced plan to divert $3.6 billion in military construction funds— even as they act to identify, by May 10, the construction projects they intend to sacrifice for the wall. Neither argument undermines Plaintiffs' standing.

Defendants' arguments on the merits are equally flawed. They brush aside constitutional concerns, urging the Court to disregard the unprecedented executive power grab at issue here and ignoring the clear record of congressional refusal to fund the wall. They propose a series of implausible statutory arguments, ranging from the incredible claim that Congress never "denied" the President's wall request, to an equally unconvincing assertion that Congress quietly conferred on the Secretary of Defense the power to unilaterally spend billions of dollars on a border wall that has otherwise been the subject of reams of failed legislation and careful Congressional control. And Defendants' argument that the border wall is a "military requirement" built under Department of Defense ("DOD") authority (an effort to evade financial law), is belied by their simultaneous and contradictory assertion that the very same sections of wall are a Department of Homeland Security ("DHS") project under DHS authority (for purposes of circumventing environmental law). As to the restrictions Congress imposed on the President's emergency power to divert military construction funds, Defendants deem them nonjusticiable and unenforceable—contrary to settled caselaw.

Finally, Defendants' arguments on the preliminary injunction factors rest largely on misstatements of both the record and relevant Ninth Circuit law. Plaintiffs face irreparable harm

1  under well-established Ninth Circuit authority, and the balance of equities and the public interest

2  both tip sharply in Plaintiffs' favor. The Court should grant Plaintiffs' motion.

**ARGUMENT**

3

4  **I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

5          **A.      Plaintiffs have properly sought review of Defendants' constitutional violations
                  and *ultra vires* actions.**

6

7          Defendants contend that Plaintiffs were required to bring their claims under the

   Administrative Procedure Act ("APA"), and that, if *ultra vires* review is available, Plaintiffs must
8
   meet a standard that is "one of the narrowest known to the law." Opp. 12–13 (quoting *Horizon Air*
9
   *Indus., Inc. v. Nat'l Mediation Bd.*, 232 F.3d 1126, 1131 (9th Cir. 2000) (quotation omitted)). Both
10
   premises mischaracterize the applicable law. First, the Ninth Circuit has never suggested that the
11
   APA is an exclusive remedy for unlawful government action. Second, Defendants improperly
12
   attempt to apply the narrow standard of review for claims governed by a statute that *precludes*
13
   judicial review here, where no such statutory preclusion exists.
14

15                  **1.      Plaintiffs were not required to seek review of Defendants' wall-building
                          scheme under the APA.**

16          Plaintiffs seek to enjoin multiple Defendants from pursuing a multi-agency scheme to

17  construct the contiguous border wall that President Trump has demanded and that Congress has

18  refused to fund. In pursuit of this unconstitutional goal, the White House, the Department of Defense

19  ("DOD"), and the Department of Homeland Security ("DHS") have each undertaken coordinated

20  actions with the overarching and forbidden goal of usurping Congress's powers. The Ninth Circuit

21  has never suggested that the APA divested courts of their equitable power to hear such claims.

22          In enacting the APA, Congress did not foreclose traditional equitable review of unlawful

23  executive action. "The APA contains no express language suggesting that Congress intended it to

24  displace constitutional claims for equitable relief." *Juliana v. United States*, 339 F. Supp. 3d 1062,

25  1084 (D. Or. 2018) (citing *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 & n.9

26  (9th Cir. 1989)). Nor is the APA the exclusive vehicle for nonconstitutional claims. *See Navajo*

27  *Nation v. Dep't of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2017) (holding that *Presbyterian*

28  *Church* is not limited to constitutional claims). It "makes little sense to hold that the APA waives

1   sovereign immunity for both APA and non-APA claims against federal agencies if the only viable

2   claims are subject to the APA's judicial review provisions." *Juliana*, 339 F. Supp. 3d at 1083; *see*

3   Br. of Federal Court Scholars 13–17.

4          Plaintiffs' "cause of action, which exists outside of the APA, allows courts to review *ultra*

5   *vires* actions by the President that go beyond the scope of the President's statutory

6   authority." *Hawaii v. Trump*, 878 F.3d 662, 682 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct.

7   2392 (2018). Courts regularly review, outside of the APA context, whether a particular executive

8   action exceeded constitutional or statutory authority. *See, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*,

9   509 U.S. 155, 187–88 (1993) (reviewing on the merits a challenge to an executive order issued

10  pursuant to § 1182(f) of the Immigration and Nationality Act without reference to the APA); *Leedom*

11  *v. Kyne*, 358 U.S. 184, 188–89 (1958) (permitting challenge to an Executive Order despite the lack

12  of a final agency action under the APA); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327–28

13  (D.C. Cir. 1996) (judicial review of a Presidential action through a challenge brought against the

14  Secretary of Labor). Plaintiffs have appropriately sought such review here.

15         Plaintiffs do not contend that any single agency action is causing their asserted injuries;

16  instead "[t]hey seek review of *aggregate action* by *multiple agencies*, something the APA's judicial

17  review provisions do not address." *Juliana*, 339 F. Supp. 3d at 1084. For example, Defendants'

18  planned construction of walls in Arizona and New Mexico involves multiple coordinated DOD and

19  DHS actions that Plaintiffs challenge as unlawful and unconstitutional. *See, e.g.*, Mot. 15–16 (DOD

20  transfer of personnel funds to counterdrug account is unlawful); Mot. 16–20 (DOD transfer from

21  counterdrug account to DHS to fund wall project is unlawful); Mot. 6–7 (DHS use of unappropriated

22  funds to evade Congress's restriction on wall construction outside the Rio Grande Valley Sector is

23  unlawful); Mot. 8–12 (combined scheme violates the Constitution). And Defendants cannot argue

24  that a challenge to their announced use of § 2808 must be brought under the APA when they

25  concede they have not completed final agency action on it. Opp. 21. Review of such claims is

26  available outside of the APA. *See, e.g.*, *Navajo Nation*, 876 F.3d at1172 (noting that the "'final

27  agency action' limitation applies only to APA claims").[1]

28  ───────────────────
           [1] Should the Court find that any of Plaintiffs' claims are more properly considered under the

                                                    3

1

### 2. The government mischaracterizes the scope and standard of *ultra vires* review.

The government claims that Plaintiffs must satisfy a "high standard" for challenging

defendants' *ultra vires* action by showing the action "contravene[s] clear and mandatory statutory

language." Opp. 12–13. As explained below, Plaintiffs would undeniably meet any such standard

given the defendants' clear violation of §§ 8005, 284, 2808, and the CAA. *See* Section I.D, *infra*.

But, in fact, no such high standard exists for Plaintiffs' claims. The government's citations are

inapposite because in those cases a "statutory provision absolutely bars judicial review." *Staacke v.*

*U.S. Sec'y of Labor*, 841 F.2d 278, 281 (9th Cir. 1988); *see Pac. Mar. Ass'n v. Nat'l Labor Relations*

*Bd.*, 827 F.3d 1203, 1207 (9th Cir. 2016) (statute precluded judicial review of National Labor

Relations Board decisions outside congressionally mandated framework); *Staacke*, 841 F.2d at 281

(statute's preclusion of judicial review "clear" and "unmistakable"). And far from being the rule for

*ultra vires* review, the "narrowest known to the law" standard Defendants claim applies here is

uniquely constrained to review of National Mediation Board decisions. As the Ninth Circuit has

explained, that standard is more limited than ordinary *ultra vires* review and is "far more limited

[even] than the review afforded to NLRB actions" because it is "directly tied to the [Mediation]

Board's unique role in labor disputes." *Horizon*, 232 F.3d at 1131–32 (Congress gave the Board

"discretion over, and the power to resolve finally, representation disputes," thus depriving federal

courts of "jurisdiction over the merits of a representation dispute decided by the Board").

Supreme Court precedent provides no support for the notion that Defendants' proposed

standard exists where, as here, Congress has neither precluded judicial review nor provided an

alternative remedial scheme. *See, e.g.*, *Sale*, 509 U.S. at 158, 171–77 (applying ordinary canons of

statutory construction to claim that return of noncitizens interdicted at sea exceeded authority);

---

APA, it has the power to treat them as APA claims without amendment of Plaintiffs' complaint. *See,*
*e.g.*, *Alto v. Black*, 738 F.3d 1111, 1117 (9th Cir. 2013) (electing to consider two claims that were
not "explicitly denominated as an APA claim" under the APA, as they were "fairly characterized as
claims for judicial review of agency action under the APA"); *Clouser v. Espy*, 42 F.3d 1522, 1533
(9th Cir. 1994) ("We shall therefore treat plaintiffs' arguments as being asserted under the APA,
although plaintiffs sometimes have not framed them this way in their pleadings."); *Japan Whaling*
*Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 228 & 230 n.4 (1986) (treating petition filed under the
Mandamus Act to compel agency action as a claim for relief under the APA); *see generally Skinner*
*v. Switzer*, 562 U.S. 521, 530 (2011) ("[A] complaint need not pin plaintiff's claim for relief to a
precise legal theory.").

*Harmon v. Brucker*, 355 U.S. 579, 581–83 (1958) (reviewing claim that Army Secretary exceeded statutory authority in ordering non-honorable discharges to inductees and applying ordinary canons of statutory construction); *Dames & Moore v. Regan*, 453 U.S. 654, 669–88 (1981) (reviewing claim that executive officials had exceeded their statutory authority and reaching conclusion based on text, other legislation, and historical practice); *see also* Br. of Federal Courts Scholars 17–19.

In any event, in a challenge like this one, asserting that executive action is both *ultra vires* and that the government's claimed statutory authority raises serious constitutional problems, the court must construe the statute to avoid those problems if possible. *See Harmon*, 355 U.S. at 581 ("In keeping with our duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case, we look first to the [challengers'] nonconstitutional claim that [defendant] acted in excess of powers granted him by Congress."); *see also* Section I.C, *infra*. Defendants' proposed "high standard" for all *ultra vires* action would improperly impose a barrier to courts fulfilling this duty, improperly requiring unnecessary confrontation of constitutional questions. While Plaintiffs would undeniably meet this "high standard" given that the President has so clearly exceeded his statutory authority, this Court should reject Defendants' misplaced attempt to impose it in this case.

**B.      Plaintiffs have standing.**

**1.      Plaintiffs have standing to challenge Defendants' transfer of military personnel funds to build the wall in purported reliance on Section 8005.**

Defendants do not dispute that Plaintiffs have standing to challenge Defendants' use of Counterdrug Account funds to build sections of wall in Arizona and New Mexico under claimed § 284 authority. Defendants nonetheless maintain that Plaintiffs may not challenge Defendants' transfer of military pay and pension funds into the depleted Counterdrug Account. Opp. 13–14. Defendants' theory is that the direct cause of Plaintiffs' harm is Defendants' use of the transferred funds to construct the President's wall under § 284, and therefore the predicate unlawful transfer under § 8005 is insulated from review. Defendants misunderstand the law of standing. There is no requirement that Plaintiffs challenge only the final link in the chain that causes their injuries.

"Causation may be found even if there are multiple links in the chain connecting the

defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain." *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014). "[I]f the complained of action is a 'but for' cause—a cause, even if not the only cause—it suffices for standing purposes." *Sierra Club v. Watt*, 608 F. Supp. 305, 316 (E.D. Cal. 1985) (citing *Scott v. Rosenberg*, 702 F.2d 1263, 1268 (9th Cir. 1983)). "The fact that the harm to the plaintiff may have resulted indirectly does not in itself preclude standing." *Mendia*, 768 F.3d at 1012 (quotation and alteration marks omitted). Defendants' claim to the contrary "wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997).

Under well-established standing rules, Defendants' use of § 8005 is a "but for" cause of Plaintiffs' injuries, and Plaintiffs can challenge it. *See, e.g.*, *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1518 (9th Cir. 1992) (finding standing where "in the instant case the injury . . . would not have occurred but for the Secretary's decision"). Without transferring money in purported reliance on § 8005, Defendants would be unable to invoke § 284 in an effort to construct sections of wall in Arizona and New Mexico. Prior to constructing any sections of the wall using the Counterdrug Account, the government had already spent more than 90 percent of the funds appropriated for that account. *See* RJN ¶ 13, Ex. M at 1. And in any event, Congress appropriated less than $1 billion for the § 284 account, while Defendants intend to funnel $2.5 billion for the President's wall through that account. *Id.* In short, as Defendants concede, they used § 8005 to fill the § 284 account, specifically "to devote additional resources to border barrier construction." Opp. 9. The § 8005 violation is thus a "but for" cause of Plaintiffs' injury: had Defendants not used § 8005 to fill the § 284 account, Defendants could not attempt to use § 284 to build the wall.[2]

_____

[2] Defendants' argument that Plaintiffs are outside the "zone of interests" of § 8005 is misplaced. Defendants confuse the requirements of APA review with those of *ultra vires* review. Plaintiffs' claim is that Defendants are spending military personnel funds on the border wall without any legal authority. They need not demonstrate that they fit within the zone of interests of § 8005 merely because Defendants have invoked it. As the D.C. Circuit explained decades ago, such a requirement would make little sense. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987) ("Appellants need not, however, show that their interests fall within the zones of interests of the constitutional and statutory powers invoked by the President in order to establish their standing to challenge the interdiction program as *ultra vires*. Otherwise, a meritorious litigant, injured by *ultra vires* action, would seldom have standing to sue since the litigant's interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he

## 2. Plaintiffs have standing to challenge Defendants' unlawful use of 10 U.S.C. § 2808.

Defendants' argument that SBCC and its members lack standing to challenge Defendants' misuse of § 2808 boils down to the proposition that although the President has declared that an urgent emergency *requires* the use of the armed forces to construct his border wall, the military might nonetheless choose to ignore the President's declaration and his subsequent veto. As Defendants concede, however, Plaintiffs need not wait until the military starts pouring concrete; they need only establish a "'substantial risk' that harm will occur." Opp. 21 (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014)). The record amply establishes such a risk. Moreover, Defendants ignore that harm has already occurred to SBCC and its members, and that these harms are ongoing. SBCC has standing to challenge Defendants' announced plan to misuse § 2808.

Defendants have proceeded far along the path of diverting military construction funds pursuant to § 2808; that they have not yet taken the final step does not render such a result remote or tenuous. Defendants' argument that SBCC's claim is based on mere "speculation that DoD *may* use § 2808 at some point in the future," Opp. 21, cannot be squared with the record. Defendants concede that on February 15, 2019, the President issued a Proclamation that declared a national emergency, "determined that 'this emergency requires use of the Armed Forces,'" and in order "to achieve [the Proclamation's] purpose," provided Defendant Shanahan with "the authority under 10 U.S.C. § 2808" to divert military construction funds. Opp. 6. That same day, the White House identified the amount of funds they would use pursuant to § 2808: $3.6 billion. Opp. 8. On March 12, the President confirmed his plan to use § 2808 to divert $3.6 billion in military construction funds to his wall by submitting to Congress a budget request for $3.6 billion to "backfill funding reallocated in FY 2019 to build border barriers." RJN ¶ 14, Ex. N at 6–9. Defendants have never wavered from their announced plan to use § 2808 and are proceeding apace: Defendant Shanahan has ordered DOD to identify, by May 10, $3.6 billion worth of military construction projects that should be sacrificed for the border wall, as well as locations for construction. *See* Rapuano Decl. ¶¶ 14–15. When the court considers "whether the threatened harm may result from a chain of contingencies, the possibility that

claims does not authorize action concerning that interest.").

defendants may change their course of conduct is not the type of contingency" that can defeat standing. *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002).

Defendants' own statements belie any argument denying a "substantial risk" that they will use § 2808 to construct the border wall. The Ninth Circuit recently rejected a similar government argument that a challenged "Executive Order is all bluster and no bite, representing a perfectly legitimate use of the presidential 'bully pulpit,' without any real meaning—'gesture without motion,' as T.S. Eliot put it." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018). The court explained that consideration of "statements made by and on behalf of the Administration outside the context of this litigation . . . suggests that the Administration's current litigation position is grounded not in the text of the Executive Order but in a desire to avoid legal consequences." *Id.* Here too, the overwhelming weight of the government's statements make clear that Defendants intend to use the national emergency declaration to build the wall faster than Congress will allow. *See, e.g.*, RJN ¶ 5, Ex. E (President Trump's statement on declaring a national emergency that he "didn't need to do this" but he'd rather build the wall "much faster"). Dispelling any doubt as to whether the national emergency authority would be used for wall construction, on the occasion of the President's veto of the resolution to terminate the emergency declaration, Vice President Pence announced that the President was "keeping [his] word by vetoing this legislation, by finding the available resources to build the wall . . . ."[3] The President confirmed that signing the veto was "a big step. We're building a lot of wall right now. It's started . . . . [W]e have many miles under construction right now, and we're going to be signing contracts over the next couple of days for literally hundreds of miles of wall."[4] Plaintiffs need not speculate that the emergency declaration will be used for wall construction; they need only take Defendants at their word. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (rejecting standing where Plaintiffs alleged "a highly speculative fear" based on a "highly attenuated chain of possibilities").

---

[3] Remarks by President Trump on the National Security and Humanitarian Crisis on our Southern Border (Mar. 15, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-security-humanitarian-crisis-southern-border-2. The Court may take judicial notice of public statements by government officials. *See Cty. of Santa Clara v. Trump*, 267 F. Supp. 3d 1201, 1217, n.11 (N.D. Cal. 2017) ("government . . . statements of public record are appropriate for judicial notice") (citing *Brown v. Valoff*, 422 F.3d 926, 933 n.9 (9th Cir. 2005)).

[4] *Id.*

Finally, Defendants address only "allegations of future injury," Opp. 21, and ignore entirely that SBCC and its members have already suffered and continue to suffer ongoing harms. *See* Mot. 24–25 (describing ongoing harms to SBCC and its members Southwest Environmental Center and Equal Voice Network); *see also* Section III.C., *infra*. This alone is sufficient to confer standing on SBCC. *See E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 852 (N.D. Cal. 2018) (rejecting argument that organizations' fears were "speculative" or "self-inflicted" because "their function is currently impaired by the Rule"). Defendants argue in passing that it is possible that § 2808 funds will be used to build a wall in a location where Plaintiffs would not have a claim to a cognizable injury. *See* Opp. 21. This argument is contrary to the record evidence, which establishes that SBCC and its members span the entire Southwestern Border. *See* Gaubeca Decl. ¶ 3 ("SBCC's membership spans the borderlands from California to Texas."); Bixby Decl. ¶ 3 (Southwest Environmental Center "works statewide in New Mexico and our campaigns extend into Eastern Arizona and West Texas"). Defendants' plan to unlawfully construct $3.6 billion worth of wall poses a "substantial risk" of harming their interests.

### C. Defendants' proposed construction of Sections 284, 2808, and 8005 violates the Constitution, or at least raises serious constitutional concerns.

Statutes must be interpreted to avoid a serious constitutional problem where another "construction of the statute is fairly possible by which the question may be avoided." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (quotations and citations omitted). Constitutional avoidance is "thus a means of giving effect to congressional intent," as it is presumed that Congress did not intend to create an alternative interpretation that would raise serious constitutional concerns, *Clark v. Martinez*, 543 U.S. 371, 382 (2005), and courts "have read significant limitations into . . . statutes in order to avoid their constitutional invalidation," *Zadvydas*, 533 U.S. at 689 (citation omitted). Defendants' efforts to usurp Congress's role trench on the Constitution's Appropriations Clause, Separation of Powers, and Presentment Clause. Mot. 8–12 (setting forth plaintiffs' constitutional claims). This Court can avoid addressing those serious constitutional problems by construing §§ 284, 2808, and 8005 to disallow building the President's border wall. Such a construction would also accord with the statutes' plain meaning and with common sense.

Defendants mistakenly argue that Plaintiffs assert no constitutional violations separate from Defendants' statutory violations. Opp. 27–28. As pled, Plaintiffs' Appropriations and Presentment Clause claims are not merely assertions that Defendants violated the terms of the statutory authority they invoke. Rather, Plaintiffs maintain that if §§ 284, 2808, and 8005 are interpreted to permit the president to ignore Congress's appropriations judgments as enacted in the CAA, they would be unconstitutional. *See* Mot. 13 n.6. The Constitution delegates to Congress "exclusive" power "not only to formulate legislative policies and mandate program and projects, but also to establish their relative priority for the Nation." *United States v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir. 2016). "The Constitution is a compact enduring for more than our time, and one Congress cannot yield up its own powers, much less those of other Congresses to follow." *Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy, J., concurring). Likewise, a statute would run afoul of the Presentment Clause if, as Defendants insist here, it permitted the president to sign an appropriations act and, "based on the same facts and circumstances that Congress considered," have the option of "rejecting the policy judgment made by Congress and relying on [its] own policy judgment." *Id.* at 444 & n.35. The government's unreasonable constructions of the statutes here would yield precisely that prohibited result. Mot. 8–10, 12.

Defendants' reliance on *Dalton v. Specter*, 511 U.S. 462 (1994), is misplaced. In *Dalton*, the Court considered whether the President had violated a statute that committed a decision entirely to his discretion. *See id.* at 478 (Souter J., joined by Blackmun, Stevens, and Ginsburg JJ., concurring) (statute "grants the President unfettered discretion to accept the Commission's base-closing report or to reject it, for a good reason, a bad reason, or no reason"); *see generally Chamber of Commerce*, 74 F.3d at 1331 ("*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available."). The plaintiff in *Dalton* "pleaded no constitutional claim against the President" and did not argue that the statute the president invoked—if construed as the president argued—would violate the Constitution. 511 U.S. at 478 (Souter, J., joined by Blackmun, Stevens, and Ginsburg, JJ., concurring). Here, by contrast, Plaintiffs assert violations of the Appropriations and Presentment Clauses, and their Separation of

Powers claim implicates an unconstitutional divestment of Congressional control over appropriations. Thus, in *Dalton* there was no constitutional question for the Court to answer if the statute was read to provide the government its claimed authority. That is not the situation here.

Defendants also deny any constitutional separation-of-powers implications because the President is not purporting to exercise his inherent authority under Article II of the Constitution. Opp. 27. But *Youngstown* specifically examined the question of statutory authority in its separation-of-powers analysis. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585–87 (1952). Indeed, the parallels between this case and *Youngstown* are striking: in both cases the president claims the very power Congress denied him. *See id.* at 639 (Jackson, J., concurring) (citing "three statutory policies inconsistent with the [president's] seizure"); *id.* at 602 (Frankfurter, J, concurring) (analyzing statutory framework and concluding that "Congress has expressed its will to withhold this power from the President as though it had said so in so many words"); *see also City & Cty. of San Francisco*, 897 F.3d at 1234 ("Congress has frequently considered and thus far rejected legislation accomplishing the goals" of the President's unilateral action). If anything, Congress's denial of the power claimed by the President is even clearer here than in *Youngstown*. *See* Br. of Former Members of Congress 14.

### D.    Defendants' statutory arguments are implausible and unavailing.

#### 1.    Section 8005 and 10 U.S.C. § 2214(b)

Plaintiffs have shown that Defendants cannot funnel military pay and pension funds to the Counterdrug Account for ultimate diversion to the President's wall project. *See* Mot. 15–16. Defendants make three implausible arguments in response: (1) Congress did not "deny funds" for the wall project by refusing to give DHS the $5 billion that the President demanded, (2) the wall project is "an unforeseen military requirement" because DOD only discovered in February 2019 that it would be called upon to transfer its own funds to DHS to replace those that Congress denied, and (3) the wall project is inherently a "military requirement" because Congress authorized limited DOD support construction under certain circumstances. Defendants' implausible reading of the statute contravenes its express language and legislative history, and should be rejected.

Defendants' argument that Congress has not "denied" the government's request to spend billions of

dollars on the President's wall outside of the Rio Grande Valley contradicts the plain meaning of the word "denied." Defendants argue that when Congress denied funds to DHS for the wall project, it was merely a "legislative judgment concerning the appropriation of funds for a different agency under different statutory authorities." Opp. 16. In other words, according to Defendants, Congress was required to explicitly state that it was denying funds to DOD—not just to the President—and that the wall restriction applied to "§ 284 projects" for the transfer bar to apply. *Id.* The plain language of § 8005 and 10 U.S.C. § 2214(b) forecloses this argument. Neither includes any limitation on the meaning of "denied" nor any reference to a requesting "agency" or "statutory authorities." Instead, Congress imposed the transfer restriction on any "item" it denied—in this case, the President's wall. *See* § 8005 (transfers may be used "in no case where the item for which funds are requested has been denied by the Congress"); 10 U.S.C § 2214(b) (transfer may not be used for "an item for which Congress has denied funds.").

Whether constructed by DHS or by DOD, and whether for counterdrug or counter-migration purposes, the wall is the same "item" Congress declined to fund. As the *amicus curiae* brief of the House of Representatives explains, legislative history confirms that these restrictions are "to be construed strictly to prevent the funding for programs which have been considered by Congress and for which funding has been denied." House Br. 10. (quotation marks and citation omitted). Congress has denied funds for wall construction outside of the Rio Grande Valley, *see* Mot. 2–3, 6–8; House Br. 4–87, and Defendants cannot rely on § 8005 to circumvent that judgment.

Defendants' radically expansive gloss on the word "unforeseen" is similarly implausible. Defendants do not even attempt an answer to Plaintiffs' argument that wall construction under a claim of counterdrug necessity cannot be "unforeseen" when the President specifically claimed to Congress in his February 2018 budget proposal that "$18 billion to fund the border wall" was necessary because "a border wall is critical to combating the scourge of drug addiction." RJN ¶ 18, Ex. R at 16; Mot. 16. They instead argue that it was unforeseen that DOD would be charged with wall construction until the moment DHS requested DOD money, a year later in February 2019, after the President's subsequent funding request was denied. Opp. 16–17. It is not plausible that Congress intended its own decisions to deny funding to constitute "unforeseen" military requirements, or that

"unforeseen" means only that a specific agency did not know its own coffers might be raided for a project that was described as "critical" for over a year. *See* House Br. 10.

Finally, Defendants maintain that wall construction is inherently a "military requirement" because Congress authorized the military in some circumstances to provide support to law enforcement for construction of barriers. Opp. 17 (citing § 284). Defendants' argument proves too much, conflating general authorization with *requirement*. If anything the military might do is deemed a "military requirement," the statutory phrase imposes no restriction at all. Such a reading violates the "presumption that statutory language is not superfluous." *McDonnell v. United States*, 136 S. Ct. 2355, 2369 (2016) (quotation marks omitted).

### 2. Section 284

Defendants' arguments with respect to § 284 boil down to three main claims: (1) Congress crafted § 284 as a broad statute authorizing the Secretary of Defense, in his sole discretion, to engage in massive wall-building projects along the border; (2) the Court must look at the § 284 projects in isolation and blind itself to their context; and (3) fiscal law restrictions have no application when multiple agencies collaborate to evade funding restrictions. None has merit.

Defendants' claim that the "text and history of § 284" supports Defendants' plan to use the statute to funnel $2.5 billion of military funds to border wall construction is refuted by their own authorities. Opp. 18. As Plaintiffs explained, it would be an absurd reading of § 284's text to find that Congress required detailed reporting of "small scale construction" under § 284 while simultaneously delegating to the Secretary of Defense unbounded authority for massive, controversial, multibillion dollar border wall construction. Mot. 17. The history Defendants cite confirms how radically they propose to depart from the limited authority Congress provided in § 284. Defendants cite Congress's 2006 decision to recommend a "$10 million increase" for fence and road construction. Opp. 18; *see also* Opp. 8. (citing 2008 congressional recommendation for a "$5 million increase to DoD's budget to continue construction"). That Defendants have already funneled $1 billion, 100 times that amount, and intend to spend an additional 150 times that amount on wall construction demonstrates the implausibility of their interpretation. It is not reasonable to read Congress's endorsement of an expenditure that was 0.004% of what Defendants seek to spend

here as an unbounded authorization for Defendants to rewrite the federal budget. *See F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (interpretation of statutes "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude"); *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." (quotation marks omitted)).

Defendants cite no authority for their claim that the Court must ignore the context of their wall-building project and focus only on individual § 284 projects in isolation. Opp. 19. Judicial review here is not restricted to an administrative record, and in any event Defendants have been perfectly clear that they are using § 284 as part of a single unitary project to build the President's wall. Responding to a recent question about how he could "combat" a "perception among some Trump supporters that the wall is not being built" when he "can't get Congress to appropriate any additional money," the Acting Secretary of Homeland Security declared that "with the expanded support of additional DOD funding . . . we're going to show a lot of progress this year."[5]

Defendants' appropriation law argument is equally unsupported and unconvincing. Defendants propose that the principle that forbids the use of a general appropriation when Congress has specifically appropriated funds for a given purpose applies only in "the circumstance of a *single* agency determining which of two appropriations *to that agency*" should be used. Opp. 30. Defendants do not cite any authority in support of this cramped reading of basic appropriations principles. As the General Accountability Office (GAO) has explained, any agency effort to go beyond a specific appropriation and seek additional money "from some other source would usurp congressional prerogative and undercut the congressional power of the purse." Availability of Receipts from Synthetic Fuels Projects for Contract Admin. Expenses of the Dep't of Treasury, Office of Synthetic Fuels Projects, B-247644, 72 Comp. Gen. 164, 165 (Apr. 9, 1993). A rule that restricted DHS to $1.375 billion in DHS funds while allowing it to add unlimited billions from general DOD accounts merely by requesting money from DOD would be contrary to the established

---

[5] Video interview of Kevin McAleenan, Acting Department of Homeland Security Secretary, Fox News (Apr. 23, 2019), https://video.foxnews.com/v/6029154226001/#sp=show-clips.

1  principle that when Congress expressly appropriates a specific amount, that "indicates that is all

2  Congress intended" for a given project "to get in [a fiscal year] *from whatever source*." *Nevada v.*

3  *Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (emphasis added). *See* Mot. 19–20.

### 3.   Section 2808

5        Defendants make no attempt to respond to the substance of Plaintiffs' arguments that § 2808

6  does not authorize construction of the President's wall. Although Plaintiffs need not satisfy

7  Defendants' proposed "clear and mandatory" standard, *see* Section I.A.2, Defendants' announced

8  plans to use § 2808 fail even that test because "Congress expressly limited that statute to

9  undertakings that (1) respond to a national emergency "that requires use of the armed forces," and

10  (2) are "military construction projects" that "are necessary to support such use of the armed forces."

11  Mot. 13 (quoting 10 U.S.C. § 2808). As Plaintiffs have shown, the President's wall-building project

12  clearly violates those restrictions. Mot. 13–15; *see also* House Br. 11–17. Defendants' only

13  argument in response is that these terms impose no limits at all, as they are either nonjusticiable or

14  nonbinding. Opp. 22–23. But Defendants are not free to disregard Congress's statutory limitations,

15  nor is this Court barred from reviewing Defendants' actions.

16        Contrary to Defendants' claims, courts regularly review whether the government complies

17  with the requirements of emergency power statutes. In *Dames & Moore v. Regan*, for example, the

18  Supreme Court reviewed whether the International Emergency Economic Powers Act ("IEEPA")

19  authorized the president to "suspend claims pending in American courts." 453 U.S. at 675. The

20  Court rejected the government's claims, finding that "[t]he terms of the IEEPA therefore do not

21  authorize the President" to take action under claimed emergency authority. *Id.* As the Court

22  emphasized, its review and rejection of the President's compliance with the terms of the emergency

23  statute was not an aberration, but rather "the view of all the courts which have considered the

24  question." *Id.* at 675–76 (citing *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*, 651

25  F.2d 800, 809–814 (1st Cir. 1981); *Am. Int'l Grp., Inc. v. Islamic Republic of Iran*, 657 F.2d 430,

26  443, n.15 (D.C. Cir. 1981); *Marschalk Co. v. Iran Nat'l Airlines Corp.*, 518 F. Supp. 69, 79

27  (S.D.N.Y. 1981); *Elec. Data Sys. Corp. v. Soc. Sec. Org. of Iran*, 508 F. Supp. 1350, 1361 (N.D.

28

Tex. 1981)).[6]

Defendants likewise cannot insulate their wall-building scheme from review merely by dressing it up in military garb. "[T]he claim of military necessity will not, without more, shield governmental operations from judicial review." *Koohi v. United States*, 976 F.2d 1328, 1331 (9th Cir. 1992). As the Ninth Circuit recently explained in another case where the government claimed unreviewable military authority to disregard statutory restrictions, "[w]e may consider national security concerns with due respect when the statute is used as a basis to request injunctive relief. This is not a grim future, and certainly no grimmer than one in which the executive branch can ask the court for leave to ignore acts of Congress." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 826 (9th Cir. 2017); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 593 n.23 (2006) ("[The president] may not disregard limitations that Congress has, in proper exercise of its own [military] powers, placed on his powers."). Judicial review is appropriate here, where the President has proposed to use the military in peacetime, inside the United States, to build a wall that Congress refused to fund.

Defendants cannot claim "a history of congressional acquiescence in conduct of the sort engaged in by the President." *Dames & Moore*, 453 U.S. at 678–79. As the President's entire reason for using § 2808 is to subvert Congress, it is unsurprising that no history supports the President's actions. *See* Opp. 10–11 (acknowledging that the only prior invocations of § 2808 were closely tied to the military's exclusive role in responding to "the Government of Iraq's invasion of Kuwait" and "the terrorist attacks against the United States on September 11, 2001"). No previous president has ever attempted to use § 2808 authority to acquire funding that Congress explicitly denied, and Congress has likewise never previously had occasion to pass a resolution disapproving of a declared emergency. *See* Brennan Center Br. 13–16; *cf. Dames & Moore*, 453 U.S. at 687–88 (noting that

---

[6] The Ninth Circuit's decision in *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076 (9th Cir. 1982), is not to the contrary. There, the Ninth Circuit rejected as "essentially-political questions" only the question of whether *any* emergency existed, and what its duration should be. *Spawr*, 685 F.2d at 1081. Unlike § 2808, which limits the type of emergency (requiring the use of the armed forces), the statute at issue in *Spawr* "contained no standards by which to determine whether a national emergency existed or continued; in fact, Congress had delegated to the President the authority to define all of the terms in that subsection of the [statute] including 'national emergency.'" *Id.* at 1080. And even under those circumstances, the court emphasized that "we are free to review whether the actions taken pursuant to a national emergency comport with the power delegated by Congress." *Id.* at 1081.

"importantly, Congress has not disapproved of the action taken here" by "pass[ing] a resolution, indicating its displeasure" or "in some way resisted the exercise of Presidential authority"); *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1081 (9th Cir. 1982) ("Congress not only tolerated this practice, it expressed approval of the President's reliance" on the statute).

As the U.S. House of Representatives explains in its *amicus* brief, Congress intended for § 2808 to constrain the President's use of emergency powers. *See* House Br. 16–17. Judicial enforcement of such constraints is central to Congress's design. *See id.* If the premise that the armed forces are necessary to stop "family units entering and seeking entry to the United States," RJN ¶ 4, Ex. D, is beyond review, and if the government may ignore Congress's definition of "military construction," Congress's careful limitations on § 2808 authority and the military's role at the border would be effectively nullified. Under Defendants' logic, the President could deploy the military to Chicago based solely on his claims that "Chicago is like a war zone," and "I will send in what we have to send in. Maybe they're not gonna have to be so politically correct."[7] Similarly, the President could, in his unreviewable discretion, order the diversion of military construction funds to build facilities at Mar-A-Lago. The Court should not adopt a reading that permits such disregard for the law. *See Ctr. for Biological Diversity*, 868 F.3d at 825 (military action could be enjoined because "to abstain from giving effect to a federal statute is less respectful to Congress than reviewing the executive's compliance").

### 4.  The Consolidated Appropriations Act (CAA)

Defendants' arguments with respect to the CAA suffer from two key flaws. First, Defendants are dead wrong that "the grant of a specific appropriation cannot be read to restrict the use of other appropriated funds for similar purposes pursuant to other statutory authority." Opp. 24. The rule is precisely the opposite: "specific appropriations preclude the use of general ones even when the two appropriations come from different accounts." *Nevada*, 400 F.3d at 16 (citing 4 Comp Gen. 476 (1924)); *see also* Mot. 19–20. This "rule has been well-established 'from time immemorial,'" and Congress has legislated against its backdrop for well over a century. GAO, Office of the General

---

[7] *TRANSCRIPT: ABC News Anchor David Muir Interviews President Trump*, ABC News (Jan. 25, 2017), https://abcnews.go.com/Politics/transcript-abc-news-anchor-david-muir-interviews-president/story?id=45047602.

Counsel, Principles of Federal Appropriations Law (4th Ed. 2017), 3-409 (quoting 1 Comp. Dec. 126 (1894)). Defendants cannot wish away established restrictions away by pretending—in stark opposition to government officials' own statements and even to the evidence that Defendants themselves have submitted in this case—that their massive wall project is a series of "similar" but distinct projects existing in artificial isolation from one another. *See, e.g.*, Def. Exhibit 7 (President Donald J. Trump's Border Security Victory (Feb. 15, 2019)) ("[T]he Administration has so far identified up to $8.1 billion that will be available to build the border wall once a national emergency is declared and additional funds have been reprogrammed.").

Second, Defendants' conclusory argument that "[a]ny funds utilized for border-barrier construction pursuant to §§ 284 and 2808 will be used for the purpose for which they were appropriated, not to increase funding for an item in the President's 2020 budget request" should be rejected. As the *amicus curiae* brief of Christopher Shays, et al. explains, Defendants' efforts to unilaterally fund the President's wall through §§ 284 and 2808 are prohibited by § 739 of the CAA because the billions Defendants seek to spend are "previously requested, but unenacted, increases in funding for a program, project or activity." Shays Br. 6, *see also* Shays Br. 4–7.

**E.      DHS cannot waive DOD's obligation to comply with NEPA when DOD acts under Section 284 authority.**

The Department of Defense does not dispute that its actions have significant effects on the environment, and that it has failed to prepare the impact statements required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332. *See Cal. Wilderness Coal. v. Dep't of Energy,* 631 F.3d 1072, 1101–02 (9th Cir. 2011) (NEPA requires preparation of environmental assessment before agency undertakes action with foreseeable effects). Defendants contend only that "the Secretary of Homeland Security waived NEPA's requirements," claiming a power that pertains exclusively to construction under § 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C. Defendants presume to extend such waiver authority to the Department of Defense's independent obligation to comply with NEPA. Opp. 25. Defendants' argument is incompatible with their own claim that they are not constructing the El Paso and Yuma sections of border wall under IIRIRA authority, but instead under wholly

separate DOD authority.

Defendants cannot have it both ways. If, as they claim, the Yuma and El Paso Sector projects are not covered by "CBP's mission under IIRIRA" but instead are "counter-drug activities in furtherance of DoD's mission under § 284," Opp. 16, any IIRIRA waiver is without effect. IIRIRA permits the Secretary of Homeland Security to waive compliance with NEPA only to the extent "necessary to ensure expeditious construction of the barriers and roads *under this section*," that is, under § 102 of IIRIRA. IIRIRA § 102(c) (emphasis added). The section authorizes the DHS Secretary to install barriers and roads "to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a). But as Defendants acknowledge, the CAA "places restrictions on border-barrier construction funded with DHS appropriations," Opp. 23, and Defendants thus seek to evade those restrictions by arguing that the Yuma and El Paso Projects are undertaken under entirely separate authority—that provided by 10 U.S.C. § 284. *See, e.g.*, Opp. 26; Opp. 16 (characterizing projects as occurring "under § 284"). Defendants identify no statutory authority for a waiver for "expeditious construction" under DOD's § 284 authority, and none exists.[8]

## II.   Plaintiffs Have Shown Irreparable Harm.

### A.   Plaintiffs have demonstrated irreparable harm to their members' recreational and aesthetic interests.

Defendants misstate Plaintiffs' allegations of irreparable environmental harm and apply the incorrect standard to evaluate them. Plaintiffs have asserted injuries to their members' aesthetic and recreational interests in borderlands threatened by wall construction. Mot. 23. But they have not, as Defendants argue, Opp. 29, alleged that these injuries stem from their interest in any given wildlife species. Cases turning on "species-level" harm are therefore inapposite. In addition, Defendants' efforts to undermine the declaration of Sierra Club member Albert Del Val are contradicted by their

---

[8] DOD may not simply transfer its § 284 project to DHS to evade NEPA. Congress foreclosed any such transfer of jurisdiction in the Department of Defense Appropriations Act, 2019, which mandates that "[n]one of the funds made available in this or any other Act may be used to pay the salary of any officer or employee of any agency funded by this Act who approves or implements the transfer of administrative responsibilities or budgetary resources of any program, project, or activity financed by this Act to the jurisdiction of another Federal agency not financed by this Act without the express authorization of Congress." 2019 Department of Defense Appropriations Act § 8113, Pub. L. No. 115-145. Defendants have identified no such "express authorization."

own declarant.

As Defendants acknowledge, a plaintiff organization can demonstrate irreparable environmental harm by showing that a federal action will harm its members' use and enjoyment of public lands. *See All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding irreparable harm to recreational and aesthetic interests); *see also Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012) (finding irreparable harm to plaintiffs who use project area for "recreation such as hiking, camping, fishing, and photography, as well as watershed research, education and observing wildlife"). Plaintiffs have done just that. They have alleged that construction of a wall using § 284 funds will irreparably harm their ability to recreate in and enjoy public lands along the border. *See* Del Val Decl. ¶¶ 7–8 (explaining that wall will impede his ability to fish and detract from enjoyment of natural environment); Bixby Decl. ¶ 6 (alleging harm to interest in hiking and camping); Walsh Decl. ¶¶ 8–9 (describing recreational interest in hiking and bird-watching); Munro Decl. ¶ 11 (wall will diminish "happiness and sense of fulfillment" derived from viewing "unique desert landscape").

Contrary to Defendants' claims, Plaintiffs have not relied on any interest tethered to populations of specific animal species near the southern border. To the extent that Plaintiffs refer to harms to wildlife, they do so in connection with their broader aesthetic, educational, and professional interests. "[L]oss of biodiversity" will harm Dr. Walsh's "aesthetic enjoyment" of borderlands, and the degradation of ephemeral wetlands will harm her educational and scientific interests in the region. *See* Walsh Decl. ¶¶ 7, 10, 15. Similarly, Ms. Munro will be harmed "professionally, aesthetically, and spiritually" from wall construction where she conducts her public education work. Munro Decl. ¶¶ 6–11, 15. Such interests suffice to show irreparable harm. *See All. for Wild Rockies v. Marten*, 253 F. Supp. 3d 1108, 1111 (D. Mont. 2017) (finding irreparable harm where project threatened "recreational, scientific, spiritual, vocational and educational interests" in viewing and utilizing "the area in its undisturbed state").

Defendants' own evidence belies their claim that "replacement of existing pedestrian border infrastructure will not change conditions" in the land Sierra Club member Albert Del Val has loved and used for fifty years. Opp. 30–31. Defendants intend to erect a "30-feet-tall" "bollard wall"

1   constructed of "steel-filled concrete," "spaced approximately four inches apart," accompanied by

2   lighting, "imbedded cameras," and a "linear ground detection system." Enriquez Decl. ¶ 12. This is a

3   massive departure from the current status quo of "vehicle fencing," which typically "stands 4 to 6

4   feet high." Enriquez Decl. ¶ 12 & Exhibit C at 2-1. Defendants fail to raise any substantial challenge

5   to Mr. Del Val's concerns that an "ominous and oppressive" 30-foot wall would "detract from the

6   natural environment [he] grew up with" and regularly enjoys, and that his use of the land will be

7   "diminished by heightened security" and "artificial light pollution." Del Val Decl. ¶¶ 7–10.

8       **B.      Plaintiffs have established irreparable constitutional harm.**

9        Defendants argue that structural constitutional violations cannot cause irreparable harm, Opp.

10  33, but "this distinction between personal and structural constitutional rights is not recognized in the

11  Ninth Circuit." *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 538 (N.D. Cal. 2017) (finding

12  irreparable constitutional harm for claims including separation of powers). The cases cited by

13  Defendants do not purport to establish a new rule. *See E. Bay Sanctuary Covenant v. Trump*, 909

14  F.3d 1219, 1254 (9th Cir. 2018); *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017). In both

15  cases the government claimed that a court order blocking executive branch action caused *the*

16  *government* irreparable harm by eroding the separation of powers. In essence, the government

17  argued that it was itself irreparably harmed any time it was enjoined by a court order. The Ninth

18  Circuit handily rejected this argument: "To the extent that the Government claims that it has suffered

19  an institutional injury by erosion of the separation of powers, that injury is not 'irreparable.' It may

20  yet pursue and vindicate its interests in the full course of this litigation." *Washington*, 847 F.3d at

21  1168; *see also E. Bay Sanctuary Covenant,* 909 F.3d at 1254. These holdings were specific to the

22  government's interests and status as a litigant, and do not alter the general rule that a plaintiff is

23  irreparably harmed when deprived of constitutional rights—including structural rights.

24      **C.      SBCC and its member organizations have demonstrated irreparable harm
25              to their missions.**

26       SBCC and its member organizations Equal Voice Network (EVN) and Southwest

27  Environmental Center (SEC) have shown that responding to the emergency declaration and

28  Defendants' announced plan to use § 2808 to construct the President's wall has put a "drain on

[their] resources" and "perceptibly impaired" their ability to carry out their missions. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Defendants' only responses are that SBCC and its members (1) are "public advocacy groups" that cannot be injured by "focus[ing] organizational resources on advocacy"; and (2) Defendants' announced plan to build the wall pursuant to the President's emergency declaration cannot be a source of injury because Defendant Shanahan "has not yet decided to undertake or authorize any barrier construction projects under § 2808." Opp. 33–34. Both of Defendants' arguments fail.

As an initial matter, Defendants provide no support for their claim that SBCC's members are "public advocacy groups." Nor could they. Advocacy constitutes "only about 20%" of EVN's activities, which largely consist of directly providing "organizing, training, and education" services to border communities. Supp. Decl. of Christina Patiño Houle ¶ 3. Similarly, public advocacy "is not primarily" the activity SEC engages in. Supp. Decl. of Kevin Bixby ¶ 5. Instead, SEC's primary activities are "research and documentation, education, and on-the-ground restoration projects" towards its mission "to protect and restore wildlife and their habitats in the Southwest." *Id.* ¶ 4.[9]

In any event, Plaintiffs' harms are well within the heartland of organizational standing doctrine. Rather than merely shifting advocacy priorities, the organizations have diverted resources in ways that the Ninth Circuit has found to confer standing and constitute irreparable harm. "The Ninth Circuit has specifically found that diversion of resources for 'outreach campaigns' and educating the public establishes a diversion of resources sufficient to establish organizational standing." *Serv. Women's Action Network v. Mattis*, 352 F. Supp. 3d 977, 985 (N.D. Cal. 2018) (citing *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) and *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105–06 (9th Cir. 2004)); *see also Valle del Sol Inc. v.*

---

[9] Even if EVN and SEC *were* public advocacy groups, Defendants' claim that such groups cannot suffer harm to their missions from diverting resources runs up against settled Ninth Circuit law. As the Ninth Circuit recently explained, the court has already recognized organizational standing based on "efforts by advocacy groups to show standing by pointing to the expenses of advocacy—the very mission of the group itself." *E. Bay Sanctuary Covenant*, 909 F.3d at 1242 (citing *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1226 (9th Cir. 2012) (Ikuta, J., dissenting)). Defendants "are not free to ignore 'the holdings of our prior cases' or 'their explications of the governing rules of law.'" *Id.* at 1243.

*Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (diverting resources to educational programs addressing members' concerns about new law constitutes irreparable harm). Much like plaintiffs in *Valle del Sol*, SBCC and its member organizations have reallocated resources to conducting outreach and educating members about the effects of the emergency declaration. *See* Gaubeca Decl. ¶¶ 7–8 (creating informational materials and media kits; training staff and partners); Houle Decl. ¶¶ 9–10 (answering calls; leading tours to border lands threatened with wall construction; tailoring programming); Bixby Decl. ¶ 11 (responding to member inquiries; developing media kits).

Plaintiffs have also shown harm to their missions under Ninth Circuit law by diverting resources to investigate and counteract Defendants' conduct. *See, e.g.*, *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (finding standing for organization that diverted resources to "investigating and other efforts to counteract [defendant's] discrimination"); *Smith*, 358 F.3d at 1105 (monitoring defendant's statutory violations and educating public about them constituted diversion of resources injury). When construction plans were announced, SEC Executive Director Kevin Bixby spent days discerning the coordinates and mapping out the exact locations where the wall will be built. Bixby Decl. ¶ 10. Senior SBCC staff and members have spent the "majority" of their time "analyzing and responding to the declaration," Gaubeca Decl. ¶ 7, and EVN staff took time away from other projects in order to "identify and resist" new construction and have been "constantly monitoring, researching, and responding" to the declaration, Houle Decl. ¶¶ 8, 9. Defendants' actions have frustrated SBCC's and its member organizations' abilities to pursue their core missions. *See* Guabeca Decl. ¶ 10 (describing obstacles to pursuing "core projects" such as "affirmative advocacy for Border Patrol accountability and immigration reform"); Bixby Decl. ¶¶ 3, 10–11 (SEC's mission of "protection and restoration of native wildlife and their habitats in the southwest" has been impaired); Houle Decl. ¶¶ 3–4, 8, 12 (core mission of working on behalf of low-income communities has been hampered).

Defendants' argument that Plaintiffs' assertions of organizational harm somehow "elide[] the distinction between the declaration and the use of § 284 or § 2808" is wrong. Plaintiffs' declarations make clear that the Proclamation and the impending emergency wall construction have forced them to divert resources and frustrated their missions. *See* Gaubeca Decl. ¶¶ 7–8, 10; Houle Decl. ¶¶ 8–10,

12; Bixby Decl. ¶¶ 3, 10–11. Defendants' reference to *Clapper* is also misplaced. Unlike the

plaintiffs in *Clapper*, SBCC and its member organizations are not responding to a "speculative

threat" but to imminent announced action by Defendants. *See supra* Section I.B.2. Plaintiffs have

suffered and will continue to suffer irreparable harm absent an injunction.

**III.    The Balance of Harms and Public Interest Overwhelmingly Favor Plaintiffs.**

Harm to Plaintiffs if construction is not enjoined outweighs any harm an injunction may

cause Defendants. No harm can result from an order enjoining the government from violating the

Constitution, and an "injunction serves the interests of the general public" when it ensures that

government actions "comply with the Constitution." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th

Cir. 2017). Defendants have shown no immediate harm from maintaining the status quo, and they

would remain free to uphold the government's interest in border security by enforcing federal

immigration laws in a lawful manner. Plaintiffs also agree with Defendants that, when fashioning

equitable relief, courts "cannot ignore the judgment of Congress, deliberately expressed in

legislation." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 551 (1937). But that only

strengthens the case for an injunction here: Congress has made it unequivocally clear that it does not

approve of the pace and manner of the wall construction Defendants are attempting. "Once

Congress, exercising its delegated powers, has decided the order of priorities in a given area, it

is . . . for the courts to enforce them when enforcement is sought." *United States v. Oakland*

*Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (quoting *TVA v. Hill*, 437 U.S. 153, 194 (1978)).

**IV.    The Court Should Issue an Injunction Providing for Full Relief.**

There is no reason to limit the scope of the injunction to the three wall segments in Yuma

Sector Projects 1 and 2 and El Paso Sector Project 1. Defendants' argument to the contrary misstates

the facts and misapplies the law. First, Defendants misstate the facts in claiming that "Plaintiffs'

arguments regarding irreparable harm focus exclusively on the specific circumstances of the three

ongoing construction projects in Arizona and New Mexico." Opp. 35. To the contrary, Plaintiffs'

opening brief identifies three categories of irreparable harm: 1) harm to Plaintiffs' members who use

areas targeted for border wall construction, 2) harm to Plaintiffs from frustration of their missions,

and 3) constitutional harm. *See* Mot. 22–25. Only the first of these harms is tied to Defendants' work

on specific projects, while the other harms result from Defendants' unlawful use of Department of Defense funds for border wall construction more generally.

Second, Defendants misapprehend the law in relying on *California v. Azar*, 911 F.3d 558 (9th Cir. 2018), instead of *E. Bay Sanctuary Covenant*, 909 F.3d 1219. *Azar* considered a challenge by four states to Affordable Care Act exemptions and held that, based on the record, an injunction limited "to the plaintiff states would provide complete relief to them." 911 F.3d at 584. *Azar* reaffirmed that a federal district court may grant nationwide relief when "necessary to provide complete relief to the plaintiffs." *Id.* at 582 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). *East Bay Sanctuary Covenant* demonstrates the proper application of the "complete relief" principle to cases, such as this, brought by organizational plaintiffs who are harmed by mission frustration. There, the government made the same overbroad relief arguments against nationwide injunctions that it makes here. 909 F.3d at 1255. The Ninth Circuit rejected these arguments, finding that "the Government "fail[ed] to explain how the district court could have crafted a narrower [remedy] that would have provided complete relief to the Organizations." *Id.* at 1256 (quotation marks omitted). The district court subsequently issued a nationwide preliminary injunction, finding that the plaintiff organizations' harms were "not limited to their ability to provide services to their *current* clients, but extend to their ability to pursue their programs writ large . . . ." *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1121 (N.D. Cal. 2018) (emphasis in original).

Plaintiffs have members in every southern border state, and an injunction limited to three specific projects would force Plaintiffs to continue diverting resources to address the detrimental impact of a border wall at other sites along the border. To remedy this harm and provide complete relief to plaintiffs, the court should issue an injunction barring the unlawful use of any DOD funds to construct a border wall. Alternatively, the Court could fashion an injunction covering the four states in which Plaintiff SBCC and its members operate: California, New Mexico, Arizona, and Texas.

## CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs a Preliminary Injunction.

Dated: May 2, 2019

Respectfully submitted,

/s/ *Dror Ladin*

Mollie M. Lee (SBN 251404)
Christine P. Sun (SBN 218701)
American Civil Liberties Union Foundation of
    Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 621-2493
Fax: (415) 255-8437
mlee@aclunc.org
csun@aclunc.org

David Donatti*
Andre I. Segura (SBN 247681)
American Civil Liberties Union Foundation
    of Texas
P.O. Box 8306
Houston, TX 77288
Tel.: (713) 325-7011
Fax: (713) 942-8966
ddonatti@aclutx.org
asegura@aclutx.org

Dror Ladin*
Noor Zafar*
Jonathan Hafetz*
Hina Shamsi*
Omar C. Jadwat*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2660
Fax: (212) 549-2564
dladin@aclu.org
nzafar@aclu.org
jhafetz@aclu.org
hshamsi@aclu.org
ojadwat@aclu.org

Cecilia D. Wang (SBN 187782)
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 343-0770
Fax: (415) 395-0950
cwang@aclu.org

Sanjay Narayan (SBN 183227)**
Gloria D. Smith (SBN 200824)**
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
Tel.: (415) 977-5772
sanjay.narayan@sierraclub.org
gloria.smith@sierraclub.org

Counsel for Plaintiffs

*Admitted* pro hac vice
**Counsel for Plaintiff* Sierra Club