1  ELIZABETH B. WYDRA (BAR NO. 218200)
2  BRIANNE J. GOROD
   BRIAN R. FRAZELLE
3  ASHWIN P. PHATAK
   CONSTITUTIONAL ACCOUNTABILITY CENTER
4  1200 18th Street, NW, Suite 501
   Washington, D.C. 20036
5  Tel.: (202) 296-6889
   Fax: (202) 296-6895
6  elizabeth@theusconstitution.org
7
8  *Counsel for* Amici Curiae *Federal Courts Scholars*

9
10  **IN THE UNITED STATES DISTRICT COURT**
    **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
11  **OAKLAND DIVISION**

12

13  STATE OF CALIFORNIA, *et al.*,

14                                          Civil Action Nos. 4:19-cv-00872-HSG,
                                            4:19-cv-00892-HSG
15          Plaintiffs,
                                            P.I. Hearing Date: May 17, 2019
16      v.                                  Time: 10:00AM

17  DONALD J. TRUMP, in his official capacity as   **BRIEF OF *AMICI CURIAE* FEDERAL**
    President of the United States, *et al.*,      **COURTS SCHOLARS IN SUPPORT OF**
18                                                  **PLAINTIFFS' MOTION FOR**
            Defendants.                             **PRELIMINARY INJUNCTION**
19
20  SIERRA CLUB and SOUTHERN BORDER
    COMMUNITIES COALITION,
21
            Plaintiffs,
22
        v.
23
    DONALD J. TRUMP, in his official capacity as
24  President of the United States, *et al.*,
25
            Defendants.
26

27

28

1

## TABLE OF CONTENTS

2

**Page**

3

TABLE OF AUTHORITIES ..................................................................................... iii

4

INTEREST OF *AMICI CURIAE* ............................................................................ 1

5

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

6

ARGUMENT............................................................................................................ 4

7

THIS COURT MAY GRANT EQUITABLE RELIEF WHERE PLAINTIFFS

8

CHALLENGE ILLEGAL EXECUTIVE ACTION ............................................... 4

9

CONCLUSION........................................................................................................ 20

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ........................................................................................ 16

*Am. Sch. of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902) ...................................................................................... 10, 11

*Armstrong v. Exceptional Child Ctr., Inc.*,
   135 S. Ct. 1378 (2015) ............................................................................ 2, 4, 5, 13

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*,
   502 U.S. 32 (1991) ...................................................................................... 15, 16, 17

*Bowen v. Michigan Acad. of Family Physicians*,
   476 U.S. 667 (1986) ........................................................................................... 2

*Carroll v. Stafford*,
   44 U.S. (3 How.) 441 (1845)....................................................................... 4, 10, 13

*Chamber of Commerce of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) .................................................................... 11, 14, 17

*Commonwealth of Puerto Rico v. United States*,
   490 F.3d 50 (1st Cir. 2007) .............................................................................. 17

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ........................................................................................... 12

*Dart v. United States*,
   848 F.2d 217 (D.C. Cir. 1988) ......................................................................... 14

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) ......................................................................................... 2, 4

*Harmon v. Brucker*,
   355 U.S. 579 (1958) ........................................................................................ 2, 11

*Hawaii v. Trump*,
   138 S. Ct. 2392 (2018) ..................................................................................... 15

*Hawaii v. Trump*,
   878 F.3d 662 (9th Cir. 2017)............................................................................ 14

iii

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Horizon Air Indus., Inc. v. Nat'l Mediation Bd.*,
    232 F.3d 1126 (9th Cir. 2000) ................................................................... 18

*Int'l Ass'n of Machinists & Aerospace Workers v. Trans World Airlines*,
    839 F.2d 809 (D.C. Cir. 1988) .................................................................. 18

*Kendall v. United States ex rel. Stokes*,
    37 U.S. (12 Pet.) 524 (1838) .................................................................... 4, 9

*King v. Baker*,
    3 Burrows 1266 ...................................................................................... 8

*Land v. Dollar*,
    330 U.S. 731 (1947) ................................................................................ 12

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949) ................................................................................ 12

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ............................................................... 4, 15, 16, 18

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ............................................................. 3, 7, 8, 9

*Oestereich v. Selective Serv. Sys. Local Bd. No. 11*,
    393 U.S. 233 (1968) ................................................................................ 12

*Pac. Mar. Ass'n v. Nat'l Labor Relations Bd.*,
    827 F.3d 1203 (9th Cir. 2016) ............................................... 14, 17, 18, 19

*Pawlett v. The Attorney Gen.*,
    Hardres 465, 145 Eng. Rep. 550 (Ex. 1668) ........................................... 6

*Payne v. Cent. Pac. Ry. Co.*,
    255 U.S. 228 (1921) ................................................................................ 12

*Pennsylvania v. Wheeling & Belmont Bridge Co.*,
    54 U.S. (13 How.) 518 (1851) ................................................................. 5, 9

*Rex v. Barker*,
    3 Burr. 1265, 97 Eng. Rep. 823 (K.B. 1762) .......................................... 3, 6

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993) ................................................................................ 12

iv

# TABLE OF AUTHORITIES – cont'd

Page(s)

*Santa Fe Pac. R.R. Co. v. Payne*,
   259 U.S. 197 (1922) ............................................................................... 12

*Staacke v. U.S. Sec'y of Labor*,
   841 F.2d 278 (9th Cir. 1988)............................................................. 16, 18

*Stark v. Wickard*,
   321 U.S. 288 (1944) ............................................................................ 3, 12

*The Case of Cardiffe Bridge*,
   1 Salk. 146, 91 Eng. Rep. 135 (K.B. 1701).............................................. 6

*United States v. Lee*,
   106 U.S. 196 (1882) ................................................................................ 10

*Vitarelli v. Seaton*,
   359 U.S. 535 (1959) ................................................................................ 12

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................................ 12


CONSTITUTIONAL PROVISIONS AND LEGISLATIVE MATERIALS

5 U.S.C. § 559............................................................................................ 4, 14

10 U.S.C. § 284.............................................................................................. 13

10 U.S.C. § 2808............................................................................................ 13

12 U.S.C. § 1818(i)(1) ................................................................................... 17

28 U.S.C. § 1331.............................................................................................. 9

Consolidated Appropriations Act of 2019 ..................................................... 13

Judiciary Act of 1789, ch. 20, § 11, 1 Stat. 73............................................. 7, 9

U.S. Const. art. III, § 2, cl. 1 .......................................................................... 2, 7


BOOKS, ARTICLES, AND OTHER AUTHORITIES

3 William Blackstone, *Commentaries on the Laws of England* (1768)........................ 8

v

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Clark Byse & Joseph V. Fiocca, *Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action*, 81 Harv. L. Rev. 308 (1967) ........................................................................................ 17

Armistead Mason Dobbie, *Handbook of Federal Jurisdiction and Procedure* (1928) ......... 2, 5

Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1 (1963) ................................................................................................ 5, 6

Louis Jaffe & Edith Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956) ........................................................................ 2, 5, 13

H. Brent McKnight, *How Then Shall We Reason, The Historical Setting of Equity*, 45 Mercer L. Rev. 919 (1994) .......................................................................................... 5

James E. Pfander, *Sovereign Immunity and the Right to Petition*, 91 Nw. U. L. Rev. 899 (1997) ............................................................................................................... 3, 5, 6

John F. Preis, *In Defense of Implied Injunctive Relief in Constitutional Cases*, 22 Wm. & Mary Bill of Rts. J. 1 (2013) ................................................................................. 5, 7

Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612 (1997) ...................................................................................................... 8, 14

1 Joseph Story, *Commentaries on Equity Jurisprudence: As Administered in England and America* § 49 (12th ed. 1877) ................................................................................... 6

U.S. Dep't of Justice, *Att'y Gen.'s Manual on the Administrative Procedure Act* (1947) ........................................................................................................................ 14

vi

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are leading scholars with expertise in the jurisdiction of the federal courts. Specifically, *amici* have expertise pertaining to the government's argument that this Court cannot hear this case because Plaintiffs have not pointed to a statutory cause of action.  As *amici* know, there is a long history of courts of equity hearing claims that executive branch officials have exceeded their statutory power, and the Supreme Court has repeatedly recognized that redressing such claims is within the equitable power of the federal courts.  This case falls squarely within that legal tradition and within Supreme Court precedent.  *Amici curiae* are:

- Erwin Chemerinsky, Dean, Jesse H. Choper Distinguished Professor of Law, University of California, Berkeley Law

- Michael C. Dorf, Robert S. Stevens Professor of Law, Cornell Law School

- David A. Strauss, Gerald Ratner Distinguished Service Professor of Law, Faculty Director of the Jenner & Block Supreme Court and Appellate Clinic, University of Chicago Law School

- Stephen I. Vladeck, A. Dalton Cross Professor in Law, University of Texas School of Law

## INTRODUCTION AND SUMMARY OF ARGUMENT

On February 15, 2019, following months of trying to secure funding from Congress to build a wall along the southern border, President Trump issued an order declaring a "national emergency" and directing that funds Congress appropriated for other purposes be diverted to build the wall.  Plaintiffs challenge that order and its implementation, arguing that this diversion of funds exceeds the President's authority under various federal laws, and they seek a preliminary injunction preventing this allegedly unlawful diversion of funds.

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

1

In response, the government argues, among other things, that Plaintiffs "do not identify any private right of action in the statutes they challenge" or any other "cause of action."  Gov't Opp., *Sierra Club*, Dkt. No. 64 ("Gov't Opp.") 12.[2]  This argument ignores, however, what the Supreme Court has made clear: that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."  *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) (citing Louis Jaffe & Edith Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956)).  The Framers incorporated this established understanding about the power of equitable courts to provide remedies in the absence of a common law right when they defined the "judicial Power" to encompass "all Cases, in Law and Equity."  U.S. Const. art. III, § 2, cl. 1; *see Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) ("the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution" (quoting Armistead Mason Dobbie, *Handbook of Federal Jurisdiction and Procedure* 660 (1928))).

As a result, "equitable relief . . . is traditionally available to enforce federal law," *Armstrong*, 135 S. Ct. at 1385-86, and even in the absence of a statutory cause of action, the federal courts possess the power to provide redress where the executive illegally exceeds its authority. *See Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 681 (1986) ("We ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command."); *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958) ("Generally, judicial relief is available to one who has

---

[2] The government does not make this argument in its opposition in *California v. Trump*, No. 4:19-cv-00872-HSG.

been injured by an act of a government official which is in excess of his express or implied powers."); *Stark v. Wickard*, 321 U.S. 288, 309-10 (1944) ("When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted," and courts are available "to protect justiciable individual rights against administrative action fairly beyond the granted powers.").

Indeed, as the Supreme Court has explained, the judicial practice of providing equitable redress when the executive engages in illegal action has deep roots in our legal tradition.  Early antecedents to modern equitable review go back to medieval England, where King Edward I encouraged subjects to submit petitions for redress when relief was unavailable through the common law.  *See* James E. Pfander, *Sovereign Immunity and the Right To Petition*, 91 Nw. U. L. Rev. 899, 909 (1997).  By the seventeenth century, the King's Bench permitted equitable relief, including mandamus relief used to command officials to take certain action consistent with law. *See Rex v. Barker*, 3 Burr. 1265, 1267, 97 Eng. Rep. 823, 824-25 (K.B. 1762) (mandamus "ought to be used upon all occasions where the law has established no specific remedy, and where in justice and good government there ought to be one").

In America, from the early days of the Republic, the Supreme Court has permitted such equitable power to be used to restrain unlawful executive action.  In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), for example, the Supreme Court concluded that although no statute expressly provided for review of the Secretary of State's decision not to deliver Marbury's commission, "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Id.* at 163.  As the Court later reiterated, "the power to enforce the performance of [an] act must rest somewhere, or it will present a case which has often been said to involve a monstrous absurdity in a well organized government,

that there should be no remedy, although a clear and undeniable right should be shown to exist." *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 624 (1838).

The government argues that the availability of redress under the Administrative Procedure Act (APA) precludes equitable relief here, but that is wrong. The APA did "not limit or repeal additional requirements imposed by statute or otherwise recognized by law." 5 U.S.C. § 559. And courts "cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." *Leedom v. Kyne*, 358 U.S. 184, 190 (1958). Thus, the Supreme Court and the lower courts have continued to permit suits to enjoin illegal executive action even after the passage of the APA. As recently as 2015, the Supreme Court reiterated that "in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer." *Armstrong*, 135 S. Ct. at 1384 (quoting *Carroll v. Stafford*, 44 U.S. (3 How.) 441, 463 (1845)).

In short, from early English history to modern American precedent, courts have consistently heard claims that executive branch officials exceeded their statutory power, without requiring a statutory cause of action. This case is no different. Plaintiffs argue that the President and his Administration are exceeding Congress's grant of statutory authority when they attempt to divert funds Congress appropriated for other purposes to build a border wall. This Court can and should hear that claim on the merits.

## ARGUMENT

## THIS COURT MAY GRANT EQUITABLE RELIEF WHERE PLAINTIFFS CHALLENGE ILLEGAL EXECUTIVE ACTION.

**1.** As the Supreme Court has explained, "the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act." *Grupo Mexicano*,

4

527 U.S. at 318 (quoting Dobbie, *supra*, at 660); *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 54 U.S. (13 How.) 518, 563 (1851) ("since the organization of the government," "[t]he usages of the High Court of Chancery in England, whenever the jurisdiction is exercised, govern the proceedings"). And at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, there was already a "long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 135 S. Ct. at 1384 (citing Jaffe & Henderson, *supra*, at 345).

Indeed, the antecedents to modern equitable review go back to medieval England. At the time, common law courts issued a "variety of standardized writs," each of which specified a "'complete set of substantive, procedural, and evidentiary law, determining who has to do what to obtain the unique remedy the writ specifies for particular circumstances.'" John F. Preis, *In Defense of Implied Injunctive Relief in Constitutional Cases*, 22 Wm. & Mary Bill of Rts. J. 1, 9 (2013) (quoting H. Brent McKnight, *How Then Shall We Reason, The Historical Setting of Equity*, 45 Mercer L. Rev. 919, 929 (1994)). However, by the fourteenth century, "Chancery had stopped issuing new writs," and the existing "[w]rits did not cover every injustice." *Id.* at 10. Thus, the Court of Chancery began issuing "new and distinct remedies for the violation of preexisting legal rights," *id.* at 12, often "creat[ing] a cause of action where none had existed before." *Id.* at 20.

These equitable remedies included actions against the Crown. "Beginning with the reign of Edward I, the English Crown encouraged subjects to seek relief unavailable at common law through the submission of petitions for redress." Pfander, *supra*, at 909; *cf.* Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1, 6 (1963) (discussing the ability to bring "property claims against the state," which would have been unavailable at common law). These so-called "'petitions of right'" sought royal consent to bring claims grounded in a legal right, which were then investigated by the Chancery, a body that would "hear the case, . . .

5

decide it on legal principles, and . . . render a judgment against the Crown." Pfander, *supra*, at 909; *see* 1 Joseph Story, *Commentaries on Equity Jurisprudence: As Administered in England and America* § 49, at 40 (12th ed. 1877) (equity jurisdiction exists where "a wrong is done, for which there is no plain, adequate, and complete remedy in the Courts of Common Law"). The existence of these petitions was grounded in the view that "the king is the fountain and head of justice and equity; and it shall not be presumed that he will be defective in either. And it would derogate from the king's honor to imagine, that what is equity against a common person should not be equity against him." *Pawlett v. The Attorney Gen.*, Hardres 465, 145 Eng. Rep. 550 (Ex. 1668).

By the seventeenth century, the King's Bench had developed equitable remedies that were analogous to today's remedies against illegal government action: the dual remedies of certiorari and mandamus. *See The Case of Cardiffe Bridge*, 1 Salk. 146, 91 Eng. Rep. 135 (K.B. 1701) ("[W]herever any new jurisdiction is erected, be it by private or public Act of Parliament, they are subject to the inspections of this Court by writ of error, or by *certiorari* and *mandamus*."). Certiorari, the "more conservative" remedy, came "into action after the government . . . acted and then only to correct and to keep action within bounds." Jaffe, *supra*, at 16. Mandamus, by contrast, was "used where government . . . simply refused to take action in the individual's favor, whether that action involve[d] conferring a positive benefit or an indirect threat." *Id.* Moreover, mandamus "operat[ed] directly on the government; it command[ed] an officer not as an individual but as a functionary." *Id.* As Lord Mansfield explained, mandamus "was introduced, to prevent disorder from a failure of justice, and defect of police. Therefore it ought to be used upon all occasions where the law has established no specific remedy, and where in justice and good government there ought to be one." *Rex*, 3 Burr. at 1267, 97 Eng. Rep. at 824-25.

6

In short, "[a]t the time of the American Founding, it was not uncommon for Chancery to enforce the common law through equitable remedies even where the common law might not itself make damages available." Preis, *supra*, at 15. And those equitable remedies were often exercised in response to illegal official action, including by the Crown itself.

**2.** When the Constitution's Framers conferred on the federal courts the "judicial Power" to decide "all Cases, in Law and Equity," U.S. Const. art. III, § 2, cl. 1, and when the first Congress gave the federal courts diversity jurisdiction over suits "in equity" in the Judiciary Act of 1789, ch. 20, § 11, 1 Stat. 73, 78, they incorporated this established understanding about the power of equitable courts to provide redress for illegal state action in the absence of a common law remedy.

From the early days of the Republic, that equitable power was used to restrain unlawful executive action. The most prominent early example is *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). Prior to that opinion's most famous section—in which the Court held that the statute giving it jurisdiction to issue original writs of mandamus to government officials was unconstitutional—the Court considered whether William Marbury had "a right to the commission" as Justice of the Peace, and whether, if the Court had jurisdiction, "the laws of his country afford him a remedy" including "a *mandamus* issuing from [the Supreme] [C]ourt." *Id.* at 154. On each of those points, the Court answered in the affirmative. The case is therefore an early example of the Supreme Court devising a remedy—mandamus relief in equity—for a legal wrong committed by an executive officer despite the absence of an express cause of action permitting review of the officer's decision.

First, the Court concluded that because Marbury had a "commission . . . signed by the President, and sealed by the secretary of state," he was "appointed," and the law gave him a "right to hold [the office] for five years." *Id.* at 162. Second, the Court concluded that the laws of the

7

country afforded Marbury a remedy to obtain that office.  Importantly, "[n]o statute expressly required the Secretary of State to deliver commissions to presidential appointees.  Nor did any statute provide an express cause of action for review of the Secretary of State's decision not to deliver up a document he possessed in his official capacity."  Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612, 1630 (1997).  Nonetheless, the Court concluded that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury."  *Marbury*, 5 U.S. (1 Cranch) at 163; *see id.* ("[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded."  (quoting 3 William Blackstone, *Commentaries on the Laws of England* \*23 (1768))).  That is because "[t]he government of the United States has been emphatically termed a government of laws," and "[i]t will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."  *Id.*  The Court acknowledged that there may be some "mere political act[s]" for which there is "no remedy," *id.* at 164, but the Court maintained that if "a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy."  *Id.* at 166.

Finally, the Court concluded that it may issue a writ of mandamus to a cabinet secretary. The Court noted a passage by Lord Mansfield in *King v. Baker*, 3 Burrows 1266, in which he said that "[w]henever there is a right to execute an office, perform a service, or exercise a franchise (more especially if it be in a matter of public concern, or attended with profit) and a person is kept out of possession, or dispossessed of such right, and has no other specific legal remedy, the court ought to assist by mandamus, upon reasons of justice."  *Marbury*, 5 U.S. (1 Cranch) at 168-69.

8

This principle, the Court concluded, applies equally to executive officers. Mandamus is appropriate for the failure of an officer to do an act "in the performance of which he is not placed under the particular direction of the President, and the performance of which the President cannot lawfully forbid, and therefore is never presumed to have forbidden." *Id.* at 171.[3]

The outcome in *Marbury* is mirrored in a number of other early Supreme Court cases. For example, in *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838), the Court issued a writ of mandamus requiring the Postmaster General to disburse certain credits to which the plaintiffs claimed they were entitled by statute. According to the Court, this was a "prosecution of a suit to enforce a right secured by a special act of congress, requiring of the postmaster general the performance of a precise, definite, and specific act, plainly enjoyed by the law." *Id.* at 624. Thus, the Court reasoned, "the power to enforce the performance of the act must rest somewhere, or it will present a case which has often been said to involve a monstrous absurdity in a well organized government, that there should be no remedy, although a clear and undeniable right should be shown to exist." *Id.* The Court's decision made clear that so long as the Court could exercise subject-matter and personal jurisdiction, it could provide a remedy. *Id.* at 623-24; *see Wheeling & Belmont Bridge Co.*, 54 U.S. at 563 ("[T]here is no other limitation to the exercise of a chancery jurisdiction by [American] courts, except the value of the matter in controversy, the residence or character of the parties, or a claim which arises under a law of the United States. . . . ").

---

[3] To be sure, the *Marbury* Court invalidated Section 25 of the Judiciary Act of 1789 insofar as it conferred original jurisdiction on the Supreme Court in violation of Article III, and for that reason Marbury did not receive his commission. However, the requirement that every Article III court have proper jurisdiction does not bear on the existence of a cause of action, and of course, this case falls squarely within the scope of this Court's jurisdiction under 28 U.S.C. § 1331.

9

Similarly, in *Carroll v. Safford*, 44 U.S. (3 How.) 441 (1845), the Court permitted an equitable claim where other legal remedies were inadequate.  The Court had "no doubt, that, in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer, for which the law might give no adequate redress."  *Id.* at 463.  And in *United States v. Lee*, 106 U.S. 196 (1882), the Court allowed plaintiffs to sue federal officers to recover land they alleged had been seized by the United States without valid authority.  The Court declared that the law is "the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound . . . to observe the limitations which it imposes upon the exercise of the authority which it gives."  *Id.* at 220.  Although the plaintiffs formally brought their claims as an action of ejectment under Virginia law against the federal officers who administered the disputed property, what they really were challenging was "the right of the United States to property held by such persons as officers or agents for the government," *id.* at 204, a type of action not authorized by any statute.  Nevertheless, the Supreme Court permitted the suit, held that it was not barred by sovereign immunity, and affirmed the judgment in favor of the plaintiffs.  The Court emphasized that "[n]o man in this country is so high that he is above the law.  No officer of the law may set that law at defiance with impunity.  All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it."  *Id.* at 220.  A contrary result would "sanction[] a tyranny which has no existence in the monarchies of Europe, nor in any other government which has a just claim to well-regulated liberty and the protection of personal rights."  *Id.* at 221.

Finally, in *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902), the Court permitted a suit in equity seeking to enjoin a local postmaster from carrying out the Postmaster General's decision to order the retention of mail sent to the plaintiffs' businesses.

Without considering whether there was a statutory cause of action, the Court explained that the Postmaster General's "right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then he cannot exclude or refuse to deliver them." *Id.* at 109. Because "the case is not one which, by any construction of those facts, is covered or provided for by the statutes under which the Postmaster General has assumed to act . . . the courts . . . must have power in a proper proceeding to grant relief." *Id.* at 109-10. The Court therefore remanded the case with orders to "grant a temporary injunction as applied for by complainants, and to take such further proceedings as may be proper." *Id.* at 111. "The reasoning of *McAnnulty* has been employed repeatedly" since then. *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (citing cases).

**3.** More recent cases have similarly permitted equitable relief in the face of illegal executive action, without any statutory cause of action. For example, in *Harmon v. Brucker*, 355 U.S. 579 (1958), the Court held that the Secretary of the Army's dishonorable discharge of petitioners based on their preinduction conduct was "in excess of powers granted him by Congress." *Id.* at 581. Critically, as an antecedent matter, the Court held that the district court erred when it concluded that it lacked the power to hear the case. As the Court explained: "Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers." *Id.* at 581-82. Thus, the district court had the "power to construe the statutes involved to determine whether the respondent did exceed his powers." *Id.* at 582. If so, then "judicial relief from this illegality would be available." *Id.* at 582. The Court then concluded that the Secretary's actions exceeded his statutory authority and remanded the case "for the relief to which petitioners are entitled in the light of this opinion." *Id.* at 583.

In other cases, the Court has decided the merits of statutory challenges to official action without even addressing the lack of a statutory cause of action permitting such a suit. For instance, in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the Court struck down the President's executive order seizing certain steel mills, which "was not authorized by an act of Congress or by any constitutional provisions." *Id.* at 583. Importantly, although *Youngstown* rested heavily on the President's lack of statutory authority for his actions, nowhere in the opinion did the Court discuss the absence of a statutory cause of action permitting the mill owners to file suit challenging the President's action. Likewise, in *Dames & Moore v. Regan*, 453 U.S. 654 (1981), the Court again addressed the merits of an action for an injunction based on a claim that officials "were beyond their statutory and constitutional powers." *Id.* at 667. While the Court rejected the plaintiffs' challenge on the merits, upholding the executive action as permissible under federal law, it never once suggested that the plaintiffs could not seek such equitable relief because they lacked a statutory cause of action.

These are only a few examples of the many decisions in which the Supreme Court has permitted equitable review of executive action that was alleged to exceed an official's statutory powers, without requiring a statutory cause of action. *See, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 165, 170 (1993); *Oestereich v. Selective Serv. Sys. Local Bd. No. 11*, 393 U.S. 233, 235, 238-39 (1968); *Vitarelli v. Seaton*, 359 U.S. 535, 537-38, 540, 545 (1959); *Land v. Dollar*, 330 U.S. 731, 734, 736-37 (1947); *Stark*, 321 U.S. at 310; *Santa Fe Pac. R.R. Co. v. Payne*, 259 U.S. 197, 198-99 (1922); *Payne v. Cent. Pac. Ry. Co.*, 255 U.S. 228, 236, 238 (1921). As the Court has repeatedly explained, "where [an] officer's powers are limited by statute, his actions beyond those limitations . . . are ultra vires his authority and therefore may be made the object of specific relief." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949).

Most recently, in *Armstrong v. Exceptional Child Center*, the Court reiterated that "in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer." 135 S. Ct. at 1384 (quoting *Carroll*, 44 U.S. (3 How.) at 463). The Court cited *McAnnulty* for the proposition that federal courts can grant injunctive relief "with respect to violations of federal law by federal officials." *Id.* Indeed, the Court explained, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* (citing Jaffe & Henderson, *supra*, at 345); *see id.* (calling equitable relief "a judge-made remedy"). Although the Court concluded that in the Medicaid Act "Congress . . . displace[d] the equitable relief that is traditionally available to enforce federal law," *id.* at 1385-86, the Court reaffirmed the long-standing principle that equitable relief is available to prevent unlawful executive action so long as legislation shows no "intent to foreclose equitable relief," *id.* at 1385 (quotation marks and citation omitted).

\* \* \*

Given this history and precedent, Plaintiffs clearly have a cause of action to bring their claims regarding the illegality of the President's attempt to use funds appropriated for other purposes to build a border wall. These claims—which allege that the executive has exceeded the authority delegated to him by 10 U.S.C. § 2808, the Consolidated Appropriations Act of 2019, and 10 U.S.C. § 284—are the type of claims that the federal courts have always had the power to hear and decide, as the Supreme Court recognized most recently just four years ago.

**4**. The government fails to engage with any of this history or case law in its opposition. Instead, the government argues that courts may engage in equitable review of unlawful official action only when a plaintiff would otherwise be wholly deprived of meaningful review, and

suggests that Plaintiffs here could have brought claims under the APA.  Gov't Opp. 12.  The government also argues that, to succeed on the merits, Plaintiffs must demonstrate that the President's actions "contravene clear and mandatory statutory language."  Gov't Opp. 13 (quoting *Pac. Mar. Ass'n v. Nat'l Labor Relations Bd.*, 827 F.3d 1203, 1208 (9th Cir. 2016)).  Both arguments are wrong.

To start, with regard to the argument that the availability of APA review prevents Plaintiffs from seeking extra-statutory equitable review, "[n]othing in the APA purports to be exclusive or suggests that the creation of APA review was intended to preclude any other applicable form of review."  Siegel, *supra*, at 1666.  To be sure, the APA imposes its own set of procedural and substantive requirements on agencies and has its own authorizations for judicial review.  But by its own terms, the APA "do[es] not limit or repeal additional requirements imposed by statute or otherwise recognized by law."  5 U.S.C. § 559; *see* U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* 139 (1947) (this provision was "intended simply to indicate that the act will be interpreted as supplementing constitutional and legal requirements imposed by existing law"); Siegel, *supra*, at 1666 (describing legislative history indicating that Congress "appeared to contemplate expressly the possibility that nonstatutory review could supplement the review provided by the APA").

The "enactment of the APA," therefore, did "not repeal the review of *ultra vires* actions recognized long before," and as a result, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority."  *Reich*, 74 F.3d at 1328 (quoting *Dart v. United States,* 848 F.2d 217, 224 (D.C. Cir. 1988)); *Hawaii v. Trump*, 878 F.3d 662, 682 (9th Cir. 2017) (explaining that a "cause of action . . . exists outside of the APA" that "allows courts to review *ultra vires* actions by the President that go beyond the scope of the President's statutory

14

authority"), *rev'd on other grounds and remanded*, 138 S. Ct. 2392 (2018).  Indeed, as discussed above, the Supreme Court has entertained suits in equity to challenge government action in numerous cases since the APA was passed without any discussion of whether the plaintiffs in those cases could seek relief under the APA.  *See supra* at 11-13.

More generally, however, the government's attempt to limit the availability of equitable relief to cases in which a plaintiff has no other avenue for meaningful review has a more fundamental problem.  The restrictive standard the government would apply to *all* claims for equitable relief in reality is required only for one narrow subclass of equitable review: cases in which Congress creates statutory rights and establishes a judicial review scheme that implicitly precludes other modes of enforcing those rights.

That rule originated in *Leedom v. Kyne*, 358 U.S. 184 (1958).  There, the plaintiffs sought to challenge a determination of the National Labor Relations Board (NLRB) that the plaintiffs argued was beyond the Board's statutory authority.  The NLRB responded that a provision authorizing judicial review of other, final Board determinations "implied, by its silence, a preclusion of review of the contested determination."  *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991) (discussing *Leedom*).  "The Court rejected that argument, emphasizing the presumption that Congress normally intends the federal courts to enforce and protect the rights that Congress has created."  *Id*. at 43.  Observing that denying review "would mean a sacrifice or obliteration of a right which Congress has given . . . for there is no other means . . . to protect and enforce that right," *Leedom*, 358 U.S. at 190 (quotation marks and citation omitted), the Court held that neither statutory silence nor negative implication offered a sufficiently clear indication of congressional intent to overcome the presumption of enforceability.

In other words, courts should not "lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." *Id.*

Importantly, *Leedom* did *not* address the background conditions under which equitable review is available as a general matter, nor did it limit the availability of such review.  The case simply "stands for the familiar proposition that 'only upon a showing of "clear and convincing evidence" of a contrary legislative intent should the courts restrict access to judicial review.'" *MCorp*, 502 U.S. at 44 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)); *see Staacke v. U.S. Sec'y of Labor*, 841 F.2d 278, 280 n.2 (9th Cir. 1988) ("the presumption favoring judicial review . . . may be overcom[e] whenever the congressional intent to preclude review is fairly discernible in the statutory scheme" (quotation marks and citation omitted)).  The government has made no effort to show "clear and convincing evidence" that Congress sought to preclude equitable remedies for violations of the statutes that undergird Plaintiffs' claims here.  Thus, even assuming that APA review may also be available, that should not prevent the Plaintiffs from seeking these equitable remedies.

The only Supreme Court case that the government cites for its rule is *Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*  But that decision was merely a straightforward application of *Leedom* in which "the congressional preclusion of review" was obvious.  *MCorp*, 502 U.S. at 44.  There, the Court considered whether a bank could sue the Federal Reserve in district court seeking to enjoin administrative actions for violating a regulation the bank believed to be in excess of the Federal Reserve's statutory authority.  *Id.* at 34.  The Court said no, relying on two factors.  First, the Financial Institutions Supervisory Act of 1966, the statute that permitted the Federal Reserve to institute the administrative proceedings, established a "regime of judicial review" that required proceedings to go to the Federal Reserve first, and then to be

16

appealed to a court of appeals.  *Id.* at 38.  Second, the Act said that "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any [Federal Reserve] notice or order under any such section."  12 U.S.C. § 1818(i)(1).  Thus, the Court concluded that not only had Congress created "a meaningful and adequate opportunity for judicial review" in the statutory scheme in question, but it also "spoke[] clearly and directly" that it intended to preclude other forms of judicial review.  *McCorp*, 502 U.S. at 43-44.

Neither of those factors exist here, and the government has made no argument that they do.  None of the statutes on which the plaintiffs base this suit prescribe a "regime of judicial review," *id.* at 38, designed to address this specific situation, much less preclude other extra-statutory means of enforcing the statutes' terms.[4]

The government's argument that Plaintiffs, to succeed on the merits, must demonstrate that the President's actions "contravene clear and mandatory statutory language," Gov't Opp. 13 (quoting *Pac. Mar. Ass'n*, 827 F.3d at 1208), is also wrong—indeed doubly wrong.

First, this standard pertains only to cases involving the *Leedom* rule, not to cases of equitable review generally.  Indeed, all three decisions cited by the government involve situations

---

[4] The government also cites a single out-of-circuit appellate decision, *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50 (1st Cir. 2007), in support of its view, *see* Gov't Opp. 12.  But as explained above, the First Circuit's statement that *MCorp* "established two critical factors that must be present to invoke nonstatutory review," *Puerto Rico*, 490 F.3d at 59 (brackets, quotation marks, and citation omitted), is simply wrong—and the court offers little reasoning in support of its statement.  Among other things, the First Circuit misinterpreted an observation from the D.C. Circuit that "[i]f a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." *Reich*, 74 F.3d at 1327 (citing Clark Byse & Joseph V. Fiocca, *Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action*, 81 Harv. L. Rev. 308, 321 (1967)).  The First Circuit misread that observation to mean that nonstatutory review is available *only* when a plaintiff is unable to bring his case under a statutory review provision.  But *Reich* itself held that nonstatutory review remains available despite the existence of a potentially viable claim under the APA.  *Id.* at 1326-27, 1328.

in which Congress created statutory rights and a review scheme for the enforcement of those rights, but where plaintiffs sought to pursue enforcement proceedings outside of those review schemes. *See Pac. Mar. Ass'n*, 827 F.3d at 1204 ("We conclude that the district court had no jurisdiction over [the plaintiff-appellee's] effort to obtain review of a non-final NLRB ruling, as the *Leedom* exception to the finality requirement does not apply."); *Staacke*, 841 F.2d at 281 (concluding that "the statutory provision absolutely bars judicial review" and that "the narrow window left open by the Supreme Court in permitting review when a clear statutory mandate has been transgressed does not justify review in this case"); *Horizon Air Indus., Inc. v. Nat'l Mediation Bd.*, 232 F.3d 1126, 1131-32 (9th Cir. 2000) (explaining that "[f]ederal court jurisdiction over NMB [National Mediation Board] actions is . . . 'one of the narrowest known to the law,'" because the relevant scheme gave the Board "discretion over, and the power to resolve finally, representation disputes," thus depriving federal courts of "jurisdiction over the merits of a representation dispute decided by the NMB" (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. Trans World Airlines*, 839 F.2d 809, 811 (D.C. Cir. 1988))).

Second, this rule pertains only to establishing *reviewability*, not to success on the merits. *See Pac. Mar. Ass'n*, 827 F.3d at 1208 ("*The exercise of jurisdiction* under *Leedom* thus requires a plaintiff to make a two-part showing.  First, the challenged [administrative] action . . . must contravene 'clear and mandatory' statutory language." (citations omitted & emphasis added) (quoting *Leedom*, 358 U.S. at 188)); *Staacke*, 841 F.2d at 281 (Under the *Leedom* rule, "*jurisdiction exists* where defendant is charged with violating a clear statutory mandate or prohibition." (citations omitted & emphasis added)); *Horizon*, 232 F.3d at 1132 (despite congressional preclusion of review, "courts have jurisdiction to review allegations that the NMB

has acted outside its legislative authority" and will "take only a 'peek at the merits' to determine if the NMB has committed an error of these dimensions").

Here, Plaintiffs assert simply that the President's actions exceed his statutory authority, and the statutes he is allegedly violating say nothing about judicial review, much less preclude review outside of a specified review scheme. Indeed, as discussed earlier, the Supreme Court has consistently permitted judicial review of illegal executive action in cases like this for the last two centuries. During that period, the Court has never held, or even suggested, that a plaintiff must meet a *higher* bar to obtain equitable relief than any other relief premised on an executive official's violation of a statute, outside of the narrow *Leedom* context. In short, Plaintiffs need not show that the Defendants' actions "contravene clear and mandatory statutory language," Gov't Opp. 13 (quoting *Pac. Mar. Ass'n*, 827 F.3d at 1208), in order to obtain the relief they seek.

**CONCLUSION**

For the foregoing reasons, this Court should reject Defendants' argument that there is no cause of action here.

Respectfully submitted,

/s/ Elizabeth B. Wydra
Elizabeth B. Wydra (Bar No. 218200)
Brianne J. Gorod
Brian R. Frazelle
Ashwin P. Phatak
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W.
Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for* Amici Curiae *Federal Courts Scholars*

Dated: May 2, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2019, the foregoing document was filed with the Clerk of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: May 2, 2019

*/s/ Elizabeth B. Wydra*
Elizabeth B. Wydra
