MICHAELE N. TURNAGE YOUNG*
DANIEL HARAWA
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300
Fax: (202) 682-1312
MTURNAGEYOUNG@NAACPLDF.ORG
*Counsel of record, CA Bar No. 247796

SHERRILYN A. IFILL
    PRESIDENT & DIRECTOR-COUNSEL
JANAI S. NELSON
SAMUEL SPITAL
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
Fax: (212) 226-7592

Counsel for Amicus Curiae NAACP Legal Defense and Educational Fund, Inc.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| SIERRA CLUB and SOUTHERN BORDER COMMUNITIES COALITION,<br><br>            *Plaintiffs,*<br><br>    v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity; PATRICK M. SHANAHAN, Acting Secretary of Defense, in his official capacity; KIRSTJEN M. NIELSEN, Secretary of Homeland Security, in her official capacity; and STEVEN MNUCHIN, Secretary of the Treasury, in his official capacity,<br><br>            *Defendants.* | Case No.: 4:19-cv-00892-HSG<br><br>P.I. Hearing Date: May 17, 2019<br>Time: 10:00 AM<br><br>**BRIEF OF AMICUS CURIAE NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## INTEREST OF AMICUS CURIAE

For over 75 years, the NAACP Legal Defense and Educational Fund, Inc. ("LDF") has strived—as its central mission—to secure the constitutional promise of equality for all people in the United States. From its earliest advocacy led by the late Supreme Court Justice Thurgood Marshall to the Supreme Court's recent decision in *Buck v. Davis*, 137 S. Ct. 759 (2017), LDF has litigated some of the most significant and pressing legal issues pertaining to discrimination against Black people in our country. *See, e.g., Smith v. Allwright*, 321 U.S. 649 (1944) (exclusion of Black voters from primary election); *Brown v. Board of Education*, 347 U.S. 483 (1954) (racial segregation of public schools); *McCleskey v. Kemp*, 481 U.S. 279 (1987) (challenge to discriminatory application of death penalty); *Shelby County v. Holder*, 133 S. Ct. 2612 (2013) (defense of constitutionality of Section 5 of the Voting Rights Act). Throughout its history of civil rights advocacy, LDF has also pressed for the equal treatment of other minority groups and individuals seeking equal protection of the laws. For example, LDF has submitted amicus briefs in support of a successful challenge to the State of California's refusal to issue fishing licenses to noncitizens, including people of Japanese ancestry, who were federally barred at that time from obtaining United States citizenship; in support of petitioners advancing the right to same-sex marriage in the United States; and in opposition to President Trump's executive order restricting entry of noncitizens from six predominantly Muslim nations. *See Takahashi v. Fish and Game Comm'n*, 334 U.S. 410 (1948); *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015); *Trump v. Hawaii*, 138 S. Ct. 2392 (2018). LDF is currently litigating a challenge to the Trump Administration's rescission of Temporary Protected Status for Haitian nationals; a federal district court recently held that the complaint in that case stated a well-pleaded claim that the rescission was motivated

1    by unconstitutional discrimination. *See NAACP v. Dep't of Homeland Security*, __ F. Supp. 3d

2    __, 2019 WL 1126386 (D. Md. March 12, 2019).

3          LDF has an interest in this case because its extensive advocacy for civil rights has shown

4    that African Americans and other minority groups are particularly vulnerable when government

5    officials are permitted to disregard the rule of law. *See, e.g., Cooper v. Aaron*, 358 U.S. 1 (1958)

6    (involving state officials' attempted defiance of Supreme Court rulings invalidating racial

7    segregation in public schools). Here, the President has sought to disregard the Constitution's

8    separation of powers by supplanting the appropriations and lawmaking authority properly held

9    by Congress. LDF has a strong interest in defending our constitutional democracy against such a

10   disturbing step toward tyranny.[1]

11                                    **ARGUMENT**

12         The President's declaration of a national emergency "does not allow us to set aside first

13   principles." *Medellin v. Texas*, 552 U.S. 491, 524 (2008). This is a case about first principles.

14   Our Constitution requires the separation of powers to ensure an enduring democracy. "Even

15   before the birth of this country, separation of powers was known to be a defense against

16   tyranny." *Loving v. United States*, 517 U.S. 748, 756 (1996) (citing Montesquieu's *The Spirit of*

17   *the Laws* and Blackstone's *Commentaries*). To protect against tyranny, it "remains a basic

18   principle of our constitutional scheme that one branch of the Government may not intrude upon

19   the central prerogatives of another." *Id.* at 757. Yet, in this case, the President has done precisely

20   _____

21

22   [1] No counsel for a party authored this brief in whole or in part, and no person other than amicus
     curiae, its members, or its counsel made a monetary contribution to the preparation or

23   submission of this brief. This brief is being filed in *Sierra Club v. Trump*, but the separation-of-
     powers analysis is also relevant to *California v. Trump* and supports the entry of a preliminary
     injunction in that case as well.

BRIEF OF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS
CASE NO. 4:19-CV-00892-HSG

that: arrogating to himself the power to contravene the will of Congress about a matter within Congress' authority, i.e., build a wall along the southern border that Congress specifically rejected. The Constitution's separation of powers prohibits this disturbing power grab.

In an effort to sidestep constitutional first principles and build the wall rejected by Congress, the President filed a proclamation declaring a national emergency and invoked his authority under, *inter alia*, the National Emergencies Act, 50 U.S.C. §§ 1601-1651, and 18 U.S.C. § 2808. For the reasons explained in the amicus brief being filed by the Brennan Center for Justice, the President's proclamation flouts the intent of the National Emergencies Act and represents a sharp departure from prior presidential use of that Act. And, for the reasons explained by the Plaintiffs, construction of the border wall is in any event not authorized by 18 U.S.C. § 2808. This brief is therefore limited to making two points.

*First*, courts must reject any invocation of executive authority that would allow the President to circumvent "the expressed or implied will of Congress" when Congress speaks on a specific question. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). *Second*, allowing the President to circumvent separation of powers in this manner would fundamentally undermine our constitutional structure and leave minority groups particularly vulnerable to the abuse of government power.

## I.     No Statute May Be Interpreted to Create an Imperial Presidency.

As the Supreme Court has stressed, one of the "first principles" of our constitutional democracy is that the President's "authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself.'" *Medellin*, 552 U.S. at 524 (quoting *Youngstown*, 343 U.S. at 585). Thus, "'[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb,' and

1    the Court can sustain his actions 'only by disabling the Congress from acting upon the subject.'"

2    *Id*. at 525 (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)) (alteration in

3    *Medellín*).

4         These first principles are dispositive here. As the Plaintiffs explain, Congress made a

5    considered judgment in the Consolidated Appropriations Act of 2019 to limit the amount of

6    funding to be used for border barrier construction this year, and to restrict the pace, location, and

7    permissible designs for such construction. *See* Plaintiffs' Motion for Preliminary Injunction,

8    Doc. No. 29, at 7-8. In so doing, Congress specifically rejected the President's requests to

9    appropriate much more money to build a much longer wall. *See id*. at 2-3. The President now

10   seeks to take measures incompatible with Congress' will by authorizing more money to construct

11   a different and much longer wall than Congress authorized. The Constitution forbids him from

12   doing so because these lawmaking decisions reside with Congress. *See, e.g., Whitman v. Am.

13   Trucking Ass'ns*, 531 U.S. 457, 472 (2001) ("Article I, § 1, of the Constitution vests '[a]ll

14   legislative Powers herein granted . . . in a Congress of the United States.'") (alterations in

15   *Whitman*); *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) ("The

16   United States Constitution exclusively grants the power of the purse to Congress, not the

17   President.").

18        The President has tried to circumvent the Constitution by declaring a "national

19   emergency," and invoking his authority under, *inter alia*, the National Emergencies Act and 18

20   U.S.C. § 2808. But for the reasons stated by Plaintiffs and the Brennan Center, those statutes do

21   not permit the President to exercise such authority.

22        The Government's contrary interpretations raise grave constitutional concerns. In the

23   Government's view, the basic separation-of-powers principles established in *Youngstown* are

BRIEF OF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS
CASE NO. 4:19-CV-00892-HSG

1   inapplicable here because the President is purportedly not relying on his Article II powers.

2   Instead, according to the Government, previous Congresses gave the President unfettered and

3   unreviewable discretion to declare a national emergency (no matter how dubious that declaration

4   is) and then exercise an extraordinary array of quintessentially legislative powers—including the

5   power to circumvent a clear policy judgment made by the current Congress on a matter within

6   Congress' constitutional authority. *See* Defendants' Opposition to Plaintiffs' Motion for

7   Preliminary Injunction, 4/25/19 at 22, 27. That dangerous argument proves far too much. It

8   would allow the President to contravene the express or implied will of today's Congress on a

9   specific subject simply by uttering the magic words "national emergency" and relying on general

10  laws passed by prior Congresses. It would therefore permit the President to undermine Congress'

11  "central prerogative[]" to appropriate funds and make laws. *Loving*, 517 U.S. at 757. It would

12  also attribute to the Congresses that passed the statutes the Government relies on an improper

13  abdication not only of their own authority, but that of future Congresses. *See Clinton v. City of*

14  *New York*, 524 U.S. 417, 452 (1988) (Kennedy J., concurring) ("The Constitution is a compact

15  enduring for more than our time, and one Congress cannot yield up its own powers, much less

16  those of other Congresses to follow. Abdication of responsibility is not part of the constitutional

17  design.") (internal citations omitted).

18          The Government's arguments would also undermine the judiciary's prerogatives to

19  "adjudicate a claimed excess by a coordinate branch of its constitutional powers," *Chadha v.*

20  *I.N.S.*, 634 F.2d 408, 419 (9th Cir. 1980), and to "say what the law is," *Marbury v. Madison*, 5

21  U.S. 137, 177 (1803), by precluding any judicial review of the President's determination to

22  unlock extraordinarily broad powers under the National Emergencies Act. The Government's

23  assertion of such judicially unreviewable power by the President is contradicted by the very

authority it cites. *See U.S. v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1080-81 (9th Cir. 1982) (declining to review a declaration of a national emergency declaration under the Trading with the Enemy Act, but recognizing that such review could be appropriate if there were a "compelling reason" for it, and further stating:  "we are free to review whether the actions taken pursuant to a national emergency comport with the power delegated by Congress").

In light of these grave constitutional concerns, the canon of constitutional avoidance weighs strongly against any interpretation of the National Emergencies Act, 18 U.S.C. § 2808, or any other general statute enacted by a prior Congress that would allow the President to circumvent the "express or implied will" of today's Congress on a specific subject. *See, e.g.*, *I.N.S. v. St. Cyr*, 533 U.S. 299-300 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems.") (citations omitted).

## II.   Allowing the President to Circumvent the Separation of Powers Would Jeopardize Our Constitutional Structure and Leave Minority Groups Vulnerable to Tyranny.

As Justice Frankfurter said, "the Framers of our Constitution were not inexperienced doctrinaires." *Youngstown*, 343 U.S. at 593 (Frankfurter, J., concurring).  They were aware of the very real "hazards" that derive from "concentrated power," and they considered the separation of powers a "necessity" because it ensures a "system of checks and balances." *Id.* "The principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into [the fabric of the Constitution]." *Buckley v. Valeo*, 424 U.S. 1, 124 (1976). The Framers "structure[d] three departments of government so that each would have affirmative powers strong enough to resist the encroachment of the others." *Id.* at 272 (White, J., concurring

1  in part and dissenting in part). The Supreme Court has since made clear that it was this "distrust

2  of governmental power" that "was the driving force behind the constitutional plan that allocated

3  powers among three independent branches." *Boumediene v. Bush*, 553 U.S. 723, 742 (2008).

4      The Framers were clear-eyed about why it was necessary to separate power: "'[T]he

5  accumulation of all powers, legislative, executive and judiciary in the same hands, whether of

6  one, a few, or many, and whether hereditary, self appointed, or elective, may justly be

7  pronounced the very definition of tyranny.'" *I.N.S. v. Chadha*, 462 U.S. 919, 960 (1983) (Powell,

8  J., concurring in the judgment) (quoting The Federalist No. 47 (J. Madison)). In Professor Lani

9  Guinier's words, "[a]lthough the American revolution was fought against the tyranny of the

10  British monarch, it soon became clear that there was another tyranny to be avoided. The

11  accumulations of all powers in the same hands, Madison warned [was] . . . 'the very definition of

12  tyranny.'" Lani Guinier, *The Tyranny of the Majority* 3 (1994). The Framers unequivocally

13  believed that unchecked executive power was an inherent threat to "individual liberty."

14  *Boumediene*, 553 U.S. at 742; *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring) ("[T]he

15  Constitution diffuses power the better to secure liberty."). Justice Kennedy put it plainly:

16  "Liberty is *always* at stake when one or more of the branches seek to transgress the separation of

17  powers." *City of New York*, 524 U.S. at 450 (Kennedy, J., concurring) (emphasis added).

18      Minority groups are particularly at risk of becoming targets when power is concentrated

19  in the same hands. *See* Guinier, *supra* at 3; *see also Chadha*, 462 U.S. at 961 (Powell, J.,

20  concurring in the judgment) (noting, in the context of concentrated legislative power, that

21  minority groups are subject to the "'tyranny of shifting majorities'"). Again, this concern was

22  first recognized by the Framers. "The Framers knew their European history, which had many

23  examples of a majority imposing its religious views on minority religions. This was always a

disaster for the country in question—whether it was the England of Bloody Mary (1553-58) or the France of Louis XIV (1685)." William N. Eskridge, Jr., *A Pluralist Theory of the Equal Protection Clause*, 11 U. PA. J. CONST. L. 1239, 1241 (2009). As a result, they created structural protections against the marginalization and oppression of minority groups. "The main idea was that the Constitution's separation of powers in Articles I through III would head off 'unjust and partial laws,' to use Hamilton's phrase." *Id.* at 1242 (quoting The Federalist No. 78). "Madison famously argued that 'ambition must be made to counteract ambition,' by which he meant" that structural protections including the the separation of powers "assured minorities of different situses for opposing partial and unjust laws." *Id.* (quoting The Federalist No. 51).

At the time of the Founding, the Framers were concerned only with protecting a small subset of favored "minority groups," i.e., white property-holding men defined along regional, religious or economic lines. *See id.* at 1241. But their recognition that the separation of powers is necessary to protect minority groups is an enduring insight, which remains essential in our pluralistic democracy.

Indeed, that insight takes on a renewed urgency today, as the President who seeks to concentrate power in himself has a disturbing record of statements and actions targeting racial minorities. President Trump has repeatedly made racist statements against Black and Latino members of coordinate branches of government, e.g., calling Congresswoman Maxine Waters "low I.Q.,"[2] labeling Congresswoman Frederica Wilson "wacky,"[3] dismissing Congresswoman

---

[2] Charles Blow, *Demonizing Minority Women*, N.Y. Times, Apr. 14, 2019, https://www.nytimes.com/2019/04/14/opinion/ilhan-omar-minority-women.html.
[3] *Id.*

Alexandria Ocasio-Cortez as a "young bartender,"[4] declaring that Congresswoman Ilhan Omar is "extremely unpatriotic and extremely disrespectful,"[5] and, as a candidate for President, describing Judge Gonzalo Curiel as "a Mexican" who would not treat him fairly.[6] President Trump has also repeatedly made derogatory statements against people from predominately non-white countries, such as reportedly stating that Haitians "all have AIDS,"[7] that Nigerian immigrants would never "go back to their huts,"[8] and that Mexico is sending "rapists" to the United States.[9] And the President has turned discriminatory words into discriminatory action. Numerous courts have recognized the plausibility of plaintiffs' well-pleaded allegations that the Trump Administration was motivated by animus against Black and Latino immigrants in ending programs protecting predominately non-white immigrants from deportation. *See, e.g.*, *Saget v. Trump*, No. 18-CV-1599 (WFK)(ST), 2019 WL 1568755 (E.D.N.Y. Apr. 11, 2019) (enjoining the administration's attempt to terminate Temporary Protected Status (TPS) for Haitian immigrants in part on equal protection grounds); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018) (holding plaintiffs stated a plausible claim that the administration's

---

[4] Caitlin Oprysko, *Trump Jokes 'Young Bartender' Ocasio-Cortez's Green New Deal Will Get Him Reelected*, Politico.com, Apr. 3, 2019, https://www.politico.com/story/2019/04/03/trump-ocasio-cortez-green-new-deal-1251095.
[5] Caitlin Oprysko, *Trump Says He Doesn't Regret Posting Edited Video Slamming Omar*, Politico.com Apr. 16, 2019, https://www.politico.com/story/2019/04/16/trump-ilhan-omar-1277533.
[6] Jia Tolentino, *Trump and the Truth: The 'Mexican' Judge*, The New Yorker, Sept. 20, 2016, https://www.newyorker.com/news/news-desk/trump-and-the-truth-the-mexican-judge.
[7] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times, Dec. 23, 2017, https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html.
[8] Eli Watkins & Abby Phillips, *Trump Decries Immigrants from 'Shithole Countries' Coming to US*, CNN.com, Jan. 12, 2018, https://www.cnn.com/2018/01/11/politics/immigrants-shithole-countries-trump/index.html.
[9] *Full text: Donald Trump announces a presidential bid*, Wash. Post, June 16, 2015, https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.48c22206ba5a.

attempt to terminate TPS for Salvadoran immigrants was motivated by unconstitutional animus); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 277 (E.D.N.Y. 2018) (recognizing that plaintiffs' allegations were "sufficiently racially charged, recurring, and troubling as to raise a plausible inference that the decision to end the DACA [Deferred Action for Childhood Arrivals] program was substantially motivated by discriminatory animus").

The risk of an authoritarian president seeking to use concentrated power to target minority groups is not theoretical or historical. It is a clear and present danger to our democracy, where the President has sought to circumvent the rule of law by invoking a dubious national emergency and arguing that it gives him the power to override clear will of Congress. The Framers of the Constitution anticipated that danger, and they enshrined the separation of powers to prevent it. To enforce the constitutional design, and to prevent this dangerous concentration of power, this Court must intervene.

Justice Frankfurter warned why a court must act in a case like this: "The accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority." *Youngstown*, 343 U.S. at 594 (Frankfurter, J., concurring). This Court should not let the President's assertion of authority, that was never his to assert in the first place, go unchecked.

\*       \*       \*

For these reasons, LDF respectfully asks that the Court grant Plaintiffs' motion for a preliminary injunction.

BRIEF OF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS
CASE NO. 4:19-CV-00892-HSG

Dated: May 13, 2019

Respectfully Submitted,

s/ Michaele N. Turnage Young

Michaele Turnage Young
  *Counsel of record*
CA Bar No. 247796
Daniel S. Harawa
NAACP Legal Defense and
  Educational Fund, Inc.
700 14th St. NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300
mturnageyoung@naacpldf.org

Sherrilyn A. Ifill
  *President & Director-Counsel*
Janai S. Nelson
Samuel Spital
NAACP Legal Defense and
  Educational Fund, Inc.
40 Rector St. 5th Floor
New York, NY 10006
Tel: (212) 965-2200