Elizabeth Goitein*
J. Andrew Boyle*
Brennan Center for Justice at NYU Law
1140 Connecticut Ave. NW, Ste. 1150
Washington, D.C. 20036
(202) 753-5909 (telephone) | (202) 223-2683 (fax)
goiteine@brennan.law.nyu.edu
boylea@brennan.law.nyu.edu

*Counsel for Amici Brennan Center &
The Cato Institute*

*Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| SIERRA CLUB and SOUTHERN BORDER COMMUNITIES COALITION, <br><br> *Plaintiffs,* <br><br> vs. <br><br> DONALD J. TRUMP, President of the United States, in his official capacity, *et al.,* <br><br> *Defendants.* | Case no. 4:19-cv-00892-HSG <br><br> P.I. Hearing Date: May 17, 2019 <br> Time: 10:00 A.M. <br><br> **BRIEF OF THE BRENNAN CENTER FOR JUSTICE AND THE CATO INSTITUTE AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ....................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

ARGUMENT ........................................................................................................ 2

    I.    Proclamation 9844 Is Contrary to the Congressional Intent Behind the NEA ................. 2

    II.   Proclamation 9844 Is Unprecedented in the History of National Emergencies Act Implementation ..................................................................................... 8

    III.  Upholding Proclamation 9844 Would Create a Dangerous Precedent ........................... 15

CONCLUSION ................................................................................................... 19

# TABLE OF AUTHORITIES

**CASES**

*Al Haramain Islamic Foundation, Inc. v. U.S. Dept. of the Treasury*,
    686 F.3d 965 (9th Cir. 2012) ............................................................. 17

*Alvarez v. Trump*, No. 19-cv-00404 (D.D.C. dismissed Apr. 23, 2019) .................................. 2, 3

*I.N.S. v. Chadha*, 462 U.S. 919 (1983). ...................................................... 8

*Kindhearts for Charitable Humanitarian Dev. v. Geithner*,
    647 F.Supp.2d 857 (N.D. Ohio 2009). ........................................... 17

*Korematsu v. United States*, 323 U.S. 214 (1944) ............................................. 3

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............................... 3

**CONSTITUTION AND STATUTES**

7 U.S.C. § 5712 .............................................................................. 18

10 U.S.C. § 712 .......................................................................... 16, 17

10 U.S.C. § 2808 ........................................................................ 2, 7, 8

40 U.SC. § 314 .............................................................................. 18

47 U.S.C. § 606 .............................................................................. 16

49 U.S.C. § 114 .............................................................................. 18

50 U.S.C. § 4309 ............................................................................ 18

50 U.S.C. § 1622 ........................................................................... 6, 8

50 U.S.C. § 1621 ............................................................................... 6

50 U.S.C. § 1631 ............................................................................... 6

50 U.S.C. § 1641 ............................................................................... 6

Department of Defense Appropriations Act, Pub. L. No. 102-396, 106 Stat. 1876 (1992) ......... 11

Department of Defense Appropriations Act, 2018, H.R. 695, 115th Cong. (2017) ................... 14

End the Shutdown and Secure the Border Act, S.Amdt. 5 to Supplemental Appropriations Act,
    2019, H.R. 268, 115th Cong. (2019) .............................................. 14

International Emergency Economic Powers Act, Pub. L. No. 95-223, 91 Stat. 1626 (1977)
    (codified as amended at 50 U.S.C. §§ 1701 et seq.)......................... 1, 8, 10, 17

International Emergency Economic Powers Enhancement Act, Pub. L. No. 110-96, 121 Stat. 1011 (2007) ..................................................... 11

National Emergencies Act of 1976, Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601-1651) .................................................. 1, 5, 6

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (1988) ................................................................ 11

Pub. L. No. 99-93, § 801, 99 Stat. 407 (1985) ...................................... 11

Trading With the Enemy Act, Pub. L. No.65-91, ch. 106 § 5(b)(1), 40 Stat. 415 (1917) (codified as amended at 50 U.S.C. § 4305(b)(1)) ................................. 9

USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001) ..................................... 11

U.S. Const. art. 1, § 9, cl. 2 .......................................... 3

U.S. Const. art. 1, § 8, cl. 15 ......................................... 3

**Executive Orders and Proclamations**

Exec. Order No. 12444, 48 Fed. Reg. 48215 (Oct. 14, 1983) .............................................. 11, 14

Exec. Order. 12722, 55 Fed. Reg. 31803 (Aug. 3, 1990) ........................................... 12

Proc. No. 6867, 61 Fed. Reg. 8843 (Mar. 1, 1996) ...................................... 12

Proc. No. 6491, 57 Fed. Reg. 47553 (Oct. 14, 1992) ..................................... 12

Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001) ................................... 12

Proc. No. 7924, 70 Fed. Reg. 54225 (Sept. 8, 2005) .................................... 12

Proc. No. 8443, 74 Fed. Reg. 55439 (Oct. 23, 2009) ................................... 12

Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) ......................... 1, 8, 13, 14, 15, 18

**Other Legislative Authorities**

120 Cong. Rec. S. 15784-86 (daily ed. Aug. 22, 1974) .......................................... 4

121 Cong. Rec. H.R. H8325-H8341 (daily ed. Sept. 4, 1972) ......................... 5

165 Cong. Rec. H.R. H2105 (daily ed. Feb. 26, 2019) ................................. 8

165 Cong. Rec. S1856 (daily ed. Mar. 14, 2019) ........................... 8

165 Cong. Rec. H2814 (daily ed. Mar. 26, 2019) .......................... 8

S. 977, 94th Cong. (1975) ................................... 6

S. Comm. on Government Operations and the Spec. Comm. on National Emergencies and
    Delegated Emergency Powers, *The National Emergencies Act (Public Law 94-412),*
    *Source Book: Legislative History, Text, and Other Documents* (1976) ................ 4, 5, 6, 7

S. Rep. No. 93-1170 (1974) ........................................................................................................ 5

S. Rep. No. 94-1168 (1976) ........................................................................................................ 7

S. Res. 242, 93rd Cong. (1974) .................................................................................................. 4

**OTHER AUTHORITIES**

*A Guide to Emergency Powers and Their Use*, Brennan Ctr. (Jan. 23, 2019),
    https://tinyurl.com/y78jkjvp ........................................................................... 7, 9, 12, 16

John Burnett, *Arrests for Illegal Border Crossings Hit 46-Year Low*, NPR
    (Dec. 5, 2017, 11:10 AM), https://tinyurl.com/y84xapfl ................................................ 13

*CBP Enforcement Statistics FY2018*, U.S. Customs and Border Protection,
    https://tinyurl.com/y9c4c6ft ............................................................................................... 13

Constitutions Containing Emergency Provisions, *Constitute*, https://tinyurl.com/y6op33d7 ........ 3

Thomas E. Cronin, *A Resurgent Congress and the Imperial Presidency*, 95 Pol. Sci. Q. 209
    (1980) ..................................................................................................................................... 4

*Declared National Emergencies Under the National Emergencies Act*, Brennan Ctr.
    (Feb. 4, 2019), https://tinyurl.com/yy3betsb ............................................... 8, 9, 10, 12, 17

Karoun Demirjian, *With vote to end U.S. involvement in Yemen's war, House sets up Trump's
    second veto,* Wash. Post, Apr. 4, 2019, https://tinyurl.com/y4fhw9aq .......................... 17

Laura K. Donohue, *Constitutional and Legal Challenges to the Anti-Terrorist Financing Regime*,
    43 Wake Forest L. Rev. 643 (2008) ........................................................................... 9, 10

*Emergency Definition,* English Oxford Living Dictionaries,
    https://tinyurl.com/y5g2pwq7 ..................................................................................... 12, 13

*Emergency Definition,* Merriam-Webster Online Dictionary,
    https://tinyurl.com/yxw5fncq ...................................................................................... 12, 13

*Excerpts from Trump's Interview with the New York Times*, N.Y. Times, (Feb. 1, 2019),
    https://tinyurl.com/y9gsosk4 ............................................................................................. 15

Dan Farber, *Using Emergency Powers to Fight Climate Change*, Legal Planet (Jan. 14, 2019),
    https://tinyurl.com/y2qgnplw ............................................................................................. 18

Louis Fisher, *Congressional Abdication: War and Spending Powers*,
    43 St. Louis U. L.J. 931 (1999). ........................................................................................ 17

Elizabeth Goitein, *Trump's Hidden Powers*, Brennan Ctr. (Dec. 5, 2018),
    https://tinyurl.com/y5484ngl ......................................................................................... 9, 16

Elizabeth Goitein, *The Alarming Scope of the President's Emergency Powers*, Atlantic, Jan./Feb. 2019 ................................................................................................ 16

Alberto R. Gonzalez, Attorney General, Office of Legal Counsel, *Legal Authorities Supporting the Activities of the National Security Agency Described by the President* (Jan. 19, 2006), https://tinyurl.com/y2f9lq26 ................................................................... 3

Elaine Halchin, Cong. Research Serv., *98-505, National Emergency Powers* (2019), https://tinyurl.com/y3mvekk3 ............................................................... 3, 4, 6

Joel B. Harris and Jeffrey P. Bialos, *The Strange New World of United States Export Controls Under the International Emergency Powers Act*, 18 Vand. J. Transnat'l L. 78 (1985) ........................................................... 11

Tamara Keith, *If Trump Declares an Emergency to Build the Wall, Congress Can Block Him*, N.P.R. (Feb. 11, 2019), https://tinyurl.com/y4vobv6m ..................................... 9

Harold Hongju Koh, The National Security Constitution: Sharing Power After the Iran-Contra Affair (Yale U. Press 1990) ................................................................. 10

Gregory Korte, *White House: States of emergency are just formalities*, USA Today (April 9, 2015), https://tinyurl.com/y4crdfmk ................................................. 10

Lawyer's Comm. for Civil Rights of the S.F. Bay Area, *The OFAC List: Due Process Challenges in Designation and Delisting* (July 2014), https://tinyurl.com/yxwzbsz6.... 17

Memorandum from Jay Bybee, Assistant Attorney General, Office of Legal Counsel, to Alberto R. Gonzalez, Counsel to the President, Re: Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340-2340A (Aug. 1, 2002), https://tinyurl.com/y39bhwbu ..................... 3

Alex Nowrasteh, *The Murder of Mollie Tibbetts and Illegal Immigrant Crime: The Facts*, Cato Institute (Aug. 22 2018), https://tinyurl.com/y5boc9me ......................... 13

David W. Opderbeck, *Does the Communications Act of 1934 Contain a Hidden Internet Kill Switch?*, 65 Fed. Comm. L.J. 1 (2013) ............................................... 16

Saikrishna Prakash, *The Imbecilic Executive*, 99 Va. L. Rev. 1391 (2013) .................................. 3

*Remarks by President Trump Before Marine One Departure*, White House (Jan. 10, 2019), https://tinyurl.com/yycew5dk ............................................................... 15

*Remarks by President Trump on the National Security and Humanitarian Crisis on our Southern Border*, White House (Feb. 15, 2019), https://tinyurl.com/y3jenqeu....................... 14, 15

Lori Robertson, *Illegal Immigration Statistics*, FactCheck.Org, (Jan. 9, 2019), https://tinyurl.com/ybn5mr7s ............................................................... 13

George Sargent, *Trump: I have the 'Absolute Right' to Declare a National Emergency if Democrats Defy Me*, Wash. Post (Jan. 9, 2019), https://tinyurl.com/y5f5eqwg ............. 15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Patrick A. Thronson, *Toward Comprehensive Reform of America's Emergency Law Regime*, 46:2 U. Mich. J.L. Reform, 737 (2012)........................................................................... 9

Jane C. Timm, *Fact check: What's a 'national emergency' and can Trump declare one to get his wall?*, NBC News (Jan. 4, 2019), https://tinyurl.com/ycxmurfn .................................... 14

*Transcript: President Trump on "Face the Nation,"* CBS News, (Feb. 3, 2019), https://tinyurl.com/y8l38g72 ........................................................................... 15

Donald J. Trump, *Veto Message to the House of Representatives for H.J. Res. 46*, White House (Mar. 15, 2019), https://tinyurl.com/y6mlsn76 ................................................................ 8

1

## INTEREST OF *AMICI CURIAE* [1]

*Amicus curiae* the Brennan Center for Justice at New York University School of Law ("the Brennan Center") is a not-for-profit, non-partisan think tank and public interest law institute that seeks to improve systems of democracy and justice. The Brennan Center's interest in this case stems from an extensive research project it recently conducted on statutory emergency powers and the National Emergencies Act (NEA). Based on this research, the Brennan Center believes that Proclamation 9844—the President's emergency declaration regarding the southern border—is contrary to the original purpose of the NEA, represents a sharp departure from past practice, and, absent judicial intervention, would open the door to presidential misuse of dozens of highly potent emergency powers.

*Amicus curiae* The Cato Institute ("Cato") is a nonpartisan public policy research foundation that advances individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutionalism that are the foundation of liberty. Toward those ends, Cato conducts conferences and publishes books, studies, and the annual *Cato Supreme Court Review*. Cato shares the Brennan Center's interest here. Allowing the president to declare an emergency under the circumstances presented in this case would fundamentally upset the Constitution's balance of power between the executive and the legislature.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress enacted the National Emergencies Act of 1976 (NEA) to rein in presidential use of statutory emergency powers. Although Congress purposely omitted a definition of "national emergency," the legislative history makes clear that Congress did not intend for the law to provide an affirmative grant of limitless discretion, and that it expected the limits contained within specific emergency powers to be scrupulously observed and enforced. Moreover, the NEA was carefully designed to ensure that presidential actions in this area would remain

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amici and their counsel made a monetary contribution to its preparation or submission. This brief has been prepared by a center affiliated with New York University School of Law, but does not purport to present the school's institutional views, if any.

subordinate to Congress's authority. An emergency declaration that attempts to harness an ill-fitting statutory power for the purpose of flouting Congress's will on a question of policy, such as President Trump's Proclamation 9844, makes a mockery of Congress's intent in passing the law.

Proclamation 9844 also represents a sharp departure from past practice in implementing the NEA. Outside of emergency declarations invoking the International Emergency Economic Powers Act (IEEPA), which must be viewed separately in light of IEEPA's legislative history and subsequent congressional actions, presidents have declared national emergencies only a handful of times in the past 40 years. All of these declarations responded to events that were sudden and unexpected—thus meeting one of the basic criteria for an "emergency," under the term's plain meaning—and none sought to implement measures for which Congress had withheld funding. By contrast, official statistics show that there has been no sudden, unexpected change in immigration patterns at the southern border. More important, the president has openly acknowledged that his purpose in issuing the declaration was to sidestep Congress, which had repeatedly refused to provide the funding he requested for a border wall. No president before now has sought to use emergency powers to circumvent Congress's explicit will and power of the purse. Nor has any president been so transparent that he was using emergency powers simply because he saw them as an expedient way to achieve a policy goal.

Allowing the emergency declaration to stand in this case could have far-reaching effects outside the four corners of this case. It would give a green light to this president and future ones to use emergency powers as a means of resolving policy disputes with Congress. The Brennan Center has catalogued 123 such powers, many of which are far more sweeping and susceptible to abuse than the one President Trump has invoked here. This Court should therefore intervene to stop this abuse of emergency power and to prevent similar abuses from becoming the norm.

## ARGUMENT

## I.    Proclamation 9844 Is Contrary to the Congressional Intent Behind the NEA

Plaintiffs argue compellingly that the Defendants cannot meet the criteria contained in 10 U.S.C. § 2808, the emergency power invoked by Proclamation 9844, for the diversion of military

construction funds. Pls.' Mot. Prelim. Inj. 13-15, ECF No. 29. Defendants respond that the president has total and unreviewable discretion, under both the NEA and 10 U.S.C. § 2808, to determine whether an emergency exists that meets the statutory criteria. Defs.' Opp'n to Pls.' Mot. Prelim. Inj. 22, ECF No. 64. The legislative history of the NEA strongly suggests otherwise. It makes clear that the law was enacted to circumscribe the president's use of statutory emergency powers, and it underscores the importance of strictly construing those powers' limits.

To understand the purpose of the NEA, it is necessary to briefly summarize the history of statutory emergency powers in the United States. Unlike most other countries' constitutions,[2] the U.S. Constitution does not provide the president with any explicit emergency powers. *See generally* U.S. Const. art. II.[3] Accordingly, from the time of the country's founding, presidents have relied on Congress to provide them with enhanced authorities in emergency situations. Throughout the eighteenth and early nineteenth centuries, Congress periodically enacted laws giving presidents standby authorities that they could use in their discretion during military, economic, or labor crises. *See* Elaine Halchin, Cong. Research Serv., *98-505, National Emergency Powers* 1 (2019), https://tinyurl.com/y3mvekk3.

Beginning in World War I, a new procedure for invoking statutory emergency powers[4] evolved. Presidents would declare a national emergency, and this declaration would give them

---

[2] A review of current constitutions reveals that at least 178 countries' constitutions have provisions for emergency rule. *See* Constitutions Containing Emergency Provisions, *Constitute*, https://tinyurl.com/y6op33d7 (last visited Apr. 25, 2019).

[3] Those powers that could be considered "emergency powers" are given to Congress under Article I, such as the power to suspend *habeas corpus*, *see* U.S. Const. art. 1, § 9, cl. 2, and to call forth "the Militia" to "suppress Insurrections and repel Invasions." U.S. Const. art. 1, § 8, cl. 15.

[4] Starting with the Civil War, claims of "inherent" emergency powers under Article II of the Constitution became more common, and served as the basis for several extraordinary exercises of emergency power in the twentieth century—including President Franklin Delano Roosevelt's internment of Japanese Americans during World War II, *see Korematsu v. United States*, 323 U.S. 214 (1944), President Harry Truman's seizure of steel mills during the Korean War, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), and President George W. Bush's programs of warrantless wiretapping, *see* Alberto R. Gonzalez, Attorney General, Office of Legal Counsel, *Legal Authorities Supporting the Activities of the National Security Agency Described by the President* (Jan. 19, 2006), https://tinyurl.com/y2f9lq26, and torture, *see* Memorandum from Jay Bybee, Assistant Attorney General, Office of Legal Counsel, to Alberto

access to statutory authorities that would otherwise lie dormant. *See* Halchin, *supra*, at 1. This system continues to this day. Before the enactment of the NEA, however, there was no overarching statute regulating it. *See id*. There was little transparency or congressional oversight with respect to the presidents' use of emergency powers, and nothing to prevent states of emergency from lingering indefinitely.

In the 1970s, several scandals involving executive branch overreach—including Watergate, the bombing of Cambodia, and domestic spying by the CIA—prompted Congress to investigate the exercise of executive power in national security matters, and to enact several laws aimed at reasserting Congress's role as a coequal branch of government and a check on executive authority. *See generally* Thomas E. Cronin, *A Resurgent Congress and the Imperial Presidency*, 95 Pol. Sci. Q. 209 (1980). It was in this context that a special Senate committee, which eventually came to be named the Special Committee on National Emergencies and Delegated Emergency Powers, was formed to examine presidential use of emergency powers. *See* S. Res. 242, 93rd Cong. (1974); Halchin, *supra*, at 7-8.

The immediate impetus for the committee's formation was Republican Senator Charles Mathias's discovery that an emergency declaration issued in 1950, at the start of the Korean War, was still in place and was being used to prosecute the war in Vietnam. *See* Halchin, *supra*, at 17. On closer examination, the committee learned that four clearly outdated states of emergency—issued in 1933, 1950, 1970, and 1971—were still in effect. *See id.* at 7. As Senator Church stated: "few, if any, foresaw that [these] temporary states of emergency . . . would become what are now regarded collectively as virtual permanent states of emergency." 120 Cong. Rec. S. 15784-86 (daily ed. Aug. 22, 1974) (statement of Sen. Church), *reprinted in* S. Comm. on Government Operations and the Spec. Comm. on National Emergencies and Delegated Emergency Powers, *The National Emergencies Act (Public Law 94-412), Source*

---

R. Gonzalez, Counsel to the President, Re: Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340-2340A (Aug. 1, 2002), https://tinyurl.com/y39bhwbu, after the attacks of 9/11. Yet even as claims of inherent emergency authority gained traction, legislative grants of emergency power continued to multiply. *See* Saikrishna Prakash, *The Imbecilic Executive*, 99 Va. L. Rev. 1391, 1367-68, 1425 (2013).

*Book: Legislative History, Text, and Other Documents*, at 73 (1976) [hereinafter *Spec. Comm. on National Emergencies Source Book*]. One House Report examining the issue observed:

> [T]here has been an emergency in one form or another for the last 43 years. … The history of continued and almost routine utilization of such emergency authorities for years after the original crisis has passed … serves only to emphasize the fact that there is an urgent need to provide adequate laws to meet our present day needs. Legislation intended for use in crisis situations is by its nature not well suited to normal, day-to-day government operations.

121 Cong. Rec. H.R. H8325-H8341 (daily ed. Sept. 4, 1972) (statement of Rep. Rodino), *reprinted in Spec. Comm. on National Emergencies Source Book*, *supra*, at 244.

Even more alarming to the committee were the nature and scope of the powers a president could exercise upon issuing an emergency declaration. The committee counted more than 470 statutory provisions that delegated extraordinary authority to the executive branch in times of national emergency. These included provisions allowing a president "to seize property and commodities, organize and control the means of production, call to active duty 2.5 million reservists, assign military forces abroad, seize and control all means of transportation and communication, restrict travel, and institute martial law, and, in many other ways, manage every aspect of the lives of all American citizens." S. Rep. No. 93-1170 (1974), *reprinted in Spec. Comm. on National Emergencies Source Book*, *supra*, at 20.

The committee's work culminated in the introduction and passage of the National Emergencies Act of 1976, which took effect in 1978. *See* National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976). The purpose of the law, evident in every facet of the legislative history, was to place limits on presidential use of emergency powers. As summarized by the committee in urging passage of the Act:

> While much work remains, none of it is more important than passage of the National Emergencies Act. Right now, hundreds of emergency statutes confer enough authority on the President to rule the country without reference to normal constitutional process. Revelations of how power has been abused by high government officials must give rise to concern about the potential exercise, unchecked by the Congress or the American people, of this extraordinary power. The National Emergencies Act would end this threat and insure that the powers now in the hands of the Executive will be utilized only in time of genuine emergency and then only under safeguards providing for Congressional review.

*Spec. Comm. on National Emergencies Source Book*, *supra*, at 50. The law employed various mechanisms to this end.[5] There were several provisions intended to increase transparency and facilitate congressional oversight with respect to the presidents' use of emergency powers. These included requirements for the president to transmit declarations of national emergency to Congress and publish them in the Federal Register, *see* National Emergencies Act, Pub. L. No. 94-412, § 201, 90 Stat. 1255 (codified at 50 U.S.C. § 1621); to specify in the declaration the specific powers he intended to invoke, and to issue updates via published executive order where necessary, *see* 50 U.S.C. § 1631; to transmit to Congress any orders, rules, or regulations issued pursuant to an emergency declaration, *see* 50 U.S.C. § 1621; and to report to Congress every six months on expenditures incurred by the government attributable to the exercise of emergency powers, *see* 50 U.S.C. § 1641(c).

The NEA also included provisions designed to prevent states of emergency from becoming permanent, and to give Congress a stronger and more active role in deciding whether states of emergency should continue. In particular, the law provided that states of emergency would terminate after a year unless renewed by the president, *see* 50 U.S.C. § 1622(d); it *allowed* Congress to terminate states of emergency at any time through a concurrent resolution (commonly referred to as a "legislative veto" because it would take effect without the president's signature), *see* National Emergencies Act, Pub. L. No. 94-412, § 202, 90 Stat. 1255 (codified as amended at 50 U.S.C. § 1622); and it *required* both houses of Congress to meet every six months while an emergency declaration was in effect to "consider a vote" on whether to end the emergency, *see* 50 U.S.C. § 1622(b).

As enacted, the law did not include a definition of "national emergency." Critically, however, this omission was not intended as a grant of unlimited discretion. Under an earlier draft of the legislation, the president was authorized to declare a national emergency "[i]n the event the President finds that a proclamation of a national emergency is essential to the preservation, protection and defense of the Constitution or to the common defense, safety, or well-being of the

---

[5] In addition to regulating future emergency declarations, the NEA returned emergency powers then active to dormancy after two years. *See* Halchin, *supra*, at 11.

territory or people of the United States." S. 977, 94th Cong. § 201 (a) (1975). One committee

report noted that this definition was "deliberately cast in broad terms that makes it clear that a

proclamation of a state of national emergency requires a grave national crisis." *Spec. Comm. on*

*National Emergencies Source Book*, *supra*, at 96.

The Senate Committee on Government Operations removed this language, not because it

was too limiting, but because the committee believed it to be too broad. As stated in the

committee's report:

> [F]ollowing consultations with several constitutional law experts, the committee
> concluded that section 201(a) is overly broad, and might be construed to delegate
> additional authority to the President with respect to declarations of national
> emergency. In the judgment of the committee, the language of this provision was
> unclear and ambiguous and might have been construed to confer upon the
> President statutory authority to declare national emergencies, other than that
> which he now has through various statutory delegations.
>
> The Committee amendment clarifies and narrows this language. The Committee
> decided that the definition of when a President is authorized to declare a national
> emergency should be left to the various statutes which give him extraordinary
> powers. The National Emergencies Act is not intended to enlarge or add to
> Executive power. Rather the statute is an effort by the Congress to establish clear
> procedures and safeguards for the exercise by the President of emergency powers
> conferred upon him by other statutes.

S. Rep. No. 94-1168, at 3 (1976), *reprinted in Spec. Comm. on National Emergencies Source*

*Book, supra*, at 292. The committee's solution ultimately proved to be flawed, as the majority of

the statutes in place today that confer power on the president during "national emergencies" do

not include definitions of the term or criteria that must be met beyond the issuance of the

declaration. *See A Guide to Emergency Powers and Their Use*, Brennan Ctr. (Jan. 23, 2019),

https://tinyurl.com/y78jkjvp. It is nonetheless significant that Congress believed that even a

definition limiting national emergencies to grave national crises would be "overly broad." The

notion that Congress intended the NEA as an affirmative delegation of unlimited discretion to the

president—one that would allow the president to circumvent the will of Congress on specific

policy proposals—is contradicted by this and every other aspect of the legislative history.

Moreover, where statutes granting emergency powers *do* include criteria beyond the mere declaration of an emergency, this legislative history underscores the importance of strictly interpreting and enforcing those limitations. In the current case, President Trump has invoked a statutory provision that provides authorization and funding for military construction projects only during emergencies that "require the use of the armed forces," 10 U.S.C. § 2808(a), and only if the projects "are necessary to support such use of the armed forces," *id.*, and meet the statutory definition of "military construction," 10 U.S.C. § 2801(a). In passing the NEA, Congress clearly intended for criteria like these to provide meaningful and enforceable checks on the president's authority to issue emergency declarations.

## II. Proclamation 9844 Is Unprecedented in the History of National Emergencies Act Implementation

In practice, the NEA has not proven to be the strong check Congress intended. Nonetheless, outside the unique context of emergency declarations invoking the International Emergency Economic Powers Act (IEEPA), past presidential use of emergency powers has been relatively restrained. A review of the law's exercise from 1978 to the present shows that Proclamation 9844 is unprecedented, both in the absence of any arguable emergency and in the declaration's underlying purpose: to sidestep a Congress that would not bend to the president's will.

The NEA's effectiveness was undermined by the Supreme Court's 1983 ruling that concurrent resolutions are unconstitutional. *See I.N.S. v. Chadha*, 462 U.S. 919, 954-55 (1983). Congress responded to the decision by substituting a joint resolution as the mechanism for terminating emergencies. *See* 50 U.S.C. § 1622(a)(1). Like any other legislation, a joint resolution must be signed into law by the president, and if the president vetoes the resolution, Congress can override the veto only with a two-thirds vote by both houses. This change greatly diluted the role of Congress as envisioned in the original Act.[6]

---

[6] The effect of this change is starkly illustrated by the current controversy. A joint resolution to terminate Proclamation 9844 passed the House by a vote of 245 to 182 on February 26, *see* 165 Cong. Rec. H.R. H2105 (daily ed. Feb. 26, 2019), and passed the Senate by a vote of 59 to 41 on March 14, *see* 165 Cong. Rec. S1856 (daily ed. Mar. 14, 2019). Under the original

In addition, Congress has essentially ignored the NEA's requirement to meet every six months while an emergency is in place and consider a vote on whether to end the emergency. States of emergency have existed throughout the 40-plus years the law has been in effect, *see Declared National Emergencies Under the National Emergencies Act*, Brennan Ctr. (Feb. 4, 2019), https://tinyurl.com/yy3betsb, which means Congress should have met approximately 80 times to review them. There is no indication, however, that Congress has ever previously done so.[7] Before now, only one resolution to end a state of emergency had ever been introduced, and the emergency declaration at issue was revoked before Congress could vote on it. *See* Tamara Keith, *If Trump Declares an Emergency to Build the Wall, Congress Can Block Him*, N.P.R. (Feb. 11, 2019), https://tinyurl.com/y4vobv6m.

The NEA has thus proven weaker in implementation than in concept. Nonetheless, it has never previously been treated as a license for presidents to invoke emergency powers literally at will—or to do so against the express wishes of Congress. Indeed, presidents have shown considerable restraint in their exercise of statutory emergency powers. According to the Brennan Center's research, nearly 70% of the authorities available to the president when he declares a national emergency remain unused more than 40 years after the NEA took effect. *See A Guide to Emergency Powers*, *supra*; Elizabeth Goitein, *Trump's Hidden Powers*, Brennan Ctr. (Dec. 5, 2018), https://tinyurl.com/y5484ngl. Although presidents have declared national emergencies 60 times during that period, 54 of those have been invoked for the sole or primary purpose of imposing foreign economic sanctions under IEEPA and related legislation. *See Declared*

---

NEA procedure, that would have been sufficient to terminate the emergency. However, under the revised legislation it went to the President's desk, and he vetoed it. *See* Donald J. Trump, *Veto Message to the House of Representatives for H.J. Res. 46*, White House (Mar. 15, 2019), https://tinyurl.com/y6mlsn76. When it returned to the House for a veto override vote, it failed to muster the necessary two-thirds majority. *See* 165 Cong. Rec. H2814 (daily ed. Mar. 26, 2019).

[7] On one occasion in 1980, the Chair of the House Foreign Affairs Committee sent a letter to the Speaker of the House expressing approval over the continuation of an existing state of emergency. *See* Patrick A. Thronson, *Toward Comprehensive Reform of America's Emergency Law Regime*, 46:2 U. Mich. J.L. Reform, 737, 752, 752 n. 108 (2012). This, apparently, is the closest Congress has come before now to considering a vote.

*National Emergencies Under the National Emergencies Act*, *supra*. These cases constitute a category unto themselves and must be addressed separately.

Congress enacted IEEPA in 1977 to limit the powers conferred by the 1917 Trading With the Enemy Act (TWEA). It was Congress's sense that the TWEA, which gave presidents broad authority to "investigate, regulate … prevent or prohibit  ... transactions" in times of war or declared emergency, Trading With the Enemy Act, Pub. L. No.65-91, ch. 106 § 5(b)(1), 40 Stat. 415 (1917) (codified as amended at 50 U.S.C. § 4305(b)(1)), had been improperly used to regulate domestic economic activity during peacetime. IEEPA thus limited the use of TWEA to wartime and created a new framework for peacetime emergencies. *See* Laura K. Donohue, *Constitutional and Legal Challenges to the Anti-Terrorist Financing Regime*, 43 Wake Forest L. Rev. 643, 647-48 (2008). Under that framework, presidents could declare a national emergency based on an "unusual and extraordinary threat" to the U.S. national security, foreign policy, or economy "which has its source in whole or substantial part outside the United States." International Emergency Economic Powers Act, Pub. L. No. 95-223, tit. II, § 202, 91 Stat. 1626 (1977) codified at 50 U.S.C. §1701 (b). The president could then authorize a range of economic actions to address this foreign threat.

Despite being tied to the mechanism of national emergency declarations, and despite the requirement of an "unusual and extraordinary threat," IEEPA has been used almost from the outset as a basic tool of foreign policy. Presidents issue declarations under IEEPA in situations where imposing sanctions on foreign actors would advance U.S. interests, regardless of whether the threat to those interests is truly "unusual and extraordinary." *See* Harold Hongju Koh, *The National Security Constitution: Sharing Power After the Iran-Contra Affair* 47 (Yale U. Press 1990).[8] IEEPA declarations create sanctions regimes that often become—and are intended to

---

[8] The White House itself has acknowledged this dynamic. After President Obama declared a national emergency to impose sanctions on Venezuela in 2015, the White House hastened to reassure the public that there was, in fact, no threat to U.S. national security, despite the executive order's words to the contrary. "[T]he United States does not believe that Venezuela poses some threat to our national security," said Deputy National Security Adviser Ben Rhodes. "We, frankly, just have a framework for how we formalize these executive orders." Gregory Korte, *White House: States of emergency are just formalities*, USA Today (April 9, 2015),

become—semi-permanent in nature. IEEPA thus underlies current U.S. economic policies toward governments or factions in Iran, Sudan, the Balkans, Zimbabwe, Iraq, Syria, Belarus, the Democratic Republic of the Congo, the Central African Republic, Burundi, Lebanon, North Korea, Venezuela, Somalia, Libya, Yemen, and Ukraine. *See Declared National Emergencies, supra*.

While the routinization of IEEPA use might seem incompatible with the congressional intent underlying the NEA, Congress has for decades acquiesced in the use of IEEPA as a substitute for ordinary sanctions legislation. Indeed, there is some evidence that Congress, in passing IEEPA, expected that it would be used to fill gaps in non-emergency legislative regimes. Presidents had previously invoked a provision of the TWEA to impose controls over certain types of exports when export-control legislation—the Export Administration Act—had lapsed. Congress imported the relevant language from the TWEA into IEEPA, and the legislative history shows that Congress anticipated it could be used in the same way if the Export Administration Act were to lapse again in the future. *See* Joel B. Harris and Jeffrey P. Bialos, *The Strange New World of United States Export Controls Under the International Emergency Powers Act*, 18 Vand. J. Transnat'l L. 78, 78 n. 16 (1985). That, indeed, is what happened in 1983. *See* Exec. Order No. 12444, 48 Fed. Reg. 48215 (Oct. 14, 1983). Both the NEA and IEEPA have subsequently been amended without Congress acting to modify this aspect of presidents' use of IEEPA. *See*, *e.g.*, Pub. L. No. 99-93, § 801, 99 Stat. 407, 448 (1985); Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107, 1371 (1988); Department of Defense Appropriations Act, Pub. L. No. 102-396, 106 Stat. 1876 (1992); USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001); International Emergency Economic Powers Enhancement Act, Pub. L. No. 110-96, 121 Stat. 1011 (2007).

---

https://tinyurl.com/y4crdfmk. State Department spokesperson Jen Psaki echoed his remarks: "This is how we describe the process of naming sanctions, and there are 20 to 30 other sanctions programs we have." *Id.*

If IEEPA declarations are set aside, the picture looks very different. Declarations of national emergency not relying on IEEPA have been few and far between. A complete list of such declarations prior to Proclamation 9844 includes:

- Executive Order 12722 (1990) – issued in response to the Iraqi invasion of Kuwait. Although the emergency was initially declared for the purpose of imposing sanctions under IEEPA, President George H.W. Bush subsequently relied on it to bolster military strength and to engage in military construction during the Gulf War. *See* Exec. Order. 12722, 55 Fed. Reg. 31803 (Aug. 3, 1990); *A Guide to Emergency Powers*, *supra.*

- Proclamation 6491 (1992)[9] – issued in response to Hurricanes Andrew and Iniki. The declaration was used to suspend minimum wage requirements with respect to reconstruction efforts in areas devastated by the hurricanes. *See* Proc. No. 6491, 57 Fed. Reg. 47553 (Oct. 14, 1992); *A Guide to Emergency Powers*, *supra.*

- Proclamation 6867 (1996) – issued in response to deadly Cuban attacks on U.S. civilian aircraft. The declaration was used to impose a naval blockade on Cuba. *See* Proc. No. 6867, 61 Fed. Reg. 8843 (Mar. 1, 1996); *A Guide to Emergency Powers*, *supra.*

- Proclamation 7463 (2001) – issued in response to the attacks of 9/11. The declaration was used primarily to make changes in the size and composition of the military forces, including calling reservists to active duty and implementing stop-loss policies. *See* Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001); *A Guide to Emergency Powers*, *supra.*

- Proclamation 7924 (2006) – issued in response to Hurricane Katrina. The declaration was used to suspend minimum wage requirements with respect to reconstruction efforts in areas devastated by the hurricane. *See* Proc. No. 7924, 70 Fed. Reg. 54225 (Sept. 8, 2005); *A Guide to Emergency Powers*, *supra.*

---

[9] Although the proclamation stated that the hurricanes constituted a "national emergency" and invoked emergency powers, it did not formally declare an emergency under the National Emergencies Act. Accordingly, this proclamation is not included in the list of national emergency declarations compiled and published by the Brennan Center. *See Declared National Emergencies*, *supra.* It is referenced in this brief to present a complete picture of how powers available during national emergencies have been used.

- Proclamation 8443 (2009) – issued in response to the swine flu epidemic. The declaration was used to waive certain legal requirements in order to facilitate the provision of public health services. *See* Proc. No. 8443, 74 Fed. Reg. 55439 (Oct. 23, 2009); *A Guide to Emergency Powers*, *supra.*

Each of these proclamations responded to events or circumstances that would qualify as an "emergency" under the plain meaning of that word; *i.e.*, there was a sudden, unexpected turn of events that at least arguably required immediate action. *See, e.g., Emergency Definition,* Merriam-Webster Online Dictionary, https://tinyurl.com/yxw5fncq (last visited Apr. 25, 2019) (defining "emergency" as "an unforeseen combination of circumstances or the resulting state that calls for immediate action"); *Emergency Definition,* English Oxford Living Dictionaries, https://tinyurl.com/y5g2pwq7 (last visited Apr. 25, 2019) (defining "emergency" as "[a] serious, unexpected, and often dangerous situation requiring immediate action"). Moreover, with the exception of Iraq's invasion of Kuwait, which prompted an emergency declaration for the initial purpose of imposing sanctions under IEEPA, these occurrences directly and significantly affected Americans' health or safety. Perhaps most significantly, in none of these cases did presidents invoke emergency powers to take action after Congress had explicitly considered and rejected legislation to authorize such action.

Proclamation 9844 is thus unprecedented in two respects. First, the problem it seeks to address cannot reasonably be described as an "emergency." At the time President Trump issued the declaration, there had been no sudden, unexpected change in illegal immigration at the southern border. According to official government data, illegal border crossings in 2017 reached their lowest point in 46 years; they remained close to that historic low, and well within the fluctuation range for the past several years, in 2018. *See* Lori Robertson, *Illegal Immigration Statistics*, FactCheck.Org, (Jan. 9, 2019), https://tinyurl.com/ybn5mr7s; John Burnett, *Arrests for Illegal Border Crossings Hit 46-Year Low*, NPR (Dec. 5, 2017, 11:10 AM), https://tinyurl.com/y84xapfl. Nor had there been any significant, unexpected changes in patterns

of crime or drug smuggling.[10] Indeed, the only change in circumstances the president was able to identify in his proclamation is an increase in families seeking asylum at the border. *See* Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019). This change, however, is not evidence of "unlawful migration"—the crisis identified in the proclamation—as these families are seeking admission to the United States through lawful means.

Moreover, it is clear from President Trump's own words and conduct that he did not believe the situation at the southern border required "immediate action." For the first two years of his administration, he accepted Congress's decision not to provide $5.7 billion in border wall funding with little pushback. He first hinted that he might declare a national emergency in early January 2019, *see* Jane C. Timm, *Fact check: What's a 'national emergency' and can Trump declare one to get his wall?*, NBC News (Jan. 4, 2019), https://tinyurl.com/ycxmurfn, yet he waited a full six weeks before declaring it. When he announced the declaration, he explicitly stated that quick action was not a necessity in this case, just a personal preference: "I could do the wall over a longer period of time. I didn't need to do this. But I'd rather do it much faster." *Remarks by President Trump on the National Security and Humanitarian Crisis on our Southern Border*, White House (Feb. 15, 2019), https://tinyurl.com/y3jenqeu.

Second, no previous president has invoked emergency powers to take an action for which Congress had explicitly withheld its consent.[11] Here, President Trump for two years sought

---

[10] Statistically, immigrants—both documented and undocumented—remain less likely to commit crimes, including violent crimes, than U.S. citizens. *See, e.g.*, Alex Nowrasteh, *The Murder of Mollie Tibbetts and Illegal Immigrant Crime: The Facts*, Cato Institute (Aug. 22 2018), https://tinyurl.com/y5boc9me (observing that "[t]he illegal immigrant conviction rate for homicide was 44 percent *below* that of native-born Americans in 2016 in Texas") (emphasis in original). Similarly, official reports indicate that the drugs President Trump has identified as posing a threat to the U.S.—methamphetamine, heroin, cocaine, and fentanyl—continue to be smuggled primarily through ports of entry, as they have in the past. *See CBP Enforcement Statistics FY2018*, U.S. Customs and Border Protection, https://tinyurl.com/y9c4c6ft (showing that, between October 2017 and August 2018, federal agents seized 88 percent of cocaine, 90 percent of heroin, 87 percent of methamphetamine, and 80 percent of fentanyl at ports of entry).

[11] The closest comparison is President Ronald Reagan's emergency declaration in 1983, which he used to continue certain export controls under IEEPA after a statute authorizing such controls had lapsed. *See* Exec. Order No. 12444, 48 Fed. Reg. 48215 (Oct.14, 1983). As noted above, however, the legislative history of IEEPA indicates Congress's awareness that presidents would be able to use IEEPA for that very purpose. *See supra* pp. 10-11. Importantly, that was not

funding from Congress to build a wall along the southern border, and Congress consistently refused to provide it. Indeed, Congress voted repeatedly not to give the president the authority and funds that he requested.[12]

The President has been quite forthright that his purpose in declaring an emergency was to get around Congress. In the weeks leading up to the declaration, he repeatedly stated that he would give Congress time to change its mind about funding the wall, and that he would declare an emergency only if Congress refused to give him what he wanted. On January 10, President Trump stated his preference for "do[ing] the deal through Congress," but he added that if the deal did not "work out," he would "almost … definitely" declare a national emergency. *Remarks by President Trump Before Marine One Departure*, White House (Jan. 10, 2019), https://tinyurl.com/yycew5dk. Asked about his threshold for declaring an emergency, President Trump responded, "My threshold will be if I can't make a deal with people that are unreasonable." George Sargent, *Trump: I have the 'Absolute Right' to Declare a National Emergency if Democrats Defy Me*, Wash. Post (Jan. 9, 2019), https://tinyurl.com/y5f5eqwg. On February 1, Trump reiterated that he was planning to wait until February 15, the date on which a temporary appropriations measure would lapse, before issuing an emergency declaration. *See Excerpts from Trump's Interview with the New York Times*, N.Y. Times, (Feb. 1, 2019), https://tinyurl.com/y9gsosk4; see also *Transcript: President Trump on "Face the Nation,"* CBS News, (Feb. 3, 2019), https://tinyurl.com/y8l38g72. He predicted that "we will be looking at a national emergency, because I don't think anything is going to happen [in Congress]. I think the Democrats don't want border security." *Remarks by President Trump in Meeting on Human Trafficking on the Southern Border*, White House (Feb. 1, 2019), https://tinyurl.com/y5ghp3eh.

---

a case in which Congress voted to deny the president authority or funding for the very action he then attempted to take.

[12] Over the course of nearly a year of negotiations, Congress repeatedly declined to allocate $5.7 billion for the border wall, and never passed a bill allocating more than $1.6 billion for fencing. *See, e.g.*, Department of Defense Appropriations Act, 2018, H.R. 695, 115th Cong. (2017) (failed in conference after an amendment adding $5.7 billion in border wall funding passed the House); End the Shutdown and Secure the Border Act, S.Amdt. 5 to Supplemental Appropriations Act, 2019, H.R. 268, 115th Cong. (2019).

1      This clear intent to circumvent Congress differentiates Proclamation 9844 from any

2  declaration that precedes it. Using emergency powers for this purpose is thus contrary, not only

3  to Congress's intent in enacting the NEA, but also to 40 years of post-enactment practice.

4  **III.      Upholding Proclamation 9844 Would Create a Dangerous Precedent**

5      If allowed to stand, President Trump's emergency declaration would create an

6  extraordinarily dangerous precedent. In the future, presidents would know that they could invoke

7  emergency powers to address even chronic or routine problems, and that they could use those

8  powers to take actions for which Congress has expressly withheld consent. In other words, where

9  emergency powers exist that could resolve a policy dispute with Congress, there would be

10  nothing to stop a president from deploying them, and it would require a veto-proof majority of

11  Congress to put an end to the contested policy. This would fundamentally upset the balance of

12  power between the president and Congress. It would also undermine one of the basic principles

13  of democracy: that the policies pursued by our government are those approved by a majority of

14  Congress, not those that Congress cannot muster a supermajority to reject.

15      Moreover, the next time a president decides to declare an emergency for political reasons,

16  he or she could invoke powers far more potent than the one that President Trump has invoked

17  here. The Brennan Center has catalogued 123 statutory provisions that become available to

18  presidents when they declare a national emergency. Ninety-six of these require nothing more

19  than the president's signature. Twelve contain a *de minimis* restriction, such as a requirement that

20  an agency head certify the necessity of the measure (something the president could simply order

21  the agency head to do). Only fifteen of these powers contain a more substantive restriction, such

22  as a requirement that the emergency have certain specified effects. *See* Goitein, *Trump's Hidden*

23  *Powers*, *supra*; *A Guide to Emergency Powers*, *supra*.

24      While some of these powers are narrowly crafted, others are sweeping, and their

25  invocation as a means of short-circuiting Congress could have profound consequences. Simply

26  by signing a declaration of national emergency, for instance, the president can take over or shut

27  down radio stations. *See* 47 U.S.C. § 606(c). If he goes further and declares a mere "threat" of

28  war, he can take over or shut down facilities for wire communication, *see* 47 U.S.C. § 606(d)—

including, according to some policymakers' interpretation, facilities for Internet traffic inside the U.S. *See* David W. Opderbeck, *Does the Communications Act of 1934 Contain a Hidden Internet Kill Switch?,* 65 Fed. Comm. L.J. 1, 3-6 (2013). This power was last exercised during World War II, when electronic communications were still at a primitive stage. *See* Elizabeth Goitein, *The Alarming Scope of the President's Emergency Powers,* Atlantic, Jan./Feb. 2019, at 39, 42. It would be infinitely more potent if deployed today—perhaps to implement cybersecurity or electronic surveillance policies that Congress refuses to endorse.

Another emergency power allows the president to detail any member of the U.S. armed forces to "any . . . country that he considers it advisable to assist in the interest of national defense." 10 U.S.C. § 712(a)(3). This power has not been exercised during the 40 years the NEA has been in effect. Yet this has also been a period of congressional acquiescence in executive branch deployments of the military. *See* Louis Fisher, *Congressional Abdication: War and Spending Powers*, 43 St. Louis U. L.J. 931, 967-80 (1999). There are some indications that Congress is beginning to reassert itself in this area. *See* Karoun Demirjian, *With vote to end U.S. involvement in Yemen's war, House sets up Trump's second veto,* Wash. Post, Apr. 4, 2019, https://tinyurl.com/y4fhw9aq. If that continues—and if courts have given their blessing to presidential use of emergency powers to resolve policy disagreements with Congress—the power to detail members of the U.S. armed forces during national emergencies could give presidents a convenient workaround.

IEEPA is particularly worrisome. To date, it has been used primarily to advance U.S. foreign policy by imposing sanctions on foreign entities, including government officials, political factions, terrorist groups, and suspected drug traffickers. *See Declared National Emergencies, supra*. This usage has been relatively uncontroversial; indeed, as noted above, Congress has for decades allowed such sanctions to stand even in the absence of true emergencies. However, the text of the law does not limit the president to foreign targets. While IEEPA declarations must cite a threat that emanates in substantial part from overseas, the actions that the president can take in response may target U.S. citizens and residents—as occurred after 9/11, when the administration of President George W. Bush used IEEPA to effectively shut down several U.S.-based Muslim

charities, asserting that their donations benefited terrorists overseas. *See* Lawyer's Comm. for Civil Rights of the S.F. Bay Area*, The OFAC List: Due Process Challenges in Designation and Delisting* 3, 20-21 (July 2014), https://tinyurl.com/yxwzbsz6. In theory, then, presidents could use IEEPA to impose crippling financial punishment on U.S. persons and organizations based on a unilateral executive branch determination that their actions undermine U.S. foreign policy.[13] Congress might not acquiesce in the widespread domestic use of IEEPA—but if the NEA is available to circumvent Congress, then the opposition of a majority of Congress would make little difference.

The list goes on. There are statutory provisions that authorize the president, during a national emergency, to prohibit or limit the export of any agricultural commodity, *see* 7 U.S.C. § 5712(c); to suspend statutory wage requirements for public contracts, *see* 40 U.S.C. § 3147; to "coordinate" domestic transportation, *see* 49 U.S.C. § 114(g) (a provision that arguably would allow the Secretary of Transportation to limit the use of trucks or automobiles for purposes of restricting emissions, *see* Dan Farber, *Using Emergency Powers to Fight Climate Change*, Legal Planet (Jan. 14, 2019), https://tinyurl.com/y2qgnplw); and to sell off aliens' property without waiting for a court judgment, *see* 50 U.S.C. § 4309. If courts uphold President Trump's actions in this case, such formidable powers could henceforth become available—to President Trump or to a future president—based simply on the president's unilateral claim that he needs them, and against the wishes of a majority of Congress.

Few presidents would be able to resist such an open invitation to unchecked power. At a minimum, we could expect government by presidential emergency order to become far more common than it has been in the past. It would become a tool for presidents of both parties to advance long-term policy goals in the face of congressional resistance. This would be

---

[13] Courts might hold that the Constitution limits the government's ability to take this approach. After 9/11, two lower courts held that aspects of the government's use of IEEPA against U.S.-based Muslim charities violated the Constitution. *See Al Haramain Islamic Foundation, Inc. v. U.S. Dept. of the Treasury*, 686 F.3d 965 (9th Cir. 2012); *Kindhearts for Charitable Humanitarian Dev. v. Geithner*, 647 F.Supp.2d 857 (N.D. Ohio 2009).

inconsistent with Congress's intent when it passed the NEA, with the constitutional separation of powers, and with basic democratic principles.

## CONCLUSION

For the foregoing reasons, we urge this court to grant the Plaintiffs' motion for a preliminary injunction and enjoin the operation of Proclamation 9844.

Respectfully submitted,

/s/ Elizabeth Goitein

Elizabeth Goitein*
J. Andrew Boyle*
Brennan Center for Justice at NYU Law
1140 Connecticut Ave. NW, Ste. 1150
Washington, D.C. 20036
(202) 753-5909 (telephone)
(202) 223-2683 (fax)
goiteine@brennan.law.nyu.edu
boylea@brennan.law.nyu.edu

*Admitted Pro Hac Vice*

*Counsel for Amici Brennan Center &
The Cato Institute*