DROR LADIN*
NOOR ZAFAR*
JONATHAN HAFETZ*
HINA SHAMSI*
OMAR C. JADWAT*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
dladin@aclu.org
nzafar@aclu.org
jhafetz@aclu.org
hshamsi@aclu.org
ojadwat@aclu.org
*Admitted pro hac vice

CECILIA D. WANG (SBN 187782)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
cwang@aclu.org

Attorneys for Plaintiffs (Additional counsel listed on following page)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO-OAKLAND DIVISION**

| | |
|---|---|
| SIERRA CLUB and SOUTHERN BORDER COMMUNITIES COALITION,<br><br>　　　　*Plaintiffs*,<br><br>　　v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity; PATRICK M. SHANAHAN, Acting Secretary of Defense, in his official capacity; KEVIN K MCALEENAN, Acting Secretary of Homeland Security, in his official capacity; and STEVEN MNUCHIN, Secretary of the Treasury, in his official capacity,<br><br>　　　　*Defendants*. | Case No.: 4:19-cv-00892-HSG<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:<br>Time:<br>Judge: Honorable Haywood S. Gilliam<br>Dept: Oakland<br>Date Filed: June 12, 2019<br>Trial Date: Not set |

Additional counsel for Plaintiffs:

SANJAY NARAYAN (SBN 183227)**
GLORIA D. SMITH (SBN 200824)**
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
2101 Webster Street, Suite 1300
Oakland, CA 94612
Tel: (415) 977-5772
sanjay.narayan@sierraclub.org
gloria.smith@sierraclub.org
**Counsel for Plaintiff SIERRA CLUB

MOLLIE M. LEE (SBN 251404)
CHRISTINE P. SUN (SBN 218701)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 621-2493
Fax: (415) 255-8437
mlee@aclunc.org
csun@aclunc.org

DAVID DONATTI*
ANDRE I. SEGURA (SBN 247681)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF TEXAS
P.O. Box 8306
Houston, TX 77288
Tel: (713) 325-7011
Fax: (713) 942-8966
ddonatti@aclutx.org
asegura@aclutx.org
*Admitted pro hac vice

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 1

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

LEGAL STANDARD.............................................................................................. 8

ARGUMENT .......................................................................................................... 9

    I.   Defendants' diversion of funds is not authorized by the statutes on which
they rely. ...................................................................................................... 9

        A.  Defendants lack authority to transfer funds into the Section 284 account because
the proposed border wall construction is an "item" for which Congress has
denied funding, is not "unforeseen," and is not a "military requirement."............. 9

        B.  Section 284 does not authorize Defendants to engage in a multibillion-
dollar wall construction project. ...................................................................... 13

    II.  Defendants' efforts to circumvent Congress's appropriations restrictions are
unconstitutional and this Court should avoid the serious constitutional
problems Defendants' efforts raise by invalidating them as ultra vires. .................... 16

    III. Defendants' final decision to construct a wall in the designated sectors
violates NEPA. ............................................................................................ 17

    IV. Ultra vires review is proper and, in the alternative, APA review is available............ 18

    V.  The Court should order injunctive and declaratory relief. ........................................ 20

        A.  The Court should enter a permanent injunction.................................................... 20

            1.  Plaintiffs will suffer irreparable harm absent a permanent injunction............ 20

            2.  Plaintiffs do not have an adequate remedy at law............................................ 22

            3.  The balance of harms and public interest support a permanent injunction..... 22

        B.  The court should declare unlawful Defendants' proposed use of DoD
transfer authorities and Section 284 to construct a border wall that Congress
rejected, as well as their violation of NEPA. ...................................................... 23

CONCLUSION....................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Aetna Life Ins. Co. v. Haworth*,
  300 U.S. 227 (1937)......................................................................................................23

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ..............................................................................21, 22

*Alto v. Black*,
  738 F.3d 1111 (9th Cir. 2013) ...................................................................................19

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987)....................................................................................................22

*City & Cty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ...................................................................................17

*Clarke v. Sec. Indus. Ass'n.*,
  479 U.S. 388 (1987)....................................................................................................19

*Clinton v. City of New York*,
  524 U.S. 417 (1998).............................................................................................16, 17

*Clouser v. Espy*,
  42 F.3d 1522 (9th Cir. 1994) .....................................................................................19

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
  789 F.3d 1075 (9th Cir. 2015) ...................................................................................20

*Dalzin v. Belshe*,
  993 F. Supp. 732 (N.D. Cal. 1997) ..............................................................................9

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ...................................................................................22

*E. Bay Sanctuary Covenant v. Trump*,
  909 F.3d 1219 (9th Cir. 2018) .............................................................................19, 23

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)....................................................................................................20

*F.D.A. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000).............................................................................................13, 14

*Feldman v. Bomar*,
  518 F.3d 637 (9th Cir. 2008) .....................................................................................24

*Haitian Refugee Ctr. v. Gracey*,
  809 F.2d 794 (D.C. Cir. 1987) ...................................................................................18

*Hawaii v. Trump*,
  878 F.3d 662 (9th Cir. 2017) .....................................................................................18

*Highland Falls- Fort Montgomery Cent. Sch. Dist. v. United States,*
    48 F.3d 1166 (Fed. Cir. 1995) ........................................................................................ 15

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir.2008) ............................................................................................ 22

*Larson v. Domestic & Foreign Commerce Corp.,*
    337 U.S. 682 (1949) ......................................................................................................... 18

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton,*
    752 F.3d 755 (9th Cir. 2014) ........................................................................................... 22

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ......................................................................................................... 19

*McDonnell v. United States,*
    136 S. Ct. 2355 (2016) ..................................................................................................... 12

*Nevada v. Dep't of Energy,*
    400 F.3d 9 (D.C. Cir. 2005) ............................................................................................. 15

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.,*
    465 F.3d 977 (9th Cir. 2006) ........................................................................................... 20

*Patchak v. Salazar,*
    632 F.3d 702 (D.C. Cir. 2011) ......................................................................................... 19

*Sierra Club v. U.S. Forest Serv.,*
    843 F.2d 1190 (9th Cir. 1988) ......................................................................................... 22

*U.S. Dep't of Navy v. Fed. Labor Relations Auth.,*
    665 F.3d 1339 (D.C. Cir. 2012) ....................................................................................... 14

*United States v. MacCollom,*
    426 U.S. 317 (1976) ......................................................................................................... 16

*United States v. McIntosh,*
    833 F.3d 1163 (9th Cir. 2016) ......................................................................................... 16

*Util. Air Regulatory Grp. v. E.P.A.,*
    573 U.S. 302 (2014) ......................................................................................................... 14

*Whitman v. Am. Trucking Ass'ns.,*
    531 U.S. 457 (2001) ......................................................................................................... 13

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ........................................................................................................ 20, 22

*Wright v. United States,*
    302 U.S. 583 (1938) ......................................................................................................... 16

*Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health,*
    654 F.3d 919 (9th Cir. 2011) ........................................................................................... 19

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................................................ 17

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ................................................................................................ 16

**Statutes**

1 U.S.C. § 105 ............................................................................................................... 14

6 U.S.C. § 202 ............................................................................................................... 12

6 U.S.C. § 251 ............................................................................................................... 12

8 U.S.C. § 1103 ............................................................................................................. 12

10 U.S.C. § 284 ...................................................................................................... passim

10 U.S.C. § 2214 ............................................................................................... 10, 12, 24

28 U.S.C. § 2201 ........................................................................................................... 23

31 U.S.C. § 1301 *et seq.* .............................................................................................. 14

31 U.S.C. § 1532 ........................................................................................................... 15

42 U.S.C. § 4332 ........................................................................................................... 17

50 U.S.C. § 3094 ........................................................................................................... 10

2019 Department of Defense Appropriations Act, Pub. Law No. 115-245 .............. passim

Administrative Procedure Act, Pub. Law No. 79-404 (1946) .................................... 9, 19

Consolidated Appropriations Act of 2019, Pub. Law No. 116-6, 133 Stat. 13 (2019) ...... 4, 13, 14, 19

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. Law
    104-208 (1996) ...................................................................................................... 6, 18

National Defense Authorization Act for Fiscal Year 2019, Pub. Law No. 115-232
    (2018) ................................................................................................................ 9, 10, 12

Pub. Law No. 99-169, 99 Stat. 1005 .............................................................................. 10

**Rules**

Fed. R. Civ. P. 54 ............................................................................................................. 8

Fed. R. Civ. P. 56 ............................................................................................................. 9

**Other Authorities**

C.F.R. 1501.4 ..................................................................................................................18

Determination Pursuant to Section 102 of IIRIRA, as Amended, 84 Fed. Reg. 17,185
(Apr. 24, 2019) .............................................................................................................6

Determination Pursuant to Section 102 of IIRIRA, as Amended, 84 Fed. Reg. 17,187
(Apr. 24, 2019) .............................................................................................................6

Determination Pursuant to Section 102 of IIRIRA, as Amended, 84 Fed. Reg. 21,798
(May 15, 2019) .............................................................................................................7

Determination Pursuant to Section 102 of IIRIRA, as Amended, 84 Fed. Reg. 21,800
(May 15, 2019) .............................................................................................................7

H.R. Rep. No. 109-452 (2006)..........................................................................................14

H.R. Rep. No. 99-106 (1985)............................................................................................10

SBA's Imposition of Oversight Review Fees on PLP Lenders, B-300248(Comp. Gen.
Jan. 15, 2004) .............................................................................................................15

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

PLEASE TAKE NOTICE that Plaintiffs Sierra Club and Southern Border Communities Coalition hereby move the Court pursuant to Federal Rule of Civil Procedure 56 for partial summary judgment against Defendants Donald J. Trump, President of the United States of America; Patrick M. Shanahan, in his official capacity as Acting Secretary of Defense; and Kevin K. McAleenan, in his official capacity as Acting Secretary of Homeland Security (collectively, "Defendants"). Plaintiffs respectfully request that this motion be decided without argument or, if the Court deems oral argument appropriate, that argument be scheduled prior to July 1, 2019.

Plaintiffs respectfully move the Court to direct entry of final judgment in their favor 1) declaring unlawful Defendants' transfer of Fiscal Year 2019 appropriated funds to the Department of Defense's Section 284 account, the use of those funds for construction of a border wall, and Defendants' failure to comply with NEPA for this construction; 2) issuing a permanent injunction prohibiting Defendants and all persons associated with them from transferring Fiscal Year 2019 appropriated funds to the Section 284 account, using those funds to build a border wall, and proceeding with construction prior to complying with NEPA; and 3) specifically enjoining the use of 284 funds to construct the wall segments in the areas Defendants have identified as Yuma Sector Project 1, El Paso Sector Project 1, El Centro Project 1 and Tucson Sector Projects 1, 2 and 3. This motion is based on this Notice of Motion and Motion, the accompanying supporting Memorandum of Points and Authorities; the declarations and request for judicial notice, and the exhibits thereto; and any other written or oral evidence or argument that may be presented at or before the time this motion is heard by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

After repeatedly failing to obtain Congress's approval for a "big, beautiful" wall along the U.S.-Mexico border, the President directed Defendants to raid military accounts and divert billions of dollars towards border wall construction. Defendants were poised to begin construction when this Court issued a preliminary injunction temporarily halting Defendants' unlawful and unconstitutional plan. Plaintiffs now move for partial summary judgment on virtually identical "legal

questions regarding whether the proposed plan for funding border barrier construction exceeds the Executive Branch's lawful authority." Order Granting in Part and Denying in Part Plaintiffs' Motion for Preliminary Injunction ("PI Order") at 2. Plaintiffs seek to permanently enjoin Defendants from unlawfully funneling $2.5 billion to build a wall that Congress explicitly refused to fund on scenic borderlands that they use and treasure.

As this Court has already held, on a nearly identical factual record, "Defendants' actions exceed[] their statutory authority" and a contrary reading of the statutes Defendants rely on "would pose serious problems under the Constitution's separation of powers principles." PI Order 36, 55. Plaintiffs' members will suffer "irreparable harm" to their "ability to recreate in and otherwise enjoy public land along the border" if Defendants are allowed to proceed with unauthorized construction. *Id*. at 49. Accordingly, Plaintiffs move for partial summary judgment and request that the Court make its preliminary injunction permanent.

## BACKGROUND

The President announced his campaign on a platform to build a "great, great wall on our southern border," Request for Judicial Notice ("RJN") ¶ 1, Ex. 1 (June 16, 2015 Presidential Announcement Speech), and, since taking office, the President and Administration have repeatedly sought appropriations to build such a wall. *See, e.g.*, RJN ¶ 2, Ex. 2 at 18 (requesting funding "to plan, design, and construct a physical wall along the southern border").

Congress has exercised its appropriations judgment, including considering and rejecting several bills that, if passed, would have appropriated billions of dollars for border barrier construction. RJN ¶¶ 3-9, Exs. 3-9 (noticing proposed legislation and its disposition).

The purported justifications for the Administration's requests have sounded a consistent refrain: a wall is needed across the Southwest to combat migration and drug trafficking. In February 2018, the White House submitted its Fiscal Year 2019 Budget Request seeking $18 billion to fund a border wall on the basis that, "since most of the illegal drugs that enter the United States come through the Southwest border, a border wall is critical to combating the scourge of drug addiction that leads to thousands of unnecessary deaths." RJN ¶ 10, Ex. 10 at 16.

Likewise the President has long expressed his wish that the Department of Defense ("DoD")

participate in DHS's counter-drug and migration activities on the border. On April 4, 2018, President Trump issued a Memorandum for the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security claiming that "[t]he situation at the border has now reached a point of crisis," and directing the Secretary of Defense "[to] support the Department of Homeland Security in securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into this country," as well as to work with DHS "to determine what other resources and actions are necessary to protect our southern border, including . . . United States military resources." Administrative Record ("Admin. R."), ECF No. 163-1, at 26. DoD has been considering using Section 284 to support DHS since the beginning of 2018. *See* RJN ¶ 11, Ex. 11 (declaring that DoD recently informed the House Committee on Armed Services that its Comptroller had withheld nearly $1 billion of fiscal year 2018 counter-drug funding until July 2018 because DoD was considering using that funding for "Southwest Border construction."); RJN ¶ 12, Ex. 12 at 95 (government counsel acknowledging that the Arcangeli declaration "suggest[s] that DoD was thinking about the possibility of 284 projects in the summer of '18," but arguing that it was only "foreseeable in general that someone at some time might ask DoD to use its 284 authority to engage in border barrier construction.").

In December 2018, Congress and the President reached an impasse over border wall funding, during which the nation endured the longest partial government shutdown in its history.

On January 6, 2019, the White House officially increased its request for border wall construction in Fiscal Year 2019. By letter to the U.S. Senate Committee on Appropriations, Acting Director of the Office of Management and Budget requested "$5.7 billion for construction of a steel barrier for the Southwest border," to "fund construction of a total of approximately 234 miles of new physical barrier." *See* RJN ¶ 13, Ex. 13 at 1. The letter asserted that "[a]ppropriations bills for fiscal year (FY) 2019 that have already been considered by the current and previous Congresses are inadequate" to address "critical issues" including the entry of drugs. *Id.*

As Congress negotiated toward compromise, the President and Administration repeatedly dismissed the appropriations process. The President threatened the wall would be built "one way or

the other." RJN ¶ 14, Ex. 14. Acting White House Chief of Staff Mick Mulvaney echoed that the President "is going to build a wall . . . We'll take as much money as you can give us, and then we'll go off and find the money someplace else . . . . But this is going to get built, with or without Congress." RJN ¶ 15 (video at 00:55-1:12). And on February 12, with congressional compromise imminent, the President told his Cabinet that "the wall is getting built;" Congress's appropriation "doesn't matter," "[b]ecause we're doing other things beyond what we're talking about here." RJN ¶ 16, Ex. 15 at 6.

On February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019 ("CAA"), Pub. Law No. 116-6, 133 Stat. 13 (2019). The CAA made available $1.375 billion "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector." *Id.* § 230(a)(1), 133 Stat. at 28. The CAA limited the use of these funds to "operationally effective designs deployed as of the date of the Consolidated Appropriations Act, 2017," and within the Rio Grande Valley Sector prohibited their use in several public and private lands.[1] CAA §§ 230(b), 231, 133 Stat. at 28. It imposed notice and comment requirements prior to the use of any funds for the construction of barriers within certain city limits. *Id.* § 232, 133 Stat. at 28-29. And it further provided that:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

*Id.* § 739, 133 Stat. at 197.

President Trump signed the CAA into law on February 15, 2019. The same day, he issued a proclamation "declar[ing] that a national emergency exists at the southern border of the United States." RJN ¶ 17, Ex. 16. Announcing the proclamation from the Rose Garden, the President stated that he "went through Congress" but was "not happy" with the $1.375 billion appropriated for a

---

[1] These are (1) the Santa Ana Wildlife Refuge, (2) the Bentsen-Rio Grande Valley State Park, (3) La Lomita Historical Park, (4) the National Butterfly Center, and (5) within or east of the Vista del Mar Ranch tract of the Lower Rio Grande Valley National Wildlife Refuge.

border wall. RJN ¶ 28, Ex. 26. "I didn't need to do this," he said. "But I'd rather do it much faster . . . that's all." *Id.*

Simultaneous to the emergency declaration, the White House issued a "fact sheet[]" explaining that the Administration "has so far identified up to $8.1 billion that will be available to build the border wall once a national emergency is declared and additional funds have been reprogrammed," including "up to $2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities (Title 10 United States Code, section 284)." RJN ¶ 18, Ex. 17.

On March 6, 2019, then-Secretary of Homeland Security Kirstjen Nielsen testified before the House Homeland Security Committee that planning had begun in the previous months. RJN ¶ 19, at 1:08:30-1:09:00. While "[the President] hoped Congress would . . . [meet] his request to fund the resources that [CBP] has requested," the Administration would proceed unilaterally. *Id.* at 28:00-28:30.

On February 25, eleven days after Congress refused to appropriate $5.7 billion to construct "approximately 234 miles of new physical barrier," DHS requested that DoD fund "approximately 218 miles" of new walls. Admin. R., ECF No. 163-1, at 24. This request was "consistent with the President's direction in his April 4, 2018, memorandum." *Id.*

The DoD's "Drug Interdiction and Counter-Drug Activities, Defense" appropriation ("counter-narcotics account") did not contain sufficient funds for the transfer. As such, the DoD needed to transfer funds into the account to finance the requested projects. *See* Admin. R., ECF No. 163-2, at 43 ("In order to support the DHS request for assistance, the Department would need to transfer funding into the Drug Interdiction and Counter-Drug Activities, Defense appropriation, using the general transfer authority provided for under Section 8005 of the DoD Appropriations Act, 2019."); *see also id.*, ECF No. 163-2, at 11 ("To meet any level of support requested by DHS, additional funds must be transferred into the 'Drug Interdiction and Counter-Drug Activities, Defense' appropriation.").

DoD officials, including Defendant Shanahan, acknowledged that the situation at the southern border is "not a military threat." RJN ¶ 20, Ex. 18 at 50-52.

Nonetheless, on March 25, 2019, Defendant Shanahan invoked Section 8005 and directed

the Under Secretary of Defense (Comptroller)/Chief Financial Officer to transfer $1 billion from Army personnel funds to the counter-narcotics account. *See* Admin. R., ECF No. 163-1, at 10. Speaking to the House Armed Services Committee about the transfer, Defendant Shanahan stated that the Administration determined to unilaterally reprogram funds "prior to the declaration of a national emergency." *See* RJN ¶ 21, Ex. 19 at 14.

The same day, Defendant Shanahan approved the diversion of funds from DoD's counter-narcotics support budget for three "drug-smuggling corridors" in New Mexico and Arizona, known as El Paso Project 1 and Yuma Sector Projects 1 and 2. Admin. R., ECF No. 163-1, at 7. Pursuant to a Modification Request submitted April 5, 2019, Defendant Shanahan modified his prior approval of 18-foot pedestrian fencing to, at significantly greater cost, provide for "30-foot bollard fencing and a 5-foot anti-climb plate" within Yuma Sector Project 1 and El Paso Sector Project 1, and 18-foot bollard fencing with a 5-foot anti-climb plate in Yuma Sector Project 2. Admin. R., ECF No. 163-2, at 8; *see also id.* No. 163-3, at 42 (detailing request for modification and stating that "DHS now requests that all fencing installed by DoD include a 5-foot anti-climb steel plate"). According to DHS, anti-climb fencing is necessary for stopping migration. DHS's explanation for modification of counterdrug construction made no reference to any counterdrug mission. *See* Admin. R., ECF 163-2, at 66-67.

Both the House Committee on Armed Services and the House Committee on Appropriations formally disapproved the DoD's attempt to "reprogram" funds for purposes of constructing barriers on the southern border. *See* RJN ¶ 22, Ex. 20; *id.* ¶ 23, Ex. 21.

To attempt to expedite DoD's construction in Arizona and New Mexico, Defendant McAleenan, as Acting Secretary of Homeland Security, published determinations pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. Law 104-208 (1996), "waiv[ing] all legal requirements that [he], in [his] sole discretion, determine[d] necessary to ensure the expeditious construction of barriers and roads" where the El Paso Sector and Yuma Sector Projects were planned. *See* Determination Pursuant to Section 102 of IIRIRA, as Amended, 84 Fed. Reg. 17,185, 17,187 (Apr. 24, 2019).

"Yuma Project 1" consists of up to 5 miles of new 30-foot fencing in southern Arizona with

new roads and lighting that will disrupt the "beautiful landscape…on either side of the Colorado River." Bevins Decl. ¶ 7. *See also* Admin. R., ECF No. 163-2, at 8, 13; Del Val Decl. ¶ 6 (describing fishing in these lands for more than fifty years). "El Paso Project 1" is the erection of 46 miles of 30-foot border wall, roads, and lighting in southern New Mexico. *See* Admin. R., ECF No. 163-2, at 8, 13. This "rolling Chihuahuan desert scrubland, adjacent to several mountain ranges, with arroyos and diverse vegetation creating an undulating landscape," is frequently visited by Plaintiffs' members in their professional and personal capacities. Bixby Decl. ¶ 6; *see also* Munro Decl. ¶ 7; Walsh Decl. ¶ 7.

On May 8, 2019, Kenneth Rapuano, Assistant Secretary of Defense, requested "approval of a second tranche of assistance" to proceed with 78.25 miles of new construction, including "El Centro Sector Project 1," consisting of 15.25 miles of 30-foot bollard wall in California, and Tucson Sector Projects 1, 2, and 3, which together consist of 63 miles of 30-foot bollard wall in Arizona. Admin. R., ECF No. 163-3, at 1-4.

Then next day, on May 9, 2019, Defendant Shanahan authorized an additional $1.5 billion for DHS's requested El Centro and Tucson Sector projects. *See* Admin. R., ECF No. 163-3, at 7. Defendant Shanahan further ordered that reprogramming should occur "without regard to comity-based policies that require prior approval from congressional committees." *Id*.

As with the prior commitment, financing the new projects would require DoD to transfer funds into the counter-narcotics account. *See* Admin. R., ECF No. 163-3, at 1 ("To provide this support under Section 284, additional funds must be transferred into the 'Drug Interdiction and Counter-Drug Activities, Defense' appropriation," including Section 8005 as well as "DoD's special transfer authority (STA), which is provided in Section 9002 of the DoD Appropriations Act, 2019."). Defendant Shanahan accordingly invoked "base funds and funds designated for Overseas Contingency Operations," including Section 8005 and "9002 of the DoD Appropriations Act, 2019, and section 1001 and 1512 of the John S. McCain National Defense Authorization Act for FY 2019." *See* Admin. R., 163-3, at 10-20.

On May 15, 2019, Defendant McAleenan issued waivers on lands encompassing the El Centro and Tucson Sector Projects. *See* Determination Pursuant to Section 102 of IIRIRA, as

Amended, 84 Fed. Reg. 21,798, 21,800 (May 15, 2019).

"El Centro Project 1" consists of "road construction," replacement of 15 miles of existing vehicle barrier with 30-foot pedestrian fencing, and installment of lighting along California's southern border. Admin. R., ECF No. 163-1, at 17. Plaintiffs and their members frequent this "culturally rich" land, which runs parallel to Highway 98, to witness "extraordinary beauty" of the desert habitat. *See* Evans Decl. ¶ 7; Armenta Decl. ¶ 6. Not only will natural environments on both sides of the border be disturbed, disruption of fragile desert crust may exacerbate air pollution and dust for communities where Plaintiffs' members reside. Ramirez Decl. ¶ 8.

"Tucson Sector Projects 1, 2, and 3" consist of approximately 63 miles of "30-foot pedestrian fencing, constructing and improving roads, and installing lighting" in southern Arizona. Admin. R., ECF No. 163-3, at 22. These biodiverse lands are frequently visited by Plaintiffs' members for their unique beauty and archaeological, historic, and biological value, including at Organ Pipe National Monument, Coronado National Memorial, the Cabeza Prieta National Wildlife Refuge, the San Pedro River, and the San Bernardino National Wildlife Refuge. *See, e.g.,* Hartmann Decl.; Hudson Decl.; Dahl Decl.; Broyles Decl.; Gerrodette Decl.; Case Decl. These lands are also "ancestral territory and traditional homelands" of Amicus Tohono O'odham Nation, which would be "divide[d]" by proposed construction. ECF No. 159-1, at 7.

Many miles of the proposed construction run along the Organ Pipe National Monument, and replace the wildlife-permeable vehicle barriers that currently exist in the National Park. According to the Department of Interior, the current barrier "has not been breached, and monitoring has revealed a dramatic decline in illegal off-road vehicle activity." RJN ¶ 24, Ex. 22. The current "barrier design allows water, and animals, including the highly endangered Sonoran Pronghorn, to safely roam their natural ranges uninterrupted." *Id.* Defendants' proposed new fence is much higher, much denser, and impermeable to most animals.

## LEGAL STANDARD

The Federal Rules of Civil Procedure provide for entry of partial summary judgment. "[T]he court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). A

party may move for summary judgment on any "claim or defense" or "part of [a] claim or defense,"

Fed. R. Civ. P. 56(a), and a district court should enter summary judgment where "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

*Id*. This motion raises issues of statutory construction that present questions of law appropriate for

resolution through partial summary judgment. *See Dalzin v. Belshe*, 993 F. Supp. 732, 734 (N.D.

Cal. 1997) ("It is axiomatic that questions of statutory interpretation are questions of law.")

**ARGUMENT**

Defendants' reprogramming of DoD funds to construct a border wall is unlawful. Their

actions are ultra vires because they exceed Defendants' authority under the statutes they invoke as

well as under the Constitution. In addition, Defendants' actions violate NEPA. Plaintiffs have

properly brought their claims in equity, but this Court may also consider them under the

Administrative Procedure Act ("APA").

**I.   Defendants' diversion of funds is not authorized by the statutes on which they rely.**

**A.   Defendants lack authority to transfer funds into the Section 284 account because the proposed border wall construction is an "item" for which Congress has denied funding, is not "unforeseen," and is not a "military requirement."**

Defendants rely on three reprogramming provisions to funnel DoD funds into the Section

284 account for wall construction. *See* Admin. R., ECF No. 163-2, at 43-46; *id*. ECF No. 163-3 at

10-20. These provisions have similar requirements, which Defendants do not satisfy. First, Section

8005 of the 2019 Department of Defense Appropriations Act, Pub. Law No. 115-245 mandates that

transfers between DoD funds "may only be used for (1) for higher priority items than those for

which originally appropriated, and (2) based on unforeseen military requirements, but (3) in no case

where the item for which funds are requested has been denied by the Congress." PI Order 16 (citing

Pub. Law No. 115-245 § 8005). Second, Section 9002 of the 2019 Department of Defense

Appropriations Act, which governs the transfer of funds within DoD's Overseas Contingency

Operations appropriation, "is, at a minimum, subject to Section 8005's limitations." *Id*. at 12 n.7;

Pub. Law No. 115-245 § 9002 ("the authority provided in this section … is subject to the same terms

and conditions as the authority provided in section 8005 of this Act"). Third and finally, Section

1512 is subject to the restrictions contained in Section 1001 of the NDAA, *see* NDAA, Pub. Law

9

No. 115-232 § 1512(b), which in turn provides that transfer authorizations may only "may not be used to provide authority for an item that has been denied authorization by Congress," NDAA § 1001(b)(2). In addition, Section 1512 is subject to the general restrictions on transfer authorities imposed in 10 U.S.C. § 2214. *See* 10 U.S.C. § 2214(a) (section applies "[w]henever authority is provided in an appropriation Act to transfer amounts in working capital funds or to transfer amounts provided in appropriation Acts for military functions of the Department of Defense (other than military construction) between such funds or appropriations (or any subdivision thereof)"). Section 2214(b)(1) in turn restricts transfers "except to provide funds for a higher priority item, based on unforeseen military requirements, than the items for which the funds were originally appropriated."

Each of Defendants' planned wall sections rests on a violation of the requirement that DoD transfers may not be used for an item that has been denied by Congress. *See* PI Order 16 ("[E]very dollar of Section 284 support to DHS and its enforcement agency, CBP, is attributable to reprogramming mechanisms."). "Congress has described its intent that appropriations restrictions of this sort be 'construed strictly' to 'prevent the funding for programs which have been considered by Congress and for which funding has been denied.'" PI Order 33 (citing H.R. Rep. No. 99-106, at 9 (1985) (discussing analogous appropriations restriction in Pub. Law No. 99-169, § 502(b), 99 Stat. 1005 (codified at 50 U.S.C. § 3094(b))). The record leaves no ambiguity over whether wall sections outside of Texas are an item that Congress has "denied." The protracted negotiations between the President and Congress, the President's repeated assertions that the wall would get built "one way or the other," and the fact that, ultimately, "Congress was presented with—and declined to grant—a $5.7 billion request for border barrier construction," make clear that "[b]order barrier construction, expressly, is the item Defendants now seek to fund via the Section 8005 transfer, and Congress denied the requested funds for that item." PI Order 34. Congress's decision to appropriate "only $1.375 billion for construction of pedestrian fencing, of a specified type, in a specified sector" reflects its considered policy judgment to limit border wall construction. PI Order 32-33.

The reprogramming authorities that Defendants invoke are also subject to the condition that they be based on "unforeseen military requirements." *See* Pub. Law No. 115-245 §§ 8005, 9002; 10 U.S.C. § 2214(b)(1). Wall construction under a claim of counterdrug necessity is not "unforeseen"

as the President specifically claimed to Congress in his February 2018 budget proposal that "$18 billion to fund the border wall" was necessary because "a border wall is critical to combatting the scourge of drug addiction." RJN ¶ 10, Ex. 10 at 16. *See also* PI Order 35 ("[T]hat the need for the requested border barrier construction funding was 'unforeseen' cannot logically be squared with the Administration's multiple requests for funding for exactly that purpose dating back to at least early 2018.").

Moreover, while any interpretation of "'unforeseen' to refer to the request for DoD assistance, as opposed to the underlying 'requirement' at issue," is "not reasonable," even such an unreasonable interpretation would not render Defendants' wall projects "unforeseen." PI Order 36. As far back as April 2018, the White House directed DoD and DHS "to determine what other resources and actions are necessary to protect our southern border, including . . . United States military resources," and to produce a report to the White House "detailing their findings and an action plan, including specific recommendations as to any other executive authorities that should be invoked to defend the border and security of the United States." Admin. R., 163-1, at 27-28. The record likewise indicates that DoD was specifically considering the use of Section 284 to construct sections of border wall in the summer of 2018. *See* RJN ¶ 11, Ex. 11 (declaring that DoD recently informed the House Committee on Armed Services that its Comptroller had withheld nearly $1 billion of fiscal year 2018 counter-drug funding until July 2018 because DoD was considering using that funding for "Southwest Border construction."); RJN ¶ 12, Ex. 12 at 95 (government counsel acknowledging that the Arcangeli declaration "suggest[s] that DoD was thinking about the possibility of 284 projects in the summer of '18," but arguing that it was only "foreseeable in general that someone at some time might ask DoD to use its 284 authority to engage in border barrier construction").

A different "interpretation likely would pose serious problems under the Appropriations Clause, by ceding essentially boundless appropriations judgment to the executive agencies." PI Order 40. To construe "unforeseen" as Defendants transfer demands "would give the agency making a request for assistance under Section 284 complete control over whether that condition is met, simply by virtue of the timing of the request." *Id.* DHS waited to see whether Congress would

grant a requested appropriation, and then turned to DoD when Congress declined. DoD did, and "could always characterize the resulting request as raising an 'unforeseen' requirement because it did not come earlier." *Id.*

Finally, the building of a permanent border wall on behalf of DHS is not a "military requirement." *See* Pub. Law No. 115-245 §§ 8005, 9002; 10 U.S.C. § 2214(b)(1); NDAA § 1512(b) (subject to restrictions in 10 U.S.C. § 2214). It is not a project to be carried out for any military or DoD purpose, but instead for DHS's purposes, as Defendant Shanahan's letter to Defendant Nielsen confirms. *See* Admin R., ECF No. 163-2, at 16-17 ("DHS will accept custody of the completed infrastructure, account for that infrastructure in its real property records, and operate and maintain the completed infrastructure."). DoD officials, including Defendant Shanahan, have acknowledged that the situation at the southern border is "not a military threat." RJN ¶ 20, Ex. 18 at 50-52.

Moreover, Congress has assigned to civilian law enforcement the responsibility for border security, including in any situation where "an actual or imminent mass influx of aliens . . . near a land border[] presents urgent circumstances requiring an immediate Federal response." 8 U.S.C. § 1103(a)(10). Should the Attorney General determine that such "urgent circumstances" exist, the "immediate Federal response" Congress provided for is that the Attorney General may authorize civilian "law enforcement officer[s]" to perform immigration functions. *Id.*; *see also* 6 U.S.C. § 202 (assigning DHS responsibility for "[s]ecuring the borders" and "immigration enforcement functions"); *id.* § 251 (assigning DHS responsibility for "Border Patrol," "detention and removal," and "inspections"); 8 U.S.C. § 1103(a)(5) (Secretary of DHS has "duty to control and guard the boundaries and borders of the United States against . . . illegal entry"). That Congress authorized the military in some circumstances, when it so appropriated, to provide support to law enforcement for construction of barriers does not convert support for civilian missions to a military *requirement*. If anything the military might do is deemed a "military requirement," the statutory phrase imposes no restriction at all. Such a reading violates the "presumption that statutory language is not superfluous." *McDonnell v. United States*, 136 S. Ct. 2355, 2369 (2016) (quotation marks omitted).

### B. Section 284 does not authorize Defendants to engage in a multibillion-dollar wall construction project.

Defendants cannot use Section 284 to override Congress's specific decision to limit the pace and manner of border wall construction. 10 U.S.C. § 284 authorizes the Secretary of Defense to provide other law enforcement agencies with small-scale support, including the "construction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(b)(7).

A commonsense reading of the statute makes clear that Congress did not use Section 284 to authorize multibillion-dollar public works to be constructed at the sole discretion of the Secretary of Defense. For example, Subsection (h)(1)(B) requires the Secretary to give Congress 15 days' written notice before providing certain forms of support, including "a description of any small scale construction project for which support is provided." The statute defines "small scale construction" as "construction at a cost not to exceed $750,000 for any project." 10 U.S.C. § 284(i)(3). Congress would not have required a description of "any small scale construction" projects if it was, at the same time, authorizing massive, multibillion-dollar expenditures under this provision. "Whether or not Section 284 formally 'limits' the Secretary to 'small scale construction' . . . reading the statute to suggest that Congress requires reporting of tiny projects but nonetheless has delegated authority to DoD to conduct the massive funnel-and-spend project proposed here is implausible, and likely would raise serious questions as to the constitutionality of such an interpretation." PI Order 39. Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns.*, 531 U.S. 457, 468 (2001).

Moreover, any general DoD authority to provide support to law enforcement agencies cannot be read to extend to billions of dollars for border barrier construction when interpreted against the more specific and more recent judgment by Congress embodied in the CAA. "[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). "This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." *Id.* at 143. Therefore, "a specific policy embodied in a later … statute should control [judicial] construction of the [earlier

broad] statute, even though it ha[s] not been expressly amended." *Id.* (quotations and citations omitted; brackets in original). Here, the CAA's specific policy limitation on border barrier construction must control, and bar, Defendants' attempt to use Section 284 to evade Congress's funding restrictions.

The CAA further prohibits the use of any appropriated funds to "increase . . . funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act" or authorized by provisions in other appropriations legislation. CAA, Division D § 739. The President has proposed an increase of funding for wall construction by several billion dollars in his budget request for fiscal year 2020. *See* RJN ¶ 26, Ex. 24 at 50 ("Budget requests $5 billion to construct approximately 200 miles of border wall along the U.S. Southwest border."); *id*. ¶ 27, Ex. 25 at 6–9 (requesting $3.6 billion "to build border barriers," and an additional $3.6 billion to "backfill funding reallocated in FY 2019 to build border barriers"). 10 U.S.C. § 284 is not an appropriations act, and therefore cannot can be used to increase border barrier funding beyond the $1.375 billion provided for in the CAA. *See* 1 U.S.C.§ 105 (defining appropriations acts).

The history of Section 284 likewise shows that Defendants' plan to use the statute to funnel $2.5 billion of military funds to border wall construction exceeds any authority provided by Section 284. For example, Congress's 2006 decision to recommend a $10 million increase for fence and road construction shows Congress contemplating a project amounting to 0.004% of Defendants' plan here. *See* H.R. Rep. No. 109-452, at 369 (2006). Interpretation of statutes "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude." *Brown & Williamson Tobacco*, 529 U.S. at 133; *see also Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." (quotation marks omitted)).

In addition to violating the specific textual requirements of Section 284, Defendants violate general appropriation laws. Their transfer-and-spend plan violates the core principle that executive branch agencies may not mix and match  funds from different accounts to exceed the funding limits

Congress imposed. Numerous "[f]ederal statutes reinforce Congress's control over appropriated funds." *U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012)(citing 31 U.S.C. § 1301 *et seq.*). These statutes include "Section 1301, known as the 'Purpose Statute,' [which] provides that appropriated funds may be applied only 'to the objects for which the appropriations were made,'" and the Transfer Statute, Section 1532, which prohibits unauthorized transfer of funds from one account to another. *Id. See also* 31 U.S.C. § 1532. The General Accountability Office ("GAO"), which guides the executive branch's use of appropriated funds by providing expert interpretations of appropriations law, confirms these core principles.[2] Many of the GAO's rules protect a key function of congressional appropriations judgment: setting a "maximum authorized program level" by specifically appropriating a finite set of funds for a particular project. SBA's Imposition of Oversight Review Fees on PLP Lenders, B-300248 (Comp. Gen. Jan. 15, 2004).

Courts have struck down similar mix-and-match funding plans as an end-run around Congress's limits on appropriations. In *Nevada v. Departmentt of Energy*, for example, the D.C. Circuit applied the GAO's rule that "specific appropriations preclude the use of general ones even when the two appropriations come from different accounts." 400 F.3d 9, 16 (D.C. Cir. 2005) (citing 4 Comp. Gen. 476 (1924)). The court rejected the use of funds from a general account to buttress a more specific and limited appropriation that Congress intended for the same purpose. *Id.*; *see id.* ("[T]he fact that Congress appropriated $1 million expressly for Nevada indicates that is all Congress intended Nevada to get in FY04 from whatever source."). Here, as in *Nevada*, Congress has allocated a specific amount of funding for an activity and the government cannot cobble together other, more general sources of money to increase funding levels for that same goal. Congress has set a maximum authorized program level for border barrier construction: $1.375 billion in Fiscal Year 2019. Defendants may not transfer and spend funds above this limit. *See, e.g.*, *Highland Falls- Fort Montgomery Cent. Sch. Dist. v. United States*, 48 F.3d 1166, 1171 (Fed. Cir. 1995) (government cannot "'raid[]' one appropriation account . . . to credit another").

---

[2] Courts frequently give "special weight to [GAO's] opinions" due to its "accumulated experience and expertise in the field of government appropriations." *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005).

## II.   Defendants' efforts to circumvent Congress's appropriations restrictions are unconstitutional and this Court should avoid the serious constitutional problems Defendants' efforts raise by invalidating them as ultra vires.

Defendants' "massive funnel-and-spend project," PI Order 39, violates the Constitution's Appropriations Clause, Presentment Clause, and the separation of powers because it represents an effort "to circumvent Congress's clear decision to deny the border barrier funding sought here when it appropriated a dramatically lower amount in the CAA." PI Order 34. However, because each of Defendants' challenged actions is unauthorized by the statutes on which they purport to rely, the Court "need not reach the second-level question of whether it would be unconstitutional for Congress to sanction such conduct." PI Order 30. In addition to the clear statutory text, the doctrine of constitutional avoidance further supports an interpretation of the transfer statutes and Section 284 that avoids the serious constitutional problems Defendants' interpretation of those statutes would raise. PI Order 36-37 ("Statutes must be interpreted to avoid a serious constitutional problem where another 'construction of the statute is fairly possible by which the question may be avoided.'" (quoting *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001))).

The Appropriations Clause provides Congress with "'absolute' control over federal expenditures—even when that control may frustrate the desires of the Executive Branch regarding initiatives it views as important." PI Order 54. The Constitution delegates to Congress "exclusive" power "not only to formulate legislative policies and mandate program and projects, but also to establish their relative priority for the Nation." *United States v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir. 2016). As in *McIntosh*, Defendants' efforts to spend money in violation of the restrictions imposed in the CAA amount to "drawing funds from the Treasury without authorization by statute and thus violating the Appropriations Clause." *Id.* at 1175; *see also United States v. MacCollom*, 426 U.S. 317, 321 (1976) ("The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.").

Likewise, a statute would run afoul of the Presentment Clause if it permitted the president to sign an appropriations act and, "based on the same facts and circumstances that Congress considered," have the option of "rejecting the policy judgment made by Congress and relying on

[its] own policy judgment." *Clinton v. City of New York*, 524 U.S. 417, 444 & n.35 (1998). "Where the President does not approve a bill, the plan of the Constitution is to give to the Congress the opportunity to consider his objections and to pass the bill despite his disapproval." *Wright v. United States*, 302 U.S. 583, 596 (1938). Instead of following this constitutional requirement, the President signed a bill to which he objected, and simultaneously announced that he would nonetheless disregard the limitations Congress imposed in the CAA by increasing funds to his liking. This violates the Presentment Clause. *See Clinton*, 524 U.S. at 445–47.

Finally, Defendants' efforts to circumvent congressional control of appropriations violate the separation of powers. "[T]he position that when Congress declines the Executive's request to appropriate funds, the Executive nonetheless may simply find a way to spend those funds 'without Congress' does not square with fundamental separation of powers principles dating back to the earliest days of our Republic." PI Order 54-55. "Congress has repeatedly rejected legislation that would have funded substantially broader border barrier construction, as noted above, deciding in the end to appropriate only $1.375 billion." PI Order 38-39 (citing *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) ("In fact, Congress has frequently considered and thus far rejected legislation accomplishing the goals of the Executive Order. The sheer amount of failed legislation on this issue demonstrates the importance and divisiveness of the policies in play, reinforcing the Constitution's 'unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process.'")); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring) ("It is quite impossible . . . when Congress did specifically address itself to a problem . . . to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld. To find authority so explicitly withheld is not merely to disregard in a particular instance the clear will of Congress. It is to disrespect the whole legislative process and the constitutional division of authority between President and Congress.").

### III.   Defendants' final decision to construct a wall in the designated sectors violates NEPA.

The National Environmental Policy Act ("NEPA") demands that federal agencies prepare an Environmental Impact Statement before taking any action with significant environmental impacts.

42 U.S.C. § 4332. To comply with that mandate, NEPA's implementing regulations require an agency to complete at least an initial Environmental Assessment to determine whether a proposed action will have such impacts. 40 C.F.R. 1501.4(b)-(c). DoD does not dispute that its actions have significant effects on the environment, nor that it has failed to prepare an Assessment. Instead, Defendants rely upon determinations issued by the Secretary of Homeland Security purporting to waive various statutory requirements, including NEPA, pursuant to Section 102(c) of IIRIRA.

Section 102(c) allows DHS to waive compliance with laws to the extent "necessary to ensure expeditious construction of the barriers and roads *under this section*"—that is, under Section 102 of IIRIRA. IIRIRA § 102(c) (emphasis added). As such, DHS's purported waiver can only eliminate the Department of Defense's NEPA obligations if the "expeditious construction" is "under" IIRIRA authority. Defendants insist, however, that their projects are *not* being undertaken under DHS's IIRIRA authority; in an attempt to evade the restrictions of the CAA, they have characterized the actions as occurring "under" Section 284. Defendants cannot have it both ways. If Defendants are diverting funds toward border barrier construction that is derivative of DHS's authorities, they have violated statutory and constitutional law. *See supra* I and II. In the alternative—that is, if the Department of Defense's construction pursuant to Section 284 is not derivative of DHS's Section 102(c) authority, Defendants have failed to satisfy their obligations under NEPA.[3]

### IV.   Ultra vires review is proper and, in the alternative, APA review is available.

A "court may grant injunctive relief against executive officers to enjoin both ultra vires acts—that is, acts exceeding the officers' purported statutory authority—and unconstitutional acts." PI Order 28. *See also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949) ("[W]here [an] officer's powers are limited by statute, his actions beyond those limitations . . . are ultra vires his authority and therefore may be made the object of specific relief."). Plaintiffs' "cause of action, which exists outside of the APA, allows courts to review ultra vires actions by the President that go beyond the scope of the President's statutory authority." *Hawaii v. Trump*, 878 F.3d 662, 682 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018).

---

[3] Plaintiffs acknowledge that the Court did not find they were likely to succeed on this NEPA argument, but respectfully present it for the Court's consideration on the merits.

"[W]here a plaintiff seeks equitable relief against a defendant for exceeding its statutory authority, the zone-of-interests test is inapposite." PI Order 30; *see also Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987) ("Appellants need not, however, show that their interests fall within the zones of interests of the constitutional and statutory powers invoked by the President in order to establish their standing to challenge the interdiction program as ultra vires."). Even if Plaintiffs were required to satisfy a further zone-of-interest test with respect to Defendants' claimed Section 8005 authority, the test would pose no obstacle to the Court's review. "The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quotations omitted). The inquiry is causal: zone-of-interests requires only that an injury "somehow be tied to" a violation of the underlying statutory or constitutional purpose. *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 932 (9th Cir. 2011).

Here, Plaintiffs' interest in avoiding circumvention of Congress's decision to deny funds is entirely aligned with Section 8005's purpose. Plaintiffs were involved with Congress's funding decisions with respect to the border wall, and repeatedly advocated with lawmakers to limit the scope and location of any construction. *See* Houle Decl. ¶ 7; Gaubeca Decl. ¶ 5. They now seek to enforce the denial of funds that Congress enacted in the CAA. *See Clarke v. Sec. Indus. Ass'n.*, 479 U.S. 388, 401 (1987) (zone-of-interests analysis "not limited to considering the statute under which respondents sued" but must consider "overall context" and "overall purposes" of congressional action). "[I]t is sufficient that the Organizations' asserted interests are consistent with and more than marginally related to the purposes of the [statute]." *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1244 (9th Cir. 2018). Plaintiffs' "stake in opposing" the use of Section 8005 to circumvent Congress's protection of the lands Plaintiffs treasure is "intense and obvious," and easily passes the "zone-of-interests test[, which] weeds out litigants who lack a sufficient interest in the controversy." *Patchak v. Salazar*, 632 F.3d 702, 707 (D.C. Cir. 2011), *aff'd sub nom. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209.

Finally, even if the Court ultimately views these claims as challenges arising under Section

8005, rather than nonstatutory ultra vires claims, it may treat them as APA claims. *See, e.g.*, *Alto v. Black*, 738 F.3d 1111, 1117 (9th Cir. 2013) (electing to consider under APA claims not "explicitly denominated as an APA claim" as they were "fairly characterized as claims for judicial review of agency action under the APA"); *Clouser v. Espy*, 42 F.3d 1522, 1533 (9th Cir. 1994) ("We shall therefore treat plaintiffs' arguments as being asserted under the APA, although plaintiffs sometimes have not framed them this way in their pleadings."). The transfers are final agency decisions because "the initial agency decisionmaker arrived at a definitive position and put the decision into effect," *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984-85 (9th Cir. 2006) (quotation omitted), leading directly to the challenged harms to Plaintiffs, PI Order 24-25.

## V.   The Court should order injunctive and declaratory relief.

### A.   The Court should enter a permanent injunction.

Less than one month ago, this Court issued a preliminary injunction finding that "Plaintiffs are likely to show that Defendants' actions exceeded their statutory authority, and that irreparable harm will result from those actions." PI Order 55. The material facts remain unchanged since then, and the standard for a permanent injunction is "essentially the same," except that a plaintiff must show actual success on the merits instead of a likelihood of success. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). More specifically, a party seeking a permanent injunction must show that "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Plaintiffs have satisfied these requirements.

### 1.   Plaintiffs will suffer irreparable harm absent a permanent injunction.

The undisputed facts demonstrate that, without an order permanently enjoining construction in the areas designated as El Paso Sector 1, Yuma Sector 1, El Centro, and Tucson Sector 1, 2, and 3, Plaintiffs' members will suffer irreparable harm to their recreational and aesthetic interests. Defendants' proposed construction "will lead to a substantial change in the environment" that

1  "cannot be remedied easily after the fact." PI Order 50.

2          The harm that border wall construction will inflict on Plaintiffs' aesthetic and recreational

3  interests constitutes irreparable injury sufficient to justify injunctive relief as a matter of law. "It is

4  well-established in the Ninth Circuit that an organization can demonstrate irreparable harm by

5  showing that the challenged action will injure its members' enjoyment of public land." PI Order 49

6  (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Plaintiffs'

7  members have established in their uncontested declarations that construction in the designated areas

8  will impede their ability to enjoy those lands. *See, e.g.*, Walsh Decl. ¶¶ 12, 15 (construction will

9  "negatively impact [her] aesthetic enjoyment of borderlands wildlife" in El Paso Sector 1); Bixby

10  Decl. ¶ 6 (describing harms to lands where he enjoys camping and hiking); Gerrodette Decl. ¶¶ 6, 8

11  ("noise, dust, and unsightliness of [wall] construction zone" will deter her from hiking and

12  observing wildlife in Tucson Sector 3); Hartmann Decl. ¶¶ 8, 9 ("proposed wall segments will

13  fundamentally alter [her] experience of these lands"); Armenta Decl. ¶¶ 6-8 (proposed construction

14  in El Centro Sector will destroy "unimpeded views, in all directions, [that] are centrally important to

15  [his] enjoyment of this landscape"); Tuell Decl. ¶¶ 7, 10 (wall construction will impede camping,

16  hiking, and wildlife observation experience); Ramirez Decl. ¶¶ 5, 8 (border wall will "irreparably

17  diminish[]" enjoyment of recreational activities and "impact [her] ability to see the valley as a whole

18  and recreate in the surrounding area"); Bevins Decl. ¶ 7 ("tall and intrusive pedestrian barrier would

19  disrupt the desert views and inhibit [him] from fully appreciating this area"); and Ardovino Decl. ¶ 6

20  (same).

21          Plaintiffs have "allege[d] recreational harms from not only the bollard wall construction but

22  also the accompanying lighting, which does not currently exist" and would diminish the quality of

23  Plaintiffs' recreational activities. PI Order 50. *See also* Munro Decl. ¶¶ 9, 11 ("increased lighting

24  and upkeep activities" will "diminish [the] happiness and sense of fulfillment [she] derive[s] from

25  visiting these beautiful landscapes and viewing local species"); Del Val Decl. ¶¶ 9, 10 (construction

26  will "create artificial light pollution interfering with the desert dark skies [he and his wife]

27  treasure"); Broyles Decl. ¶¶ 8, 9 (enjoyment of areas will be "damaged by the incessant lighting

28  associated with the wall and its construction" which will "disrupt night flights of migrating birds

and mar [his] and others' view of the night skies"); Dahl Decl. ¶ 8 (increased lighting will "impede the desert dark skies that are a hallmark of this landscape, and generally degrade [his] camping experience"); Hudson Decl. ¶¶ 10, 11 (light pollution will "drastically impact [his] ability to stargaze in this beautiful border region"); Case Decl. ¶¶ 10-12 (increased lighting is "an intrusive nuisance and decreases [her] enjoyment of the area," including ability to birdwatch); Evans Decl. ¶ 8 (lighting "detrimental to [his] ability to enjoy[] a dark sky full of stars" and nocturnal wildlife).

The harms Plaintiffs will experience if construction proceeds are real, significant, and potentially irreversible. This proposed construction "constitutes a change in conditions" that will irreparably harm Plaintiffs' members. PI Order 50. Plaintiffs injuries are "are not speculative, and will be irreparable in the absence of an injunction." *Id*. at 54.

### 2. Plaintiffs do not have an adequate remedy at law.

No remedy at law can compensate Plaintiffs for the harm that wall construction imposes. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent." *Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir.2008) (en banc) (quoting *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987)), *abrogated in part on other grounds by Winter*, 555 U.S. at 20; *see also League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (noting that payment of money damages cannot remedy environmental injury stemming from logging); *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (same). Once Defendants commence construction—which includes preparatory activities such as installing additional lighting, creating access roads, and moving heavy machinery on location—environmental damage will have already occurred. This harm is irreversible, permanently altering the surrounding environment and causing irreparable injury to Plaintiffs. No amount of after-the-fact monetary damages can remedy this harm.

### 3. The balance of harms and public interest support a permanent injunction.

The public interest and balance of equities favor the entry of a permanent injunction. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (these two factors merge when the government is a party). Unless Defendants are permanently enjoined from wall construction using funds reprogrammed to the Section 284 account, Plaintiffs will continue to face

1   the prospect that the borderlands they treasure will be irreversibly destroyed. *See All. for the Wild*

2   *Rockies*, 632 F.3d at 1138 (there is a well-established "public interest in preserving nature and

3   avoiding irreparable environmental injury" (quotations omitted)). The public also "has an interest in

4   ensuring that statutes enacted by their representatives are not imperiled by executive fiat." PI Order

5   54 (quoting *E. Bay Sanctuary*, 909 F.3d at 1255). "Accordingly, this factor favors Plaintiffs" and

6   counsels in favor of a permanent injunction. *Id*.

7          The public interest further supports a stay because the administration's own expert

8   assessment is that a border would do little to stanch the flow of heroin, fentanyl, and cocaine.

9   According to the Drug Enforcement Agency, the "majority of the [heroin] flow is through [privately

10  operated vehicles] entering the United States at legal ports of entry, followed by tractor-trailers,

11  where the heroin is co-mingled with legal goods." RJN ¶ 25, Ex. 23 at 19. Fentanyl transiting the

12  Southern border is likewise most commonly smuggled in "multi-kilogram loads" in vehicles

13  crossing at legal ports of entry. *Id.* at 33. And privately owned vehicles "remain the primary method

14  used to smuggle cocaine across the [Southwest border]. Traffickers hide cocaine amongst legitimate

15  cargo of commercial trucks or within secret compartments built within passenger vehicles." *Id.* at 52.

16          **B.  The court should declare unlawful Defendants' proposed use of DoD transfer**
             **authorities and Section 284 to construct a border wall that Congress rejected, as**
17           **well as their violation of NEPA.**

18          This Court may issue declaratory relief "[i]n a case of actual controversy within its

19  jurisdiction." 28 U.S.C. § 2201(a); *see also Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-40

20  (1937). Throughout the course of this litigation, Defendants have announced the use of new and

21  different transfer authorities to move various funds into the Section 284 account for the purpose of

22  wall construction. At the time Plaintiffs filed this lawsuit, Defendants had announced plans to

23  transfer $2.5 billion to wall construction through the use of Section 284. Defendants subsequently

24  announced their first use of Section 8005 on March 25, 2019, and announced their first uses of

25  "section 9002 of the Department of Defense Appropriations Act, 2019, and section 1512 of the John

26  S. McCain National Defense Authorization Act for Fiscal Year 2019" on May 9, 2019. *See* Admin.

27  R., ECF 163-3, at 10-20; *see also id.*,163-2, at 19-20. Defendants also announced a series of

28  different Section 284 projects over the course of this litigation. They identified for the first time on

March 25, 2019, DoD's intention to transfer funds for construction of the wall sections identified as El Paso Project 1 and Yuma Sector Projects 1 and 2. *See* Admin. R., 163-2, at 19-20. On May 9, Defendants announced that they intended to use Section 284 funds to construct wall in areas identified as El Centro Project 1 and Tucson Sector Projects 1, 2 and 3. *See* Admin. R., 163-3, at 7-8.

Accordingly, Plaintiffs request that the Court declare unlawful the use of any DoD authority to transfer funds for construction of border barriers, because construction of border barriers was denied by Congress and is not an unforeseen military requirement. The Court can make this declaration as to every DoD transfer authority, because restrictions in 10 U.S.C. § 2214 apply "[w]henever authority is provided in an appropriation Act to transfer amounts in working capital funds or to transfer amounts provided in appropriation Acts for military functions of the Department of Defense (other than military construction) between such funds or appropriations (or any subdivision thereof)." Section 2214(b) in turn restricts transfers "except to provide funds for a higher priority item, based on unforeseen military requirements, than the items for which the funds were originally appropriated" and bars any transfer "if the item to which the funds would be transferred is an item for which Congress has denied funds." And it can make this declaration as to all sections of the border, because "Plaintiffs have demonstrated that their members span the entire U.S.-Mexico border." PI Order 27. In addition, because Defendants have indicated through their consistent actions that they will not undertake NEPA reviews for border barrier construction, instead purporting to waive all environmental laws, Plaintiffs respectfully request that the Court enter a declaratory judgment on this claim as well.

A "case or controversy exists justifying declaratory relief" because "the challenged government activity is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008) (internal quotation omitted). The Court should enter Plaintiffs' requested declaratory relief.

## CONCLUSION

For the reasons stated above, Plaintiffs ask that the Court grant their Motion for Partial Summary Judgment and order injunctive and declaratory relief.

Dated: June 12, 2019

Respectfully submitted,

/s/ *Noor Zafar*

Mollie M. Lee (SBN 251404)
Christine P. Sun (SBN 218701)
American Civil Liberties Union Foundation of
    Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 621-2493
Fax: (415) 255-8437
mlee@aclunc.org
csun@aclunc.org

David Donatti*
Andre I. Segura (SBN 247681)
American Civil Liberties Union Foundation
    of Texas
P.O. Box 8306
Houston, TX 77288
Tel: (713) 325-7011
Fax: (713) 942-8966
ddonatti@aclutx.org
asegura@aclutx.org

Dror Ladin*
Noor Zafar*
Hina Shamsi*
Omar C. Jadwat*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
Fax: (212) 549-2564
dladin@aclu.org
nzafar@aclu.org
hshamsi@aclu.org
ojadwat@aclu.org

Cecillia D. Wang (SBN 187782)
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
Fax: (415) 395-0950
cwang@aclu.org

Sanjay Narayan (SBN 183227)**
Gloria D. Smith (SBN 200824)**
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
Tel: (415) 977-5772
sanjay.narayan@sierraclub.org
gloria.smith@sierraclub.org

Counsel for Plaintiffs

*Admitted* pro hac vice
**Counsel for Plaintiff* Sierra Club