SUZANNE R. SCHAEFFER (*pro hac vice* pending)
suzanne.schaeffer@dentons.com
SAMUEL F. DAUGHETY (*pro hac vice* pending)
samuel.daughety@dentons.com
DENTONS US LLP
1900 K Street, NW
Washington, District of Columbia  20006
Telephone:   (202) 496-7500
Facsimile:   (202) 408-6399

MATTHEW G. ADAMS (SBN 229021)
matthew.adams@dentons.com
DENTONS US LLP
One Market Plaza, Spear Tower, 24th Fl.
San Francisco, California  94105
Telephone:   (415) 267-4000
Facsimile:   (415) 267-4198

Attorneys for *Amicus Curiae*
Tohono O'odham Nation

JOSHUA O. REES (*pro hac vice* pending)
joshua.rees@tonation-nsn.gov
Acting Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, Arizona 85634
Telephone:   (520) 383-3410
Facsimile:   (520) 383-2689

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

SIERRA CLUB and SOUTHERN BORDER COMMUNITIES COALITION,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case No.  4:19-cv-00892-HSG

***AMICUS CURIAE* BRIEF OF TOHONO O'ODHAM NATION IN SUPPORT OF PLAINTIFFS' MOTION FOR SUPPLEMENTAL PRELIMINARY INJUNCTION**

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* THE TOHONO O'ODHAM NATION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

    I.    The Project will cause irreparable harm to natural and cultural resources of great importance to the Nation. ............................................................................ 3

        A.    The Nation's Significant Interest in Natural and Cultural Resources on its Reservation and in Areas Affected by the Tucson Project............. 3

        B.    The Construction of a Border Wall in the Tucson Projects Will Cause Irreparable Harm to Valuable Cultural and Natural Resources ................................................................................................. 7

        C.    A Preliminary Injunction to Protect these Resources is in the Public Interest.............................................................................................. 9

    II.    The Project will Cause Irreparable Harm to the Nation's Public Safety and Related Resources ..................................................................................... 10

        A.    Impacts of Increased Border Crossing Activity on the Nation ............. 10

        B.    The Construction of a Border Wall in Tucson Project Areas 1 and 2 Will Result in Increased Migrant Traffic and Harms to the Nation ................................................................................................... 11

        C.    The Harms to the Nation are Inconsistent with the Public Interest........ 15

    III.    The Federal Government's Trust Responsibility to the Nation Amplifies the Nation's Interest in this Case. .......................................................................... 16

CONCLUSION ................................................................................................................. 18

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

*All. for Wild Rockies v. Cottrell,*
622 F.3d 1045 (9th Cir. 2010); ..................................................................................9

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011)..............................................................................9, 15

*All. for the Wild Rockies v. United States Forest Serv.,*
No. 15-CV-00193, 2016 WL 3349221 (D. Idaho June 14, 2016) ...........................16

*California v. Azar,*
No. 19-CV-01184, 2019 WL 1877392 (N.D. Cal. Apr. 26, 2019) ....................2, 16

*City of Sausalito v. O'Neill,*
386 F.3d 1186 (9th Cir. 2004)...................................................................................16

*Colorado River Indian Tribes v. Marsh,*
605 F. Supp. 1425 (C.D. Cal. 1985) ..........................................................................9

*Cty. of Santa Clara v. Trump,*
250 F. Supp. 3d 497 (N.D. Cal. 2017) .................................................................15, 16

*Earth Island Inst. v. Elliott,*
290 F. Supp. 3d 1102 (E.D. Cal. 2017).....................................................................16

*Golden Gate Rest. Ass'n v. City & Cty. of San Francisco,*
512 F.3d 1112 (9th Cir. 2008)....................................................................................2

*Lands Council v. McNair,*
537 F.3d 981 (9th Cir. 2008).....................................................................................15

*Morris v. N. Haw. Cmty. Hosp.,*
37 F. Supp. 2d 1181 (D. Haw. 1999) ........................................................................16

*Morton v. Ruiz,*
415 U.S. 199 (1974) ...................................................................................................16

*Nance v. EPA,*
645 F.2d 701 (9th Cir. 1981)......................................................................................17

*Northern Cheyenne Tribe v. Hodel,*
12 Indian L. Rptr. 3065 (D. Mont.1985)....................................................................17

*Northwest Sea Farms, Inc. v. U.S. Army Corps of Engineers,*
931 F. Supp. 1515 (W.D. Wash. 1996)......................................................................17

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

*Pyramid Lake Paiute Tribe of Indians v. Morton*,
    354 F. Supp. 252 (D.D.C. 1972) ........................................................................16

*Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*,
    755 F. Supp. 2d 1104 (S.D. Cal. 2010) .............................................................9

*Ramos v. Nielsen*,
    336 F. Supp. 3d 1075 (N.D. Cal. 2018) .......................................................2, 15

*Save Our Sonoran, Inc. v. Flowers*,
    408 F.3d 1113 (9th Cir. 2005) ............................................................................9

*South Fork Band Council v. US Dept. of Interior*,
    588 F.3d 718 (9th Cir. 2009).............................................................................9

*Spiegel v. City of Houston*,
    636 F.2d 997 (5th Cir. 1981).............................................................................15

*United States v. North Carolina*,
    192 F.Supp.3d 620 (M.D.N.C. 2016)................................................................16

**Tribal Authorities**

CONSTITUTION OF THE TOHONO O'ODHAM NATION (1986), available at http://tolc-
    nsn.org/docs/Constitution.pdf .............................................................................4

Tohono O'odham Legislative Council Resolution No. 07-714, available at
    http://www.tolc-nsn.org/docs/Actions07/07714.pdf ..........................................4

Tohono O'odham Legislative Council Resolution No. 17-053, available at
    http://tolc-nsn.org/docs/Actions17/17053.pdf...................................................10

Tohono O'odham Legislative Council Resolution No. 18-032, available at
    http://tolc-nsn.org/docs/actions18/18032.pdf....................................................10

Tohono O'odham Legislative Council Resolution No. 19-088, available at
    http://tolc-nsn.org/docs/Actions19/19088.pdf...................................................10

**Federal Statutes**

Proclamation 2232, 50 Stat. 1827 (Apr. 13, 1937) .................................................4

**Other Authorities**

83 Fed. Reg. 52537 (Oct. 17, 2018).........................................................................5

Bell, F., Anderson, K., and Stewart, Y, *The Quitobaquito Cemetery and Its
    History*, U.S. National Park Service, (Dec. 1980), available at
    http://npshistory.com/series/anthropology/wacc/quitobaquito/report.pdf ..................5

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

Fish, Paul R.; Fish, Suzanne K.; Madsen, John H., *Prehistory and early history of the Malpai Borderlands: Archaeological synthesis and recommendations*, U.S. Department of Agriculture, Forest Service (2006), available at https://www.fs.fed.us/rm/pubs/rmrs_gtr176.pdf ...................................................6, 7

Nunez-Neto, B. and Vina, S., Congressional Research Service, *Border Security: Barriers Along the U.S. International Border* (Sept. 21, 2006), available at: https://trac.syr.edu/immigration/library/P1065.pdf...........................................12, 14

Rankin, Adrianne G., *Archeological Survey of Organ Pipe Cactus National Monument, Southwestern Arizona: 1989-1991*, Publications in Anthropology 61, Tucson, Arizona: Western Archeological and Conservation Center (1995), available at https://core.tdar.org/document/4301/archeological-survey-at-organ-pipe-national-monument-southwestern-arizona-1989-1991..................5, 6, 7

Saxton, D., Saxton, L., & Enos, S., Tohono O'odham/Pima to English: English to Tohono O'odham/Pima Dictionary. Tucson, AZ: The University of Arizona Press (2d ed. 1998) .....................................................................................4

Testimony of The Hon. Edward Manuel, Chairman, Tohono O'odham Nation, U.S. House Committee on Appropriations, Subcommittee on Interior, Environment and Related Agencies (Mar. 6, 2019), available at https://docs.house.gov/meetings/AP/AP06/20190306/109006/HHRG-116-AP06-Wstate-ManuelE-20190306.pdf ..............................................................10

Tohono O'odham Nation Issue Brief: The Tohono O'odham Nation Opposes a "Border Wall" (Feb. 2017), available at: http://www.tonation-nsn.gov/wp-content/uploads/2017/02/Issue-Brief-Tohono-Oodham-Nation-Opposes-Border-Wall.pdf .........................................................................................10

U.S. Border Patrol, *Environmental Impact Statement for Construction, Maintenance, and Operation of Tactical Infrastructure, Rio Grande Valley Sector, Texas* (Nov. 2007), available at https://www.dhs.gov/sites/default/files/publications/0006_-_bw1_foia_cbp_000649-001186_part1.pdf,..............................................9, 11, 12

U.S. Border Patrol FOIA Response, *Environmental Assessment for the Proposed Installation, Operation, and Maintenance of Primary Pedestrian Fence Near Lukeville, Arizona.* (Jan. 2008), available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part1.pdf and https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf .............................................. *passim*

U.S. Fish and Wildlife Service, *Cabeza Prieta National Wildlife Refuge: Comprehensive Conservation Plan*, Wilderness Stewardship Plan and Environmental Impact Statement" (Aug. 2006), available at https://www.fws.gov/uploadedFiles/CPNWREIS.pdf ............................................6

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

iv

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

U.S. Fish and Wildlife Service, *Environmental Assessment of the Malpai Borderlands Habitat Conservation Plan* (July 26, 2008), available at https://www.fws.gov/southwest/es/arizona/Documents/HCPs/Malpai/MBHCP %20EA%20w%20FONSI.pdf .................................................................................... 6

U.S. National Park Service, *Effects of the International Boundary Pedestrian Fence in the Vicinity of Lukeville, Arizona, on Drainage Systems and Infrastructure, Organ Pipe Cactus National Monument, Arizona* (Aug. 2008), available at https://www.nps.gov/orpi/learn/nature/upload/FloodReport_July2008_final.pdf ................. 7, 8

U.S. National Park Service, *Organ Pipe Cactus National Monument, Final General Management Plan, Development Concept Plans, Environmental Impact Statement* (Feb. 1997), available at https://www.nps.gov/orpi/learn/management/upload/fingmp.pdf ............................................. 5

Woods, Teri Knutson; Blaine, Karen; and Francisco, Lauri (2002) *O'odham Himdag as a Source of Strength and Wellness Among the Tohono O'odham of Southern Arizona and Northern Sonora, Mexico*, 29 J. OF SOCIOLOGY & SOCIAL WELFARE 1 (2002), available at https://scholarworks.wmich.edu/jssw/vol29/iss1/4 ....................................................................... 4

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

v

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

## INTRODUCTION AND INTEREST OF *AMICUS CURIAE* THE TOHONO O'ODHAM NATION

*Amicus* Tohono O'odham Nation ("Nation") is a federally recognized Indian tribe with more than 34,000 members.  The O'odham have lived in what is now Arizona and northern Mexico since time immemorial.  The Nation's Reservation in southern Arizona is one of the largest in the country, comprising nearly 2.8 million acres.  When the international line marking the boundary between the United States and Mexico was drawn in 1854, it sliced through the Nation's aboriginal territory, separating its people.  As a result, the Nation's Reservation shares a 62-mile border with the Republic of Mexico, and approximately two thousand of the Nation's members live on the Mexican side of the border.  The Nation's ancestral territory and traditional homelands include the Organ Pipe Cactus National Monument (adjacent to the western boundary of the Nation's Reservation), Cabeza Prieta National Wildlife Refuge, and stretch east to include the San Bernardino National Wildlife Refuge.  The Nation has significant and well-documented connections to these lands and the plants, animals and cultural resources within them.

The Nation's location on the Mexican border exposes its Reservation and members to major impacts from border crossing traffic, including border-related burglaries and thefts, litter, land desecration, destruction of natural resources and protected species, migrant rescues, migrant deaths, drug trafficking, and human smuggling.  While the Nation works closely with U.S. Customs and Border Patrol ("CBP") and U.S. Immigration and Customs Enforcement on a variety of state-of-the-art border security measures, it strongly opposes construction of a physical wall on its southern boundary, as it would divide the Nation's historic lands and communities, hamper the Nation's traditional crossings for domestic, ceremonial, and religious purposes, prevent the migration of wildlife, exacerbate flooding, harm wildlife and natural resources sacred to the O'odham, and militarize the Nation's border.  What is more, the Nation receives extremely limited federal funding to address border impacts, and therefore is forced to spend millions of dollars annually from its own treasury on border security and enforcement and associated costs.

The Nation agrees with Plaintiffs that the Defendants' planned border wall construction contemplated by the Tucson and El Centro Projects must be enjoined for the reasons stated in

*AMICUS CURIAE* BRIEF OF TOHONO O'ODHAM NATION

Plaintiffs' Motion for Supplemental Preliminary Injunction (Dkt. No. 150), and writes separately to articulate the substantial and irreparable harm that the Tucson Projects will cause to the Nation. Tucson Projects 1 and 2 contemplate the construction of over forty miles of border wall, starting in Cabeza Prieta National Wildlife Refuge, continuing across Organ Pipe Cactus National Monument, and ending less than two miles from the western boundary of the Nation's Reservation. This new border wall, as well as the wall construction contemplated in Tucson Project 3, will cause irreparable harm to natural and cultural resources of significant importance to the Nation, both in these sensitive areas and on the Nation's Reservation. The construction of the border walls in Tucson Project 1 and 2 areas will also substantially increase migrant traffic on the Nation's Reservation lands, and exacerbate the impacts that the Nation experiences from this traffic and the cost to the Nation to address it.

These harms also speak directly to the public interest factor, which properly focuses on the impact of the challenged conduct on non-parties like the Nation. *See California v. Azar*, No. 19-CV-01184, 2019 WL 1877392, at *13 (N.D. Cal. Apr. 26, 2019) ("Plaintiffs are not the only ones that will suffer hardship absent an injunction…In considering the public interest, we may consider the hardship to all individuals covered by the [challenged law], not limited to parties…."), quoting *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008); *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1085-86 (N.D. Cal. 2018) (noting that "[t]he amicus briefs underscore that the harms to [Plaintiffs] will also harm the public interest."). The Nation's interest is particularly relevant because the United States has a special responsibility for the Tribe as its federal trustee, a responsibility that extends to the protection of tribal reservation lands and resources. The harms to the Nation and its trust resources that the Tucson Sector Project border wall construction would cause, coupled with the harm Plaintiffs already have identified, decidedly tips this factor in favor of injunction. *Id.* at 1089 (noting "that, without a preliminary injunction, there is a strong likelihood that Plaintiffs would suffer irreparable injury, with concomitant harm to state and local communities as well.").

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

**ARGUMENT**

### I.   THE PROJECT WILL CAUSE IRREPARABLE HARM TO NATURAL AND CULTURAL RESOURCES OF GREAT IMPORTANCE TO THE NATION.

Tucson Projects 1 and 2 would create a 43-mile, 30-foot high wall, together with road improvements and lighting.[1]  Project plans call for replacement of about 38 miles of existing vehicle barriers and another five miles of existing pedestrian fencing near the Lukeville Port of Entry.[2]  Defendants originally installed this existing pedestrian fencing in 2008.[3]  Construction of this 43-mile section of the wall would start in Cabeza Prieta National Wildlife Refuge, continue across Organ Pipe National Monument, and end less than two miles from the western boundary of the Nation's reservation.  Similar construction is also planned for Tucson Project 3 to the east of the Nation's Reservation, to include the San Bernardino National Wildlife Refuge.[4]  Defendants' construction of a border wall through Tucson Projects 1, 2, and 3 will cause irreparable harm to cultural and natural resources of vital importance to the Nation, both in terms of damage to the resources from construction and associated impacts at the Project sites off-reservation, and damage caused by increased migrant traffic and interdiction on-reservation.

### A.   The Nation's Significant Interest in Natural and Cultural Resources on its Reservation and in Areas Affected by the Tucson Project.

Like many Native American tribes, the preservation and protection of the natural and cultural environment of its homelands is profoundly important to the Tohono O'odham Nation. The Nation has enshrined these values in its Constitution, which states, at Article XVIII, Sec. 1:

> It shall be the policy of the Tohono O'odham Nation to encourage productive and enjoyable harmony between members of the nation and their environment; to promote efforts which will preserve and protect the natural and cultural environment of the Tohono O'odham Nation, including its lands, air, water, flora and fauna, its

---

[1] *See* May 24, 2019 Order Granting in Part and Denying in Part Plaintiffs' Motion for Preliminary Injunction, (PI Order) at 11-12 (Dkt. No. 144); Rapuano Decl. ¶ 3, Exhibit A at 10-11 (Dkt. No. 64-8); Rapuano Second Decl. ¶ 6, Exhibit A (Dkt. No. 118-1).

[2] *See* Rapuano Decl. ¶ 3, Exhibit A at 11.

[3] U.S. Border Patrol FOIA Response, *Environmental Assessment for the Proposed Installation, Operation, and Maintenance of Primary Pedestrian Fence Near Lukeville, Arizona.* (Jan. 2008) ("Lukeville EA"), available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf.

[4] *See* Rapuano Decl. ¶ 3, Exhibit A at 11.

3

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

> ecological systems, and natural resources, and its historic and
> cultural artifacts and archeological sites; and to create and maintain
> conditions under which members of the nation and nature can exist
> in productive harmony and fulfill the social, economic, and other
> requirements of present and future generations of members of the
> Tohono O'odham Nation.[5]

The Nation further has recognized that "access to and preservation of the Nation's traditional lands and sacred sites" including in Organ Pipe Cactus National Monument and Cabeza Prieta National Wildlife Refuge, "are essential to the O'odham himdag."[6]  "Himdag" is a word that escapes easy translation, but has been referred to as "a way of life; a culture; a custom or practice; traditions."[7]

The federal government has recognized the Nation's cultural interest in these areas.  In creating the Organ Pipe Cactus National Monument, President Franklin Roosevelt explicitly provided that the "administration of the monument shall be subject to … [the] [r]ight of the Indians of the Papago Reservation[8] to pick the fruits of the organ pipe cactus and other cacti, under such regulations as may be prescribed by the Secretary of the Interior …."  Proclamation 2232, 50 Stat. 1827 (Apr. 13, 1937).  The National Park Service ("NPS") General Management Plan for the Monument repeatedly recognizes land within the Monument as "sacred" to the O'odham, notes the cultural importance of multiple sites within the Monument, and acknowledges the Nation's continued cultural use of Monument Lands.  Quitobaquito Spring, located 200 yards from the border, is of particular importance:

> There are 11 springs in the monument, eight of which are located
> at Quitobaquito, by far the largest source of water. The pond
> and dam at Quitobaquito were constructed in 1860, and the resulting
> body of water is one of the largest oases in the Sonoran Desert.

---

[5] CONSTITUTION OF THE TOHONO O'ODHAM NATION, art, XVIII, § 1 (1986), available at http://tolc-nsn.org/docs/Constitution.pdf

[6] Tohono O'odham Legislative Council Resolution No. 07-714 at 1, available at http://www.tolc-nsn.org/docs/Actions07/07714.pdf

[7] Saxton, D., Saxton, L., & Enos, S., TOHONO O'ODHAM/PIMA TO ENGLISH: ENGLISH TO TOHONO O'ODHAM/PIMA DICTIONARY. Tucson, AZ: The University of Arizona Press (2d ed. 1998) at 22; *see also* Woods, Teri Knutson; Blaine, Karen; and Francisco, Lauri (2002) *O'odham Himdag as a Source of Strength and Wellness Among the Tohono O'odham of Southern Arizona and Northern Sonora, Mexico*, 29 J. OF SOCIOLOGY & SOCIAL WELFARE 1, 41-49 (2002), available at https://scholarworks.wmich.edu/jssw/vol29/iss1/4. "Himdag" is alternately transliterated "himthag."  *See id.* at 41.

[8] The Nation was formerly known as the Papago Tribe.

4                                    *AMICUS CURIAE* BRIEF OF TOHONO
                                     O'ODHAM NATION

> The site is also sacred to the O'odham, who have used the water from this spring for all of their residence in the area.
>
> …
>
> There still exist sites within the monument which are sacred to the O'odham, including Quitobaquito Springs … *Even to the present day, the O'odham continue to visit the monument to collect sacred water from the Springs, to gather medicinal plants, and to harvest the fruit of the organ pipe and saguaro cactus.*[9]

The General Management Plan also notes that "the general geography of the monument itself includes … numerous archeological features, including significant Hohokam and O'odham settlements."[10]  And NPS explicitly has acknowledged its understanding of the "O'odham world view … that the O'odham believe they have been in the area since time immemorial, and that all parts of the ecosystem – water, land, and culture – are integrated, cannot be separated and are sacred."[11]

Given the Nation's historical presence throughout Southern Arizona, it is not surprising that the Tucson Project areas also contain sensitive archeological resources of significant importance to the Nation.  An archeological survey of the Organ Pipe Cactus National Monument in the 1990s revealed numerous archeological sites, including several within the construction zone contemplated for Tucson Project 1 and 2.[12]  The U.S. Forest Service prepared an

---

[9] U.S. National Park Service, *Organ Pipe Cactus National Monument, Final General Management Plan, Development Concept Plans, Environmental Impact Statement* (Feb. 1997), at 30, 33, available at https://www.nps.gov/orpi/learn/management/upload/fingmp.pdf (emphasis added); *see also* Bell, F., Anderson, K., and Stewart, Y, *The Quitobaquito Cemetery and Its History*, U.S. National Park Service, (Dec. 1980), at 3, available at http://npshistory.com/series/anthropology/wacc/quitobaquito/report.pdf (noting that Quitobaquito Spring is located 200 yards from the border).

[10] U.S. National Park Service, *supra* n.9, at 25.  "The Hohokam are regarded as the ancestors of the Tohono O'odham Nation …."  Notice of Intent to Repatriate Cultural Items: Sternberg Museum of Natural History, Hays, KS, 83 Fed. Reg. 52537, 52538 (Oct. 17, 2018).

[11] U.S. National Park Service, *supra* n.9, at 66.  This language mirrors the above declaration of policy in the Nation's Constitution, as well as the comments on the Plan submitted by the two districts of the Nation (Hickiwan District and Gu Vo District) adjacent to the Monument.  *See id.* at 153 ("The Sonoran Desert is the homeland of the O'odham– who better to explain the connection and importance of the water, land plants, animals, and people.  The O'odham believe the whole system is important: the entire Sonoran Desert is Sacred.")

[12] *See* Rankin, Adrianne G., *Archeological Survey of Organ Pipe Cactus National Monument, Southwestern Arizona: 1989-1991*, Publications in Anthropology 61, Tucson, Arizona: Western Archeological and Conservation Center (1995) at 24, 119 (describing the survey of seventy acres in the Dos Lomitas area on the border, noting that "[a]rtifact density is quite high with over 650 flakes recorded in a 5-m-diameter collection unit"), available at https://core.tdar.org/document/4301/archeological-survey-at-organ-pipe-national-monument-southwestern-arizona-1989-1991.  *Id.* at 557-60 (site description for numerous artifacts immediately north of the border).

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

*AMICUS CURIAE* BRIEF OF TOHONO O'ODHAM NATION

archeological report in 2006 that similarly shows notable archeological sites in the immediate vicinity of Tucson Project 3 in the San Bernardino Valley.[13]  The U.S. Fish and Wildlife Service's 2006 Comprehensive Plan for Cabeza Prieta National Wildlife Refuge notes that "[e]thnographically, the refuge was the homeland of the Hia C-ed O'odham,"[14] most of whom are members of the Nation, and that "the Tohono O'odham Nation and Hia-Ced O'odham band … have cultural links to the refuge lands."[15]

Unfortunately, these areas remain under-surveyed.  For example, according to the U.S. Fish and Wildlife Service, the Malpai Borderlands area of the San Bernardino Valley "is rich in archeological resources.  Archeological investigation, however, while not insignificant, has been spotty, often poorly documented, and involved many small-scale studies by professionals and amateurs, but relatively few large-scale, systematic efforts."[16]  And at Cabeza Prieta, while "45 prehistoric and historic sites have been recorded by statewide survey … [l]ess than one percent of the refuge has been inventoried for archeological and historic sites."[17]  But even the existing survey work underscores significant cross-border activity on the part of the Nation's ancestors. Both Cabeza Prieta and Organ Pipe Cactus National Monument show substantial evidence of the early desert southwest shell trade, whereby "the Hohokam and other southwestern cultural groups obtained marine shell primarily from the Pacific Ocean," and principally in the Gulf of California.[18]

---

[13] Fish, Paul R.; Fish, Suzanne K.; Madsen, John H., *Prehistory and early history of the Malpai Borderlands: Archaeological synthesis and recommendations*, U.S. Department of Agriculture, Forest Service (2006) at 29-30, available at https://www.fs.fed.us/rm/pubs/rmrs_gtr176.pdf.

[14] U.S. Fish and Wildlife Service, *Cabeza Prieta National Wildlife Refuge: Comprehensive Conservation Plan, Wilderness Stewardship Plan and Environmental Impact Statement* (Aug. 2006) at 172, 586, available at https://www.fws.gov/uploadedFiles/CPNWREIS.pdf.

[15] *Id.* at 172.

[16] U.S. Fish and Wildlife Service, *Environmental Assessment of the Malpai Borderlands Habitat Conservation Plan* (July 26, 2008) at 17, available at https://www.fws.gov/southwest/es/arizona/Documents/HCPs/Malpai/MBHCP%20EA%20w%20FONSI.pdf.

[17] U.S. Fish and Wildlife Service, *supra* n.14, at 170.

[18] Rankin, *supra* n.12, at 631; *see also id.* at 59 (noting that "Charlie Bell Well, also in the Cabeza Prieta Refuge, and several Sedentary-period sites identified during the present survey of Organ Pipe, appear to have played a key role in the shell trading network.").

*AMICUS CURIAE* BRIEF OF TOHONO O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

**B.**     **The Construction of a Border Wall in the Tucson Project Areas Will Cause Irreparable Harm to Valuable Cultural and Natural Resources**

The contemplated border wall and associated road construction in the Tucson Project areas will undoubtedly destroy numerous trees, cacti, and other plants of significant and recognized interest to the Nation, disturb or destroy archaeological sites of O'odham ancestors, and hamper or eliminate wildlife migration and access to vitally important sources of water.  *See, e.g.*, Dkt. No. 150-3, Dahl Decl. at ¶8; Rankin, *supra* n.12 at 557-60 (noting presence of archeological artifacts in close proximity to border in Organ Pipe Cactus National Monument); Fish, *supra* n.13 at 29-30 (noting presence of archeological artifacts in proximity to border in San Bernardino Valley, Arizona); Dkt. No.150-2, Hudson Decl. at ¶ 8 (noting that "Quitobaquito Springs is extremely important to wildlife in the area.  The replacement of penetrable vehicle barriers with pedestrian fencing will have a tremendous impact on the species that rely on this water source."); Dkt. No. 150-3, Dahl Decl. at 3-4, ¶7 (noting that "[c]onstruction of a wall at and near Quitobaquito Springs will impede wildlife from crossing from Mexico to get to this vital source of water ….").  Construction impacts to Quitobaquito would impede – and threaten to eliminate – traditional O'odham use of this sacred spring, both by limiting access (through CBP restrictions) and by permanently altering this sensitive ecosystem.  In addition, because much of the land impacted by the Tucson Project construction is under-surveyed from a cultural and archeological perspective, it is likely that construction will disturb or destroy additional cultural resources that have yet to be ascertained.  As noted above, these harms may be particularly acute near the border in Cabeza Prieta and Organ Pipe, where ancestral O'odham trade routes involved significant cross-border traffic from the Gulf of California.

Completed border walls are also likely to increase flooding near the Project areas, permanently altering nearby vegetation and hydrological and cultural resources on a massive scale.  The National Park Service detailed similar impacts in 2008 following a summer monsoon storm (an event exceedingly common in Southern Arizona) that delivered 1-2 inches of rain in the

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

area of the newly-constructed 5.2 miles of Lukeville pedestrian fencing.[19]  Contrary to the

Finding of No Significant Impact that accompanied the Lukeville EA, NPS found that, in

actuality, flooding led to significant blockage and sedimentation along the fence line, along with

elevated ponding in blocked areas and corresponding water deprivation on the other side of the

fence.[20]  NPS concluded that "[d]uring the next few decades, vegetation change will occur in

those areas along the northern edge of the patrol road that receive and retain runoff," and that

"natural resources [of the Monument] and NPS infrastructure will be impacted, as well as

resources and infrastructure on neighboring lands in the U.S. and Mexico."[21]  NPS anticipated

that other short- and long-term impacts would include the following:

- Riparian vegetation will change in response to increase sedimentation.
- Channel morphology and floodplain function will change over time.
- Channelized waters will begin a gullying process that has the potential to transform land surfaces in the affected watersheds.[22]

Given that the proposed Tucson Projects 1 and 2 contemplate a wall that is nearly eight

times as long, these effects will surely be magnified, with corresponding harm to resources

beyond the construction footprint.  The potential impact on Quitobaquito Springs is particularly

worrisome given that it is located in immediate proximity to the Project area.  As NPS has

acknowledged, the pond fed by the Springs – one of the largest sources of water in the Sonoran

Desert – sits only 200 yards north of the International Boundary.[23]

What is more, as discussed below in Section II, the wall construction associated with

Tucson Projects 1 and 2 will also cause harm to natural resources, wildlife, and archeological and

cultural resources on the Nation's Reservation because it will result in increased migrant traffic in

these areas.  Indeed, in its Environmental Impact Statement for pedestrian fencing (i.e., a wall) in

---

[19] U.S. National Park Service, *Effects of the International Boundary Pedestrian Fence in the Vicinity of Lukeville, Arizona, on Drainage Systems and Infrastructure, Organ Pipe Cactus National Monument, Arizona* (Aug. 2008) at 1, available at https://www.nps.gov/orpi/learn/nature/upload/FloodReport_July2008_final.pdf.

[20] *Id.* at 12-15.

[21] *Id.* at 15-16.

[22] *Id.* at 16.

[23] *See* Bell F., et al., *supra* n.9, at 3.

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

the Rio Grande Valley Sector, CBP acknowledged that this increased traffic in areas without pedestrian fencing would "reduce vegetation, disturb soils, and lead to increased soil erosion," adversely impact wildlife and wildlife habitat, "uncover and destroy unknown" archeological resources, and cause "long-term major adverse impacts" to sensitive species."[24]  Similar harms to resources on the Nation's Reservation are extremely likely given that the Nation's western boundary is less than two miles from the eastern terminus of the Tucson Project 1 and 2 wall.

    **C.**    **A Preliminary Injunction to Protect these Resources is in the Public Interest.**

    Courts repeatedly have found that the public interest favors injunctive relief to protect cultural resources of Native American tribes.  *See, e.g.*, *Colorado River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1440 (C.D. Cal. 1985) ("The court is also mindful of the advancement of the public interest in preserving these resources. They represent a means by which to better understand the history and culture of the American Indians in the past, and hopefully to provide some insight and understanding of the present day American Indians."); *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1122 (S.D. Cal. 2010) (public interest favored protection of cultural resources where plaintiffs raised "serious questions going to the merits of the federal action"), quoting *All. for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1049 (9th Cir. 2010); *see also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) ("the public interest in careful consideration of environmental impacts before major federal projects go forward, and … that suspending such projects until that consideration occurs 'comports with the public interest.'"), quoting *South Fork Band Council v. US Dept. of Interior*, 588 F.3d 718, 728 (9th Cir. 2009); *cf. Save Our Sonoran, Inc. v. Flowers*, 408 F.3d

---

[24] *See* U.S. Border Patrol, *Environmental Impact Statement for Construction, Maintenance, and Operation of Tactical Infrastructure, Rio Grande Valley Sector, Texas* (Nov. 2007) ("Rio Grande EIS"), at BW1 FOIA CBP 000795, available at https://www.dhs.gov/sites/default/files/publications/0006_-_bw1_foia_cbp_000649-001186_part1.pdf, (noting that "Increased foot traffic between fence sections would reduce vegetation, disturb soils, and lead to increased soil erosion…."); *id.* at 000805 (noting that "wildlife and wildlife habitat between the 21 proposed tactical infrastructure sections would be adversely impacted by the funneling of cross border violators into the areas where there would be no fence and concentrated USBP operations."); *id.* at 000808 (noting that "funneling of cross-border violators into occurrences of [listed species] could have long-term major adverse impacts on these species."); *id.* at 000816 ("Archaeological resources between the 21 proposed tactical infrastructure sections could be adversely impacted by the funneling of cross border violators into the areas where there would be no fence. Increased foot traffic around the ends of sections of fence in remote areas would reduce vegetation, disturb soils, and could uncover and destroy unknown resources."); *see also* Lukeville EA, *supra* n.3 at 001030, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part1.pdf.

*AMICUS CURIAE* BRIEF OF TOHONO O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

1113, 1124 (9th Cir. 2005) (affirming preliminary injunction because "once the desert is

disturbed, it can never be restored.").  Given the breadth and significance of potential damage to

resources at issue in this case, the Court should similarly find that the public interest favors

injunctive relief here.

## II.    THE PROJECT WILL CAUSE IRREPARABLE HARM TO THE NATION'S PUBLIC SAFETY AND RELATED RESOURCES

In addition to the harms to cultural and natural resources identified in Section I,  the

construction of border wall in Tucson Projects 1 and 2 would cause irreparable harm to the

Nation's public safety resources, increasing costs and further strain on already overburdened law

enforcement and border security resources and significant damage to the Nation's roads and

infrastructure as a result of increased migrant traffic on the reservation.

### A.    Impacts of Increased Border Crossing Activity on the Nation

The Nation has supported the federal government with a wide variety of border security

enforcement measures, working cooperatively with it relating to the construction of extensive

vehicle barriers, the operation of two CBP forward operating bases on the Reservation, the

development of border security technologies like integrated fixed towers, and the authorization of

CBP checkpoints on reservation highways.[25]  However, the Nation strongly opposes construction

of a physical wall on its southern boundary, because such a wall would divide the Nation's

historic lands and communities, separating the approximately two thousand tribal members that

live south of the border, hamper the Nation's traditional crossings for domestic, ceremonial, and

religious purposes, prevent the migration of wildlife, exacerbate flooding, interfere with the

natural flow of critically important water resources, harm wildlife sacred to the O'odham, destroy

cacti and other culturally significant plants, and militarize the lands on the Nation's southern

---

[25] Tohono O'odham Legislative Council Resolution No. 18-032, available at http://tolc-nsn.org/docs/actions18/18032.pdf; Tohono O'odham Nation Issue Brief: The Tohono O'odham Nation Opposes a "Border Wall" (Feb. 2017), available at: http://www.tonation-nsn.gov/wp-content/uploads/2017/02/Issue-Brief-Tohono-Oodham-Nation-Opposes-Border-Wall.pdf (reprt. in U.S. Border Patrol FOIA Response, *supra* n.3 at CBP 000892).  The Nation recently approved construction of integrated fixed towers specifically aimed at providing increased border security while obviating the need for additional physical border barriers.  *See* Tohono O'odham Legislative Council Resolution No. 19-088, available at http://tolc-nsn.org/docs/Actions19/19088.pdf.

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

boundary.[26]

Despite the Nation's strong and continuing support for federal border security, federal funding to assist the Nation with border security-related law enforcement on the Nation's Reservation is extremely limited.  As a result, the Nation spends in excess of $3 million of its own money annually to help meet the United States' border security responsibilities, and spends more than a third of the Tohono O'odham Police Department budget on border security.[27]  For example, the Nation's Police Department investigates on average more than 75 immigrant deaths per year, and provides funding for autopsies at a cost of $2,600 per autopsy, along with supplies and detective investigative hours, with no financial assistance from CBP.[28]  The Nation also absorbs all costs to address damage to its natural resources, including the removal of vehicles used and abandoned by smugglers and the control of wildland fires attributed to cross-border illegal activity.[29]  Much of the Nation's 734.8 miles of federal reservation roads are riddled with sinkholes, potholes, broken and cracked pavement, and washed-out bridges, damage that is caused or at least exacerbated by significant and extensive CBP vehicle use.[30]  Maintenance and repair of these roads is inadequate, in part due to the inability of CBP and the Bureau of Indian Affairs, the agency charged with supervision of Indian reservations, to agree on a permanent source of federal funding for repairs.[31]

**B.     The Construction of a Border Wall in Tucson Project Areas 1 and 2 Will Result in Increased Migrant Traffic and Harms to the Nation**

Construction of the 43-mile long, 30-foot high concrete-filled steel wall in Tucson Projects 1 and 2, which is designed to prevent migrants from crossing the border on foot, will instead redirect migrant traffic onto the Nation's lands, particularly since the wall is less than two

---

[26] Tohono O'odham Legislative Council Resolution No. 17-053, available at http://tolc-nsn.org/docs/Actions17/17053.pdf (reprt. in U.S. Border Patrol FOIA Response, *supra* n.3 at 000720-26); *see also* Tohono O'odham Nation Issue Brief, *supra* n. 25; Testimony of The Hon. Edward Manuel, Chairman, Tohono O'odham Nation, U.S. House Committee on Appropriations, Subcommittee on Interior, Environment and Related Agencies (Mar. 6, 2019) at 2, available at https://docs.house.gov/meetings/AP/AP06/20190306/109006/HHRG-116-AP06-Wstate-ManuelE-20190306.pdf.
[27] Manuel Testimony, *supra* n.26 at 2.
[28] *Id.*
[29] *Id.* at 3.
[30] *Id.*
[31] *Id.*

*AMICUS CURIAE* BRIEF OF TOHONO O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

miles from the Nation's western border.  This effect, which CBP refers to as "circumvention" or "funneling" is well documented,[32] and causes increased migrant traffic and associated adverse impacts to areas near the Projects.  For example, in 2006, the Congressional Research Service ("CRS") concluded that the flow of illegal immigration had adapted to the construction of border barriers and increased enforcement in the San Diego sector (known as Operation Gatekeeper), shifting illegal immigration to the more remote areas of the Arizona desert:

> …there is considerable evidence that the flow of illegal immigration has adapted to this enforcement posture and has shifted to the more remote areas of the Arizona desert.  Over the twelve year period between 1992 and 2004, overall apprehensions in the San Diego sector declined by 75% while apprehensions in the Yuma sector increased by 591%.[33]

The CRS similarly noted that:

> One unintended consequence of [increased San Diego and El Paso sector barriers and enforcement] and the shift in migration pattern has been an increase in the number of migrant deaths each year; on average 200 migrants died each year in the early 1990s, compared with 472 migrants deaths in 2005.  Another unintended consequence of this enforcement posture may have been a relative increase, compared to the national average, in crime along the border in these more-remote regions.[34]

CBP explicitly acknowledged the potential negative impacts from "funneling of illegal cross border activities" into areas between sections of proposed fencing in its 2007 EIS for wall construction in the Rio Grande Valley Sector in Texas.[35]  A year later, CBP again explicitly acknowledged migrant "circumvention" of pedestrian barriers in the 2008 Environmental Assessment that was prepared to analyze the impacts of construction of the primary pedestrian

---

[32] See, e.g., Lukeville EA, supra n.3 at 000977, 001000-11, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part1.pdf, 001012-41, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf, (describing effect of migrant "circumvention" of pedestrian fencing); Rio Grande EIS, supra n.24, at 00792, 00795, 00802, 00805, 00806, 00808, 00816, 00817, available at https://www.dhs.gov/sites/default/files/publications/0006_-_bw1_foia_cbp_000649-001186_part1.pdf.

[33] Nunez-Neto, B. and Vina, S., Congressional Research Service, Border Security: Barriers Along the U.S. International Border, (Sept. 21, 2006), 2, available at:  https://trac.syr.edu/immigration/library/P1065.pdf.

[34] Id. at CRS-26.

[35] Rio Grande EIS, supra n.24, at 00792, 00795, 00802, 00805, 00806, 00808, 00816, 00817, 00818, available at https://www.dhs.gov/sites/default/files/publications/0006_-_bw1_foia_cbp_000649-001186_part1.pdf, (adverse, long-term impacts to land use, vegetation, soils, wildlife, habitat, federally listed species and cultural resources from funneling of migrants resulting in increased foot traffic between fence sections; impacts considered "minor" because fence locations "were based on USBP operational requirements including the ability to make apprehensions.").

AMICUS CURIAE BRIEF OF TOHONO
O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

fence that runs on either side of the Lukeville Port of Entry in the Organ Pipe Cactus National Monument.[36]  The Lukeville EA recognized that "indirect" negative impacts to land use, soils, wildlife habitat, unique and sensitive areas, biological resources, protected species like the Sonoran pronghorn, critical habitat, socioeconomic resources and aesthetics (trash and debris from undocumented migrants) could occur in areas outside the project corridor as "IAs [illegal aliens] attempt to avoid detection and circumvent the proposed infrastructure."[37]  CBP did not directly address these adverse impacts to areas outside the project corridor, asserting that the "impacts cannot be quantified at this time because IA patterns and migration routes are completely out of USBP's control."[38]  It suggested, however, that these harms would be mitigated because "the primary pedestrian fence would act as a force multiplier and allow USBP [CBP] to deploy agents to areas without pedestrian barriers, therefore, minimizing potential adverse indirect impacts."[39]  The EA specifically acknowledged potential socioeconomic impacts to the Nation that could occur from a shift in illegal pedestrian traffic as a result of constructing the primary pedestrian fence near the Lukeville Point of Entry,[40] but CBP dismissed those impacts as insignificant because it was "impossible" to determine what they might be, as the direction of illegal pedestrian traffic "is solely at the discretion of the IAs" and "the primary pedestrian fence would allow USBP to deploy agents to those areas lacking infrastructure to minimize impacts from any potential shift in IA traffic."[41]

CBP reached these conclusions despite its earlier experience with Operation Gatekeeper and the documented increase in migration and related negative impacts to more remote areas

---

[36] Lukeville EA, *supra* n.3 at 000977, 001000-11, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part1.pdf, 001012-41, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf.

[37] Lukeville EA, *supra* n.3 at 001000-01, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part1.pdf, 001026-28, 001030, 001032, 001034, 001041, 001043, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf.

[38] *Id.* at 001026-28, 001030, 001032, 001034, 001036, 001040, 001041, 001043, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf.

[39] The Finding of No Significant Impact (FONSI) for the Lukeville Primary Pedestrian Fence project issued by CBP reaches the same conclusion.  Lukeville EA, *supra* n.3 at 000972.

[40] *See* Lukeville EA, *supra* n.3 at 001041, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf.

[41] *Id.* at 001041, 001042, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf.

*AMICUS CURIAE* BRIEF OF TOHONO O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

outside that project area.  The fact that CBP now proposes to construct new border wall to replace and extend for over 40 miles the wall that was the subject of the 2008 Lukeville EA merely underscores the hollowness of CBP's claim that the Lukeville wall would minimize adverse impacts outside of the fenced areas through the deployment of additional agents in those areas. Instead, the primary fencing had the impacts that the EA predicted (but that CBP dismissed as uncertain):  increased migration outside the project area as migrants circumvented the barriers, with resulting negative impacts on natural and socioeconomic resources and increased illegal activity and crime in those outside areas, like that documented in the CRS Report.[42]

If CBP constructs the wall proposed in Tucson Projects 1 and 2, there is no question that the Tohono O'odham Nation, whose Reservation is within two miles of  the endpoint of the 43-mile pedestrian barrier in Organ Pipe National Monument, will suffer those same kinds of harms on its Reservation, and will incur exorbitant costs attempting to address them.  In particular, the potential socioeconomic impacts to the Nation from migrant circumvention recognized in the Lukeville EA are far more likely to occur on the Nation's Reservation and can no longer be dismissed as "insignificant."  In many ways this is a self-fulfilling prophecy – the Lukeville EA shows that the circumvention of existing barriers leads to the justification for additional barriers, rather than having any force multiplier effect.  There is a very strong likelihood that history will repeat itself, this time on the Nation's land, resulting in further irreparable harm to the Nation.[43]

Increases in the number of migrants attempting to cross the border on the Nation's reservation, migrant deaths, illegal activity and crime, damage to the Nation's natural and cultural resources, trash and debris, wildland fires caused by migrants — all can be expected as migrants attempt to circumvent 43 miles of a border wall that ends on the Nation's doorstep.  The Nation's public safety and border security resources will be stretched beyond the breaking point in an

[42] *See, e.g.,* Dkt. No. 64-8, Rapuano Decl., Exhibit A, DHS Memorandum to Department of Defense (DOD) (Feb. 25, 2019) at 5-6 (noting high number of apprehensions and drug smuggling between border crossings in Tucson Sector, and lack of pedestrian fencing in Tucson Sector resulting in increased drug trafficking and border violence, *i.e.,* increases in the areas that were "outside" the project area in the 2008 EA); Dkt. No. 118-1, Rapuano Second Decl., ¶ 6 (noting DOD approval of funding to block drug-smuggling corridors, including Tucson Projects 1 and 2).

[43] The irony is that the deployment of additional barriers likely will not result in the desired increase in apprehensions of undocumented migrants.  As reported by CRS, national statistics demonstrated that CBP made 1.2 million apprehensions in 1992 and again in 2004, strongly suggesting that the increased enforcement in San Diego sector had little impact on overall apprehensions.  Congressional Research Service, *Border Security*, *supra* n. 33 at 2.

14

AMICUS CURIAE BRIEF OF TOHONO
O'ODHAM NATION

effort to address these harms.  The Nation's Police Department and emergency responders, as well as the Nation's public works department and other government agencies will be forced to divert even more of their already limited resources to border security as the Nation attempts to respond to these significant negative impacts to its reservation lands, its natural and cultural resources, and its members.  CBP use of the Nation's reservation roads also is likely to increase, further damaging those roads, without any realistic possibility that adequate funding will be available for their repair.

The federal government's long history of failing to provide adequate resources to address border security issues on the Nation's lands will only further exacerbate the harms that the Nation will experience as a result of the funneling effects caused by Tucson Projects 1 and 2.  As explained above, the Nation already spends millions of tribal dollars every year to help fulfill the federal government's border security obligations, but receives very little federal funding to assist with border security, law enforcement, and infrastructure, including the repair of roads damaged by heavy CBP usage.  The additional public safety and related resources that the Nation will be forced to expend in response to the likely increase of migrants and attendant damages to reservation resources and infrastructure will inflict serious and irreparable harm on the Nation.

## C.     The Harms to the Nation are Inconsistent with the Public Interest

As described above, the likely harms to the Nation's public safety and related resources (as well as natural and cultural resources on the reservation[44]) that the Nation will face if Defendants proceed with Tucson Projects 1 and 2 constitute irreparable harms that are sufficient to support a preliminary injunction, particularly as they affect the public interest inquiry.  The weight of the evidence regarding funneling or circumvention, based on the fencing constructed near Lukeville and in the San Diego Sector, makes it clear that the resulting harms to the Nation are very likely, if not inevitable.  *See All. for the Wild Rockies*, 632 F.3d at 1131 (irreparable harm is likely, not just possible, in the absence of an injunction).  Courts also regularly consider economic harms like those that the Nation will experience in the context of the public interest

---

[44] *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) ("Preserving environmental resources is certainly in the public's interest.").

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

factor in granting injunctive relief, *see, e.g., Ramos*, 336 F. Supp. 3d at 186 (economic harms to state *amici* favored preliminary injunction); *Spiegel v. City of Houston,* 636 F.2d 997, 1002 (5th Cir. 1981) (plaintiff may assert economic harms in challenging overbroad injunction to address law enforcement practices not in the public interest); *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (fear of losing federal funding under Executive Order and interference with County's ability to operate, provide key services, budget and plan for the future justified injunction), citing *United States v. North Carolina*, 192 F.Supp.3d 620, 629 (M.D.N.C. 2016) (irreparable harm where the unavailability of funds was "likely to have an immediate impact on [the state's] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding [was] subsequently reinstated"),[45] as well as harms to public safety and public services.  *See, e.g., Azar*, 2019 WL 1877392, at *13 (N.D. Cal. Apr. 26, 2019) (public health harms to municipal *amici* favored preliminary injunction); *Earth Island Inst. v. Elliott,* 290 F. Supp. 3d 1102, 1125 (E.D. Cal. 2017) (examining public safety implications of proposed injunction on Forest Service tree removal project); *Cty. of Santa Clara*, 250 F. Supp. 3d at 537 (harm to public services); *Morris v. N. Haw. Cmty. Hosp*., 37 F. Supp. 2d 1181, 1188-89 (D. Haw. 1999) (discussing public interest in ensuring that eligible people receive home health care benefits).[46]  The extent of harm that construction in the Tucson Sector will cause to the Nation clearly weighs in favor of the public interest and the granting of the injunction.

## III.   THE FEDERAL GOVERNMENT'S TRUST RESPONSIBILITY TO THE NATION AMPLIFIES THE NATION'S INTEREST IN THIS CASE.

The nature and weight of the harms to the Nation are further amplified when considered against the backdrop of the United States' trust responsibility to Indian tribes and its obligation to protect trust assets, which Defendants clearly have failed to honor.  *See, e.g., Morton v. Ruiz,* 415 U.S. 199, 236 (1974) ("The overriding duty of our Federal Government to deal fairly with Indians wherever located has been recognized by this Court on many occasions."); *Pyramid Lake Paiute*

---

[45] *See also All. for the Wild Rockies v. United States Forest Serv.,* No. 15-CV-00193, 2016 WL 3349221, at *5 (D. Idaho June 14, 2016) (denying temporary restraining order, but considering economic benefits to surrounding communities as part of the public interest analysis).

[46] *See also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1198 (9th Cir. 2004) (addressing alleged "public safety" harms to municipality in standing context).

*AMICUS CURIAE* BRIEF OF TOHONO O'ODHAM NATION

*Tribe of Indians v. Morton*, 354 F. Supp. 252, 254-58 (D.D.C. 1972) (the general trust relationship imposes a duty upon the Secretary of the Interior to consider the interest of a tribe carefully when allocating off-reservation water rights); *Nance v. EPA,* 645 F.2d 701, 710-11 (9th Cir. 1981) (reading the trust obligation to extend to any federal government action); *Northern Cheyenne Tribe v. Hodel,* 12 Indian L. Rptr. 3065, 3071 (D.Mont.1985) ("a federal agency's trust obligation to a tribe extends to actions it takes off a reservation which uniquely impact tribal members or property on a reservation."); *Northwest Sea Farms, Inc. v. U.S. Army Corps of Engineers*, 931 F. Supp. 1515, 1520-21 (W.D. Wash. 1996) (general trust relationship imposed a duty on the Army Corps to ensure treaty rights were not violated).  In fact, the actions contemplated by Defendants in carrying out Tucson Projects 1 and 2, rather than protecting the Nation's trust resources on its Reservation, almost certainly will affirmatively harm those resources – including lands, cultural and natural resources, roads, and other trust property.

//

//

//

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

**CONCLUSION**

The Court should grant Plaintiffs' Motion for Supplemental Preliminary Injunction.


Dated: June 5, 2019                                       DENTONS US LLP



                                                         By:   */s/ Matthew G. Adams*
Suzanne R. Schaeffer (*pro hac vice* pending)              Matthew G. Adams (SBN 229021)
suzanne.schaeffer@dentons.com                              matthew.adams@dentons.com
Samuel F. Daughety (*pro hac vice* pending)                DENTONS US LLP
samuel.daughety@dentons.com                                One Market Plaza, Spear Tower, 24th Fl.
DENTONS US LLP                                             San Francisco, California  94105
1900 K Street, NW                                          Telephone: (415) 267-4000
Washington, District of Columbia  20006                    Facsimile:  (415) 267-4198
Telephone:      (202) 496-7500
Facsimile:      (202) 408-6399


Joshua O. Rees (*pro hac vice* pending)
joshua.rees@tonation-nsn.gov
Acting Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, Arizona 85634
Telephone:      (520) 383-3410                             Attorneys for *Amicus Curiae*
Facsimile:      (520) 383-2689                             Tohono O'odham Nation

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

18