JAMES M. BURNHAM
Deputy Assistant Attorney General
JOHN R. GRIFFITHS
Director, Federal Programs Branch
ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel
KATHRYN C. DAVIS
MICHAEL J. GERARDI
LESLIE COOPER VIGEN
RACHAEL WESTMORELAND
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:     (202) 616-5084
Fax:     (202) 616-8470

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

|  |  |
|---|---|
| SIERRA CLUB, *et al.*,<br><br>             Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>             Defendants. | No. 4:19-cv-00892-HSG<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT THEREOF AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date:  None set per Court order |

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

BACKGROUND ........................................................................................................................... 2

    I.   Congress's Express Authorization of Border Barrier Construction .............................. 2

    II.  Congress's Authorization for DoD Support of DHS's Border Security Efforts ......... 3

    III. DoD's Current Support for DHS's Efforts to Secure the Southern Border .............. 4

    IV. The President's Proclamation Declaring a National Emergency at the Southern Border ......... 4

    V.  The Use of Spending Authorities for Barrier Construction .......................................... 6

        A.  10 U.S.C. § 284 ...................................................................................................... 6

STANDARD OF REVIEW ......................................................................................................... 9

ARGUMENT ............................................................................................................................. 10

    I.   DoD's Transfer of Funds Pursuant to § 8005 is Lawful. ........................................... 10

    II.  DoD's Use of Counterdrug Support Authority Under § 284 Is Lawful. .................... 13

    III. DoD's Use of Its Transfer and Counterdrug Support Authority Does Not Violate the Constitution. ...................................................................................................... 16

    IV. The Acting Secretary of Homeland Security Has Waived NEPA's Application Pursuant to IIRIRA. ........................................................................................................ 19

    V.  The States Have Not Met The Requirements For A Permanent Injunction. ............. 20

        A.  The States Have Not Established an Irreparable Injury. ...................................... 21

        B.  The Balance of Equities and Public Interest Strongly Weigh Against Injunctive Relief. .......................................................................................... 23

    VI. The Court Should Deny Plaintiffs' Request for Overbroad Injunctive Relief, Stay Any Injunction Pending Appeal, and Certify its Final Judgment for Appeal Pursuant to Rule 54(b). ........................................................................................ 24

CONCLUSION .......................................................................................................................... 25

1

<u>**TABLE OF AUTHORITIES**</u>

2

<u>**CASES**</u>

3

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ............................................................... 21

4

*Am. Fed'n of Labor & Congress of Industrial Orgs. v. Kahn,*
  618 F.2d 784 (D.C. Cir. 1979) ............................................................... 18

5

*Armstrong v. Exceptional Child Ctr., Inc.,*
  135 S. Ct. 1378 (2015) ........................................................................... 10

6

7

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ........................................................... 24, 25

8

9

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................................. 9

10

11

*City and County of San Francisco v. Trump,*
  897 F.3d 1225 (2018) ............................................................................. 18

12

13

*City of Houston v. Department of Hous. & Urban Dev.,*
  24 F.3d 1421 (D.C. Cir. 1994) ......................................................... 23, 24

14

*City of Sausalito v. O'Neil,*
  386 F.3d 1186 (9th Cir. 2004) ............................................................... 11

15

16

*Clarke v. Securities Indus. Ass'n,*
  479 U.S. 388 (1987) ............................................................................... 13

17

18

*Clinton v. City of New York,*
  524 U.S. 417 (1998) ......................................................................... 18, 19

19

20

*Ctr. for Biological Diversity v. Hays,*
  No. 2:15-cv-01627-TLN-CMK, 2015 WL 5916739 (E.D. Cal. Oct. 8, 2015) ........................... 21, 22

21

*Dalton v. Specter,*
  511 U.S. 462 (1994) ...................................................... 2, 16, 17, 18

22

23

*Defs. of Wildlife v. Chertoff,*
  527 F. Supp. 2d 119 (D.D.C. 2007) ....................................................... 20

24

25

*Gallatin Wildlife Ass'n v. U.S. Forest Serv.,*
  2018 WL 1796216 (D. Mt. April 16, 2018) ........................................... 21

26

27

*Gringo Pass, Inc. v. Kiewit Sw. Co.,*
  2012 WL 12905166 (D. Ariz. Jan. 11, 2012) ......................................... 3

28

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
　527 U.S. 308 (1999) ............................................................................................... 10

*Highland Falls-Fort Montgomery Central Sch. Dist. v. United States*,
　48 F.3d 1166 (Fed. Cir. 1995) .............................................................................. 15

*In re Border Infrastructure Envtl. Lit.*,
　915 F.3d 1213 (9th Cir. 2019) .............................................................................. 20

*Jewel v. Nat'l Sec. Agency*,
　810 F.3d 622 (9th Cir. 2015) ................................................................................ 25

*Kater v. Churchill Downs Inc.*,
　886 F.3d 784 (9th Cir. 2018) .................................................................................. 6

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
　572 U.S. 118 (2014) ...................................................................................10, 11, 13

*Lincoln v. Vigil*,
　508 U.S. 182 (1993) ............................................................................................... 13

*Lublin Corp. v. United States*,
　84 Fed. Cl. 678 (2008) .......................................................................................... 24

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
　567 U.S. 209 (2012) ............................................................................................... 11

*Monsanto Co. v. Geertson Seed Farms*,
　561 U.S. 139 (2010) ............................................................................................... 20

*N. Cheyenne Tribe v. Norton*,
　503 F.3d 836 (9th Cir. 2007) ................................................................................ 21

*Nat'l Treasury Employees Union v. Von Raab*,
　489 U.S. 656 (1989) ............................................................................................... 23

*Navarro v. Encino Motorcars, LLC*,
　780 F.3d 1267 (9th Cir. 2015), *overruled on other grounds by* 136 S. Ct. 2117 (2016) ........................... 15

*Nevada v. Dep't of Energy*,
　400 F.3d 9 (D.C. Cir. 2005).............................................................................14, 15

*Nken v. Holder*,
　556 U.S. 418 (2009) ............................................................................................... 25

*People With Disabilities Found. v. Colvin*,
　Case No. 15-CV-02570-HSG, 2016 WL 2984898 (N.D. Cal. May 24, 2016) .................................... 6

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment
iii

*Russello v. United States,*
   464 U.S. 16 (1983) .................................................................................................... 14

*Salazar v. Ramah Navajo Chapter,*
   567 U.S. 182 (2012) .................................................................................................. 15

*United States v. Guzman-Padilla,*
   573 F.3d 865 (9th Cir. 2009) .................................................................................... 23

*United States v. McIntosh,*
   833 F.3d 1163 (9th Cir. 2016) .................................................................................. 18

*United States v. Will,*
   449 U.S. 200 (1980) .................................................................................................. 16

*Winter v. Natural Res. Def. Council,*
   555 U.S. 7 (2008) ............................................................................... 20, 21, 23, 24

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) .......................................................................................... 17, 18

**<u>Statutes</u>**

5 U.S.C. § 551 ............................................................................................................ 11

10 U.S.C. § 284 ................................................................................................... *passim*

10 U.S.C. § 2808 .......................................................................................................... 6

31 U.S.C. § 1301 ........................................................................................................ 15

31 U.S.C. § 1532 ........................................................................................................ 15

42 U.S.C. 4321 ............................................................................................................. 9

Pub. L. No. 101-510, 104 Stat. 1485 (1990) ............................................................... 6

Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA),
   Pub. L. No. 104-208, 110 Stat. 3009 (1996) (codified at 8 U.S.C. § 1103) .............. 2, 19, 20

Pub. L. No. 109-13, Pub. L. No. 109-13, 119 Stat. 231 .............................................. 3

Pub. L. No. 109-367, 120 Stat. 2638 ........................................................................... 3

Pub. L. No. 110-161, 121 Stat. 1844 ........................................................................... 3

John S. McCain National Defense Authorization Act for Fiscal Year 2019 (NDAA),
   Pub. L. 115-232, 132 Stat. 1636 (Aug. 13, 2018) .......................................... 8, 9, 10

DoD Appropriations Act for Fiscal Year 2019,
    Pub. L. No. 115-245 ................................................................................................ *passim*

Consolidated Appropriations Act for Fiscal Year 2019,
    Pub. L. No. 116-6, 133 Stat. 13 (2019) ................................................................ *passim*

**Other Legislative Materials**
Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and
    Capabilities, 1999 WL 258030 (Apr. 27, 1999) ........................................... 3, 7, 10

H.R. Rep. No. 103-200 ........................................................................................... 3, 7, 14

H.R. Rep. No.109-72 .................................................................................................. 3, 19

H.R. Rep. No. 109-452 .................................................................................................... 14

H.R. Rep. No. 110-652 ....................................................................................................... 7

H.R. Rep. No. 114-840 ................................................................................................. 7, 12

Senate Hearing on the DHS FY 2018 Budget,
    2017 WL 2311065 (May 25, 2017) ............................................................................ 4

Veto Message for H.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019) ................... 5, 23

**Rules**
Fed. R. Civ. P. 54(b) ........................................................................................10, 25, 26

Fed. R. Civ. P. 56(a) ....................................................................................................... 10

**Regulations**
Determinations Pursuant to Section 102 of the IIRIRA, as Amended,
    84 Fed. Reg. 17185 (Apr. 24, 2019) ...........................................................9, 19, 20

Determinations Pursuant to Section 102 of the IIRIRA, as Amended,
    84 Fed. Reg. 21798 (May 15, 2019) ............................................................9, 19, 20

**Other Authorities**
Border Security and Immigration Enforcement Improvements, Exec. Order No. 13767,
    82 Fed. Reg. 8793 (Jan. 25, 2017) ............................................................................4

"Securing the Southern Border of the United States." Presidential Memorandum,
    2018 WL 1633761 (Apr. 4, 2018) .......................................................................... 4, 6

Declaring a Nat'l Emergency Concerning the S. Border of the United States,
    Pres. Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019 .......................4, 5, 6, 23

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that Defendants hereby move the Court pursuant to Federal Rules of Civil Procedure 54(b) and 56 for partial summary judgment with respect to the funding and construction of the border barrier projects identified as El Paso Sector Project 1, Yuma Sector Project 1, El Centro Sector Project 1, and Tucson Sector Projects 1, 2, and 3.  The motion is based on the following Memorandum of Points and Authorities in support of Defendants' motion and in opposition to Plaintiffs' motion for partial summary judgment, as well as all previous filings in this action, including the certified administrative record (ECF No. 163), Defendants' opposition to Plaintiffs' motion for a preliminary injunction (ECF No. 64), and Defendants' motion for a stay pending appeal (ECF No. 146).

**MEMORANDUM OF POINTS AND AUTHORITIES**

At the southern border, enormous quantities of illegal drugs are flowing into our Nation.  In response to this crisis, and pursuant to longstanding statutory authority (10 U.S.C. § 284), the Department of Homeland Security (DHS) asked the Department of Defense (DoD) to support its counternarcotics operations by building barriers and roads and installing lighting in two high priority drug-smuggling corridors between ports of entry.  The Court should not permanently enjoin DoD from providing DHS that critical support.

Partial summary judgment should be granted in favor of Defendants because DoD lawfully transferred funds across internal budget accounts to fund the requested barrier projects in accordance with the requirements of § 8005 of the DoD Appropriations Act for Fiscal Year 2019, Pub. L. No. 115-245.  Section 8005 governs DoD's internal budget and regulates the agency's relationship with Congress; it does not provide a cause of action for private enforcement.  Even assuming there is an implied cause of action in equity for private enforcement of this internal transfer provision of the Defense budget, the aesthetic and recreational interests Plaintiffs allege fall well outside any zone of interests conceivably protected by § 8005.  And even if the Court reaches the merits, § 8005's requirements are satisfied here.

Plaintiffs also fall outside the zone of interests protected by § 284, which authorizes DoD to provide support to civilian law enforcement agencies through "construction of roads and fences and

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

1

installation of lighting to block drug smuggling corridors across international boundaries of the United States." Even if Plaintiffs could raise a challenge on the merits, the elements of § 284 are plainly satisfied here because the border barrier projects DoD plans to undertake at DHS's request are located in drug-smuggling corridors.

Plaintiffs' remaining claims similarly lack merit. The National Environmental Policy Act (NEPA) claims fail because the Acting Secretary of Homeland Security has exercised his statutory authority to waive NEPA. Additionally, Plaintiffs' constitutional claims fail because they contravene the principle that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

Finally, the Court should deny Plaintiffs' request for a permanent injunction. Plaintiffs' alleged aesthetic and recreational interests do not come close to outweighing the harm from interfering with efforts to stop the flow of drugs entering the country. Moreover, the Executive Branch would face significant irreparable harm from the entry of a permanent injunction because it would prevent DoD from obligating toward the projects millions of dollars that will permanently lapse at the end of the fiscal year, as well as impose significant unrecoverable expenses for stopping work on the projects.

For these reasons, as further explained below, the Court should deny Plaintiffs' motion, grant Defendants' motion, and enter final judgment for Defendants on all claims related to the funding and construction of El Centro Sector Project 1, El Paso Sector Project 1, Yuma Sector Project 1, and Tucson Sector Projects 1, 2, and 3.

## **BACKGROUND**

### I.    **Congress's Express Authorization of Border Barrier Construction**

The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) authorizes the Secretary of Homeland Security to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." Pub. L. No. 104-208, Div. C., Title I § 102(a), 110 Stat. 3009 (1996) (codified at 8 U.S.C. § 1103 note). In 2005, Congress grew frustrated by "[c]ontinued delays caused by litigation" preventing border barrier construction and amended IIRIRA by granting the Secretary of Homeland Security authority to "to waive all legal requirements such Secretary, in such

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

2

Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." *See* H.R. Rep. 109-72, at 171 (May 3, 2005); Pub. L. No. 109-13, Div. B, Title I § 102, 119 Stat. 231, 302, 306 (IIRIRA § 102(c).  Congress amended IIRIRA again in 2006, requiring construction of "physical barriers, roads, lights, cameras, and sensors" across hundreds of miles of the southern border in five specified locations.  Pub. L. No. 109-367, § 3, 120 Stat. 2638.  In 2007, Congress expanded this requirement to require "construct[ion of] reinforced fencing along not less than 700 miles of the southwest border."  Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 1844 (2007) (IIRIRA § 102(b).  Relying on these authorities, DHS has installed approximately 650 miles of barriers along the southern border.  *See* Senate Hearing on the DHS FY 2018 Budget, 2017 WL 2311065 (May 25, 2017) (Testimony of then-Secretary of Homeland Security John Kelly).

## II.   Congress's Authorization for DoD Support of DHS's Border Security Efforts

Congress also has expressly authorized DoD to provide a wide range of support to DHS at the southern border.  10 U.S.C. § 284; *see id.* §§ 271-74.  Since the early 1990s, military personnel have supported civilian law-enforcement agency activities to secure the border, counter the spread of illegal drugs, and respond to transnational threats.  *See* H. Armed Servs. Comm. Hr'g on S. Border Defense Support (Jan. 29, 2019) (Joint Statement of John Rood and Vice Admiral Michael Gilday) (Ex. 1).  For decades, U.S. military forces have played an active role in barrier construction and reinforcement on the southern border.  Military personnel were critical to construction of the first modern border barrier near San Diego, CA in the early 1990s, as well as other border fence projects.  *See* H.R. Rep. No. 103-200, at 330-31, 1993 WL 298896 (1993) (commending DoD for its role in construction of the San Diego primary fence); Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Test. of Barry R. McCaffrey) (military personnel constructed over 65 miles of barrier fencing).  In 2006, the National Guard improved southern border security infrastructure by building more than 38 miles of fence, 96 miles of vehicle barrier, and more than 19 miles of new all-weather road, and performing road repairs exceeding 700 miles.  *See* Joint Statement of Rood and Gilday.  More recently, the U.S. Army Corps of Engineers has assisted DHS by providing planning, engineering, and barrier construction support.  *See, e.g.*, *Gringo Pass, Inc. v. Kiewit Sw. Co.*, 2012 WL 12905166, at *1 (D. Ariz. Jan. 11, 2012).

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

3

### III.   DoD's Current Support for DHS's Efforts to Secure the Southern Border

On January 25, 2017, the President issued an Executive Order directing federal agencies "to deploy all lawful means to secure the Nation's southern border."  Border Security and Immigration Enforcement Improvements, Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017).  To "prevent illegal immigration, drug and human trafficking, and acts of terrorism," *id.*, the Order required agencies to "take all appropriate steps to immediately plan, design and construct a physical wall along the southern border," including to "[i]dentify and, to the extent permitted by law, allocate all sources of Federal funds" to that effort.  *Id.* at 8794.

On April 4, 2018, the President issued a memorandum to the Secretary of Defense, Secretary of Homeland Security, and the Attorney General titled, "Securing the Southern Border of the United States."  Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018).  The President stated "[t]he security of the United States is imperiled by a drastic surge of illegal activity on the southern border" and pointed to "the combination of illegal drugs, dangerous gang activity, and extensive illegal immigration."  *Id.* at 1.  The President determined the situation at the border had "reached a point of crisis" that "once again calls for the National Guard to help secure our border and protect our homeland."  *Id.*  To address this crisis, the President directed DoD to support DHS in "securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into this country."  *Id.* at 2.  Over the course of the last year, military personnel, both active duty and National Guard, have provided a wide range of border security support to DHS, including hardening U.S. ports of entry, erecting temporary barriers, and emplacing concertina wire.  *See* Joint Statement of Rood and Gilday.

### IV.   The President's Proclamation Declaring a National Emergency at the Southern Border

On February 15, 2019, the President issued a proclamation declaring that "a national emergency exists at the southern border of the United States."  *See* Declaring a Nat'l Emergency Concerning the S. Border of the United States, Pres. Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) (Proclamation).  The President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

4

constitutes a national emergency." *Id.* The President explained:

> The southern border is a major entry point for criminals, gang members, and illicit
> narcotics. The problem of large-scale unlawful migration through the southern border
> is long-standing, and despite the executive branch's exercise of existing statutory
> authorities, the situation has worsened in certain respects in recent years.

*Id.* "Because of the gravity of the current emergency situation," the President determined that "this emergency requires use of the Armed Forces" and "it is necessary for the Armed Forces to provide additional support to address the crisis." *Id.*

On March 15, 2019, the President vetoed a joint resolution passed by Congress that would have terminated the President's national emergency declaration. *See* Veto Message for H.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019). The President relied upon statistics published by U.S. Customs and Border Protection (CBP) as well as congressional testimony by the Secretary of Homeland Security to reaffirm that a national emergency exists along the southern border. *See id.* The President highlighted (1) the recent increase in the number of apprehensions along the southern border; (2) CBP's seizure of more than 820,000 pounds of drugs in 2018; and (3) arrests of 266,000 aliens in 2017 and 2018 previously charged with or convicted of crimes. *See id.* The President also emphasized that migration trends along the southern border have changed to caravans that include record numbers of families and unaccompanied children, which requires frontline border enforcement personnel to divert resources away from border security to humanitarian efforts and medical care. *See id.* Further, the President stated that criminal organizations are taking advantage of the large flows of families and unaccompanied minors to conduct a range of illegal activity. *See id.* The President stated that border enforcement personnel and resources are strained "to the breaking point" and concluded that the "situation on our border cannot be described as anything other than a national emergency, and our Armed Forces are needed to help confront it." *See id.*

The situation at the southern border "is growing worse by the day" and DHS is facing "a system-wide meltdown." *See* Testimony of Kevin McAleenan, Acting Secretary of Homeland Security, Before the U.S. Senate Committee on the Judiciary (June 11, 2019) (Ex. 2); Letter from Secretary of Homeland Security Kirstjen M. Nielsen to the United States Senate and House of Representatives (Mar. 28, 2019) (Ex. 3). "DHS facilities are overflowing, agents and officers are stretched too thin,

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

5

and the magnitude of arriving and detained aliens has increased the risk of life threatening incidents." *See* Nielsen Letter.  In May 2019 alone, over 132,887 people were apprehended between ports of entry on the southern border, compared with 99,304 in April and 92,840 in March.  *See* DHS Sw. Border Migration Statistics FY 2019, at 2 (dated June 5, 2019) (Ex. 4).[1]

## V.    The Use of Spending Authorities for Barrier Construction

On the same day the President issued the Proclamation, the White House announced the sources of funding to be used to construct additional barriers along the southern border.  In addition to the $1.375 billion appropriation to DHS as part of the Consolidated Appropriations Act for Fiscal Year 2019 (CAA), *see* Pub. L. No. 116-6, § 230, 133 Stat. 13 (2019), the fact sheet identifies three additional sources of funding:  (1) About $601 million from the Treasury Forfeiture Fund; (2) Up to $2.5 billion of DoD funds transferred for Support for Counterdrug Activities (10 U.S.C. § 284); and (3) Up to $3.6 billion reallocated from Department of Defense military construction projects pursuant 10 U.S.C. § 2808.  *See* President Donald J. Trump's Border Security Victory (Feb. 15, 2019) (Ex. 5).  The parties' respective motions for partial summary judgment address only the funding and construction of border barriers pursuant to § 284.

### A.    10 U.S.C. § 284

10 U.S.C. § 284 authorizes DoD to provide "support for the counterdrug activities . . . of any other department or agency of the Federal Government," including for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  *Id.* § 284(a); (b)(7).  Congress first provided DoD this authority in the National Defense Authorization Act for Fiscal Year 1991.  Pub. L. No. 101-510, § 1004, 104 Stat. 1485 (1990).  Congress regularly renewed § 1004 and praised DoD's involvement in building barrier fences along the southern border.  For example, in 1993, Congress "commend[ed]" DoD's efforts to reinforce the border fence along a 14-mile drug smuggling corridor in "the San Diego-Tijuana border area"  H.R.

---

[1] The Court may take judicial notice of the official U.S. Government documents and the publicly available information on Government websites cited herein and attached.  *See Kater v. Churchill Downs Inc.*, 886 F.3d 784, 788 n.2 (9th Cir. 2018); *People With Disabilities Found. v. Colvin*, Case No. 15-CV-02570-HSG, 2016 WL 2984898, at *3 (N.D. Cal. May 24, 2016).

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

6

Rep. No. 103-200, at 330-31, 1993 WL 298896 (1993).  Executive Branch officials and Congress have also noted the importance of DoD's involvement in border security projects to prevent drug smuggling.  *See* Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Testimony of Barry R. McCaffrey) (testifying about the "vital contributions" made by DoD to construct 65 miles of barrier fencings, 111 miles of roads, and 17 miles of lighting); H.R. Rep. No. 110-652, 420 (2008) (describing border fencing as an "invaluable counter-narcotics resource" and recommending a $5 million increase to DoD's budget to continue construction).  In light of the threat posed by illegal drug trafficking, Congress permanently codified § 1004 at 10 U.S.C. § 284 in 2016, directing DoD "to ensure appropriate resources are allocated to efforts to combat this threat."  H.R. Rep. No. 114-840, 1147 (2016).

In accordance with § 284, on February 25, 2019, DHS requested DoD's assistance in blocking 11 specific drug-smuggling corridors on federal land along certain portions of the southern border. *See* Administrative Record (AR) at 15-24 (ECF No. 163).  The request sought the replacement of existing vehicle barricades or dilapidated pedestrian fencing with new pedestrian fencing, the construction of new and improvement of existing patrol roads, and the installation of lighting.  *Id.*

As relevant to this case, the Acting Secretary of Defense approved construction and funding of six border barrier projects.  *See* AR at 1-8; 137-144.[2]  El Paso Sector Project 1 will replace existing vehicle barriers with 30-foot high pedestrian fencing along approximately 46 miles of federal land in Luna and Doña Ana Counties, New Mexico.  *See* AR at 22-23, 55-60; First Declaration of Paul Enriquez (April 25, 2019) ¶¶ 16-18 (Ex. 6).  Yuma Sector Project 1 will replace approximately 5 miles of existing vehicle barriers with 30-foot high pedestrian fencing on federal land in Yuma County, Arizona.  *See* AR at 18-19, 55-60; First Enriquez Declaration ¶¶ 10-12.  El Centro Sector Project 1 involves replacing approximately 15 miles of existing vehicle barriers with new pedestrian fencing in Imperial County, California.  *See* AR at 17, 138; Second Declaration of Paul Enriquez (June 19, 2019) ¶¶ 11-13 (Ex. 7).  Tucson Projects 1, 2, and 3 collectively will replace approximately 63 miles of existing

---

[2] The Acting Secretary approved a seventh project (Yuma Sector Project 2), but the Army Corps of Engineers subsequently decided not to fund or construct that project pursuant to § 8005 and § 284.  *See* Second Declaration of Kenneth Rapuano ¶ 4 (ECF No. 118).

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

7

vehicle barrier and outmoded pedestrian barrier in Pima and Cochise Counties, Arizona.  *See* AR at 138; Second Enriquez Decl. ¶¶ 14-16.

In approving these projects, the Acting Secretary of Defense noted that that DHS identified each project location as a drug-smuggling corridor, thereby satisfying the statutory requirement of § 284(b)(7).  *See* AR at 7, 143.  The United States Border Patrol collectively had more than 4,000 separate drug-related events between border crossings in the El Paso, El Centro, Tucson, and Yuma Sectors in fiscal year 2018, through which it seized over 155,000 pounds of marijuana, over 640 pounds of cocaine, over 285 pounds of heroin, over 4,300 pounds of methamphetamine, and over 17 pounds of fentanyl.  *See id.* at 17-22; Second Declaration of Millard LeMaster ¶¶ 6 (June 19, 2019) (Ex. 8).[3] These high rates of drug smuggling have continued into fiscal year 2019.  *See* First Declaration of Millard LeMaster ¶¶ 4-5 (May 28, 2019) (Ex. 9); Second LeMaster Decl. ¶¶ 7-8.  The existing vehicle barriers in these areas must be replaced because they no longer effectively stop transnational criminal organizations from smuggling illegal drugs into United States.  *See* AR at 17-22.

To fund the El Paso and Yuma projects, the Acting Secretary of Defense authorized the transfer of $1 billion to the Drug Interdiction and Counter-Drug Activities, Defense, appropriation, from Army personnel funds that had been identified as excess to current requirements.  *See* AR at 2, 5, 10-11, 35-37.  The Acting Secretary directed the transfer of funds pursuant to DoD's general transfer authority under § 8005 of the DoD Appropriations Act for Fiscal Year 2019, Pub. L. 115-245, div. A, 132 Stat. 2981, 2999 (Sept. 28, 2018), and § 1001 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (NDAA), Pub. L. 115-232, § 1001, 132 Stat. 1636, 1945 (Aug. 13, 2018).  *See id.*

Section 8005 authorizes the Secretary of Defense to transfer up to $4 billion of certain DoD funds between appropriations provided "[t]hat the authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements than those for which originally

---

[3] In preparation of this filing, Defendants discovered that the February 2019 request for support from DHS to DoD (*See* AR at 19) understated the amount of marijuana, cocaine, and heroin seized in the Tucson Sector in fiscal year 2018.  This declaration corrects and updates those statistics.  *See* Second LeMaster Decl. ¶ 6.

appropriated and in no case where the item for which funds are requested has been denied by the Congress." Pub. L. No. 115-245, § 8005.  Section 1001 of the NDAA provides the Secretary of Defense with similar transfer authority and incorporates the same substantive elements as § 8005.  *See* Pub. L. 115-232, § 1001.  The Acting Secretary concluded the transfer of funds met the requirements of these statutes.  *See* AR at 5, 10-11.

To fund the El Centro and Tucson projects, the Acting Secretary of Defense authorized a transfer of $1.5 billion pursuant to § 8005 and § 1001, as well as DoD's special transfer authority under § 9002 of the DoD Appropriations Act and § 1512 of the NDAA.  *See* AR at 137-141, 146-56.  Section 9002 authorizes the Secretary of Defense to transfer up to $2 billion "between the appropriations or funds made available to the Department of Defense in [Title IX]" of the DoD Appropriations Act "subject to the same terms and conditions as the authority provided in section 8005 of this Act."  *See* Pub. L. No. 115-245, § 8005.  Section 1512 of the NDAA authorizes special transfer authority similar to § 9002 and also requires compliance with same requirements as § 8005.  *See* Pub. L. 115-232, § 1512.

On April 24 and May 15, 2019, the Acting Secretary of Homeland Security exercised his authority under § 102(c)(1) of IIRIRA to waive the application of various laws to ensure expeditious construction of the projects.  *See* Determinations Pursuant to Section 102 of the IIRIRA, as Amended, 84 Fed. Reg. 17185-87 (Apr. 24, 2019); 21798-801 (May 15, 2019).  The waived laws include NEPA (42 U.S.C. 4321 *et seq.*) along with "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of, the [listed] statutes."  *Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the evidence and drawing all reasonable inferences most favorably to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).  Here, where the parties have filed cross-motions for partial summary judgment, "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."  *See* Fed. R. Civ. P. 54(b).

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

9

1

## ARGUMENT

2

### I.    DoD's Transfer of Funds Pursuant to § 8005 is Lawful.

3         With respect to the transfer of funds pursuant to the requirements set forth in § 8005,

4   Defendants acknowledge that the Court previously rejected Defendants' arguments about the proper

5   interpretation of § 8005 in its opinion granting in part and denying in part Plaintiffs' motion for

6   preliminary injunction.  *See* ECF No. 144 at 27-42.  Defendants' respectfully submit that the Court

7   erred for two reasons.[4]

8         First, Plaintiffs fall outside the zone of interests of § 8005 and thus cannot sue to enforce it.

9   The zone-of-interests requirement is a general presumption about Congress's intended limits on the

10  scope of *all* causes of action, not just express causes of action under the APA or other statutes.  *See*

11  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (the zone-of-interests test

12  "is a requirement of general application").  The Court incorrectly concluded that the zone-of-interests

13  requirement did not apply to the Plaintiffs because they sought equitable relief against Defendants for

14  exceeding statutory authority.  *See* PI Order at 29-30.  *Lexmark*'s reference to the requirement applying

15  to all "statutory" or "statutorily created" causes of action, *see id.*, encompasses equitable causes of

16  action, which are inferred from Congress's statutory grant of equity jurisdiction and which enforce

17  statutes enacted against the backdrop of the zone-of-interests limitation, *see Armstrong v. Exceptional*

18  *Child Ctr., Inc.*, 135 S. Ct. 1378, 1384-85 (2015); *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund,*

19  *Inc.*, 527 U.S. 308, 318 (1999).  It turns the separation of powers on its head to hold that the zone-of-

20  interests requirement applies where Congress has provided a statutory cause of action, but that, where

21  Congress has not expressly authorized suit *at all*, any injured persons can sue, even if their interests

22  are entirely unrelated to the interests protected by the statute.  There is no basis to conclude that

23  Congress intended to allow individuals outside the zone of interests of a particular statute nonetheless

24  to enforce that statute in equity.

25

26         [4] Because § 1001, § 1512, and § 9002 incorporate § 8005 by reference or are subject to the

27  same substantive requirements as § 8005, *see* PI Order 12 n.7, this motion refers to these
    requirements collectively by reference to § 8005.

28

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

10

Even if there were an implied cause of action in equity for private enforcement of § 8005,[5] Plaintiffs' fall outside of any interest conceivably protected by § 8005 because the statute exists to govern the relationship between Congress and DoD with respect to military spending. *See Lexmark*, 572 U.S. at 129-32. Plaintiffs' recreational or aesthetic harms from a project paid for with transferred funds are "so marginally related" to § 8005's interests that the statute does not even "arguably" authorize enforcement suits by such persons under the APA or otherwise. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). Private parties alleging aesthetic or recreational harms from DoD's intended uses for its internally transferred funds are not "reasonable" or "predictable" challengers under § 8005. *Id.* at 227-28. To the contrary, private enforcement of § 8005 is unprecedented, and Plaintiffs cite no authority in which private parties have ever brought suit to challenge any similar internal transfer of agency funds.

Second, DoD has satisfied the requirements set forth in § 8005. The Court previously concluded that DoD had not satisfied two of § 8005's elements, holding that DoD had transferred funds for an "item" that was previously "denied" by Congress and that supported a military requirement that was not "unforeseen." *See* PI Order at 31-36. The Court's rationale was that, at the time of DoD's appropriation, the Executive Branch's general desire for border-wall funding was foreseen and Congress provided DHS only a limited amount of funding. *See id.* But that reasoning considers the appropriations process at far too high a level of generality and misunderstands both the statutory language and budget process. Section 8005 is a provision in the *DoD* appropriations statute, which grants DoD limited authorization to make internal transfers to fund *particular items* after DoD's annual appropriations statute is enacted. Under § 8005, an "item for which funds are requested" is a particular budget item requiring additional funding beyond the amount in the DoD appropriation for the fiscal year. At no point in the budgeting process, however, did Congress deny DoD funding for construction of the six projects at issue here under its counter-narcotics support appropriation.

---

[5] Because Congress did not create a private right of action to enforce § 8005 or the statutes that form the basis of Plaintiffs' motion, their claims should be governed by the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, as challenges to agency action. *See City of Sausalito v. O'Neil*, 386 F.3d 1186, 1205 (9th Cir. 2004) (citing cases); Defs.' Opp'n to Pls' Mot. for Prelim. Inj. at 12-13. *But see* PI Order at 10-11.

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

11

Consequently, Plaintiffs' reliance on Executive Branch funding requests for the border wall generally, Pls.' Mot. at 10-11, are irrelevant to the meaning of § 8005.

Similarly, the "item" at issue here—DoD's support for the projects requested by DHS under § 284—was "unforeseen."  An expenditure is "unforeseen" under § 8005 if DoD was not aware of the specific need when it made its budgeting requests and Congress finalized the DoD appropriation. Congress enacted DoD's fiscal year 2019 appropriation on September 28, 2018.  *See* Pub. L. No. 115-245, 132 Stat. 2981.  DHS did not request DoD's assistance in blocking specific drug-smuggling corridors until February 25, 2019, five months later.  *See* AR at 15-24.  Therefore, the need for DoD to provide support to DHS for projects at issue here was not known at the time of DoD's budget request in 2018.  *See* AR 10-11, 146-47.  Further, DoD may undertake counter-drug support pursuant to § 284 only upon receiving a request by another agency, *see* 10 U.S.C. § 284(a), thus there is no merit to the argument that the funding requests at issue were "foreseen" simply that there was an ongoing legislative debate over DHS's separate request for appropriations for border barriers.

Section 284 support is also undoubtedly a "military requirement" under § 8005.  Congress enacted § 284 precisely because it recognized the need for DoD to support civilian agencies by bringing military resources, both skills and funding, to bear upon the problem of drug smuggling.  *See* H.R. Rep. 114-840, 1147 (Nov. 30, 2016).  Concluding that DoD's support for counter-drug activities is not a "military requirement" requires overriding Congress's assignment of that function to the military in § 284.  Moreover, Plaintiffs' proposed interpretation of a "military requirement" is inconsistent with the way Congress and DoD have understood the provision for many years.  *See* Reprogramming Application & Congressional Approvals, Sept. 2007 (Ex. 10) (§ 8005 transfer to the counter-drug account for an infrastructure project in Nicaragua to prevent smuggling of cocaine into the United States); Reprogramming Application & Congressional Approvals, Sept. 2006 (Ex. 11) (§ 8005 transfer to support DoD's involvement in CBP's border security mission).  Accordingly, there is no historical or legal basis for the Court to adopt Plaintiffs' narrow construction that § 8005 transfers should be limited solely for activities that suppress "military threats" for which only DoD has exclusive authority to address.  *See* Plaintiffs' Motion for Partial Summary Judgment at 12 (ECF No. 168) (Pls.' SJ Mot.).

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

12

There is also no constitutional issue presented by Defendants' interpretation of § 8005. Congress has long provided agencies with "lump-sum appropriation[s]," and agencies' delegated authority over "[t]he allocation of funds" is not only constitutional, but "committed to agency discretion by law" and "accordingly unreviewable." *Lincoln v. Vigil*, 508 U.S. 182, 192-93 (1993).  Given that Congress thus could have granted DoD unfettered discretion over its total budget, § 8005's limited grant of transfer authority poses no constitutional concerns, however broadly construed.

## II.   DoD's Use of Counterdrug Support Authority Under § 284 Is Lawful.

DoD is lawfully providing counterdrug support to DHS pursuant to its authority under § 284 to construct barrier projects in drug-smuggling corridors along the southern border.  Accordingly, the Court should enter partial summary judgment in Defendants' favor on Plaintiffs' § 284 claims.

As a threshold matter, Plaintiffs cannot sue to enforce § 284 because Plaintiffs are not within the zone of interests of the statute.  *See Lexmark*, 572 U.S. at 129.  Section 284's limitations on when DoD can provide counter-drug support are designed to regulate the relationship between Congress, DoD, and state or federal agencies seeking assistance, based on budgetary control and agency focus. The "interests protected by the" statute are completely unrelated to the aesthetic and recreational interests Plaintiffs seek to vindicate in this case.  *See id.* at 131.  Nothing in the statute suggests that Congress intended to give private parties a remedy for protecting against the alleged negative externalities of barrier construction; and as such, neither the APA nor an implied cause of action in equity provides Plaintiffs a remedy for an alleged violation.  *Id.* at 129; *see Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 396, 400 & n. 16 (1987).

Even if Plaintiffs could sue to enforce § 284, DoD's construction of the barrier projects at issue is squarely within its counterdrug support authority.  Plaintiffs' motion does not dispute that the projects at issue were approved in accordance with § 284's procedural requirements, *id.* § 284(a), (a)(1)(A), and encompass the type of border infrastructure construction permitted by the statute, *id.* § 284(b)(7).  Plaintiffs' motion likewise does not dispute that the projects at issue are being constructed in "drug smuggling corridors" along the U.S.-Mexico border.  10 U.S.C. § 284(b)(7).  As explained above, the record includes extensive evidence to support recent drug-smuggling activities between ports of entry in the El Paso, Yuma, Tucson, and El Centro Sectors, and explains why border-barrier

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

13

construction is necessary to impede and deny illegal drug activities in these areas. *See supra* at 8.

Instead, Plaintiffs raise only issues of statutory interpretation, all of which lack merit. The text and history of § 284 contradict Plaintiffs' claim that Congress impliedly limited DoD's authority under the statute. *See* Pls.' SJ Mot. at 13 (citing the congressional notification requirement for "small scale construction" under $750,000 provided in § 284(h)(1)(B), (i)(3)). No monetary restrictions appear in the types of support permitted under § 284. *See* 10 U.S.C. § 284(b)-(c). To the contrary, the statute broadly approves certain construction without regard to the size, scale, or budget of the project. *Id.* § 284(b)(7). And since Congress first provided this authority in 1990, DoD has repeatedly used it, with Congress's explicit approval, to complete large-scale fencing projects along the southern border in support of DHS's counter-drug activities. *See* H.R. Rep. No. 103-200, at 330-31; H.R. Rep. No. 109-452, at 368. In fact, Congress has recommended that DoD spend millions of dollars on specific border projects. *See* H.R. Rep. No. 109-452, at 369; *see also supra* at 6-7. There is simply no reason to infer that Congress intended to limit all "support" authorized under § 284 by the types of congressional notification required in § 284(h). Indeed, inferring some unspecified monetary limit on DoD's § 284's authority would be entirely arbitrary, as nothing in the statute even arguably defines any upper limit.

There is also nothing inherently "implausible" about Congress choosing to require notice for some, but not all, projects that DoD could construct under § 284. *See* Pls.' SJ Mot. at 13. Certain types of support authorized under § 284 explicitly refer to—*but are not limited to*—"small scale" or "minor" construction. *See* 10 U.S.C. § 284(b)(4), (c)(1)(B). Accordingly, if Congress wanted to limit all construction authorized by § 284 to "small scale construction," it "presumably would have done so expressly." *Russello v. United States*, 464 U.S. 16, 23 (1983). "The short answer is that Congress did not write the statute that way." *Id.*

Plaintiffs also incorrectly claim that DoD's use of § 284 authority "violate[s] general appropriation laws." *See* Pls.' SJ Mot. at 13-15. They rely on the principle that, where two appropriations are available to an agency—one for a "specific purpose" and another that "in general terms . . . might be applicable in the absence of the specific appropriation," the agency must use the specific appropriation to the exclusion of the general appropriation. *See Nevada v. Dep't of Energy*, 400

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

14

F.3d 9, 16 (D.C. Cir. 2005).  Plaintiffs cite no authority that the principle extends beyond the circumstance of a *single* agency determining which of two appropriations *to that agency* should be used for a particular object or purpose.[6]  That is not the case here.  Separate from the $1.375 billion appropriation to DHS, DoD is acting under its § 284 authority, using its own appropriated funds transferred pursuant to § 8005 and § 9002.[7]

Congress did not expressly or impliedly limit in either DHS's or DoD's fiscal year 2019 appropriations the use of DoD's authority to provide support to DHS through barrier construction activities pursuant to § 284.  And contrary to Plaintiffs' contention, Congress's decision not to appropriate to DHS the full amount of funds requested by the President for fiscal year 2019 border-barrier construction does not "bar" the Acting Secretary from utilizing his § 284 authority for such construction.  *See* Pls.' SJ Mot. at 14.  "An agency's discretion to spend appropriated funds is cabined only by the text of the appropriation."  *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012).  Plaintiffs have identified no restriction in the CAA on the funding of border-barrier construction pursuant to other statutory authorities, nor does its plain text include one.  *See* Pls.' SJ Mot. at 13-14; *see generally* Pub. L. No. 116-6 (2019).  Congress did not modify any of the statutes at issue here in the CAA.  *See id.*  And the CAA's funding provisions do not otherwise alter the meaning or availability of permanent statutes already in effect.  *See Navarro v. Encino Motorcars, LLC*, 780 F.3d 1267, 1276 n.5 (9th Cir. 2015), *overruled on other grounds by* 136 S. Ct. 2117 (2016); *Olive v. Comm'r of Internal Revenue*, 792 F.3d 1146, 1150 (9th Cir. 2015).  In the absence of language to the contrary, the grant of a specific, one-year appropriation to DHS in the CAA cannot be read to restrict DoD's permanent statutory authority under § 284.

Indeed, the purpose of § 284 is to permit DoD to use its own appropriated funds to support

---

[6] Indeed, the authority Plaintiffs cite involves that very scenario.  *See Nevada*, 400 F.3d at 16; *Highland Falls-Fort Montgomery Central Sch. Dist. v. United States*, 48 F.3d 1166, 1171 (Fed. Cir. 1995).

[7] For the same reason, DHS and DoD have not violated the Purpose Statute.  *See* 31 U.S.C. § 1301. Both agencies are applying their appropriations "only to the objects for which the appropriations were made."  *Id.* § 1301(a).  And, as explained above, because DoD is using its transfer authority conferred in § 8005 and § 9002, it likewise does not violate the Transfer Statute.  *See* 31 U.S.C. § 1532 (prohibiting transfer of funds from one appropriation account to another unless "authorized by law.").

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

15

DHS through, among other things, construction of barriers to block drug-smuggling corridors.  *See supra* at 6-7.  If the Court were to accept Plaintiffs' argument, DoD would be prohibited from providing such authorized support under § 284 in any year in which Congress appropriates funds to DHS specifically for border fence construction.  Inferring such a restriction—without Congress's express intention and contrary to the purpose of § 284—would be tantamount to a repeal by implication, a disfavored rule that "applies with special force when the provision advanced as the repealing measure was enacted in an appropriations bill."  *United States v. Will*, 449 U.S. 200, 221-22 (1980).

Finally, Plaintiffs claim incorrectly that the Acting Secretary of Defense's actions are nonetheless prohibited by § 739 of the Financial Services and General Government Appropriations Act, 2019 (a component of the CAA).  That provision states:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or *unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act*.

Pub. L. No. 116-6, div. D, § 739 (emphasis added).  Plaintiffs claim that, because the President has requested border-barrier funding for fiscal year 2020, no funds in excess of the $1.375 billion specifically appropriated to DHS for border-barrier construction may be used for that purpose.  *See* Pls.' SJ Mot. at 14.  Plaintiffs misapprehend the situation.  The funds utilized for border-barrier construction pursuant to § 284 will be used for the purpose for which they were appropriated, not to increase funding for an item in the President's 2020 budget request.  Thus, the use of funds at issue here complies with the requirements of § 739.

### III.   DoD's Use of Its Transfer and Counterdrug Support Authority Does Not Violate the Constitution.

DoD's use of its statutory authority to fund and construct the projects at issue is not unconstitutional.  Plaintiffs' claims to the contrary merely recast their statutory claims in constitutional terms, and "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."  *Dalton*, 511 U.S. at 473.  As Plaintiffs acknowledge, *See* Pls.' SJ Mot. at 16, the

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

16

outcome of their claims turns on what the transfer and counterdrug support statutes mean—a purely statutory dispute with no constitutional dimension.

The Supreme Court's decision in *Dalton* makes this clear.  In *Dalton*, the Court specifically rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471.  The Court instead recognized that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration." *Id.* at 474.

By asserting that DoD acted unconstitutionally by violating § 284, Plaintiffs make precisely the argument that the Court disapproved in *Dalton*.  Plaintiffs assert no constitutional violation separate from the alleged statutory violations.  Instead, Plaintiffs assert that Defendants' use of statutory authorities violated the appropriations to DHS in the CAA.  Plaintiffs' Appropriations Clause claim hinges on the allegation that Defendants acted "in violation of the restrictions imposed in the CAA." *See* Pls.' SJ Mot. at 16.  Plaintiffs' separation-of-powers claim likewise turns on the allegation that Defendants acted contrary to the will of Congress because they allegedly took actions outside the CAA's restrictions. *See id.* at 17.  And Plaintiffs' Presentment Clause claim amounts to an assertion that, by directing the funding of border barrier construction pursuant to statutory authorities that Plaintiffs allege do not apply, the President "disregard[ed]" the CAA. *Id.*  These allegations of ultra vires statutory actions do not state independent constitutional claims.[8] *See Dalton*, 511 U.S. at 473-74.

Plaintiffs' separation-of-powers claim also fails because the President has not purported to exercise his inherent authority under Article II of the Constitution.  Contrary to Plaintiffs' contentions, *see id.*, this case presents a sharp contrast to *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), in which the President directed the Secretary of Commerce to seize the nation's steel mills relying solely upon "the aggregate of his powers under the Constitution," and conceding the absence of

---

[8] This is so even if the Court believes that Defendants' interpretation of its statutory authority "would pose serious [constitutional] problems." PI Order at 36.  Although Defendants respectfully disagree, the resulting ruling would likely be that Defendants' actions were not statutorily authorized, not that they were unconstitutional. *Id.* at 36-37.

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

17

statutory authority. *Id.* at 585-87.  The situation here is entirely different, for the actions at issue are all "pursuant to an express . . . authorization of Congress," such that the agencies' "authority is at its maximum." *Id.* at 635 (Jackson, J. concurring).  For that reason, Plaintiffs' reliance on *City and County of San Francisco v. Trump*, 897 F.3d 1225 (2018), is misplaced because the decision there hinged on the absence of congressional authorization. *See id.* at 1234-35.

The fact that Congress authorized one-year funding for certain border-barrier construction in the CAA does not mean that it prohibited the use of other available statutory sources to provide additional funding for such construction.  Had Congress wished to prohibit the use of those permanent authorities, it could have explicitly stated so. *See United States v. McIntosh*, 833 F.3d 1163, 1179 (9th Cir. 2016).  Because Congress has statutorily authorized the conduct at issue, there can be no concerns that Defendants are usurping "Congress's constitutionally-mandated power" to assess and determine "permissible spending." PI Order at 38.  DoD is acting pursuant to authority granted by Congress, and *Youngstown* is thus inapposite. *See Am. Fed'n of Labor & Congress of Industrial Orgs. v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979) (en banc); *see also Dalton*, 511 U.S. at 473.

Plaintiffs' Appropriations Clause claim also fails because all actions by the President and DoD alleged here are statutorily authorized.  As such, this case is distinguishable from *United States v. McIntosh*.  The court in *McIntosh* held that, where the Department of Justice spent funds in a manner expressly prohibited by the text of an appropriations bill, and without any other source of congressional authorization, such expenditures could violate the Appropriations Clause. *See* 833 F.3d at 1175.  In contrast, here, the § 284 projects at issue will be funded under statutes authorizing such action.  Nothing in the CAA prohibit the expenditure of funds pursuant to these statutes.  Accordingly, unlike in *McIntosh*, DoD has not expended funds without the authorization of Congress, and Plaintiffs' claims amount to allegations of statutory—not constitutional—violations.

Finally, Plaintiffs have not alleged an actual Presentment Clause violation.  Plaintiffs cannot dispute that the President signed the CAA into law according to the constitutionally mandated procedure. *See* U.S. Const., art. 1, § 7.  And their claim that the President has disregarded that law is baseless.  This case is in no way comparable to *Clinton v. City of New York*, 524 U.S. 417 (1998), wherein the Supreme Court held that the President's action explicitly "cancel[ing] in whole" portions of

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

18

enacted statutes violated the Constitution.  *Id.* at 436; *see also id.* at 439.  The CAA remains in effect, and DoD has acted pursuant to other statutory authority to fund border-barrier construction.  Such use of these statutory authorities does not render the CAA moot.

## IV.   The Acting Secretary of Homeland Security Has Waived NEPA's Application Pursuant to IIRIRA.

Plaintiffs' NEPA claim fails because the Acting Secretary of Homeland Security has waived NEPA's requirements for the border barrier projects at issue here.  The Court rejected Plaintiffs' NEPA argument in its preliminary injunction opinion, *see* PI Order at 46-48, and Plaintiffs do not present any new arguments that would warrant a different conclusion on the merits.  *Compare* Pls.' Mot. at 17-18 *with* Pls.' Reply In Support of Mot. For Prelim. Inj. at 18-19 (ECF No. 91).

IIRIRA authorizes such waivers in conjunction with the statutory directive that the Secretary of Homeland Security "take such actions as may be necessary" to install "physical barriers" on the "United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a).  That statutory mandate includes a directive requiring DHS to "construct reinforced fencing along not less than 700 miles of the southwest border."  *Id.* § 102(b)(1)(A).  Congress grew frustrated by "[c]ontinued delays caused by litigation" preventing border barrier construction and granted the Secretary of Homeland Security authority to waive any "laws that might impede the expeditious construction of security infrastructure along the border."  *See* H.R. Rep. 109-72, at 171 (May 3, 2005).  IIRIRA seeks to ensure expeditious construction pursuant to these mandates by authorizing the Secretary of Homeland Security to waive a broad array of legal impediments: "Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section."  IIRIRA § 102(c)(1).

Acting under § 102 of IIRIRA to take "such actions as may be necessary" to install border barriers, DHS requested that DoD, pursuant its authority under § 284(b)(7), assist DHS by constructing fences, roads, and lighting for the border barrier projects at issue in this case.  *See* AR at 15-16.  The Acting Secretary of Homeland Security subsequently exercised his authority under

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

19

§ 102(c)(1) of IIRIRA to issue waivers for these projects.  *See* Determinations Pursuant to IIRIRA, 84 Fed. Reg. 17185-87 (Apr. 24, 2019); 21798-801 (May 15, 2019).  As relevant here, the waived laws include NEPA along with "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of, the [listed] statutes."  *Id.*  Under the law of this circuit, the "waiver of the relevant environmental laws under section 102(c) is an affirmative defense to all the environmental claims." *In re Border Infrastructure Envtl. Lit.*, 915 F.3d 1213, 1221, 1225 (9th Cir. 2019).

Plaintiffs erroneously contend that IIRIRA waivers apply only to actions "under this section— that is, under section 102 of IRRIRA" and the waivers here do not extend to DoD because its authority to construct the projects is derived from § 284.  *See* Pls.' SJ Mot. at 18.  But as the Court previously recognized, there is no basis "to find that even though it is undisputed that DHS could waive NEPA's requirements if it were paying for the projects out of its own budget, that waiver is inoperative when DoD provides support in response to a request from DHS."  *See* PI Order at 48.  Further, there is no legal basis "to impose different NEPA requirements on DoD when it acts in support of DHS's Section 102 authority in response to a direct request under Section 284 than would apply to DHS itself."  *Id.*; *see Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 121, 129 (D.D.C. 2007) (applying IIRIRA waiver where the Army Corps of Engineers, a DoD component, constructed border fencing "on behalf of DHS" and dismissing NEPA claim against the Bureau of Land Management, a component of the Interior Department, after DHS issued IIRIRA waiver).  For these reasons, Plaintiffs' NEPA claim fails and partial summary judgment should be granted in favor of Defendants.

## V. Plaintiffs Have Not Met The Requirements For A Permanent Injunction.

The Court should deny Plaintiffs' request for a permanent injunction to prohibit the funding and construction of the Yuma, El Paso, El Centro, and Tucson projects.

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-58 (2010); *See Winter v. Natural Res.*

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

20

*Def. Council,* 555 U.S. 7, 32 (2008). Even if Plaintiffs were to prevail on the merits of their claims, permanent "injunctive relief is not automatic, and there is no rule requiring automatic issuance of a blanket injunction when a violation is found." *See N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007). As the Supreme Court has emphasized, a permanent "injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32.

### A.   Plaintiffs Have Not Established an Irreparable Injury.

Plaintiffs argue that the challenged projects will harm their enjoyment of public lands in two ways. First, they argue that border wall construction will negatively impact their members' subjective enjoyment of nearby public lands. *See* Pls.' SJ Mot. at 21. Second, they argue that significant light pollution will inevitably accompany border infrastructure, disrupting their members' ability to stargaze or observe nocturnal wildlife in the border area. *See id.* at 21-22. These allegations fall short of the demanding standard for injunctive relief; the border wall will not cut Plaintiffs' members off from nearby recreational resources and CBP will utilize mitigation measures to restrict impacts associated with lighting. For these reasons, Plaintiffs have not shown an irreparable injury sufficient to warrant a permanent injunction.

Plaintiffs must show that their members face a likely—not just possible—threat of irreparable harm to their interests in the area. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter*, 555 U.S. at 22).[9] In the Ninth Circuit, a plaintiff may attempt to meet this burden by showing that a challenged federal action will prevent its members from using a public area. *All. for the Wild Rockies*, 632 F.3d at 1135; *but see Gallatin Wildlife Ass'n v. U.S. Forest Serv.*, 2018 WL 1796216, at *5 (D. Mt. April 16, 2018) (distinguishing *Cottrell* and finding no irreparable harm where challenged grazing would not prevent use and where area was already disturbed by past grazing); *Ctr. for Biological Diversity v. Hays*, No. 2:15-cv-01627-TLN-CMK, 2015 WL 5916739, at *10 (E.D. Cal. Oct. 8, 2015)

---

[9] In *Cottrell*, the Ninth Circuit also held that the "'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*." *Cottrell*, 632 F.3d at 1134. We preserve that holding for review by the Ninth Circuit en banc or the Supreme Court.

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

21

1    (rejecting an "aesthetic opinion that post-fire logging is 'ugly'" as sufficient to establish an irreparable

2    harm).

3            In *Cottrell*, on which Plaintiffs continue to heavily rely, the Ninth Circuit found an irreparable

4    harm where a post-fire salvage project "would prevent the use and enjoyment by [plaintiffs] of 1,652

5    acres of the forest," which the Ninth Circuit held was "hardly a *de minimis* injury." *Id.*  Here, in contrast,

6    Plaintiffs will still be able to access lands near the southern border.  The construction activities for the

7    projects will occupy only a narrow, 60-foot strip of federal land directly adjacent to the international

8    boundary line.  *See* First Enriquez Decl. ¶¶ 10-12, 16-18, 63; Second Enriquez Decl. ¶¶ 10-16.  That

9    land is already heavily disturbed—by both existing border barriers and roads—and functions primarily

10   as a law enforcement corridor.  *See* First Enriquez Decl. ¶¶ 50, 63-64; Second Enriquez Decl. ¶ 67.

11   Border wall construction will not impact land uses in the thousands of acres surrounding the limited

12   project areas, where the forms of recreation Plaintiffs enjoy will remain possible.  *See* First Enriquez

13   Decl. ¶¶ 63-64; Second Enriquez Decl. ¶¶ 46, 66-69.  For this reason, Plaintiffs have not shown that

14   the border wall will prevent their use of neighboring public lands.

15           Nor have Plaintiffs shown they are likely to suffer irreparable harm from lighting that will be

16   installed along the border.  Plaintiffs provide no evidence to suggest that the narrow strip of land

17   immediately adjacent to the proposed barriers is the only location across the entire southern border

18   where they can view the night stars and nocturnal animals.  Nor do Plaintiffs cite any authority for the

19   proposition that the inability to stargaze or observe nocturnal animals in a specific area constitutes

20   irreparable injury, particularly where, as here, there are thousands of acres of nearby land available for

21   those very activities.  In any event, CBP will take steps to minimize light spillage beyond the immediate

22   vicinity of the narrow project areas, including through the installation of light shields.  *See* Second

23   Enriquez Decl. ¶¶ 60-61.  And, because the land is already heavily disturbed—and is thus unlikely to

24   be used as animal habitat—new lighting is not likely to have a significant impact on nocturnal animal

25   species or Plaintiffs' members' ability to enjoy those species.  *See id.* ¶ 61.  Accordingly, Plaintiffs have

26   not shown that lighting on the border will cause irreparable harm to their members' recreational

27   interests in neighboring lands.

28

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

22

**B.** **The Balance of Equities and Public Interest Strongly Weigh Against Injunctive Relief.**

A permanent injunction prohibiting construction of the border barrier projects will cause serious harm to the Government and public interest that significantly outweighs the alleged recreational and aesthetics interests asserted by the Plaintiffs. *See Winter*, 555 U.S. at 23-24.

The Supreme Court has recognized that the Government has "compelling interests in safety and in the integrity of our borders," *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 (1989), but a permanent injunction would prohibit the Government from taking critical steps needed to prevent the continuing surge of illegal drugs from entering the country through the southern border. As the President recently explained in declaring the national emergency, tens of thousands of pounds of illegal drugs are smuggled across the southern border each year and the border is a "major entry point" for "illegal narcotics." *See* Proclamation; Veto Message.  As discussed above, DHS identified the barrier projects at issue because of the high rates of drug smuggling between ports of entry in the Yuma, El Paso, El Centro, and Tucson Sectors. *See supra* at 8.  Indeed, the record establishes that thousands of pounds of illegal drugs are entering the country between ports of entry in these sectors, and explains that existing barriers in these areas have proved ineffective as transnational drug organizations have changed their tactics. *See id.*; *see also* McAleenan Testimony at 2 (drug cartels are using large caravans as diversions to redirect border patrol agents).  A permanent injunction would harm the Government's "strong interest[ ]" in "interdicting the flow of drugs" entering the United States. *United States v. Guzman-Padilla*, 573 F.3d 865, 889 (9th Cir. 2009).

Moreover, the injunction would permanently deprive DoD of its authorization to use the funds at issue to complete the projects, because the funding will lapse at the end of the fiscal year. In addition to prohibiting any actual spending on these projects, a permanent injunction would forbid DoD from obligating approximately $1.1 billion it has transferred for these projects but has not yet obligated via construction contracts. *See* First Declaration of Eric McFadden ¶ 6 (Ex. 12) (May 29, 2019); Second Declaration of Eric McFadden ¶ 6 (Ex. 13) (June 18, 2019).  Unless those funds are obligated by September 30, 2019, this money will no longer remain available to DoD. *See* First McFadden Decl. ¶ 7; Second McFadden Decl. ¶ 7; *see also City of Houston v. Department of Hous.*

*& Urban Dev.*, 24 F.3d 1421, 1424, 1426-27 (D.C. Cir. 1994) (recognizing the "well-settled matter of constitutional law that when an appropriation has lapsed . . . federal courts cannot order the expenditure of funds that were covered by that appropriation"). This harm is particularly acute because the complex and time-consuming process required to obligate the remaining money requires DoD to take multiple steps before the September 30 deadline. *See* First McFadden Decl. ¶¶ 8-10; Second McFadden Decl. ¶¶ 8-10. By contrast, Plaintiffs identify no irreparable injury from the mere obligation of funds, which simply creates a legal liability for the Government to pay for goods or services that would be provided or performed by the contractors. *See Lublin Corp. v. United States*, 84 Fed. Cl. 678, 685 (2008).

In addition, a permanent injunction would force DoD to incur unrecoverable fees and penalties of hundreds of thousands of dollars to its contractors for each day that construction is suspended. *See* First McFadden Decl. ¶¶ 11-19; Second McFadden Decl. ¶¶ 11-19. That money cannot be spent for productive purposes, and will result in significant costs for the Government. *See* First McFadden Decl. ¶¶ 14-15 (estimating costs of $195,000 per day for El Paso Project 1 and $20,000 per day Yuma Project 1); Second McFadden Decl. ¶¶ 14-15 (estimating costs of $235,180 per day for the Tucson projects and $47,000 per day for the El Centro project). These costs will quickly become unsustainable for the Government, and if the contracts remain suspended for too long, DoD will be forced to de-scope or terminate the contracts. *See* First McFadden Decl. ¶ 19; Second McFadden Decl. ¶ 19.

As was the case in *Winter*, the lopsided equitable balance of harms in favor of the Government supports denial of a permanent injunction in this case. *See* 555 U.S. at 23-31.

**VI.    The Court Should Deny Plaintiffs' Request For Overbroad Injunctive and Declaratory Relief, Stay Any Injunction Pending Appeal, and Certify its Final Judgment for Appeal Pursuant to Rule 54(b).**

In the event the Court grants Plaintiffs' request for injunctive and declaratory relief, that relief should be tailored solely to the six specific border projects presently before the Court. *See California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). Plaintiffs argue for much broader relief and request that the Court "declare unlawful the use of any DoD authority to transfer funds for

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

24

construction of border barriers" for "all sections of the border." *See* Pls.' SJ Mot. at 23-24.  But there is no basis for the Court to issue the equivalent of nationwide declaratory or injunctive relief in order to provide complete relief to the Plaintiffs.  *See Azar*, 911 F.3d at 582-83.  The Court should not enjoin or declare unlawful other projects in other locations that are not before it.

Further, if the Court grants Plaintiffs' requested injunction, the Court should stay the order pending appeal.  For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

In addition, the Court should certify its final judgment pursuant to Rule 54(b):  "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."  Here, there is no reason to delay entry of final judgment with respect to the claims related to the funding and construction of the six projects pursuant to § 8005, § 9002, and § 284.  The legal and factual issues do not "intersect and overlap" with the outstanding claims in this case, which focus on separate statutory authorities, and final judgment on these claims will not result in piecemeal appeals on the same sets of facts. *Jewel v. Nat'l Sec. Agency*, 810 F.3d 622, 629-30 (9th Cir. 2015).

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for partial summary judgment, grant Defendants' motion for partial summary judgment, and enter final judgment for Defendants on all claims related to the funding and construction of the border barrier projects identified as El Paso Sector Project 1, Yuma Sector Project 1, El Centro Sector Project 1, and Tucson Sector Projects 1, 2, and 3.  A proposed order is attached.

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

25

DATE:  June 19, 2019

Respectfully submitted,

JAMES M. BURNHAM
Deputy Assistant Attorney General

JOHN G. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/ Andrew I. Warden
ANDREW I. WARDEN
Senior Trial Counsel (IN Bar No. 23840-49)

/s/ Kathryn C. Davis
RACHAEL L. WESTMORELAND
KATHRYN C. DAVIS
MICHAEL J. GERARDI
LESLIE COOPER VIGEN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 616-5084
Fax:    (202) 616-8470

JEFFREY BOSSERT CLARK
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

/s/ Tyler M. Alexander
TYLER M. ALEXANDER
(CA Bar No. 313188)
Natural Resources Section
Trial Attorney
PO Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0238
Fax: (202) 305-0506
tyler.alexander@usdoj.gov