**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

JUL 3 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SIERRA CLUB; SOUTHERN BORDER COMMUNITIES COALITION, | No.   19-16102 <br> 19-16300 |
| Plaintiffs-Appellees, | D.C. No. 4:19-cv-00892-HSG <br> Northern District of California, <br> Oakland |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; et al., | ORDER |
| Defendants-Appellants. | |

Before:  CLIFTON, N.R. SMITH, and FRIEDLAND, Circuit Judges.

Order by Judges Clifton and Friedland

Dissent by Judge N.R. Smith

CLIFTON and FRIEDLAND, Circuit Judges:

This emergency proceeding arises from a challenge to a decision by the

President and certain of his cabinet members (collectively, "Defendants")[1] to

---

[1] When federal officials are parties to litigation, we usually refer to them collectively as "the Government."  That terminology seems inapt in this proceeding given that the question before us is whether the Executive Branch of the federal government is attempting to exercise authority that is allocated by the Constitution to the Legislative Branch of the federal government, and whether the Executive Branch is doing so without authorization from the Legislative Branch.

"reprogram" funds appropriated by Congress to the Department of Defense

("DoD") for Army personnel needs and to redirect those funds toward building a

barrier along portions of our country's southern border.

This reprogramming decision was made after President Trump had

repeatedly sought appropriations from Congress for the construction of a border

barrier.  Although Congress provided some funding for those purposes, it

consistently refused to pass any measures that met the President's desired funding

level, creating a standoff that led to a 35-day partial government shutdown.  The

President signed the budget legislation that ended the shutdown, but he then

declared a national emergency and pursued other means to get additional funding

for border barrier construction beyond what Congress had appropriated.  One of

those means, and the one at issue in this emergency request for a stay, was a

reprogramming of funds by DoD in response to a request by the Department of

Homeland Security ("DHS").

Specifically, DoD relied on section 8005 of the Department of Defense

Appropriations Act of 2019 and related provisions to reprogram approximately

$2.5 billion, moving the funds from DoD to DHS, for the purpose of building

---

And the House of Representatives, which is part of the Legislative Branch, has
filed an amicus brief opposing the Executive Branch's position.  To avoid
confusion, we therefore refer to the President and the cabinet members sued here
collectively as "Defendants."

border barriers in certain locations within Arizona, California, and New Mexico. Section 8005 authorizes the Secretary of Defense to transfer funds for military purposes if the Secretary determines that the transfer is "for higher priority items, based on unforeseen military requirements" and "the item for which funds are requested has [not] been denied by the Congress."  Pub. L. No. 115-245, § 8005, 132 Stat. 2981, 2999 (2018) (hereinafter "section 8005").

The Sierra Club and the Southern Border Communities Coalition (collectively, "Plaintiffs") sued Defendants to enjoin the reprogramming and the funds' expenditure.  They argued that the requirements of section 8005 had not been satisfied and that the use of the funds to build a border barrier was accordingly unsupported by any congressional appropriation and thus unconstitutional.  A federal district court agreed with Plaintiffs and enjoined Defendants from using reprogrammed funds to construct a border barrier. Defendants now move for an emergency stay of the district court's injunction.

To rule on Defendants' motion, we consider several factors, including whether Defendants have shown that they are likely to succeed on the merits of their appeal, the degree of hardship to each side that would result from a stay or its denial, and the public interest in granting or denying a stay.

We conclude, first, that Defendants are not likely to succeed on the merits of their appeal.  The Appropriations Clause of the Constitution provides that "No

Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art I., § 9, cl. 7.  Defendants assert that, through section 8005, Congress authorized DoD to reprogram the funds at issue.  We agree with Plaintiffs, however, that the requirements of section 8005 have not been met. Specifically, the need for which the funds were reprogrammed was not "unforeseen," and it was an item for which funds were previously "denied by the Congress."  Defendants do not argue that their contrary interpretation of section 8005 is entitled to any form of administrative deference, and we hold that no such deference would be appropriate in any event.

Because section 8005 did not authorize DoD to reprogram the funds—and Defendants do not and cannot argue that any other statutory or constitutional provision authorized the reprogramming—the use of those funds violates the constitutional requirement that the Executive Branch not spend money absent an appropriation from Congress.

Defendants contend that these Plaintiffs are unlikely to prevail because they lack a cause of action through which to challenge the reprogramming.  We disagree.  Plaintiffs either have an equitable cause of action to enjoin a constitutional violation, or they can proceed on their constitutional claims under the Administrative Procedure Act, or both.  To the extent any zone of interests test

were to apply to Plaintiffs' constitutional claims, we hold that it would be satisfied here.

Considering the remaining factors relevant to Defendants' request for a stay—the degree of hardship that may result from a stay or its denial, and the public interest at stake—we are not persuaded that a stay should be entered.  There is a strong likelihood that Plaintiffs will prevail in this litigation, and Defendants have a correspondingly low likelihood of success on appeal.  As for the public interest, we conclude that it is best served by respecting the Constitution's assignment of the power of the purse to Congress, and by deferring to Congress's understanding of the public interest as reflected in its repeated denial of more funding for border barrier construction.  We therefore hold that a stay of the district court's order granting Plaintiffs an injunction is not warranted.

## I.    Factual & Procedural Background

President Trump has made numerous requests to Congress for funding for construction of a barrier on the U.S.-Mexico border.  In his proposed budget for Fiscal Year 2018, for example, the President requested $2.6 billion for border security, including "funding to plan, design, and construct a physical wall along the southern border."  Office of Mgmt. & Budget, Exec. Office of the President, *Budget of the United States Government, Fiscal Year 2018*, at 18 (2017).  Congress partially obliged, allocating in the 2018 Consolidated Appropriations Act $1.571

billion for border fencing, "border barrier planning and design," and the

"acquisition and deployment of border security technology."  Consolidated

Appropriations Act, 2018, Pub. L. No. 115-141, div. F, tit. II, § 230(a), 132 Stat.

348, 616 (2018).  Throughout 2018, House and Senate lawmakers introduced

numerous bills that would have authorized or appropriated additional billions for

border barrier construction.  Specifically, Congress considered and rejected the

Securing America's Future Act of 2018, H.R. 4760, 115th Cong. § 1111 (2018)

(instructing the Secretary of Homeland Security to take necessary actions to build a

physical barrier on the southern border); the Border Security and Immigration

Reform Act of 2018, H.R. 6136, 115th Cong. § 5101 (2018) (appropriating

$16.625 billion for a border wall); the American Border Act, H.R. 6415, 115th

Cong. § 4101 (2018) (same); the Fund and Complete the Border Wall Act, H.R.

6657, 115th Cong. § 2 (2018) (creating a "Secure the Southern Border Fund" for

appropriations for border barrier construction); the Build the Wall, Enforce the

Law Act of 2018, H.R. 7059, 115th Cong. § 9 (2018) (again, appropriating

$16.625 billion for a "border wall system"); the 50 Votes for the Wall Act, H.R.

7073, 115th Cong. § 2 (2018) (establishing a "Border Wall and Security Trust

Fund" of up to $25 billion to "construct a wall (including physical barriers and

associated detection technology, roads, and lighting)" along the U.S.-Mexico

border); and the WALL Act of 2018, S. 3713, 115th Cong. § 2 (2018)

(appropriating $25 billion for the construction of a border wall).  Lawmakers spent countless hours considering these various proposals, but none ultimately passed.

The situation reached an impasse in December 2018.  During negotiations with Congress over an appropriations bill to fund various parts of the federal government for the remainder of the fiscal year, the President announced his unequivocal position that "any measure that funds the government must include border security."  C-SPAN, *Farm Bill Signing* (Dec. 20, 2018), https://www.c-span.org/video/?456189-1/president-government-funding-bill-include-money-border-wall.  He declared that he would not sign any funding bill that did not allocate substantial funding for a physical barrier on the U.S.-Mexico border.  Erica Werner et al., *Trump Says He Won't Sign Senate Deal to Avert Shutdown, Demands Funds for Border Security*, Wash. Post (Dec. 21, 2018), https://wapo.st/2EIpkHu?tid=ss_tw&utm_term=.6e7c259f6857 ("Werner et al.").  The President also stated that he was willing to declare a national emergency and use other mechanisms to get the money he desired if Congress refused to allocate it.  *Remarks by President Trump in Meeting with Senate Minority Leader Chuck Schumer and House Speaker-Designate Nancy Pelosi*, The White House (Dec. 11, 2018, 11:40 A.M.), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-senate-minority-leader-chuck-schumer-house-speaker-designate-nancy-pelosi/.  On December 20, 2018, the House of Representatives

passed a continuing resolution that allocated $5.7 billion in border barrier funding. H.R. 695, 115th Cong. § 141 (2018) ("[T]here is appropriated for 'U.S. Customs and Border Protection—Procurement, Construction, and Improvements' $5,710,357,000 for fiscal year 2019."). But the Senate rejected the bill. The President could not reach an agreement with lawmakers on whether the spending bill would include border barrier funding, triggering what would become the nation's longest partial government shutdown. Werner et al., *supra*; Mihir Zaveri et al., *The Government Shutdown Was the Longest Ever. Here's the History.*, N.Y. Times (Jan. 25, 2019), https://nyti.ms/2RATHG9.

On January 6, 2019, during the shutdown, the President "request[ed] $5.7 billion for construction of a steel barrier for the Southwest border" in a letter to the Senate Committee on Appropriations, explaining that the request "would fund construction of a total of approximately 234 miles of new physical barrier," including in the top ten priority areas in the Border Security Improvement Plan created by Customs and Border Protection ("CBP"). Letter from Russell T. Vought, Acting Dir. of the Office of Mgmt. and Budget, to Richard Shelby, Chairman of the Senate Comm. on Appropriations (Jan. 6, 2019). This represented a $4.1 billion increase over the President's February 2018 request for $1.6 billion for the Fiscal Year 2019 budget, which had been for the construction of "65 miles

of border wall in south Texas."  Office of Mgmt. & Budget, Exec. Office of the President, *Budget of the U.S. Government, Fiscal Year 2019*, 58 (2018).

After 35 days, the government shutdown ended without an agreement providing increased border barrier funding.  Remarks Delivered by President Trump on the Government Shutdown (Jan. 25, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-government-shutdown/.  Congress passed and the President signed a stopgap spending measure to reopen for three weeks the parts of the Government that had been shut down.  H.R.J. Res. 28, 116th Cong. (2019).  But the President made clear that he still intended to build a border barrier, with or without funding from Congress.  As the Acting White House Chief of Staff explained, the President was prepared to both reprogram money and declare a national emergency to obtain a total sum "well north of $5.7 billion."  Gregg Re, *Border Wall Talks Break Down Ahead of Second Possible Government Shutdown*, Fox News (Feb. 10, 2019), https://fxn.ws/2SmNK0I.

Congress passed the Consolidated Appropriations Act of 2019 ("CAA") on February 14, 2019, which included the Department of Homeland Security Appropriations Act for Fiscal Year 2019.  Pub. L. No. 116-6, div. A, 133 Stat. 13 (2019).  The CAA appropriated only $1.375 billion of the $5.7 billion the President had sought in border barrier funding and specified that the $1.375 billion was "for

the construction of primary pedestrian fencing . . . in the Rio Grande Valley Sector." *Id.* § 230(a)(1), 133 Stat. at 28.  Congress also imposed several limitations on the use of those funds, including by not allowing construction within certain wildlife refuges and parks.  *Id.* § 231, 133 Stat. at 28.

The President signed the CAA into law the following day.  *Statement by the President*, The White House (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/statement-by-the-president-28/. He concurrently issued a proclamation under the National Emergencies Act, 50 U.S.C. §§ 1601-1651, "declar[ing] that a national emergency exists at the southern border of the United States." Proclamation No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) ("Proclamation No. 9844").

Proclamation No. 9844 described "a border security and humanitarian crisis that threatens core national security interests" because the border served as a major entry point for criminals, gang members, and illicit narcotics and the number of family units entering the United States had recently increased.  *Id.*  It declared this "emergency situation" necessitated support from the Armed Forces.  *Id.*  The proclamation made available to DoD "the construction authority provided in" 10 U.S.C. § 2808, which is limited to presidential declarations "that require[] use of the armed forces," *id.* § 2808(a).

An accompanying White House Fact Sheet explained that the President was "using his legal authority to take Executive action to secure additional resources" to build a border barrier. *President Donald J. Trump's Border Security Victory*, The White House (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory/. It continued: "Including funding in Homeland Security appropriations, the Administration has so far identified up to $8.1 billion that will be available to build the border wall once a national emergency is declared and additional funds have been reprogrammed." *Id.* The fact sheet specifically identified three funding sources: (1) "[a]bout $601 million from the Treasury Forfeiture Fund," 31 U.S.C. § 9705(a); (2) "[u]p to $2.5 billion under the Department of Defense [reprogrammed] funds transferred [to DHS] for Support for Counterdrug Activities" pursuant to 10 U.S.C. § 284 ("section 284");[2] and (3) "[u]p to $3.6 billion reallocated from [DoD] military construction projects under the President's

---

[2] Title 10, Chapter 15 of the U.S. Code describes various forms of military support for civilian law enforcement agencies. Within that chapter, section 284 authorizes the Secretary of Defense to "provide support for the counterdrug activities . . . of any other department or agency of the Federal Government" if it receives a request from "the official who has responsibility for the counterdrug activities." 10 U.S.C. §§ 284(a), 284(a)(1)(A). The statute permits, among other things, support for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b)(7). DoD's provision of support for other agencies pursuant to section 284 does not require the declaration of a national emergency.

declaration of a national emergency" pursuant to 10 U.S.C. § 2808 ("section 2808"), which provides that the Secretary of Defense may authorize military construction projects whenever the President declares a national emergency that requires use of the armed forces. *Id.*

The House and Senate adopted a joint resolution terminating the President's declaration of a national emergency pursuant to Congress's authority under 50 U.S.C. § 1622(a)(1). H.R.J. Res. 46, 116th Cong. (2019). The President vetoed the joint resolution, *Veto Message to the House of Representatives for H.J. Res. 46*, The White House (Mar. 15, 2019), https://www.whitehouse.gov/briefings-statements/veto-message-house-representatives-h-j-res-46/, and a vote in the House to override the veto fell short of the required two-thirds majority, 165 Cong. Rec. H2799, H2814-15 (2019).

Almost immediately, executive branch agencies began to use the funds identified in Proclamation 9844 for border barrier construction. The same day the President issued the proclamation, the Department of the Treasury approved DHS's December 2018 request to use treasury forfeiture funds to enhance border security infrastructure, providing up to $601 million in funding.[3] Letter from

---

[3] The three funding sources the White House had identified were to "be used sequentially and as needed." *President Donald J. Trump's Border Security Victory*, The White House (Feb. 15, 2019). In other words, the government first began spending the treasury forfeiture funds, followed by DoD funding

David F. Eisner, Assistant Sec'y for Mgmt., U.S. Dep't of the Treasury, to the House and Senate Appropriations Comms.' Subcomms. on Fin. Servs. & Gen. Gov't (Feb. 15, 2019).  Then, on February 25, DHS submitted a request to DoD for assistance, pursuant to section 284, with construction of fences, roads, and lighting within eleven drug-smuggling corridors identified by DHS along the border. Memorandum re: Request for Assistance Pursuant to 10 U.S.C. § 284 from Christina Bobb, Exec. Sec'y, DHS, to Capt. Hallock N. Mohler, Jr., Exec. Sec'y, DoD, (Feb. 25, 2019).  In response to that request, on March 25, the Acting Secretary of Defense, Patrick Shanahan, approved the transfer of up to $1 billion in funds from DoD to DHS for the three highest priority drug-smuggling corridors: the Yuma Sector Project 1 and Yuma Sector Project 2 in Arizona, and the El Paso Sector Project 1 in New Mexico.[4]  Letter from Patrick M. Shanahan, Acting Sec'y of Def., DoD, to Kirstjen Nielsen, Sec'y of Homeland Sec., DHS (Mar. 25, 2019).

   To fund the approved projects, Shanahan invoked section 8005 of the Department of Defense Appropriations Act of 2019 and section 1001 of the John S. McCain National Defense Authorization Act ("NDAA") for Fiscal Year 2019 to "reprogram" approximately $1 billion from Army personnel funds to the

---

reprogrammed under section 8005 and transferred to DHS pursuant to section 284, and finally military construction funds reallocated under section 2808.
   [4] The U.S. Army Corps of Engineers, which is tasked with initial project scoping and construction, has since decided not to fund or construct Yuma Project 2 under § 284.

counter-narcotics support budget, which Shanahan asserted then made those funds available for transfer to DHS pursuant to section 284.  Section 8005 authorizes the Secretary of Defense to transfer up to $4 billion "of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction)."  The Secretary must first determine that "such action is necessary in the national interest" and obtain approval from the White House Office of Management and Budget.  Section 8005 further provides that the authority to transfer may only be used "for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress."[5]  It also imposes a "prompt[]" congressional notification requirement for all transfers made under its authority.  Reprogramming of funds under section 8005 does not require the declaration of a national emergency.

A memo from Shanahan asserted that the statutory requirements for reprogramming under section 8005 had been met: that the items to be funded were a higher priority than the Army personnel funds; that the need to provide support for the Yuma and El Paso Projects was "an unforeseen military requirement not

---

[5] Equivalent language restricting the circumstances in which reprogramming is permitted has been included in defense appropriations statutes since 1974.  *See* Pub. L. No. 93-238, § 735, 87 Stat. 1026, 1044 (1974); H.R. Rep. No. 93-662, at 16 (1973).

known at the time of the FY 2019 budget request"; and that support for construction of the border barrier in these areas "ha[d] not been denied by Congress."  Memorandum re: Funding Construction in Support of the Department of Homeland Security Pursuant to 10 U.S.C. § 284 from Patrick M. Shanahan, Acting Sec'y of Def., DoD, to Under Sec'y of Def. (Comptroller)/Chief Fin. Officer (Mar. 25, 2019).  Specifically, DoD concluded that "Army personnel funds were available for transfer because expenditures for service member pay and compensation, retirements benefits, food, and moving expenses through the end of fiscal year 2019 [would] be lower than originally budgeted."  As required by section 8005, Shanahan also formally notified Congress of the reprogramming authorization, explaining that the reprogrammed funds were "required" so that DoD could provide DHS the support it requested under section 284.[6]

The next day, both the House Committee on Armed Services and the House Committee on Appropriations formally disapproved of DoD's section 8005 reprogramming.  The Armed Services Committee wrote in a letter to DoD that it "denie[d] this [reprogramming] request," and that the committee "[did] not approve the proposed use of Department of Defense funds to construct additional

---

[6] DoD had previously adhered to a "gentlemen's agreement" with Congress where it sought approval from the relevant committees *before* reprogramming funds, rather than simply notifying them after the decision had been finalized. House Armed Services Committee Holds Hearing on Fiscal 2020 Defense Authorization, CQ Cong. Transcripts (Mar. 26, 2019).

physical barriers and roads or install lighting in the vicinity of the United States border." Letter from Adam Smith, Chairman of the U.S. House of Representatives Comm. on Armed Servs., to David L. Norquist, Under Sec'y of Def., Comptroller, and Chief Fin. Officer (Mar. 26, 2019). The Appropriations committee similarly denied the reprogramming request. Letter from Peter J. Visclosky, Chairman of the Def. Subcomm. of the U.S. House of Representatives Comm. on Appropriations (Mar. 26, 2019).

Officials at DoD and DHS pressed forward with reprogramming-enabled border barrier construction plans. In early April, DoD awarded contracts for work in the Yuma and El Paso Project areas, and the agencies began environmental planning and consultation. *Contracts for Apr. 9, 2019*, U.S. Dep't of Def. (Apr. 9, 2019), https://dod.defense.gov/News/Contracts/Contract-View/Article/1809986/.

Meanwhile, Shanahan reported on May 8 that DoD and DHS had secured funding for DHS to build about 256 miles of border barrier using both treasury forfeiture funds and reprogrammed monies. *Acting Defense Secretary Shanahan Testimony on Fiscal Year 2020 Budget Request* (C-SPAN May 8, 2019), https://www.c-span.org/video/?460437-1/acting-defensesecretary-shanahan-testifies-2020-budget-request. DoD also reported selecting twelve companies to compete for up to $5 billion worth of border barrier construction contracts. *Contracts for May 8, 2019*, U.S. Dep't of Def. (May 8, 2019),

https://dod.defense.gov/News/Contracts/Contract-View/Article/1842189/.  On May

9, Shanahan invoked section 8005 and section 1001 of the NDAA again—along

with related reprogramming provisions, section 9002 of the Department of Defense

Appropriations Act of 2019 and section 1512 of the NDAA[7]—to authorize an

additional $1.5 billion in reprogramming to fund four more projects.

Memorandum re: Additional Support to the Dep't of Homeland Security from

Patrick M. Shanahan, Acting Sec'y of Def., DoD (May 9, 2019).  The new

projects, El Centro Project 1 and Tucson Sector Projects 1, 2, and 3, are located in

California and Arizona.  Around the same time, the President indicated that he

expected to approve additional projects using funds authorized by the national

emergency declaration pursuant to section 2808, although no concrete action has

---

[7] Section 9002 of the Department of Defense Appropriations Act of 2019 authorizes the Secretary of Defense to transfer up to $2 billion between the appropriations or funds made available to DoD if he determines "that such action is necessary in the national interest" and obtains approval from the Office of Management and Budget.  Pub. L. No. 115-245, § 9002, 132 Stat 2981, 3042 (2018).  Section 9002 "is subject to the same terms and conditions as the authority provided in section 8005."  *Id.*  Section 1512 of the NDAA likewise provides a special transfer authority for up to $3.5 billion upon determination that it is "necessary in the national interest," and, under section 1001 of the NDAA, is subject to identical terms and conditions as 8005.  Pub. L. No. 115-232, § 1512, 132 Stat. 1636, 2096 (2018).  Because it is uncontested that all of these reprogramming provisions are subject to section 8005's requirements, we refer to these requirements collectively by reference to section 8005.  *See* Order Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment, *Sierra Club v. Trump*, No. 19-cv-00892-HSG, 2019 WL 2715422, at *2 (N.D. Cal. June 28, 2019).

been taken in that regard.  *See* White House Memorandum on Sequencing of

Border Barrier Construction Authorities (Mar. 4, 2019).

On February 19, 2019, the Sierra Club and Southern Border Communities

Coalition filed a lawsuit against Donald J. Trump, in his official capacity as

President of the United States; Patrick M. Shanahan, in his official capacity as

Acting Secretary of Defense; Kirstjen M. Nielsen, in her official capacity as

Secretary of Homeland Security; and Steven Mnuchin, in his official capacity as

Secretary of the Treasury (collectively, "Defendants," *see supra* n.1).[8]  This

lawsuit followed closely on the heels of a related action brought by a coalition of

states against the same group of Defendants and others.

Plaintiffs are two nonprofit organizations who sued on behalf of themselves

and their members.  The Sierra Club is dedicated to enjoyment of the outdoors and

environmental protection, and it engages in advocacy and public education on

issues such as habitat destruction, land use, and the human and environmental

impact of construction projects, including the proposed construction of the border

barrier.  SBCC is a program of Alliance San Diego that brings together

organizations from California, Arizona, New Mexico, and Texas to promote

---

[8] The current Acting Secretary of Defense, Mark Esper, has been automatically substituted for Shanahan.  The current Acting Secretary of Homeland Security, Kevin K. McAleenan, has been automatically substituted for Nielsen.

policies aimed at improving the quality of life in border communities, including border enforcement and immigration reform policies.

Plaintiffs' operative Complaint alleges that Defendants exceeded the scope of their constitutional and statutory authority by spending money in excess of what Congress allocated for border security; that Defendants' actions violated separation of powers principles as well as the Appropriations Clause and Presentment Clause of the Constitution; and that Defendants failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. Plaintiffs also allege that Defendants are acting *ultra vires* (without authority) in seeking to divert funding without statutory authority to do so.

Plaintiffs allege that Defendants' use of the reprogrammed funds would injure their members because the noise of construction, additional personnel, visual blight, and negative ecological effects that would accompany a border barrier and its construction would detract from their ability to hike, fish, enjoy the desert landscapes, and observe and study a diverse range of wildlife in areas near the U.S.-Mexico border. Plaintiffs also allege that they participated in the legislative process by "devot[ing] substantial staff and other resources towards legislative advocacy leading up to the appropriations bill passed by Congress in February 2019, specifically directed towards securing Congress's denial of substantial funding to the border wall." The Complaint requests declaratory and permanent

injunctive relief to prevent construction of the border barrier using the funding at issue in the lawsuit.

On April 4, Plaintiffs filed a motion for a preliminary injunction, asking the district court to enter a "preliminary injunction prohibiting Defendants and all persons associated with them from taking action to build a border wall using funds or resources from the Defense Department; and specifically enjoining construction of the wall segments in the . . . 'Yuma Sector Projects 1 and 2 and El Paso Sector Project 1 [areas].'"  In particular, Plaintiffs moved to enjoin Defendants from using DoD's reprogramming authority in section 8005 to transfer funds from Army personnel into the counterdrug appropriations line, from subsequently using section 284 to divert those funds from DoD's counterdrug appropriations line to be used by DHS for border barrier construction, from invoking section 2808 to divert funds appropriated to military construction projects, and from taking any further action before complying with NEPA's procedural requirements.  Plaintiffs argued that a preliminary injunction was necessary because Defendants had already diverted funds, and that Plaintiffs would be irreparably harmed if Defendants proceeded with their threatened construction during the pendency of the district court proceedings.  After receiving briefing from both sides, the district court held a multiple-hour hearing on May 17, 2019.

On May 24, the district court issued an order granting the motion in part and denying it in part. *Sierra Club v. Trump*, No. 4:19-cv-00892-HSG, 2019 WL 2247689 (N.D. Cal. May 24, 2019).  After concluding that Plaintiffs had standing to bring their challenge, the district court held that Plaintiffs were entitled to a preliminary injunction with respect to the section 8005 reprogramming authority because they would likely succeed in arguing that Defendants acted *ultra vires*, they had demonstrated that they would be irreparably harmed, and the balance of equities weighed in their favor. *Id.* at *13-23, *27-28, *29.  The court declined to rule on Plaintiffs' likelihood of success on their section 2808 arguments, however, because Defendants had not yet disclosed a plan for diverting funds under that authority. *Id.* at *25, *28-29.  Finally, the court concluded that Plaintiffs were unlikely to succeed on their NEPA argument. *Id.* at *26.  It accordingly granted the following preliminary injunction:

> Defendants Patrick M. Shanahan, in his official capacity as Acting Secretary of Defense, Kevin K. McAleenan, in his official capacity as Acting Secretary of Homeland Security, Steven T. Mnuchin, in his official capacity as Secretary of the Department of the Treasury, and all persons acting under their direction, are enjoined from taking any action to construct a border barrier in the areas Defendants have identified as Yuma Sector Project 1 and El Paso Sector Project 1 using funds reprogrammed by DoD under Section 8005 of the Department of Defense Appropriations Act, 2019.

*Id.* at 30.[9]

Defendants filed a motion in the district court to stay the preliminary injunction pending appeal. The district court denied that motion, concluding that Defendants were unlikely to prevail on the merits and that the "request to proceed immediately with the enjoined construction would not preserve the status quo" but rather would "effectively moot [Plaintiffs'] claims." *Sierra Club v. Trump*, No. 4:19-cv-00892-HSG, 2019 WL 2305341, at *1 (N.D. Cal. May 30, 2019).

On June 3, 2019, Defendants filed an emergency motion with this court requesting a stay pending appeal. Defendants implored our court to act as quickly as possible because they were incurring daily fees and penalties from contractors due to the suspension of construction and because, if the injunction remained in place, Defendants would need to begin the process of reprogramming the funds again by the end of June or else face the risk of being deprived of the use of those funds entirely.[10]

---

[9] The district court simultaneously denied the motion for a preliminary injunction in the related case brought by states, explaining that there was no likelihood of irreparable injury once it had granted the injunction in the *Sierra Club* case. *See State v. Trump*, No. 4:19-cv-00872-HSG, 2019 WL 2247814, at *17 (N.D. Cal. May 24, 2019).

[10] We note that Defendants did not file any motion to expedite the appeal itself, and as explained below, actually filed a motion to delay the expedited briefing schedule our court had issued for the preliminary injunction appeal, asking us to let the parties wait until *after* further anticipated decisions in the district court and our court's decision on their stay motion to propose a new briefing schedule that could govern "any" full appeal.

Initial briefing on the stay motion was completed on June 14, and we heard oral argument on June 20.  On June 24, we requested supplemental briefing from the parties on issues that arose during oral argument but that had not been briefed. That briefing was completed on June 28.

Meanwhile, proceedings continued in the district court.  On May 29, Plaintiffs filed a motion for a supplemental preliminary injunction to block the additional planned construction in California and Arizona using funds reprogrammed under sections 8005 and 9002 of the Department of Defense Appropriations Act of 2019, as well as section 1512 of the 2019 NDAA.  Plaintiffs acknowledged that the motion "present[ed] virtually identical legal questions regarding whether the proposed plan for funding border barrier construction exceeds the Executive Branch's lawful authority" to the ones that the court had decided in its May 24 order granting in part Plaintiffs' motion for a preliminary injunction.  On June 12, 2019, Plaintiffs moved for partial summary judgment, seeking a permanent injunction based on the same arguments made in their initial and supplemental motions for a preliminary injunction.  Defendants cross-moved for summary judgment, resting on the same arguments they had made against the preliminary injunction.  Briefing on those motions was completed on June 24.

On June 28, the district court issued an order granting in part and denying in part Plaintiffs' motion for partial summary judgment, and denying Defendants'

cross-motion for partial summary judgment.  *Sierra Club v. Trump*, No.

4:19-cv-00892-HSG, 2019 WL 2715422 (N.D. Cal. June 28, 2019).  In that order,

the court issued a permanent injunction prohibiting Defendants from using

reprogrammed funds to construct a border barrier in the El Paso and Yuma Sectors

(the subject of the initial preliminary injunction) as well as the more recently-

announced El Centro and Tucson Sector areas (the subject of the motion for a

supplemental preliminary injunction).[11]  *Id.* at *6.  The district court concluded that

Plaintiffs' legal challenge was meritorious, that Plaintiffs had shown that they

would suffer irreparable harm absent a permanent injunction, and that the balance

of hardships and the public interest supported a permanent injunction.  *Id.* at *4-5.

The court heeded Defendants' request to certify the judgment for immediate

---

[11] The terms of the permanent injunction are identical to those of the preliminary injunction, but it also covers funds reprogrammed under sections 8005 and 9002 for construction in the El Centro and Tucson sectors.  In full, the permanent injunction states:

> Defendants Mark T. Esper, in his official capacity as Acting Secretary of Defense, Kevin K. McAleenan, in his official capacity as Acting Secretary of Homeland Security, Steven T. Mnuchin, in his official capacity as Secretary of the Department of the Treasury, and all persons acting under their direction, are enjoined from taking any action to construct a border barrier in the areas Defendants have identified as El Paso Sector 1, Yuma Sector 1, El Centro Sector, and Tucson Sectors 1–3 using funds reprogrammed by DoD under Sections 8005 and 9002 of the Department of Defense Appropriations Act, 2019.

*Sierra Club*, 2019 WL 2715422, at *6.

appeal, *see* Fed. R. Civ. P. 54(b), and it denied Defendants' request to stay the injunction pending appeal. *Id.* at *5-6.

Defendants filed an immediate notice of appeal from that decision. At Defendants' request, we consolidated their new appeal with the pending appeal of the preliminary injunction. Defendants now seek a stay of the permanent injunction pending appeal, resting on the same arguments they made about the preliminary injunction because the underlying legal questions are identical.

## II.    Issues Not Before the Court

Before turning to the merits, we highlight what is not at issue in this appeal. First, Defendants at oral argument acknowledged that they are "not challenging [Article III] standing for purposes of the stay motion." Thus, Defendants do not dispute that Plaintiffs have suffered an "actual or imminent," "concrete and particularized," "injury in fact" that is "fairly traceable" to Defendants' actions and that will "likely" be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotation marks and alterations omitted); *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). We have satisfied ourselves that Defendants' assessment is correct. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (discussing a court's *sua sponte* obligation to assure itself that it has jurisdiction before proceeding to the merits). Plaintiffs have alleged enough to satisfy the requirements for standing

under Article III at this stage of the litigation.  *Id.* at 181-83 (holding that the plaintiffs' injuries from environmental harm were sufficient for standing).

Second, although Defendants may have access to other funding sources to build a border barrier, the only source at issue in this stay motion is section 8005 reprogramming.[12]  The district court's preliminary injunction order discussed various other potential sources, including the Treasury Forfeiture Fund and money reallocated after a national emergency declaration for "military construction projects" under section 2808.  *Sierra Club v. Trump*, No. 4:19-cv-00892-HSG, 2019 WL 2247689, at *11 (N.D. Cal. May 24, 2019).  The injunction, however, only concerns section 8005 reprogramming for border barrier construction in Yuma Sector Project 1, El Paso Sector 1, El Centro Sector 1, and Tucson Sectors 1-3.  We have not been asked to expand the scope of the injunction, and the parties have not addressed in this stay motion any non-section 8005 funding sources.  Accordingly, our decision does not address any sources of funds Defendants might use to build a border barrier except those reprogrammed under section 8005.

Third, as the district court observed in the preliminary injunction order,

> The case is not about whether the challenged border
> barrier construction plan is wise or unwise.  It is not

---

[12] As noted above, the parties do not contest that the related reprogramming provisions—section 9002 of the Department of Defense Appropriations Act of 2019 and section 1512 of the NDAA—are subject to section 8005's requirements. We accordingly refer to these requirements collectively by reference to section 8005.

> about whether the plan is the right or wrong policy
> response to existing conditions at the southern border of
> the United States.  These policy questions are the subject
> of extensive, and often intense, differences of opinion,
> and this Court cannot and does not express any view as to
> them.

*Sierra Club,* 2019 WL 2247689, at *1.  Our consideration is limited to legal

questions regarding the authority of the Executive Branch under the Constitution

and under statutes enacted into law by Congress.

### III.    Justiciability

Defendants have not argued that jurisdiction over this action is lacking.  Nor

have they asserted that Plaintiffs' challenge to the section 8005 reprogramming

presents a nonjusticiable "political question."  They have contended, however, that

"[t]he real separation-of-powers concern is the district court's intrusion into the

budgeting process," which "is between the Legislative and Executive Branches—

not the judiciary."  We consider, therefore, whether it is appropriate for the courts

to entertain Plaintiffs' action in the first place.  We conclude that it is.

"Cases" and "controversies" that contain "a textually demonstrable

constitutional commitment of the issue to a coordinate political department," *Baker*

*v. Carr*, 369 U.S. 186, 217 (1962), or "revolve around policy choices and value

determinations constitutionally committed for resolution to the halls of Congress or

the confines of the Executive Branch," *Japan Whaling Ass'n v. Am. Cetacean Soc.*,

478 U.S. 221, 230 (1986), present a "narrow exception" to our responsibility to

decide cases properly before us, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012).

Nowhere does the Constitution grant Congress the exclusive ability to determine whether the Executive Branch has violated the Appropriations Clause. *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990).  Nor does the Constitution leave the Executive Branch to police itself.  Rather, the judiciary "appropriately exercises" its constitutional function "where the question is whether Congress or the Executive is 'aggrandizing its power at the expense of another branch.'"  *Zivotofsky*, 566 U.S. at 197 (quoting *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991)).

The current action does not ask us to decide whether the projects for which Defendants seek to reprogram funds are worthy or whether, as a policy judgment, funds should be spent on them.  Instead, we are asked whether the reprogramming of funds is consistent with the Appropriations Clause and section 8005.  That "is a familiar judicial exercise."  *Id*. at 196.

Chief Justice Marshall's answer to "whether the legality of an act of the head of a department be examinable in a court of justice" or "only politically examinable" remains the same: "[W]here a specific duty is assigned by law, and individual rights depend upon the performance of that duty, . . . the individual who considers himself injured, has a right to resort to the laws of his country for a

remedy." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165-66 (1803).  Pursuant to

its exclusive power of appropriation, Congress imposed on the Executive Branch a

duty—contained in section 8005—not to transfer funds unless certain

circumstances were present.  As discussed above, *see supra* Section II, Defendants

have not disputed that Plaintiffs have sufficiently alleged injuries that satisfy

Article III's standing requirement to enable them to pursue this action.  Although

"our decision may have significant political overtones," *Japan Whaling Ass'n*, 478

U.S. at 230, "courts cannot avoid their responsibility merely 'because the issues

have political implications,'" *Zivotofsky*, 566 U.S. at 196 (quoting *INS v. Chadha*,

462 U.S. 919, 943 (1983)).  In sum, it is appropriate for this action to proceed in

federal court.

## IV.   Stay Standards

We decide whether to issue a stay by considering four factors, reiterated by

the Supreme Court in *Nken v. Holder*, 556 U.S. 418 (2009):

> (1) whether the stay applicant has made a strong showing that he is
> likely to succeed on the merits; (2) whether the applicant will be
> irreparably injured absent a stay; (3) whether issuance of the stay will
> substantially injure the other parties interested in the proceeding; and
> (4) where the public interest lies.

*Id.* at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  The first two

factors "are the most critical," and we only reach the last two "[o]nce an applicant

satisfies the first two factors."  *Id.* at 434-35.

The requirement that an applicant for a stay make a "strong showing" may be explained at least in part by the fact that "[a] stay is not a matter of right, even if irreparable injury might otherwise result." *Id.* at 433 (quoting *Virginian Ry. Co. v. United States,* 272 U.S. 658, 672 (1926)).  Indeed, "[a] stay is an intrusion into the ordinary processes of administration and judicial review." *Id.* at 427 (quotation marks omitted).  Issuing a stay is therefore "an exercise of judicial discretion" not to be issued "reflexively," but rather based on the circumstances of the particular case. *Id.* at 427, 433.  "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id*. at 433-34.  Here, Defendants carry those burdens because it is Defendants who have sought a stay.

That being said, the unusual circumstances of this case complicate our typically restrained approach to assessing the merits in this procedural posture.  When deciding whether to issue a stay, we usually speak about the merits in probabilistic "likelihood" terms, in part because we recognize that the "ordinary processes of administration and judicial review" best ensure "careful review and a meaningful decision." *Id.* at 427 (quotation marks omitted).  Particularly given a recent increase in emergency petitions asking for injunctive relief or stays of injunctive relief, we think it is especially important for courts to strive to follow the traditional process of judicial review.  Otherwise, we are forced to decide "justice on the fly." *Id.*

Here, however, both sides contend that we must evaluate the merits of this case now to preserve their interests—both agree that there is no time for the "ordinary" course of appellate review.[13]  As Defendants represented in their briefing and again at oral argument, if the injunction remains in place, DoD's authority to spend the remaining challenged funds on border barrier construction, or to redirect them for other purposes, will lapse.  At the same time, as the district court noted, allowing Defendants to move forward with spending the funds will allow construction to begin, causing immediate, and likely irreparable, harm to Plaintiffs.  *Sierra Club v. Trump*, No. 4:19-cv-00892-HSG, 2019 WL 2247689, at *27-28 (N.D. Cal. May 24, 2019).  In either scenario, many of the issues in this case may become moot or largely moot before fuller litigation of the appeal can be completed.  Accordingly, we proceed to evaluate the merits more fully than we otherwise might in response to a stay request.[14]

---

[13] The dissent suggests that we should not be analyzing the merits at this stage because there will be a fuller appeal later.  Dissent at 2 n.1.  That argument depends on disbelieving Defendants' assertions that the Executive Branch will lose its ability to spend the reprogrammed money by the beginning of July, if not earlier.  To the extent Defendants' representations about their imminent injury are not credible, Defendants certainly do not deserve the equitable relief of a stay.

[14] In an appeal from a district court's grant of a permanent injunction, we may "affirm the district court on any ground supported by the record."  *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 608 (9th Cir. 2000) (quoting *Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*, 810 F.2d 869, 874 (9th Cir. 1987)).  Evaluating whether Defendants have a likelihood of

## V.     Likelihood of Success on the Merits

In their operative Complaint, Plaintiffs framed their claim in various ways. Plaintiffs asserted constitutional claims based on violations of separation of powers principles, the Appropriations Clause, and the Presentment Clause; a claim that Defendants acted *ultra vires*; and a statutory claim under the Consolidated Appropriations Act of 2019.[15]  Because we conclude that Plaintiffs' claim is, at its core, one alleging a constitutional violation, we focus on that issue.  More than one legal doctrine offers Plaintiffs a cause of action to raise that claim, and Plaintiffs' success under each depends on whether Defendants' actions indeed violate the Constitution.

### A. Plaintiffs' Constitutional Claim

The Constitution's Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.  In addition to safeguarding "the public treasure, the common fund of all," and providing "a most useful and salutary check upon . . . corrupt influence and public peculation," it ensures that the "the executive [does not] possess an unbounded power over the public purse of the nation."  3 Joseph

---

success on appeal therefore requires assessing whether there are clear grounds for affirmance supported by the record.

[15] Plaintiffs also separately asserted a NEPA claim.  The parties have not made any arguments about the NEPA claim in these stay proceedings, so we do not address it.

Story, *Commentaries on the Constitution of the United States* § 1342 (Boston,

Hilliard, Gray & Co. ed. 1833).

This approach to the power of the purse comported with the Founders'

"declared purpose of separating and dividing the powers of government," namely

"to 'diffus[e] power the better to secure liberty.'"  *Bowsher v. Synar*, 478 U.S. 714,

721 (1986) (alteration in original) (quoting *Youngstown Sheet & Tube Co. v.*

*Sawyer,* 343 U.S. 579, 635 (1952) (Jackson, J., concurring)); *see also INS v.*

*Chadha*, 462 U.S. 919, 949-50 (1983) (collecting sources and explaining the

Founders' belief in "the need to divide and disperse power in order to protect

liberty").  In response to critiques that his proposed Constitution would

dangerously concentrate power in a single central government, James Madison

argued that the risk of abuse of such power was low because "the sword and purse

are not to be given to the same member" of the government.  3 *Debates in the*

*Several State Conventions on the Adoption of the Federal Constitution* 393

(Jonathan Elliot ed., 2d ed. 1836).  Instead, Madison explained that "[t]he purse is

in the hands of the representatives of the people," who "have the appropriation of

all moneys."  *Id.*

Plaintiffs' principal legal theory is that Defendants seek to spend funds for a

different purpose than that for which Congress appropriated them, thereby

violating the Appropriations Clause.[16]  Defendants' defense to this claim is that,

through section 8005, Congress allowed Defendants to make this reallocation.  If

Defendants were correct that section 8005 allowed this spending reallocation,

Plaintiffs' claim would fail, because the spending would be consistent with

Congress's appropriation legislation.  If section 8005 does not authorize the

reallocation, however, then Defendants are acting outside of any statutory

appropriation and are therefore spending funds contrary to Congress's

appropriations decisions.  We believe Plaintiffs are correct that there is no statutory

appropriation for the expenditures that are the subject of the injunction.

Reprogramming and spending those funds therefore violates the Appropriations

Clause.

## 1. Section 8005's Meaning

Defendants argue that they are likely to prevail on appeal because Congress

has authorized DoD to reprogram funds, the planned use of funds is consistent with

that reprogramming authorization, and this spending is therefore authorized by an

appropriation from Congress as the Appropriations Clause requires.  We disagree.

---

[16] Throughout this litigation, Plaintiffs' claim has been framed in various ways.  The lack of compliance with section 8005 has sometimes been labeled *ultra vires* as outside statutory authority or as outside the President's Article II powers, and spending without an appropriation has been described as a violation of the Appropriations Clause.  However their claim is labeled, Plaintiffs' theory is ultimately the same.

DoD's proposed expenditures are not authorized by the applicable reprogramming statute. They therefore are not "in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

At bottom, this constitutional issue turns on a question of statutory interpretation. Section 8005 of the Department of Defense Appropriations Act of 2019 provides that the Secretary of Defense may reprogram funds for certain military functions other than those for which they were initially appropriated, but it limits the Secretary's ability to do so to a narrow set of circumstances. Pub. L. No. 115-245, § 8005, 132 Stat. 2981, 2999 (2018).[17] Transferred funds must address

---

[17] Section 8005 provides, in relevant part:

> Upon determination by the Secretary of Defense that such action is necessary in the national interest, he may, with the approval of the Office of Management and Budget, transfer not to exceed $4,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the same time period, as the appropriation or fund to which transferred: *Provided*, That such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress . . . *Provided further*, That no part of the funds in this Act shall be available to prepare or present a request to the Committees on Appropriations for reprogramming of funds, unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in

"higher priority items, based on unforeseen military requirements, than those for which originally appropriated." *Id.* And "in no case" may the Secretary use the funds "where the item for which reprogramming is requested has been denied by the Congress." *Id.* We conclude, as Plaintiffs argue, that those requirements are not satisfied.

### i.    "Unforeseen"

Plaintiffs argue that the President's repeated and unsuccessful requests for more border barrier funding make the request here obviously not unforeseen. Defendants assert in response, without citation, that "[a]n expenditure is 'unforeseen' . . . if DoD was not aware of the specific need when it made its budgeting requests." Defendants contend that DoD could not have foreseen the "need to provide support" to DHS for border barrier construction in the relevant sectors when it made its budget requests for 2019, before DHS's own budget was even finalized.

Defendants mistakenly focus on the assertion that DoD "could not have anticipated that DHS would request specific support for roads, fences, and lighting." Even assuming that is true, the fact remains that DHS came to DoD for funds because Congress refused to grant DHS itself those funds. And when

---

no case where the item for which reprogramming is requested has been denied by the Congress.

properly viewed as applying to the broader "requirement" of a border wall, not to DHS's specific need to turn to an entity other than Congress for funds, it is not credible that DoD did not foresee this requirement.  The long history of the President's efforts to build a border barrier and of Congress's refusing to appropriate the funds he requested makes it implausible that this need was unforeseen.

### ii.    "Denied by the Congress"

Even if there could be doubt about how to interpret "unforeseen," it is clear that Congress denied this request.  Because each of section 8005's conditions must be satisfied for DoD's reprogramming and spending to be constitutionally permissible, this conclusion alone undermines Defendants' likelihood of success on the merits on appeal.

Defendants urge that "an 'item for which funds are requested'" refers to "a *particular* budget item" for section 8005 purposes, so "Congress's decisions with respect to DHS's more general request for border-wall funding [are] irrelevant." But this interpretation, which would require that a specific funding request be explicitly rejected by Congress, is not compatible with the plain text of section 8005.  First, the statute refers to "item[s] . . . denied by the Congress," not to *funding requests* denied by the Congress, suggesting that the inquiry centers on what DoD wishes to spend the funds on, not on the form in which Congress

considered whether to permit such spending.  Second, Defendants give the term "denied" a meaning other than its "ordinary, contemporary, and common" one. *United States v. Iverson*, 162 F.3d 1015, 1022 (9th Cir. 1998).  In common usage, a general denial of something requested can, and in this case does, encompass more specific or narrower forms of that request.  To illustrate, if someone offered a new job asks her potential future employer for a larger compensation package than was included in the job offer and the request is denied, she has been denied a five percent higher salary even if her request did not specifically ask for that amount.

As the district court noted, Defendants' reading of section 8005 also would produce the perverse result that DoD could, by declining to present Congress with a particular line item to deny, reprogram funds for a purpose that Congress refused to grant another agency elsewhere in the budgeting process.[18]  In other words, it would simply invite creative repackaging.  But putting a gift in different wrapping paper does not change the gift.  Identifying the request to Congress as having come previously from DHS instead of from DoD does not change what funding was requested for: a wall along the southern border.

Construing section 8005 with an eye towards the ordinary and common-sense meaning of "denied," real-world events in the months and years

---

[18] That result would hardly comport with Congress's stated desire in drafting the language currently in section 8005 "to tighten congressional control of the reprogramming process."  H.R. Rep. No. 93-662, at 16 (1973).

leading up to the 2019 appropriations bills leave no doubt that Congress considered and denied appropriations for the border barrier construction projects that DoD now seeks to finance using its section 8005 authority.  Long before the emergency declaration and DoD's reprogramming at issue here, the President made plain his desire to construct a border barrier, requesting $5.7 billion from Congress to do so. Throughout 2018, Congress considered multiple bills that would have supported construction of such a barrier; it passed none of them.  *See supra* Section I.

That DoD never specifically requested from Congress the specific sums at issue here for the specific purpose of counterdrug funding at the southern border (and that Congress therefore never had cause to deny that specific request) is of no moment.  The amount to be appropriated for a border barrier occupied center stage of the budgeting process for months, culminating in a prolonged government shutdown that both the Legislative and Executive Branches clearly understood as hinging on whether Congress would accede to the President's request for $5.7 billion to build a border barrier.

In sum, Congress considered the "item" at issue here—a physical barrier along the entire southern border, including in the Yuma, El Paso, Tucson, and El Centro sectors—and decided in a transparent process subject to great public scrutiny to appropriate less than the total amount the President had sought for that item.  To call that anything but a "denial" is not credible.

## 2. Defendants' Interpretation and Agency Deference

Defendants did not argue in their briefing to the district court, their stay motion, or their supplemental briefing that their contrary interpretation of section 8005 is entitled to agency deference. Even setting aside whether Defendants' failure to raise such an argument may operate as a waiver or forfeiture, we conclude that their position is unworthy of deference when evaluated under traditional standards for reviewing agency action.

Under the two-step framework articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), a reviewing court will often defer to an agency's interpretation of an ambiguous statute administered by the agency. *Id.* at 843. To determine whether the *Chevron* framework governs at all, however, there is a threshold "step zero" inquiry in which we ask whether "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and [whether] the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). "Delegation of such authority may be shown in a variety of ways, [such] as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Id.* at 227. And to evaluate whether the agency exercised its authority, we look to "the interpretive method used and the nature of

the question at issue," considerations that may include "the interstitial nature of the legal question, the related expertise of the [a]gency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the [a]gency has given the question over a long period of time." *Barnhart v. Walton*, 535 U.S. 212, 222 (2002).  If we determine that (1) Congress did not intend to delegate interpretive authority to the agency, or (2) that the agency did not take the challenged action in exercise of that authority, we defer to the agency only to the extent that the agency's reasoning is persuasive.  *Mead*, 533 U.S. at 234 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

Under this framework, DoD's current interpretation of section 8005 is not entitled to deference.  First, it does not appear that Congress intended to delegate to DoD the power to interpret section 8005.  DoD's authorizing and appropriating statutes do not contain an explicit grant of rulemaking power to the agency. Section 8005 could suggest a potential congressional intent to delegate to DoD the authority to interpret the phrase "higher priority items, based on unforeseen military requirements," because these are subjects about which DoD has expertise. But the same is not true of the "denied by the Congress" limitation, given that DoD has no clear expertise in assessing what "denied by the Congress" might mean. Moreover, as discussed above, Congress's intent in inserting the "denied by the

Congress" limitation in the first place was to tighten the fiscal reins and retain

congressional control over the appropriations process. *See supra* n.18.

Second, the agency has not advanced its interpretation in a manner that

would typically trigger review under *Chevron*. There is no question that DoD did

not conduct notice-and-comment rulemaking or other formalized procedures in

interpreting section 8005. *See Mead*, 533 U.S. at 230 ("[T]he overwhelming

number of our cases applying *Chevron* deference have reviewed the fruits of

notice-and-comment rulemaking or formal adjudication."). Nor were there any

other features in DoD's interpretive process here that might otherwise justify

*Chevron* deference. *See Barnhart*, 535 U.S. at 222. There is no indication that

DoD's decision was the product of "careful consideration . . . over a long period of

time" or any other procedural rigor that would more closely approximate a formal

rulemaking. *Id.* On the contrary, DoD's interpretation appears to have emerged in

a matter of weeks. And to the extent that DoD has mustered further support for its

interpretation during this litigation, that litigating position is not entitled to

*Chevron* deference. *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 830

(9th Cir. 2012) (en banc) ("Without a basis in agency regulations or other binding

agency interpretations, there is usually no justification for attributing to an agency

litigating position 'the force of law.'" (quoting *Mead*, 533 U.S. at 227)).

Accordingly, we conclude that *Chevron* deference to DoD's interpretation of section 8005 is not warranted.

An agency action not entitled to *Chevron* deference may nevertheless carry persuasive weight based on the factors that the Supreme Court enumerated in *Skidmore*, 323 U.S. at 140. *See Mead*, 533 U.S. at 234-35. Under *Skidmore*, we look to "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." 323 U.S. at 140.

DoD's interpretation of section 8005 does not warrant deference under *Skidmore*'s standards either. The two documents in the record that appear to contain DoD's analysis of the section 8005 requirements—the official reprogramming action and a related memorandum to DoD's comptroller—are entirely conclusory. The reprogramming action merely parrots the statute without analysis:

> This reprogramming action provides funding in support of higher priority items, based on unforeseen military requirements, than those for which originally appropriated; and is determined to be necessary in the national interest. It meets all administrative and legal requirements, and none of the items has previously been denied by the Congress.

The memorandum contains little more, stating that "[t]he need to provide support . . . was . . . not known at the time of the [Fiscal Year] 2019 budget request" and that Congress had not denied funding for the items. The Supreme

43

Court has found unpersuasive under *Skidmore* agency determinations containing far more reasoning than that which we confront here.  *See Gonzales v. Oregon,* 546 U.S. 243, 253-54 (2006) (rejecting as unpersuasive under *Skidmore* an interpretive rule announced by the Attorney General that "[i]ncorporat[ed] the legal analysis of a memorandum he had solicited from his Office of Legal Counsel"); *Christensen v. Harris County*, 529 U.S. 576, 581, 587 (2000) (rejecting as unpersuasive under *Skidmore* an interpretation in an opinion letter containing brief textual analysis and citation to operative regulations).

Defendants' interpretation also fails to rest on the sort of expertise that might inspire deference.  *See Gonzales,* 546 U.S. at 269 ("[*Skidmore*] deference here is tempered by the Attorney General's lack of expertise in this area."); *cf. Kisor v. Wilkie*, No. 18-15, 2019 WL 2605554, at *9 (U.S. June 26, 2019) (explaining that when an agency interprets its own regulation, its "interpretation must in some way implicate its substantive expertise" to be entitled to deference); *compare Mead*, 533 U.S. at 235 ("There is room at least to raise a *Skidmore* claim here, where . . . [the agency] can bring the benefit of specialized experience to bear on the subtle questions in this case.").

\* \* \*

Without section 8005's statutory authorization to reprogram funds for section 284 security measures, no congressional action permits Defendants to use

those funds to construct border barriers.  "The President's power . . . must stem either from an act of Congress or from the Constitution itself.  There is no statute that expressly authorizes the President to [act] as he did here.  Nor is there any act of Congress to which our attention has been directed from which such a power can fairly be implied."  *Youngstown*, 343 U.S. at 585.  Defendants' attempt to reprogram and spend these funds therefore violates the Appropriations Clause and intrudes on Congress's exclusive power of the purse, for it would cause funds to be "drawn from the Treasury" not "in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

## B.  Whether Plaintiffs Have a Cause of Action

Defendants argue that none of the foregoing analysis matters because Plaintiffs lack a cause of action to challenge the reprogramming of funds at issue here.  We disagree.  Plaintiffs may bring their challenge through an equitable action to enjoin unconstitutional official conduct, or under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, as a challenge to a final agency decision that is alleged to violate the Constitution, or both.  Either way, Plaintiffs have an avenue for seeking relief.

## 1. Equitable Cause of Action

The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against" federal officials violating federal

law.  *Armstrong v. Exceptional Child Ctr.*, *Inc.*, 135 S. Ct. 1378, 1384 (2015); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.").  "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 135 S. Ct. at 1384; *see also Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999) ("[T]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief . . . depend on traditional principles of equity jurisdiction." (quoting 11A Charles Alan Wright et al., Federal Practice and Procedure § 2941, at 31 (2d ed. 1995)).

In *Youngstown*, for example, the Supreme Court heard a challenge to a wartime presidential order directing the Secretary of Commerce to seize and operate a majority of the nation's steel mills.  343 U.S. at 582.  Acting pursuant to the presidential order, the Secretary of Commerce issued possessory orders that required the seized companies to operate according to the Secretary's direction.  *Id.* at 583.  The plaintiff steel mill owners challenged the order as amounting to lawmaking, a function that "the Constitution has expressly confided to the Congress and not to the President." *Id.* at 582.  The President contended that his order was "necessary to avert a national catastrophe." *Id.*  In addressing the

46

dispute, the Court held that there was no statute that authorized the order, and that "[t]he order [could not] properly be sustained as an exercise of the President's military power," or any other constitutional grant of power to the President. *Id.* at 587. The Court therefore held that "th[e] seizure order [could not] stand." *Id.* at 589.

More recently, in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), the Supreme Court heard a challenge to a presidential proclamation restricting the entry of certain foreign nationals into the United States on the ground that it violated the Establishment Clause of the First Amendment. *Id.* at 2403. Plaintiffs were individuals who alleged that they were injured by being separated from relatives barred from entering the country. *Id.* at 2416. Without discussing whether a cause of action existed to challenge the alleged constitutional violation, the Court reached the merits of the plaintiffs' Establishment Clause claim. *See id.* at 2416-17. The government had contended that the plaintiffs' claims were not justiciable because the Establishment Clause did not give them a legally protected interest in the admission of particular foreign nationals, but the Court rejected this argument and proceeded to evaluate the merits of the plaintiffs' claim. *Id.* at 2416. *Trump v. Hawaii* and *Youngstown* therefore support the conclusion that Plaintiffs may seek equitable relief to remedy an alleged constitutional violation.

Consistent with these cases, our court allowed an equitable action to enforce the Appropriations Clause in *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016). In *McIntosh*, appellants were criminal defendants who had been federally indicted on marijuana-related offenses. *Id.* at 1168-69. They sought to enjoin their prosecutions, claiming that a congressional appropriations rider prohibited the Department of Justice ("DOJ") from spending money on their prosecutions because their marijuana-related activities were licensed under state law. *Id.* at 1169, 1177. We held that the defendant-appellants could properly "enjoin their prosecutions on the grounds that [DOJ] [was] prohibited from spending funds to prosecute them" if they could demonstrate that their conduct was authorized by state law and thus fell within what the appropriations rider was enacted to protect. *Id.* at 1169, 1174. As we explained: "Congress has enacted an appropriations rider that specifically restricts DOJ from spending money to pursue certain activities," and it had acted within its "'exclusive province'" in doing so. *Id.* at 1172 (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978)). Once Congress has so acted, "it is for . . . the courts to enforce" its decisions. *Id.* (quoting *Tenn. Valley Auth.*, 437 U.S. at 194). Contrary to the dissent's characterization, we did not in *McIntosh* treat the alleged constitutional violation only "as a *defense* for criminal defendants." Dissent at 21. Instead we held that "Appellants . . . can seek—and

48

have sought—to enjoin [an agency] from *spending funds*" contrary to Congress's restrictions. *McIntosh*, 833 F.3d at 1172.

Relying on *Dalton v. Specter*, 511 U.S. 462 (1994), Defendants argue that there cannot be a constitutional cause of action here. *Dalton* involved a challenge to the President's discretionary decision to agree to a specific military base closure included in a base closure package proposed by an independent commission pursuant to the Defense Base Closure and Realignment Act of 1990 ("DBCRA"). *Id.* at 464-66. The Supreme Court held that the plaintiff's statutory challenge to the President's decision failed because the statute gave the President unfettered discretion. *Id.* at 474-76. The Court then also rejected the argument that because the President had allegedly violated the statute, he had acted unconstitutionally. *Id.* at 472-74. In explanation, the Court stated that "every action by the President, or by another executive official, in excess of his statutory authority is [not] *ipso facto* in violation of the Constitution." *Id.* at 472. The Court did not say, however, that action in excess of statutory authority can *never* violate the Constitution or give rise to a constitutional claim. Statutory and constitutional claims are not mutually exclusive. Indeed, the Court went on in *Dalton* to state that *Youngstown* "cannot be read for the proposition that an action taken by the President in excess of his statutory authority *necessarily* violates the Constitution." *Id*. at 473 (emphasis

added).  There would have been no reason for the Court to include the word "necessarily" if the two claims were always mutually exclusive.

In *Dalton*, the President's authority was put at issue because of the contention that he had violated requirements set by DBCRA.  It was only because Congress had enacted a statutory process for closing bases that the Court considered whether it could review the President's compliance with DBCRA and ultimately concluded that it could not because the statute gave the President unreviewable discretion.  *Id.* at 474-76.  It was in that context that the Court explained that an allegation that the President had not complied with the statute would not necessarily become a constitutional claim through an *ultra vires* theory. *Id.* at 472-73.  Because DBCRA authorized unfettered discretion by the President to either approve or disapprove the package of base closures as a whole, the Court had no occasion to consider the constitutional implications of violating statutes, such as section 8005, that authorize executive action contingent on satisfaction of certain requirements.[19]  Here, unlike in *Dalton*, Plaintiffs' claim is not one "*simply* alleging that the President has exceeded his statutory authority.*"  *Id.* at 473

---

[19] The dissent notes that when Congress appropriates funds in lump-sum amounts, and leaves it to the unfettered discretion of the agency to re-allocate funds, no judicial review is available.  Dissent at 8 (citing *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993)).  That principle has no bearing here.  Section 8005 does not involve a lump sum whose allocation is committed to the agency's discretion, but instead imposes restrictions on when and for what purposes the agency may use reprogrammed funds.

(emphasis added).  Rather, Plaintiffs claim that to the extent Defendants did not

have statutory authority to reprogram the funds, they acted in violation of

constitutional separation of powers principles because Defendants lack any

background constitutional authority to appropriate funds—making Plaintiffs' claim

fundamentally a constitutional one.[20]  *Dalton* therefore does not foreclose

Plaintiffs' constitutional claim here.[21]

---

[20] Defendants rely on *Harrington v. Schlesinger*, 528 F.2d 455 (4th Cir. 1975), in which the Fourth Circuit held that the claims of several individual taxpayers who alleged that the government was spending money in violation of two statutes did not satisfy the test for taxpayer standing enunciated in *Flast v. Cohen*, 392 U.S. 83 (1968), because they "present[ed] no constitutional challenge to any congressional appropriation," *Harrington*, 528 F.2d at 457.  *Harrington* is largely inapposite, because Plaintiffs do not rely on taxpayer standing here.  The court in *Harrington* noted, however, that "[i]f there were a clear and flagrant violation of congressional limitations upon expenditures, a court in a taxpayer suit might find its intervention appropriate." *Id.* at 458.  Thus, if *Harrington* has any persuasive value here, we think it is in suggesting that Plaintiffs *do* have a cause of action because, as we have discussed, there has been a clear violation of Congress' limits on expenditures.

[21] The dissent suggests that *Train v. City of New York*, 420 U.S. 35 (1975), supports the proposition that a claim attacking the Executive Branch's reading of an appropriations statute sounds only in that statute and not in the Constitution. Dissent at 8-9.  But the plaintiffs in *Train* argued not that the Executive Branch was spending money that Congress had never appropriated, rather that the Executive Branch was *refusing* to allot money Congress had specifically *instructed* it to spend.  420 U.S. at 42.  There was thus no constitutional claim at issue in *Train*, and if there had been, it would have had nothing to do with the prohibitions on unauthorized spending imposed by the Appropriations Clause.  The Supreme Court in *Train* considered only the statutory question whether an Executive Branch agency had failed to comply with a specific statutory mandate because that was the only issue in that case, not because the existence of a statute had any bearing on constitutional reviewability.

Defendants also cannot be right in their apparent contention that as long as an official identifies some statutory authorization for his actions, doing so makes any challenge to those actions statutory and precludes constitutional review.  It cannot be that simply by pointing to any statute, governmental defendants can foreclose a constitutional claim.  At the risk of sounding tautological, only if the statute *actually* permits the action can it *even possibly* give authority for that action.[22]  For the reasons explained above, section 8005 does not permit the action here.

Congress may, of course, limit a court's equitable power to enjoin acts violating federal law.  *See Armstrong*, 135 S. Ct. at 1385 (explaining that an equitable remedy is not available where Congress has demonstrated an "intent to foreclose" that form of relief, as where a statutory provision (1) expressly provided a method of enforcing a substantive right, or (2) lacked a judicially administrable standard (quoting *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002))).  But Defendants do not argue that Congress has demonstrated any

---

[22] Although in *Youngstown* the President *conceded* that no statute authorized his actions, and relied only on his Article II powers, 343 U.S. at 587, we do not see how Defendants' willingness or unwillingness to concede that a particular statute does not authorize their actions should affect whether Plaintiffs in this case have a cause of action—particularly when, as we have discussed, we think it quite clear that section 8005 does not authorize the reprogramming.  Thus, we do not think that the concession in *Youngstown* was determinative, or that the lack of a concession is determinative here.

such intent to limit equitable remedies here, and we have identified no statute that does so.  Indeed, to foreclose a remedy for a constitutional violation, Congress must demonstrate its intent by "clear and convincing evidence."  *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975) (quoting *Johnson v. Robinson*, 415 U.S. 361, 373 (1974)); *see also City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 183 (1997) ("[J]udicial review of [federal] administrative action is the rule, and nonreviewability an exception which must be demonstrated." (alterations in original) (quoting *Barlow v. Collins*, 397 U.S. 159, 166 (1970)).

## 2. Administrative Procedure Act Cause of Action

Plaintiffs' claim is also cognizable under the APA.  The APA provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704. Here, Plaintiffs have a cause of action under the APA as long as there has been final agency action, and as long as Congress has not limited review of such actions through other statutes or committed them to agency discretion.  Neither of these bars to APA relief is present here.  *See* 5 U.S.C. §§ 701(a), 704, 706; *Bennett v. Spear*, 520 U.S. 154, 175 (1997).

The APA mandates that a court "shall . . . hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  Plaintiffs' challenge is to a final agency

action and alleges that the action violates the Appropriations Clause, so it falls within the APA's scope.[23]

Although section 701(a)(2) of the APA "preclude[s] judicial review of certain categories of administrative decisions," this case does not involve such an "administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191-92 (1993). In their emergency stay motion and related supplemental briefing, Defendants do not argue that DoD's actions were committed to "agency discretion by law," so as to preclude review under the APA. We agree with Defendants' implicit concession that this is not a case involving a "statute . . . drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Any constitutional challenge that Plaintiffs may advance under the APA would exist regardless of whether they could also assert an APA claim that DoD's

---

[23] Defendants argue that DoD's reprogramming action is not a final agency action in part because it "imposes no obligations and confers no rights upon plaintiffs." **Exec. Tan Br. at 14.** But the question we must ask in determining finality is whether the agency action imposes obligations on the agency, not whether it imposes obligations on Plaintiffs. *See Bennett*, 520 U.S. at 177 (holding that the challenged agency actions were final because they "alter[ed] the legal regime *to which the action agency* [wa]s subject" (emphasis added)). Here, as we have discussed, the reprogramming action purports to affect DoD's legal right to use particular funds to build a border barrier instead of the purpose for which they were originally appropriated.

application of section 8005 was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C); *see Webster v. Doe*, 486 U.S. 592, 602-04 (1988) (holding that a plaintiff may raise under the APA a constitutional challenge to agency action even where the plaintiff lacks an avenue under the APA to argue that the same agency action is invalid for statutory or procedural reasons).  If "Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear."  *Webster*, 487 U.S. at 603. Congress has not done so here.

### 3. Survival of at Least One Cause of Action

The dissent argues that Plaintiffs' claim is necessarily one encompassed by the APA, and that the availability of an APA cause of action precludes Plaintiffs' equitable claim.  We do not think that the APA forecloses Plaintiffs' equitable claim.  And even if it did, then for the reasons we have discussed, Plaintiffs would have an APA claim.  Either way, it cannot be that both an equitable claim and an APA claim foreclose the other, leaving Plaintiffs with no recourse.

It is true that the APA is the general mechanism by which to challenge final agency action.  *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (noting the "basic presumption of judicial review [created by the APA] for one 'suffering legal wrong because of agency action'" (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)).  But this does not mean the APA

forecloses other causes of action.  In *Navajo Nation v. Department of the Interior*, 876 F.3d 1144 (9th Cir. 2017), we explained that "a court is foreclosed by [APA section] 704 from entertaining claims *brought under the APA* seeking review of non-final agency action (and not otherwise permitted by law)," but that this final agency action limitation does not apply "to other types of claims (like . . . constitutional claims)."  *Id.* at 1170.

Likewise, in *Presbyterian Church v. United States*, 870 F.2d 518 (9th Cir. 1989), we allowed constitutional claims to proceed without even deciding whether an APA cause of action was available.  There, plaintiff churches brought claims for injunctive relief against the United States, DOJ, and the Immigration and Naturalization Service ("INS") and certain INS officials, alleging violations of their First and Fourth Amendment rights by INS agents' surreptitious recording of their church services.  *Id.* at 520.  The district court dismissed the plaintiffs' claims as, in relevant part, barred by sovereign immunity.  *Id.* at 521.  We reversed, holding that APA section 702 waived the government defendants' sovereign immunity for claims seeking non-monetary relief.  *Id.* at 523-24.  We further explained that this waiver of sovereign immunity was not limited to suits involving an "agency action" as defined under the APA.  *Id.* at 525.  We therefore did not reach the question whether the actions challenged in that case were ones for which the APA would provide a cause of action.  *Id.* at 525 n.8.  Rather, we remanded for

further analysis of standing and mootness, and, if the district court determined it had jurisdiction, for evaluation of the plaintiffs' constitutional claims. *Id.* at 529. *Navajo Nation* and *Presbyterian Church* clearly contemplate that claims challenging agency actions—particularly constitutional claims—may exist wholly apart from the APA.

In fact, the APA provides for judicial review only of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Here, no statute expressly makes Plaintiffs' claims reviewable, but, as we have explained, Plaintiffs do have an adequate remedy in a court: an equitable cause of action for injunctive relief. If either form of their claim precludes the other, it would therefore seem that their equitable claim to enjoin unconstitutional action would preclude their APA claim to enjoin unconstitutional action. But even if it is the other way around, these causes of action cannot possibly be the legal equivalent of baking soda and vinegar—when they come in contact, there is no reason to believe they both go up in smoke.

### C. Zone of Interests

Defendants argue that even if a cause of action generally exists to challenge the reprogramming, Plaintiffs must satisfy a "zone of interests" test to establish that *they*, specifically, have a cause of action for the constitutional violation they allege here. Defendants argue that this test would apply to Plaintiffs' claim

whether characterized as an equitable cause of action to enjoin a constitutional violation or as an APA claim. We are doubtful that a zone of interests test applies to Plaintiffs' equitable cause of action. Although we recognize that the APA generally does carry a zone of interests test, there is some lack of clarity with respect to what that might look like in a constitutional context. We need not resolve these ambiguities in the case law, however, because we believe Plaintiffs fall within any zone of interests test that may apply.

### 1. Applicability of a Zone of Interests Test

Courts apply the zone of interests test to "determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). To determine whether a plaintiff satisfies this test we ask whether the plaintiff's "interests fall within the zone of interests protected by the law invoked." *Id.* at 129 (quotation marks omitted). In answering this question, we recognize that "the breadth of the [applicable] zone of interests varies according to the provisions of law at issue." *Id.* at 130 (quoting *Bennett*, 520 U.S. at 163).

The zone of interests test derives from the Supreme Court's decision in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970), where the Court articulated a limit on causes of action conferred by the

APA.  But the Court clarified in *Lexmark* that the test "applies to *all* statutorily created causes of action . . . and that Congress is presumed to 'legislate against the background of' the zone-of-interests limitation, 'which applies unless it is expressly negated.'"  *Lexmark*, 572 U.S. at 129 (emphasis added) (quoting *Bennett*, 520 U.S. at 163).[24]

We are doubtful that any zone of interests test applies to Plaintiffs' equitable cause of action to enjoin a violation of the Appropriations Clause, particularly after *Lexmark*.

As an initial matter, we are skeptical that there could be a zone of interests requirement for a claim alleging that official action was taken in the absence of all authority, like that which Plaintiffs assert here.  The D.C. Circuit's decision in *Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987), explains why it does not make sense to treat such claims as carrying a zone of interests requirement.  There, the court heard a challenge to a government program for

---

[24] Many pre-*Lexmark* cases refer to the zone of interests test—and the broader question whether a particular plaintiff has a cause of action—as a part of the standing inquiry (and, more specifically, as a component of "prudential standing").  *See Lexmark*, 572 U.S. at 126-27.  In *Lexmark*, however, the Court clarified that the zone of interests test does not go to a plaintiff's standing but rather to whether the plaintiff has a cause of action.  *Id.* at 127, 128 n.4.  The Court suggested that holding otherwise would be "in some tension with [the Court's] recent affirmation of the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'"  *Id.* at 126 (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013).

intercepting ships carrying undocumented immigrants, in which the plaintiffs argued that the program exceeded authority granted by statute or the Constitution. *Id.* at 797-98.  The court ultimately held that the plaintiffs lacked standing.  *Id.* at 800-01.  But, citing *Youngstown* in its discussion, the D.C. Circuit noted that the plaintiffs were not required to "show that their interests [fell] within the zones of interests of the constitutional and statutory powers invoked by the President in order to . . . challenge the . . . program as *ultra vires*."  *Id.* at 811 n.14. "Otherwise," the court explained, "a meritorious litigant, injured by *ultra vires* action, would seldom have standing to sue since the litigant's interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest."  *Id.*  In other words, where the very claim is that *no* statutory or constitutional provision authorized a particular governmental action, it makes little sense to ask whether *any* statutory or constitutional provision was written for the benefit of any particular plaintiffs.

Consistent with this logic, *Youngstown* did not apply a zone of interests test. Although we acknowledge that *Youngstown* was decided before the Supreme Court had formally articulated a zone of interests test, *Youngstown* did not address any similar concept, either.  Rather, the Court held that the President had unlawfully intruded on the lawmaking function reserved to Congress without ever discussing

whether the plaintiffs, steel mill owners whose property was ordered to be seized, were the intended beneficiaries of the structural provisions in Article II.

Similarly, in *Clinton v. City of New York*, 524 U.S. 417 (1998), which addressed a Presentment Clause challenge, the Supreme Court said nothing about a zone of interests requirement. In that case, two sets of plaintiffs challenged the constitutionality of the Line Item Veto Act, which allowed the President to veto only particular provisions in enacted laws, rather than the entire law. *Id.* at 420-21. One set of plaintiffs consisted of the City of New York, a hospital and two hospital associations, and unions representing hospital employees. *Id.* at 425. Another consisted of a cooperative of Idaho potato growers, and an individual potato farmer. *Id.* All the plaintiffs alleged that they were injured by the President's cancellation of particular line items in the budget that would have inured to their financial benefit. *Id.* at 421. The Supreme Court held that the Act violated the structural protections provided by the Presentment Clause, without asking whether the plaintiffs fell within any zone of interests of that clause. *Id.* at 436-48.

The Appropriations Clause likewise operates as a structural protection built into our constitutional system. Just as the Court in *Clinton* treated as sufficient that the plaintiffs were concretely injured as a result of the alleged Presentment Clause violation, we believe it is likely sufficient here that Plaintiffs would be concretely

injured by the alleged Appropriations Clause violation, and that no zone of interests test applies to their claim.

Even if a zone of interests test may have been applied to some cases considering constitutional claims like Plaintiffs' prior to *Lexmark*, we think that *Lexmark* has called into question its continuing applicability to constitutional claims. *Lexmark* focuses on *Congress's intent* in creating statutory causes of action, casting doubt on Defendants' argument that a zone of interests test has any role to play here, where Plaintiffs' theory derives from the Constitution. The Court in *Lexmark* described the purpose of the zone of interests test as being to discern whether a statutory cause of action exists—specifically, "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." 572 U.S. at 127. Because the Constitution was not created by any act of Congress, it is hard to see how the zone of interests test would even apply.[25]

---

[25] Defendants argue that an equitable cause of action to enjoin a constitutional violation is, at its root, a creation of statute, and is therefore encompassed within *Lexmark*'s references to causes of action created by statute. Although Defendants are correct that Congress granted federal courts equity jurisdiction by statute, *see Grupo Mexicano*, 527 U.S. at 318 ("The Judiciary Act of 1789 conferred on the federal courts jurisdiction over all suits . . . in equity." (quotation marks omitted)); *see also* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."), we think it a stretch to conclude that the traditional equitable cause of action to enjoin a constitutional violation was therefore *created by statute*. Indeed, the lower federal courts are created entirely by statute, *see* An Act to Establish the Judicial Courts of the United States §§ 2-6, 1 Stat. 73 (1789),

Indeed, in its recent decision in *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, No. 18-96, 2019 WL 2605555 (U.S. June 26, 2019), in which the plaintiffs alleged a violation of the dormant Commerce Clause, the Supreme Court did not even mention the zone of interests test.  Given that the Court did apply a zone of interests test in *Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318 (1977), a pre-*Lexmark* dormant Commerce Clause case, *Tennessee Wine* supports the idea that *Lexmark* has changed the landscape.  *See* 429 U.S. at 602 n.3.

For all of these reasons, we doubt that any zone of interests test applies to Plaintiffs' equitable cause of action.

We recognize that the Supreme Court has consistently applied a zone of interests test to causes of action arising under the APA.  When the Court has applied the zone of interests test in APA actions, however, it has analyzed the zone of interests of the statute the agency is alleged to have violated, not any zone of interests of the APA itself.  In *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012), for example, the Court examined an APA action alleging that the government had exceeded its statutory authority to take title

---

but this does not mean that all constitutional claims filed in a federal district court are really statutory claims.  *See, e.g.*, *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971) (recognizing "a cause of action under the Fourth Amendment" for damages).

to a piece of property "for the purpose of providing land for Indians." *Id.* at 211
(quoting the Indian Reorganization Act, 25 U.S.C. § 465 (2012) (current version at
25 U.S.C. § 5108)).  It concluded that the plaintiff, who lived near land that had
been acquired by the Secretary of the Interior for an Indian tribe seeking to open a
casino, was "arguably within the zone of interests to be protected or regulated by"
the Indian Reorganization Act, which "authorize[d] the acquisition of property 'for
the purpose of providing land for Indians.'"  *Id.* at 211-12, 224-26 (first quoting
*Ass'n of Data Processing Serv. Orgs.*, 397 U.S. at 153, then quoting 25 U.S.C.
§ 465 (2012) (current version at 25 U.S.C. § 5108)).  In so doing, it departed from
the reasoning of the district court, which had concluded that the plaintiff fell
outside the Act's zone of interests because he was "not an Indian, nor [did] he
purport to seek to protect or vindicate the interests of any Indians or Indian tribes."
*Patchak v. Salazar*, 646 F. Supp. 2d 72, 77 (D.D.C. 2009).  And in *Air Courier
Conference of America v. American Postal Workers Union*, 498 U.S. 517 (1991),
the Court asked whether postal workers bringing a claim under the APA were
within the zone of interests protected by the Private Express Statutes on which
their claims depended.[26]

---

[26] In *Bennett*, the Court noted that because the zone of interests test "varies
according to the provisions of law at issue, . . . what comes within the zone of
interests of a statute for purposes of obtaining judicial review . . . under the
'generous review provisions' of the APA may not do so for other purposes."  520

Here, rather than looking at a statute underlying an APA action to determine the relevant zone of interests, we would need to look at the Appropriations Clause. Because, as we have discussed, we are doubtful that any zone of interests test applies to claims seeking to enjoin a violation of the Appropriations Clause, we think it is possible that the present type of APA claim is distinct from typical APA claims and that there is no zone of interests requirement here. We need not decide that question, however, because we believe that, even if a zone of interests test applied here, it would be satisfied.

## 2. Whether Any Zone of Interests Test Is Satisfied

Defendants argue that Plaintiffs cannot satisfy the zone of interests test because their claims fall outside the zone of interests of section 8005. Although Plaintiffs' Complaint did assert a claim under section 8005, it also asserted constitutional claims, including a claim for a violation of the Appropriations Clause. To the extent any zone of interests test applies to that constitutional claim (whether brought in equity or under the APA), it requires us to ask whether Plaintiffs fall within the zone of interests of the Appropriations Clause, not of section 8005. And when the Supreme Court has applied a zone of interests test to

---

U.S. at 163 (quoting *Clark v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987)). We read this not to suggest that a particular zone of interests test applies to *all* APA actions, but that when analyzing whether a plaintiff falls within the zone of interests of a particular statute, courts should be particularly lenient if a violation of that statute is being asserted through an APA claim.

claims about structural provisions of the Constitution, it has applied a very lenient version of that test.

For example, in *Boston Stock Exchange*, the Court held that plaintiff businesses that alleged financial injury from a state tax that discriminated against out-of-state businesses fell within the zone of interests of the implied dormant Commerce Clause, which functions as a limit on a state's power relative to that of Congress to regulate interstate commerce. 429 U.S. at 320 n.3. Although the suit was not brought by Congress seeking to protect its Commerce Clause authority, or even by another state alleging harm from the defendant state's tax law, the Court held that the plaintiffs were permitted to assert that the state defendant had acted in a manner that infringed on Congress's constitutional authority. *Id.*

More recently, in *McIntosh*, we allowed criminal defendants charged with marijuana-related offenses to seek an injunction prohibiting DOJ from spending funds in violation of the Appropriations Clause. 833 F.3d at 1168, 1172. We explained: "When Congress has . . . expressly prohibit[ed] DOJ from spending funds on certain actions, federal criminal defendants may seek to enjoin the expenditure of those funds, and we may exercise jurisdiction over a district court's direct denial of a request for such injunctive relief." *Id.* at 1172-73. To the extent we implicitly applied a zone of interests test to the criminal defendants, it was not a restrictive one—indeed, our primary concern was to confirm that the defendants

had standing to challenge the Appropriations Clause violation (and we concluded they did). *Id.* at 1173-74.

Accordingly, if Plaintiffs must fall within a zone of interests served by the constitutional provision they seek to vindicate, we are persuaded that they do. The Appropriations Clause is a vital instrument of separation of powers, which has as its aim the protection of individual rights and liberties—not merely separation for separation's sake. *See supra* section V.A. As Justice Kennedy put it in *Clinton*:

> [I]f a citizen who is taxed has the measure of the tax or the decision to spend determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened. . . . The individual loses liberty in a real sense if that instrument is not subject to traditional constitutional constraints.

524 U.S. at 451 (Kennedy, J., concurring). Because "individuals, too, are protected by the operations of separation of powers and checks and balances," it follows that "they are not disabled from relying on those principles in otherwise justiciable cases and controversies." *Bond v. United States*, 564 U.S. 211, 223 (2011).

Plaintiffs assert that if Defendants' allegedly unconstitutional spending proceeds, they will suffer injuries to their environmental, professional, aesthetic, and recreational interests. Those individual rights and interests resemble myriad interests that the Supreme Court has concluded—either explicitly or tacitly—fall within any applicable zone of interests encompassed by structural constitutional

67

principles like separation of powers.  *See, e.g.*, *Chadha*, 462 U.S. at 935-36, 951-52 (allowing a plaintiff with an interest in avoiding deportation to bring a constitutional claim based on bicameralism and presentment requirements); *Bos. Stock Exch.*, 429 U.S. at 602 n.3 (allowing a plaintiff stock exchange with an interest in avoiding a state tax to bring a claim enforcing Congress's dominion over the regulation of interstate commerce).  Plaintiffs' claim that their rights or liberties were infringed by a violation of the Appropriations Clause therefore falls within any zone of interests required to enforce that clause's provisions.

## VI.    The Remaining Stay Factors

Our focus to this point has been on the first of the four factors to be considered in deciding a motion to stay, "whether the stay applicant has made a strong showing that he is likely to succeed on the merits."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  The second factor, "whether the applicant will be irreparably injured absent a stay," was identified in *Nken* together with the first factor as "the most critical."  *Id*.

The Supreme Court observed in *Nken* that the third and fourth factors—whether issuance of a stay will substantially injure other parties and where the public interest lies—"merge when the Government is the opposing party."  *Id.* at 435.  That case involved an application for a stay of removal by a noncitizen who was facing deportation.  The motion before us presents a variant on that situation.

68

Here, it is Defendants who seek a stay, so the question whether Defendants will be irreparably injured absent a stay may, in practical terms, merge with consideration of the public interest.

Public interest is a concept to be considered broadly. The Court noted in *Nken*, for example, that there is a public interest in "preventing aliens from being wrongfully removed," but also that there is "always a public interest in prompt execution of removal orders." *Id*. at 436.

Defendants have discussed these three remaining factors together in terms of the "equitable balance of harms." There is logic in that, so we will do the same, considering the respective impacts on Defendants, Plaintiffs and others interested in the proceedings, and the general public.

The primary harm cited by Defendants if a stay is not granted is that a "delay in the construction of border fencing pending appeal will create irreparable harm" because "deadly drugs [will] flow into this country in the interim." They argue that CBP has recorded over 4,000 "drug-related events" between border crossings in the El Paso, El Centro, Tucson, and Yuma Sectors in Fiscal Year 2018 and cites CBP's seizure of thousands of pounds of marijuana and lesser amounts of other illegal substances, including cocaine, heroin, methamphetamine, and fentanyl.

We do not question in the slightest the scourge that is illegal drug trafficking and the public interest in combatting it. Our circuit includes several border states,

and our courts deal with no small number of cases involving illegal drugs crossing those states' borders.

Defendants have not actually spoken to the more relevant questions, however. What will be the impact of building the barriers they propose? Even more to the point, what would be the impact of delaying the construction of those barriers? If these specific leaks are plugged, will the drugs flow through somewhere else? We do not know, but the evidence before us does not support a conclusion that enjoining the construction of the proposed barriers until this appeal is fully resolved will have a significant impact.

To begin with, the statistics cited by Defendants describe drug trafficking that CBP has detected with existing barriers and law enforcement efforts. They do not tell us how much gets through undetected or what additional amounts would be stopped by the proposed barriers.

As Plaintiffs point out, according to the Drug Enforcement Administration's most recent assessment, the "majority of the [heroin] flow is through [privately operated vehicles] entering the United States at legal ports of entry, followed by tractor-trailers, where the heroin is co-mingled with legal goods." Drug Enforcement Admin., *2018 National Drug Threat Assessment* 19 (2018), https://www.dea.gov/sites/default/files/2018-11/DIR-032-18%202018%20NDTA%20final%20low%20resolution.pdf. Only "a small

percentage of all heroin seized by [CBP] along the land border was between Ports of Entry." *Id*. Fentanyl transiting the southern border is likewise most commonly smuggled in "multi-kilogram loads" in vehicles crossing at legal ports of entry. *Id*. at 33. Defendants have not disputed these assessments.

That does not lead to a conclusion that leaks should not be plugged. It does suggest, however, that Defendants' claim that failing to stay the injunction pending appeal will cause significant irreparable harm is supported by much less than meets the eye. Congress could have appropriated funds to construct these barriers if it concluded that the expenditure was in the public interest, but it did not.

For similar reasons, we are unmoved by Defendants' contention that "the injunction threatens to permanently deprive DoD of its authorization to use the funds at issue to complete" the selected projects, including "approximately $1.1 billion it has transferred for these projects but has not yet obligated via construction contracts," because "the funding will likely lapse during the appeal's pendency." A lapse in funding does not mean that the money will disappear from the Treasury. The country will still have that money. It could be spent in the future, including through appropriations enacted by Congress for the next fiscal year. The lapse simply means that Defendants' effort to justify spending those funds based on the appropriations act for the current fiscal year and the authority to reprogram funds under section 8005 may be thwarted.

Defendants' identification of this lapse as a factor that should tip the balance of harms in their favor actually serves instead to illustrate the underlying weakness in their position. Defendants' rush to spend this money is necessarily driven by their understanding that Congress did not appropriate requested funding for these purposes in the current budget and their expectation that Congress will not authorize that spending in the next fiscal year, either. The effort by Defendants to spend this money is not consistent with Congress's power over the purse or with the tacit assessment by Congress that the spending would not be in the public interest.

Finally, Defendants maintain that a stay is necessary because DoD "is incurring unrecoverable fees and penalties of hundreds of thousands of dollars to its contractors for each day that construction is suspended." But that liability resulted from Defendants' own decisions about how to proceed in the face of litigation. Plaintiffs filed their motion for a preliminary injunction on April 4, 2019, and a hearing was held on May 17. When DoD awarded contracts on April 9 for El Paso Project Sector 1, and May 15 for Yuma Project Sector 1 and Tucson Project Sectors 1-3, DoD knew this litigation was pending and that the district court had been asked to enter a preliminary injunction. Placing significant weight on financial obligations that Defendants knowingly undertook would, in effect, reward them for self-inflicted wounds.

Moving to the impacts on the Plaintiffs, Defendants denigrate those impacts as limited to "aesthetic and recreational injuries."  As noted above, *see supra* Section II, Defendants have elected not to dispute that Plaintiffs' interests are sufficiently substantial to support Article III standing.  Environmental injuries have been held sufficient in many cases to support injunctions blocking substantial government projects.  The Supreme Court has observed that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).

As to the public interest, we conclude that the public interest weighs forcefully against issuing a stay.  The Constitution assigns to Congress the power of the purse.  Under the Appropriations Clause, it is Congress that is to make decisions regarding how to spend taxpayer dollars.  As we have explained, *see supra* Section V.C.2., the Appropriations Clause serves as a check by requiring that "not a dollar of [money in the Treasury] can be used in the payment of any thing not thus previously sanctioned" by Congress," as "[a]ny other course would give to the fiscal officers a most dangerous discretion."  *Reeside v. Walker*, 52 U.S.

272, 291 (1850).  In the words of then-Judge Kavanaugh, the Appropriations

Clause is

> a bulwark of the Constitution's separation of powers
> among the three branches of the National Government.  It
> is particularly important as a restraint on Executive
> Branch officers: If not for the Appropriations Clause, the
> executive would possess an unbounded power over the
> public purse of the nation; and might apply all its monied
> resources at his pleasure.

*U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir.

2012) (Kavanaugh, J.) (quotation marks omitted).  The Clause prevents the

Executive Branch from "even inadvertently obligating the Government to pay

money without statutory authority."  *Id.*  The public interest in ensuring protection

of this separation of powers is foundational and requires little elaboration.  *See*

*supra* Section V.A.

Similarly, when Congress chooses how to address a problem, "[i]t is quite

impossible . . . to find secreted in the interstices of legislation the very grant of

power which Congress consciously withheld," as doing so is "not merely to

disregard in a particular instance the clear will of Congress," but "to disrespect the

whole legislative process and the constitutional division of authority between

President and Congress."  *Youngstown*, 343 U.S. at 609 (1952) (Frankfurter, J.,

concurring).  Congress did not appropriate money to build the border barriers

Defendants seek to build here.  Congress presumably decided such construction at

this time was not in the public interest.  *See id.*; *supra* Section V.A.1.ii.  It is not for us to reach a different conclusion.

The public interest and the balance of hardships do not support granting the motion to stay.

## VII.   Conclusion

In his concurrence in *Youngstown*, Justice Jackson made eloquent comments that seem equally apt today:

> The essence of our free Government is "leave to live by no man's leave, underneath the law"—to be governed by those impersonal forces which we call law.  Our Government is fashioned to fulfill this concept so far as humanly possible.  The Executive, except for recommendation and veto, has no legislative power.  The executive action we have here originates in the individual will of the President and represents an exercise of authority without law. . . .  With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.
>
> Such institutions may be destined to pass away. But it is the duty of the Court to be last, not first, to give them up.

343 U.S. at 654-55 (Jackson, J., concurring).

Heeding Justice Jackson's words, we deny Defendants' motion for a stay.

FILED

JUL 03 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

<u>Sierra Club v. Trump</u>, Case Nos. 19-16102, 19-16300

N.R. SMITH, Circuit Judge, dissenting:

The majority here takes an uncharted and risky approach—turning every question of whether an executive officer exceeded a *statutory* grant of power into a *constitutional* issue. This approach is in contradiction to the most fundamental concepts of judicial review. The majority has created a constitutional issue where none previously existed. *See Dalton v. Specter*, 511 U.S. 462, 472–74 (1994). We have no right to expand the Judiciary's role in this manner and, as explained in greater detail below, the majority's approach has been expressly rejected by the Supreme Court.

Turning to the merits of the case before us, we are asked solely whether we should stay a permanent injunction prohibiting Defendants from transferring certain funds within the budget of the Department of Defense (DoD) to support counterdrug activities, while the parties await a final ruling on the merits of the permanent injunction order. We are not, as the majority claims, "evaluat[ing] the merits more fully that we otherwise might." Maj. Op. at 31. In fact, the parties have expressly informed the court that they will be presenting an expedited briefing schedule for the merits panel by July 8, 2019, Dkt. No. 65 at 4—four days after the

parties anticipate a decision from the current panel.[1] Because Defendants have

satisfied their burden to obtain the requested relief when Plaintiffs' claim is

properly cast as a statutory issue, the majority should grant Defendants' motion to

stay the permanent injunction until the matter is finally determined on appeal.

In deciding whether to stay an injunction pending appeal, we must consider:

"(1) whether the stay applicant has made a strong showing that [it] is likely to

succeed on the merits; (2) whether the applicant will be irreparably injured absent a

stay; (3) whether issuance of the stay will substantially injure the other parties

interested in the proceeding; and (4) where the public interest lies," *Nken*, 556 U.S.

at 434 (citation omitted). "[H]arm to the opposing party and weighing the public

interest . . . merge when the Government" is one of the parties. *Id.* at 435. Although

"[t]he first two factors . . . are the most critical," *id.* at 434, we must "give serious

consideration to the public interest factor," *Nat. Res. Def. Council, Inc. v. Winter,*

_____

[1]The majority ignores this declaration. Maj. Op. at 31. The parties have asked us to expedite our decision, but they have not asked us to make a merits decision in contravention of traditional procedure. *Nken v. Holder*, 556 U.S. 418, 427 (2009) (recognizing that the "ordinary processes of administration and judicial review" best ensure "careful review and a meaningful decision" (citation omitted)). Whether an issue may become moot during the course of an appeal does not change the scope of our review for a motion to stay. Even though the parties rely on their previous briefs for purposes of this motion, they do not suggest that they do not have additional arguments for the merits of appeal. We should not be deciding the merits of these issues (potentially binding the merits panel).

2

502 F.3d 859, 863 (9th Cir. 2007). In any event, the decision to grant or deny a

stay is discretionary. *Nken*, 556 U.S. at 433–34. Here, each factor favors issuing a

stay.[2]

## I.    Defendants are Likely to Succeed on the Merits

The district court granted a permanent injunction in Plaintiffs' favor based

on a purported statutory claim under the DoD Appropriations Act for Fiscal Year

2019, Pub. L. No. 115-245, §§ 8005, 9002, 132 Stat. 2981, 2999. *See* Permanent

Injunction Order at 3–4, 6–8. The district court analyzed only whether Defendants

exceeded their statutory authority under § 8005, without discussing whether they

also separately violated any constitutional provision. *See generally id.*

---

[2]Whether Defendants are likely to succeed on the merits of this appeal
ultimately turns on whether the district court abused its discretion in issuing the
permanent injunction. *See La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
762 F.3d 867, 879 (9th Cir. 2014). Thus, even though this is only a motion to stay,
we review the district court's grant of a permanent injunction for abuse of
discretion, and we review its legal conclusions de novo. *Aircraft Serv. Int'l, Inc. v.
Int'l Bhd. of Teamsters*, 779 F.3d 1069, 1072 (9th Cir. 2015) (en banc). "It is an
abuse of discretion to apply the wrong legal standard." *United States v. Emmett*,
749 F.3d 817, 819 (9th Cir. 2014). As explained in greater detail below, the district
court abused its discretion here by failing to analyze Plaintiffs' claim under the
Administrative Procedure Act. *See, e.g.*, Permanent Injunction Order at 4 ("[T]he
Court continues to find that the [zone of interests] test has no application in an
*ultra vires* challenge, which operates outside of the APA framework."). The
majority does not defend the district court's decision, but rules in Plaintiffs' favor
under a completely different—yet equally faulty—legal theory.

Nevertheless, the majority views Plaintiffs' claim as, "at its core, one alleging a constitutional violation." Maj. Op. at 32. As discussed below, viewing Plaintiffs' claim as alleging a statutory violation is the proper approach. *Dalton*, 511 U.S. at 472–74.

When their claim is properly viewed as alleging a statutory violation, Plaintiffs have no mechanism to challenge Defendants' actions. Plaintiffs have neither an implied statutory cause of action under § 8005, nor an equitable cause of action. *See generally Dalton*, 511 U.S. at 472–76. Nor do Plaintiffs have a cause of action to challenge the DoD's § 8005 reprogramming under the Administrative Procedure Act (APA), as they fall outside of the zone of interests for such a claim. Consequently, Defendants have made a strong showing that they are likely to succeed on the merits of their appeal.

### 1. Plaintiffs Claim Is Properly Viewed as Alleging a Statutory Violation

Because we are allowed to affirm the permanent injunction "on any ground supported by the record," *Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 608 (9th Cir. 2000) (citation omitted), the majority denies Defendants' motion for a stay by re-characterizing Plaintiffs' claim as a constitutional violation—despite the contrary ground relied on by the district court in its

decision³—which the majority now analyzes on the fly.

The majority's primary mistake is drawing no distinction between a claim that an agency is violating a statute and a claim that an agency is violating the Constitution:

> If section 8005 does not authorize the reallocation, however, then Defendants are acting outside of any statutory appropriation and are therefore spending funds contrary to Congress's appropriations decisions. . . . The lack of compliance with section 8005 has sometimes been labeled *ultra vires* as outside statutory authority or as outside the President's Article II powers, and spending without an appropriation has been described as a violation of the Appropriations Clause. However their claim is labeled, Plaintiffs' theory is ultimately the same.

Maj. Op. at 34 & n.16. This approach is flatly contradicted by *Dalton* and related cases, which clarified the distinction between "claims of constitutional violations and claims that an official has acted in excess of his statutory authority" and declared that "[o]ur cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is

---

³The district court construed Plaintiffs' claim as an *ultra vires* action to enforce § 8005. Permanent Injunction Order at 4. It determined that principles of constitutional avoidance required it to first analyze whether § 8005 supported the reprogramming, and reach the constitutional analysis only if necessary. *Sierra Club v. Trump*, No. 19-CV-00892-HSG, 2019 WL 2247689, *18 (N.D. Cal. March 24, 2019); Permanent Injunction Order at 5 ("[N]o new factual or legal arguments persuade the Court that its analysis in the preliminary injunction order was wrong."). Thus, the court never conducted a constitutional analysis of this question.

5

*ipso facto* in violation of the Constitution." *Dalton*, 511 U.S. at 472.

Indeed, recasting Plaintiffs' challenge—fundamentally a dispute about whether the DoD erred in deciding that the pre-conditions of § 8005 were met—as a constitutional claim against the DoD for violating the Appropriations Clause contradicts several lines of caselaw.

First, *Dalton* clarifies that cases such as *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) involve constitutional violations, because "[t]he only basis of authority asserted was the [executive's] inherent constitutional power." *Dalton*, 511 U.S. at 473. In those instances, "the case necessarily turned on whether *the Constitution* authorized the [executive's] actions," only "[b]ecause no statutory authority was claimed." *Id.* (emphasis added).

This is not that type of case. As noted by the majority, Plaintiffs' claim entirely rises or falls on whether the DoD complied with the limitations in § 8005. Maj. Op. at 34 ("If Defendants were correct that section 8005 allowed this spending reallocation, Plaintiffs' claim would fail, because the spending would be consistent with Congress's appropriation legislation. If section 8005 does not authorize the reallocation, however, then Defendants are acting outside of any statutory appropriation and are therefore spending funds contrary to Congress's appropriations decisions."). The DoD offers no other source of authority *besides* a

statute. Accordingly, this case "concern[s] *only* issues of statutory interpretation" and "*no constitutional question whatever is raised.*" *Dalton*, 511 U.S. at 474 n.6 (emphasis added) (citation and internal quotation marks omitted).

Second, applying *Dalton* to the Appropriations Clause context requires us to reject the majority's logic, which relies on the assumption that every violation of an appropriations statute is *necessarily* a constitutional violation. In *Dalton*, Congress granted the President discretion to take certain actions, and the plaintiffs asserted that he had exceeded that authority. *Id.* at 474. The plaintiffs further claimed that, *because* the President had exceeded his statutory authority, he had also violated the Constitution. *Id.* That is precisely the majority's approach in this case. *See* Maj. Op. at 51 ("Plaintiffs claim that to the extent Defendants did not have statutory authority to reprogram the funds, they acted in violation of constitutional separation of powers principles because Defendants lack any background constitutional authority to appropriate funds."). The Supreme Court rejected this type of constitutional claim, flatly reminding us that "[t]he distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration." *Dalton*, 511 U.S. at 474.

Finally, the distinction between an Appropriations Clause violation and a

non-constitutional "exceeding statutory authority" claim turns on the degree of

discretion Congress has provided to the agency or President in appropriating funds.

On the one hand, if Congress has entirely withdrawn agency discretion over the

who, what, when, where, and why of agency spending, an Appropriations Clause

violation may lie. *See, e.g.*, *United States v. McIntosh*, 833 F.3d 1163, 1172, 1175

(9th Cir. 2016). On the other hand, if Congress has merely appropriated a lump-

sum amount and leaves it to the agency to re-allocate funds toward a particular

statutory purpose, Congress has provided such discretion to the agency that, not

only could there be no *constitutional* violation, a challenger does not even have a

viable "exceeding statutory authority" claim.[4] *See Lincoln v. Vigil*, 508 U.S. 182,

193 (1993). Section 8005, which appropriates funds to the DoD and makes

allocating those funds incumbent on the Secretary's determination of the "national

interest" and other factors, falls somewhere in the middle. Unlike the

appropriations language in *McIntosh*, which we observed "*specifically* restricts [the

Department of Justice (DOJ)] from spending money to pursue certain activities,"

833 F.3d at 1172 (emphasis added), or the non-discretionary "not to exceed" and

"shall be allotted" language in *Train v. City of New York*, 420 U.S. 35, 42 (1975),

---

[4]The statutory claims in *Dalton* ultimately failed on this basis. *See Dalton*, 511 U.S. at 474–76.

8

§ 8005 provides some discretion over the who, what, when, where, and why of agency spending. Yet, unlike the virtually unfettered discretion of the agency to re-allocate funds towards particular statutory purposes in *Lincoln*, 508 U.S. at 192–93, § 8005 constrains the discretion and the DoD is "not free simply to disregard *statutory* responsibilities." *Id.* at 193 (emphasis added). Accordingly, the DoD's reprogramming of funds is a judicially reviewable statutory claim. The majority overlooks these points.

In attempting to distinguish *Dalton*, the majority misstates the chronology of the Supreme Court's decision, claiming that "[t]he Supreme Court held that the plaintiff's statutory challenge to the President's decision failed because the statute gave the President unfettered discretion . . . [and] then also rejected the argument that because the President had allegedly violated the statute, he had acted unconstitutionally." Maj. Op. at 49. However, the Supreme Court declared *first* that there was no constitutional issue, *Dalton*, 511 U.S. at 472–74, and only thereafter determined that the plaintiffs' statutory claim failed based on the President's unfettered discretion, *id.* at 474–76. Consequently, the Court's conclusion that "no constitutional question whatever is raised" did not stem from its later conclusion that the President had, in fact, acted within his statutory authority in that case. *Id.* at 474 n.6; *see also id.* at 476–77 ("In sum . . . [t]he claim that the President exceeded

his authority under the 1990 Act *is not a constitutional claim, but a statutory one*.

Where a statute, such as the 1990 Act, commits decisionmaking to the discretion of

the President, judicial review of the President's decision is not available."

(emphasis added)).

The majority also attempts to distinguish *Dalton* on the grounds that it "did

not say . . . that action in excess of statutory authority can *never* violate the

Constitution or give rise to a constitutional claim." Maj. Op. at 49. Albeit true that

claims alleging statutory violations and those alleging constitutional violations are

not mutually exclusive, *Dalton* expressly discussed when the two may be asserted

together—by pointing to cases where the constitutionality of the authorizing statute

itself is called into question. *Dalton*, 511 U.S. at 473 n.5; *see, e.g.*, *Chamber of*

*Commerce of United States v. Reich*, 74 F.3d 1322, 1325 (D.C. Cir. 1996)

(determining that a claim raised a constitutional violation, because it alleged that

the relevant statutory authority itself was "an unconstitutional delegation" of

Congressional power). But Plaintiffs have not alleged that § 8005 is itself

unconstitutional.

The majority's approach would turn our current system of administrative

review on its head, directing courts in this circuit to deem *unconstitutional* any

reviewable executive actions (i.e., any actions that are not entirely within the

actor's discretion) that exceed a *statutory* grant of authority. Such an approach directly contradicts the Supreme Court's declaration that "[o]ur cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution."[5] *Dalton*, 511 U.S. at 472. For those reasons, the majority's approach is flawed; no claim of a constitutional violation exists in this case.

### 2. Plaintiffs have no Implied Statutory Claim

Whether Plaintiffs have an implied statutory cause of action under § 8005 turns on "whether Congress intended to create a private cause of action." *Karahalios v. Nat'l Fed'n of Fed. Emps., Local 1263*, 489 U.S. 527, 532 (1989) (citation and internal quotation marks omitted).

Here, "[t]here is no express suggestion" that Congress intended a direct judicial remedy for a § 8005 violation, and "neither the language nor the structure of the Act shows any congressional intent to provide a private cause of action to" judicially enforce such a violation. *Id.* at 532–33. Likewise, "[n]othing in the

---

[5] The majority's approach is also directly contradicted by the D.C. Circuit. In *Mountain States Legal Foundation v. Bush*, our sister circuit determined that "[n]o constitutional . . . claim is before us, as the President exercised his delegated powers *under the Antiquities Act*," precisely because "that statute includes intelligible principles to guide the President's actions." 306 F.3d 1132, 1137 (D.C. Cir. 2002) (emphasis added).

legislative history of [§ 8005] has been called to our attention indicating that Congress contemplated direct judicial enforcement." *Id.* at 533.

Furthermore, § 8005 is directed not at private parties or individuals, but at the Secretary of Defense; creates no apparent individual rights, much less an individual remedy; and "lacks the sort of rights-creating language needed to imply a private right of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1387 (2015).

### 3. Plaintiffs have no APA Claim

With *Dalton* limiting our ability to construe Plaintiffs' claim as alleging a constitutional violation, and with no implied statutory cause of action to challenge the agency's action as a violation of § 8005, Plaintiffs are left with challenging the DoD's reprogramming under the APA as an "abuse of discretion," "not in accordance with law," or "in excess of statutory jurisdiction." *See* 5 U.S.C. § 706(2)(A), (C). *See Clouser v. Espy*, 42 F.3d 1522, 1527 n.5 (9th Cir. 1994) (construing a plaintiff's challenge to Forest Service rulings "as issued without statutory authority" to be "a claim challenging agency action 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right' under 5 U.S.C. § 706(2)(C)"). However, although the APA is the proper vehicle for challenging the DoD's § 8005 reprogramming, Plaintiffs are not a proper party to bring such a

12

claim, as they fall outside § 8005's zone of interests. The majority errs by fashioning an equitable claim to bypass the APA's limitations.

### a. The APA is the Proper Vehicle for Challenging the DoD's Action

Where a statute imposes obligations on a federal agency but "does not give rise to a 'private' right of action against the federal government[,] [a]n aggrieved party may pursue its remedy under the APA." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1096–99 (9th Cir. 2005) (explaining how a federal action is nearly always reviewable under the APA for conformity with statutory obligations even absent a "private right of action"). In other words, the APA opens the door for judicial review provided: (1) the agency's action is "final," 5 U.S.C. § 704; (2) the statute imposing obligations on the federal agency does not "preclude judicial review," *id.* § 701(a)(1); and (3) the agency action is not "committed to agency discretion by law," *id.* § 701(a)(2). *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). Each element is satisfied here.

First, the agency's action satisfies the test for "final agency action" for purposes of 5 U.S.C. § 704. The finality of an agency's action turns on whether the decision represents the "consummation of the agency's decisionmaking process" and whether it determines rights or obligations, or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). After

approving the Department of Homeland Security's (DHS) request for support

under 10 U.S.C. § 284, the Secretary of Defense concluded support could be

funded through the reprogramming of funds under § 8005. The Secretary found the

§ 8005 criteria were met. Following the necessary procedures, the DoD transferred

the funds to the Drug Interdiction and Counter-Drug Activities, Defense,

appropriation account. Because the DoD committed those funds for § 284(b)(7)

support, "legal consequences [began to] flow." *See Bennett*, 520 U.S. at 178

(citation omitted). Indeed, Defendants acknowledge that the § 8005 transfer was

necessary for authorizing support under § 284 and constructing the wall.

Second, as explained above, § 8005 does not "preclude judicial review." *See*

5 U.S.C. § 701(a)(1). Further, neither party presented "clear and convincing

evidence" that § 8005 precludes APA's default remedy. *See Abbott Labs. v.

Gardner*, 387 U.S. 136, 140–41 (1967), *abrogated on other grounds by Califano v.

Sanders*, 430 U.S. 99 (1977).

Finally, the DoD's reprogramming of funds under § 8005 is not "committed

to agency discretion by law." 5 U.S.C. § 701(a)(2). Defendants do not argue to the

contrary, nor would such an argument succeed. The APA embodies a broad

presumption of judicial review of agency action. *Abbott Labs.*, 387 U.S. at 140–41.

Out of concern that "legal lapses and violations occur, and especially so when they

14

have no consequence," *Weyerhaeuser Co.*, 139 S. Ct. at 370 (quoting *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1652–53 (2015)), the Supreme Court "read[s] the [phrase 'committed to agency discretion'] quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* (quoting *Lincoln*, 508 U.S. at 191).

The appropriation scheme governing § 8005 allows the DoD to reprogram funds provided the transferred funds address "higher priority items, based on unforeseen military requirements, than those for which originally appropriated."[6] § 8005. And "in no case" may the Secretary use the funds "where the item for which reprogramming is requested has been denied by the Congress." *Id.* Thus, we do not confront one of those rare circumstances where a court would have no meaningful standard for judging the agency's exercise of discretion. *See Weyerhaeuser*, 139 S. Ct. at 371–72 (citing *Lincoln*, 508 U.S. at 191); *accord Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). For example, whether the "item" to be funded by the reprogrammed funds was "denied" by Congress turns on a meaningful question of statutory interpretation—i.e., what

---

[6] Section 9002 is subject to these same limitations.

15

does "item" and "denied" mean?[7] This court is generally required to provide some

deference to such an interpretation, depending on the circumstance, *see Chevron,*

*U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Skidmore v. Swift*

*& Co.*, 323 U.S. 134 (1944),[8] but the phrase undoubtedly places a judicially

reviewable constraint on the DoD's actions.

### b. Plaintiffs are Not the Proper Party to Bring an APA Claim

However, to bring a valid APA claim, Plaintiffs must establish that they "fall

within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v.*

*Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (citation omitted). They

have failed to do so.[9]

_____

[7]Unlike in *Lincoln*, the appropriation scheme governing Plaintiffs' claims does not involve a lump-sum appropriation designed with merely a general, overarching goal and no specific strings attached to the money. 508 U.S. at 189–92.

[8]In determining whether Defendants violated § 8005, we should defer to the DoD's interpretation under *Skidmore*. *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 487 (2004). *Skidmore* deference operates like a sliding scale, meaning the degree of deference we give the agency's interpretation of a statute "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. We also consider whether the agency has changed its position or whether its interpretation "was framed for the specific purpose of aiding a party in this litigation." *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 400 (2008).

[9]Because the majority concludes Plaintiffs' APA claim is constitutional, we
(continued...)

The zone of interests test requires a court to determine whether, "in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). "[T]he relevant zone of interests is not that of the APA itself, but rather the zone of interests to be protected or regulated by the statute that the plaintiff says was violated." *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1244 (9th Cir. 2018) (alteration omitted) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)). "[W]e first discern the interests arguably to be protected by the statutory provision at issue; we then inquire whether the plaintiff's interests affected by the agency action in question are among them." *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 492 (1998) (alteration and internal quotation marks omitted).

Although, "in the APA context, . . . the test is not 'especially demanding,'" *Lexmark*, 572 U.S. at 130, it "is not toothless," *Nw. Requirements Utils. v. FERC*,

---

⁹(...continued)
disagree as to what zone of interests applies. However, as a statutory claim, Plaintiffs must fall within the zone of interests of § 8005. They have failed to do so. Because this claim should not be viewed as a constitutional claim under the Appropriations Clause, it is not necessary to decide whether Plaintiffs could (or would need to) fall within that zone of interests.

798 F.3d 796, 808 (9th Cir. 2015). "In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399. Even under this generous standard, we have found certain APA claims fail the zone of interests test.[10] *See, e.g.*, *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005) ("[P]urely economic interests do not fall within [the National Environmental Policy Act's (NEPA)] zone of interests" because "the zone of interests that NEPA protects [is] environmental."); *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166–67 (9th Cir. 2018) (recognizing that the plaintiff's environmental interests fell outside the Mining Act's zone of interests, but within the Federal Land Policy and Management Act's zone of interests); *Nw. Requirements Util*s., 798 F.3d at 809 (determining zone of interests test not satisfied where the plaintiffs' goals were likely to frustrate rather than further statutory objectives).

---

[10]Plaintiffs cite the D.C. Circuit's decision in *Scheduled Airlines Traffic Offices, Inc. v. Department of Defense*, 87 F.3d 1356 (D.C. Cir. 1996) as "illustrat[ing] the expansive zone of interests for claims arising under statutes protecting Congress's control over appropriations decisions." However, that case merely applied the same zone of interests test that we do here to determine that the plaintiff's economic interests were "sufficiently congruent" with the statute and fell within the zone of interests. *Id.* at 1360.

Here, Plaintiffs' interests fall outside § 8005's zone of interests. Section 8005 operates only to authorize the Secretary of Defense to transfer previously-appropriated funds between DoD accounts, based upon certain conditions and circumstances. This statute arguably protects Congress and those who would have been entitled to the funds as originally appropriated; and as a budgetary statute regarding the transfer of funds among DoD accounts, it arguably protects economic interests. Plaintiffs have not asserted that they would have been entitled to the funds but for the transfer, nor have they raised any other economic interests. Rather, they assert aesthetic, recreational, and generalized environmental interests that will be affected, not by the transfer of funds, but by the building of the border wall. Nothing in § 8005 requires that aesthetic, recreational, or environmental interests be considered before a transfer is made, nor does the statute even address such interests. At best, Plaintiffs' interests are only "marginally related to . . . the purposes implicit in the statute [such] that it cannot reasonably be assumed that Congress intended to permit the suit," *Clarke*, 479 U.S. at 399, and they fall outside § 8005's zone of interests. Thus, Plaintiffs may not bring this APA claim, because their interests are not protected by the relevant statute.

### c. The Existence of an APA Claim Also Precludes an Equitable Constitutional Claim

Even though *these* Plaintiffs lack a cause of action under the APA, this court

cannot save their claim by fashioning an "equitable" work-around to assert a constitutional claim, as the majority has done. Even if we ignored the discretion § 8005 provides to the DoD and thus could reframe Plaintiffs' claim as a constitutional one, the APA's "scope of review" provision would cover it. Those provisions provide that a reviewing court shall:

> [H]old unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) *contrary to constitutional right, power, privilege, or immunity*;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]

5 U.S.C. § 706(2) (emphasis added). Where courts can review an agency action under the APA to ensure the agency has not abused its discretion, violated the Constitution, or otherwise operated outside its authority, we have no business devising additional "equitable" causes of action. Here, an avenue for challenging the DoD's reprogramming action exists under the APA—just not for these Plaintiffs. Thus, there is no reason to resort to the extraordinary step of implying an equitable cause of action for these Plaintiffs.

As the majority recognizes, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity." *See Armstrong*, 135 S. Ct. at 1384–85. However, this "judge-made remedy" does not

provide courts the unfettered power to enjoin executive action; our power "is subject to express and implied statutory limitations." *Id.* at 1385. The majority ignores this limitation, relying on inapposite cases to conclude that a federal court's "equity" jurisdiction allows any would-be plaintiff to avoid proceeding under the APA. Maj. Op. at 46–47. That the Supreme Court considered challenges to a *president*'s action in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) and *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) lends the majority no support; the APA does not apply to the President, *see Dalton*, 511 U.S. at 468, so *no plaintiff* would have an APA claim in those cases. Yet this case is about an *agency* action, and therefore the APA applies. Moreover, *McIntosh* arose in a very different context; our court did not "allow[] an equitable action to enforce the Appropriations Clause," Maj. Op. at 48, we considered the Appropriations Clause as a *defense* for criminal defendants indicted for federal marijuana offenses, *McIntosh*, 833 F.3d at 1168 ("We are asked to decide whether criminal defendants may avoid prosecution for various federal marijuana offenses on the basis of a congressional appropriations rider that prohibits the United States Department of Justice from spending funds to prevent states' implementation of their own medical marijuana laws."). Allowing defendants to invoke constitutional principles as a defense is common, *see, e.g.*, *Bond v. United States*, 564 U.S. 211, 225–26 (2011),

21

and distinguishable from the affirmative enforcement that the majority provides here.[11]

The majority's reliance on *Armstrong* highlights its fundamental misunderstanding of cases involving a court's equitable power to enjoin acts violating federal law. Maj. Op. at 52–53. Congress has not *displaced* the possibility of judge-made equitable remedies against federal agencies through the APA, *see Armstrong*, 135 S. Ct. at 1385, it *codified* judicial review of agency action.[12] *Cf. W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) ("The fact that APA's procedures are available where no other adequate alternative remedy exists further indicates Congress's intent that courts should not devise

---

[11]The majority misunderstands my point about the distinguishing features of *McIntosh*. Maj. Op. at 48. The question facing the *McIntosh* court was whether criminal defendants could halt their prosecutions by attacking how the DOJ was funding the prosecutions. 833 F.3d at 1172–73. All of the defendants "filed motions to dismiss or to enjoin on the basis of the rider." *Id.* at 1170. In granting relief, the court stated that it "need not decide in the first instance exactly how the district courts should resolve claims that the DOJ is spending money to prosecute a defendant in violation of an appropriations rider. We therefore take no view on the precise relief required and leave that issue to the district courts in the first instance." *Id.* at 1172 n.2. As such, *McIntosh* simply did not address or contemplate an injunction to enjoin spending funds parallel to the pending criminal proceedings.

[12]Without supporting authority, the majority even suggests that the availability of an equitable cause of action would *preclude* an APA claim under the APA provision providing for judicial review when "there is no other adequate remedy in a court." Maj. Op. at 57 (quoting 5 U.S.C. § 704).

additional, judicially crafted default remedies."); *San Carlos Apache Tribe*, 417 F.3d at 1096–97 ("[C]reating a direct private action against the federal government makes little sense in light of the administrative review scheme set out in the APA.").[13]

The majority's failure to channel Plaintiffs' claims through the APA's framework for challenging agency action will inevitably lead to peculiar results. What prevents future plaintiffs from simply challenging any agency action "equitably," thereby avoiding the APA's limited judicial review under the "arbitrary and capricious" standard, so that a court may substitute its own judgment for that of the agency? *See* 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The majority offers no reason to distort decades of administrative law practice to recognize Plaintiffs' "equitable" action when the APA provides for review of the

---

[13]The majority's reliance on *Navajo Nation v. Department of the Interior*, 876 F.3d 1144 (9th Cir. 2017) and *Presbyterian Church v. United States*, 870 F.2d 518 (9th Cir. 1989) is misplaced. *Presbyterian Church* reserved the determination of whether there was "agency action" within the meaning of the APA, 870 F.2d at 525 n.8, meaning there was no "alternative" APA claim. *Navajo Nation* addressed the limits of the APA's waiver of sovereign immunity, but offered no guidance about the propriety of bringing parallel claims espousing the same theory under two different causes of action (under the APA and "equitably"). 876 F.3d at 1171–72. Thus, neither case stands for the proposition that, where (as here) an agency action *is* reviewable under the APA, Plaintiffs may bring a parallel "equitable" claim.

DoD's reprogramming actions.

Although it may seem unjust that Plaintiffs have no viable recourse for their asserted injuries, "[t]he judicial power of the United States conferred by Article III of the Constitution is upheld just as surely by withholding judicial relief where Congress has permissibly foreclosed it, as it is by granting such relief where authorized by the Constitution or by statute." *Dalton*, 511 U.S. at 477. Plaintiffs' relief has been permissibly foreclosed here, and Defendants have accordingly demonstrated a strong likelihood of success on the merits of their appeal.

## II.   The Other Relevant Factors Also Favor a Stay

To reemphasize, the issue before us is a motion to stay the district court's injunction under Federal Rule of Appellate Procedure 8. We are limited to decide only whether a stay should be granted until the appeal on the merits is final. Although "[a] stay is not a matter of right, even if irreparable injury might otherwise result," it is "an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433 (citations, alteration, and quotation marks omitted). Here, the circumstances of this case merit our discretionary relief pending appeal.

Even if Defendants had failed to show a strong likelihood of success on the merits, they "may be entitled to prevail if [they] can demonstrate a 'substantial case

24

on the merits' and the second and fourth factors [irreparable injury and public interest] militate in [their] favor." *Winter,* 502 F.3d at 863. Because Plaintiffs have no viable claim for relief, Defendants have more than demonstrated a substantial case on the merits.[14] Therefore, our panel must "give serious consideration" to the second and fourth factors. *Id.*

As to irreparable harm, Defendants argue that without a stay they will be prevented from ever using the enjoined funds to complete the identified projects addressed by the permanent injunction. Defendants are likely correct. The funding for those projects will lapse on September 30th, and even if Defendants prevail in this court's final ruling, we could not order or permit Defendants to spend funds granted in a lapsed appropriation. *See, e.g.*, *City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1424, 1426–27 (D.C. Cir. 1994). No one appears to dispute that this will likely be the practical consequence if a stay is denied.

---

[14]As to the discretionary standard of review, the district court did not apply the second and fourth factors (for the short period of time for which this appeal would be pending) to the request for the permanent injunction. Thus, its factual findings are not clear as to the motion before us. It did have the occasion to apply these two factors in its analysis of the stay of the preliminary injunction. However, in its analysis of that stay, it chose to ignore these factors, concluding that, "[b]ecause the Court finds that Defendants have not met their burden to make a strong showing that they are likely to succeed on the merits of their appeal, the Court need not further address the other *Nken* factors." *Sierra Club v. Trump*, No. 19-CV-00892-HSG, 2019 WL 2305341, at *2 n.2 (N.D. Cal. May 30, 2019). This conclusion was an abuse of discretion. *See Winter*, 502 F.3d at 862.

Congress may opt to appropriate new funds for these projects in the future, but that possibility is irrelevant. Simply, the permanent injunction will certainly render Defendants unable to use the funds at issue here under § 284(b)(7). Thus, there is a "possibility that . . . corrective relief will [not] be available at a later date, in the ordinary course of litigation." *See Sampson v. Murray*, 415 U.S. 61, 90 (1974). Therefore, Defendants have demonstrated that they will be irreparably injured if a stay is not issued. *See id.*

As to the public interest, Defendants argue that their interests in preventing drug trafficking easily outweigh Plaintiffs' aesthetic, recreational, and generalized environmental injuries. In the narrow context of this stay motion, Defendants are correct. Even though environmental injuries may be significant in the long term, the injunction will only be stayed for a short period.[15] If the DoD is precluded from obligating these funds in the 2019 fiscal year, it must forgo providing support under § 284(b)(7). Defendants have adequately demonstrated that the public interest weighs in their favor for supporting § 284(b)(7) for at least three reasons.[16]

---

[15]As previously noted, the parties have suggested that an expedited briefing schedule will be requested. Given the need for a timely resolution of this case, this case should be resolved shortly.

[16]Whether the district court appropriately balanced these interests when it issued the permanent injunction is not before us. Our inquiry is limited to the motion to stay, and the final determination on the balance on interests is one that

(continued...)

First, no one disputes that Defendants have broad authority to carry out a variety of actions aimed at disrupting the cross-border flow of narcotics in the affected areas. *Cf. United States v. Guzman-Padilla*, 573 F.3d 865, 889 (9th Cir. 2009). Nor does anyone dispute that Defendants are authorized by statute to construct fencing and other barriers for that purpose in the areas at issue in this lawsuit. *See* 10 U.S.C. § 284(b)(7). Nor even does anyone seriously dispute the DoD's determination that drug trafficking along our southern border (including in the project areas at issue here) threatens the safety and security of our nation and its citizens. *See Winter*, 502 F.3d at 862 ("We customarily give considerable deference to the Executive Branch's judgment regarding foreign policy and national defense." (citing *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988))); *see also Franklin*, 505 U.S. at 818. Given this significant national security interest, the public would benefit more from a stay that—while this appeal is pending—permits Defendants to effect the policies that it has determined are necessary to minimize that threat, than it would from a decision that hampers Defendants' ability to combat this threat throughout the present appellate process.[17]

---

[16](...continued)
the merits panel will ultimately decide.

[17]The record does not reflect that Congress "denied" funding under § 284. The funds at issue here will be used solely to "provide support for the counterdrug
(continued...)

Second, if the injunction is allowed to remain in effect, it will, for reasons outlined above, potentially cause irreparable harm to Defendants. On the other hand, the irreparable harm to Plaintiffs during this relatively short period (if a stay is granted) is less clear. Defendants have represented to this court that the projects at issue are needed to protect national security and must go forward even if there is a possibility that a merits panel may eventually order them to remove whatever was constructed while a stay was in place. This is not the sort of determination that courts will ordinarily second guess. *See Winter*, 502 F.3d at 862; *Franklin*, 505 U.S. at 818 (recognizing "the principle of judicial deference that pervades the area of national security"); *see also Munaf v. Geren*, 553 U.S. 674, 689 (2008) ("We therefore approach these questions cognizant that 'courts traditionally have been

---

[17](...continued)
activities." § 284. The fact that there were numerous discussions surrounding the building of a wall, during the budgetary negotiations and the shut down of the government, does not alter what Congress set forth in its appropriations bill for the DoD. *See Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012) ("An agency's discretion to spend appropriated funds is cabined only by the 'text of the appropriation,' not by Congress' expectations of how the funds will be spent, as might be reflected by legislative history." (citation omitted)). Nowhere in the DoD Appropriations Act are there limitations on its ability to act under § 284. Moreover, the transfer of funds stays within the DoD's allotted appropriations and does not increase the appropriations of the DHS. Even if we should look to all appropriation acts, the only limitations placed on the DHS "for the construction of pedestrian fencing" were for geographic areas and "funds made available by this Act or prior Acts." *See* Pub. L. No. 116-6, § 231, 133 Stat. 13, 28. *see also id.* § 232.

reluctant to intrude upon the authority of the Executive in military and national security affairs.'" (quoting *Egan*, 484 U.S. at 530)). It is difficult to determine that Plaintiffs' inability to recreate in and otherwise enjoy this public land would outweigh the claimed national interests during the limited period of time the requested stay would be in place—especially considering Plaintiffs do not have a viable cause of action to challenge Defendants' actions under § 8005.

Third, the district court's reasoning that the public interest does not favor Defendants, because the public has a generalized interest in ensuring that the Executive acts within the limits imposed by statute and by the Constitution, simply begs the question. If a court accepts the premise that Defendants exceeded statutory or constitutional limitations on its authority, then the public has an interest in seeing that the Executive Branch is "reined in." However, if Defendants show that they did not exceed those bounds, then the public interest articulated by Plaintiffs and the district court has no merit. Moreover, when considering whether to grant a stay, the public interest factor cannot rise or fall on how the appeal is ultimately resolved on its merits. That analysis would collapse the public interest factor into the first element of the four-part test.

In conclusion, because Defendants have more than demonstrated a substantial case on the merits, and because the second and fourth factors "militate

29

in [their] favor," we should exercise our discretion and issue a stay pending the appeal of the district court's permanent injunction. *See Winter*, 502 F.3d at 863. It makes little sense to tie Defendants' hands while the appellate process plays out, especially given Plaintiffs' lack of a viable claim and given the national security considerations present in this case.