DROR LADIN*
NOOR ZAFAR*
JONATHAN HAFETZ*
HINA SHAMSI*
OMAR C. JADWAT*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
dladin@aclu.org
nzafar@aclu.org
jhafetz@aclu.org
hshamsi@aclu.org
ojadwat@aclu.org
*Admitted pro hac vice

CECILIA D. WANG (SBN 187782)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
cwang@aclu.org

Attorneys for Plaintiffs (Additional counsel listed on following page)

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| SIERRA CLUB and SOUTHERN BORDER COMMUNITIES COALITION, | Case No.: 4:19-cv-00892-HSG |
| *Plaintiffs*, | |
| v. | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| DONALD J. TRUMP, President of the United States, in his official capacity; MARK T. ESPER, Secretary of Defense, in his official capacity; KEVIN K MCALEENAN, Acting Secretary of Homeland Security, in his official capacity; and STEVEN MNUCHIN, Secretary of the Treasury, in his official capacity, | Date: Nov. 20, 2019 Time: 10:00 AM Judge: Honorable Haywood S. Gilliam Dept: Oakland Date Filed: October 11, 2019 |
| *Defendants*. | |

Additional counsel for Plaintiffs:

SANJAY NARAYAN (SBN 183227)**
GLORIA D. SMITH (SBN 200824)**
SIERRA CLUB ENVIRONMENTAL LAW
        PROGRAM
2101 Webster Street, Suite 1300
Oakland, CA 94612
Tel: (415) 977-5772
sanjay.narayan@sierraclub.org
gloria.smith@sierraclub.org
**Counsel for Plaintiff SIERRA CLUB

MOLLIE M. LEE (SBN 251404)
AMERICAN CIVIL LIBERTIES UNION
        FOUNDATION OF NORTHERN
        CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 621-2493
Fax: (415) 255-8437
mlee@aclunc.org

DAVID DONATTI*
ANDRE I. SEGURA (SBN 247681)
AMERICAN CIVIL LIBERTIES UNION
        FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Tel: (713) 325-7011
Fax: (713) 942-8966
ddonatti@aclutx.org
asegura@aclutx.org
*Admitted pro hac vice

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT .................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

INTRODUCTION ................................................................................... 1

BACKGROUND .................................................................................... 2

LEGAL STANDARD............................................................................... 6

ARGUMENT ........................................................................................ 6

I.   Defendants' diversion of funds violates the CAA ........................................ 7

II.  Section 2808 does not authorize Defendants to raid military construction projects to fund a multibillion dollar civilian law enforcement wall that Congress refused to fund........................................................................................... 8

    A.  Congress's decision to deny the President's requested wall funding to DHS is not an emergency requiring the use of the armed forces ...................................... 9

    B.  A wall extending across the southern border does not constitute a "military construction" project. ................................................................... 11

    C.  A border wall intended to "reduce the challenges to CBP" fails Section 2808's requirement that construction be necessary to support the use of the armed forces ................................................................................. 13

III. Defendants' efforts to circumvent Congress's appropriations restrictions are unconstitutional and this Court should avoid the serious constitutional problems Defendants' efforts raise by invalidating them as ultra vires. .................................. 15

IV.  Defendants are not free to disregard NEPA ............................................ 18

V.   Equitable review is proper and, in the alternative, APA review is available.............. 21

    A.  The Ninth Circuit's binding decision in *Sierra Club v. Trump* establishes that Plaintiffs have a cause of action................................................... 21

    B.  Plaintiffs have an equitable claim under the Constitution ................................... 22

    C.  Plaintiffs satisfy any zone-of-interests requirements for an APA claim.............. 23

VI.  The Court should order injunctive and declaratory relief........................................ 25

    A.  The Court should enter a permanent injunction.................................................... 25

        1.  Plaintiffs will suffer irreparable harm absent an injunction........................... 25

            a.  Wall construction will cause irreparable injury to Plaintiffs' members' aesthetic and recreational interests................................. 26

            b.  SBCC and its member organizations have suffered irreparable harm ...... 28

c.   Defendants' actions irreparably harm Plaintiffs' constitutional interests.................................................................................... 32

2.   Plaintiffs do not have an adequate remedy at law............................................ 32

3.   The balance of harms and public interest support a permanent injunction..... 33

B.  The Court should declare unlawful Defendants' proposed use of Section 2808 to construct a border wall that Congress rejected, as well as Defendants' violation of NEPA.................................................................................................. 33

CONCLUSION............................................................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*Aetna Life Ins. Co. v. Haworth,*
  300 U.S. 227 (1937) ............................................................................................... 34

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ........................................................................... 26, 33

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
  559 F.3d 1046 (9th Cir. 2009) ................................................................................ 32

*Amoco Prod. Co. v. Vill. of Gambell,*
  480 U.S. 531 (1987) ............................................................................................... 32

*Bond v. United States,*
  564 U.S. 211 (2011) ............................................................................................... 23

*City & Cty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ................................................................................ 17

*City of Indianapolis v. Edmond,*
  531 U.S. 32 (2000) ................................................................................................. 10

*Clinton v. City of New York,*
  524 U.S. 417 (1998) ......................................................................................... 17, 18

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
  657 F.3d 936 (9th Cir. 2011) .................................................................................. 31

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States,*
  482 F.3d 1157 (9th Cir. 2007) ........................................................................... 20, 21

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*
  789 F.3d 1075 (9th Cir. 2015) ................................................................................ 25

*Cty. of Santa Clara v. Trump,*
  250 F. Supp. 3d 497 (N.D. Cal. 2017) .................................................................... 32

*Dalzin v. Belshe,*
  993 F. Supp. 732 (N.D. Cal. 1997) ........................................................................... 6

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ........................................................................................... 11

*Dodds v. U.S. Dep't of Educ.,*
  845 F.3d 217 (6th Cir. 2016) .................................................................................. 22

*Doe v. Trump,*
  284 F. Supp. 3d 1182 (W.D. Wash. 2018) .............................................................. 22

*Drakes Bay Oyster Co. v. Jewell,*
  747 F.3d 1073 (9th Cir. 2014) ................................................................................ 33

*Durham v. Prudential Ins. Co. of Am.*,
    236 F. Supp. 3d 1140 (C.D. Cal. 2017) ............................................................... 22

*E. Bay Sanctuary v. Trump*,
    909 F.3d 1219 (9th Cir. 2018) ............................................................................. 33

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ............................................................................................. 25

*F.D.A. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ............................................................................................. 15

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*,
    666 F.3d 1216 (9th Cir. 2012) ............................................................................. 30

*Fair Hous. of Marin v. Combs*,
    285 F.3d 899 (9th Cir. 2002) ............................................................................... 31

*Feldman v. Bomar*,
    518 F.3d 637 (9th Cir. 2008) ............................................................................... 34

*Gartner v. United States*,
    166 F.2d 728 (9th Cir. 1948) ................................................................................. 7

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ............................................................................................. 12

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ............................................................................................. 28

*Lair v. Bullock*,
    798 F.3d 736 (9th Cir. 2015) ............................................................................... 21

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ............................................................................... 32

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ............................................................................... 32

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................................. 33

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ....................................................................................... 24, 25

*McDonnell v. United States*,
    136 S. Ct. 2355 (2016) ........................................................................................ 13

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ......................................................................... 32, 33

*Nat'l Council of La Raza v. Cegavske*,
    800 F.3d 1032 (9th Cir. 2015) ............................................................................. 30

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO: 4:19-cv-00892-HSG

*No GWEN All. v. Aldridge*,
   855 F.2d 1380 (9th Cir. 1988) ............................................................................................ 18

*Or. Nat. Res. Council v. Thomas*,
   92 F.3d 792 (9th Cir. 1996) ............................................................................ 19, 20, 21

*Ordlock v. Comm'r*,
   533 F.3d 1136 (9th Cir. 2008) ............................................................................................ 19

*Patchak v. Salazar*,
   632 F.3d 702 (D.C. Cir. 2011) ............................................................................................ 25

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ............................................................................................................ 18

*Serv. Women's Action Network v. Mattis*,
   352 F. Supp. 3d 977 (N.D. Cal. 2018) ............................................................................... 30

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) ..................................................................... 21, 22, 23, 33

*Sierra Club v. U.S. Forest Serv.*,
   843 F.2d 1190 (9th Cir. 1988) ............................................................................................ 32

*Sierra Club v. U.S. Forest Serv.*,
   93 F.3d 610 (9th Cir. 1996) ................................................................................................ 21

*Smith v. Pac. Props. & Dev. Corp.*,
   358 F.3d 1097 (9th Cir. 2004) ..................................................................................... 30, 31

*Trump v. Sierra Club*,
   No. 19A60 (S. Ct. July 26, 2019) ....................................................................................... 23

*United States v. MacCollom*,
   426 U.S. 317 (1976) .............................................................................................................. 8

*United States v. McIntosh*,
   833 F.3d 1163 (9th Cir. 2016) ........................................................................... 17, 22, 23

*United States v. Novak*,
   476 F.3d 1041 (9th Cir. 2007) ............................................................................................ 19

*United States v. Stanchich*,
   550 F.2d 1294 (2d Cir. 1977) ............................................................................................. 11

*Util. Air Regulatory Grp. v. E.P.A.*,
   573 U.S. 302 (2014) ...................................................................................................... 12, 15

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ............................................................................................ 28

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................................................ 32

*Wright v. United States*,
    302 U.S. 583 (1938)....................................................................................................17

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)...........................................................................................11, 18

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)....................................................................................................16

## Statutes

1 U.S.C. § 105 ...................................................................................................................8

6 U.S.C. § 202 ........................................................................................................9, 11, 13

6 U.S.C. § 251 ..............................................................................................................9, 11

8 U.S.C. § 1103 ..........................................................................................9, 10, 11, 14

10 U.S.C. § 275 ...............................................................................................................10

10 U.S.C. § 2801 ......................................................................................................11, 12

10 U.S.C. § 2803 .............................................................................................................19

10 U.S.C. § 2808 .......................................................................................................passim

10 U.S.C. § 2821 .............................................................................................................20

18 U.S.C. § 1385 .............................................................................................................10

28 U.S.C. § 2201 .............................................................................................................33

41 U.S.C.§ 6303 ..............................................................................................................20

42 U.S.C. § 4332 .............................................................................................................18

Consolidated Appropriations Act of 2019, Pub. Law No. 116-6, 133 Stat. 13 (2019)............ 1, 3, 7, 8

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No.
    104-208 (1996).........................................................................................................20

## Rules

Fed. R. Civ. P. 54 ..............................................................................................................6

Fed. R. Civ. P. 56 ..............................................................................................................6

**Other Authorities**

H.J. Res. 46, 116th Cong. (2019) ............................................................................. 4

Michael J. Vassalotti & Brendan W. McGarry, Cong. Research Serv., IN11017, *Military Construction Funding in the Event of a National Emergency* (Jan. 11, 2019) ...................... 12, 13

Report Accompanying Military Construction Authorization Act, 1982, H. Rep. No. 97-44 ........... 19

S.J. Res. 54, 116th Cong. (2019) ............................................................................. 4

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

PLEASE TAKE NOTICE that Plaintiffs Sierra Club and Southern Border Communities Coalition hereby move the Court pursuant to Federal Rule of Civil Procedure 56 for partial summary judgment against Defendants Donald J. Trump, President of the United States of America; Mark T. Esper, in his official capacity as Secretary of Defense; and Kevin K. McAleenan, in his official capacity as Acting Secretary of Homeland Security (collectively, "Defendants").

Plaintiffs respectfully move the Court to direct entry of final judgment in their favor (1) declaring unlawful both Defendants' actions to expend $3.6 billion on a border wall in purported reliance on 10 U.S.C. § 2808 and Defendants' failure to comply with the National Environmental Policy Act ("NEPA") for this construction; (2) issuing a permanent injunction prohibiting Defendants and all persons associated with them from engaging in border wall construction under 10 U.S.C. § 2808, and from proceeding with construction prior to complying with NEPA; and (3) specifically enjoining the use of 10 U.S.C. § 2808 to construct the wall segments in the areas Defendants have identified as Yuma 2, Yuma 10/27, Yuma 3, Yuma 6, San Diego 4, San Diego 11, El Paso 2, El Centro 5, El Paso 8, El Centro 9, and Laredo 7. This motion is based on this Notice of Motion and Motion, the accompanying supporting Memorandum of Points and Authorities; the declarations and request for judicial notice, and the exhibits thereto; and any other written or oral evidence or argument that may be presented at or before the time this motion is heard by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Congress has considered, and rejected, the executive branch's plans to spend billions of dollars on construction of the specific barriers at issue in this motion. Congress has weighed the same justifications Defendants offer here—claims of a "long-standing" problem of "large-scale unlawful migration through the southern border"—and has consistently refused to fund a multibillion-dollar border wall as a policy response.

The impasse between Congress and the administration over border wall funding resulted in the longest government shutdown in U.S. history. The shutdown was finally resolved after Congress passed—and the President signed—the Consolidated Appropriations Act, which provided

1   a fraction of the wall funding that the executive branch requested, and imposed geographic and

2   other limitations on construction.

3         Defendants now claim the power to sidestep Congress's enacted funding decisions, asserting

4   that 10 U.S.C. § 2808 ("Section 2808") grants the executive branch essentially unlimited power to

5   restructure the nation's priorities according to the executive branch's policy preferences. But

6   Defendants' efforts to spend billions that Congress denied them are contrary to both the

7   Constitution's careful design and Congress's explicit restrictions on the use of Section 2808. This

8   Court should bar Defendants' attempt to undermine the Appropriations Clause and fundamental

9   separation-of-powers principles.

10   **BACKGROUND**

11         Since taking office, Defendant Trump has repeatedly sought appropriations to build a wall

12   on the border with Mexico. *See, e.g.*, Request for Judicial Notice ("RJN") ¶ 1, Ex. 1 at 18

13   (requesting funding "to plan, design, and construct a physical wall along the southern border").

14   Congress has exercised its appropriations judgment, including considering and rejecting several

15   bills that, if passed, would have appropriated billions of dollars for border barrier construction. RJN

16   ¶¶ 2–8, Exs. 2–8 (noticing proposed legislation and its disposition). In December 2018, Congress

17   and the President reached an impasse over border wall funding, during which the nation endured the

18   longest partial government shutdown in its history.

19         On January 6, 2019, the White House officially increased its request for border wall

20   construction in Fiscal Year 2019. By letter to the U.S. Senate Committee on Appropriations, the

21   Acting Director of the Office of Management and Budget requested "$5.7 billion for construction

22   of a steel barrier for the Southwest border," to "fund construction of a total of approximately 234

23   miles of new physical barrier." *See* RJN ¶ 9, Ex. 9 at 1. As Congress negotiated toward

24   compromise, the White House repeatedly dismissed the appropriations process. Defendant Trump

25   threatened the wall would be built "one way or the other." RJN ¶ 10, Ex. 10. Acting White House

26   Chief of Staff Mick Mulvaney echoed that the President "is going to build the wall . . . We'll take

27   as much money as you can give us, and then we'll go off and find the money someplace else . . . .

28   But this is going to get built, with or without Congress." RJN ¶ 11 (video at 00:55–1:12). And on

February 12, with Congress about to exercise its judgment through an appropriations act, Defendant Trump told his Cabinet that "the wall is getting built;" Congress's appropriation "doesn't matter," "[b]ecause we're doing other things beyond what we're talking about here." RJN ¶ 12, Ex. 11 at 5.

On February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019 ("CAA"), Pub. Law No. 116-6, 133 Stat. 13 (2019). The CAA made available $1.375 billion "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector." *Id.* § 230(a)(1), 133 Stat. at 28. The CAA limited the use of these funds to "operationally effective designs deployed as of the date of the Consolidated Appropriations Act, 2017," and prohibited their use in several ecologically sensitive lands.[1] *Id.* §§ 230(b), 231, 133 Stat. at 28. It imposed notice and comment requirements prior to the use of any funds for the construction of barriers within certain city limits. *Id.* § 232, 133 Stat. at 28–29. And it further provided that:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

*Id.* § 739, 133 Stat. at 197.

Defendant Trump signed the CAA into law on February 15, 2019. The same day, he issued a proclamation "declar[ing] that a national emergency exists at the southern border of the United States." RJN ¶ 13, Ex. 12 at 1. In describing the nature of the purported national emergency, the text of the Proclamation refers to a "long-standing" problem of "large-scale unlawful migration through the southern border" that has "worsened" in recent years due to "sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space" for them. *Id.* It further states that these family units "are often released into the country and are often difficult to remove from the United States because they fail to appear for

---

[1] These are (1) the Santa Ana Wildlife Refuge, (2) the Bentsen-Rio Grande Valley State Park, (3) La Lomita Historical Park, (4) the National Butterfly Center, and (5) within or east of the Vista del Mar Ranch tract of the Lower Rio Grande Valley National Wildlife Refuge.

hearings, do not comply with orders of removal, or are otherwise difficult to locate." *Id.*

Announcing the emergency proclamation from the Rose Garden, Defendant Trump stated that he "went through Congress" but was "not happy" with the $1.375 billion appropriated for a border wall. RJN ¶ 14, Ex. 13 at 12. "I didn't need to do this," he explained. "But I'd rather do it much faster . . . that's all." *Id.* at 12–13. Simultaneous to the emergency declaration, the White House issued a "fact sheet" entitled "President Donald J. Trump's Border Security Victory," stating that Defendants would divert up to $3.6 billion from congressionally-approved military construction projects "to build the border wall." RJN ¶ 15, Ex. 14 at 1.

Testifying before Congress, DoD officials, including Acting Secretary of Defense Patrick Shanahan and General Dunford, the Chairman of the Joint Chiefs of Staff, acknowledged that although Defendants sought to divert military construction funding, the situation at the southern border was "not a military threat." RJN ¶ 16, Ex. 15 at 50–52. Admiral Mike Gilday, director of operations for the Joint Staff testified that "[n]one of capabilities that we are provided are combat capabilities, it's not a war zone along the border." RJN ¶ 17, Ex. 16 at 2–3.

For the first time in U.S. history, Congress disapproved the President's declaration of an emergency. On February 26, 2019, the House of Representatives overwhelmingly passed a resolution pursuant to the National Emergencies Act to terminate the President's declaration of emergency. H.J. Res. 46, 116th Cong. (2019). In the Senate, a bipartisan majority likewise voted 59-41 to terminate the President's declaration of emergency. On March 15, 2019, President Trump vetoed the disapproval resolution. Six months later, on September 25, 2019, the Senate again approved a bipartisan resolution to disapprove the emergency. S.J. Res. 54, 116th Cong. (2019). On September 27, the House passed this resolution as well.

For nearly seven months after the White House announcement that an emergency existed requiring the use of the armed forces, and that $3.6 billion in military construction funds would be diverted to the border wall, Defendants continued to maintain that DoD had made no decision to spend a single dollar in military construction money on the border wall. Finally, on September 3, 2019, Defendant Esper announced that he had reached a decision: to support the use of the armed forces, it was necessary to divert exactly $3.6 billion from military construction projects to the

border wall. *See* Notice Of Decision By The Department Of Defense To Authorize Border Barrier Projects Pursuant To 10 U.S.C. § 2808 ("Notice"), ECF No. 201 at 1.

That same day, DoD representatives explained that billions of dollars in construction allegedly "necessary to support the use of the armed forces" would in fact benefit DHS: "this will all go—funding will all go to adding significantly new capabilities to DHS's ability to prevent illegal entry." RJN ¶ 18, Ex. 17 at 2, 5.

To fund the border wall, Defendants are stripping billions of dollars from military construction projects that DoD previously told Congress were necessary to support servicemembers and military missions. For example, Defendants have taken the funding that Congress allocated to the Child Development Center at Joint Base Andrews, intended to replace a daycare facility for the young children of servicemembers that reportedly suffers from "sewage backups, flooding, mold and pests." RJN ¶ 19, Ex. 18 at 1. Defendants aim to strip funding from dozens of congressionally-approved projects to support military families and operations, including numerous schools, fire and rescue stations, hazardous materials storage facilities, and a medical care center. Administrative Record ("Admin. R."), ECF No. 206-4 at 87–89.

As Defendant Trump confirmed on September 9, this diversion of funds is entirely a response to Congress's refusal to fund the President's wall: "We're taking money from all over because, as you know, the Democrats don't want us to build the wall." RJN ¶ 20 (video at 00:17–00:22). Ten days later, Defendant Trump again confirmed that Defendants' use of Section 2808 was the result of Congress's refusal to accede to his funding request: "We wanted Congress to help us. It would have made life very easy. And we still want them to get rid of loopholes, but we've done it a different way. . . . We still want them to do it because it would be a little bit easier, but Congress wouldn't do it." RJN ¶ 21, Ex. 19 at 11.

Although Congress had specifically exempted ecologically sensitive areas from wall construction in the CAA, Defendant Esper claimed the authority to waive all environmental law with respect to wall construction, as well as all other laws which "include, but [are] not limited to" the National Historic Preservation Act and all military procurement law. Admin. R., ECF No. 206–2 at 9. Defendants' decision to dispense with the environmental protections that Congress enacted

1   exacerbates the threat posed by Defendants' massive construction project. Plaintiffs' members

2   include individuals who have treasured these unique borderlands for decades, who make their

3   homes in communities along the border, and who have worked for years to protect and conserve

4   these delicate landscapes.

### LEGAL STANDARD

6   The Federal Rules of Civil Procedure provide for entry of partial summary judgment. "[T]he

7   court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties

8   only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b).

9   A party may move for summary judgment on any "claim or defense" or "part of [a] claim or

10  defense," Fed. R. Civ. P. 56(a), and a district court should enter summary judgment where "there is

11  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

12  law." *Id*. This motion raises issues of statutory construction that present questions of law

13  appropriate for resolution through partial summary judgment. *See Dalzin v. Belshe*, 993 F. Supp.

14  732, 734 (N.D. Cal. 1997) ("It is axiomatic that questions of statutory interpretation are questions of

15  law.").[2]

### ARGUMENT

17  Defendants' actions encroach on Congress's exclusive power to appropriate funds as

18  enacted in the CAA. Defendants cannot use Section 2808 as an end-run around the appropriations

19  process, both because the border wall project is unauthorized by the plain language of Section 2808

20  and because Section 2808 cannot constitutionally permit the executive branch to set aside

21  Congress's enacted appropriations decisions. In addition, because Section 2808 does not provide a

22  blanket exemption from environmental law, Defendants are not free to disregard the requirements

23  that Congress imposed on agency actions, like these, that are likely to have significant

24  environmental consequences.

---

[2] Plaintiffs seek partial summary judgment on their claims involving military construction funds because Defendants assert that they have made no final decision with respect to the use of funds from the Treasury Forfeiture Fund.

## I.   Defendants' diversion of funds violates the CAA.

Defendants' actions to divert funds committed by Congress to other purposes for the construction of the border wall directly violate the CAA. In enacting the CAA, Congress specifically considered and rejected the administration's plan to spend billions of taxpayer dollars to quickly build a wall along the length of the Southwest border. Congress's appropriations judgment, as expressed in the bill that passed both chambers and was signed into law by Defendant Trump, is that only $1.375 billion should be used to construct border barriers, that such barriers must be limited geographically to the Rio Grande Valley Sector, that certain sections must be subject to consultation with local stakeholders, and that these new sections should be limited in design to primary pedestrian fencing. Defendants' actions to exceed these appropriations limitations violate the CAA.

Through the CAA, Congress reached a directly contrary decision from Defendants on several issues. First, Congress acted clearly to constrain the size and scope of the Defendants' wall project. The White House requested $5.7 billion for 234 miles of wall in a letter dated January 6, 2019, but Congress decided on the far lower amount of $1.375 billion. *See* RJN ¶ 9, Ex. 9 at 1. As Defendant Trump conceded on the day he signed the CAA, when it came to the legislation the "primary fight was on the wall," and although the CAA gave the administration "so much money, we don't know what to do with it . . . . [t]he only place they don't want to give as much money — $1,375,000,000" was for his wall. *Id.* ¶ 14, Ex. 13 at 8, 12. When it came to this disagreement, "Congress, as holder of the purse strings, was free to deal with the subject on whatever basis it saw fit." *Gartner v. United States*, 166 F.2d 728, 729 (9th Cir. 1948). Although Defendant Trump maintained that $1.375 billion was insufficient for his plan, "beyond this Congress did not go, and there can be no fair doubt that its restraint was deliberate and purposeful." *Id.* at 730.

Second, Congress disagreed with Defendant Trump on the particulars of the border wall funding by restricting the pace, location, permissible designs, and funding for border barrier construction. *See* CAA, Division A §§ 230–32. "Where Congress has addressed the subject as it has here, and authorized expenditures where a condition is met, the clear implication is that where the condition is not met, the expenditure is not authorized." *United States v. MacCollom*, 426 U.S. 317,

321 (1976). The executive branch cannot override Congress's deliberate and specific plan for funding border barriers.

Third, Congress ensured that Defendants could not unilaterally increase funding to projects before Congress acts to approve such actions. The CAA prohibits the use of any appropriated funds to "increase . . . funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act" or authorized by provisions in other appropriations legislation. CAA, Division D § 739. Defendants cannot dispute that the President has proposed an increase of funding for wall construction by several billion dollars in his budget request for fiscal year 2020. *See* RJN ¶ 22, Ex. 20 at 50 ("Budget requests $5 billion to construct approximately 200 miles of border wall along the U.S. Southwest border."); *id.* ¶ 23, Ex. 21 at 6–9 (requesting $9.2 billion "to build border barriers," and "backfill funding reallocated in FY 2019 to build border barriers"). Defendant Trump's sole lawful option after signing the CAA into law was to make his appropriation request to Congress another time, not to usurp Congress's power of the purse and the legislative process by diverting funds that were previously committed for other purposes.[3]

Defendants' actions to evade Congress's enacted decisions therefore directly interfere with a primary function of appropriations legislation—to limit the size and scope of particular projects and keep the executive branch accountable to the legislature through the mechanism of annual budgeting.

## II.   Section 2808 does not authorize Defendants to raid military construction projects to fund a multibillion dollar civilian law enforcement wall that Congress refused to fund.

Defendants have invoked 10 U.S.C. § 2808 as the source of their authority to take money away from appropriated military construction projects, but Congress expressly limited that statute to undertakings that (1) respond to a national emergency "that requires use of the armed forces,"

---

[3] The only exception to the Section 739 prohibition on increases in funding is for increases "made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act." Section 2808 is not an appropriations act, therefore it cannot be used to increase border barrier funding beyond the $1.375 billion provided for in the CAA. *See* 1 U.S.C. § 105 (defining appropriations acts).

1   and (2) are "military construction projects" that (3) "are necessary to support such use of the armed

2   forces." 10 U.S.C. § 2808. Defendants' actions to build the border wall fail all three statutory

3   requirements.

### A. Congress's decision to deny the President's requested wall funding to DHS is not an emergency requiring the use of the armed forces.

Congress expressly limited the executive branch's power to defund approved military

construction projects and reallocate their appropriated funds to either a declared war or a national

emergency "that requires use of the armed forces." 10 U.S.C. § 2808. Congress also expressly

assigned the tasks of border security and immigration enforcement to civilian agencies, rather than

the military. Because Defendants' efforts to construct a border wall do not involve an emergency

requiring the use of the armed forces, Defendants cannot rely on Section 2808 to authorize their

plan to strip funding from approved military construction projects.

By its own terms, the Emergency Proclamation does not describe any emergency requiring

use of the armed forces. In describing the nature of the purported national emergency, the text of the

Proclamation refers to a "long-standing" problem of "large-scale unlawful migration through the

southern border" that has "worsened" in recent years due to "sharp increases in the number of

family units entering and seeking entry to the United States and an inability to provide detention

space" for them. RJN ¶ 13, Ex. 12 at 1. It further states that these family units "are often released

into the country and are often difficult to remove from the United States because they fail to appear

for hearings, do not comply with orders of removal, or are otherwise difficult to locate." *Id.*

Taking the President's words at face value, none of these conditions "requires use of the

armed forces." Instead, Congress has made clear that response to any such condition is a core

function of the *civilian* components of the Department of Homeland Security. *See* 6 U.S.C. § 202

(assigning DHS responsibility for "[s]ecuring the borders" and "immigration enforcement

functions"); *id.* § 251 (assigning DHS responsibility for "Border Patrol," "detention and removal,"

and "inspections"); 8 U.S.C. § 1103(a)(5) (Secretary of DHS has "duty to control and guard the

boundaries and borders of the United States against the illegal entry of aliens"). Congress has

specifically provided for a civilian, rather than military, response if "an actual or imminent mass

influx of aliens . . . near a land border[] presents urgent circumstances requiring an immediate Federal response. . . ." 8 U.S.C. § 1103(a)(10). Should the Attorney General determine that such "urgent circumstances" exist, the "immediate Federal response" Congress provided for is that the Attorney General may authorize civilian "law enforcement officer[s]" to perform immigration functions. *Id.* In the United States, border security tasks are reserved for civilian law enforcement—not the armed forces. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000) (noting that "Securing the border" is "of course, [a] law enforcement activit[y]"). This accords with Congress's longstanding design, which strictly distinguishes between the responsibilities of civilian law enforcement agents and those of the military. Congress has specifically barred the armed forces from "execut[ing] the laws," 18 U.S.C. § 1385, or from participating in "search[es], seizure[s], arrest[s], or other similar activit[ies]." 10 U.S.C. § 275.

Testimony by Department of Defense officials further dispels any claim that the unique capabilities of the armed forces are required here. In DoD's own words, the situation on the border is "not a military threat" and "[n]one of capabilities that we are provided are combat capabilities, it's not a war zone along the border." RJN ¶ 16, Ex. 15 at 50–52; RJN ¶ 17, Ex. 16 at 2–3. Highlighting the complete inapplicability of Section 2808, not only is there no emergency requiring the armed forces, the forces deployed to the border were not even required to be *armed*. As former Secretary of Defense Mattis explained, his orders were that troops deployed to the border "will not be armed, not with a firearm." RJN ¶ 24, Ex. 22 at 2. The military's official service awards likewise recognize the simple fact that there is no border emergency requiring armed force: two months ago, troops deployed to the border were announced to be eligible for a special "military award reserved for troops who 'encounter no foreign armed opposition or imminent hostile action.'" RJN ¶ 25, Ex. 23 at 1.

Congress's decision to assign the task of border security to civilian law enforcement, like its decision to limit appropriations for wall construction, cannot be undone by presidential fiat. Were it otherwise, as Justice Jackson warned, a president could "vastly enlarge his mastery over the internal affairs of the country" through "commitment of the Nation's armed forces"—an outcome that could not be "more sinister and alarming" in its departure from the core separation-of-powers principles

embodied in the Constitution. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 642 (1952) (Jackson, J., concurring).

This is particularly so where the emergency allegedly requiring military force is "family units entering and seeking entry to the United States." RJN ¶ 13, Ex. 12 at 1. Both common sense and congressional design make clear that unarmed parents and children seeking refuge do not require a military response. *See, e.g.*, 6 U.S.C. § 202 (assigning DHS responsibility for "[s]ecuring the borders" and "immigration enforcement functions"); *id.* § 251 (assigning DHS responsibility for "Border Patrol," "detention and removal," and "inspections"); 8 U.S.C. § 1103(a)(5) (Secretary of DHS has "duty to control and guard the boundaries and borders of the United States against . . . illegal entry").

In sum, the Court should give effect to the limits Congress enacted and reject Defendants' patently pretextual claim that wall construction is being undertaken in response to an emergency requiring the use of the armed forces. Even where review is "deferential," courts "are 'not required to exhibit a naïveté from which ordinary citizens are free.'" *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). Congress assigned to DHS, a civilian law enforcement agency, the responsibility to secure the border and prevent unlawful entry. Congress limited border wall construction in the CAA, using its budgetary control over DHS to control the size and scope of Defendants' wall-building project. And Congress specifically limited Section 2808's use to emergencies that *require* the use of the armed forces. Defendants are not free to disregard these limits and use Section 2808 as freestanding authority to remake the federal budget to their liking.

### B. A wall extending across the southern border does not constitute a "military construction" project.

Defendants' efforts to use Section 2808 to construct a border wall also fail because building a wall across the border does not qualify as a "military construction" project. Congress limited "military construction" for the purposes of Section 2808 to construction associated with a "military installation" or "defense access road." 10 U.S.C. § 2801(a). Congress defined "military installation," in turn, as a "base, camp, post, station, yard, center, or other activity under the

jurisdiction of the Secretary of a military department . . . ." *Id.* § 2801(c)(4). As this Court has explained, "the term 'other activity' appears after a list of closely related types of discrete and traditional military locations: 'a base, camp, post, station, yard, [and] center.' It is thus proper to construe 'other activity' as referring to similar discrete and traditional military locations." Order Granting in Part and Denying in Part Plaintiffs' Motion for Preliminary Injunction ("PI Order"), ECF No. 144 at 45 (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)).

A 175-mile stretch of border bears no resemblance to any discrete and traditional military location. With the exception of 33 miles along the Barry M. Goldwater Range, the lands Defendants have targeted for construction are entirely unrelated to and disconnected from *any* military locations, and were not even under the jurisdiction of the military at the time DoD decided to construct a wall. Nor does a wall along the domestic border resemble any previous use of Section 2808. This authority has been used exclusively for overseas construction on military bases except for a single project, shortly after the 9/11 attacks, to secure weapons of mass destruction held on domestic Army facilities. *See* Michael J. Vassalotti & Brendan W. McGarry, Cong. Research Serv., IN11017, *Military Construction Funding in the Event of a National Emergency* (Jan. 11, 2019), at 2–3. Nor, finally, is there any similarity between the scope of the border wall construction and the discrete projects previously authorized under Section 2808. The combined total dollar value of every single previous project undertaken under Section 2808 in the past eighteen years is less than half of what Defendants claim they may spend on the border wall here. *Id.* at 2. "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism." *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) (quotation marks and citation omitted).

Defendants appear to believe that all that is required to convert the border into a "military installation" is an administrative transfer of jurisdiction to DoD. But as this Court has explained, "[h]ad Congress intended for 'other activity' in Section 2801(c)(4) to be so broad as to transform literally any activity conducted by a Secretary of a military department into a 'military installation,' there would have been no reason to include a list of specific, discrete military locations." PI Order 45. By dispensing entirely with Congress's decision to enact a list of discrete military locations,

1   such an unbounded definition of "military installation" would violate the "presumption that

2   statutory language is not superfluous." *McDonnell v. United States*, 136 S. Ct. 2355, 2369 (2016)

3   (quotation marks and citation omitted). Nor would it accord with congressional design to allow a

4   paper land transfer to convert the border into a military installation. Congress assigned to the

5   Secretary of Homeland Security jurisdiction over "[s]ecuring the borders." 6 U.S.C. § 202(2).

6   Defendants cannot simply wave a pen and convert hundreds of miles of land to a military

7   installation when convenient for the purposes of Section 2808. "[I]n context and with an eye toward

8   the overall statutory scheme, nothing demonstrates that Congress ever contemplated that 'other

9   activity' has such an unbounded reading that it would authorize Defendants to invoke Section 2808

10  to build a barrier on the southern border." PI Order 46.

11          C. A border wall intended to "reduce the challenges to CBP" fails Section
              2808's requirement that construction be necessary to support the use of
12            the armed forces.

13          Defendants cannot divert billions of dollars in military construction funds to a permanent

14  border wall because Section 2808 is limited to construction "necessary to support" the "use of the

15  armed forces." Construction projects that are "necessary to support" the armed forces are structures

16  that enable the military to conduct *military* operations. Accordingly, Section 2808 authority has

17  been used to build hangars, runways, logistics hubs, and facilities for storing ammunition and

18  weapons of mass destruction. *See* Vassalotti & McGarry, *Military Construction Funding in the*

19  *Event of a National Emergency*, at 2–3. Section 2808 does not, by its terms, provide freewheeling

20  authority to raid the military budget for the benefit of other agencies' missions. Defendants cannot

21  defund congressionally–approved military construction projects to build a wall across the southern

22  border because such a wall is not necessary to enable any uniquely military mission, much less the

23  specific use of the military at the border.

24          As the administrative record confirms, to the extent the border wall would support the

25  operations of any agency, the beneficiary would be DHS and its subagency CBP—not the armed

26  forces. The purported benefit of the border wall is that it would "reduce the challenges to CBP,"

27  Admin. R., ECF No. 206-3 at 60–61, by working a "fundamental and enduring change to the

28  USBP's operational capability." Admin. R., ECF No. 206-4 at 106. At most, then, the record

establishes that a wall would support the operations of Border Patrol, rather than serving as a necessary predicate to enable the emergency use of the armed forces. *Compare* Admin. R., ECF No. 206-2 at 6 (DoD claim that wall construction is "necessary to support the use of the armed forces" because "construction of such physical barriers will deter illegal entry") *with* 8 U.S.C. § 1103(a)(5) (Secretary of DHS has "duty to control and guard the boundaries and borders of the United States against . . . illegal entry"). DoD does not even expect to derive a benefit from wall construction on the Barry M. Goldwater Range, which is the only military site involved in Defendants' plan. According to the administrative record, while construction "along the Barry M. Goldwater range" might be expected to "limit potential impact to military training," in fact "impact to military training over the past five years has been negligible." Admin. R., ECF No. 206-3 at 69. In short, as DoD officials recently confirmed: "this will all go—funding will all go to adding significantly new capabilities to DHS's ability to prevent illegal entry." RJN ¶ 18, Ex. 17.

The disconnect between a permanent border wall and the operational needs of the armed forces is made even more stark by Defendants' claim that the border wall would obviate, rather than enable, the presence of the armed forces. According to Defendant Trump, "If we had a wall, we don't need the military because we'd have a wall." RJN ¶ 14, Ex. 13 at 5. This position is completely at odds with previous uses of Section 2808, where the armed forces were the entity that would use the completed structures—be they airfields, barracks, or ammunition depots—to accomplish uniquely military missions. By contrast, according to Defendant Trump, the armed forces could not possibly make use of the wall because any military presence would end with the wall's completion. It cannot be that construction is "necessary to support" the "use" of the military under Section 2808 while simultaneously rendering the use of the military unnecessary.

Moreover, Defendants' claim that exactly $3.6 billion in wall construction is "necessary" for the use of the armed forces cannot be squared with the historical record. Defendant Trump ordered that the military deploy to the border in October 2018. Although Congress had by that point appropriated more than a billion dollars for border barrier construction, Defendants did not spend it, representing as recently as April 30, 2019—months after the emergency proclamation—that they had "only constructed 1.7 miles of fencing with that funding." PI Order 54 n.22. Further

underscoring the lack of any necessity for wall construction, DoD waited nearly seven months after the emergency proclamation to make any decision about whether to spend a single dollar of military construction money on a wall. Even once a decision was made, DoD decided that in many areas work would not even get underway before April 2020. Notice, ECF No. 201 at 4. These extreme delays are entirely inconsistent with a claim that construction is "necessary" to enable emergency military operations, demonstrating again the mismatch between Defendants' massive public works project and Congress's limited grant of emergency military construction authority. It would be absurd to read Section 2808's emergency military construction authority to encompass years-long, multibillion-dollar construction projects that have been the subject of years of congressional debate and executive delay. *See Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. at 324 ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." (quotation marks and citation omitted)).

Finally, DoD's authority to undertake emergency military construction in support of urgent military need cannot be read to extend to billions of dollars for border wall construction when interpreted against the more specific and more recent judgment by Congress embodied in the CAA. "[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). "This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." *Id.* at 143. Therefore, "a specific policy embodied in a later . . . statute should control [judicial] construction of the [earlier broad] statute, even though it ha[s] not been expressly amended." *Id.* (quotations and citations omitted). Here, the CAA's specific policy limitation on border barrier construction must control, and bar, Defendants' attempt to use Section 2808 to evade Congress's funding restrictions.

### III. Defendants' efforts to circumvent Congress's appropriations restrictions are unconstitutional and this Court should avoid the serious constitutional problems Defendants' efforts raise by invalidating them as ultra vires.

Defendants' plan to construct a massive, multibillion-dollar wall that Congress considered and rejected violates the Constitution's Appropriations Clause, Presentment Clause, and the separation of powers because it represents an effort "to circumvent Congress's clear decision to

deny the border barrier funding sought here when it appropriated a dramatically lower amount in the CAA." PI Order 34. However, because Defendants' plan is not authorized by the clear text of Section 2808, the Court "need not reach the second-level question of whether it would be unconstitutional for Congress to sanction such conduct." PI Order 30. Even if there were any ambiguity about the scope of Section 2808, the doctrine of constitutional avoidance requires an interpretation of Section 2808 that avoids the serious constitutional problems Defendants' interpretation of those statutes would raise. *See* PI Order 36–37 ("Statutes must be interpreted to avoid a serious constitutional problem where another 'construction of the statute is fairly possible by which the question may be avoided.'" (quoting *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001))).

President Trump has acknowledged explicitly and repeatedly that his use of Section 2808 is purely an effort to sidestep Congress's considered decisionmaking in passing the CAA and his own actions in signing the CAA into law. Congress and the president negotiated for months, explicitly going back and forth on the proper funding level for any border wall construction. The President simultaneously signed Congress's appropriations judgment into law and announced that he would ignore it by invoking Section 2808. He was explicit that that he "went through Congress . . . made a deal," and, that he "*didn't need to do this*," but was declaring an emergency because he would "rather do it much faster." RJN ¶ 14, Ex. 13 (emphasis added). Last month, just after DoD announced that it would proceed with Defendant Trump's military construction plan, Defendant Trump again confirmed that Defendants were raiding the military budget because of a funding disagreement with Congress: "We wanted Congress to help us. It would have made life very easy. And we still want them to get rid of loopholes, but we've done it a different way. . . . We still want them to do it because it would be a little bit easier, but Congress wouldn't do it." RJN ¶ 21, Ex. 19 at 11. Section 2808 cannot constitutionally provide the president with a power to unilaterally override Congress's appropriations judgment.

The Appropriations Clause provides Congress with "'absolute' control over federal expenditures—even when that control may frustrate the desires of the executive branch regarding initiatives it views as important." PI Order 54. The Constitution delegates to Congress "exclusive" power "not only to formulate legislative policies and mandate programs and projects, but also to

establish their relative priority for the Nation." *United States v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir. 2016). Congress has exercised this judgment, and "repeatedly rejected legislation that would have funded substantially broader border barrier construction . . . deciding in the end to appropriate only $1.375 billion." PI Order 38–39 (citing *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) ("In fact, Congress has frequently considered and thus far rejected legislation accomplishing the goals of the Executive Order. The sheer amount of failed legislation on this issue demonstrates the importance and divisiveness of the policies in play, reinforcing the Constitution's 'unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process.'")). If Section 2808 permitted Defendants to circumvent Congress's appropriations judgment, "this reading of DoD's authority under the statute would render meaningless Congress's constitutionally-mandated power to assess proposed spending, then render its binding judgment as to the scope of permissible spending." PI Order 38. Such an interpretation of Section 2808 "would pose serious problems under the Appropriations Clause, by ceding essentially boundless appropriations judgment to the executive agencies." PI Order 40.

Likewise, a statute would run afoul of the Presentment Clause if it permitted the president to sign an appropriation act and, "based on the same facts and circumstances that Congress considered," have the option of "rejecting the policy judgment made by Congress and relying on his own policy judgment." *Clinton v. City of New York*, 524 U.S. 417, 444 & n.35 (1998). "Where the President does not approve a bill, the plan of the Constitution is to give to the Congress the opportunity to consider his objections and to pass the bill despite his disapproval." *Wright v. United States*, 302 U.S. 583, 596 (1938). Instead of following this constitutional requirement, Defendant Trump signed a bill to which he objected, and simultaneously announced that he would nonetheless disregard the limitations Congress imposed in the CAA by increasing funds to his liking.

If Section 2808 enables a president to simply substitute his own judgment—whether under claim of emergency or otherwise—for Congress's simultaneous decision, it violates the Presentment Clause, as the Supreme Court explained in *Clinton*: "Because the Line Item Veto Act requires the President to act within five days, every exercise of the cancellation power will necessarily be based on the same facts and circumstances that Congress considered, and therefore

1    constitute a rejection of the policy choice made by Congress." 524 U.S. at 444 n.35. Congress has

2    no power to authorize "the President himself to effect the repeal of laws, for his own policy reasons,

3    without observing the procedures set out in Article I, § 7." *Id.* at 445. "The Constitution is a

4    compact enduring for more than our time, and one Congress cannot yield up its own powers, much

5    less those of other Congresses to follow." *Id.* at 452 (Kennedy, J., concurring).

6          Finally, Defendants' efforts to circumvent congressional control of appropriations violate

7    the separation of powers. Defendants have invoked Section 2808 specifically to circumvent

8    Congress's lawful exercise of its appropriations judgment. If Section 2808 indeed grants

9    Defendants the power to sidestep Congress, the statute would violate fundamental separation of

10   powers principles: "[T]he position that when Congress declines the Executive's request to

11   appropriate funds, the Executive nonetheless may simply find a way to spend those funds 'without

12   Congress' does not square with fundamental separation of powers principles dating back to the

13   earliest days of our Republic." PI Order 54–55; *see also Youngstown*, 343 U.S. at 609 (Frankfurter,

14   J., concurring) ("It is quite impossible . . . when Congress did specifically address itself to a

15   problem . . . to find secreted in the interstices of legislation the very grant of power which Congress

16   consciously withheld. To find authority so explicitly withheld is not merely to disregard in a

17   particular instance the clear will of Congress. It is to disrespect the whole legislative process and

18   the constitutional division of authority between President and Congress.").

19          **IV.     Defendants are not free to disregard NEPA.**

20          The National Environmental Policy Act ("NEPA") compels federal agencies to assess the

21   environmental impact of agency actions that "significantly affect[] the quality of the human

22   environment." 42 U.S.C. § 4332(C). NEPA does not establish substantive environmental standards,

23   and instead sets "action-forcing" procedures that compel agencies to take a "hard look" at

24   "environmental consequences." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

25   348–50 (1989). If agency action "might significantly affect environmental quality," NEPA compels

26   preparation of what is known as an Environmental Impact Statement ("EIS"). *WildEarth Guardians*

27   *v. Provencio*, 923 F.3d 655, 669 (9th Cir. May 6, 2019). "There is no 'national defense' exception

28   to NEPA." *No GWEN All. v. Aldridge*, 855 F.2d 1380, 1384 (9th Cir. 1988).

Although it plans to undertake a multibillion-dollar construction project on ecologically-sensitive borderlands, DoD has not prepared and will not prepare an EIS. Instead, the Secretary of Defense, after waiting seven months to act, has directed the Secretary of the Army to disregard NEPA and commence construction "without regard to any other provision of law that could impede such expeditious construction in response to the national emergency." Admin. R., ECF 206-2, at 9. Defendants specifically claim the right to disregard environmental laws, historic preservation laws, and all restrictions and controls on bidding and procurement. *Id*.

Section 2808 does not provide such sweeping authority. The Ninth Circuit "ha[s] repeatedly held that the phrase 'notwithstanding any other law' is not always construed literally." *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 796 (9th Cir. 1996). Courts construe the reach of a given "notwithstanding" clause by taking into account "the whole of the statutory context in which it appears." *United States v. Novak*, 476 F.3d 1041, 1046–47 (9th Cir. 2007) (citing *Or. Nat. Res. Council*, 92 F.3d at 796). Such context defines the scope of the agency action that may be taken, as well as the otherwise applicable laws that may be set aside.

Read in context, it is clear that Congress empowered DoD in Section 2808 to disregard only the ordinarily applicable requirements that military construction projects be specifically authorized by appropriations legislation. Title 10 generally, and Section 2808 specifically, are concerned with the *authorization* of projects, either expressly by Congress or conditionally in the event of contingencies or emergencies. Section 2808 "provide[s] a construction *authority* in the event of a declaration of war or national emergency" in order to enable "restructuring construction priorities." Report Accompanying Military Construction Authorization Act, 1982, H. Rep. No. 97-44, at 72 (emphasis added). It is this authorization that Section 2808 contemplates should be made "without regard to any other provision of law," insofar as other provisions conflict with the Secretary's emergency authority to restructure construction priorities. *Cf. Ordlock v. Comm'r*, 533 F.3d 1136, 1141 (9th Cir. 2008) ("Thus, it appears that this decision is the 'determination' that the final sentence of [26 U.S.C.] § 6015(a) contemplates should be made 'without regard to community property laws.'"). These provisions might otherwise limit, or altogether prohibit, such reprioritization. *See, e.g.*, 10 U.S.C. § 2803 (authorizing the Secretary to carry out otherwise

unauthorized military construction projects vital to the national security, but limiting permissible obligations to $50,000,000); 10 U.S.C. § 2821 (prohibiting funds "for the construction, acquisition, leasing, addition, extension, expansion, alteration, relocation, or operation and maintenance of family housing . . . unless the appropriation of such funds has been authorized by law"); 41 U.S.C.§ 6303 (prohibiting contracts "to make any public improvement" that are "made on terms requiring the Federal Government to pay more than the amount specifically appropriated for the activity covered by the contract").

But neither NEPA's objectives nor its requirements conflict with the reprioritization power provided by Section 2808. And unlike other statutes that impliedly or explicitly waive NEPA's requirements, Section 2808 contains no language requiring that projects be undertaken "without delay" or "expeditiously." Congress knows how to fashion such waivers of environmental law, and it did not do so in Section 2808. *Cf. Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1167 (9th Cir. 2007) (considering a provision authorizing the Interior Secretary to, "[n]otwithstanding any other provision of law," "without delay, carry out the All American Canal Lining Project"); *Or. Nat. Res. Council*, 92 F.3d at 795 (considering a provision that "[n]otwithstanding any other law . . . the Secretary concerned shall expeditiously prepare, offer, and award timber sale contracts"). As the Ninth Circuit has explained, "when Congress has directed *immediate* implementation 'notwithstanding any other provision of law,' we have construed the legislation to exempt the affected project from the reach of environmental statutes which would delay implementation." *Consejo de Desarrollo Economico de Mexicali*, 482 F.3d at 1169 (emphasis added and citation omitted). Congress did not grant such authority in Section 2808 because there is no "express Congressional directive to proceed immediately or . . . 'without delay.'" *Id.* Section 2808 is thus entirely unlike the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208 (1996) ("IIRIRA"), which Defendants have invoked to waive environmental requirements for several projects before this Court. *Cf.* IIRIRA § 102(c)(1) (authorizing Secretary of Homeland Security "to waive all legal requirements . . . necessary to ensure *expeditious* construction" of border barriers (emphasis added)).

Moreover, interpreting Section 2808 to contain a waiver of any law that clashes with the

implementation of Defendants' construction plans would convert Section 2808 into a far more broad-ranging executive authority than courts have ever recognized. In the past, statutes that were held to authorize the executive branch to set aside environmental requirements had tightly-defined geographic and temporal scopes. *See, e.g., Consejo de Desarrollo Economico de Mexicali*, 482 F.3d at 1169 (addressing specific authorization for the All American Canal Lining Project); *Sierra Club v. U.S. Forest Serv.*, 93 F.3d 610, 612 (9th Cir. 1996) (addressing salvage timber sales "in preparation" during the date of enactment); *Or. Nat. Res. Council*, 92 F.3d at 794 (addressing timber sales in "old growth and late successional forests from the Canadian border to northern California"). By contrast, Section 2808 does not limit the type of works that might be undertaken, or define a geographic scope. Defendants' claimed authority to disregard any law that might constrain any construction under Section 2808 would thus far exceed the delegation of IIRIRA's express waiver, empowering the Secretary of Defense to build almost anything, anywhere, while disregarding virtually the entire U.S. code.

**V.   Equitable review is proper and, in the alternative, APA review is available.**

**A.   The Ninth Circuit's binding decision in *Sierra Club v. Trump* establishes that Plaintiffs have a cause of action.**

As this Court correctly held, and as the Ninth Circuit affirmed, "where a plaintiff seeks equitable relief against a defendant for exceeding its statutory authority, the zone-of-interests test is inapposite." PI Order 30; *see also Sierra Club v. Trump*, 929 F.3d 670, 701 (9th Cir. 2019) ("[W]here the very claim is that *no* statutory or constitutional provision authorized a particular governmental action, it makes little sense to ask whether *any* statutory or constitutional provision was written for the benefit of any particular plaintiffs."). The Ninth Circuit's publication of its affirmance requires its treatment as binding precedent here. *See Lair v. Bullock*, 798 F.3d 736, 744, 747 (9th Cir. 2015) (holding that published decision on emergency motion to stay injunction was binding).

The Supreme Court's stay does not erase the binding effect of the Ninth Circuit's published decision, which therefore remains binding on this Court. As district courts in this circuit have recognized, if the court of appeals resolves an issue in a published decision, courts within this

1   circuit may not "ignore this binding precedent because the Supreme Court stayed the Ninth

2   Circuit's decision." *Doe v. Trump*, 284 F. Supp. 3d 1182, 1185 (W.D. Wash. 2018); *see also id.*

3   (noting that "this court is not at liberty to simply ignore binding Ninth Circuit precedent based on

4   Defendants' divination of what the Supreme Court was thinking when it issued the stay orders");

5   *Durham v. Prudential Ins. Co. of Am.*, 236 F. Supp. 3d 1140, 1147 (C.D. Cal. 2017) ("[I]t appears

6   that a stay of proceedings pending Supreme Court review does not normally affect the precedential

7   value of the circuit court's opinion."). As the Sixth Circuit observed in *Dodds v. United States*

8   *Department of Education*, a Supreme Court stay decision "does nothing more than show a

9   possibility of relief," and thus cannot be read to decide the questions answered by appellate stay

10   panels or to upset a circuit's "settled law." 845 F.3d 217, 221 (6th Cir. 2016) (per curiam).

11          Accordingly, for the reasons previously found by this Court and the Ninth Circuit,

12   Plaintiffs have a cause of action to review Defendants' efforts to spend $3.6 billion in military

13   construction funds on the border wall. "Defendants' attempt to reprogram and spend these funds

14   therefore violates the Appropriations Clause and intrudes on Congress's exclusive power of the

15   purse, for it would cause funds to be 'drawn from the Treasury' not 'in Consequence of

16   Appropriations made by Law.'" *Sierra Club v. Trump*, 929 F.3d at 694. Such a claim is reviewable

17   as "an equitable action to enjoin unconstitutional official conduct," or under the APA "as a

18   challenge to a final agency decision that is alleged to violate the Constitution, or both. Either way,

19   Plaintiffs have an avenue for seeking relief." *Id.*

20          **B.  Plaintiffs have an equitable claim under the Constitution.**

21          Even if the Ninth Circuit's decision in *Sierra Club* were not binding on this Court, earlier

22   Ninth Circuit authority establishes that Plaintiffs have a constitutional cause of action in equity

23   under the Appropriations Clause. In *United States v. McIntosh*, the Ninth Circuit held that when the

24   government seeks to spend money in ways Congress has restricted, it is "drawing funds from the

25   Treasury without authorization by statute and thus violating the Appropriations Clause." 833 F.3d

26   at 1175. "Once Congress, exercising its delegated powers, has decided the order of priorities in a

27   given area, it is for . . . the courts to enforce them when enforcement is sought." *Id.* at 1172 (citation

28   omitted). Therefore, while "novel and important questions about the ability of private parties to

enforce Congress' appropriations power" may yet be undecided by the Supreme Court, Stay Opinion at 1–2, *Trump v. Sierra Club*, No. 19A60 (S. Ct. July 26, 2019) (Breyer, J., concurring in part and dissenting in part), they have been settled in this circuit since 2016.

Where, as here, a litigant has Article III standing, it is circuit law that an equitable cause of action will lie for the spending of funds in violation of statute. *See McIntosh*, 833 F.3d at 1174. *McIntosh* establishes that private plaintiffs can invoke the Appropriations Clause as the source of a constitutional cause of action, consistent with the numerous cases establishing that "private parties, rather than government departments, were able to rely on separation-of-powers principles in otherwise justiciable cases or controversies," *Id.* (collecting cases). The Ninth Circuit grounded this ruling in the principle that "separation-of-powers constraints in the Constitution serve to protect individual liberty, and a litigant in a proper case can invoke such constraints '[w]hen government acts in excess of its lawful powers.'" *Id.* at 1174 (quoting *Bond v. United States*, 564 U.S. 211, 217 (2011)). Because "individuals, too, are protected by the operations of separation of powers and checks and balances," it follows that "they are not disabled from relying on those principles in otherwise justiciable cases and controversies." *Bond*, 564 U.S. at 223. *McIntosh* is clear: the Appropriations Clause "constitutes a separation-of-powers limitation" that private litigants can invoke when the executive branch is "drawing funds from the Treasury without authorization by statute and thus violating the Appropriations Clause." 833 F.3d at 1175.

As explained above, Section 2808 does not authorize Defendants to spend taxpayer funds on a border wall in excess of the limits Congress set in the CAA. Accordingly, Plaintiffs have a cause of action to challenge Defendants' unauthorized spending in violation of the Appropriations Clause and separation-of-powers constraints. To the extent any zone-of-interests tests applies to this cause of action, Plaintiffs' "individual rights and interests resemble myriad interests that the Supreme Court has concluded—either explicitly or tacitly—fall within any applicable zone of interests encompassed by structural constitutional principles like separation of powers." *Sierra Club v. Trump*, 929 F.3d at 704 (collecting cases); *see also McIntosh*, 833 F.3d at 1174 (collecting cases).

**C.  Plaintiffs satisfy any zone-of-interests requirements for an APA claim.**

Even if Plaintiffs were required to satisfy a further zone-of-interest test with respect to

Defendants' claimed Section 2808 authority, the test would pose no obstacle to the Court's review. In *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, the Supreme Court considered a statute that "authorizes the acquisition of property 'for the purpose of providing land for Indians.'" 567 U.S. 209, 224 (2012) (citation omitted). The statute said nothing at all about construction, imposed no environmental or aesthetic restrictions, and was enacted entirely for the benefit of Native Americans. The Supreme Court nonetheless held that the "environmental" and "aesthetic" interests of non-Indians lay within the statute's bounds. *Id.* at 227–28. If a nonbeneficiary plaintiff's asserted "economic, environmental, and aesthetic harm" from eventual construction comes within the zone of interests of a statute that is completely silent about construction, Plaintiffs' identical interests are certainly within the zone of interests of Section 2808, a statute that explicitly concerns construction and requires consideration of land use.

The Supreme Court has already determined that claims arising from a nonbeneficiary's land use lie within the zone of interests of statutes that even implicitly contemplate construction. As the Supreme Court explained in *Match-E-Be-Nash-She-Wish*, it was of no moment that the plaintiff was a nonbeneficiary who was "'not an Indian or tribal official seeking land' and does not 'claim an interest in advancing tribal development.'" *Id.* at 225 n.7 (citation omitted). Nor did it matter that the statute addressed only predicate land purchases, and said nothing at all about construction—much less imposed any aesthetic or environmental restrictions. What mattered was that when the agency used its statutory powers to acquire land, it acted "with at least one eye directed" toward construction on the land it acquired. *Id.* at 226. And it was construction that the plaintiff objected to, because he claimed it would cause "an irreversible change in the rural character of the area," and cause "aesthetic, socioeconomic, and environmental problems." *Id.* at 213 (quotation marks omitted). This connection was sufficient.

Under controlling Supreme Court law, therefore, Plaintiffs' identical interests are within the zone of interests of Section 2808. Plaintiffs' claims are even stronger than those held sufficient in *Match-E-Be-Nash-She-Wish*, because Section 2808 explicitly refers to construction (and not merely land acquisition), and requires that the Secretary of Defense or Secretaries of the military departments contemplate and approve specific construction projects before any decision under the

statute is reached. If a statute that is silent about construction, but "typically" involves consideration of a land's "eventual use" may be challenged by "neighbors to the use," Plaintiffs are unquestionably proper challengers to construction decisions under Section 2808, which *always* involves considerations of land use. *Match-E-Be-Nash-She-Wish*, 567 U.S. at 227–28.

The law is clear: where decisions under a statute are made with "an eye towards" the use of land, "neighbors to the use (like [Plaintiffs]) are reasonable—indeed, predictable—challengers of the Secretary's decisions: Their interests, whether economic, environmental, or aesthetic, come within [the statute's] regulatory ambit." *Id.* Plaintiffs' "stake in opposing" circumvention of Congress's protection of the lands they treasure is "intense and obvious," and easily passes the "zone-of-interests test[, which] weeds out litigants who lack a sufficient interest in the controversy." *Patchak v. Salazar*, 632 F.3d 702, 707 (D.C. Cir. 2011), *aff'd sub nom. Match-E-Be-Nash-She-Wish*, 567 U.S. 209.

## VI.     The Court should order injunctive and declaratory relief.

### A.  The Court should enter a permanent injunction.

A party seeking a permanent injunction must show that "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Plaintiffs have satisfied these requirements.

#### 1.  Plaintiffs will suffer irreparable harm absent an injunction.

As this Court found with respect to Defendants' previous plans, Defendants' proposed Section 2808 construction "will lead to a substantial change in the environment" that "cannot be remedied easily after the fact." PI Order 50. Without an order permanently enjoining construction in the areas designated as Yuma 2, Yuma 10/27, Yuma 3, Yuma 6, San Diego 4, San Diego 11, El Paso 2, El Centro 5, El Paso 8, El Centro 9, and Laredo 7, Plaintiffs' members will suffer irreparable harm to their recreational and aesthetic interests. In addition, absent a permanent

1    injunction, Plaintiff SBCC and its member organizations will suffer a frustration of their missions

2    and be forced to continue to divert resources in response to Defendants' unlawful wall construction

3    plan. Finally, coupled with these other harms, Plaintiffs face irreparable harm from Defendants'

4    constitutional violations.

### a. Wall construction will cause irreparable injury to Plaintiffs' members' aesthetic and recreational interests.

6        As this Court previously noted, "[i]t is well-established in the Ninth Circuit that an

7    organization can demonstrate irreparable harm by showing that the challenged action will injure its

8    members' enjoyment of public land." PI Order 49 (citing *All. for the Wild Rockies v. Cottrell*, 632

9    F.3d 1127, 1135 (9th Cir. 2011)). The wall construction at issue here will impede Plaintiffs'

10   members' ability to enjoy, work, and recreate in the wilderness areas they have used for years along

11   the U.S.-Mexico border.

12       For example, Robert Ardovino regularly photographs, hikes, camps, and target shoots in

13   threatened areas within the proposed El Paso projects, and worries that instead of "open

14   landscapes" he has enjoyed for decades, he will see a "tall metal wall" when he "recreate[s] in the

15   sprawling vistas near Antelope Wells." Ardovino Decl. ¶ 6. At night, rather than a "dark desert

16   wilderness," he will be confronted by "an artificially lit militarized landscape." *Id.* ¶ 7. Construction

17   in El Paso Project 2 will likewise "hamper [the] unobstructed views of the scenic vistas" that Dr.

18   Gary Roemer enjoys while riding his motorcycle along Highway 9 and will "create a barrier to

19   wildlife movement" that "could have numerous negative impacts on […the] research" he is

20   conducting in the region. Roemer Decl. ¶¶ 15, 12, 13. Kevin Bixby also frequently recreates in the

21   Bootheel region of New Mexico, camping at Gray Ranch and hiking up Hatchet Peak to enjoy the

22   views of the surrounding habitats that the border wall "threaten[s] to destroy." Third Bixby Decl.

23   ¶ 13. And Elizabeth Walsh, who enjoys "bird-watching and hiking around Antelope Wells," Walsh

24   Decl. ¶ 7, fears based on her experience that "the adverse impact of wall construction in El Paso 2

25   will not just adversely impact my personal interests and ability to enjoy the wildlife in this area, but

26   also my interest in enjoying and recreating in a large geographic zone in the El Paso Sector that I

27   also routinely visit and intend to continue to visit in the future," *id.* ¶ 10.

28

Similarly, construction of a "tall and intrusive pedestrian barrier" in Yuma Project 6 will "fragment [the] vista" visible from just across the border in Los Algodones and prevent Orson Bevins "from fully appreciating this area." Bevins Decl. ¶ 7. It would also deter Nancy Meister's "ability to look at birds north" of Morelos Dam, Meister Decl. ¶ 15. An open water and marshy area rich with a variety of birds, and attendant floodlights will "ruin" the "desert dark skies" that Albert Del Val has treasured as a child. Del Val Decl. ¶ 6. A border wall will have "negative impacts" on the unique "biodiversity that exists in [the Laredo 7] section of the Rio Grande Valley," the use of which is a "fundamental part of [Tom Miller's] work and [ ] livelihood." Miller Decl. ¶ 10.

Erecting pedestrian fencing in California pursuant to San Diego Projects 4 and 11 and El Centro Projects 5 and 9 will harm the professional and aesthetic interests of Sierra Club members who live and work in and around those areas. Daniel Watman has visited the border in the Otay Mountain Wilderness more than forty times, and leads tours of the Wilderness, "one of the only places along the border where there is complete tranquility." Watman Decl. ¶¶ 7, 10. Construction would destroy his use of these lands and "the purpose of the tours—to see nature continuing unimpeded across the border—would be lost." *Id.* ¶ 12. *See also* Wellhouse Decl. ¶ 5 ("enjoy[s] visiting [San Diego Project 4 and 11] areas to birdwatch and study other plants and animals" and worries that new construction will "significantly harm local species particularly low level flyers and terrestrial species"); Ramirez Decl. ¶ 5 ("Construction along the border will make me less likely to hike Mount Signal and enjoy outdoor recreational activities; and when I do undertake those activities, my enjoyment of them will be irreparably diminished."); Guerrero Decl. ¶ 6 ("Building a primary and secondary wall within this desert wilderness would forever change my experience visiting these places.").

Gayle Hartmann and Bill Broyles have "decades of professional and personal experience working on and recreating at the Goldwater Range and Cabeza Prieta," Second Hartmann Decl. ¶ 7; *see also* Broyles Decl. ¶ 4. Ms. Hartmann has "lived on the range to study the history and prehistory of Tinajas Altas, a series of pools that provide one of the most important sources of water in the region and are located on the Range a few miles north of the border," and together with Mr. Broyles co-authored a book on the subject. Hartmann Decl. ¶ 9. Ms. Hartmann and Mr. Broyles were

involved in the creation of a permit system for access to the Range, which is "not intended to limit public accessibility, but to educate potential users—helping inform people about cultural objects, as well as potential hazards like old pieces of weaponry." *Id.* ¶ 12. Mr. Broyles has "camped in these areas" for nearly 50 years and collaborated with the military on preserving them. Broyles Decl. ¶ 12. Having used and helped protect these lands for decades, Ms. Hartmann explains that "[t]he proposed wall segments will be rather like having a 30-foot wall built through my living room. Southwestern Arizona and northern Mexico, together, are a cultural and historic universe; for me, the splendor of a 100-year, or 500-year or 1,000-year perspective, when people survived by moving from one water source to another, will be scarred by the wall." Hartmann Decl. ¶ 15; *see also* Tuell Decl. ¶ 12 (construction will "diminish [her] ability to recreate and enjoy these natural spaces and prevent [her] from passing this tradition down through [her] son to [ ] future generations").

The harms Plaintiffs will experience if construction proceeds are real, significant, and potentially irreversible. Just as this Court found with respect to wall construction Defendants proposed to undertake using Section 284, this proposed construction "constitutes a change in conditions" that will irreparably harm Plaintiffs' members. PI Order 50. Plaintiffs' injuries "are not speculative, and will be irreparable in the absence of an injunction." PI Order 54.

### b.   SBCC and its member organizations have suffered irreparable harm.

Defendants' actions have also "perceptibly impaired" Plaintiff SBCC's and its member organization's missions and caused "concrete and demonstrable injury to the organization[s'] activities." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). These injuries constitute irreparable harm because they include "ongoing harms to [their] organizational missions" and require the organizations to "divert resources" in response to Defendants' unlawful conduct. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018, 1029 (9th Cir. 2013).

Since Defendant Trump declared a national emergency and announced plans to use Section 2808 funding to build a border wall, Plaintiff SBCC and its member organizations have diverted staff time and resources to countering the negative impacts of the imminent construction and experienced a frustration of their missions. SBCC member organization Texas Civil Rights Project

("TCRP") has "divert[ed] scarce resources in protection of Texas landowners" who are at risk of having their property condemned for border wall construction. Garza Decl. ¶ 10. TCRP has been centrally involved in advising and representing impacted landowners facing condemnation as a result of border wall construction for years, and is committed to "represent or secure representation for every low income landowner threatened with condemnation." *Id.* ¶ 15. Although TCRP is based in the Rio Grande Valley, due to the "imminent land seizure and 'military construction' across 52 miles of borderlands in Laredo," TCRP has had to expand its reach to Laredo—where it does not have a physical presence and has never directly represented anyone because it is "prohibitive" to do so. *Id.* ¶¶ 10, 12. The organization recently held an event in the area where it announced its commitment to assist impacted landowners, and since then it has been fielding inquiries from landowners in Laredo and "divert[ing] [ ] time away from [ ] other projects on issues impacting border communities." *Id.* ¶¶ 14, 16.

SBCC member organization Southwest Environmental Center ("SWEC") focuses on hands-on habitat restoration, public education, and advocacy. Third Bixby Decl. ¶¶ 4–8, 13. As a result of Defendants' actions, it has been forced to divert resources to monitoring construction, planning border wall events, and focusing on defensive campaigns. *Id.* ¶¶ 12–16. This has forced it to devote less time to its core restoration projects. *Id.* ¶ 16 (whereas Executive Director would normally devote 20% of time to restoration work, he is now only able to devote 5%). "The lack of notice and transparency surrounding the Administration's plans for border wall construction using military funds has frustrated SWEC's ability to provide meaningful input about potential environmental and ecological harms"—a key component of SWEC's mission. *Id.* ¶ 13.

SBCC member American Friends Service Committee (AFSC) works with community organizations and migrant communities in the San Diego area. Rios Decl. ¶ 5. "The communities [AFSC] serve[s] on the border are deeply concerned about and affected by border wall construction," *id.* ¶ 7, and AFSC will be forced do divert resources to "physically monitor the construction of border wall wherever it happens in San Diego and surrounding areas, including Calexico." *Id.* ¶ 9. AFSC will have to spread its small staff thin to cover Defendants' construction

1   plans, which will substantially inhibit its ability to deliver know-your-rights trainings and

2   leadership development. *Id.* ¶¶ 12–13.

3       SBCC itself "has been forced to devote substantial staff time and resources to analyze,

4   mobilize, and respond to the harms a wall will cause along the southern border." Third Gaubeca

5   Decl. ¶ 8. Its staff have been forced to spend time "mapping coordinates, and determining which

6   communities, habitats, and sacred and cultural sites will be threatened. [They] have engaged

7   organizations and individuals in or near affected areas, and supported their efforts to organize local

8   resistance." *Id.* ¶ 11. SBCC has been forced to reduce the time devoted to "core projects" such as

9   Border Patrol accountability and community engagement on local health and education. *Id*. ¶ 12.

10      The injuries Plaintiffs have suffered are identical to those that the Ninth Circuit has found to

11  confer standing and constitute irreparable harm. "[T]he Ninth Circuit has specifically found that

12  diversion of resources for 'outreach campaigns' and educating the public establishes a diversion of

13  resources sufficient to establish organizational standing." *Serv. Women's Action Network v. Mattis*,

14  352 F. Supp. 3d 977, 985 (N.D. Cal. 2018) (citing *Nat'l Council of La Raza v. Cegavske*, 800 F.3d

15  1032, 1040 (9th Cir. 2015) and *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105–06 (9th

16  Cir. 2004)). SWEC and TCRP have "redirect[ed] [their] limited resources and limited staff hours to

17  answering questions" from members whose recreational interests are threatened by construction and

18  planned a community education event "in direct response to concerns" raised by members. *Id*. at

19  981 (quotation marks omitted); *see also* Third Bixby Decl. ¶ 14; Garza Decl. ¶¶ 11–13. SWEC has

20  also started a new education campaign that takes members to the border wall "in order to raise

21  awareness about the potential destruction it can cause to the surrounding environment and wildlife."

22  Third Bixby Decl. ¶ 16; *see also Fair Hous. Council of San Fernando Valley v. Roommate.com,*

23  *LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (starting "new education and outreach campaigns

24  targeted at" the defendant's discriminatory conduct constituted irreparable harm). As part of a new

25  campaign that SBCC started to push against the national emergency, it created toolkits, "created

26  and provided background and educational material", and "wrote up action alerts." Third Gaubeca

27  Decl. ¶ 9.

28      In addition, Plaintiffs have diverted resources to monitor and investigate Defendants'

conduct and counter its negative impacts. *See Smith*, 358 F.3d at 1105 (expending resources to monitor the defendant's conduct constitutes diversion of resources); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (finding diversion of resources for "investigating and other efforts to counteract [defendant's] discrimination"). This has resulted in a frustration of their missions. SBCC's mission to "improve quality of life in border communities" and push for "accountability and transparency in the government policies and practices that impact" these communities is frustrated by the construction of a wall—built without any public comment—that will divide bi-national border communities and damage the natural habitats that they live, work, and recreate in. Third Gaubeca Decl. ¶¶ 3, 4; *see also Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (ordinance preventing day laborers from soliciting work frustrated organization's mission "to strengthen and expand the work of local day laborer organizing groups"). Resources that would "normally go towards [SWEC's] longer term restoration efforts" are "instead being channeled to immediate border wall advocacy" and efforts "to stay on top of the Administration's ever-changing plans for new wall construction." Third Bixby Decl. ¶¶ 12, 15.

In the absence of injunctive relief, Plaintiffs will be forced to continue diverting resources. SBCC and its member organizations will continue fielding community inquiries about the proposed construction and its impacts, offering legal representation or referrals for Laredo landowners facing condemnation actions, and shifting resources away from their core mission in order to engage in defensive border wall-related advocacy. Third Bixby Decl. ¶ 15; Garza Decl. ¶¶ 15–16; Third Gaubeca Decl. ¶ 10. If construction using Section 2808 funds is permanently enjoined, Plaintiffs can resume work that affirms their core organizational priorities. *See* Garza Decl. ¶ 16 (will no longer be forced to expend resources trying to protect Laredo landowners from condemnation actions); Third Gaubeca Decl. ¶ 12 (can focus on "affirmative work" "advocating for law enforcement, health, education, and economic policies that [border] communities would benefit from"). Permanent relief is appropriate. *Cf.* PI Order 52 (finding that preliminary relief was inappropriate because "[w]ith or without an injunction, Plaintiffs will have to continue to litigate this case and otherwise divert resources in the manner they have described until the case is

1    resolved").

2                    **c.  Defendants' actions irreparably harm Plaintiffs' constitutional
                            interests.**

3        When coupled with the additional injuries Plaintiffs stand to suffer, "the deprivation of

4    constitutional rights unquestionably constitutes irreparable injury," *Melendres v. Arpaio*, 695 F.3d

5    990, 1002 (9th Cir. 2012) (quotation marks omitted). This principle applies even where the

6    government's constitutional violation is structural, rather than a deprivation of individual

7    constitutional rights. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th

8    Cir. 2009) (finding with respect to Supremacy Clause that "constitutional violation alone, coupled

9    with the damages incurred, can suffice to show irreparable harm"); *Cty. of Santa Clara v. Trump*,

10   250 F. Supp. 3d 497, 538 (N.D. Cal. 2017) (rejecting distinction between violations of structural

11   and personal constitutional rights, and finding irreparable harm arising from separation of powers

12   and Spending Clause violations). Plaintiffs are experiencing and will continue to experience

13   irreparable harm stemming from Defendants' usurpation of Congress's authority.

14                    **2.   Plaintiffs do not have an adequate remedy at law.**

15       No remedy at law can compensate Plaintiffs for the harm that wall construction imposes.

16   "[E]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and

17   is often permanent." *Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) (en banc)

18   (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)), *abrogated in part on

19   other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also League of

20   Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir.

21   2014) (noting that payment of money damages cannot remedy environmental injury stemming from

22   logging); *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (same). Once

23   Defendants commence construction—which includes preparatory activities such as installing

24   additional lighting, creating access roads, and moving heavy machinery on location—

25   environmental damage will have already occurred. This harm is irreversible, permanently altering

26   the surrounding environment and causing irreparable injury to Plaintiffs. No amount of after-the-

27   fact monetary damages can remedy this harm.

28

In addition, SBCC and its members face ongoing harm to their organizational missions, which cannot be remedied by damages. *See, e.g.*, *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (obstacles that "make it more difficult for [organizations] to accomplish their primary mission" impose "irreparable harm"). And, when coupled with the additional injuries Plaintiffs stand to suffer, "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres*, 695 F.3d at 1002 (internal quotation marks omitted).

### 3. The balance of harms and public interest support a permanent injunction.

The public interest and balance of equities favor the entry of a permanent injunction. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (these two factors merge when the government is a party). Unless Defendants are permanently enjoined from wall construction, Plaintiffs will continue to face the prospect that the borderlands they treasure will be destroyed. *See All. for the Wild Rockies*, 632 F.3d at 1138 (there is a well-established "public interest in preserving nature and avoiding irreparable environmental injury"). The public also "has an interest in ensuring that statutes enacted by their representatives are not imperiled by executive fiat." PI Order 54 (quoting *E. Bay Sanctuary v. Trump*, 909 F.3d 1219, 1255 (9th Cir. 2018)).

As this Court has observed, "Congress considered all of Defendants' proffered needs for border barrier construction, weighed the public interest in such construction against Defendants' request for taxpayer money, and struck what it considered to be the proper balance—in the public's interest—by making available only $1.375 billion in funding, which was for certain border barrier construction not at issue here." Order, ECF No. 185 at 8. The public interest is "best served by respecting the Constitution's assignment of the power of the purse to Congress, and by deferring to Congress's understanding of the public interest as reflected in its repeated denial of more funding for border barrier construction." *Sierra Club v. Trump*, 929 F.3d at 677.

### B. The Court should declare unlawful Defendants' proposed use of Section 2808 to construct a border wall that Congress rejected, as well as Defendants' violation of NEPA.

This Court may issue declaratory relief "[i]n a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a); *see also Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–40

(1937). A "case or controversy exists justifying declaratory relief" because "the challenged government activity is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008). The Court should enter Plaintiffs' requested declaratory relief.

## CONCLUSION

For the reasons stated above, Plaintiffs ask that the Court grant their Motion for Partial Summary Judgment and order injunctive and declaratory relief.

Dated: October 11, 2019                           Respectfully submitted,

                                                  /s/ *Dror Ladin*

Mollie M. Lee (SBN 251404)                        Dror Ladin*
American Civil Liberties Union Foundation         Noor Zafar*
     of Northern California, Inc.                 Jonathan Hafetz*
39 Drumm Street                                   Hina Shamsi*
San Francisco, CA 94111                           Omar C. Jadwat*
Tel: (415) 621-2493                               American Civil Liberties Union Foundation
Fax: (415) 255-8437                               125 Broad Street, 18th Floor
mlee@aclunc.org                                   New York, NY 10004
                                                  Tel: (212) 549-2660
David Donatti*                                    Fax: (212) 549-2564
Andre I. Segura (SBN 247681)                      dladin@aclu.org
American Civil Liberties Union Foundation         nzafar@aclu.org
     of Texas                                     jhafetz@aclu.org
P.O. Box 8306                                     hshamsi@aclu.org
Houston, TX 77288                                 ojadwat@aclu.org
Tel: (713) 325-7011
Fax: (713) 942-8966                               Cecillia D. Wang (SBN 187782)
ddonatti@aclutx.org                               American Civil Liberties Union Foundation
asegura@aclutx.org                                39 Drumm Street
                                                  San Francisco, CA 94111
                                                  Tel: (415) 343-0770
                                                  Fax: (415) 395-0950
Counsel for Plaintiffs                            cwang@aclu.org

*Admitted* pro hac vice                           Sanjay Narayan (SBN 183227)**
**Counsel for Plaintiff* Sierra Club              Gloria D. Smith (SBN 200824)**
                                                  Sierra Club Environmental Law Program
                                                  2101 Webster Street, Suite 1300
                                                  Oakland, CA 94612
                                                  Tel: (415) 977-5772
                                                  sanjay.narayan@sierraclub.org
                                                  gloria.smith@sierraclub.org

---

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO: 4:19-cv-00892-HSG