SUZANNE R. SCHAEFFER (*pro hac vice*)
suzanne.schaeffer@dentons.com
SAMUEL F. DAUGHETY (*pro hac vice*)
samuel.daughety@dentons.com
DENTONS US LLP
1900 K Street, NW
Washington, District of Columbia  20006
Telephone:     (202) 496-7500
Facsimile:      (202) 408-6399

JESSICA L. DUGGAN (SBN 271703)
jessica.duggan@dentons.com
DENTONS US LLP
One Market Plaza, Spear Tower, 24th Fl.
San Francisco, California  94105
Telephone:     (415) 267-4000
Facsimile:      (415) 267-4198

JOSHUA O. REES (*pro hac vice*)
joshua.rees@tonation-nsn.gov
Acting Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, Arizona 85634
Telephone:     (520) 383-3410
Facsimile:      (520) 383-2689

Attorneys for *Amicus Curiae*
Tohono O'odham Nation

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| SIERRA CLUB and SOUTHERN BORDER COMMUNITIES COALITION,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Case No.  4:19-cv-00892-HSG<br><br>***AMICUS CURIAE* BRIEF OF TOHONO O'ODHAM NATION IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* THE TOHONO O'ODHAM NATION ........................................................................................................... 1

ARGUMENT ........................................................................................................................ 3

I.     Yuma Sector Project 3 Will Cause Irreparable Harm To Natural And Cultural Resources Of Great Importance To The Nation. ................................................ 3

        A.     The Nation's Significant Interest in Natural and Cultural Resources on its Reservation and in Areas Affected by the Planned Construction ........................................................................................ 3

        B.     The Construction of a Border Wall in Yuma Sector Project 3 Will Cause Irreparable Harm to Valuable Cultural and Natural Resources ................................................................................................ 5

        C.     A Preliminary Injunction to Protect these Resources is in the Public Interest ........................................................................................ 7

II.     The Planned Construction will Cause Irreparable Harm to the Nation's Public Safety and Related Resources ............................................................................ 8

        A.     Impacts of Increased Border Crossing Activity on the Nation ............... 8

        B.     The Planned Construction Will Result in Increased Migrant Traffic and Harms to the Nation ....................................................................... 9

        C.     The Harms to the Nation are Inconsistent with the Public Interest ....... 13

III.    The Federal Government's Trust Responsibility to the Nation Amplifies the Nation's Interest in this Case. ................................................................................ 14

CONCLUSION .................................................................................................................. 15

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

*AMICUS CURIAE* BRIEF OF TOHONO O'ODHAM NATION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*All. for Wild Rockies v. Cottrell,*
    622 F.3d 1045 (9th Cir. 2010)............................................................................8

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011)......................................................................8, 13

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018)...........................................................................14

*California v. Azar,*
    No. 19-CV-01184, 2019 WL 1877392 (N.D. Cal. Apr. 26, 2019) .....................2, 14

*Colorado River Indian Tribes v. Marsh,*
    605 F. Supp. 1425 (C.D. Cal. 1985) ..................................................................7

*Cty. of Santa Clara v. Trump,*
    250 F. Supp. 3d 497 (N.D. Cal. 2017) .............................................................14

*Earth Island Inst. v. Elliott,*
    290 F. Supp. 3d 1102 (E.D. Cal. 2017)............................................................14

*Golden Gate Rest. Ass'n v. City & Cty. of San Francisco,*
    512 F.3d 1112 (9th Cir. 2008)...........................................................................2

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008)...........................................................................13

*Morris v. N. Haw. Cmty. Hosp.,*
    37 F. Supp. 2d 1181 (D. Haw. 1999)...............................................................14

*Morton v. Ruiz,*
    415 U.S. 199 (1974).......................................................................................14

*Nance v. EPA,*
    645 F.2d 701 (9th Cir. 1981)...........................................................................14

*Northern Arapahoe Tribe v. Hodel,*
    808 F.2d 741 (10th Cir. 1987).........................................................................15

*Parravano v. Babbitt,*
    70 F. 3d 539 (9th Cir. 1995)...........................................................................15

*Pyramid Lake Paiute Tribe of Indians v. Morton,*
    354 F. Supp. 252 (D.D.C. 1972) .....................................................................15

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

ii

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

*Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*,
   755 F. Supp. 2d 1104 (S.D. Cal. 2010) ................................................................7

*Ramos v. Nielsen*,
   336 F. Supp. 3d 1075 (N.D. Cal. 2018) .........................................................2, 14

*S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
   588 F.3d 718 (9th Cir. 2009)................................................................................7

*Save Our Sonoran, Inc. v. Flowers*,
   408 F.3d 1113 (9th Cir. 2005)..............................................................................8

*South Fork Band Council v. US Dept. of Interior*,
   588 F. 3d 718 (9th Cir. 2009)..............................................................................8

*Spiegel v. City of Houston*,
   636 F.2d 997 (5th Cir. 1981)..............................................................................14

*United States v. North Carolina*,
   192 F.Supp.3d 620 (M.D.N.C. 2016)..................................................................14

**Tribal Authorities**

CONSTITUTION OF THE TOHONO O'ODHAM NATION (1986),
   Article XVIII, § 1
   http://tolc-nsn.org/docs/Constitution.pdf ............................................................3

Tohono O'odham Legislative Council Resolution No. 07-714
   http://www.tolc-nsn.org/docs/Actions07/07714.pdf ...........................................4

Tohono O'odham Legislative Council Resolution No. 18-032
   http://tolc-nsn.org/docs/actions18/18032.pdf.....................................................8

Tohono O'odham Legislative Council Resolution No. 19-088
   http://tolc-nsn.org/docs/Actions19/19088.pdf.....................................................9

**Statutes**

Arizona Desert Wilderness Act of 1990, 16 U.S.C. § 1132 note................................4, 5

   § 301(f)(1) ...........................................................................................................5

   § 301(f)(2) ...........................................................................................................5

   § 301(g)(1) ..........................................................................................................5

   § 301(g)(2) ..........................................................................................................5

10 U.S.C. § 2808 ....................................................................................................3, 5

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

*AMICUS CURIAE* BRIEF OF TOHONO
O'ODHAM NATION

**Other Authorities**

Nunez-Neto, B. and Vina, S., Congressional Research Service, *Border Security: Barriers Along the U.S. International Border* (Sept. 21, 2006), https://trac.syr.edu/immigration/library/P1065.pdf .......................................7, 10, 12

Rankin, Adrianne G*., Archeological Survey of Organ Pipe Cactus National Monument, Southwestern Arizona: 1989-1991, Publications in Anthropology 61, Tucson, Arizona: Western Archeological and Conservation Center* (1995), https://core.tdar.org/document/4301/archeological-survey-at-organ-pipe-national-monument-southwestern-arizona-1989-1991 ...........................................4

Saxton, D., Saxton, L., & Enos, S., TOHONO O'ODHAM/PIMA TO ENGLISH: ENGLISH TO TOHONO O'ODHAM/PIMA DICTIONARY, Tucson, AZ: The University of Arizona Press (2d ed. 1998) ......................................................................4

Testimony of The Hon. Edward Manuel, Chairman, Tohono O'odham Nation, U.S. House Committee on Appropriations, Subcommittee on Interior, Environment and Related Agencies (Mar. 6, 2019), https://docs.house.gov/meetings/AP/AP06/20190306/109006/HHRG-116-AP06-Wstate-ManuelE-20190306.pdf .........................................................9

Tohono O'odham Nation Issue Brief: The Tohono O'odham Nation Opposes a "Border Wall" (Feb. 2017), http://www.tonation-nsn.gov/wp-content/uploads/2017/02/Issue-Brief-Tohono-Oodham-Nation-Opposes-Border-Wall.pdf.............................................8

U.S. Border Patrol*, Environmental Impact Statement for Construction, Maintenance, and Operation of Tactical Infrastructure, Rio Grande Valley Sector, Texas* (Nov. 2007), https://www.dhs.gov/sites/default/files/publications/0006_-_bw1_foia_cbp_000649-001186_part1.pdf, ...........................................7, 10

U.S. Border Patrol FOIA Response, *Environmental Assessment for the Proposed Installation, Operation, and Maintenance of Primary Pedestrian Fence Near Lukeville, Arizona* (Jan. 2008), https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part1.pdf https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf ...............................7, 8, 10, 11

U.S. Fish and Wildlife Service, *Cabeza Prieta National Wildlife Refuge: Comprehensive Conservation Plan, Wilderness Stewardship Plan and Environmental Impact Statement* (Aug. 2006), https://www.fws.gov/uploadedFiles/CPNWREIS.pdf .............................................4

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

*AMICUS CURIAE* BRIEF OF TOHONO O'ODHAM NATION

U.S. National Park Service, *Effects of the International Boundary Pedestrian Fence in the Vicinity of Lukeville, Arizona, on Drainage Systems and Infrastructure, Organ Pipe Cactus National Monument, Arizona* (Aug. 2008), https://www.nps.gov/orpi/learn/nature/upload/FloodReport_July2008_final.pdf ......................6

Woods, Teri Knutson; Blaine, Karen; and Francisco, Lauri (2002) "*O'odham Himdag as a Source of Strength and Wellness Among the Tohono O'odham of Southern Arizona and Northern Sonora, Mexico,*" 29 J. OF SOCIOLOGY & SOCIAL WELFARE (2002), https://scholarworks.wmich.edu/jssw/vol29/iss1/4 .....................................................................4

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

v

*AMICUS CURIAE* BRIEF OF TOHONO O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

## INTRODUCTION AND INTEREST OF *AMICUS CURIAE*
## THE TOHONO O'ODHAM NATION

*Amicus* Tohono O'odham Nation ("Nation") is a federally recognized Indian tribe with more than 34,000 members.  The O'odham have lived in what is now Arizona and northern Mexico since time immemorial.  The Nation's Reservation in southern Arizona is one of the largest in the country, comprising nearly 2.8 million acres.  When the international line marking the boundary between the United States and Mexico was drawn in 1854, it sliced through the Nation's aboriginal territory, separating its people.  As a result, the Nation's Reservation shares a 62-mile border with the Republic of Mexico, and approximately two thousand of the Nation's members live on the Mexican side of the border.  The Nation's ancestral territory and traditional homelands include Cabeza Prieta National Wildlife Refuge, which is the subject of a substantial portion of Defendants' contemplated Yuma Sector Project 3 and related Tucson Sector Project 1 border wall construction, and Organ Pipe Cactus National Monument (also subject to Tucson Sector Project 1 and 2 border wall construction), which sits between Cabeza Prieta and the western boundary of the Nation's Reservation.  The Nation has significant and well-documented connections to these lands and the plants, animals, and cultural resources within these areas.

The Nation's location on the Mexican border exposes its Reservation and members to major impacts from border crossing traffic, including border-related burglaries and thefts, litter, land desecration, destruction of natural resources and protected species, migrant rescues, migrant deaths, drug trafficking, and human smuggling.  While the Nation works closely with U.S. Customs and Border Patrol ("CBP") and U.S. Immigration and Customs Enforcement on a variety of state-of-the-art border security measures, it strongly opposes construction of a physical wall on its southern boundary, as it would divide the Nation's historic lands and communities, hamper the Nation's traditional crossings for domestic, ceremonial, and religious purposes, prevent the migration of wildlife, exacerbate flooding, harm wildlife and natural resources sacred to the O'odham, and militarize the Nation's border.  What is more, the Nation receives extremely limited federal funding to address border impacts, and therefore is forced to spend millions of dollars annually from its own treasury on border security and enforcement and associated costs.

AMICUS CURIAE BRIEF OF TOHONO
O'ODHAM NATION

1    The Nation agrees with Plaintiffs that the Defendants' planned border wall construction

2  contemplated by Yuma Sector Project 3 must be enjoined for the reasons stated in Plaintiffs'

3  Motion for Partial Summary Judgment (Oct. 11, 2019) (Dkt. No. 210), and writes separately to

4  articulate the substantial and irreparable harm that the planned border wall construction will cause

5  to the Nation.  Yuma Sector Project 3 contemplates the construction of over thirty miles of border

6  wall, through approximately half of Cabeza Prieta National Wildlife Refuge, to connect with the

7  planned construction of border wall in Tucson Sector Projects 1 and 2, which calls for

8  construction across both Cabeza Prieta and Organ Pipe Cactus National Monument, ending less

9  than two miles from the western boundary of the Nation's Reservation.  This new border wall will

10  cause irreparable harm to natural and cultural resources of significant importance to the Nation,

11  both in these sensitive areas and on the Nation's Reservation.  The construction of the border wall

12  in these areas also will substantially increase migrant traffic on the Nation's Reservation lands,

13  and exacerbate the impacts that the Nation experiences from this traffic and the cost to the Nation

14  to address it.

15    These harms also speak directly to the public interest factor for Plaintiffs' requested

16  injunctive relief, which properly focuses on the impact of the challenged conduct on non-parties

17  like the Nation.  *See California v. Azar*, No. 19-CV-01184, 2019 WL 1877392, at *13 (N.D. Cal.

18  Apr. 26, 2019) ("Plaintiffs are not the only ones that will suffer hardship absent an injunction…In

19  considering the public interest, we may consider the hardship to all individuals covered by the

20  [challenged law], not limited to parties…."), quoting *Golden Gate Rest. Ass'n v. City & Cty. of*

21  *San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008); *see also Ramos v. Nielsen*, 336 F. Supp. 3d

22  1075, 1085-86 (N.D. Cal. 2018) (noting that "[t]he amicus briefs underscore that the harms to

23  [Plaintiffs] will also harm the public interest.").  The Nation's interest is particularly relevant

24  because the United States has a special responsibility for the Tribe as its federal trustee, a

25  responsibility that extends to the protection of tribal reservation lands and resources. The harms to

26  the Nation and its trust resources that this border wall construction will cause, coupled with the

27  harm Plaintiffs already have identified, decidedly tips this factor in favor of injunction.  *Id.* at

28  1089 (noting "that, without a preliminary injunction, there is a strong likelihood that Plaintiffs

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

AMICUS CURIAE BRIEF OF TOHONO
O'ODHAM NATION

would suffer irreparable injury, with concomitant harm to state and local communities as well.").

## ARGUMENT

**I.    YUMA SECTOR PROJECT 3 WILL CAUSE IRREPARABLE HARM TO NATURAL AND CULTURAL RESOURCES OF GREAT IMPORTANCE TO THE NATION.**

Yuma Sector Project 3 would create a 31-mile long, 30-foot high wall, together with road improvements and lighting in Cabeza Prieta National Wildlife Refuge.[1]  This construction would connect with other planned border wall construction (which is the subject of this Court's previous injunction)[2] creating a 74-mile long wall that ends less than two miles from the western boundary of the Nation's Reservation.  Defendants' construction of this border wall will cause irreparable harm to cultural and natural resources of vital importance to the Nation, both in terms of damage to the resources from construction and associated impacts at the Project sites off-reservation, and damage caused by increased migrant traffic and interdiction on-reservation.

**A.    The Nation's Significant Interest in Natural and Cultural Resources on its Reservation and in Areas Affected by the Planned Construction.**

Like many Native American tribes, the preservation and protection of the natural and cultural environment of its homelands is profoundly important to the Tohono O'odham Nation. The Nation has enshrined these values in its Constitution, which states, at Article XVIII, Sec. 1:

> It shall be the policy of the Tohono O'odham Nation to encourage productive and enjoyable harmony between members of the nation and their environment; to promote efforts which will preserve and protect the natural and cultural environment of the Tohono O'odham Nation, including its lands, air, water, flora and fauna, its ecological systems, and natural resources, and its historic and cultural artifacts and archeological sites; and to create and maintain conditions under which members of the nation and nature can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations of members of the Tohono O'odham Nation.[3]

[1] *See* Dkt. No. 201, Notice of Decision by the Department of Defense to Authorize Border Barrier Projects Pursuant to 10 U.S.C. § 2808, Exhibit 1 at 3 (Sept. 3, 2019).

[2] Dkt. No. 185, Order Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment, Denying Defendants' Motion for Partial Summary Judgment, Certifying Judgment for Appeal and Denying Request to Stay (June 28, 2019).

[3] CONSTITUTION OF THE TOHONO O'ODHAM NATION, art, XVIII, § 1 (1986), available at http://tolc-nsn.org/docs/Constitution.pdf.

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

AMICUS CURIAE BRIEF OF TOHONO O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

The Nation further has recognized that "access to and preservation of the Nation's traditional lands and sacred sites" including in Cabeza Prieta National Wildlife Refuge, "are essential to the O'odham himdag."[4]  "Himdag" is a word that escapes easy translation, but has been referred to as "a way of life; a culture; a custom or practice; traditions."[5]

In 1990, Congress set aside the vast majority of the Cabeza Prieta Wildlife Refuge (including portions impacted by Defendants' border wall construction) as protected wilderness area through the Arizona Desert Wilderness Act of 1990.[6]  The U.S. Fish and Wildlife Service's 2006 Comprehensive Plan for Cabeza Prieta National Wildlife Refuge notes that "[e]thnographically, the refuge was the homeland of the Hia C-ed O'odham,"[7] most of whom are members of the Nation, and that "the Tohono O'odham Nation and Hia-Ced O'odham band … have cultural links to the refuge lands."[8]  Existing survey work in these areas underscores significant cross-border activity on the part of the Nation's ancestors.  Cabeza Prieta lands show substantial evidence of the early desert southwest shell trade, whereby "the Hohokam and other southwestern cultural groups obtained marine shell primarily from the Pacific Ocean," and principally in the Gulf of California.[9]  But while "45 prehistoric and historic sites have been recorded by statewide survey … [l]ess than one percent of the refuge has been inventoried for archeological and historic sites."[10]

---

[4] Tohono O'odham Legislative Council Resolution No. 07-714 at 1, available at http://www.tolc-nsn.org/docs/Actions07/07714.pdf.

[5] Saxton, D., Saxton, L., & Enos, S., TOHONO O'ODHAM/PIMA TO ENGLISH: ENGLISH TO TOHONO O'ODHAM/PIMA DICTIONARY, Tucson, AZ: The University of Arizona Press (2d ed. 1998) at 22; *see also* Woods, Teri Knutson; Blaine, Karen; and Francisco, Lauri (2002) *O'odham Himdag as a Source of Strength and Wellness Among the Tohono O'odham of Southern Arizona and Northern Sonora, Mexico*, 29 J. OF SOCIOLOGY & SOCIAL WELFARE 1, 41-49 (2002), available at https://scholarworks.wmich.edu/jssw/vol29/iss1/4. "Himdag" is alternately transliterated "himthag."  *See id.* at 41.

[6] 16 U.S.C. § 1132 note; Pub. L. No. 101-628, 104 Stat. 4478 (Nov. 28, 1990), title III.

[7] U.S. Fish and Wildlife Service, *Cabeza Prieta National Wildlife Refuge: Comprehensive Conservation Plan, Wilderness Stewardship Plan and Environmental Impact Statement* (Aug. 2006) at 172, 586, available at https://www.fws.gov/uploadedFiles/CPNWREIS.pdf.

[8] *Id.* at 172.

[9] Rankin, Adrianne G.*, Archeological Survey of Organ Pipe Cactus National Monument, Southwestern Arizona: 1989-1991, Publications in Anthropology 61, Tucson, Arizona: Western Archeological and Conservation Center (1995), available at* https://core.tdar.org/document/4301/archeological-survey-at-organ-pipe-national-monument-southwestern-arizona-1989-1991 at 631; *see also id.* at 59 (noting that "Charlie Bell Well, also in the Cabeza Prieta Refuge, and several Sedentary-period sites identified during the present survey of Organ Pipe, appear to have played a key role in the shell trading network.").

[10] U.S. Fish and Wildlife Service, *supra* n.7, at 170.

4

AMICUS CURIAE BRIEF OF TOHONO
O'ODHAM NATION

**B.      The Construction of a Border Wall in Yuma Sector Project 3 Will Cause Irreparable Harm to Valuable Cultural and Natural Resources**

In addition to violating the requirements of 10 U.S.C. § 2808, as Plaintiffs argue in their motion [Dkt. No. 210 at 8-13], Defendants' use of military construction funds to build border walls in Cabeza Prieta is entirely inconsistent with Congress' explicit directive in creating Cabeza Prieta as a wilderness area.  The Arizona Desert Wilderness Act of 1990 specifies that the only military activities permitted within Cabeza Prieta wilderness areas are the continuation of "low-level overflights by military aircraft" or "maintenance of existing associated ground instrumentation." § 301(f)(1) and (2).  In contrast, border operations within these areas are allowed to continue through the Immigration and Naturalization Service (now U.S. Citizenship and Immigration Services), the Drug Enforcement Administration, and the United States Customs Service (now CBP).  *Id.* at § 301(g)(1) and (2).  Defendants' planned construction in Yuma Sector Project 3 violates Congress' careful directive in separating military and civilian border and law enforcement activities.

This construction also will undoubtedly destroy numerous trees, cacti, and other plants of significant and recognized interest to the Nation, disturb or destroy archaeological sites of O'odham ancestors, and hamper or eliminate wildlife migration and access to vitally important sources of water.  *See, e.g.*, Dkt. 210-1, Exh. 4, Second Broyles Decl. ¶¶ 6, 15-17 (impacts to wildlife, water sources, biological resources), Exh. 9, Second Hartmann Decl. ¶¶ 9, 15-16 (impacts to water sources, wildlife, indigenous people), Exh. 16, Tuell Decl. ¶¶ 4, 7, 13 (impacts to wildlife, water, soil, and native plants).  In addition, because much of the impacted land is under-surveyed from a cultural and archeological perspective, it is likely that construction will disturb or destroy additional cultural resources that have yet to be ascertained.  As noted above, these harms may be particularly acute near the border in Cabeza Prieta, where ancestral O'odham trade routes involved significant cross-border traffic from the Gulf of California.

Completed border walls are also likely to increase flooding near the Project area, permanently altering nearby vegetation and hydrological and cultural resources on a massive scale.  The National Park Service detailed similar impacts in 2008 following a summer monsoon

AMICUS CURIAE BRIEF OF TOHONO
O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

storm (an event exceedingly common in Southern Arizona) that delivered 1-2 inches of rain in the area of the then newly-constructed 5.2 miles of Lukeville pedestrian fencing in Tucson Project Sector 2.[11]  Contrary to the Finding of No Significant Impact that accompanied the Lukeville EA, the Park Service found that, in actuality, flooding led to significant blockage and sedimentation along the fence line, along with elevated ponding in blocked areas and corresponding water deprivation on the other side of the fence.[12]  The Park Service concluded that "[d]uring the next few decades, vegetation change will occur in those areas along the northern edge of the patrol road that receive and retain runoff," and that "natural resources [of the Monument] and [Park Service] infrastructure will be impacted, as well as resources and infrastructure on neighboring lands in the U.S. and Mexico."[13]  The Park Service anticipated that other short- and long-term impacts would include the following:

- Riparian vegetation will change in response to increase sedimentation.
- Channel morphology and floodplain function will change over time.
- Channelized waters will begin a gullying process that has the potential to transform land surfaces in the affected watersheds.[14]

Given that the proposed construction contemplates a wall that, together with Tucson Sector Projects 1 and 2 is more than fourteen times as long, these effects will surely be magnified, with corresponding harm to resources beyond the construction footprint.

What is more, as discussed below in Section II, the planned wall construction will also cause harm to natural resources, wildlife, and archeological and cultural resources on the Nation's Reservation because it will result in increased migrant traffic in these areas.  Indeed, in its Environmental Impact Statement for pedestrian fencing (*i.e.*, a wall) in the Rio Grande Valley Sector, CBP acknowledged that this increased traffic in areas without pedestrian fencing would

---

[11] U.S. National Park Service, *Effects of the International Boundary Pedestrian Fence in the Vicinity of Lukeville, Arizona, on Drainage Systems and Infrastructure, Organ Pipe Cactus National Monument, Arizona* (Aug. 2008) at 1, available at https://www.nps.gov/orpi/learn/nature/upload/FloodReport_July2008_final.pdf.
[12] *Id.* at 12-15.
[13] *Id.* at 15-16.
[14] *Id.* at 16.

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

6

AMICUS CURIAE BRIEF OF TOHONO
O'ODHAM NATION

"reduce vegetation, disturb soils, and lead to increased soil erosion," adversely impact wildlife and wildlife habitat, "uncover and destroy unknown" archeological resources, and cause "long-term major adverse impacts" to sensitive species."[15]  Similar harms to resources on the Nation's Reservation are extremely likely given that the Nation's western boundary is less than two miles from the eastern terminus of the planned wall construction associated with Yuma Sector Project 3 and Tucson Sector Projects 1 and 2.[16]

**C.     A Preliminary Injunction to Protect these Resources is in the Public Interest.**

Courts repeatedly have found that the public interest favors injunctive relief to protect cultural resources of Native American tribes.  *See, e.g., S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 721, 728 (9th Cir. 2009) (reversing a District Court order denying injunctive relief regarding NEPA claims because there is high "likelihood of irreparable environmental injury without adequate study of the adverse effects" concerning a "mountain that has religious significance for Indian tribes"); *Colorado River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1440 (C.D. Cal. 1985) ("The court is also mindful of the advancement of the public interest in preserving these resources. They represent a means by which to better understand the history and culture of the American Indians in the past, and hopefully to provide some insight and understanding of the present day American Indians."); *Quechan Tribe of Fort*

---

[15] *See* U.S. Border Patrol, *Environmental Impact Statement for Construction, Maintenance, and Operation of Tactical Infrastructure, Rio Grande Valley Sector, Texas* (Nov. 2007) ("Rio Grande EIS"), at BW1 FOIA CBP 000795, available at https://www.dhs.gov/sites/default/files/publications/0006_-_bw1_foia_cbp_000649-001186_part1.pdf, (noting that "Increased foot traffic between fence sections would reduce vegetation, disturb soils, and lead to increased soil erosion…."); *id.* at 000805 (noting that "wildlife and wildlife habitat between the 21 proposed tactical infrastructure sections would be adversely impacted by the funneling of cross border violators into the areas where there would be no fence and concentrated USBP operations."); *id.* at 000808 (noting that "funneling of cross-border violators into occurrences of [listed species] could have long-term major adverse impacts on these species."); *id.* at 000816 ("Archaeological resources between the 21 proposed tactical infrastructure sections could be adversely impacted by the funneling of cross border violators into the areas where there would be no fence. Increased foot traffic around the ends of sections of fence in remote areas would reduce vegetation, disturb soils, and could uncover and destroy unknown resources."); *see also* U.S. Border Patrol FOIA Response, *Environmental Assessment for the Proposed Installation, Operation, and Maintenance of Primary Pedestrian Fence Near Lukeville, Arizona* (Jan. 2008) (Lukeville EA) at 001030, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part1.pdf.

[16] *See id.*, *see also* Lukeville, EA001012-41, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf  (describing effect of migrant "circumvention" of pedestrian fencing); Nunez-Neto, B. and Vina, S., Congressional Research Service, *Border Security: Barriers Along the U.S. International Border*, (Sept. 21, 2006), 2, CRS-26, available at:  https://trac.syr.edu/immigration/library/P1065.pdf. (noting shift in migration patterns and related crime outside newly constructed border barriers).

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

AMICUS CURIAE BRIEF OF TOHONO
O'ODHAM NATION

*Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1122 (S.D. Cal. 2010) (public interest favored protection of cultural resources where plaintiffs raised "serious questions going to the merits of the federal action"), quoting *All. for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1049 (9th Cir. 2010); *see also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) ("the public interest in careful consideration of environmental impacts before major federal projects go forward, and … suspending such projects until that consideration occurs 'comports with the public interest.'"), quoting *South Fork Band Council v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009); *cf. Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2005) (affirming preliminary injunction because "once the desert is disturbed, it can never be restored.").  Given the breadth and significance of potential damage to resources at issue in this case, the Court should similarly find that the public interest favors injunctive relief here.

## II.   THE PLANNED CONSTRUCTION WILL CAUSE IRREPARABLE HARM TO THE NATION'S PUBLIC SAFETY AND RELATED RESOURCES

In addition to the harms to cultural and natural resources identified in Section I,  the construction of border wall in Yuma Sector Project 3, coupled with the construction in Tucson Project Sectors 1 and 2 would cause irreparable harm to the Nation's public safety resources, increasing costs and further strain on already overburdened law enforcement and border security resources and significant damage to the Nation's roads and infrastructure as a result of increased migrant traffic (and associated law enforcement vehicle use) on the Reservation.

### A.   Impacts of Increased Border Crossing Activity on the Nation

The Nation has supported the federal government with a wide variety of border security enforcement measures, working cooperatively with it relating to the construction of extensive vehicle barriers, the operation of two CBP forward operating bases on the Reservation, the development of border security technologies like integrated fixed towers, and the authorization of CBP checkpoints on reservation highways.[17]  Despite the Nation's strong and continuing support

---

[17] Tohono O'odham Legislative Council Resolution No. 18-032, available at http://tolc-nsn.org/docs/actions18/18032.pdf; Tohono O'odham Nation Issue Brief: The Tohono O'odham Nation Opposes a "Border Wall" (Feb. 2017), available at: http://www.tonation-nsn.gov/wp-content/uploads/2017/02/Issue-Brief-Tohono-Oodham-Nation-Opposes-Border-Wall.pdf (rept. in U.S. Border Patrol FOIA Response, *supra* n.15 at 000892).  The Nation recently approved construction of integrated fixed towers specifically aimed at providing

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

AMICUS CURIAE BRIEF OF TOHONO O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

for federal border security, federal funding to assist the Nation with border security-related law enforcement on the Nation's Reservation is extremely limited.  As a result, the Nation spends in excess of $3 million of its own money annually to help meet the United States' border security responsibilities, and spends more than a third of the Tohono O'odham Police Department budget on border security.[18]

For example, the Nation's Police Department investigates on average more than 75 immigrant deaths per year, and provides funding for autopsies at a cost of $2,600 per autopsy, along with supplies and detective investigative hours, with no financial assistance from CBP.[19] The Nation also absorbs all costs to address damage to its natural resources, including the removal of vehicles used and abandoned by smugglers and the control of wildland fires attributed to cross-border illegal activity.[20]  Much of the Nation's 734.8 miles of federal reservation roads are riddled with sinkholes, potholes, broken and cracked pavement, and washed-out bridges, damage that is caused or at least exacerbated by significant and extensive CBP vehicle use.[21] Maintenance and repair of these roads is inadequate, in part due to the inability of CBP and the Bureau of Indian Affairs, the agency charged with supervision of Indian reservations, to agree on a permanent source of federal funding for repairs.[22]

### B.     The Planned Construction Will Result in Increased Migrant Traffic and Harms to the Nation

Construction of the 74-mile long, 30-foot high concrete-filled steel wall contemplated by Yuma Sector Project 3 and Tucson Project Sectors 1 and 2, which are designed to prevent migrants from crossing the border on foot, will instead redirect migrant traffic onto the Nation's lands, particularly since the wall is less than two miles from the Nation's western border.  This

---

increased border security while obviating the need for additional physical border barriers.  *See* Tohono O'odham Legislative Council Resolution No. 19-088, available at http://tolc-nsn.org/docs/Actions19/19088.pdf.
[18] Testimony of The Hon. Edward Manuel, Chairman, Tohono O'odham Nation, U.S. House Committee on Appropriations, Subcommittee on Interior, Environment and Related Agencies (Mar. 6, 2019) at 2, available at https://docs.house.gov/meetings/AP/AP06/20190306/109006/HHRG-116-AP06-Wstate-ManuelE-20190306.pdf.
[19] *Id.*
[20] *Id.* at 3.
[21] *Id.*
[22] *Id.*

9

AMICUS CURIAE BRIEF OF TOHONO
O'ODHAM NATION

1  effect, which CBP refers to as "circumvention" or "funneling" is well documented,[23] and causes

2  increased migrant traffic and associated adverse impacts to areas near border wall construction.

3  For example, in 2006, the Congressional Research Service concluded that the flow of illegal

4  immigration had adapted to the construction of border barriers and increased enforcement in the

5  San Diego sector (known as Operation Gatekeeper), causing an enormous shift in illegal

6  immigration to the more remote areas of the Arizona desert and an increase in migrant deaths and

7  crime in these remote areas:

8  
9  
10  
11  

> …there is considerable evidence that the flow of illegal immigration has adapted to this enforcement posture and has shifted to the more remote areas of the Arizona desert.  Over the twelve year period between 1992 and 2004, overall apprehensions in the San Diego sector declined by 75% while apprehensions in the Yuma sector increased by 591%.[24]

11  The Congressional Research Service similarly noted that:

12  
13  
14  
15  
16  

> One unintended consequence of [increased San Diego and El Paso sector barriers and enforcement] and the shift in migration pattern has been an increase in the number of migrant deaths each year; on average 200 migrants died each year in the early 1990s, compared with 472 migrants deaths in 2005.  Another unintended consequence of this enforcement posture may have been a relative increase, compared to the national average, in crime along the border in these more-remote regions.[25]

17        CBP explicitly acknowledged the potential negative impacts from "funneling of illegal

18  cross border activities" into areas between sections of proposed fencing in its 2007 EIS for wall

19  construction in the Rio Grande Valley Sector in Texas.[26]  A year later, CBP again explicitly

20  acknowledged migrant "circumvention" of pedestrian barriers in the 2008 Environmental

21  

---

22  [23] *See, e.g.*, Lukeville EA, *supra* n.15 at 000977, 001000-11, available at
23  https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_-_001536_part1.pdf, 001012-41, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf, (describing effect of migrant "circumvention" of pedestrian fencing); Rio Grande EIS, *supra* n.15, at 00792, 00795,
24  00802, 00805, 00806, 00808, 00816, 00817, available at https://www.dhs.gov/sites/default/files/publications/0006_-_bw1_foia_cbp_000649-001186_part1.pdf.
25  [24] Nunez-Neto, B. and Vina, S., Congressional Research Service, *Border Security: Barriers Along the U.S. International Border*, (Sept. 21, 2006), 2, available at:  https://trac.syr.edu/immigration/library/P1065.pdf.
26  [25] *Id.* at CRS-26.
27  [26] Rio Grande EIS, *supra* n.15, at 00792, 00795, 00802, 00805, 00806, 00808, 00816, 00817, 00818, available at
28  https://www.dhs.gov/sites/default/files/publications/0006_-_bw1_foia_cbp_000649-001186_part1.pdf, (adverse, long-term impacts to land use, vegetation, soils, wildlife, habitat, federally listed species and cultural resources from funneling of migrants resulting in increased foot traffic between fence sections; impacts considered "minor" because fence locations "were based on USBP operational requirements including the ability to make apprehensions.").

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

AMICUS CURIAE BRIEF OF TOHONO
O'ODHAM NATION

Assessment that was prepared to analyze the impacts of construction of the primary pedestrian fence that runs on either side of the Lukeville Port of Entry in the Organ Pipe Cactus National Monument.[27]  CBP's Lukeville EA recognized that "indirect" negative impacts to land use, soils, wildlife habitat, unique and sensitive areas, biological resources, protected species like the Sonoran pronghorn, critical habitat, socioeconomic resources and aesthetics (trash and debris from undocumented migrants) could occur in areas outside the project corridor as "IAs [illegal aliens] attempt to avoid detection and circumvent the proposed infrastructure."[28]  CBP did not directly address these adverse impacts to areas outside the project corridor, asserting that the "impacts cannot be quantified at this time because IA patterns and migration routes are completely out of USBP's [CBP's] control."[29]  It suggested, however, that these harms would be mitigated because "the primary pedestrian fence would act as a force multiplier and allow USBP to deploy agents to areas without pedestrian barriers, therefore, minimizing potential adverse indirect impacts."[30]  The EA specifically acknowledged potential socioeconomic impacts to the Nation that could occur from a shift in illegal pedestrian traffic as a result of constructing the primary pedestrian fence near the Lukeville Point of Entry,[31] but CBP dismissed those impacts as insignificant because it was "impossible" to determine what they might be, as the direction of illegal pedestrian traffic "is solely at the discretion of the IAs" and "the primary pedestrian fence would allow USBP to deploy agents to those areas lacking infrastructure to minimize impacts from any potential shift in IA traffic."[32]

CBP reached these conclusions despite its earlier experience with Operation Gatekeeper

---

[27] Lukeville EA, *supra* n.15 at 000977, 001000-11, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part1.pdf, 001012-41, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf.

[28] *Id.* at 001000-01, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part1.pdf, 001026-28, 001030, 001032, 001034, 001041, 001043, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf.

[29] *Id.* at 001026-28, 001030, 001032, 001034, 001036, 001040, 001041, 001043, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf.

[30] The Finding of No Significant Impact (FONSI) for the Lukeville Primary Pedestrian Fence project issued by CBP reaches the same conclusion.  Lukeville EA, *supra* n.15 at 000972.

[31] *See* Lukeville EA, *supra* n.15 at 001041, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf.

[32] *Id.* at 001041, 001042, available at https://www.dhs.gov/sites/default/files/publications/0001_-_bw6_foia_cbp_000899_-_001536_part2.pdf.

DENTONS US LLP
1900 K STREET, NW.
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

AMICUS CURIAE BRIEF OF TOHONO
O'ODHAM NATION

and the documented increase in migration and related negative impacts to more remote areas outside that project area.  The fact that CBP now proposes to construct new border wall to replace and extend the wall that was the subject of the 2008 Lukeville EA merely underscores the hollowness of CBP's claim that the Lukeville wall would minimize adverse impacts outside of the fenced areas through the deployment of additional agents in those areas.  Instead, the primary fencing had the impacts that the EA predicted (but that CBP dismissed as uncertain):  increased migration outside the project area as migrants circumvented the barriers, with resulting negative impacts on natural and socioeconomic resources and increased illegal activity and crime in those outside areas, just as the Congressional Research Service previously documented.[33]

If CBP constructs the planned border wall, there is no question that the Tohono O'odham Nation, whose Reservation is within two miles of  its endpoint, will suffer those same kinds of harms on its Reservation, and will incur exorbitant costs attempting to address them.  In particular, the potential socioeconomic impacts to the Nation from migrant circumvention recognized in the Lukeville EA are far more likely to occur on the Nation's Reservation and can no longer be dismissed as "insignificant."  In many ways this is a self-fulfilling prophecy – the Lukeville EA shows that the circumvention of existing barriers leads to the justification for additional barriers, rather than having any "force multiplier" effect.  There is a very strong likelihood that history will repeat itself, this time on the Nation's land, resulting in further irreparable harm to the Nation.[34]

Increases in the number of migrants attempting to cross the border on the Nation's reservation, migrant deaths, illegal activity and crime, damage to the Nation's natural and cultural resources, trash and debris, wildland fires caused by migrants — all can be expected as migrants

---

[33] *See, e.g.,* Dkt. No. 64-8, Rapuano Decl., Exhibit A, DHS Memorandum to Department of Defense (DOD) (Feb. 25, 2019) at 5-6 (noting high number of apprehensions and drug smuggling between border crossings in Tucson Sector, and lack of pedestrian fencing in Tucson Sector resulting in increased drug trafficking and border violence, *i.e.,* increases in the areas that were "outside" the project area in the 2008 EA); Dkt. No. 118-1, Rapuano Second Decl., ¶ 6 (noting DOD approval of funding to block drug-smuggling corridors, including Tucson Projects 1 and 2) (May 13, 2019).

[34] The irony is that the deployment of additional barriers likely will not result in the desired increase in apprehensions of undocumented migrants.  As reported by CRS, national statistics demonstrated that CBP made 1.2 million apprehensions in 1992 and again in 2004, strongly suggesting that the increased enforcement in San Diego sector had little impact on overall apprehensions.  Congressional Research Service, *Border Security, supra* n.16 at 2.

AMICUS CURIAE BRIEF OF TOHONO O'ODHAM NATION

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

attempt to circumvent 74 miles of a border wall that ends on the Nation's doorstep. The Nation's public safety and border security resources will be stretched beyond the breaking point in an effort to address these harms. The Nation's Police Department and emergency responders, as well as the Nation's public works department and other government agencies will be forced to divert even more of their already limited resources to border security as the Nation attempts to respond to these significant negative impacts to its reservation lands, its natural and cultural resources, and its members. CBP use of the Nation's reservation roads also is likely to increase, further damaging those roads, without any realistic possibility that adequate funding will be available for their repair.

The federal government's long history of failing to provide adequate resources to address border security issues on the Nation's lands will only further exacerbate the harms that the Nation will experience as a result of the funneling effects caused by the new border wall construction. As explained above, the Nation already spends millions of tribal dollars every year to help fulfill the federal government's border security obligations, but receives very little federal funding to assist with border security, law enforcement, and infrastructure, including the repair of roads damaged by heavy CBP usage. The additional public safety and related resources that the Nation will be forced to expend in response to the likely increase of migrants and attendant damages to reservation resources and infrastructure will inflict serious and irreparable harm on the Nation.

**C.    The Harms to the Nation are Inconsistent with the Public Interest**

As described above, the likely harms to the Nation's public safety and related resources (as well as natural and cultural resources on the reservation[35]) that the Nation will face if Defendants proceed with border wall construction constitute irreparable harms that are sufficient to support a preliminary injunction, particularly as they affect the public interest inquiry. The weight of the evidence regarding funneling or circumvention, based on the fencing constructed near Lukeville and in the San Diego Sector, makes it clear that the resulting harms to the Nation are very likely, if not inevitable. *See All. for the Wild Rockies*, 632 F.3d at 1131 (irreparable harm

---

[35] *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) ("Preserving environmental resources is certainly in the public's interest.").

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA 20006
(202) 496-7500

AMICUS CURIAE BRIEF OF TOHONO
O'ODHAM NATION

is likely, not just possible, in the absence of an injunction). This Court and others also regularly consider public safety and economic harms like those that the Nation will experience in the context of the public interest factor in granting injunctive relief, *see, e.g., Ramos*, 336 F. Supp. 3d at 186 (economic harms to state *amici* favored preliminary injunction); *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) (finding "potentially dire public health and fiscal consequences" resulting from government's actions favored injunction); *Spiegel v. City of Houston,* 636 F.2d 997, 1002 (5th Cir. 1981) (plaintiff may assert economic harms in challenging overbroad injunction to address law enforcement practices not in the public interest); *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (fear of losing federal funding under Executive Order and interference with County's ability to operate, provide key services, budget and plan for the future justified injunction); *United States v. North Carolina*, 192 F.Supp.3d 620, 629 (M.D.N.C. 2016) (irreparable harm where the unavailability of funds was "likely to have an immediate impact on [the state's] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding [was] subsequently reinstated").[36]

## III.   THE FEDERAL GOVERNMENT'S TRUST RESPONSIBILITY TO THE NATION AMPLIFIES THE NATION'S INTEREST IN THIS CASE.

The nature and weight of the harms to the Nation are further amplified when considered against the backdrop of the United States' trust responsibility to Indian tribes and its obligation to protect trust assets, which Defendants clearly have failed to honor.  *See, e.g., Morton v. Ruiz,* 415 U.S. 199, 236 (1974) ("The overriding duty of our Federal Government to deal fairly with Indians wherever located has been recognized by this Court on many occasions."); *Nance v. EPA,* 645 F.2d 701, 711 (9th Cir. 1981) ("It is fairly clear that *any* Federal government action is subject to the United States' fiduciary responsibilities toward the Indian tribes") (emphasis original).  This responsibility extends to a wide variety of resources and tribal property, including wildlife

---

[36] *See also Azar*, 2019 WL 1877392, at *13 (N.D. Cal. Apr. 26, 2019) (public health harms to municipal *amici* favored preliminary injunction); *Earth Island Inst. v. Elliott,* 290 F. Supp. 3d 1102, 1125 (E.D. Cal. 2017) (examining public safety implications of proposed injunction on Forest Service tree removal project); *Cty. of Santa Clara*, 250 F. Supp. 3d at 537 (harm to public services); *Morris v. N. Haw. Cmty. Hosp.*, 37 F. Supp. 2d 1181, 1188-89 (D. Haw. 1999) (discussing public interest in ensuring that eligible people receive home health care benefits).  The extent of harm that construction in the Tucson Sector will cause to the Nation clearly weighs in favor of the public interest and the granting of the injunction.

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500

14

resources, *see Northern Arapahoe Tribe v. Hodel*, 808 F.2d 741, 750 (10th Cir. 1987); off-reservation water resources, *see Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F. Supp. 252, 254-58 (D.D.C. 1972); and actions taken off-reservation that impact tribal rights on-reservation, *see Parravano v. Babbitt*, 70 F. 3d 539, 546-47 (9th Cir. 1995).  In fact, the actions contemplated by Defendants in carrying out the planned border wall construction will injure and destroy, rather than protect, the Nation's on- and off-Reservation resources – including lands, cultural and natural resources, roads, and other trust property.

### CONCLUSION

The Court should grant Plaintiffs' Motion for Partial Summary Judgment.

Dated: October 18, 2019                          DENTONS US LLP

                                                 By:   /s/

Suzanne R. Schaeffer (*pro hac vice*)            JESSICA L. DUGGAN (SBN 271703)
suzanne.schaeffer@dentons.com                    jessica.duggan@dentons.com
Samuel F. Daughety (*pro hac vice*)              Dentons US LLP
samuel.daughety@dentons.com                      One Market Plaza, Spear Tower, 24th Fl.
DENTONS US LLP                                   San Francisco, California  94105
1900 K Street, NW                                Telephone: (415) 267-4000
Washington, District of Columbia  20006          Facsimile:  (415) 267-4198
Telephone:      (202) 496-7500
Facsimile:      (202) 408-6399

Joshua O. Rees (*pro hac vice*)
joshua.rees@tonation-nsn.gov
Acting Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, Arizona 85634
Telephone:      (520) 383-3410                    Attorneys for *Amicus Curiae*
Facsimile:      (520) 383-2689                    Tohono O'odham Nation

DENTONS US LLP
1900 K STREET, NW,
WASHINGTON, DISTRICT OF COLUMBIA  20006
(202) 496-7500