JAMES M. BURNHAM
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel
KATHRYN C. DAVIS
MICHAEL J. GERARDI
LESLIE COOPER VIGEN
RACHAEL WESTMORELAND
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 616-5084
Fax:    (202) 616-8470
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| SIERRA CLUB, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> Defendants. | No. 4:19-cv-00892-HSG <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING BORDER BARRIER PROJECTS UNDERTAKEN PURSUANT TO 10 U.S.C. § 2808; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Hearing Date:  November 20, 2019 <br> Time:  10 a.m. <br> Place:  Oakland Courthouse <br>        Courtroom 2, 4th Floor |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT .................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

INTRODUCTION ....................................................................................................................... 1

BACKGROUND ......................................................................................................................... 3

    I.    DoD's Support for DHS' Efforts to Secure the Southern Border ................................. 3

    II.   The President's Proclamation Declaring a National Emergency at the Southern
        Border ................................................................................................................................ 4

    III.  10 U.S.C. § 2808 ............................................................................................................ 6

    IV.  The Secretary of Defense's Decision to Undertake 11 Border Barrier Military Construction
        Projects Pursuant to § 2808 .......................................................................................... 7

LEGAL STANDARD .................................................................................................................. 9

ARGUMENT ............................................................................................................................... 9

    I.    Plaintiffs Are Outside the Zone of Interests Protected by § 2808 and the CAA ...................... 9

    II.   Plaintiffs Lack an Implied Equitable Cause of Action Under the Constitution ..................... 11

    III.  The President's Declaration of a National Emergency Requiring the Use of the Armed
        Forces is Nonjusticiable ................................................................................................... 12

        A.   The President's National Emergency Declaration Presents a Nonjusticiable Political
            Question ................................................................................................................. 13

        B.   Plaintiffs Lack a Cause of Action Against the President ..................................... 14

        C.   The Court Cannot Second-Guess Statutorily-Authorized Discretionary Judgments
            of the President ..................................................................................................... 15

    IV.  The § 2808 Border Barriers Are Military Construction Projects ......................................... 16

    V.   The Border Barrier Projects are Necessary to Support the Use of the Armed Forces ............ 19

    VI.  DoD's Use of § 2808 Does Not Violate the CAA .......................................................... 23

    VII. DoD's Use of § 2808 Does Not Violate the Constitution ............................................... 24

    VIII. NEPA Does Not Apply to the § 2808 Border Barrier Projects ..................................... 26

    IX. Plaintiffs Have Not Met The Requirements For A Permanent Injunction .......................... 27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A.   Plaintiffs Have Not Established Irreparable Injury ................................................. 28

   1.   Plaintiffs Have Not Demonstrated Harm to Their Recreational and Aesthetic Interests .................................................................................................... 28

   2.   Plaintiffs Have Not Demonstrated Irreparable Harm to Their Mission .................... 31

   3.   Plaintiffs Have Not Demonstrated Constitutional Harm ............................. 31

B.   The Balance of Equities and Publice Interests Weign Against Injunctive Relief ............ 33

CONCLUSION .................................................................................................................. 34

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG

Defs.' Motion for Partial Summary Judgment re: 2808 and Opp. to Pls.' Motion for Summary Judgment

ii

# TABLE OF AUTHORITIES

**CASES**

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ........................................................................29, 30, 31

*Am. Fed'n of Gov't Emps., Local 3295 v. Fed. Labor Relations Auth.,*
    46 F.3d 73 (D.C. Cir. 1995) ........................................................................... 18

*Armstrong v. Exceptional Child Ctr., Inc.,*
    135 S. Ct. 1378 (2015) .................................................................................. 12

*Boston Stock Exch. v. State Tax Comm'n,*
    429 U.S. 318 (1977) ..................................................................................... 10

*Chappell v. Wallace,*
    462 U.S. 296 (1983) ..................................................................................... 20

*Cisneros v. Alpine Ridge Grp.,*
    508 U.S. 10 (1993) .............................................................................11, 18, 26

*City and County of San Francisco v. Dep't of Transp.,*
    796 F.3d 993 (9th Cir. 2015) ......................................................................... 19

*Clarke v. Securities Indus. Ass'n,*
    479 U.S. 388 (1987) ..................................................................................... 10

*Clinton v. City of New York,*
    524 U.S. 417 (1998) ..................................................................................... 26

*Ctr. for Biological Diversity v. Mattis,*
    868 F.3d 803 (9th Cir. 2017) ......................................................................... 14

*Ctr. for Biological Diversity v. Hays,*
    No. 2:15-cv-01627-TLN-CMK, 2015 WL 5916739 (E.D. Cal. Oct. 8, 2015) ................... 29

*Dakota Central Telephone Co. v. South Dakota ex rel. Payne,*
    250 U.S. 163 (1919) ..................................................................................... 15

*Dalton v. Specter,*
    511 U.S. 462 (1994) ....................................................................... 14, 15, 16, 25

*Dep't of Navy v. Egan,*
    484 U.S. 518 (1988) ..................................................................................... 20

*eBay Inc. v. MercExchange, LLC.,*
    547 U.S. 388 (2006) .................................................................................27, 28

*Sierra Club, et al. v. Donald J. Trump, et al.,* 4:19-cv-00892-HSG
Defs.' Motion for Partial Summary Judgment re: 2808 and Opp. to Pls.' Motion for Summary Judgment
iii

*El-Shifa Pharm. Indus. Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010) .................................................................... 13, 14

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) .................................................................................. 14, 15

*Gallatin Wildlife Ass'n v. U.S. Forest Serv.,*
    No., 2018 WL 1796216 (D. Mt. April 16, 2018) .................................... 29, 31

*Gilligan v. Morgan,*
    413 U.S. 1 (1973) ........................................................................... 13, 20, 22

*Goldman v. Weinberger,*
    475 U.S. 503 (1986) ..................................................................... 20, 21, 33

*Grupo Mexicano De Desarrollo SA v. All. Bond Fund, Inc.,*
    527 U.S. 308 (1999) .................................................................................... 12

*Harrington v. Schlesinger,*
    528 F.2d 455 (4th Cir. 1975) ....................................................................... 26

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ............................................................................... 31, 32

*Heckler v. Chaney,*
    470 U.S. 821 (1985) .................................................................................... 19

*In re Korean Air Lines Disaster of Sept. 1, 1983,*
    597 F. Supp. 613 (D.D.C. 1984)),
    *aff'd on other grounds,* 957 F.2d 886 (D.C. Cir. 1992) .............................. 14

*Individuals for Responsible Gov't, Inc. v. Washoe Cnty.,*
    110 F.3d 699 (9th Cir. 1997) ....................................................................... 10

*Industria Panificadora, S.A. v. United States,*
    763 F. Supp. 1154 (D.D.C. 1991) ............................................................... 14

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.,*
    534 U.S. 124 (2001) .................................................................................... 23

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
    478 U.S. 221 (1986) .................................................................................... 13

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) .................................................................................... 14

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) ...................................................................... 20, 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ............................................................................... 9, 10, 12

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) .......................................................................................... 25

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ..................................................................................... 10, 11

*Miller v. Gammie*,
   335 F.3d 889 (9th Cir. 2003) ........................................................................... 10

*Mississippi v. Johnson*,
   71 U.S. 475 (1866) ...................................................................................... 14, 15

*Mobarez v. Kerry*,
   187 F. Supp. 3d 85 (D.D.C. 2016) ................................................................... 14

*N. Cheyenne Tribe v. Norton*,
   503 F.3d 836 (9th Cir. 2007) ........................................................................... 28

*Nat'l Treasury Emps. Union v. Von Raab*,
   489 U.S. 656 (1989) ......................................................................................... 33

*NFFE v. United States*,
   905 F.2d 400 (D.C. Cir. 1990) ......................................................................... 20

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ......................................................................................... 14

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................... 10, 33

*North Dakota v. United States*,
   495 U.S. 423 (1990) ......................................................................................... 20

*Orloff v. Willoughby*,
   345 U.S. 83 (1953) ........................................................................................... 20

*Pruitt v. Cheney*,
   963 F.2d 1160 (9th Cir. 1991) ......................................................................... 20

*Rostker v. Goldberg*,
   453 U.S. 57 (1981) ..................................................................................... 20, 21

*Salazar v. Ramah Navajo Chapter,*
   567 U.S. 182 (2012) ............................................................................................................ 23

*Sardino v. Fed. Reserve Bank of New York,*
   361 F.2d 106 (2d Cir. 1966) ............................................................................................... 13

*Sebra v. Neville,*
   801 F.2d 1135 (9th Cir. 1986) ............................................................................................ 20

*Sierra Club v. Morton,*
   405 U.S. 727 (1972) ............................................................................................................ 31

*Sierra Club v. Trump,*
   379 F. Supp. 3d 883 (N.D. Cal. 2019) ..................................................................... *passim*

*Sierra Club v. Trump,*
   929 F.3d 670 (9th Cir. 2019) .............................................................................................. 10

*Tennessee Valley Auth. v. Hill,*
   437 U.S. 153 (1978) ............................................................................................................ 23

*Thompson v. North Am. Stainless, LP,*
   562 U.S. 170 (2011) ........................................................................................................ 9, 11

*Trump v. Sierra Club,*
   --- S. Ct. ----, 2019 WL 3369425 (U.S. July 26, 2019) .................................................... 10

*United States v. 32.42 Acres of Land, More or Less, Located in San Diego Cty., Cal.,*
   683 F.3d 1030 (9th Cir. 2012) ............................................................................................ 19

*United States v. Amirnazmi,*
   645 F.3d 564 (3d Cir. 2011) ............................................................................................... 13

*United States v. Apel,*
   571 U.S. 359 (2014) ............................................................................................................ 18

*United States v. McIntosh,*
   833 F.3d 1163 (9th Cir. 2016) ............................................................................................ 12

*United States v. Novak,*
   476 F.3d 1041 (9th Cir. 2007) .................................................................................18, 26, 27

*United States v. Spawr Optical Research, Inc.,*
   685 F.2d 1076 (9th Cir. 1982) ...................................................................................... 13, 16

*Valle del Sol Inc. v. Whiting,*
   732 F.3d 1006 (9th Cir. 2013) ............................................................................................ 31

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ................................................................................................ 10

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
    435 F.3d 989 (9th Cir. 2006) .................................................................................. 12

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................ *passim*

**STATUTES**

5 U.S.C. § 551 *et. seq.* ................................................................................................ 10

5 U.S.C. § 701 ............................................................................................................ 19

10 U.S.C. § 2687 ........................................................................................................ 18

10 U.S.C. § 2801 ................................................................................................. *passim*

10 U.S.C. § 2803 ........................................................................................................ 27

10 U.S.C. § 2808 ................................................................................................. *passim*

10 U.S.C. §§ 251–52 ................................................................................................... 4

12 U.S.C. § 1702 ........................................................................................................ 27

31 U.S.C. § 1112 ........................................................................................................ 24

40 U.S.C. § 101 *et. seq.* ......................................................................................... 8, 19

40 U.S.C. § 521 .......................................................................................................... 19

43 U.S.C. § 1701 *et. seq.* ............................................................................................. 8

43 U.S.C. § 1702 ........................................................................................................ 19

43 U.S.C. § 1714 ........................................................................................................ 19

50 U.S.C. § 1601 *et. seq.* ........................................................................................ 6, 12

50 U.S.C. § 1621 ................................................................................................... 12, 13

50 U.S.C. § 1631 ................................................................................................... 12, 13

Pub. L. No. 114-287, 130 Stat. 1463 (2016) ............................................................ 18

Pub. L. No. 116-6, 133 Stat. 13 (2019) .............................................................. *passim*

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defs.' Motion for Partial Summary Judgment re: 2808 and Opp. to Pls.' Motion for Summary Judgment
vii

## REGULATIONS

83 Fed. Reg. 48545 (Sept. 12, 2019) ..............................................................................6

84 Fed. Reg. 4949 (Feb. 15, 2019) ......................................................................... *passim*

84 Fed. Reg. 50063–65 (Sept. 24, 2019) ........................................................................8

## RULES

Fed. R. Civ. P. 54 .........................................................................................................1, 9

Fed. R. Civ. P. 56 .........................................................................................................1, 9

## UNITED STATES CONSTITUTION

U.S. Const., art. I, § 9..................................................................................................... 26

U.S. Const., art. II, § 2................................................................................................... 14

## OTHER AUTHORITIES

Admin. Law and Governmental Relations, 94th Cong. 27 (March 6, 1975)........................ 16

DoD Instruction 4165.14, *Real Property Inventory and Forecasting*................................ 17

DoD Instruction 4165.71, *Real Property Acquisition*................................................... 17

Exec. Order No. 12734, 55 Fed. Reg. 48099 (Nov. 14, 1990) ........................................6

Exec. Order No. 13295, 66 Fed. Reg. 58343 (Nov. 16, 2001) ........................................6

Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017)...........................................3

GAO, *A Glossary of Terms Used in the Federal Budget Process* 80 (Sept. 2005) ........................ 24

H.R. Rep. No. 97-44 (1981)......................................................................................23, 27

H.R. Rep. No. 103-200, 1993 WL 298896 (1993) .........................................................4

Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities,
1999 WL 258030 (Apr. 27, 1999)................................................................................4

Kenneth Culp Davis, Administrative Law §§ 28:1 (1984) ................................................. 19

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG
Defs.' Motion for Partial Summary Judgment re: 2808 and Opp. to Pls.' Motion for Summary Judgment
viii

1

Proclamation No. 758, 35 Stat. 2136 (May 27, 1907) ............................................................. 34

2

Presidential Memorandum,
    2018 WL 1633761 (Apr. 4, 2018).......................................................................... 3, 4

3

4

Summary, H.R.J. Res. 46, 116th Cong. (2019), www.congress.gov/bill/116thcongress/house-joint-
    resolution/46.................................................................................................................5

5

6

Summary S.J. Res. 54, 116th Cong. (2019), www.congress.gov/bill/116th-congress/senate-joint-
    resolution/54.................................................................................................................5

7

Veto Message for H.R.J. Res. 46,
    2019 WL 1219481 (Mar. 15, 2019).........................................................................5

8

9

Veto Message for S.J. Res. 54,..................................................................................... 5, 6

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that Defendants hereby move the Court pursuant to Federal Rules of Civil Procedure 54(b) and 56 for partial summary judgment with respect to the funding and construction of the border barrier projects undertaken pursuant to 10 U.S.C. § 2808.  The motion is based on the following Memorandum of Points and Authorities in support of Defendants' motion and in opposition to Plaintiffs' motion for partial summary judgment, as well as all previous filings in this action, including the certified administrative record (ECF No. 206) and Defendants' opposition to Plaintiffs' motion for preliminary injunction (ECF No. 64).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

On February 15, 2019, the President issued a proclamation declaring that a national emergency exists at the southern border. *See* Presidential Proclamation on Declaring a Nat'l Emergency Concerning the S. Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019) (Proclamation). Because the southern border is "a major entry point for criminals, gang members, and illicit narcotics" as well "large-scale unlawful migration," the President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." *Id.*  Given the "gravity of the current emergency situation," the President also determined that "this emergency requires use of the Armed Forces" and "it is necessary for the Armed Forces to provide additional support to address the crisis." *Id.*

To respond to the national emergency, the President's Proclamation invoked and made available to the Department of Defense (DoD) the statutory authority conferred in 10 U.S.C. § 2808, which authorizes DoD to spend unobligated military construction funds to undertake military construction projects necessary to support the use of the armed forces in response to a national emergency that requires the use of the armed forces.  DoD has been building barriers along the southern border since the 1990s, and several thousand military personnel are currently deployed to the southern border to provide a wide range of assistance to the Department of Homeland Security (DHS) in its border security mission.  To provide additional support for these military forces, the

Secretary of Defense undertook an extensive multi-agency deliberative process that culminated in his decision on September 3, 2019, to undertake eleven border barrier military construction projects in California, Arizona, New Mexico, and Texas pursuant to § 2808 as necessary to support the use of the armed forces in connection with the national emergency.

Plaintiffs here, the Sierra Club and Southern Border Communities Coalition (SBCC), raise various statutory and constitutional challenges to the Secretary's decision, but none of them has merit. As a threshold matter, Plaintiffs' claims fail because their alleged injuries fall outside the zone of interests protected by the limitations in § 2808 as well as the Consolidated Appropriations Act of 2019 (CAA), Pub. L. No. 116-6, 133 Stat. 13 (2019).  Further, Plaintiffs lack an implied cause of action in equity to enforce the Appropriations Clause.

With respect to the merits of § 2808, Plaintiffs challenge the President's decision to declare a national emergency that requires the use of the armed forces, but they have no cause of action against the President; Plaintiffs cannot challenge a statutorily-authorized discretionary judgment of the President; and the decision to declare a national emergency is a nonjusticiable political question. Moreover, the Secretary of Defense's decision to undertake the projects was lawful and consistent with the requirements of § 2808.  The projects all constitute "military construction" undertaken "with respect to a military installation."  *See* 10 U.S.C. § 2801.  Congress defined these terms broadly and the border barrier projects here easily fall within those statutory definitions.  The Secretary also properly determined that the projects are necessary to support the use of the armed forces in connection with the national emergency at the southern border because the projects will, among other things, enhance the ability of military forces to support DHS more effectively and efficiently.  The Secretary's military judgment with respect to the allocation of resources to support the armed forces is committed to his discretion by law or, at most, is subject to review under a highly deferential standard given the long line of authority requiring judicial deference to military judgments.

The Court should also reject Plaintiffs' argument that the use of § 2808 violates other statutory and constitutional provisions.  DoD's use of its independent statutory authority pursuant to § 2808 does not violate any provision of the CAA.  Additionally, Plaintiffs' claim against DoD under the National Environmental Policy Act (NEPA) fails because § 2808 authorizes military construction

"without regard to any other provision of law" and thus sweeps aside statutes like NEPA that would impede the activities authorized by § 2808. Plaintiffs' purported constitutional claims under the Appropriations Clause, Presentment Clause, and separation of powers are nothing more than dressed-up allegations of statutory violations and otherwise fail on the merits.

Plaintiffs' request for a permanent injunction should also be denied because they have not carried their burden to establish an irreparable injury based on Sierra Club's alleged harm to its members' aesthetic and recreational interests or based on SBCC's alleged diversion of resources. Moreover, the balance of equities tips sharply in favor of the Government given the compelling interests in supporting military forces and in protecting the safety and integrity of the Nation's borders, as compared to Plaintiffs' aesthetic interests in the border area.

For these reasons, as explained below, the Court should deny Plaintiffs' motion for partial summary judgment, grant Defendants' motion for partial summary judgment, and enter final judgment for Defendants on all claims related to the funding and construction of § 2808 border barrier projects.

## BACKGROUND

### I.     DoD's Support for DHS's Efforts to Secure the Southern Border.

On January 25, 2017, the President issued an Executive Order stating that it is the policy of the Executive Branch to "secure the southern border of the United States through the immediate construction of a physical wall on the southern border, monitored and supported by adequate personnel so as to prevent illegal immigration, drug and human trafficking, and acts of terrorism." *See* Border Security and Immigration Enforcement Improvements, Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017). On April 4, 2018, the President issued a memorandum to the Secretary of Defense, Secretary of Homeland Security, and the Attorney General titled, "Securing the Southern Border of the United States." Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018). The President stated that "[t]he security of the United States is imperiled by a drastic surge of illegal activity on the southern border" and pointed to an "anticipated rapid rise in illegal crossings," as well as "[t]he combination of illegal drugs, dangerous gang activity, and extensive illegal immigration." *Id.* The President determined the situation at the border had "reached a point of crisis" that "once again calls for the National Guard to help secure our border and protect our homeland." *Id.* To address this

1   crisis, the President directed the Secretary of Defense to support DHS in securing the border,

2   including through the use of the National Guard.  *Id.*

3        The President's directive for the military to assist with DHS's border security efforts builds on

4   a decades-long practice of DoD providing support to civilian law-enforcement activities at the border.

5   Congress has authorized the military to provide a wide range of support to DHS at the southern

6   border.  *See, e.g.*, 10 U.S.C. §§ 251–52, 271–84.  And since the early 1990s, military personnel have

7   provided extensive assistance to civilian law-enforcement agency activities to secure the border,

8   counter the spread of illegal drugs, and respond to transnational threats.  *See* H. Armed Servs. Comm.

9   Hr'g on S. Border Defense Support (Jan. 29, 2019) (Joint Statement of John Rood, Under Secretary

10  of Defense for Policy, and Vice Admiral Michael Gilday, Director of Operations for the Joint Chiefs

11  of Staff) (Exhibit 1).  Indeed, for decades, U.S. military forces have played an active role in barrier

12  construction and reinforcement on the border.  *See, e.g.*, H.R. Rep. No. 103-200, at 330-31, 1993 WL

13  298896 (1993) (commending DoD for its role in constructing the San Diego primary fence); Hr'g

14  Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL

15  258030 (Apr. 27, 1999) (military personnel constructed over 65 miles of barrier fencing); Joint

16  Statement of Rood and Gilday (National Guard built over 100 miles of barriers).

17       Since the President issued his April 2018 memorandum, military personnel deployed to the

18  southern border have performed a broad range of administrative, logistical, and operational tasks in

19  support of DHS's border security mission.  *See* Administrative Record re: § 2808 (AR) at 45 (ECF No.

20  206); H. Comm. Homeland Security Hr'g on DoD's Deployment to the U.S. Mexico Border (June 20,

21  2019) (Statement of Robert G. Salesses, Deputy Assistant Secretary of Defense) (Exhibit 2); *see id.*

22  (Statement of Carla Provost, Chief, U.S. Border Patrol) (Exhibit 3).  These activities include installing

23  vehicle and pedestrian barriers; emplacing concertina wire along the border and at ports of entry; and

24  operating aerial and mobile surveillance equipment to detect activity along the border.  *See id.*

25  **II.   The President's Proclamation Declaring a National Emergency at the**

26       **Southern Border**

27       On February 15, 2019, the President declared that "a national emergency exists at the southern

28  border of the United States."  *See* Proclamation.  The President determined that "[t]he current situation

at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." *Id.* The President explained:

> The southern border is a major entry point for criminals, gang members, and illicit narcotics. The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years. In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending. If not detained, such aliens are often released into the country and are often difficult to remove from the United States because they fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate.

*Id.* "Because of the gravity of the current emergency situation," the President determined that "this emergency requires use of the Armed Forces" and "it is necessary for the Armed Forces to provide additional support to address the crisis." *Id.*

On March 15, 2019, the President vetoed a joint resolution passed by Congress that would have terminated the national emergency declaration. *See* Veto Message for H.R.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019). The President relied upon statistics published by U.S. Customs and Border Protection (CBP) as well congressional testimony by the Secretary of Homeland Security to reaffirm that a national emergency exists along the southern border. *See id.* The President highlighted, among other things, (1) a recent increase in the number of apprehensions along the southern border; (2) CBP's seizure of hundreds of thousands of pounds of illegal drugs; and (3) arrests of aliens previously charged with or convicted of crimes. *See id.* The President concluded that the "situation on our border cannot be described as anything other than a national emergency, and our Armed Forces are needed to help confront it." *Id.*

On October 15, 2019, the President vetoed a second joint resolution that sought to terminate the national emergency declaration. *See* S.J. Res. 54 Veto Message (Exhibit 4).[1] The President again reaffirmed that there is a national emergency requiring the use of the armed forces at the southern border. *See id.* The President stated that the "ongoing crisis at the southern border threatens core

---

[1] Congress failed to override the President's vetoes. *See* Summary, H.R.J. Res. 46, 116th Cong., www.congress.gov/bill/116thcongress/house-joint-resolution/46;   Summary   S.J.   Res.   54, www.congress.gov/bill/116th-congress/senate-joint-resolution/54.

national security interests" and termination of the national emergency would "impair the Government's capacity to secure the Nation's southern borders against unlawful entry and to curb the trafficking and smuggling that fuels the present humanitarian crisis." *Id.*

### III.    10 U.S.C. § 2808

The President's Proclamation made available to the Secretary of Defense the military construction authority provided by 10 U.S.C. § 2808. *See* Proclamation. 10 U.S.C. § 2808(a) provides:

> In the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 *et seq.*) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces. Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.

The term "military construction" as used in § 2808 "includes any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land . . . ." 10 U.S.C. § 2801(a). Congress defined the term "military installation" to mean "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the Secretary of a military department or the Secretary of Defense, without regard to the duration of operational control." *Id.* § 2801(c)(4).

Presidents have invoked the military construction authority under § 2808 on two prior occasions. First, President George H.W. Bush authorized the use of § 2808 in 1990 following the Government of Iraq's invasion of Kuwait. *See* Exec. Order No. 12734, 55 Fed. Reg. 48099 (Nov. 14, 1990). Second, President George W. Bush invoked § 2808 in response to the terrorist attacks against the United States on September 11, 2001. *See* Exec. Order No. 13295, 66 Fed. Reg. 58343 (Nov. 16, 2001). The national emergency addressing the September 11 attacks remains in effect today, *see* 84 Fed. Reg. 48545 (Sept. 12, 2019), and DoD has used its § 2808 authority to build a wide variety of military construction projects over the past 18 years, including security fencing and protective barriers at domestic military installations. *See* Cong. Research Serv., Military Construction Funding in the

Event of a National Emergency at 1–3 & tbl. 1 (updated Jan. 11, 2019); *see* Memorandum for the Secretary of the Army (Dec. 4, 2001) (Exhibit 5).

### IV.   The Secretary of Defense's Authorization to Undertake 11 Border Barrier Military Construction Projects Pursuant to § 2808.

On September 3, 2019, pursuant to § 2808, the Secretary of Defense determined that 11 border barrier projects along the international border with Mexico are necessary to support the use of the armed forces in connection with the President's declaration of a national emergency.  *See* AR at 1–33. Based on analysis from the Chairman of the Joint Chiefs of Staff, among others, the Secretary concluded the projects will deter illegal entry, increase the vanishing time of those illegally crossing the border (*i.e.*, the time that passes before a subject who illegally crosses the border can no longer be identified), and channel migrants to ports of entry.  *Id.* at 9.  Further, the projects will support the use of the armed forces by reducing demand for DoD personnel and assets at the locations where the barriers are to be constructed, allowing for redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers.  *Id.*  Consequently, the barriers serve as force multipliers enhancing military capabilities and allow DoD to provide support to DHS more efficiently and effectively.  *See id.*

Plaintiffs here seek an injunction prohibiting the construction of all eleven projects.  Those projects are:

1. **San Diego 4:**  1.5 miles of new primary pedestrian fence system and 2 miles of new secondary pedestrian fence system in San Diego County, CA (3.5 miles);

2. **San Diego 11:**  New secondary pedestrian fence system in San Diego County, CA (3 miles);

3. **El Paso 2:**  Replace vehicle barriers with new pedestrian fencing in non-contiguous segments in Hidalgo and Luna Counties, NM (23.1 miles);

4. **El Paso 8:**  Replace vehicle barriers with 6 miles of new primary pedestrian fence system and 6 miles of new secondary pedestrian fence system in Hidalgo County, NM (12 miles);

5. **El Centro 9:**  New secondary pedestrian fence system in Imperial County, CA (12 miles);

6. **El Centro 5:**  New secondary pedestrian fence system in Imperial County, CA (1 mile);

7. **Yuma 6:**  1 mile of new primary pedestrian fence system and 2 miles of new secondary pedestrian fence system in Imperial County, CA and Yuma County, AZ (3 miles);

8. **Yuma 2:** Replace primary pedestrian fencing on the Barry M. Goldwater Range in Arizona (2 miles);

9. **Yuma 10/27:** New secondary pedestrian fence system on the Goldwater Range in Arizona (31 miles);

10. **Yuma 3:** Replace vehicle barriers with new pedestrian fencing in Yuma County, AZ (31 miles);

11. **Laredo 7:** New primary pedestrian fence system in Laredo County, TX (52 miles).

*See* AR at 11; Declaration of Alex Beehler, Assistant Secretary of the Army for Installations, Energy, and Environment, ¶¶ 3–32 (describing project areas and attaching maps.) (Exhibit 6).

To fund these projects, the Secretary approved the use of up to $3.6 billion in unobligated military construction funds. *See id.* at 82–89. The Secretary directed that, initially, only funds associated with projects located outside the United States will be provided to the Department of the Army. *See id.* at 82. Deferred military construction projects outside the United States account for $1.8 billion of the required funds. *See id.* The remaining $1.8 billion associated with deferred projects located in the United States (including U.S. territories) will be made available to the Secretary of the Army when needed for obligation. *See id.* at 87–89 (list of all deferred projects).

The Secretary identified three different types of land on which the projects would be built and authorized the Secretary of the Army to take steps to acquire and add that land to the Army's real property inventory, either as a new military installation or as part of an existing military installation. *See id.* at 3, 6, 9–10, 30–31. First, several projects will be located in whole or in part on Federal land not subject to the Federal Property and Administrative Services Act (Property Act), 40 U.S.C. § 101 *et. seq.*, and that can be transferred under the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.*; Declaration of Brigadier General Glenn Goddard ¶ 10 (ECF No. 201-3). The Secretary authorized and directed the Secretary of the Army to request that the Department of the Interior (DoI) transfer Federal lands subject to the FLPMA required for the projects to the Army. *See* AR at 9–10, 30–31. On September 18, 2019, DoI announced transfers of the public lands for five projects in this category. *See* Public Land Order Nos. 7883–87, 84 Fed. Reg. 50063–65 (Sept. 24, 2019) (land transfers for San Diego 4, El Paso 2 & 8, and Yuma 3 & 6). Second, for Federal land governed by the Property Act, the Secretary authorized and directed the Secretary of the Army to

request that the relevant Federal land holding agency, through the General Services Administration (GSA), transfer administrative jurisdiction over lands in the project areas to the Army expeditiously and without charge. *See* AR at 9–10, 30–31. Third, with respect to any non-Federal land, the United States intends to acquire that land through negotiated purchases or condemnation. *See id.* at 3; Goddard Decl. ¶¶ 9, 10.c. On October 8, 2019, the Secretary of the Army assigned all land necessary for the § 2808 projects to the U.S. Army Garrison Fort Bliss, Texas, making those lands, upon transfer of administrative jurisdiction to the Army, part of the Fort Bliss military installation. *See* General Order No. 2019-36, Assignment of Southwest Border Sites (Exhibit 7).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that a party may move for summary judgment on some or all of the claims or defenses presented in a case. Summary judgment is appropriate when, viewing the evidence and drawing all reasonable inferences most favorably to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the parties file cross-motions for partial summary judgment, "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determine that there is no just reason for delay." *See* Fed. R. Civ. P. 54(b).

## ARGUMENT

### I.    Plaintiffs Fall Outside the Zone Of Interests Protected By § 2808 and the CAA.

Plaintiffs' claims fail because their alleged injuries fall outside the zone of interests protected by the limitations in § 2808 and the CAA.

The "zone-of-interests" requirement limits the types of plaintiffs who "may invoke [a] cause of action" to enforce a particular statutory provision. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014). That limitation reflects the reality that Congress generally does not intend to provide a cause of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce. *Thompson v. North Am. Stainless*, LP, 562 U.S. 170, 178 (2011). "Congress is presumed to legislate against the background of the zone-of-interests limitation," which excludes putative plaintiffs whose interests do not "fall within the zone of interests protected by the law invoked." *Lexmark*, 572 U.S. at 129.

When a plaintiff brings a cause of action under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, to challenge the government's compliance with another statute, the "interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Where a plaintiff invokes an implied cause of action in equity, the Supreme Court has suggested that a heightened zone-of-interest requirement applies, and the provision must be intended for the "*especial* benefit" of the plaintiff. *See Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 396, 400 & n.16 (1987). Thus, regardless of whether Plaintiffs' cause of action in this case is considered under the APA or as an implied equitable action, the zone-of-interests requirement applies. *See, e.g., Lexmark Int'l, Inc.,* 572 U.S. at 129; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982); *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320–21 & n.3 (1977); *Individuals for Responsible Gov't, Inc. v. Washoe Cnty.*, 110 F.3d 699, 703 (9th Cir. 1997).

Indeed, the absence of a cause of action was among the reasons the Supreme Court stayed the injunction issued by this Court against the border barrier projects funded by transfers pursuant to § 8005 of the DoD Appropriations Act, 2019. *See Trump v. Sierra Club*, --- S. Ct. ----, 2019 WL 3369425 (U.S. July 26, 2019) ("Among the reasons is that the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005.").

Defendants acknowledge that this Court previously concluded that the zone-of-interests test does not apply in an *ultra vires* challenge outside of the APA framework. *See Sierra Club v. Trump*, 379 F. Supp. 3d 883, 910 (N.D. Cal. 2019). Defendants respectfully submit that the Court erred for the reasons explained above. Moreover, in granting the extraordinary relief of a stay of the Court's injunction pending appeal, the Supreme Court necessarily concluded that Defendants had satisfied the standard to obtain a stay of the injunction, including a likelihood of success on the merits related to the absence of a cause of action. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (reciting stay standard). That decision is "clearly irreconcilable" with, and thus supersedes, the Court of Appeals' motions panel's contrary holding that the government had not satisfied the stay standard. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc); *see Sierra Club v. Trump*, 929 F.3d 670, 700–04 (9th Cir. 2019).

1   Because the Supreme Court's decision sends a strong signal that the analysis of the cause of action

2   and zone of interests by this Court and the Ninth Circuit motions panel was incorrect, Defendants

3   respectfully submit that the Court should not follow that analysis here.

4          Plaintiffs here lack a cause of action to enforce the limitations in § 2808 because their aesthetic,

5   recreational, mission resource interests fall outside its zone of interests.  Section 2808 provides that in

6   the event the President declares a national emergency that requires the use of the armed forces, DoD

7   may undertake military construction projects, "without regard to any other provision of law," that are

8   "necessary to support such use of the armed forces."  Nothing in the text of § 2808 suggests that

9   Congress intended to permit enforcement of the statute's limitations by parties who, like the

10  environmental and immigration advocacy groups here, assert that a military construction project

11  would indirectly harm their recreational and resource interests.  Section 2808 authorizes DoD to

12  undertake  military construction projects "without regard to any other provision of law" and reflects

13  Congress' decision to give DoD significant flexibility to engage in construction projects necessary to

14  support the use of the armed forces.  Section 2808 has nothing to do with environmental or

15  recreational interests that such construction might implicate and certainly does not evince

16  congressional intent to protect such interests.  Indeed, the text of the statute—specifically its "without

17  regard to any other provision of law" clause—authorizes DoD to bypass the extrinsic statutory and

18  regulatory requirements that would otherwise limit DoD from exercising its military construction

19  authority effectively and expeditiously.  *See Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993)

20  (approving lower courts' statements that a notwithstanding clause "supersede[s] all other laws" and

21  that a "clearer statement is difficult to imagine").  For these reasons, § 2808 is distinguishable from

22  the land acquisition statute at issue in *Patchak*, 567 U.S. at 225.  *See* Pls.' Mot. at 24–25 (ECF No. 210).

23  And given the language in § 2808 that contrary laws must give way to facilitate military construction—

24  making clear that the statute not only does not protect Plaintiffs' recreational and aesthetic interests

25  but applies notwithstanding other provisions that might do so—it would be especially odd to allow

26  suit by "plaintiffs who might technically be injured in an Article III sense but whose interests are

27  unrelated" to the limitations in § 2808.  *Thompson,* 562 U.S. at 176-78.

28         Plaintiffs also fall outside the zone of interests protected by the CAA.  *See* Pls.' Mot. at 7–8,

15–16.  Like § 8005, the CAA regulates the relationship between Congress and the Executive Branch regarding federal spending.  Thus, the "interests protected by" the statute are completely unrelated to the interests Plaintiffs seek to vindicate in this case.  *See Lexmark*, 527 U.S. at 131.

## II.  Plaintiffs Lack an Implied Equitable Cause of Action Under the Constitution.

In addition, Plaintiffs lack a cause of action because this is not "a proper case" for the "judge-made remedy" of an implied cause of action under the Appropriations Clause.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *Grupo Mexicano De Desarrollo SA v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).  As explained below, *see infra* at 25–26, this case raises purely statutory, not constitutional issues, and Plaintiffs identify no history or tradition of courts of equity inferring an analogous equitable cause of action directly under the Appropriations Clause in such circumstances.  *See Grupo Mexicano*, 527 U.S. at 319 (1999).  Plaintiffs argue *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016), supports such a cause of action, Pls.' Mot. at 22–23, but that case involved a criminal defendant who argued that an appropriations rider explicitly prohibited funds from being spent on his prosecution.  *Id.* at 1174.  The defendant thus fell squarely within the core of the statute's zone of interests.  Although dicta in that case referred to an "appropriations rider" violation, the Ninth Circuit's analysis focused entirely on the operative statutory limitation, not an independent Appropriations Clause violation.  *See id.* at 1172.

In the absence of an equitable cause of action, Plaintiffs' motion should be denied because they did not plead a cause of action under the APA in their complaint.  *See, e.g., Wasco Prods., Inc. v. Southwall Techs., Inc.,* 435 F.3d 989, 992 (9th Cir. 2006) ("summary judgment is not a procedural second chance to flesh out inadequate pleadings"); *see generally* Pls.' Am. Compl (ECF No. 26).  Should the Court construe Plaintiffs' claims as being based on the APA, however, Plaintiffs would still lack a cause of action for failure to satisfy the zone-of-interests test, as explained above.

## III.  The President's Declaration of a National Emergency Requiring the Use of the Armed Forces is Nonjusticiable.

Section 2808's military construction authority is made available to DoD upon "a declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces[.]"  The President's Proclamation complied with

the procedural requirements of the National Emergencies Act (NEA), *see* 50 U.S.C. §§ 1621(a), 1631, and explained why a national emergency exists at the southern border that requires the use of the armed forces.  *See* Proclamation; *see also* H.R.J. Res. 46 Veto Message; S.J. Res. 54 Veto Message. Plaintiffs' challenge to the President's discretionary decision to declare a national emergency that requires the use of the armed forces is nonjusticiable.

### A.   The President's National Emergency Declaration Presents a Nonjusticiable Political Question.

Courts that have considered the issue have uniformly concluded that the President's national emergency declarations present nonjusticiable political questions.  *See, e.g.*, *Spawr Optical Research, Inc.*, 685 F.2d at 1081; *United States v. Amirnazmi*, 645 F.3d 564, 581 (3d Cir. 2011) ("[F]ederal courts have historically declined to review the essentially political questions surrounding the declaration or continuance of a national emergency."); *Sardino v. Fed. Reserve Bank of New York*, 361 F.2d 106, 109 (2d Cir. 1966) (concluding that President Truman's national emergency declaration concerning the situation in Korea was not justiciable and "courts will not review a determination so peculiarly within the province of the chief executive").

The President's determination that the national emergency "require[s] use of the armed forces" is—like the declaration of a national emergency itself—also a nonjusticiable political question.  10 U.S.C. § 2808(a).  "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  There are no judicially manageable standards to evaluate the President's decision to deploy the armed forces to the southern border to address the national emergency.  As the Supreme Court has explained, "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10–12 (1973) (holding that a case seeking to impose restrictions on the domestic deployment of National Guard forces raised nonjusticiable political questions). "[C]ourts lack the competence to assess the strategic decision to deploy" the armed forces "or to create standards to determine" whether use of the armed forces "was justified or well-founded." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 844

1   (D.C. Cir. 2010) (en banc); *see Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 823 (9th Cir. 2017) (A

2   political question exists where the court would have to "pass judgment on the wisdom of the

3   Executive's ultimate foreign policy or military decisions."). "To attempt to decide such a matter

4   without the necessary expertise and in the absence of judicially manageable standards would be to

5   entangle the court in matters constitutionally given to the executive branch." *Industria Panificadora, S.A.*

6   *v. United States*, 763 F. Supp. 1154, 1160 (D.D.C. 1991) (quoting *In re Korean Air Lines Disaster of Sept.*

7   *1, 1983*, 597 F. Supp. 613, 616 (D.D.C. 1984)), *aff'd on other grounds*, 957 F.2d 886 (D.C. Cir. 1992).

8   Moreover, the Commander-in-Chief Clause of the Constitution textually commits control of the

9   armed forces to the President. *See* U.S. Const., art. II, § 2, cl. 1; *see Johnson v. Eisentrager*, 339 U.S. 763,

10  789 (1950) ("Certainly it is not the function of the Judiciary to entertain private litigation—even by a

11  citizen—which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in

12  sending our armed forces abroad or to any particular region."). Accordingly, "it is the President who,

13  as head of the Executive Branch and Commander in Chief . . . decides whether and when to deploy

14  military forces, not this Court." *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 93 (D.D.C. 2016).

15          **B.       Plaintiffs Lack a Cause of Action Against the President.**

16          Additionally, to the extent Plaintiffs rely on the APA as a cause of action to challenge the

17  President's national emergency declaration, that claim fails because the APA "does not expressly allow

18  review of the President's action." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see Dalton v. Specter*,

19  511 U.S. 462, 476 (1994).

20          Nor is there any basis for the Court to infer a novel equitable cause of action to enforce the

21  Appropriations Clause against the President. In addition to the reasons explained above regarding the

22  absence of a cause of action generally, *see supra* at 9–12, the Supreme Court has repeatedly held that,

23  in light of the President's unique role in the constitutional structure, separation-of-powers concerns

24  mandate that an "express statement by Congress" is required before even a generally available cause

25  of action may be extended specifically to the President. *See Franklin*, 505 U.S. at 801; *Nixon v. Fitzgerald*,

26  457 U.S. 731, 748 n.27 (1982). This conclusion is further reinforced by the fact that no equitable relief

27  is available against the President in his official capacity. Imposing such relief would violate the

28  fundamental principle, rooted in the separation of powers, that federal courts have "no jurisdiction of

a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866); *see Franklin*, 505 U.S. at 802-03, 806 (plurality op.); *id.* at 827 (Scalia, J., concurring in part and concurring in the judgment) ("apparently unbroken historical tradition supports the view" that courts may not order the President to "perform particular executive … acts"). Accordingly, there is no basis for the Court to conclude that the President is subject to an implied cause of action in equity when, as here, there is neither historical precedent nor express congressional language supporting Plaintiffs' claims.

### C.   The Court Cannot Second-Guess Statutorily-Authorized Discretionary Judgments of the President.

Even if Plaintiffs had a cause of action to challenge Presidential action, that claim would fail because Plaintiffs cannot challenge a statutorily-authorized discretionary judgment of the President. In *Dalton*, the Supreme Court held that when courts are confronted with a claim alleging that the President has "violated the terms of" a statute, "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President." 511 U.S. at 474.[2]  Plaintiffs present exactly the sort of challenge that the Court rejected in *Dalton*; their claim is that the President exceeded his statutory authority under § 2808 because border security is a law enforcement mission that did not warrant declaring a national emergency requiring the use of the armed forces. *See* Pls.' Mot. at 9–11. In other words, Plaintiffs argue that the President's decision to declare a national emergency that requires the use of the armed forces was improper in these particular factual circumstances. *Cf. Dalton*, 511 U.S. at 474. But that claim "concerns not a want of Presidential power, but a mere excess or abuse of discretion in exerting a power given." *See id.* (quoting *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)).[3]  When a statute "commits

---

[2] The Supreme Court only "assume[d] for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA." *Dalton*, 511 U.S. at 474.

[3] In *Dakota Central Telephone Co.*, the Supreme Court rejected the same type of claim that Plaintiffs assert here, namely that the President "exceeded the authority given him" pursuant to a statute by taking action when "there was nothing in the conditions at the time the power was exercised which justified the calling into play of the authority." 250 U.S. at 184.

1    decisionmaking to the discretion of the President, judicial review of the President's decision is not

2    available." *Id.* at 477.

3         Congress did not define the term "national emergency" in the NEA or § 2808 or impose any

4    conditions or restrictions in § 2808 that would limit the President's discretionary authority as

5    Commander-in-Chief to decide whether a national emergency would require the use of the armed

6    forces.  Instead, Congress intentionally left these determinations to the President's discretion.  *See*

7    *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1080 (9th Cir. 1982) (recognizing that

8    Congress gave the President "flexibility" and a "broad delegation" to declare a national emergency);

9    *see also* Nat'l Emergencies Act: Hr'gs Before the Subcomm. On Admin. Law and Governmental

10   Relations, 94th Cong. 27, 31 (March 6, 1975) (multiple statements that Congress did not attempt to

11   limit the circumstances under which the President could declare a national emergency).  Here, in

12   accordance with § 2808, the President chose to confront the crisis at the southern border by declaring

13   a national emergency that requires the use of the armed forces.  There is no basis for the Court to

14   second-guess that military judgment because "[h]ow the President chooses to exercise the discretion

15   Congress has granted him is not a matter for [judicial] review."  *Dalton*, 511 U.S. at 476.

16        **IV.    The § 2808 Border Barriers Are Military Construction Projects.**

17        Assuming the Court reaches the merits of Plaintiffs' claim, the Secretary's actions are plainly

18   lawful. Section 2808(a) authorizes the Secretary of Defense to "undertake military construction

19   projects" and there is no dispute that the planned border barriers constitute "construction" being

20   undertaken by DoD.  *See Sierra Club*, 379 F. Supp. 3d at 920.  Accordingly, the projects fall within the

21   definition of "military construction" so long as they are undertaken "with respect to a military

22   installation."  10 U.S.C. § 2801(a).

23        The locations of the planned border barrier projects fall within the broad definition of

24   "military installation," which includes "a base, camp, post, station, yard, center, or other activity under

25   the jurisdiction of the Secretary of a military department[.]"  *Id.* § 2801(c)(4).  Two of the projects are

26   on the Goldwater Range, an existing military installation.  *See* AR at 11 (Yuma 2 & Yuma 10/27).

27   With respect to the remaining project areas, DoD has the authority to obtain administrative

28   jurisdiction over the requisite land and either convert that land into a new military installation or add

it to an existing military installation in accordance with DoD's regulations governing property acquisition. *See* DoD Instruction 4165.14, *Real Property Inventory and Forecasting*; DoD Instruction 4165.71, *Real Property Acquisition*. As explained above, the Secretary of Defense has directed the Secretary of the Army to acquire administrative jurisdiction of real property from other Federal agencies and acquire the non-Federal real property necessary to undertake the § 2808 projects. *See supra* at 8. And the Secretary of the Army has determined that the sites designated for the § 2808 border barrier military construction projects will be part of the Fort Bliss military installation upon transfer of administrative jurisdiction of those sites to the Department of the Army. *See* Exhibit 7. There is thus no merit to Plaintiffs' argument that the projects are not "military construction." All of the planned construction will be undertaken "with respect to a military installation": either the Goldwater Range or Fort Bliss. These are clearly existing military installations, (*i.e.*, a "base, camp, post, station, yard, center"), and any land assigned to Fort Bliss by the Secretary of the Army where § 2808 activity would occur would also be an "activity under the jurisdiction of the Secretary of a military department." 10 U.S.C. § 2801(c)(4).

Defendants are *not* arguing that the entire southern U.S. border falls within the scope of an "other activity" constituting a military installation. Thus, the Court need not revisit its earlier concern that canons of statutory construction "likely preclude[] treating the southern border as an 'other activity.'" *Sierra Club*, 379 F. Supp. 3d at 920. That issue is not presented because the Secretary of Defense has selected 11 discrete, specific project locations on which to construct border barrier projects. *See* AR at 11. Certain of these project locations are already within preexisting military installations, and a lawful process is underway for DoD to obtain administrative jurisdiction over the remaining project locations and assign land to be part of the preexisting Fort Bliss military installation. The border barrier construction DoD will undertake pursuant to § 2808 thus falls within the broad statutory definition of a "military installation." 10 U.S.C. § 2801(c)(4).

To be sure, the Court has observed that the term "other activity" should be construed as referring to "discrete and traditional military locations" similar to "a base, camp, post, station, yard, [and] center." *Sierra Club*, 379 F. Supp. 3d at 921. But, as explained, the § 2808 project locations are discrete and specific. And the Court also recognized that "'other activity' is not an empty term," and

that "Congress undoubtedly contemplated that military installations would encompass more than just 'a base, camp, post, station, yard, [or] center.'" *Id.* Congress's choice to include an unqualified, all-encompassing term like "or other activity" indicates its intent to make the term "military installation" inclusive of activities under the jurisdiction of the Secretary of a military department *in addition to* those facilities listed in the statute. 10 U.S.C. § 2801(c)(4). Indeed, the Supreme Court has noted, with specific reference to the statute defining the terms in § 2808, that federal law treats the term "military installation" as "synonymous with the exercise of *military jurisdiction*," *United States v. Apel*, 571 U.S. 359, 368 (2014)—an exercise of jurisdiction that is present for all the projects here. If Congress had wished to limit the definition of "military installation" here, it could have done so, as it has in other statutes that define the term more narrowly in different contexts. *See* 10 U.S.C. § 2687(g)(1) (defining, for the purpose of base closures and realignments, "military installation" to include "other activity under the jurisdiction of the Department of Defense" but clarifying that "[s]uch term does not include any facility used primarily for civil works" or similar activities); Pub. L. No. 114-287, § 3, 130 Stat. 1463 (2016) (defining military installation as "any fort, camp, post, naval training station, airfield proving ground, military supply depot, military school, or any similar facility of the Department of Defense."). There is simply no basis to conclude that the § 2808 projects do no fall within the broad term "other activity under the jurisdiction of the Secretary of a military department."

Nor is there any question that DoD has the authority to acquire land necessary for § 2808 projects, given that § 2808 expressly authorizes "military construction," including "any acquisition of land." 10 U.S.C. § 2801(a). Section 2808 further authorizes the Secretary of Defense to undertake military construction projects (including land acquisitions) "without regard to any other provision of law." This broad language—a variant of a *non obstante* or "notwithstanding" clause—sweeps aside all statutory and regulatory provisions that might otherwise constrain the authority provided by § 2808. *See Am. Fed'n of Gov't Emps., Local 3295 v. Fed. Labor Relations Auth.*, 46 F.3d 73, 76 (D.C. Cir. 1995). The clause thus provides "a sweeping dispensation from all legal constraints," and "indicate[s] that Congress intended agencies to enjoy 'unfettered discretion.'" *Id.* at 76; *See Cisneros*, 508 U.S. at 18; *United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007) (en banc) ("The Supreme Court has indicated as a general proposition that statutory 'notwithstanding' clauses broadly sweep aside

potentially conflicting laws.").  Accordingly, land acquisition authorized by § 2808 need not comply with otherwise-applicable statutory restrictions.

In addition, for land currently controlled by other federal agencies, Congress has authorized land transfers between federal agencies, although such transfers are not subject to statutory constraints because of § 2808's *non obstante* clause.  FLPMA authorizes the Secretary of the Interior to make "withdrawals" of land, 43 U.S.C. § 1714(a), including the "transfer[ of] jurisdiction over an area of Federal land . . . from one department, bureau or agency to another department, bureau or agency," *id.* § 1702(j).  Further, the Property Act, 40 U.S.C. §§ 101 *et seq.*, authorizes GSA to transfer excess real property between agencies. *See id.* § 521.  Finally, for any non-federal land, the federal government's power of eminent domain has long been used to acquire property for military installations.  *See, e.g., United States v. 32.42 Acres of Land, More or Less, Located in San Diego Cty., Cal.*, 683 F.3d 1030, 1038 (9th Cir. 2012).

## V.    The Border Barrier Projects are Necessary to Support the Use of the Armed Forces.

Section 2808 also requires that the military construction projects must be "necessary to support such use of the armed forces." 10 U.S.C. § 2808(a).  Plaintiffs' contrary arguments lack merit. *See* Pls.' Mot. at 13–15.

As a threshold matter, the Secretary's decision to undertake military construction under § 2808 is not subject to judicial review because it is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).[4]  A decision is generally "'committed to agency discretion by law' when 'a court would have no meaningful standard against which to judge the agency's exercise of discretion." *City and County of San Francisco v. Dep't of Transp.*, 796 F.3d 993, 1001 (9th Cir. 2015) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" *Heckler*, 470 U.S. at 830.  Here, there is no meaningful standard by which the Court could review the Secretary of Defense's decision that the border barrier projects "are necessary to support

---

[4] The principle of committing decisions to agency discretion applies whether Plaintiffs' claims are brought under APA or as a non-statutory challenge to agency action.  *See* Kenneth Culp Davis, Administrative Law §§ 28:1, 5, 15 (1984) (summarizing pre-APA law on unreviewable agency action).

such use of the armed forces."  10 U.S.C. § 2808.  That is a military judgment committed to the Secretary, and the statute does not specify any criteria the Secretary must consider in making his determination.  Nor does it include any specific prohibitions or judicially manageable standards limiting the Secretary's determination of what would constitute a project "necessary" to support the use of the armed forces.  *See NFFE v. United States*, 905 F.2d 400, 405–06 (D.C. Cir. 1990) (concluding that decisions about closure of military bases were committed to agency discretion by law because "the federal judiciary is ill-equipped to conduct reviews of the nation's military policy").

Even if the Secretary's judgment were reviewable, it would be entitled to substantial deference from this Court.  *See, e.g.,  Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (military officials are owed "great deference" by courts faced with requests to enjoin military action); *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) (Courts must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest."); *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981) (Courts must give "a healthy deference to legislative and executive judgments in the area of military affairs."); *Pruitt v. Cheney*, 963 F.2d 1160, 1166 (9th Cir. 1991) ("We readily acknowledge, as we must, that military decisions by the Army are not lightly to be overruled by the judiciary.").  Indeed, the Supreme Court has traditionally been reluctant to intervene in the conduct of military affairs.  *See, e.g., Winter.*, 555 U.S. at 24–27; *North Dakota v. United States*, 495 U.S. 423, 443 (1990); *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988); *Chappell v. Wallace*, 462 U.S. 296, 300 (1983); *Gilligan*, 413 U.S. at 10; *Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953); *see also Sebra v. Neville*, 801 F.2d 1135, 1142 (9th Cir. 1986) ("Courts are properly wary of intruding upon that sphere of military decision-making" regarding "deployment of troops and overall strategies of preparedness").  This reluctance rests on separation-of-powers concerns as well as the principle that judges "are not given the task of running the Army," *Orloff,* 345 U.S. at 93, and are "ill-equipped" to determine the impact of judicial intrusion on military decision making, *Chappell*, 462 U.S. at 305.  For these reasons, the Supreme Court has instructed courts to defer to "[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force."  *Gilligan*, 413 U.S. at 10; *see Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019) (granting writ of mandamus where the court failed to apply "the appropriate deference due to a proffered military decision").

1       Applying this highly deferential standard of review, the administrative record amply supports

2  the Secretary's military judgment that the projects are necessary to support the use of the armed forces

3  in connection with the national emergency at the southern border.  *See* AR at 1–11; 42–75; 97–137.

4  In reaching this decision, the Secretary undertook a thorough and deliberate process of study and

5  review that is the hallmark of judicial deference to military decisions.  *See, e.g., Goldman*, 475 U.S. at

6  508–09; *Rostker*, 453 U.S. at 71–72; *Karnoski*, 926 F.3d at 1202.  The Secretary requested and received

7  information from DHS concerning which border barrier projects DHS considers to be most effective

8  in improving the effectiveness and efficiency of DoD personnel supporting CBP at the southern

9  border.  *See* AR 50–57, 91.  DHS explained that the proposed border barrier construction would

10 fundamentally change the dynamic at the border, would give a distinct and enduring advantage to the

11 Border Patrol as a force multiplier, and would provide agents with capabilities to respond more quickly

12 to illicit activities.  *Id.* at 56–57.  As such, the projects would improve the effectiveness and efficiency

13 of DoD personnel by allowing them to shift away from providing support to frequent, low risk border

14 incursions and instead concentrate on monitoring, tracking, and responding to a smaller, more focused

15 set of higher risk activities at the border.  *Id.* at 57.  By serving as a force multiplier for DHS, the

16 projects will reduce DHS' reliance on DoD for force protection, surveillance support, engineering

17 support, and air support, and thus allow DoD to focus its efforts on a smaller, more focused area.  *Id.*

18      In addition, the Secretary received two separate reports from the Chairman of the Joint Chiefs

19 of Staff providing his views on whether and how border barrier projects would support the use of the

20 armed forces deployed to the border to support DHS.  The Chairman provided a preliminary

21 assessment in February 2019, *see* AR at 119–24.  That assessment concluded, among other things, that

22 constructing physical barriers in areas where military personnel are deployed could allow those forces

23 to be re-prioritized to other missions in support of DHS, thereby enabling a more efficient use of

24 DoD personnel.  *See id.* at 122–24.  After receiving DHS' recommendation, the Secretary requested

25 that the Chairman provide an updated and expanded report assessing a variety of factors analyzing

26 how border barriers could support the use of the armed forces.  *See id.* at 97–98.

27      The Chairman's final report, based on consultations with multiple DoD and DHS

28 components, identified four key factors upon which to assess whether the projects were necessary to

support the use of the armed forces at the southern border: 1) DHS' prioritization of the projects; 2) current migrant flows measured by apprehensions per month; 3) current troop dispositions and support missions by CBP sector; and 4) the type of land upon which the proposed projects were to be undertaken. *See id.* at 61–62. The Chairman then conducted a detailed analysis of these factors for each border patrol sector where proposed construction would take place. *See id.* 63–70. The Chairman analyzed, among other things, the type of proposed border barrier construction, the location and mileage of each project, the number of DoD personnel deployed to each sector and the support activities they provide to DHS, and the impact the barriers are expected to have on denying illegal entry, channeling migrants to ports of entry, and increasing vanishing times along the southern border. *See id.* For example, the Chairman concluded that barriers will reduce the areas where migrants can cross easily, thereby reducing the need for DoD personnel to operate mobile surveillance camera as well as conduct monitoring and detection operations between ports of entry. *See id.* at 68–70. In the end, the Chairman developed a prioritized list of border barrier projects and concluded that the projects are necessary to support the use of the armed forces because they support those forces by enabling more efficient use of DoD personnel, and may ultimately reduce the demand for military support over time. *Id.* at 64. Contrary to Plaintiffs' argument, *see* Pls.' Mot. at 13–16, the record explains how the projects are necessary to support military personnel, separate and apart from any benefit the projects also provide to DHS.

Relying on the Chairman's analysis and advice, as well as input from the U.S. Army Corps of Engineers, DHS, and DoI, the Secretary of Defense determined that the border barrier projects discussed above are necessary to support the use of the armed forces in connection with the national emergency. *See* AR at 1–11; 42–48 (Secretary's determination and summary of analysis regarding necessity of border barriers). The Secretary concluded that the border barrier projects will deter illegal entry, increase the vanishing time of those illegally crossing the border, and channel migrants to ports of entry. *See* AR at 9. Thus, he determined, the projects will reduce the demand for DoD personnel and assets at the locations where the barriers are constructed and allow the redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers. *See id.* Given the extensive record supporting the Secretary's decision, the Court should defer to his military judgment

1    that the barriers are necessary to support the use of military forces at the border.  *See, e.g., Gilligan*, 413

2    U.S. at 10.

3    **VI.    DoD's Use of § 2808 Does Not Violate the CAA.**

4        Plaintiffs allege a violation of the CAA, *see* Pls.' Mot. at 7–8, but the fact that the CAA

5    appropriates funds to *DHS* for certain border-barrier construction, *see* Pub. L. No. 116-6, § 230(a),

6    does not mean that Congress impliedly prohibited *DoD* from using its permanent statutory authority

7    to use its funding for different border barrier projects in response to a national emergency.  *See Salazar*

8    *v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012) ("An agency's discretion to spend appropriated

9    funds is cabined only by the text of the appropriation."); *Tennessee Valley Auth. v. Hill*, 437 U.S. 153,

10   190 (1978) ("doctrine disfavoring repeals by implication applies with full vigor when . . . the

11   subsequent legislation is an appropriations measure").  Indeed, the entire point of § 2808 is to provide

12   DoD with the flexibility to undertake military construction projects and use military construction

13   funds during a national emergency outside of the normal, time-consuming congressional authorization

14   and appropriations process.  *See* H.R. Rep. No. 97-44, at 72 (1981) (§ 2808 provides "authority to

15   immediately restructure construction priorities").  Plaintiffs try to create a statutory conflict between

16   the CAA and § 2808 where none exists, and in doing so violate the principle that where two statutes

17   "are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional

18   intention to the contrary, to regard each as effective."  *See J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l,*

19   *Inc.*, 534 U.S. 124, 143–44 (2001).

20       Plaintiffs also argue that DoD cannot use § 2808 for the projects at issue because Congress

21   has provided a more specific appropriation to DHS for other border barrier projects.  *See* Pls.' Mot.

22   at 7–8, 15.  But DoD is using its own appropriated funds for the § 2808 projects and Plaintiffs cite no

23   case for the proposition that an appropriation of funds to one agency (here, to DHS in the CAA) can

24   limit a second agency (DoD) from using its own separate appropriations, particularly where the

25   agencies are undertaking different projects.  Indeed, the Government Accountability Office (GAO)—

26   the independent, nonpartisan arm of Congress charged with auditing Executive spending—recently

27   concluded that DoD did not violate the general-specific appropriation principle in using §§ 8005 and

28   284 for border barrier construction even though Congress had appropriated funds for such

construction to DHS in the CAA.  *See* GAO Opinion B-330862 at 13–15 (Sept. 5, 2019) (Exhibit 8) (citing prior GAO opinions).  The same reasoning applies equally to DoD's use of § 2808 and provides further support to deny Plaintiffs' claim.

Plaintiffs also argue that use of § 2808 is prohibited by § 739 of the CAA.  *See* Pls.' Mot. at 8. Section 739 states, "None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act."  Pub. L. No. 116-6, div. D, § 739.  Plaintiffs' argument rests upon a faulty premise:  that barrier construction undertaken pursuant to separate funding and statutory authority under § 2808 is somehow adding money to DHS' appropriation in the CAA.  *See id.* § 231.  It is not.  Section 739 merely caps the amount of money an agency can spend under a designated appropriation unless the agency invokes its congressionally-authorized transfer authority to increase that amount or Congress appropriates additional funds to that appropriation for the next fiscal year.  There is no violation of § 739 because DoD is not adding additional money to a "program, project, or activity" within one of DHS's budget accounts, as that term is understood in the appropriations context.  *See* GAO, *A Glossary of Terms Used in the Federal Budget Process* 80 (Sept. 2005) (defining "program, project, or activity" as an "[e]lement within a budget account"); *see* 31 U.S.C. § 1112 (GAO is statutorily required to publish and maintain standard terms related to the federal budget process).  The fact that § 2808 provides DoD with independent authority to construct border barriers does not transform DoD's use of *its* military construction authorities into an excess infusion of money to an entirely separate *DHS* appropriation.[5]

### VII.   DoD's Use of § 2808 Does Not Violate the Constitution.

DoD's use of § 2808 is not unconstitutional.  Plaintiffs' claims turn on the meaning and interpretation of § 2808—a purely statutory dispute with no constitutional dimension.

As a threshold matter, Plaintiffs lack a cause of action and cannot satisfy the zone-of-interests

---

[5] For these reasons, as well as the absence of a cause of action to enforce the CAA, the Court should not follow the decision in *El Paso Cty. v. Trump*, No. EP-19-CV-66-DB, 2019 WL 5092396 (W.D. Tex. Oct. 11, 2019), that any use § 2808 violates the CAA.

requirement for constitutional claims under the separation of powers, Appropriations Clause, and Presentment Clause.  Just as their recreational, aesthetic, and resource injuries are entirely unrelated to § 2808's limitations, those injuries also do not fall within the asserted constitutional limitations on Congress's power to authorize DoD to engage in emergency military construction.

In any event, the Supreme Court unanimously rejected Plaintiffs' argument in *Dalton*, explaining that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." 511 U.S. at 472.  The Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases).  The Constitution is implicated if executive officers rely on it as an independent source of authority to act—which is not the case here—or if the officers rely on a statute that itself violates the Constitution. *Id.* at 473 & n.5.  But claims alleging that an official has "exceeded his statutory authority are not 'constitutional' claims." *Id.* at 473.  *Dalton*'s reasoning applies here and refutes Plaintiffs' argument that they have a constitutional claim or cause of action.  This case concerns "simply" whether the Secretary of Defense has "exceeded his statutory authority" in authorizing the border barrier projects at issue; "no constitutional question whatever is raised," "only issues of statutory interpretation." *Id.* at 473-74 & n.6.

In advancing a constitutional claim based on the separation of powers, Plaintiffs make precisely the argument the Supreme Court rejected in *Dalton*.  Their claim hinges on the allegation that DoD acted contrary to the will of Congress because it allegedly took actions contrary to *statutory* limitations in the CAA. *See* Pls.' Mot. at 16, 18.  Not only is there no violation of the CAA here, but Congress statutorily authorized the conduct at issue when it enacted § 2808—there is thus no concern that DoD is usurping "Congress's constitutionally-mandated power" to assess and determine "permissible spending." *Sierra Club,* 379 F. Supp. 3d at 916.  Nor does DoD's use of § 2808 "violate the Constitution's separation of powers principles" by providing "unbounded authorization for Defendants to rewrite the federal budget." *Id.*  Congress has long provided agencies with "lump-sum appropriation[s]," and agencies' delegated authority over "[t]he allocation of [such] funds" is not only constitutional, but "committed to agency discretion by law" and "accordingly unreviewable." *Lincoln v. Vigil*, 508 U.S. 182, 192–93 (1993).  Given that Congress could have granted DoD unfettered

discretion over its total budget, Congress' decision to provide DoD with a more limited authority to reallocate unobligated military construction funds to emergency military construction projects does not pose constitutional concerns.

Plaintiffs' Appropriations Clause claim also fails.  *See* Pls.' Mot. at 16–17.  The Appropriations Clause simply requires that money drawn from the Treasury must be "in Consequence of Appropriations made by Law."  U.S. Const., art. I, § 9, cl. 7.  Accordingly, action undertaken pursuant to a federal statute like § 2808 that authorizes an expenditure "by Law" cannot violate the Appropriations Clause.  *See Harrington v. Schlesinger*, 528 F.2d 455, 457–58 (4th Cir. 1975) (statutory funding disputes turn solely on "the interpretation and application of congressional statutes under which the challenged expenditures either were or were not authorized," not on a "controversy about the reach or application of" the Appropriations Clause).

Additionally, Plaintiffs assert that § 2808 violates the Presentment Clause, *see* Pls.' Mot. at 17–18, but § 2808 does not empower any executive official to amend or repeal any law.  It is thus in no way comparable to *Clinton v. City of New York*, 524 U.S. 417 (1998), which held the Line Item Veto Act unconstitutional because it purported to authorize the President to "cancel in whole" portions of enacted statutes.  *Id.* at 435–37.  The CAA remains in effect, and the Presentment Clause does not prevent DoD from acting pursuant to other statutes to fund additional border barrier construction.

## VIII.   NEPA Does Not Apply to § 2808 Border Barrier Projects.

The Court should reject Plaintiffs' arguments that Defendants violated NEPA by failing to conduct environmental reviews of § 2808 border barrier projects.  *See* Pls.' Mot. at 18–21.

Plaintiffs' NEPA claims should be dismissed because § 2808 authorizes the Secretary of Defense to undertake emergency military construction projects "without regard to any other provision of law."  As noted above, this broad language sweeps aside all statutory and regulatory provisions, such as NEPA, that might otherwise constrain or impede the activities authorized by § 2808, including construction and acquisitions of land.  *See Cisneros*, 508 U.S. at 18; *Novak*, 476 F.3d at 1046.

The Court should reject Plaintiffs' proposed narrow construction of § 2808's "without regard to" clause as limited to exempting DoD from those requirements that "military construction be specifically authorized by appropriations legislation."  *See* Pls.' Mot. at 19.  To be sure, *non-obstante*

clauses are "not always construed literally" and courts often assess the scope of the clauses "by taking into account the whole of the statutory context."  *Novak*, 476 F.3d at 1046.  Here, however, the statutory context supports interpreting § 2808's "without regard to" clause as broadly as it is written. Section 2808 applies only "[i]n the event of a declaration of war or the declaration by the President of a national emergency," and Congress drafted the statute to give DoD great flexibility during such times to engage in emergency construction projects necessary to support the use of the armed forces. *See* H.R. Rep. No. 97-44, at 72 (1981) (§ 2808 provides "authority to immediately restructure construction priorities").  There is no evidence to suggest Congress intended for DoD to engage in the potentially lengthy process of complying with environmental statutes such as NEPA prior to engaging in military construction during a time of war or national emergency.  The fact that § 2808 does not contain an express statement to engage in immediate military construction is of no moment when the authority is available only in extraordinary situations such as time of war or national emergency that, by their very nature, require expedited military responses.  Moreover, Congress omitted from § 2808 other types of restrictions it has imposed for other emergency military construction authorities.  *See* 10 U.S.C. § 2803 (authorizing military construction in a broader range of emergencies but without a *non-obstante* clause and imposing a report-and-wait requirement before construction can proceed).  Indeed, Congress knows how to limit the scope of "without regard to" clauses when it wants to do so.  *Compare* 12 U.S.C. § 1702 (Secretary of Housing and Urban Development authorized to take action "without regard to any other provisions of law governing the expenditure of public funds").  Had Congress wanted to limit the scope of the clause in § 2808 solely to enable DoD to disregard appropriations laws, it could have said so expressly.  *See* 50 U.S.C. § 3038(c) ("without regard to the provisions of law or regulation relating to the expenditure of Government funds").  Instead, Congress did not qualify or restrict the clause to a particular subject matter, thus laws such as NEPA that would impede or delay § 2808 construction must give way to the *non obstante* clause.  *See Nat'l Coal. to Save Our Mall v. Norton*, 161 F. Supp. 2d 14, 21 (D.D.C.), *aff'd* 269 F.3d 1092 (D.C. Cir. 2001).

## IX.   Plaintiffs Have Not Met The Requirements For A Permanent Injunction.

The Court should deny Plaintiffs' request for a permanent injunction.  *See* Pls.' Mot. at 1.  "[A]

plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC.*, 547 U.S. 388, 391 (2006). Even if Plaintiffs were to prevail on the merits of their claims, permanent "injunctive relief is not automatic, and there is no rule requiring automatic issuance of a blanket injunction when a violation is found." *See N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007). As the Supreme Court has emphasized, a permanent "injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32.

**A.    Plaintiffs Have Not Established an Irreparable Injury.**

**1.    Plaintiffs Have Not Demonstrated Irreparable Harm to Their Recreational and Aesthetics Interests.**

Plaintiffs base their claim of irreparable injury on three claims, all of which fail. First, Plaintiffs argue that the challenged projects will "impede their members' ability to enjoy, work, and recreate in the wilderness areas" along the southern border. Pls.' Mot. at 26. The attached declaration of Alex A. Beehler, Assistant Secretary of the Army for Installations, Energy, and Environment, responds to the allegations of recreational and aesthetic harm set forth in Plaintiffs' declarations, including a detailed description of the eleven project areas and a project-by-project rebuttal of Plaintiffs' allegations. *See generally* Beehler Decl. In short, Plaintiffs' allegations of harm fall short of demonstrating a sufficient injury-in-fact to support standing, much less satisfy the demanding standard for a permanent injunction. *See, e.g.*, ECF 210-1 at 31-32 (alleging an unspecified impediment to enjoy the lands around Yuma 6 with no specific factual support); *id.* at 61 ¶ 16 (alleging a subjective fear of being observed by CBP agents while in a public area); *id.* at 97 ¶ 10 (alleging an inability to visit public lands due to border construction unrelated to § 2808 funding). The border wall segments at issue will occupy existing, narrow law enforcement corridors—the majority of which are already heavily disturbed with border infrastructure—directly adjacent to the international boundary line. *See* Beehler

1   Decl. ¶¶ 3–32.  Plaintiffs will not lose the ability to recreate on public lands near the border.  And

2   Plaintiffs' members' individual subjective opinions that a border wall is unsightly does not warrant a

3   permanent injunction.

4          As discussed *supra*, Plaintiffs must show their members face a likely—not just possible—

5   irreparable harm to their interests in the absence of injunctive relief.  *Winter,* 555 U.S. at 22; *see also All.*

6   *for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Plaintiffs alleging an irreparable

7   harm to their members' recreational interests may attempt to meet that burden by showing that a

8   challenged federal action will prevent their members from recreating in a public area.  *See All. for the*

9   *Wild Rockies*, 632 F.3d at 1135; *but see Gallatin Wildlife Ass'n v. U.S. Forest Serv.*, No., 2018 WL 1796216,

10  at *5 (D. Mt. April 16, 2018) (distinguishing *All. for the Wild Rockies* and finding no irreparable harm

11  where challenged grazing would not prevent use and where area was already disturbed by past grazing);

12  *Ctr. for Biological Diversity v. Hays*, No. 2:15-cv-01627-TLN-CMK, 2015 WL 5916739, at *10 (E.D. Cal.

13  Oct. 8, 2015) (rejecting an "aesthetic opinion that post-fire logging is 'ugly'" as sufficient to establish

14  an irreparable harm).

15         Plaintiffs' declarations mischaracterize the project areas and the adjacent lands.  Some of the

16  challenged construction will take place in urban environments where Plaintiffs cannot credibly claim

17  an interest in wilderness recreation.  *See* Beehler Decl. at ¶¶ 13, 16.  Other portions are surrounded by

18  private holdings, on which Plaintiffs' members have no claim of right to recreate.  *Id.* at ¶¶ 19, 74, 88,

19  90.  And all of the projects except Laredo 7 will take place in or near previously disturbed areas where

20  existing border infrastructure is already present.  *See id.* at ¶¶ 3–32; AR at 11.  Plaintiffs make no effort

21  to grapple this reality.

22         For example, Declarants Ardovino and Bixby allege that they recreate in the lands surrounding

23  the El Paso 8 area.  ECF 210-1 at 7 ¶ 6; *id.* at 19 ¶ 11.  But the lands adjacent to El Paso 8 are private,

24  and construction will only take place on a small footprint directly adjacent to the international border.

25  Beehler Decl. ¶ 88.  Similarly, Declarant Bevins complains that the construction of secondary fencing

26  at Yuma 6 will "fragment the vista."  ECF 210-1 at 13 ¶ 7.  Declarant Bevins fails to mention that

27  considerable border security fencing already exists in the area or that most of the new secondary

28  fencing will parallel existing primary pedestrian fencing.  Beehler Decl. ¶ 76.  Declarant Ramirez

1    suggests that secondary pedestrian fencing in El Centro 5 and 9—once again, parallel to existing

2    primary pedestrian fencing and an existing road—will somehow make her "less likely to hike Mount

3    Signal and enjoy outdoor recreation activities."  ECF No. 210-1 at 70 ¶ 5.  But Mount Signal is located

4    in Mexico and is thus not part of the construction footprint.  To the extent Ms. Ramirez is suggesting

5    an inability to cross the border into Mexico to go hiking, the new secondary pedestrian fencing will

6    not alter her ability to use the Calexico port of entry to enter Mexico and return to the United States.[6]

7    Other of Plaintiffs' declarations also mischaracterize the project areas or describe lands well outside

8    of the construction footprint.  *See, e.g.*, ECF No. 210-1 at 49 ¶ 5 (discussing hiking in the Otay Open

9    Space Preserve, an area well to the North West of San Diego Project 4); *id.* at 107 ¶ 6-7 (alleging the

10   declarant likes to get "away from the hustle and bustle" in the highly urbanized and disturbed lands

11   bordering the San Diego 11 project).

12           Plaintiffs also attempt to claim an interest in lands located on the Goldwater Range.  *Id.* at 24-

13   29; 52-56.  Approximately 75% of the Goldwater Range is made available to the public for recreational

14   use through a permitting system, but very little of the portion of the Range along the international

15   border is accessible to the public.  Beehler Decl. ¶ 79–81.  Indeed, only approximately 10 of the 31

16   miles scheduled for construction along the Range are accessible to members of the public.  *Id.* at ¶ 80.

17   Moreover, the areas within the Range that are currently available to the public will remain so through

18   the existing permitting scheme.  *Id.* ¶ 81.  Construction of the border wall along the international

19   border in the Range will not alter Plaintiffs' members' ability to recreate in the existing areas open to

20   the public.  *Id.*

21           At the preliminary injunction stage for the § 284 projects, this Court, citing *Alliance for the Wild*

22   *Rockies*, held that "an organization can demonstrate irreparable harm by showing that the challenged

23   action will injure its members' enjoyment of public land."  *Sierra Club v. Trump*, 379 F. Supp. 3d at 924

24   (citing *All. for the Wild Rockies*, 632 F.3d at 1135).  *Alliance for the Wild Rockies* was about access to public

25   lands.  *All. for the Wild Rockies*, 632 F.3d at 1135.  There, the Ninth Circuit found irreparable harm

26

27           [6] This Court should also disregard Ms. Ramirez's declaration because it is not sworn under
     penalty of perjury.  *See* ECF No. 210-1 at 72.  The Walsh declaration also suffers from this defect
28   and should likewise be disregarded.  *See id.* at 104.

where implementation of the challenged salvage logging project would prevent the plaintiffs' members from using "1,652 acres of the forest," which the Ninth Circuit held was "hardly a de minimus injury." *Id.* Not so here. Plaintiffs' members will not lose access to the public lands they presently enjoy. At bottom, all Plaintiffs can muster is their members' subjective opinion that a border wall adjacent to lands on which they recreate will be more unsightly than the currently disturbed law enforcement corridor. *Alliance for the Wild Rockies* did not credit this theory of injury, and other courts in this circuit have specifically rejected it. *See Gallatin Wildlife Ass'n*, No. , 2018 WL 1796216, at *5; *Ctr. for Biological Diversity*, 2015 WL 5916739 at *10. Plaintiffs are not entitled to a permanent injunction based on their alleged recreational harms.

### 2. Plaintiffs Have Not Demonstrated Irreparable Harm to Their Mission.

Second, Plaintiff SBCC asserts that it is irreparably injured because DoD's plan to use § 2808 for border barrier construction has caused SBCC to redirect its organizational resources to "counter the negative impacts of imminent construction." *See* Pls.' Mot. at 28-31. But Plaintiffs' assertions of organizational harm extend well beyond *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and cases applying it that Plaintiffs rely upon. *See* Pls.' Mot. at 30. *Havens* held a fair housing organization had standing to challenge a real estate company's racial steering practices because the policy made it more difficult for its members to obtain equal access to housing, and the organization diverted resources to identifying and counteracting the unlawful practice. *See Havens Realty Corp.*, 455 U.S. at 379. Absent such a direct impairment on its mission caused by the challenged action, an irreparable injury does not exist whenever a public interest organization decides to spend money opposing a particular governmental policy of concern or the organization suffered a "setback to [its] abstract social interests," *id.* (citing *Sierra Club v. Morton,* 405 U.S. 727, 739 (1972)).

SBCC and its affiliate organizations are public advocacy groups, and the asserted harms to their interests arise almost entirely from First Amendment protected activity in support of their policy goals. Pls.' Mot. at 28–30 (summarizing these activities). The relevant analysis under *Havens* and *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013), is whether § 2808 construction interferes with the organizations' ability to carry out these activities. Here, SBCC's mission is to "fight for policies and solutions that improve quality of life in border communities" and "promote rationale and

humane immigration policies. *See* Third Declaration of Vicki Gaubeca ¶¶ 3-4 (ECF No. 210-1). But the § 2808 projects impose no obstacles or constraints on SBCC's ability to engage in these activities. Nor are SBCC's recent activities in response to § 2808 construction different in kind from its prior mission of education, advocacy, and organizing for its preferred border barrier policies. *See* Pls.' Mot. at 29 (SBCC has been "centrally involved" in counseling "landowners facing condemnation as a result of border wall for years," and alleges harm from expanding that outreach to homeowners in Laredo). Moreover, Plaintiffs cite no authority for the proposition that an organization suffers irreparable injury requiring the extraordinary remedy of a permanent injunction when it decides to spend more of its time and money on responding to one government policy as opposed to another. *See id.* at 30 (SBCC has devoted time responding to border barrier construction at the expense of "Border Patrol accountability"); *see also id.* at 28 (citing *Havens Realty* standing cases).

Additionally, this Court previously rejected SBCC's diversion-of-resources argument in the preliminary injunction opinion addressing the § 284 projects and there is no basis for the Court to depart from its prior conclusion. *See Sierra Club*, 379 F. Supp. 3d at 925–26. The Court emphasized that *Winter* requires a plaintiff to establish that an "irreparable injury is likely in the absence of an injunction," 555 U.S. at 22, and Plaintiffs had not presented any evidence that an injunction "will make any difference to the purported harm to their mission interests, which will continue until this case's resolution." *Id.* at 925. Here, SBCC has not presented sufficient evidence to carry their burden that they will suffer an irreparable injury in the absence of their requested injunction. SBCC merely states that if § 2808 construction is enjoined, it can devote time and money to other border advocacy initiates. *See* Pls.' Mot. at 31. But SBCC does not put forth any evidence beyond vague allegations that § 2808 construction has caused it "to reduce the time we devote to our core projects" and an injunction would enable it to resume that work. *See id.*; Gaubeca Decl. ¶ 12. Reallocating resources always has an opportunity cost, but Plaintiffs never explain how that reallocation has imposed concrete irreparable harms beyond simply undertaking a different form of border policy advocacy. Similar to the preliminary injunction stage, Plaintiffs have to failed provide "persuasive counterfactual analysis showing a likelihood that irreparable harm would occur absent an injunction, but would not occur if an injunction is granted." *See Sierra Club*, 379 F. Supp. 3d at 925–26.

### 3.   Plaintiffs Have Not Demonstrated Constitutional Harm.

Third, Plaintiffs argue that Defendants' alleged constitutional violations cause them independent irreparable harm. *See* Pls.' Mot. at 32. But here again, Plaintiffs assert the same argument that the Court previously rejected in its preliminary injunction opinion. *See Sierra Club*, 379 F. Supp. 3d at 925. Plaintiffs present no new argument on this point and the Court should follow its prior conclusion that "Plaintiffs must demonstrate some likely irreparable harm in the absence of a preliminary injunction barring the challenged action, and not simply a constitutional violation." *Id.*

### B.   The Balance of Equities and Public Interest Weigh Against Injunctive Relief.

The balance of equities and public interest also weigh decidedly in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that these factors merge when the government is a party). The President has declared a national emergency because of the large numbers of aliens attempting to cross the border and the huge quantities of illegal drugs that continue to be smuggled across the border each year. *See* Proclamation; Veto Messages; *see* also Declaration of Millard LeMaster (Exhibit 9) (summarize drug and crossing statistics in fiscal year 2019). As the Supreme Court has recognized, the Government has "compelling interests in safety and in the integrity of our borders." *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 (1989). The President has also determined that the unique skills and resources of the armed forces are required to confront this crisis. *See* Proclamation; Veto Messages. Further, the Secretary of Defense has concluded, based on detailed analysis and advice from the Chairman of the Joint Chiefs of Staff, that the § 2808 border barrier projects are necessary to support the use of the armed forces in the context of their support to DHS at the southern border. The Government and the public thus have a compelling interest in ensuring that its military forces are properly supported and have the necessary resources to ensure mission success. *See Goldman*, 475 U.S. at 507 (courts must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest."); *Winter*, 555 U.S. at 25 (military training and readiness are of the "utmost importance to the Navy and the Nation").

These interests "plainly outweigh[]" Plaintiffs' asserted aesthetic and recreational injuries, just as the harms from prohibiting the Navy's sonar testing did when balanced against the plaintiffs' observational and scientific interests in *Winter*, 555 U.S. at 26, 33. Indeed, Plaintiffs' interests here are

even less substantial than those in *Winter*. Plaintiffs allege the equites fall in their favor because § 2808 construction will "destroy[]" the borderlands. *See* Pls.' Mot. at 33. The projects will occur on a 60-foot strip of land that parallels the international border and many of the projects areas are already heavily disturbed, urbanized, or marked by existing barriers. *See* Beehler Decl. ¶¶ 3–32. Plaintiffs fail to offer a persuasive explanation how replacing existing fencing or adding a secondary fence to areas that currently function as a law-enforcement zone outweigh the Government's compelling interests. *Id.* ¶¶ 71–91. Further, for the two projects on the Goldwater Range, only a limited portion of the project areas are even accessible to the public. *Id.* ¶ 80. Consequently, no injunction should issue in projects areas on the Range where Plaintiffs cannot recreate. More broadly, Plaintiffs' purported interest in recreating on the narrow strip of land where the barriers will be built is exceedingly minimal because this area has been removed from the public lands of the United States for over 100 years in furtherance of border security. In 1907, President Theodore Roosevelt reserved "all public lands within sixty feet of the international boundary between the United States and the Republic of Mexico" in California, New Mexico, and Arizona as a "protection against the smuggling of goods" between the United States and Mexico. *See* Proclamation No. 758, 35 Stat. 2136 (May 27, 1907). Construction of the § 2808 projects in this limited area will not impact land uses in the thousands of acres surrounding the limited project areas, where the forms of recreation Plaintiffs enjoy will remain possible. Given the lopsided balance of equities, it would be an abuse of discretion to award the "extraordinary remedy" of a permanent injunction when Plaintiffs have not made a "clear showing" that they are entitled to such relief. *Winter,* 555 U.S. at 22.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for partial summary judgment, deny Plaintiffs' motion for partial summary judgment, and enter final judgment for Defendants on all claims related to the funding and construction of the § 2808 projects. A proposed order is attached.

1   DATE:  October 25, 2019                    Respectfully submitted,

2
                                              JAMES M. BURNHAM
3                                             Deputy Assistant Attorney General

4                                             ALEXANDER K. HAAS
5                                             Director, Federal Programs Branch

6                                             ANTHONY J. COPPOLINO
                                              Deputy Director, Federal Programs Branch
7
                                              /s/ Andrew I. Warden
8                                             ANDREW I. WARDEN
9                                             Senior Trial Counsel (IN Bar No. 23840-49)

10                                            KATHRYN C. DAVIS
                                              RACHAEL L. WESTMORELAND
11                                            MICHAEL J. GERARDI
                                              LESLIE COOPER VIGEN
12                                            Trial Attorneys
13                                            U.S. Department of Justice
                                              Civil Division, Federal Programs Branch
14                                            1100 L Street, NW
15                                            Washington, D.C. 20530
                                              Tel.:    (202) 616-5084
16                                            Fax:     (202) 616-8470
                                              Email: Andrew.Warden@usdoj.gov
17
18                                            JEFFREY BOSSERT CLARK
                                              Assistant Attorney General
19                                            United States Department of Justice
                                              Environment & Natural Resources Division
20
                                              /s/ Tyler M. Alexander
21                                            TYLER M. ALEXANDER
22                                            (CA Bar No. 313188)
                                              Natural Resources Section
23                                            Trial Attorney
                                              PO Box 7611
24                                            Washington, DC 20044-7611
25                                            Tel: (202) 305-0238
                                              Fax: (202) 305-0506
26                                            Email: tyler.alexander@usdoj.gov

27

28