1
2
3
4

Lawrence J. Joseph (SBN 154908)
Law Office of Lawrence J. Joseph
1250 Connecticut Ave, NW, Suite 700-1A
Washington, DC 20036
Tel: 202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com

5

Counsel for *Amicus Curiae* U.S. Rep. Andy Barr

6

7

8

9

**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

10

11

12

13

14

15

16

SIERRA CLUB, et al.,

     *Plaintiffs*,

     v.

DONALD J. TRUMP, President of the United States, in his official capacity, et al.,

     *Defendants*.

———————————————

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 4:19-cv-00892-HSG

**BRIEF OF U.S. REP. ANDY BARR AS** *AMICUS CURIAE* **IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Judge:         Hon. Haywood S. Gilliam, Jr.
S.J. Hearing Date:  November 20, 2019
Time:         10:00 a.m.
Courtroom:    2, 4th Floor

17

18

19

20

21

22

23

24

25

26

*AMICUS CURIAE* **BRIEF OF REP. ANDY BARR No. 4:19-cv-00892-HSG**

# TABLE OF CONTENTS

Table of Contents.................................................................................................i

Table of Authorities..........................................................................................ii

Memorandum of Points and Authorities...........................................................1

Identity and Interest of *Amicus Curiae*..........................................................1

Statement of the Case.........................................................................................1

Argument............................................................................................................2

I.   This Court lacks jurisdiction over Plaintiffs' claims. ...............................2

    A.   Plaintiffs lack not only an Article III case or controversy but also prudential standing...........................................................................................2

        1.   Plaintiffs' interests are insufficiently related to an "injury in fact" to satisfy Article III jurisdiction................................................4

        2.   Plaintiffs' interests fall outside the relevant zones of interests. ...........6

        3.   Plaintiffs' diverted resources do not satisfy Article III. ......................7

        4.   Plaintiffs' NEA claims are non-justiciable political questions. ..........10

            a.   The NEA provides the President with flexibility and Congress — not private parties — with oversight.................................................11

            b.   Even if the switch from concurrent to joint resolutions would have changed some votes in 1976, Congress ratified the current NEA with the post-*Chadha* amendment in 1985. ..........................................13

    B.   Sovereign immunity bars Plaintiffs' challenge. .......................................15

        1.   Plaintiffs cannot sue under the APA. ..................................................15

        2.   Plaintiffs cannot bring a non-APA and pre-APA suit in equity. .........17

II.  Plaintiffs' claims lack merit.....................................................................18

    A.   § 2808 displaces or preempts Plaintiffs' environmental-review rights. .....18

    B.   DoD did not violate § 2808. ....................................................................19

    C.   DoD did not violate the CAA. .................................................................19

    D.   DoD did not violate the Constitution........................................................21

III. The public interest and Plaintiffs' lack of irreparable harm aslo weigh against injunctive relief....................................................................................22

    A.   Plaintiffs' cognizable harm is trivial to non-existent, while the Government's interests are significant. ....................................................22

    B.   The public interest favors denial of injunctive relief.................................23

Conclusion .......................................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner,*
 387 U.S. 136 (1967) ........................................................................... 17

*Action Alliance of Senior Citizens v. Heckler,*
 789 F.2d 931 (D.C. Cir. 1986) ............................................................. 9

*Air Courier Conference v. Am. Postal Workers Union,*
 498 U.S. 517 (1991) ............................................................................. 6

*Alabama Power Co. v. Ickes,*
 302 U.S. 464 (1938) ...................................................................... 6, 18

*Allen v. Wright,*
 468 U.S. 737 (1984) ............................................................................. 3

*Animal Legal Def. Fund v. USDA,*
 632 F. App'x 905 (9th Cir. 2015) ........................................................ 7

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,*
 397 U.S. 150 (1970) ........................................................................... 17

*Bender v. Williamsport Area Sch. Dist.,*
 475 U.S. 534 (1986) ............................................................................. 2

*Canadian Lumber Trade All. v. United States,*
 517 F.3d 1319 (Fed. Cir. 2008) ..................................................... 7, 18

*Chamber of Commerce of the United States v. Reich,*
 83 F.3d 439 (D.C. Cir. 1996) ............................................................. 19

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
 401 U.S. 402 (1971) ........................................................................... 16

*Clapper v. Amnesty Int'l USA,*
 568 U.S. 398 (2013) ............................................................................. 8

*Coal. for Econ. Equity v. Wilson,*
 122 F.3d 692 (9th Cir. 1997) ............................................................. 23

*Cooper Indus., Inc. v. Aviall Serv., Inc.,*
 543 U.S. 157 (2004) ............................................................................. 9

*Ctr. for Competitive Politics v. Harris,*
 784 F.3d 1307 (9th Cir. 2015) ........................................................... 23

*DaimlerChrysler Corp. v. Cuno,*
 547 U.S. 332 (2006) ............................................................................. 3

*Davis v. Mineta,*
 302 F.3d 1104 (10th Cir. 2002) ......................................................... 23

*Dep't of Army v. Blue Fox, Inc.*,
  525 U.S. 255 (1999) ..................................................................................... 15

*Diamond v. Charles*,
  476 U.S. 54 (1986) ..................................................................................... 5-6

*E. Bay Sanctuary Covenant v. Trump*,
  909 F.3d 1219 (9th Cir. 2018) ........................................................................ 9

*Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*,
  729 F.App'x 287 (5th Cir. 2018) ..................................................................... 9

*Ex parte Young*,
  209 U.S. 123 (1908) .................................................................................... 17

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*,
  666 F.3d 1216 (9th Cir. 2012) ........................................................................ 7

*Flast v. Cohen*,
  392 U.S. 83 (1968) ....................................................................................... 5

*Fleming v. Mohawk Co.*,
  331 U.S. 111 (1947) .................................................................................... 14

*Gladstone, Realtors v. Bellwood*,
  441 U.S. 91 (1979) ....................................................................................... 8

*Gray v. Powell*,
  314 U.S. 402 (1941) .................................................................................... 16

*Hardin v. Ky. Utils. Co.*,
  390 U.S. 1 (1968) ......................................................................................... 6

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .............................................................................7-9, 23

*Heckler v. Chaney*,
  470 U.S. 821 (1985) .................................................................................... 16

*Heckler v. Lopez*,
  464 U.S. 879 (1983) .................................................................................... 23

*In re Border Infrastructure Envtl. Litig.*,
  915 F.3d 1213 (9th Cir. 2019) ........................................................................ 4

*In re Fed.-Mogul Glob.*,
  684 F.3d 355 (3d Cir. 2012) ......................................................................... 19

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) ...............................................................................16-17

*INS v. Chadha*,
  462 U.S. 919 (1983) ...............................................................................13-14

*Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
  456 U.S. 694 (1982) ..................................................................................... 2

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994)............................................................................................2

*Lane v. Pena*,
    518 U.S. 187 (1996)..........................................................................................15

*Lewis v. Casey*,
    518 U.S. 343 (1996)............................................................................................3

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973)............................................................................................5

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................................3-4

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990)............................................................................................7

*Luther v. Borden*,
    48 U.S. 1 (1849)................................................................................................10

*McConnell v. FEC*,
    540 U.S. 93 (2003)..........................................................................................5-6

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)..........................................................................................22

*Mount Evans Co. v. Madigan*,
    14 F.3d 1444 (10th Cir. 1994) ......................................................................7, 18

*Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996)........................................................................3, 9

*Muskrat v. United States*,
    219 U.S. 346 (1911)............................................................................................2

*Nader v. Saxbe*,
    497 F.2d 676 (D.C. Cir. 1974)............................................................................5

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)..........................................................................................20

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
    290 F.3d 578 (3d Cir. 2002)..............................................................................23

*Panama Canal Co. v. Grace Line, Inc.*,
    356 U.S. 309 (1958)..........................................................................................16

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976)............................................................................................8

*People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture*,
    797 F.3d 1087 (D.C. Cir. 2015)..........................................................................7

*PG&E Co. v. Cal. ex rel. Cal. Dep't of Toxic Substances Control*,
    350 F.3d 932 (9th Cir. 2003) ............................................................................18

*AMICUS CURIAE* **BRIEF OF REP. ANDY BARR, No. 4:19-cv-00892-HSG**          iv

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
   136 S.Ct. 1938 (2016) ............................................................19

*Red Lion Broad. Co. v. FCC*,
   395 U.S. 367 (1969) ............................................................14

*Schlesinger v. Reservists Comm. to Stop the War*,
   418 U.S. 208 (1974) ..............................................................3

*Second City Music, Inc. v. City of Chicago*,
   333 F.3d 846 (7th Cir. 2003) ...............................................23

*Secretary of State of Md. v. Joseph H. Munson Co.*,
   467 U.S. 947 (1984) ..............................................................3

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
   815 F.3d 623 (9th Cir. 2016) .................................................2

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) ..........................................................4, 8

*South Central Bell Tel. Co. v. Alabama*,
   526 U.S. 160 (1999) ..............................................................9

*Steel Co. v. Citizens for a Better Env't.*,
   523 U.S. 83 (1998) ................................................................2

*Trump v. Sierra Club*,
   204 L.Ed.2d 1170 (2019) ....................................................15

*United States v. Apel*,
   571 U.S. 359 (2014) ............................................................19

*United States v. Lee*,
   106 U.S. 196 (1882) ............................................................17

*United States v. Mendoza*,
   464 U.S. 154 (1984) ..............................................................9

*United States v. Will*,
   449 U.S. 200 (1980) ............................................................20

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ..............................................................2

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) ..........................................................3-4

*Vieth v. Jubelirer*,
   541 U.S. 267 (2004) ............................................................10

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
   529 U.S. 765 (2000) ........................................................5-6, 9

*Wadley S. R. Co. v. Georgia*,
   235 U.S. 651 (1915) ............................................................17

*Warth v. Seldin*,
    422 U.S. 490 (1975) ...........................................................................8

*Waters v. Churchill*,
    511 U.S. 661 (1994) ...........................................................................9

*Yakus v. United States*,
    321 U.S. 414 (1944) .........................................................................23

*Youngberg v. Romeo*,
    457 U.S. 307 (1982) .........................................................................17

## STATUTES

U.S. CONST. art. III ................................................................2-5, 7-8, 15, 18-19, 22

U.S. CONST. art. III, § 2 ............................................................................2

Administrative Procedure Act,
    5 U.S.C. §§ 551-706 .................................................................12, 15-18

5 U.S.C. § 701(a)(1) ...............................................................................15

5 U.S.C. § 701(a)(2) ...............................................................................15

5 U.S.C. § 702 .........................................................................................15

5 U.S.C. § 702(2) ....................................................................................16

5 U.S.C. § 703 .........................................................................................15

5 U.S.C. § 704 .........................................................................................15

5 U.S.C. § 706(2)(B) ...............................................................................17

5 U.S.C. § 706(2)(C) ...............................................................................17

10 U.S.C. § 284 ..........................................................................................1

10 U.S.C. § 2801(c)(4) ............................................................................19

10 U.S.C. § 2808 ................................................... 1, 4, 6, 18-19, 21-23

10 U.S.C. § 2808(a) .................................................................................18

National Environmental Policy Act,
    42 U.S.C. §§ 42 U.S.C. § 4331-4347 ...........................................1, 19

National Emergencies Act,
    50 U.S.C. §§ 1601-1651 ...........................1, 6, 10-14, 16-17, 19-22

50 U.S.C. § 1621(a) ...........................................................................11, 20

50 U.S.C. § 1621(b) ............................................................................21-22

PUB. L. NO. 80-772, § 1, 62 Stat. 683, 765 (1948) .................................12

PUB. L. NO. 94-412, 90 Stat. 1255 (1976) ..............................................10

PUB. L. NO. 94-574, § 1, 90 Stat. 2721 (1976)........................................15

PUB. L. No. 99-93, § 801, 99 Stat. 405, 448 (1985) .................................................... 14

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    PUB. L. No. 104-208, Div. C, 110 Stat. 3009, 3009-546 to 3009-724 (1996) ................ 4

PUB. L. No. 104-208, Div. C, § 102(c)(1),
    110 Stat. 3009, 3009-546 to 3009-724, 3009-555 (1996) .................................................. 4

Real ID Act of 2005, PUB. L. No. 109-13, Tit. I, Div. B,
    119 Stat. 231, 302-11 (2005) ..................................................................................... 4

PUB. L. No. 109-13, Tit. I, Div. B, § 102,
    119 Stat. 231, 306 (2005) (codified at 8 U.S.C. § 1103 note) ......................... 4

Consolidated Appropriations Act 2019,
    PUB. L. No. 116-6, 132 Stat. 2981 (2019) .................................................19-22

8 U.S.C. § 1254(c)(2) (1982) ................................................................................ 14

18 U.S.C. § 1383 (1970) ...................................................................................... 12

## LEGISLATIVE HISTORY

S. Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies and
    Delegated Emergency Powers, 94th Cong., 2d Sess., The National Emergencies
    Act Source Book: Legislative History, Texts, and Other Documents (1976) .............. 10

H.R. REP. No. 99-240 (1985) ................................................................................ 14

S. REP. No. 93-1170 (1974) ................................................................................. 12

120 CONG. REC. 29,975, 29,983 (Aug. 22, 1974) ...................................................... 12

120 CONG. REC. 34,011, 34,013 (Oct. 7, 1974) ........................................................ 10

121 CONG. REC. 27,632, 27,636 (Sept. 4, 1975) ....................................................... 11

121 CONG. REC. 27,632, 27,645 (Sept. 4, 1975) ...............................................11-12, 16

121 CONG. REC. 27,632, 27,646 (Sept. 4, 1975) ....................................................... 13

122 CONG. REC. 28,466 (Aug. 31, 1976) ................................................................. 13

131 CONG. REC. 14,671, 14,947 (June 7, 1985) ........................................................ 14

## RULES AND REGULATIONS

Presidential Proclamation on Declaring a National Emergency Concerning the Southern
    Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019)..................................... 1

## OTHER AUTHORITIES

Kenneth Culp Davis, *"Nonreviewable Administrative Action,"* 96 U. PA. L. REV.
    749 (1948) ..................................................................................................... 16

## MEMORANDUM OF POINTS AND AUTHORITIES

Two public-interest groups (collectively, "Plaintiffs") have sued various federal officials and offices (collectively, the "Government") to enjoin the Government's using "reprogrammed" (*i.e.*, transferred) funds from within the Department of Defense ("DoD") budget for border-wall projects under 10 U.S.C. §§ 284, 2808. Plaintiffs' other claims include a challenge under the National Environmental Policy Act, 42 U.S.C. §§ 42 U.S.C. § 4331-4347 ("NEPA"), and a challenge to the use of the National Emergencies Act, 50 U.S.C. §§ 1601-1651 ("NEA") for the President's actions at the southern border. *See* Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019). Although DoD funding under 10 U.S.C. § 2808 falls under the NEA, DoD actions under 10 U.S.C. § 284 do not require an emergency to transfer or reprogram funds. The cross-motions for partial summary judgment now before the Court concern the Government's use of funds under § 2808.

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Rep. Andy Barr has represented Kentucky's 6th congressional district since 2013. A lawyer by training, Rep. Barr also taught constitutional law at the University of Kentucky and Morehead State University when his practice was based in Kentucky. Rep. Barr supports the President's attention to the humanitarian and public-safety emergency on the southern border as both a citizen and as a Member of Congress. In his legislative capacity, Rep. Barr has a significant interest in protecting the statutory scheme that Congress enacted to delegate power in emergencies to the President, not to courts.

## STATEMENT OF THE CASE

Although Plaintiffs' underlying complaint raises multiple issues, this appeal concerns only Plaintiffs' claims under § 2808. *Amicus* adopts the facts as stated by the Government. Gov't

Br. at 1-9. Because a likelihood of prevailing on the merits is not the same as prevailing, *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 631 n.5 (9th Cir. 2016) (quoting *Camenisch*, 451 U.S. at 395).

## ARGUMENT

## I.     THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS.

Federal courts are courts of limited jurisdiction. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The parties cannot confer jurisdiction by consent or waiver, *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 (1982), and federal courts instead have the obligation to assure themselves of jurisdiction before reaching the merits. *Steel Co. v. Citizens for a Better Env't.,* 523 U.S. 83, 95 (1998). As explained in this section, Plaintiffs lack an Article III case or controversy, and the United States' sovereign immunity bars this litigation.

### A.     Plaintiffs lack not only an Article III case or controversy but also prudential standing.

Under Article III, federal courts cannot issue advisory opinions, *Muskrat v. United States*, 219 U.S. 346, 356-57 (1911), but must instead focus on the cases or controversies presented by affected parties before the court. U.S. CONST. art. III, § 2. "All of the doctrines that cluster about Article III — not only standing but mootness, ripeness, political question, and the like — relate in part, and in different though overlapping ways, to … the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of

government." *Allen v. Wright,* 468 U.S. 737, 750 (1984) (interior quotation marks omitted). Under these limits, a federal court lacks the power to interject itself into public-policy disputes when the plaintiff lacks standing.

At its constitutional minimum, standing presents the tripartite test of whether the party invoking a court's jurisdiction raises a sufficient "injury in fact" under Article III, that is, a legally cognizable "injury in fact" that (a) constitutes "an invasion of a legally protected interest," (b) is caused by the challenged action, and (c) is redressable by a court. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-62 (1992) (interior quotation marks omitted). Moreover, plaintiffs must establish standing separately for each form of relief they request. *Lewis v. Casey,* 518 U.S. 343, 358 n.6 (1996) ("standing is not dispensed in gross,"); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 & n.5 (2006). In addition to the constitutional limits on standing, the judiciary has adopted prudential limits on standing that bar review even when the plaintiff meets Article III's minimum criteria. *See*, *e.g.*, *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 475 (1982) (zone-of-intertest test); *Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 955 (1984) (litigants must raise their own rights). Moreover, all these constitutional and prudential criteria must align to provide standing for a given injury. *Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1232 (D.C. Cir. 1996).

Finally, a given plaintiff's lack of standing does not depend upon *someone else's* having standing: "The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974). The notion that *someone* must have standing assumes incorrectly "that the business of the federal courts is correcting constitutional errors, and that 'cases and

*AMICUS CURIAE* **BRIEF OF REP. ANDY BARR, No. 4:19-cv-00892-HSG**          **3**

controversies' are at best merely convenient vehicles for doing so and at worst nuisances that may be dispensed with when they become obstacles to that transcendent endeavor." *Valley Forge Christian Coll.*, 454 U.S. at 489. It may be that Congress — not a federal court — has the only institutional power that can be brought to bear here.

### 1.    Plaintiffs' interests are insufficiently related to an "injury in fact" to satisfy Article III jurisdiction.

A plaintiff can, of course, premise its standing on non-economic injuries, *Valley Forge Christian Coll.*, 454 U.S. at 486, including a "change in the aesthetics and ecology of [an] area," *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972). But the threshold requirement for "the irreducible constitutional minimum of standing" is that a plaintiff suffered an "injury in fact" through "an invasion of a *legally protected interest* which is … concrete and particularized" to that plaintiff. *Defenders of Wildlife*, 504 U.S. at 560 (emphasis added). To be sure, the requirement for particularized injury typically poses the biggest problem for plaintiffs — for example, both *Valley Forge Christian College* and *Morton*, *supra*, turned on the lack of a particularized injury — but the requirement for a legally protected interest is even more basic.[2]

As the Supreme Court recently explained in rejecting standing for *qui tam* relators based on their financial stake in a False Claims Act penalty, not all *interests* are *legally protected interests*:

---

[2]    Aesthetic injuries do not qualify as legally protected interests here for two reasons. First, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, PUB. L. NO. 104-208, Div. C, 110 Stat. 3009, 3009-546 to 3009-724 ("IIRIRA"), gave DHS's predecessor the discretionary (and unreviewable) authority to waive environmental review for certain border-wall projects, *id.* at § 102(c)(1), 110 Stat. at 3009-555, and the Real ID Act of 2005, PUB. L. NO. 109-13, Tit. I, Div. B, 119 Stat. 231, 302-11, broadened that waiver authority, and transferred it to DHS. *Id.* § 102, 119 Stat. at 306 (codified at 8 U.S.C. § 1103 note); *In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1221-26 (9th Cir. 2019) (majority); *accord id.* at 1226-27 (Callahan, J., dissenting). Second, as set forth in Section II.A, *infra*, § 2808 preempts environmental review.

---

*AMICUS CURIAE* **BRIEF OF REP. ANDY BARR, No. 4:19-cv-00892-HSG**          **4**

> There is no doubt, of course, that as to this portion of the recovery — the bounty he will receive if the suit is successful — a *qui tam* relator has a concrete private interest in the outcome of the suit. But the same might be said of someone who has placed a wager upon the outcome. *An interest unrelated to injury in fact is insufficient to give a plaintiff standing.* The interest must consist of obtaining compensation for, or preventing, the violation of a legally protected right. A *qui tam* relator has suffered no such invasion[.]

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772-73 (2000) (emphasis added, interior quotation marks, citations, and alterations omitted); *accord McConnell v. FEC*, 540 U.S. 93, 226-27 (2003). Thus, even harm to a pecuniary interest does not *necessarily* qualify as an injury in fact. Rather, "Art. III standing requires an injury with a nexus to the substantive character of the statute or regulation at issue." *Diamond v. Charles*, 476 U.S. 54, 70 (1986).[3] The statutes here have no nexus to Plaintiffs' alleged aesthetic or financial injuries. Plaintiffs have not suffered an injury in fact under the statutes at issue here.[4]

Fifty years ago, federal courts would have rejected as a generalized grievance any injuries to a plaintiff that challenged an otherwise lawful project based only on a challenge to the project's source of federal funding:

---

[3] After rejecting standing based on an interest in a *qui tam* bounty, *Stevens* held that *qui tam* relators have standing on an assignee theory (*i.e.*, the government has an Article III case or controversy and assigns a portion of it to the *qui tam* relator). *Stevens*, 529 U.S. at 771-73. Outside of taxpayer-standing cases that implicate the Establishment Clause, the nexus test of *Flast v. Cohen*, 392 U.S. 83 (1968), typically arises in cases challenging a failure to prosecute. *See, e.g.*, *Nader v. Saxbe*, 497 F.2d 676, 680-82 (D.C. Cir. 1974); *Linda R.S. v. Richard D.*, 410 U.S. 614, 617-18 (1973) ("in the unique context of a challenge to a criminal statute, appellant has failed to allege a sufficient nexus between her injury and the government action which she attacks"). Even without the *Flast* nexus test, Article III nonetheless requires that the claimed interest qualify as a "legally protected right." *Stevens*, 529 U.S. at 772-73.

[4] Although analogous to the prudential zone-of-interests test, *Stevens* and *McConnell* make clear that the need for a *legally protected interest* is an element of the threshold inquiry under Article III of the Constitution, not a merely prudential inquiry that a party could waive.

---

*AMICUS CURIAE* **BRIEF OF REP. ANDY BARR, No. 4:19-cv-00892-HSG**          **5**

> This Court has, it is true, repeatedly held that … injury which results from lawful competition cannot, in and of itself, confer standing on the injured business to question the legality of any aspect of its competitor's operations. But competitive injury provided no basis for standing in the above cases simply because the statutory and constitutional requirements that the plaintiff sought to enforce were in no way concerned with protecting against competitive injury.

*Hardin v. Ky. Utils. Co.*, 390 U.S. 1, 5-6 (1968) (citations omitted); *Alabama Power Co. v. Ickes*, 302 U.S. 464, 478-79 (1938). This Court need not find that *Ickes* and *Hardin* remain good law; *Stevens*, *McConnell*, and *Diamond* certainly do. Plaintiffs' alleged injuries might suffice to support standing for environmental review statutes, but they do not suffice under the statutes at issue here.

### 2.   Plaintiffs' interests fall outside the relevant zones of interests.

Assuming *arguendo* that Plaintiffs had constitutional standing based on their injuries, *but see* Section I.A.1, *supra*, Plaintiffs would remain subject to the zone-of-interests test, which defeats their claims for standing to sue under the statutes that they invoke. Quite simply, nothing in those statutes supports an intent to protect aesthetic or other non-federal interests from military construction projects funded with transferred funds. Significantly, the President's NEA emergency is not limited to civil immigration enforcement and contains national-security elements. In the NEA's national-emergency context, it is absurd to suggest that the legislation had parochial interests within the zone of interests of the NEA and implementing legislation like § 2808.

To satisfy the zone-of-interests test, a "plaintiff must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Air Courier Conference v. Am. Postal Workers Union*, 498 U.S. 517, 523-24

(1991) (interior quotation marks omitted, emphasis in original). For violations of appropriations legislation, the *statute* — not the Appropriations Clause — provides the relevant zone of interests. *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1334-35 (Fed. Cir. 2008); *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1452-53 (10th Cir. 1994). And not every frustrated interest meets the test:

> [F]or example, the failure of an agency to comply with a statutory provision requiring "on the record" hearings would assuredly have an adverse effect upon the company that has the contract to record and transcribe the agency's proceedings; but since the provision was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters, that company would not be "adversely affected within the meaning" of the statute.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990). *Amicus* respectfully submits that the interests here are even further afield from the statutes involved than court reporters' fees are from a statute requiring hearings on the record.

### 3.    Plaintiffs' diverted resources do not satisfy Article III.

Plaintiffs assert "diverted-resource" standing. Because these injuries are self-inflicted and outside the relevant statutory zone of interests, *Amicus* respectfully submits that such injuries do not suffice to support standing.

This type of diverted-resource standing derives from *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372-73 (1982). As Judge Millett of the U.S. Court of Appeals for the District of Columbia Circuit has explained, "[t]he problem is not *Havens*[; the] problem is what our precedent has done with *Havens*." *People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture*, 797 F.3d 1087, 1100-01 (D.C. Cir. 2015) (Millett, J., dissenting); *accord Animal Legal Def. Fund v. USDA*, 632 F. App'x 905, 909 (9th Cir. 2015) (Chhabria, J., concurring); *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1225-26

(9th Cir. 2012) (Ikuta, J., dissenting). Under the unique statutory and factual situation in *Havens Realty*, a housing-rights organization's diverted resources provided it standing, but in most other settings such diverted resources are mere self-inflicted injuries. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013) (self-censorship due to fear of surveillance insufficient for standing); *Pennsylvania v. New Jersey,* 426 U.S. 660, 664 (1976) (financial losses state parties could have avoided insufficient for standing). Indeed, if mere spending could manufacture standing, any private advocacy group could establish standing against any government action merely by spending money to oppose it. But that clearly is not the law. *Sierra Club v. Morton,* 405 U.S. 727, 739 (1972) (mere advocacy by an organization does not confer standing to defend "abstract social interests"). To confine federal courts to their constitutional authority, this Court should review the diverted-resources rationale for Article III standing.

Relying on *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 102-09 (1979), *Havens Realty* held that the Fair Housing Act at issue there extends "standing under § 812 … to the full limits of Art. III," so that "courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section," 455 U.S. at 372, thereby collapsing the standing inquiry into the question of whether the alleged injuries met the Article III minimum of injury in fact. *Id.* The typical organizational plaintiff and typical statute lack several critical criteria from *Havens Realty*.

First, the *Havens Realty* organization had a statutory right (backed by a statutory cause of action) to truthful information that the defendants denied to it. Because "Congress may create a statutory right[,] … the alleged deprivation of [such rights] can confer standing." *Warth v. Seldin,* 422 U.S. 490, 514 (1975). Under a typical statute, by contrast, a typical organizational plaintiff has no claim to any rights related to its own voluntarily diverted resources.

Second, and related to the first issue, the injury that the plaintiff claims must align with the other components of its standing, *Stevens*, 529 U.S. at 772; *Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1232 (D.C. Cir. 1996); *Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F.App'x 287, 299 (5th Cir. 2018) (collecting cases), including the allegedly cognizable right. In *Havens Realty,* the statutorily protected right to truthful housing information aligned with the alleged injury (costs to counteract false information given in violation of the statute). By contrast, under the DoD appropriations acts (or any typical statute), there will be no rights even *remotely* related to a third-party organization's discretionary spending.

Third, and most critically, the *Havens Realty* statute eliminated prudential standing, so the zone-of-interests test did not apply. When a plaintiff — whether individual or organizational — sues under a statute that *does not eliminate prudential standing*, that plaintiff cannot bypass the zone-of-interests test or other prudential limits on standing.[5] Typically, it would be fanciful to suggest that a statute has private, third-party spending in its zone of interests. Certainly, that is the case for the DoD appropriations. *See* Section I.A.2, *supra*.

Non-mutual estoppel does not apply to the federal government, *United States v. Mendoza,* 464 U.S. 154 (1984), and *stare decisis* cannot be applied so conclusively that, in effect, it operates as preclusion against non-parties to the prior litigation. *South Central Bell Tel. Co. v. Alabama,* 526 U.S. 160, 167-68 (1999). While Judge Millet acknowledged problematic precedent under *Havens Realty*, those "cases cannot be read as foreclosing an argument that they never dealt with." *Waters v. Churchill*, 511 U.S. 661, 678 (1994) (plurality); *Cooper Indus., Inc.*

---

[5]   For example, applying *Havens Realty* to diverted resources in *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 939 (D.C. Cir. 1986) (R.B. Ginsburg, J.), then-Judge Ginsburg correctly recognized the need to ask whether those diverted resources fell within the zone of interests of the Age Discrimination Act. 789 F.2d at 939; *see also E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1239 (9th Cir. 2018) (applying zone-of-interests test).

*v. Aviall Serv., Inc.,* 543 U.S. 157, 170 (2004). *Amicus* respectfully submits that this Court has a constitutional obligation to consider diverted-resource standing without regard to either issue preclusion or preclusive resort to *stare decisis* from decisions that did not expressly consider the foregoing issues.

### 4.    Plaintiffs' NEA claims are non-justiciable political questions.

Plaintiffs ask this Court to delve into several areas that the NEA leaves to Congress and the President, including "a textually demonstrable constitutional commitment of the issue to a coordinate political department" and "a lack of judicially discoverable and manageable standards for resolving [the case]." *Vieth v. Jubelirer,* 541 U.S. 267, 277-78 (2004) (interior quotation marks omitted) As explained in Section I.B.1, *infra,* the lack of manageable standards for resolving these issues also goes to the Court's jurisdiction under the APA's waiver of sovereign immunity. As the only unelected branch of government, courts are the *least* fit to answer such questions: "making judges supreme arbiters in political controversies … [would] dethrone [the people] and [make them] lose one of their … invaluable birthrights." *Luther v. Borden,* 48 U.S. 1, 52-53 (1849).

Congress enacted the NEA in 1976, Pᴜʙ. L. Nᴏ. 94-412, 90 Stat. 1255 (1976), culminating a review of emergency legislation begun by the Senate's formation of the Special Committee on the Termination of the National Emergency — later renamed the Special Committee on National Emergencies and Delegated Emergency Powers (hereinafter, the "Special Committee") — in 1973 to study national emergencies that remained "on the books" even though the triggering emergency had passed. 120 Cᴏɴɢ. Rᴇᴄ. 34,011, 34,013 (Oct. 7, 1974) (Sen. Mathias), *reprinted in* S. Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies and Delegated Emergency Powers, 94th Cong., 2d Sess., The National Emergencies Act Source Book: Legislative History, Texts, and Other Documents, at 84-85

(1976) (hereinafter, "NEA Source Book"). Sens. Church and Mathias co-chaired the Special Committee, which also included several other Senators, including — as relevant here — Sen. Pearson. Representatives Morehead and Flowers were the floor managers for the bill in the House.

### a. The NEA provides the President with flexibility and Congress — not private parties — with oversight.

The original NEA provided the President unfettered discretion to *declare* an emergency, subject only to the power of Congress to *terminate* an emergency by concurrent resolution:

> As a firm believer in a strong Presidency and Executive flexibility, I could not support this bill if it would impair any of the rightful constitutional powers of the President. [The bill] will have no impact on the flexibility to declare a national emergency and to quickly respond if the necessity arises.

121 CONG. REC. 27,632, 27,636 (Sept. 4, 1975) (Rep. Hutchinson), *reprinted in* NEA Source Book, at 252-53; 121 CONG. REC. 27,632, 27,645 (Sept. 4, 1975) (Red. Drinan), *reprinted in* NEA Source Book, at 279 ("H.R. 3884 [has] no standard really, whatsoever, when and why the President can proclaim a national emergency"). Consistent with the statutory text, 50 U.S.C. § 1621(a), a President has full discretion to declare an emergency in the first instance.

As enacted, the NEA relied on congressional oversight, 121 CONG. REC. 27,632, 27,636 (Sept. 4, 1975) (Rep. Moorhead), *reprinted in* NEA Source Book, at 254 ("Congress would assume the major role of reviewing and overseeing the conduct of the Executive branch in a national emergency situation"), not on judicial review:

> Unlike inherent Presidential powers which can be reviewed by the Supreme Court, emergency powers are specific legal delegations of authority to a President. The Supreme Court has generally given deference to such delegations of authority. The laws are viewed as persuasive evidence of Congressional intent that the President should be permitted special latitude during crises. Thus, *unless the Congress itself imposes controls, emergency powers shall remain largely unchecked.*

*AMICUS CURIAE* BRIEF OF REP. ANDY BARR, No. 4:19-cv-00892-HSG          **11**

120 CONG. REC. 29,975, 29,983 (Aug. 22, 1974) (Sen. Pearson), *reprinted in* NEA Source Book, at 84-85 (emphasis added). NEA's legislative history addresses APA review — obliquely — in two places. In an interim report, the Special Committee used the example of the reviewability of arrests under former 18 U.S.C. § 1383 (1970):[6] "Would these arrests be reviewable in court? It is not clear. Judicial review of agency action is guaranteed in 5 USC 702, but 5 USC 701 excludes action taken under declarations of martial law." S. REP. NO. 93-1170, at 2 (1974), *reprinted in* NEA Source Book, at 20; Special Committee Report, at 3, *reprinted in* NEA Source Book, at 35 (same). While the NEA did not resolve whether pre-NEA law would allow judicial review of hypothetical arrests under § 1383, this example raises two important issues. First, the Special Committee recognized that in addition to the APA's generous review, the question of reviewability also hinged on the APA's *limits* to that review. Second, the Special Committee hypothesized APA review of the *arrests*, not of the underlying *Executive order* that triggered § 1383 in the first place.

Rep. Drinan introduced an amendment to limit the President's authority to initiate an NEA emergency to instances during wartime or attack, with all other emergencies requiring a joint resolution of the two houses of Congress authorizing the President to declare an emergency. 121 CONG. REC. 27,632, 27,645 (Sept. 4, 1975), *reprinted in* NEA Source Book, at 278. Rep. Drinan introduced his amendment to trim the President's flexibility: "In H.R. 3884 there is no standard really, whatsoever, when and why the President can proclaim a national emergency."

---

[6] When the NEA was enacted, § 1383 provided as follows: "Whoever, contrary to the restrictions applicable thereto, enters, remains in, leaves, or commits any act in any military area or military zone prescribed under the authority of an Executive order of the President, by the Secretary of the Army, or by any military commander designated by the Secretary of the Army, shall, if it appears that he knew or should have known of the existence and extent of the restrictions or order and that his act was in violation thereof, be fined not more than $5,000 or imprisoned not more than one year, or both." PUB. L. NO. 80-772, § 1, 62 Stat. 683, 765 (1948).

*Id.*, *reprinted in* NEA Source Book, at 279 (Rep. Drinan). Rep. Moorhead opposed the Drinan amendment because it "would completely take away from the President the flexibility of acting in times of crisis or an emergency." 121 CONG. REC. 27,632, 27,646 (Sept. 4, 1975), *reprinted in* NEA Source Book, at 280 (Rep. Moorhead). These rival positions appear to have been resolved by the power that the NEA gave the Congress to terminate a presidentially declared emergency with a concurrent resolution. 121 CONG. REC. 27,632, 27,646 (Sept. 4, 1975) ("A concurrent resolution would not require Presidential signature or acceptance. It would be an impossibility that it would be vetoed.") (Rep. Flowers), *reprinted in* NEA Source Book, at 280. After that clarification, the Drinan amendment was rejected. *Id.* The NEA gave the President full authority to declare emergencies.

In a later colloquy, Rep. Moorhead asked Rep. Flowers to "tell the House whether there is any intent here to limit either the President's power or flexibility to declare a national emergency," and Rep. Flowers replied that "there is not" and that "I do not think that we want to do that by legislation in any event." 122 CONG. REC. 28,466 (Aug. 31, 1976), *reprinted in* NEA Source Book, at 342 (Reps. Moorhead and Flowers). In sum, as passed in 1976, the NEA allowed the President full discretion to declare emergencies, subject only to the ability of the two houses of Congress to terminate an emergency by a veto-proof concurrent resolution.

        **b.**        **Even if the switch from concurrent to joint resolutions would have changed some votes in 1976, Congress ratified the current NEA with the post-*Chadha* amendment in 1985.**

*Amicus* does not doubt that some members of Congress voted for the NEA because, under it, Congress would retain the power unilaterally to terminate a presidentially declared emergency through a concurrent resolution passed by a majority vote in each house, with no room for a presidential veto. *See* 121 CONG. REC. 27,632, 27,646 (Sept. 4, 1975), *reprinted in* NEA Source Book, at 280 (Reps. Conyers and Flowers). In *INS v. Chadha,* 462 U.S. 919, 946

(1983), however, the Supreme Court rejected the one-house veto provisions of former 8 U.S.C. § 1254(c)(2) (1982) for failing to meet the constitutional requirements of bicameralism and presentment. In doing so, *Chadha* cast grave doubt on the ability of Congress to void presidential action by a concurrent resolution (*i.e.*, without presentment to the President). Simply put, bicameralism alone is insufficient: either the President must sign the bill, or Congress must override a veto.

If Congress had not acted to address the NEA's revealed constitutional infirmity, this Court might well have to consider whether the remainder of the NEA was severable from the unconstitutional concurrent-resolution provision. In 1985, however, Congress amended the NEA to replace *concurrent* resolutions with *joint* resolutions, PUB. L. NO. 99-93, § 801, 99 Stat. 405, 448 (1985), and that amendment ratified the rest of the NEA as enacted. *See Fleming v. Mohawk Co.*, 331 U.S. 111, 118-19 (1947); *cf. Red Lion Broad. Co. v. FCC,* 395 U.S. 367, 380-81 (1969) (post-enactment history is "entitled to great weight in statutory construction" of the original statute). As interesting as severability and vetoed resolutions might be, they are irrelevant.

Specifically, the 1985 amendment expressly addressed the NEA's *Chadha* problem and provided a legislative fix. 131 CONG. REC. 14,671, 14,947 (June 7, 1985) ("we should amend the National Emergencies Act and replace the use of the concurrent resolution for termination of a State or national emergency with the procedure of a joint resolution") (Sen. Mathias). The amendment passed the Senate and was added to the House bill in Conference. *Id.*; H.R. REP. NO. 99-240, at 86 (1985) (Conf. Rep.) ("Senate amendment amends the National Emergencies Act to stipulate that a national emergency may be terminated by joint resolution of the Congress," and "Conference Substitute is identical to the Senate amendment"). Because of the 1985

amendment, a resolution passed by both houses of Congress to terminate a presidentially declared emergency is irrelevant, unless the President signs the bill or both houses override a presidential veto.

### B.   Sovereign immunity bars Plaintiffs' challenge.

In addition to the lack of Article III jurisdiction, Plaintiffs' claims also fall outside the scope of the APA's waiver of sovereign immunity[7] and thus are subject to an independent jurisdictional bar: "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit," without regard to any perceived unfairness, inefficiency, or inequity. *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999). The scope of such waivers, moreover, is strictly construed in favor of the sovereign. *Lane v. Pena*, 518 U.S. 187, 192 (1996). Because Plaintiffs' claims neither fall within the APA nor within the non-APA and pre-APA equitable exceptions to sovereign immunity, Plaintiffs lack jurisdiction for this litigation.

### 1.   Plaintiffs cannot sue under the APA.

Subject to certain limitations, the APA provides a cause of action for judicial review to those "aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. For example, the APA excludes review under "statutes [that] preclude judicial review," those that commit agency action to agency discretion, and those with "special statutory review," non-final actions. 5 U.S.C. §§ 701(a)(1)-(2), 703, 704. As the Supreme Court recognized, Plaintiffs do not have a cause of action for judicial review. *Trump v. Sierra Club*, 204 L.Ed.2d 1170 (2019) ("the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005"). Other APA limits apply to other parts of Plaintiffs' suit.

---

[7]   The waiver of sovereign immunity was added to 5 U.S.C. § 702 in 1976. Pub. L. No. 94-574, § 1, 90 Stat. 2721 (1976).

For example, questions of the presence or absence of an emergency or priorities are committed to agency discretion within the meaning of the APA. 5 U.S.C. § 702(2); *accord id.* § 701(a)(2). Judicial review is precluded "to the extent that … agency action is committed to agency discretion by law." 5 U.S.C. § 702(2); *accord id.* § 701(a)(2). One sign that Congress has committed an issue to executive officers' discretion is when a reviewing court would have "no law to apply" in reviewing the agency action. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Similarly, "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 830 (1985). Indeed, this principle predates the APA, *Gray v. Powell,* 314 U.S. 402, 412 (1941), and forms a "common law" of "nonreviewability." Kenneth Culp Davis, *Nonreviewable Administrative Action,* 96 U. Pa. L. Rev. 749, 750-51 (1948). Review is particularly outside judicial expertise when, as here, "the duty to act turns on matters of doubtful or highly debatable inference from large or loose statutory terms." *Panama Canal Co. v. Grace Line, Inc.,* 356 U.S. 309, 318 (1958).

The NEA does not give reviewing courts "law to apply." As Rep. Drinan acknowledged in trying to amend the bill to give Congress control over non-war emergencies, "H.R. 3884 [has] no standard really, whatsoever, when and why the President can proclaim a national emergency." 121 Cong. Rec. 27,632, 27,645 (Sept. 4, 1975) (Red. Drinan), *reprinted in* NEA Source Book, at 279.

> Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.

*INS v. Cardoza-Fonseca,* 480 U.S. 421, 442-43 (1987) (citation omitted). Because Congress purposefully enacted legislation that gives the President complete flexibility — and thus gives a reviewing court "no law to apply" to measure the exercise of that discretion — this Court should thus find NEA declarations unreviewable and outside the APA's waiver of sovereign immunity.

Although the APA's "generous review provisions must be given a hospitable interpretation," *Abbott Labs. v. Gardner*, 387 U.S. 136, 140-41 (1967) (interior quotation marks omitted), Plaintiffs seek to avoid the APA, presumably because the zone-of-interests test clearly limits APA review. *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153-54 (1970) (zone-of-interests test applies to APA); Section I.A.2, *supra* (Plaintiffs cannot satisfy the zone-of-interests test). The theory that Plaintiffs can avoid the APA based on "*ultra vires*" or constitutional review is unsound, given that the APA expressly allows review of agency action "contrary to constitutional right, power, privilege, or immunity" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)-(C). In any event, as explained in the next section, equity review does not aid Plaintiffs here.

### 2.    Plaintiffs cannot bring a non-APA and pre-APA suit in equity.

In order to sue in equity, Plaintiffs need more than an aesthetic injury that would — or at least *could* — suffice to confer standing under the APA. Instead, an equity plaintiff or petitioner must invoke a statutory or constitutional right for equity to enforce, such as life, liberty, or property under the Due Process Clause or equal protection under the Equal Protection Clause or its federal equivalent in the Fifth Amendment. *See, e.g.*, *United States v. Lee*, 106 U.S. 196, 220-21 (1882) (property); *Ex parte Young*, 209 U.S. 123, 149 (1908) (property); *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) (liberty); *cf. Wadley S. R. Co. v. Georgia*, 235 U.S. 651, 661 (1915) ("any party affected by [government] action is entitled, by the due process clause, to

a judicial review of the question as to whether he has been thereby deprived of a right protected by the Constitution"). Plaintiffs' claimed injuries here fall short of what equity requires.

Unlike the APA and the liberal modern interpretation of Article III, pre-APA equity review requires "direct injury," which means "a wrong which directly results in the violation of a legal right." *Ickes*, 302 U.S. at 479. Without that elevated level of direct injury, there is no review:

> It is an ancient maxim, that a damage to one, without an injury in this sense, (*damnum absque injuria*), does not lay the foundation of an action; because, if the act complained of does not violate any of his legal rights, it is obvious, that he has no cause to complain. Want of right and want of remedy are justly said to be reciprocal. Where therefore there has been a violation of a right, the person injured is entitled to an action. The converse is equally true, that where, although there is damage, there is no violation of a right no action can be maintained.

*Id.* (alterations, citations, and interior quotation marks omitted). In short, Plaintiffs do not have an action in equity. But even if Plaintiffs did have an action in equity, they still would need to satisfy Article III and to meet the zone-of-interests test, in which the relevant zone would be the zone protected by the appropriations statute that Plaintiffs seek to enforce. *Canadian Lumber Trade*, 517 F.3d at 1334-35; *Mount Evans Co.*, 14 F.3d at 1452-53; *see also* Gov't Br. at 9-12. As already explained, Plaintiffs cannot meet that test. *See* Section I.A.2, *supra*.

## II.    PLAINTIFFS' CLAIMS LACK MERIT.

Even if this Court finds that it has jurisdiction, *but see* Section I, *supra*, Plaintiffs fail to state a claim on the merits under § 2808 or the Constitution.

### A.    § 2808 displaces or preempts Plaintiffs' environmental-review rights.

Because it applies notwithstanding other provisions of law, 10 U.S.C. § 2808(a) ("the Secretary … without regard to any other provision of law, may undertake military construction projects"), § 2808 qualifies as *express* preemption. *PG&E Co. v. Cal. ex rel. Cal. Dep't of Toxic*

*Substances Control*, 350 F.3d 932, 946 (9th Cir. 2003); *accord In re Fed.-Mogul Glob.*, 684 F.3d 355, 369 (3d Cir. 2012). That independently displaces not only NEPA, *Chamber of Commerce of the United States v. Reich*, 83 F.3d 439, 441 (D.C. Cir. 1996) (federal statutes can "preempt" or displace federal law), but also any state-law environmental review that Plaintiffs assert. Significantly, there is no presumption against preemption for express-preemption statutes, *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S.Ct. 1938, 1946 (2016). Instead, "the plain wording of the clause … necessarily contains the best evidence" of congressional intent. *Id.* Here, § 2808 plainly applies without regard to other laws, as is fitting given the emergency context of § 2808 as legislative implementation of the NEA.

## B.    DoD did not violate § 2808.

As the Government explains, the discrete projects that the Government has funded under § 2808 all involve construction at, or permissible additions to, two current military installations. *See* Gov't Br. at 16-19; 10 U.S.C. § 2801(c)(4) (linking status as a "military installation" to the exercise of military jurisdiction); *United States v. Apel*, 571 U.S. 359, 368 (2014) (recognizing that the definition of "military installation" is "synonymous with the exercise of *military jurisdiction*") (emphasis in original). Two results flow from this. First, the Government is not arguing that § 2808 would allow constructing a barrier across the entire southern border. Second, the claim that the Government violated § 2808 for *these projects* (*i.e.*, the Article III case or controversy arguably before this Court) — as distinct from an abstract violation of § 2808 and the CAA — is unfounded.

## C.    DoD did not violate the CAA.

Plaintiffs have not argued that § 2808 would prohibit any and all border-barrier construction, but rather that provisions of the Consolidated Appropriations Act of 2019, PUB. L. NO. 116-6, 132 Stat. 2981 (2019) ("CAA"), related to DHS prohibit DoD from using DoD funds.

---

*AMICUS CURIAE* BRIEF OF REP. ANDY BARR, No. 4:19-cv-00892-HSG          **19**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Plaintiffs' claim posits that the CAA's funding of a DHS border-wall project repealed by implication the DoD's appropriation act authority to reprogram funds for a different border-wall project.

With respect to repeals by implication, the Supreme Court recently has explained that a court will not presume repeal "unless the intention of the legislature to repeal is clear and manifest" and "unless the later statute expressly contradicts the original act or … such a construction is absolutely necessary in order that the words of the later statute shall have any meaning at all." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007) (interior alterations, citations, and quotation marks omitted). While the presumption against implied repeal is always strong, *id.*, and dispositive here, the presumption "applies with especial force when the provision advanced as the repealing measure was enacted in an appropriations bill." *United States v. Will*, 449 U.S. 200, 221-22 (1980) (citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978)). Here, the CAA's providing DHS with $1.375 billion to build certain projects in Texas is entirely consistent with DoD's having other, pre-existing statutory authority to build other projects for other DoD purposes. Given its silence on DoD transfers and expenditures for border-wall funding, a *new DHS appropriation* cannot be read implicitly to repeal DoD's pre-existing authority.

In addition, Plaintiffs' CAA-based arguments – like the CAA itself – fail to consider the unique emergency context of the Government's NEA-based actions. The NEA authorizes the President "to declare such national emergency" with regard to any statutes "authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a). Neither a reviewing court nor Plaintiffs can argue that the President violated the NEA: there is no judicial review of NEA actions, and Congress has twice failed to overturn

the President's declaration via the only method that NEA allows. Furthermore, "[n]o law enacted after September 14, 1976, shall supersede [the NEA] unless it does so in specific terms, referring to [the NEA], and declaring that the new law supersedes the provisions of [the NEA]." 50 U.S.C. § 1621(b). As a post-11976 statute, the CAA could only have excluded the NEA expressly, but the CAA did no such thing. Indeed, Plaintiffs cannot cite any law that expressly supersedes presidential authority under the NEA. Instead, Plaintiffs' quarrel is with the CAA for ineffectively limiting presidential flexibility to fund the border barrier via means other than the 2019 DHS appropriations bill.

### D. DoD did not violate the Constitution.

Plaintiffs argue that the Government has violated the separation of powers, the Appropriations Clause, and the Presentment Clause. Plaintiffs' real quarrel, however, is that the CAA did not adequately prevent the Government from exercising its pre-existing powers under the NEA and § 2808. It is frivolous to claim that duly enacted and entirely valid prior laws somehow retroactively violate the Constitution because Plaintiffs' legislative allies failed to circumvent those pre-existing laws with a new law. If Congress had wanted to seal off the President's NEA authority, the NEA expressly provides a process to do so. *See* 50 U.S.C. § 1621(b). The CAA did not follow that path, and this Court should squarely reject Plaintiffs' CAA-based claims to the contrary.

When viewed against that background, Plaintiffs' three constitutional arguments readily fail:

- **Appropriations Clause**. Because the Government complied with § 2808's requirements for reprogramming funds under § 2808, *see* Sections II.B-II.C, *supra*, the money that the Government has spent or will spend on the projects complies with the Appropriations Clause.

- **Separation of Powers**. Plaintiffs claim a separation-of-powers violation in a perceived violation of the CAA, but that argument cannot surmount either the canon against repeals by implication or § 1621(b). *See* Section II.C, *supra*. Far from asking this Court to redress a separation-of-powers injury, Plaintiffs ask this Court to commit a separation-of-powers violation by enjoining valid Executive action without the jurisdiction to do so.

- **Presentment Clause**. Analogizing to a line-item veto under which the President purports to enact a law different from the legislative package that Congress presented, Plaintiffs argue that the NEA and § 2808 — first enacted in 1976 and 1982, respectively — violate the Presentment Clause because the CAA – enacted in 2019 – worked a repeal by implication and failed to comply with § 1621(b). *See* Section II.C, *supra*. The better reading of the relevant statutes is that the CAA applies to DHS's 2019 budget and has no impact on DoD's 2019 budget, § 2808, or the President's authority under the NEA.

Because Plaintiffs' statutory and constitutional arguments all fail, this Court must rule for the Government on the cross-motions for summary judgment on projects funded under § 2808.

## III. THE PUBLIC INTEREST AND PLAINTIFFS' LACK OF IRREPARABLE HARM ASLO WEIGH AGAINST INJUNCTIVE RELIEF.

Even if this Court finds that it has jurisdiction and that Plaintiffs prevail on the merits, an injunction is not automatic. Instead, this Court also must consider whether the public interest supports the Government, and Plaintiffs must prove irreparable harm. Compared to the Government's significant public-health and public-safety concerns, Plaintiffs' harms are trivial and likely not even cognizable.

### A. Plaintiffs' cognizable harm is trivial to non-existent, while the Government's interests are significant.

Injuries that qualify as sufficiently immediate under Article III can nonetheless fail to qualify under the higher bar for irreparable harm, *Monsanto Co. v. Geertson Seed Farms*, 561

U.S. 139, 149-50, 162 (2010), and an absence of jurisdiction "negates giving controlling consideration to the irreparable harm." *Heckler v. Lopez*, 464 U.S. 879, 886 (1983) (Brennan, J., dissenting from the denial of motion to vacate the Circuit Justice's stay). Here, Plaintiffs do not even appear to clear those jurisdictional thresholds. *See* Section I, *supra*. But even if this Court finds jurisdiction, irreparable harm requires more.

Assuming *arguendo* that Plaintiffs could qualify for *standing* under *Havens Realty*, their self-inflicted expenditures would nonetheless not qualify as irreparable injury: "self-inflicted wounds are not irreparable injury." *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003); *accord Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("injury … may be discounted by the fact that [a party] brought that injury upon itself"); *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002). Further, Plaintiffs' aesthetic and environmental injuries are preempted or displaced by § 2808's applying not withstanding other law, which nullifies any claimed harm. *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1319-20 (9th Cir. 2015); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 710-11 (9th Cir. 1997). The best reading of the applicable laws holds that Plaintiffs lack cognizable interests, *see* Sections I.A.1-I.A.2, *supra*, which tips the balance of hardships decidedly in favor of the Government because of the Government's significant public-health and public-safety concerns.

**B.    The public interest favors denial of injunctive relief.**

The public interest would favor denial of injunctive relief, even if Plaintiffs has a winning merits case. In public-injury cases, equitable relief that affects competing public interests "has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff" because courts also consider adverse effects on the public interest. *Yakus v. United States*, 321 U.S. 414, 440 (1944). The public interest lies in ameliorating the

humanitarian and security crises at the border, against which Plaintiffs' meager claims of their irreparable injuries — if even cognizable, *see* Section III.A, *supra* — do not justify injunctive relief.

## CONCLUSION

This Court should grant summary judgment for the Government.

Dated: November 4, 2019

Respectfully submitted,

/s/ Lawrence J. Joseph

Lawrence J. Joseph (SBN 154908)

Law Office of Lawrence J. Joseph
1250 Connecticut Ave, NW, Suite 700-1A
Washington, DC 20036
Tel: 202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com

*Counsel for Amicus Curiae*