1

2

3

4                           UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    STATE OF CALIFORNIA, et al.,              Case No. 19-cv-00872-HSG

8                 Plaintiffs,                  **ORDER GRANTING IN PART AND**
                                               **DENYING IN PART PLAINTIFFS'**
9          v.                                  **MOTIONS FOR PARTIAL SUMMARY**
                                               **JUDGMENT AND DENYING**
10   DONALD J. TRUMP, et al.,                  **DEFENDANTS' MOTIONS FOR**
                                               **PARTIAL SUMMARY JUDGMENT**
11                Defendants.
                                               Re: Dkt. No. 220, 236
12   SIERRA CLUB, et al.,
                                               Case No. 19-cv-00892-HSG
13                Plaintiffs,

14         v.

15   DONALD J. TRUMP, et al.,                  Re: Dkt. Nos. 210, 236

16                Defendants.

17

18        Pending before the Court are cross-motions for partial summary judgment in two related

19   cases, *State of California v. Trump*, No. 19-cv-00872-HSG, and *Sierra Club v. Trump*, No. 19-cv-

20   00892-HSG.[1]  Plaintiffs in both cases challenge Defendants' proposed reallocation of $3.6 billion

21   in military construction funds under 10 U.S.C. § 2808 ("Section 2808") to build a wall along the

22   southern border of the United States.  Section 2808 is just one of several alternative sources of

23   _____

24   [1] Plaintiffs in *State of California v. Trump* are a coalition of nine states, including California,
     Colorado, Hawaii, Maryland, New Mexico, New York, Oregon, Wisconsin, and the
25   Commonwealth of Virginia ("State Plaintiffs").  Plaintiffs in *Sierra Club v. Trump* include the
     Sierra Club and the Southern Border Communities Coalition ("Sierra Club Plaintiffs").  Because
26   Plaintiffs' motions for summary judgment overlap considerably, the Court refers collectively to
     both State and Sierra Club Plaintiffs in this order as "Plaintiffs," unless otherwise specified.
27   Defendants in both cases include President Donald J. Trump and certain of his cabinet members,
     in their official government capacities.  The Court refers to them collectively as "Defendants" in
28   this order to avoid confusion in light of the apparent conflict between the Executive and
     Legislative branches of the government in these cases.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    funding that Defendants identified for border construction after Congress appropriated only

2    $1.375 billion for that purpose in the Consolidated Appropriations Act of 2019 ("CAA"), far less

3    than the $5.7 billion the President ultimately requested.  *Compare California*, 19-cv-00872-HSG,

4    Dkt. No. 59-4, Ex. 25, *with* CAA, Pub. L. No. 116-6, 133 Stat. 13 (2019).  Plaintiffs assert that

5    Defendants' reliance on Section 2808—like Defendants' other alternative funding plans—

6    improperly circumvents the CAA and Congress' appropriations power under the Constitution.[2]

7    Plaintiffs therefore seek declaratory and injunctive relief, prohibiting Defendants from using funds

8    under Section 2808 to build border barriers.

9         As the Court has previously explained, these two cases are not about—and the Court offers

10   no opinion regarding—whether the challenged border barrier construction plan is sound policy.

11   *See City and County of San Francisco v. United States Citizenship and Immigration Services*, No.

12   19-17213, (9th Cir. Dec. 5, 2019), Dkt. No. 27 at 2–3 (Bybee, J., concurring) (explaining that

13   "even as we are embroiled in these controversies, no one should mistake our judgments for our

14   policy preferences," and that "our thoughts on the efficacy of the one approach versus the other

15   are beside the point, since our business is not to judge the wisdom of the National Government's

16   policy" (quotation omitted)); *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (indicating that the

17   Supreme Court "express[ed] no view on the soundness of the policy" at issue there); *In re Border

18   Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092, 1102 (S.D. Cal. 2018) (noting that the court

19   "cannot and does not consider whether underlying decisions to construct the border barriers are

20   politically wise or prudent").[3]  Neither does the Court here address any of the other sources of

21   funding that Defendants have identified to pay for the border barrier construction.  Rather, the

22   issues currently before the Court are narrow:  whether Defendants' proposed plan for funding

23

24   [2] The Appropriations Clause of the Constitution provides that "No Money shall be drawn from the
     Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art I., § 9, cl. 7.

25   [3] There also appears to be no dispute between the Executive and Congress that at least some
     border barrier construction is warranted, as Congress has historically appropriated funds for this

26   purpose.  For fiscal year 2018, for example, Congress appropriated $1.571 billion for physical
     barriers and associated technology along the southwest border.  *See California*, No. 19-cv-00872-

27   HSG, Dkt. No. 161; *see also* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F,
     tit. II, § 230(a) 132 Stat. 348 (2018).  And even for fiscal year 2019, the Administration initially
     requested $1.6 billion for border barrier construction, *see California*, No. 19-cv-00872-HSG, Dkt.

28   No. 112-1, Ex. 51 at 58, and Congress appropriated $1.375 billion, *see* CAA, 133 Stat. 13.

border barrier construction under Section 2808 (1) exceeds the Executive Branch's statutory and constitutional authority; (2) is arbitrary and capricious under the Administrative Procedures Act, 5 U.S.C. §§ 551 *et seq.*, ("APA"); and (3) violates the National Environmental Policy Act ("NEPA").

Nevertheless, the Court assesses these issues against a complicated and unprecedented backdrop.  As an initial matter, presidents have only invoked Section 2808 twice since it was enacted in 1982.  *See* Michael J. Vassalotti & Brendan W. McGarry, *Military Construction Funding in the Event of a National Emergency*, Cong. Research Serv., IN11017 (Jan. 11, 2019) at 2–3; Jennifer K. Elsea, Edward C. Lieu, & Jay B. Sykes,  *Can the Department of Defense Build the Border Wall*, Cong. Research Serv., LSB10242 (Feb. 18, 2019) at 3–4.  Of the military construction projects funded through Section 2808, only one was located in the United States, and that project related to securing facilities holding weapons of mass destruction shortly after the 9/11 attacks.  *See, e.g.*, Vassalotti, at 1–3; *see also Sierra Club*, 19-cv-00892-HSG, Dkt. No. 236-5, Ex. 5.  And critically, a president has never before invoked Section 2808 to secure funding for projects that Congress specifically declined to fund in its appropriations judgment.  *Id.*  Yet here the President has been explicit in his intention to obtain funds for border barrier construction, with or without Congress.  *See, e.g.*, *California*, 19-cv-00872-HSG, Dkt. No. 59-4, Exs. 13, 21; *Sierra Club*, 19-cv-00892-HSG, Dkt. No. 36-3, Ex. C.  Accordingly, the President invoked Section 2808 the day after Congress passed the CAA, which provided limited funding for, and contained restrictions regarding funding for, border barrier construction.  *See* CAA, § 230(a)(1), 133 Stat. at 28.

The Court heard argument on these motions on November 20, 2019.  *See California*, 19-cv-00872-HSG, Dkt. No. 250; *Sierra Club*, 19-cv-00892-HSG, Dkt. No. 248.  After carefully considering the parties' arguments, the Court **GRANTS IN PART** Sierra Club Plaintiffs' partial motion for summary judgment; **GRANTS IN PART** State Plaintiffs' partial motion for summary judgment; and **DENIES** Defendants' motions.

//

//

United States District Court
Northern District of California

3

United States District Court
Northern District of California

# I.    BACKGROUND

## A.    Factual Background

The Court has detailed the lengthy history of these cases in its prior orders, and incorporates the factual background in full.  *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 144.  The Court also briefly summarizes and notes subsequent factual developments as relevant to this order.

### i.    Emergency Declaration

Following the longest partial government shutdown in the nation's history, Congress passed the CAA on February 14, 2019, making available $1.375 billion "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector." *See* CAA, § 230(a)(1), 133 Stat. at 28.  On February 15, 2019, the President signed the CAA into law.  *See generally id.*  That same day, the President invoked his authority under the National Emergencies Act ("NEA"), Pub. L. 94–412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601–51), and declared that "a national emergency exists at the southern border of the United States."  *See* Proclamation No. 9844, 84 Fed. Reg. 4,949 (Feb. 15, 2019) ("Proclamation No. 9844").  The proclamation further "declar[ed] that this emergency requires use of the Armed Forces," and made available "the construction authority provided in [S]ection 2808."  *Id.*  When announcing the proclamation, the President explained that he initially "went through Congress" for the $1.375 billion in funding, but was "not happy with it."  *See California*, No. 19-cv-00872-HSG, Dkt. No. 59-4, Ex. 50.

Since that time, Congress has sought to terminate the national emergency on two separate occasions.  On March 14, 2019, Congress passed a joint resolution to terminate the emergency declaration.  *See* H.R.J. Res. 46, 116th Cong. (2019).  On March 15, 2019, the President vetoed the joint resolution.  *See Veto Message to the House of Representatives for H.J. Res. 46*, The White House (Mar. 15, 2019), https://www.whitehouse.gov/briefings-statements/veto-message-house-representatives-h-j-res-46/.  Congress failed to override the President's veto.  *See* 165 Cong. Rec. H2799, H2814–15 (2019).  On September 27, 2019, Congress passed a second joint resolution to terminate the emergency declaration.  *See* S.J. Res. 54, 116th Cong. (2019).  And on

4

United States District Court
Northern District of California

1  October 15, 2019, the President vetoed the second joint resolution.  *See S.J. Res. 54 Veto Message*,

2  The White House (Oct. 15, 2019), https://www.whitehouse.gov/presidential-actions/s-j-res-54-

3  veto-message/ ("S.J. Res. 54 Veto Message").  Again, Congress failed to override the veto.  *See*

4  S.J. Res. 54, 116 Cong. (2019).  Congress has an ongoing obligation to consider whether to

5  terminate the emergency every six months, but the President's declaration of a national emergency

6  remains in effect.[4]  *See* 50 U.S.C. § 1622(a)–(b).

7           **ii.     Military Construction Funds and Diverted Projects**

8           On February 11, 2019, prior to the President's proclamation and invocation of Section

9  2808, the Chairman of the Joint Chiefs of Staff submitted a preliminary assessment to the Acting

10  Secretary of Defense regarding whether and how military construction projects could support the

11  use of the armed forces in addressing a national emergency at the southern border.  *See California*,

12  No. 19-cv-00872-HSG, Dkt. No. 212 ("Administrative Record" or "AR")[5] at 119–124.  The

13  memorandum explained that the Department of Homeland Security ("DHS") identified specific

14  geographic areas in which border barriers could allow Department of Defense ("DoD") personnel

15  and resources "to be employed more efficiently" and "reduce DHS requirements for DoD

16  support."  *Id.*  However, although the President authorized use of military construction funds

17  under Section 2808 in his February 15 proclamation, Defendants did not exercise this authority for

18  several months.

19           Instead, in the intervening months, the Chairman of the Joint Chiefs of Staff submitted a

20  supplemental assessment on May 6, 2019, regarding military construction projects at the southern

21  

22  [4] Under the NEA as initially drafted in 1976, the national emergency would have ended once
    Congress passed the first joint resolution.  The NEA did not require a presidential signature on the

23  joint resolution, nor was it subject to a presidential veto, until the Supreme Court ruled in *INS v.
    Chadha* that the president must have the power to approve or veto such congressional acts.  *See*

24  462 U.S. 919, 944–58 (1983).
    [5] The parties do not oppose the Court's consideration of the administrative record, *see California*,

25  No. 19-cv-00872-HSG, Dkt. Nos. 212-2, 212-3, 212-4, or the Plaintiffs' request to take judicial
    notice of various documents.  The Court finds it may take judicial notice of documents from the

26  administrative record and Plaintiffs' requests that are cited in this order, all of which are:
    (1) statements of government officials or entities that are not subject to reasonable dispute; or

27  (2) other public records and government documents available on reliable internet sources, such as
    government websites.  *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 n.5 (9th

28  Cir. 2018) (taking "judicial notice of government documents, court filings, press releases, and
    undisputed matters of public record").

border.  *See* AR at 59–70.  In the updated memorandum, the Chairman again concluded that such construction "can reasonably be expected to support the use of the armed forces by enabling more efficient use of DoD personnel, and may ultimately reduce the demand for military support over time."  *See id.* at 60.  The Chairman explained that although "any border barrier construction supports the use of the armed forces on the border to some extent," the Joint Chiefs prioritized fifteen projects, totaling $3.6 billion.  *See id.* at 63.  On May 15, 2019, Defendants informed the Court that the Under Secretary of Defense had identified existing military construction project funding to divert for border barrier construction pursuant to Section 2808, but that the Acting Secretary of Defense had "not yet decided to undertake or authorize any barrier construction projects under § 2808."  *See California*, 19-cv-00872-HSG, Dkt. No. 151 at 3.

Then on September 3, 2019, the Secretary of Defense announced that he had decided to authorize eleven specific border barrier construction projects in California, Arizona, New Mexico, and Texas, pursuant to Section 2808.  *See California*, 19-cv-00872-HSG, Dkt. Nos. 206, 206-1, Ex. 1.  In doing so, he reiterated that these projects "will reduce the demand for DoD personnel and assets to other high-traffic areas on the border without barriers."  *See id.*, Dkt. No. 206-1, Ex. 1.  He concluded that "[i]n short, these barriers will allow DoD to provide support to DHS more efficiently and effectively."  *Id.*

Collectively, the eleven projects total $3.6 billion and include 175 miles of border barrier construction across four states.  *Id.*  These projects fall into three categories:

- Two projects on the Barry M. Goldwater Range military installation in Arizona;
- Seven projects on federal public domain land that is under the jurisdiction of the Department of the Interior; and
- Two projects on non-public land that would need to be acquired through either purchase or condemnation before construction could begin.

*See id.*, Dkt. Nos. 206 at 2–4, 206-1, Ex. 1.  The Secretary of Defense authorized the Secretary of the Army "to expeditiously undertake the eleven border barrier military construction projects," including taking the necessary steps to acquire the public domain and non-public land as part of "the Army's real property inventory, either as a new military installation or as part of an existing

United States District Court
Northern District of California

military installation." *See id.*, Dkt. No. 206-1, Ex. 1 at 1; *see also* AR at 3–6, 9–10, 30–31.  That same day, in a briefing on the use of Section 2808, DoD representatives explained that the $3.6 billion would "all go to adding significantly new capabilities to DHS's ability to prevent illegal entry." *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 210-2, Ex. 17 at 5.

Two days later, on September 5, 2019, the Secretary of Defense identified which military construction projects DoD intended to defer in order to fund the border barrier construction projects. *See California*, 19-cv-00872-HSG, Dkt. Nos. 207, 207-1, Ex. 1.  In total, the Secretary of Defense authorized diverting funding from 128 military construction projects, domestically and abroad. *See id.*, Dkt. No. 207-1, Ex. 1.  Sixty-four of the defunded military construction projects are located within the United States; and nineteen projects, totaling over $500 million, are within Plaintiff States California, Colorado, Hawaii, Maryland, New Mexico, Oregon, Virginia, and Wisconsin. *See id.*; *see also id.*, No. 19-cv-00872-HSG, Dkt. No. 220-5, Exs. 2–19.

The Secretary of Defense explained that he sought to identify projects for defunding and deferral based on the projects' timing, and thus the 128 projects "are not scheduled for award until fiscal year 2020 or later." *See* AR at 13.  Doing so, he stated, would "provide [DoD] time to work with [Congress] to determine opportunities to restore funds for these important military construction projects . . . ." *California*, 19-cv-00872-HSG, Dkt. No. 206-2, Ex. 2 at 2; *cf.* S. 1790, 116th Cong. § 2906 ("Replenishment of Certain Military Construction[] Funds").  The deferred projects include rebuilding hazardous materials warehouses at Norfolk and the Pentagon; replacing a daycare facility for servicemembers' children at Joint Base Andrews, which reportedly suffers from "sewage backups, flooding, mold and pests"; and improving security to comply with anti-terrorism and force protection standards at Kaneohe Bay.  *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 202-1, Ex. 1; *id.*, Dkt. No. 210-2, Ex. 18; *see also California*, No. 19-cv-00872-HSG, Dkt. No. 232 (Brief of *Amici Curiae* Iraq and Afghanistan Veterans of America) ("IAVA Brief").

In accordance with the Secretary of Defense's directive, the Secretary of the Army has taken steps over the past few months to obtain administrative jurisdiction over some of the land for the border barrier construction projects.  On October 7, 2019, the Secretary of the Interior

announced the transfer of approximately 560 acres of federal lands to the Department of the Army for a period of three years for border barrier construction in Arizona, California, and New Mexico. *See California*, No. 19-cv-00872-HSG, Dkt. No. 220-5, Ex. 1.  Additionally, on October 8, 2019, the Secretary of the Army issued General Order No. 2019-36, which automatically assigns all land transferred to the Army for Section 2808 border barrier construction projects to the U.S. Army Garrison Fort Bliss, Texas, irrespective of the location of the land.  *See id.*, Dkt. No. 236-7, Ex. 7.

During the hearing on the motions for partial summary judgment, Defendants' counsel also represented to the Court that there have been two contracts awarded related to the border barrier construction projects.  *See California*, No. 19-cv-00872-HSG, Dkt. No. 254 at 81:2–24.  The first contract relates to the projects on the Barry M. Goldwater Range, in Arizona:  that contract was awarded on November 6, 2019, and ground disturbing activity was anticipated to start no earlier than November 27, 2019.  *Id.*  The second contract relates to a project in San Diego County, California:  that contract was awarded on November 19, 2019, and ground disturbing activity was anticipated to start no earlier than December 9, 2019.  *Id.*

## B.    Procedural History

Following the passage of the CAA and the President's national emergency declaration in February 2019, the State and Sierra Club Plaintiffs filed suit challenging Defendants' anticipated diversion of federal funds for border barrier construction pursuant to several statutory provisions. These include reallocating funds from the Treasury Forfeiture Fund; DoD's Appropriations Act of 2019 under Section 8005 and 10 U.S.C. § 284; and DoD appropriations for military construction projects under Section 2808.  *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 36-7, Ex. G at 2–4; *see also id.*, Dkt. No. 64-8, ¶¶ 5–6.

The Court first preliminarily enjoined Defendants' use of funds for two border barrier construction projects in New Mexico and Arizona under Section 8005.  *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 144.  The Court reasoned that Plaintiffs were likely to show that (1) the language and purpose of Section 8005 precluded Defendants' transfer and use of funds for construction of border barriers because Congress had already explicitly denied those requested funds; (2) the need for such funds was not unforeseen as the Administration had requested such

funding as early as 2018; and (3) Defendants' proposal likely would violate the Constitution's separation of powers principles to the extent it bypassed Congress' appropriations authority. *Id.* At the time, Sierra Club Plaintiffs also sought a preliminary injunction to preclude Defendants' proposed use of Section 2808. *See id.*, Dkt. No. 29 at 13–15, 23–25. However, the Court found that Plaintiffs could not show irreparable harm as needed to warrant an injunction because as of May 2019, Defendants had not yet made a final decision as to whether to use Section 2808 funds. *Id.*, Dkt. No. 144 at 51–53.

The Court subsequently affirmed its ruling on Defendants' use of Section 8005, granting in part the motions for partial summary judgment filed by California, New Mexico, and the Sierra Club Plaintiffs, and denying Defendants' motions for partial summary judgment. *See California*, No. 19-cv-00872-HSG, Dkt. No. 185; *Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 185. The Court entered a permanent injunction, prohibiting Defendants from taking any action to construct a border barrier in the six sectors that Defendants identified in New Mexico, Arizona, and California, using funds reprogrammed by DoD under Section 8005. *Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 185 at 10.

Following the Court's summary judgment orders, Defendants filed an emergency application with the Ninth Circuit for a stay of the injunction. On July 3, 2019, the Ninth Circuit motions panel denied the stay application, finding that Defendants' border barrier construction was not authorized by any statutory appropriation, such that the proposed reprogramming and use of these funds violated the Appropriations Clause. *See Sierra Club v. Trump*, 929 F.3d 670, 676–77 (9th Cir. 2019). The motions panel further held—over Defendants' objection—that Plaintiffs have an equitable cause of action to challenge Defendants' funding proposal as unconstitutional, and that Plaintiffs satisfied any "zone of interests" test that may apply to their claim. *See id.* at 694–704; *see also* Section III.A below.

On July 26, 2019, the Supreme Court stayed the permanent injunction pending resolution of the government's appeal before the Ninth Circuit and any subsequent writ of certiorari. *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019). In the one-paragraph decision, the Supreme Court stated that "the Government has made a sufficient showing at this stage that the plaintiffs have no

United States District Court
Northern District of California

cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Id.* The Supreme Court, however, provided no further explication of its reasoning, and the appeal before the Ninth Circuit regarding Section 8005 remains pending.

In the interim, the parties agreed to stay the summary judgment briefing schedule as to Section 2808 and the Treasury Forfeiture Fund until the Acting Secretary of Defense and U.S. Customs and Border Protection ("CBP"), respectively, reached a final decision to fund specific barrier construction projects under these provisions. *See California*, No. 19-cv-00872-HSG, Dkt. Nos. 199, 200; *Sierra Club*, No. 19-cv-00892-HSG, Dkt. Nos. 191, 197. Because the Secretary of Defense has since announced his authorization for border barrier construction projects pursuant to Section 2808, as detailed in Section I.A.ii above, the parties now move for partial summary judgment as to this proposal.

## II.      LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). If a court finds that there is no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment. Fed. R. Civ. P. 56(a).

## III.     DISCUSSION

### A.       Plaintiffs' Cause of Action

As a threshold matter, Defendants contend that Plaintiffs lack a cause of action through which they may challenge the proposed use of military construction funds under Section 2808.

United States District Court
Northern District of California

1  They argue that Plaintiffs may not seek equitable relief through an implied cause of action under

2  the Constitution, and that Plaintiffs fall outside the zone of interests protected by Section 2808 and

3  the CAA.  As Defendants acknowledge, they raised the same arguments before this Court and the

4  Ninth Circuit motions panel in the context of Plaintiffs' challenge to funding a border wall using

5  Section 8005.  In response, the Ninth Circuit engaged in a detailed discussion—and rejection—of

6  each point, concluding that "Plaintiffs have an avenue for seeking relief."  *See Sierra Club*, 929

7  F.3d at 694–704; *see also Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 245 (Brief of *Amici*

8  *Curiae* Federal Courts Scholars).

9      *First*, the Ninth Circuit held that Plaintiffs could challenge the reprogramming of funds

10  under Section 8005 "through an equitable action to enjoin unconstitutional official conduct."

11  *Sierra Club*, 929 F.3d at 694.  Plaintiffs' argument there, as here, is that Defendants' attempt to

12  reprogram funds for border barrier construction violates the Appropriations Clause, and thus

13  separation of powers principles, because "Defendants lack any background constitutional authority

14  to appropriate funds."  *See id.* at 696.  The Ninth Circuit confirmed that such a claim is

15  "fundamentally a constitutional one," and "Plaintiffs may seek equitable relief to remedy an

16  alleged constitutional violation."  *Id.* at 695–97.  That Defendants rely on Section 8005 (or here,

17  Section 2808) as the basis for their efforts to reallocate funds for border barrier construction does

18  not convert a constitutional claim into a statutory one.  *See id.* at 697 ("It cannot be that simply by

19  pointing to any statute, governmental defendants can foreclose a constitutional claim.").

20      *Second*, the Ninth Circuit expressed "doubt[] that any zone of interests test applies to

21  Plaintiffs' equitable cause of action to enjoin a violation of the Appropriations Clause."  *Id.* at 700.

22  A zone of interests test is used "to 'determine, using traditional tools of statutory interpretation,

23  whether a legislatively conferred cause of action encompasses a particular plaintiff's claim.'"  *Id.*

24  (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014)).  The

25  test "ask[s] whether the plaintiff's 'interests fall within the zone of interests protected by the law

26  invoked.'"  *Id.* (quoting *Lexmark*, 572 U.S. at 129).  The Ninth Circuit highlighted the problems

27  with applying a zone of interests test to Plaintiffs' constitutional claim:  "[W]here the very claim is

28  that no statutory or constitutional provision authorized a particular governmental action, it makes

little sense to ask whether any statutory or constitutional provision was written for the benefit of any particular plaintiffs." *Id.* at 701 (emphasis omitted). Moreover, "[b]ecause the Constitution was not created by any act of Congress, it is hard to see how the zone of interests test would even apply." *Id.* at 702. Thus, the Court concluded that "it is likely sufficient here that Plaintiffs would be concretely injured by the alleged Appropriations Clause violation, and that no zone of interests test applies to their claim." *Id.* at 701.

*Third*, even if a zone of interests test *did* apply to such a constitutional claim, the Ninth Circuit explained that the proper inquiry is whether Plaintiffs fall within the zone of interests of the constitutional provision, and not the statute Defendants raise in defense. *Id.* at 703–04. The Court explained that "individuals, too, are protected by the operations of separation of powers and checks and balances," and thus, Plaintiffs' contention "that their rights or liberties were infringed by a violation of the Appropriations Clause . . . falls within any zone of interests required to enforce that clause's provisions." *Id.* at 704 (quotation omitted).

### i.   *Miller v. Gammie*

Defendants urge the Court to disregard the Ninth Circuit's reasoning in light of the Supreme Court's opinion staying the permanent injunction as to Section 8005. *See Trump*, 140 S. Ct. at 1. Defendants argue that the "Supreme Court decision sends a strong signal" that they ultimately will prevail on the claim that their exercise of authority under Section 8005 may not be challenged by these Plaintiffs. *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 236 at 11. This claimed "strong signal" is based on a sentence in the Supreme Court's stay order stating that "the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *See Trump*, 140 S. Ct. at 1.[6]  However, notwithstanding Defendants' characterization of this "signal," the Court may not

---

[6] The October 15, 2019, veto message went further, claiming that the proclamation itself "has withstood judicial challenge in the Supreme Court." *See* S.J. Res. 54 Veto Message. This is inaccurate: the injunction that was the subject of the stay involved a funding source that did not depend on the emergency declaration, and the validity of the proclamation has never been addressed by the Ninth Circuit or the Supreme Court. *See Sierra Club*, 929 F.3d at 686 (explaining that the Ninth Circuit's opinion "does not address any sources of funds Defendants might use to build a border barrier except those reprogrammed under section 8005"), 679, & n.1 (explaining that DoD's proposed use of funds reprogrammed under Section 8005 to provide

United States District Court
Northern District of California

so readily disregard the Ninth Circuit's opinion.  The Ninth Circuit has cautioned that only in cases of "clear irreconcilability" can district courts "consider themselves bound by the intervening higher authority and reject the prior opinion of [the Ninth Circuit] as having been effectively overruled."  *Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc).  "This is a high standard," which "requires [the district court] to look at more than the surface conclusions of the competing authority."  *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (quotation omitted).

At this stage, the Court can only speculate regarding the reasoning underlying the stay, including what it means for how the Supreme Court may ultimately assess the merits of these two cases.[7]  As Justice Breyer explained, "[t]his case raises novel and important questions about the ability of private parties to enforce Congress' appropriations power."  *Trump*, 140 S. Ct. 1 (Breyer, J., concurring in part and dissenting in part).  Because the Supreme Court opinion does not address these questions directly, the Court cannot find that it is "clearly irreconcilable with the reasoning or theory" in the Ninth Circuit panel opinion.  *See Miller*, 335 F.3d at 899; *accord Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1074 (9th Cir. 2018) (holding that even where a prior panel opinion's "reasoning would be suspect today, [] it is not clearly irreconcilable with intervening higher authority"); *Doe v. Trump*, 284 F. Supp. 3d 1182, 1184–85 (W.D. Wash. 2018) ("[T]his court is not at liberty to simply ignore binding Ninth Circuit precedent based on Defendants' divination of what the Supreme Court was thinking when it issued the stay orders . . . .").  The Ninth Circuit's opinion in *Sierra Club v. Trump* therefore controls this Court's analysis.

### ii.   Zone of Interests

Following the Ninth Circuit's reasoning, as it must, the Court finds that Plaintiffs may challenge Defendants' funding for border barrier construction under Section 2808.  As with their

---

support for other agencies under section 284 "does not require the declaration of a national emergency").

[7] During oral argument on the motions, counsel for Defendants also acknowledged that he did not know the precise grounds on which the Supreme Court stayed the permanent injunction.  Counsel opined that the majority could have "meant there is not a cause of action period, or there's not a cause of action for these plaintiffs because of the zone of interests test" applicable to their claim.  *See California*, No. 19-cv-00872-HSG, Dkt. No. 254 at 53:17–20.

United States District Court
Northern District of California

1   challenge to Defendants' use of funds under Section 8005, Plaintiffs' claim that Defendants' use

2   of military construction authority under Section 2808 violates the Appropriations Clause is

3   "fundamentally a constitutional" claim. *See Sierra Club*, 929 F.3d at 696–97. And to the extent

4   Plaintiffs must fall within the zone of interests of the Appropriations Clause to assert this claim,

5   *see id.* at 703–04, the Court finds this "low bar" easily satisfied here. *See Cook v. Billington*, 737

6   F.3d 767, 771 (D.C. Cir. 2013) (Kavanaugh, J.) ("A plaintiff with Article III standing satisfies the

7   requirement unless his interests are so marginally related to or inconsistent with the purposes

8   implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the

9   suit." (quotation omitted)).

10         The Court first looks to the fundamental interests protected by the Appropriations Clause,

11  and observes that the importance of those interests cannot be overstated. The Appropriations

12  Clause "is particularly important as a restraint on Executive Branch officers: If not for the

13  Appropriations Clause, the Executive would possess an unbounded power over the public purse of

14  the nation; and might apply all its monied resources at his pleasure." *U.S. Dep't of Navy v. Fed.*

15  *Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.) (quotation omitted).

16  As such, members of the public, and not just Congress, have an interest in ensuring that the

17  Constitution's checks on executive power are upheld. As the Ninth Circuit noted, "[t]he

18  Appropriations Clause is a vital instrument of separation of powers, which has as its aim the

19  protection of individual rights and liberties—not merely separation for separation's sake." *Sierra*

20  *Club*, 929 F.3d at 704. Both State and Sierra Club Plaintiffs assert that if Defendants proceed with

21  their proposed spending plan in contravention of Congress' appropriations judgment, they will

22  suffer injury to their "environmental, professional, aesthetic, and recreational interests." *Id.* In

23  short, the Court finds that Plaintiffs have a cause of action to challenge Defendants' invocation of

24  Section 2808 as unconstitutional, and proceeds to analyze this claim below.

25      **B.    Section 2808**

26         The Ninth Circuit's opinion in *Sierra Club v. Trump* further guides the Court's analysis of

27  Plaintiffs' constitutional claim. *See Sierra Club*, 929 F.3d at 689–92. Plaintiffs' claim—and the

28  legal theory undergirding both cases—is that Defendants seek to circumvent Congress'

appropriations power, and its judgment to provide the Administration with limited funds for specified and limited border barrier construction, by seeking funding through alternative channels. Defendants' counsel characterized the Administration's approach as "a full-court press," meaning they are using any means that they contend are available to them to fund a border wall. *See California*, No. 19-cv-00872-HSG, Dkt. No. 254 at 73:5–19. Although Plaintiffs appear to challenge all funding for border barrier construction outside of the CAA, for purposes of this order, Defendants contend that in Section 2808, Congress allowed Defendants to make this reallocation from existing military construction projects to the border barrier construction. Because Congress only exercises its appropriations power through statutes, the Ninth Circuit accordingly focused its analysis on the text and purpose of Defendants' asserted defense. *Sierra Club*, 929 F.3d at 689–92. The critical inquiry, therefore, is whether Section 2808 authorizes this reallocation. If it does not, "then Defendants are acting outside of any statutory appropriation and are therefore spending funds contrary to Congress's appropriations decisions." *Id.* at 689. The Court therefore analyzes whether Defendants' conduct falls within the statutory authority provided by Section 2808.

Under Section 2808, the Secretary of Defense may use funds previously appropriated for other projects in limited circumstances where three factors are satisfied: (1) there is a national emergency that requires use of the armed forces, and (2) "military construction projects" are (3) "necessary to support such use of the armed forces." *See* 10 U.S.C. § 2808(a). Plaintiffs challenge all three conditions, arguing that Defendants fail to satisfy any of them.

### i. Justiciability

As a threshold matter, Defendants assert that the Court may not assess whether they have satisfied the statute's requirements, because their decision to undertake military construction pursuant to Section 2808 was entirely committed to agency discretion. *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 236 at 15–16, 19–20. Defendants reason that there is no meaningful standard against which the Court can determine whether the President or Secretary of Defense exceeded the authority granted by Congress by declaring a national emergency that required use of the armed forces; authorizing use of Section 2808; or undertaking military construction projects

under Section 2808. *Id.* In short, Defendants contend that the President and Secretary of Defense have unreviewable discretion, under both the NEA and Section 2808, to determine whether an emergency exists that meets the statutory criteria. Plaintiffs indicated during oral argument that they are not challenging the President's emergency declaration per se, but rather whether it meets the statutory criteria for an emergency under Section 2808. *See California*, No. 19-cv-00872-HSG, Dkt. No. 254 at 12:6–16:12. The Court addresses that narrow challenge as part of its statutory analysis in Section III.B.ii. Here, however, the Court cabins its analysis to Defendants' argument that their invocation of Section 2808 itself is committed to agency discretion by law, and as such, is nonjusticiable. *See* 5 U.S.C. § 701(a)(2). The Court disagrees that its ability to review Defendants' conduct is so circumscribed.

As the Ninth Circuit has repeatedly held, "[t]he default rule is that agency actions are reviewable under federal question jurisdiction, pursuant to 28 U.S.C. § 1331 . . . even if no statute specifically authorizes judicial review." *See Perez v. Wolf*, No. 18-35123, 2019 WL 6224421, at *5 (9th Cir. Nov. 11, 2019) (quoting *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 890 (9th Cir. 2004)). A decision is generally committed to agency discretion by law, and thus not subject to judicial review, when a court would have "no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at *5 (quotation omitted). This is rare. "Only where there is truly 'no law to apply' ha[s] [the Ninth Circuit] found an absence of meaningful standards of review." *Id.* at *6 (quoting *Spencer Enterprises, Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003)). Courts must assess "the language of the statute and whether the general purposes of the statute would be endangered by judicial review.'" *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015) (quotation omitted).

Engaging in this exercise, the Ninth Circuit recently explained that "courts routinely treat discretion-laden standards as providing 'law to apply.'" *Perez*, 2019 WL 6224421, at *8–*9 (collecting cases). In *Perez v. Wolf*, the Ninth Circuit held that U-Visa determinations made by the United States Citizenship and Immigration Service ("USCIS") are subject to judicial review because the statutory framework provides a meaningful standard against which to assess the agency's exercise of discretion. *Id.* at 15–16. The statutory provision requires that a U-Visa

applicant:

> (1) has suffered "substantial physical or mental abuse" as a result of having been a victim of qualifying criminal activity; (2) "possesses information" about qualifying criminal activity; and (3) "has been helpful, is being helpful, or is likely to be helpful" to an authority "investigating or prosecuting" qualifying criminal activity.

*Id.* at *8 (citing 8 U.S.C. § 1101(a)(15)(U)(i)).  Although terms such as "substantial" and "helpful" contain an element of subjectivity, the Ninth Circuit nevertheless found that they constituted "law to apply."  *Id.*

The Court finds that Section 2808 likewise provides "meaningful standards" for reviewing Defendants' compliance with its conditions.  The diversion of funds from existing military construction projects is only authorized for (1) "military construction projects" that are (2) "necessary to support such use of the armed forces."  *See* 10 U.S.C. § 2808(a).  Congress defined military construction as "any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land or construction of a defense access road."  *Id.* § 2801(a).  And Congress defined "military installation," in turn, as "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the Secretary of a military department or the Secretary of Defense, without regard to the duration of operational control."  *Id.* § 2801(c)(4).  Section 2808 therefore establishes statutory standards that constrain its use.  And applying these standards to determine "whether the reprogramming of funds is consistent with the Appropriations Clause and [Section 2808] . . . is a familiar judicial exercise."  *See Sierra Club*, 929 F.3d at 687 (quotation omitted).

That the statute conditions authorization on the existence of a national emergency and the use of the armed forces does not, on its own, convert the legal exercise of statutory interpretation into a purely political one.  The Ninth Circuit's opinion in *United States v. Spawr Optical Research, Inc.*, is illustrative.  In *Spawr*, President Gerald Ford relied on the continued existence of two national emergencies to forbid the shipment of certain strategic items to foreign countries

under the Trading with the Enemy Act ("TWEA").  685 F.2d 1076, 1079–80 (9th Cir. 1982).

During a national emergency, TWEA empowered the president to "regulate, . . . prevent or

prohibit . . . any exportation of . . . or transactions involving[] any property in which any foreign

country . . . has any interest."  50 U.S.C. § 4305(b)(1)(B).  The Ninth Circuit distinguished

between "the essentially political questions surrounding the declaration or continuance of a

national emergency," on the one hand, and the legal question of "whether the actions taken

pursuant to a national emergency comport with the power delegated by Congress," on the other.

*See Spawr*, 685 F.2d at 1080–81.  The Ninth Circuit held that courts "are free to review" whether

the Executive Branch has legal authority to act, and went on to determine whether the regulations

at issue were rationally related to the emergencies.  *See id.* at 1081 (concluding that "President

Ford's effort to limit the exportation of strategic items clearly had a rational relationship to the

prevention of aggression and armed conflict").

The Court fully appreciates that "[n]ational-security policy is the prerogative of the

Congress and President," and that their military judgments are due deference.  *See Ziglar v.*

*Abbasi*, 137 S. Ct. 1843, 1861 (2017); *see also Rostker v. Goldberg*, 453 U.S. 57, 66 (1981)

(acknowledging "a healthy deference to legislative and executive judgments in the area of military

affairs").  But "the judiciary appropriately exercises its constitutional function where the question

is whether Congress or the Executive is aggrandizing its power at the expense of another branch."

*Sierra Club*, 929 F.3d at 687 (quotation omitted).  As the Ninth Circuit explained, "'courts cannot

avoid their responsibility merely because the issues have political implications.'"  *Id.* (quoting

*Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012)).  The Court accordingly may, and must,

determine whether Defendants have exceeded the limits set by Congress regarding spending under

Section 2808, while affording both branches due deference.  As summarized by the Ninth Circuit

in another case in which the Executive Branch invoked national security concerns in support of its

nonjusticiability argument:

> To declare that courts cannot even look to a statute passed by
> Congress to fulfill international obligations turns on its head the role
> of the courts and our core respect for a co-equal political branch,
> Congress.  Interpreting and applying [the statute at issue] does not

18

prevent the military from planning and building bases.  It requires only that the executive take into account certain procedural obligations, required by Congress, before it takes steps forward.  The courts may then look to whether the executive complied with its obligations.  We may consider national security concerns with due respect when the statute is used as a basis to request injunctive relief. This is not a grim future, and certainly no grimmer than one in which the executive branch can ask the court for leave to ignore acts of Congress.

*Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 825–26 (9th Cir. 2017).

### ii.   Statutory Interpretation

Having found that Section 2808 provides meaningful standards against which the Court may analyze Defendants' conduct under the statute, the Court reviews their compliance with those standards.  The Court provided its initial impression as to Defendants' compliance with Section 2808 in its preliminary injunction order in *Sierra Club v. Trump*.  *See Sierra Club*, 19-cv-00892-HSG, Dkt. No. 144 at 42–46.  At the time, the Court expressed reservations that "border barrier construction could reasonably constitute a 'military construction project' such that Defendants' invocation of Section 2808 would be lawful," and also raised concerns that Defendants' interpretation of Section 2808 would cede unbounded authority to Defendants to redirect military construction funds.  *See id.* at 42–43.  Now that Defendants have specified how they intend to use Section 2808, the Court confirms its preliminary analysis, finding that the eleven border barrier projects are not  "military construction projects" that are "necessary to support such use of the armed forces."  *See* 10 U.S.C. § 2808(a).

### a.   Emergency Requiring Use of the Armed Forces

Sierra Club Plaintiffs alone challenge the President's February 15 declaration of a national emergency to the extent that the President simultaneously concluded that this emergency required use of the armed forces.[8]  *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 210 at 9–11.  Sierra Club Plaintiffs couch this as a statutory condition, and thus as a matter of statutory interpretation under Section 2808 rather than one of policy or politics.  The Court is not persuaded.

---

[8] State Plaintiffs, on the other hand, explicitly note that for purposes of their motion for partial summary judgment they are not challenging the President's declaration of a national emergency. *See California*, No. 19-cv-00872-HSG, Dkt. No. 220 at 8.

19

1    Sierra Club Plaintiffs assert that there is no true emergency at the southern border, and that

2  even if there were, DHS, not DoD, has jurisdiction over protecting the nation's borders.  In

3  support of their challenge, Sierra Club Plaintiffs point to the text of the proclamation itself, which

4  states in relevant part:

5           [R]ecent years have seen sharp increases in the number of family units
          entering and seeking entry to the United States and an inability to
6           provide detention space for many of these aliens while their removal
          proceedings are pending . . . [T]he Department of Defense has
7           provided support and resources to the Department of Homeland
          Security at the southern border.  Because of the gravity of the current
8           emergency situation, it is necessary for the Armed Forces to provide
          additional support to address the crisis.
9

10  Proclamation No. 9844.  Plaintiffs contend that "unarmed parents and children seeking refuge do

11  not require a military response."  *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 210 at 11.

12  Plaintiffs also point to comments made by DoD officials outside the proclamation that the

13  situation at the border is "not a military threat."  *See, e.g.*, *id.*, Dkt. No. 210-2, Ex. 15 at 50–52

14  (Acting U.S. Secretary of Defense Shanahan and General Joseph Dunford concurring that the

15  "situation on the southern border" is a "security challenge" and "not a military threat"); Ex. 16 at 2

16  (Admiral Michael M. Gilday, Operations Director of the Joint Staff, stating that "[n]one of the

17  capabilities that we are providing are combat capabilities" and "[i]t's not a war zone along the

18  border").  Rather, in Plaintiffs' view, Defendants are using DoD's temporary and limited support

19  of DHS—the civilian agency that Congress has tasked with border security and immigration

20  enforcement—to justify funding the border barriers that DHS has sought to build.  *See, e.g.*, 6

21  U.S.C. §§ 202, 251; 8 U.S.C. §§ 1103(a)(5), (a)(10).

22    At bottom, Plaintiffs' theory is premised on the idea that the proclamation was designed

23  solely to avoid Congress' appropriations judgment and that the emergency is a convenient pretext.

24  The Court acknowledges that both the timing and nature of the emergency raise obvious questions.

25  The Administration repeatedly and unsuccessfully sought appropriations from Congress for border

26  barrier construction.  When Congress and the President could not agree on such funding, the

27  President suggested his willingness to declare a national emergency if Congress refused to

28  appropriate the money he requested.  *See, e.g.*, *California*, 19-cv-00872-HSG, Dkt. No. 59-4, Ex.

United States District Court
Northern District of California

21.  When asked about his threshold for declaring an emergency, the President stated, "[m]y threshold will be if I can't make a deal with people that are unreasonable."  *See* George Sargent, *Trump: I have the 'absolute right' to declare a national emergency if democrats defy me*, Wash. Post (Jan. 9, 2019), https://tinyurl.com/y5f5eqwg.  And the President then declared the national emergency one day after Congress passed the CAA, which limited appropriations for border barrier construction.  *See* Proclamation No. 9844.  In announcing the national emergency declaration, the President explained, "I could do the wall over a longer period of time.  I didn't need to do this.  But I'd rather do it much faster. . . .  And I think that I just want to get it done faster, that's all."  *See California*, No. 19-cv-00872-HSG, Dkt. No. 59-4, Ex. 50.

All this said, there is no precedent for a court overriding a President's discretionary judgment as to what is and is not an emergency.  That one of the conditions to invoke Section 2808 is that the emergency require use of the armed forces does not alter the nature of the inquiry.  Sierra Club Plaintiffs are still asking the Court to evaluate the "policy choice[] and value determination[]" underlying the President's emergency proclamation.  *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986).  Plaintiffs have not cited, and the Court has not found, any case in which a court has assessed the nature and validity of an emergency proclamation.  *Cf. California*, No. 19-cv-00872-HSG, Dkt. No. 254 at 12:6–16:12.  To the contrary, as discussed in Section III.B.i above, the Ninth Circuit has characterized "the declaration or continuance of a national emergency" as an "essentially political question[]."  *Spawr*, 685 F.2d at 1080–81.  The Court accordingly finds that whether the national emergency truly exists, and requires use of the armed forces, are nonjusticiable political questions.

The Court nevertheless acknowledges the significant constitutional tension inherent in the President's invocation of a national emergency under the NEA for the avowed purpose of accessing money to fund projects that Congress expressly considered and declined to fund.  It is apparent that at the time Congress enacted the NEA it did not envision the statute would (or even could) be used to circumvent the will of Congress.  As the Court previously explained, Congress initially reserved the right to terminate a national emergency with a simple majority and without the opportunity for a presidential veto.  *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 144 at

13–14, & n.8; *see also id.*, Dkt. No. 219 at 10–15 (Brief of *Amici Curiae* Brennan Center for Justice and the Cato Institute) ("Brennan Center Brief").  Thus, prior to the Supreme Court's opinion in *INS v. Chadha*, it would have been impossible for the President to use the NEA to somehow bypass the will of a congressional majority.  *See* 462 U.S. at 944–58; *see also Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 219 (Brennan Center Brief) at 15 ("The notion that Congress intended the NEA as an affirmative delegation of unlimited discretion to the president— one that would allow the president to circumvent the will of Congress on specific policy proposals—is contradicted by this and every other aspect of the legislative history.").

Still, Congress is not without recourse.  Under the NEA, "[a]ny national emergency declared by the President in accordance with this subchapter shall terminate if . . . there is enacted into law a joint resolution terminating the emergency."  50 U.S.C. § 1622(a)(1).  Moreover, the NEA not only allows, but in fact obligates, Congress to "consider a vote on a joint resolution to determine whether that emergency shall be terminated" every six months.  *See id.* § 1622(b).  Congress thus has the authority to monitor and if needed, reverse, the President's determination that circumstances at the southern border constitute a national emergency.  That Congress has so far been unable to override the President's veto with a two-thirds majority vote does not somehow transform this fundamentally political question into a legal one.  Because the national emergency remains in effect, the Court may not opine as to whether the President properly invoked the NEA by declaring a national emergency requiring the use of the armed forces at the southern border.

### b.  Military Construction Project

Next, the parties disagree as to whether the border barrier construction projects constitute "military construction projects" for purposes of Section 2808.[9]  As noted above, Congress defined the term "military construction" to "include[] any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy

---

[9] During the hearing, Sierra Club Plaintiffs explained that they are not challenging whether the two projects on the Barry M. Goldwater Range, an existing military installation, constitute military construction for purposes of Section 2808.  *See California*, No. 19-cv-00872-HSG, Dkt. No. 254 at 85:12–19.  Defendants have identified these two projects as Yuma Project 2 and Yuma Project 10/27.  But Plaintiffs still challenge whether any of the eleven projects are necessary to support use of the armed forces.  *See* Section III.B.ii.c.

United States District Court
Northern District of California

temporary or permanent requirements, or any acquisition of land or construction of a defense access road . . . ." 10 U.S.C. § 2801(a).  Because it is apparent that border barrier construction constitutes "construction," the critical question before the Court is whether the eleven proposed projects are being "carried out with respect to a military installation." *Id.*; *see also id.* § 2801(b) ("A military construction project includes all military construction work . . . necessary to produce a complete and useable facility or a complete and usable improvement to an existing facility.").

A "military installation," in turn, "means a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department . . . ." *Id.* § 2801(c)(4). Defendants do not attempt to characterize the projects as either a "base, camp, post, station, yard, [or] center." *See id.* § 2801(c)(4).  Instead, they reason that the 175 miles of proposed border barrier construction fall within the "other activity" definition because DoD has obtained—or will obtain—administrative jurisdiction over the land for these projects and assign it to Fort Bliss in Texas. *See California*, No. 19-cv-00872-HSG, Dkt. No. 236-7, Ex. 7 (General Order No. 2019-36).  By obtaining administrative jurisdiction over the land in this way, they conclude, all eleven projects will be part of an existing military installation. *Id.*  In other words, Defendants contend that "military installation" is "inclusive of [any] activities under the jurisdiction of the Secretary of a military department." *See id.*, Dkt. No. 236 at 13.  The Court finds several flaws with this expansive interpretation.

*First*, Defendants' interpretation requires the Court to disregard the plain language of the statute.  Defendants would have the Court transform the definition of "military installation" to include not just "other activity," but "*any* activity" under military jurisdiction.  That simply is not what the statute says.[10]  As the Supreme Court has noted, when interpreting a statute, context matters.  *See, e.g.*, *McDonnell v. United States*, 136 S. Ct. 2355, 2368 (2016) ("[W]e look to the

---

[10] In its opposition to Sierra Club Plaintiffs' motion for a preliminary injunction as to Section 2808, *see Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 64 at 21–23, Defendants initially posited that the as-yet unidentified border barrier projects would fall within the "other activity" category. Applying traditional tools of statutory construction, the Court explained that "a base, camp, post, station, yard, [and] center" are all discrete and traditional military locations, and "other activity" must refer to similar locations.  The Court incorporates that reasoning again here, in all respects. *See id.*, Dkt. No. 144 at 44–45.

context in which the words appear."); *see also ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1210 (9th Cir. 2015) ("[T]he plain language of a statute should be enforced according to its terms, in light of its context.").  And here, as the Court cautioned before, the terms "base, camp, post, station, yard, [or] center" are not mere surplusage to ignore, but rather supply meaning and provide boundaries to the term "other activity."  *See, e.g.*, *McDonnell*, 136 S. Ct. at 2369 (explaining that canons of construction are "wisely applied . . . to avoid the giving of unintended breadth to the Acts of Congress" (quotation omitted)); *Yates v. United States*, 135 S. Ct. 1074, 1087 (2015) ("Had Congress intended 'tangible object' in § 1519 to be interpreted so generically as to capture physical objects as dissimilar as documents and fish, Congress would have had no reason to refer specifically to 'record' or 'document.'  The Government's unbounded reading of 'tangible object' would render those words misleading surplusage."); *CSX Transp., Inc. v. Ala. Dept. of Revenue*, 562 U.S. 277, 295 ("We typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless.").  Defendants do not even attempt to explain how the proposed projects are similar in nature or scope to "a base, camp, post, station, yard, [or] center," 10 U.S.C. § 2801(c)(4), and the Court finds that they are not.

Rather than engaging with the text of the statute, Defendants rely heavily on the Supreme Court's decision in *United States v. Apel*, 571 U.S. 359, 368 (2014).  There, the Supreme Court noted that "'military duty' and 'military protection' are synonymous with the exercise of military jurisdiction," and that the term "'military installation' is used [that way] elsewhere in federal law." *Id.* (emphasis omitted).  The Supreme Court, however, was not analyzing the definition of military installations under Section 2808 or 10 U.S.C. § 2801(c)(4).  The case involved an entirely different statute under Title 18, which imposed a criminal fine on anyone who reentered a "military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation" after being removed.  *See* 18 U.S.C. § 1342.  The question before the Court in *Apel* was whether a public easement on an Air Force base was still considered part of the military installation.  The Court rejected "[t]he use-it-or-lose-it rule" that § 1342 only applied where the military had exclusive use, possession, or control over the property in question.  *Apel*, 571 U.S. at 372.  In doing so, the Court cited the language of 10 U.S.C. § 2801(c)(4), but did not engage in any

United States District Court
Northern District of California

1    analysis of its possible limitations.  *See id.* at 368.  Indeed, to the extent *Apel* provides any insight

2    for the interpretation of Section 2808, it is simply that statutes must be read in context, and with an

3    eye toward common sense.  *Id.* at 369–72.

4            Defendants also suggest that Congress intended "military installation" in Section 2808 to

5    be read broadly because elsewhere it defined the term differently.  Under 10 U.S.C. § 2687(g)(1),

6    for example, Congress defined "military installation" in the context of base closures to "mean[] a

7    base, camp, post, station, yard, center, homeport facility for any ship, or other activity under the

8    jurisdiction of the Department of Defense," but excluded "any facility used primarily for civil

9    works, rivers and harbors projects, or flood control projects."  *Id.*  The Court acknowledges that

10   Congress may provide different definitions in different statutes, but this does not open the door to

11   a limitless definition of military installation in Section 2808.  Again, part of the inquiry is context

12   and congressional intent, but Defendants do not engage with either.

13           *Second*, Defendants' interpretation would grant them essentially boundless authority to

14   reallocate military construction funds to build anything they want, anywhere they want, provided

15   they first obtain jurisdiction over the land where the construction will occur.  Although Defendants

16   attempt to reassure the Court that they "are *not* arguing that the entire southern U.S. border"

17   constitutes a military installation for purposes of Section 2808, *see California*, No. 19-cv-00872-

18   HSG, Dkt. No. 236 at 13, there is nothing in their interpretation to preclude them from doing so.

19   When asked during the hearing whether Defendants' reading of Section 2808 had a limiting

20   principle, counsel could not articulate one.  *See id.*, Dkt. No. 254 at 62:21–64:3.

21           The scale of what is possible under this reading is immense.  The eleven projects at issue

22   in the instant motions are illustrative.  Defendants acknowledge that nine of the proposed projects

23   are on federal public domain or non-public land, not previously under military jurisdiction.  *See*

24   *id.*, Dkt. Nos. 206 at 2–4, 206-1, Ex. 1.  These nine projects, which cover 140 of the 175 total

25   miles of border barrier construction at issue, are located on land spanning several hundred miles in

26   Arizona, California, New Mexico, and Texas.  But Fort Bliss, the military installation to which

27   Defendants will administratively assign the land, is located near El Paso, Texas.  Defendants

28   suggest that projects located several hundred miles away from Fort Bliss are nevertheless "carried

25

out with respect to [that] military installation," provided Defendants complete the right paperwork. *See* 10 U.S.C. § 2801(a).[11]  Under this interpretation, construction can be considered "carried out with respect to a military installation" even if it is otherwise wholly unrelated to the installation's functions, purpose, or even geography.  Indeed, Defendants do not offer any substantive connection between the proposed construction here and Fort Bliss.  Instead they acknowledge that the construction sites are assigned administratively to Fort Bliss "for real property accountability purposes."  *See California*, No. 19-cv-00872-HSG, Dkt. No. 251 at 4; *see id.*, Dkt. No. 251-1 at ¶¶ 7–11.  They further state that "Fort Bliss is the largest, most capable Active Army installation in the vicinity of the southern border."  *Id.*  The Court is not persuaded that Congress intended "military construction" to have no stronger connection to a military installation than Defendants' own administrative convenience.  If this were true, Defendants could redirect billions of dollars from projects to which Congress appropriated funds to projects of Defendants' own choosing, all without congressional approval (and in fact directly *contrary* to Congress' decision not to fund these projects).  Elevating form over substance in this way risks "the Executive [] aggrandizing its power at the expense of [Congress]."  *Sierra Club*, 929 F.3d at 687 (quotation omitted).

*Third*, Defendants' interpretation contravenes clear congressional intent to limit—not expand—executive emergency powers.  The NEA was passed in 1976 as a reform measure, following concern about the duration of the national emergencies that presidents had declared historically, and the scope of their related emergency powers.  *See* L. Elaine Halchin, *National Emergency Powers*, Cong. Research Serv., 98-505 (Aug. 5, 2019).  For example, an emergency declaration that was issued at the start of the Korean War in 1950 was still being used decades

---

[11] The Court notes that in an August 21, 2019, "Action Memo," the Assistant Secretary of Defense, Homeland Defense and Global Security said that in order for border barrier projects to constitute military construction projects, a military department would need to report the land in its inventory "either as its own installation or as part of an existing, *nearby* military installation."  AR at 3 (emphasis added).  Defendants now contend that this common-sense "nearby" condition is not actually a formal requirement of the statute.  *See California*, No. 19-cv-00872-HSG, Dkt. No. 251 at 3–4.  Even if that is technically true, the Court finds it plain that Defendants' characterization of the breadth of the asserted power to cobble together far-flung parcels as part of one "military installation" goes far beyond any historical example they cite.  *See id.*, Dkt. No. 249 at 7–8 (citing auxiliary landing field located 40 miles away from main military installation as an example of a "geographically separated location[] . . . part of, but physically separate from" that installation).

United States District Court
Northern District of California

later with respect to the Vietnam War.  *Id.* at 7.  In 1973, there were four national emergencies still in effect from 1933, 1950, 1970, and 1971.  *See id.*  The Senate, therefore, created a special committee, known as the Special Committee on National Emergencies and Delegated Emergency Powers, to evaluate this issue.  *See id.* at 7–8.  Through its work, the Committee identified 470 provisions of federal law that granted the president extensive emergency powers.  *See id.* at 8.

The Committee developed legislation—the NEA—to limit the scope of such emergency powers.  In support of the NEA, the Committee explained the need to place limits on the presidential use of emergency powers:

> Right now, hundreds of emergency statutes confer enough authority on the President to rule the country without reference to normal constitutional process.  Revelations of how power has been abused by high government officials must give rise to concern about the potential exercise, unchecked by the Congress or the American people, of this extraordinary power.  The National Emergencies Act would end this threat and [e]nsure that the powers now in the hands of the Executive will be utilized only in time of genuine emergency and then only under safeguards providing for Congressional review.

*See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 219 (Brennan Center Brief) at 12–13 (quoting *The National Emergencies Act (Public Law 94-412), Source Book: Legislative History, Text, and Other Documents* (1976) ("*NEA Source Book*").  In its report, the Committee noted that "[t]he National Emergencies Act is not intended to enlarge or add to Executive power.  Rather the statute is an effort by the Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers conferred upon him by other statutes."  *Id.* at 14 (quoting *NEA Source Book*).

In keeping with this narrower view of executive emergency powers, Section 2808 has rarely been used, and never to fund projects for which Congress withheld appropriations.  Rather, Section 2808 has been used to build projects like aircraft hangars, barracks, airfield runways, detention facilities, logistics hubs, and waste water treatment plants.  *See* Vassalotti, at 2–3.  Defendants' invocation of Section 2808 for border barrier construction, in conflict with Congress'

judgment on those projects, is simply unprecedented, contrary to the Administration's claims. [12] This, on its own, is enough to warrant close scrutiny:  "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism."  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quotation omitted).  Put simply, the Court does not find that Section 2808 was intended to be used to resolve policy disputes with Congress or to provide the Executive Branch with unchecked power to transform the responsibilities assigned by law to a civilian agency into military ones by reclassifying large swaths of the southern border as "military installations."  Such an interpretation defies both the text and spirit of the statute.  The Court, therefore, finds that the border barrier construction projects, with the exception of the two projects on the Barry M. Goldwater range, are not "carried out with respect to a military installation" within the meaning of Section 2808.

### c.  Necessary to Support Use of the Armed Forces

Even assuming the border barrier construction could somehow be considered military construction for purposes of Section 2808, the parties also disagree as to whether the proposed projects are necessary to support the use of the armed forces.  Defendants rely on a lengthy administrative record, which, they say, explains why the projects are necessary to provide such support.  But even crediting all facts in the administrative record, and giving due deference to the strategic and military determinations in it, the Court finds that Defendants have not established that the projects are necessary to support the use of the armed forces.

The problem is twofold.  Inherent in Defendants' argument and the administrative record is that the proposed border barrier projects are intended to support and benefit DHS, a civilian agency, rather than the armed forces.  And although the administrative record explains why such

---

[12] *Compare* S.J. Res. 54 Veto Message ("Proclamation 9844 was neither a new nor novel application of executive authority.  Rather it is the sixtieth Presidential invocation of the [NEA]. It relies upon the same statutory authority used by both of the previous two Presidents to undertake more than 18 different military construction projects from 2001 through 2013."), *with Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 219 (Brennan Center Brief) at 20 ("Perhaps most significantly, in none of these cases did presidents invoke emergency powers to take action after Congress had explicitly considered and rejected legislation to authorize such action.").

United States District Court
Northern District of California

1  border barrier projects may be beneficial to DHS's mission, Defendants have not established that

2  they are in fact *necessary to support the use of the armed forces*—which is the statutory limitation

3  set by Congress.  The Court discusses each issue in turn.

4          On April 4, 2018, the President directed the Secretary of Defense to support DHS "in

5  securing the southern border and taking other necessary actions" due to "[t]he crisis at our

6  southern border."  *See California*, 19-cv-00872-HSG, Dkt. No. 59-4, Ex. 27.  The President

7  further empowered the Secretary of Defense to "request use of National Guard personnel to assist"

8  as needed.  *Id.*  As of August 13, 2019, DoD had approximately 5,500 personnel supporting DHS

9  in its "border security mission."  *See AR* at 1, 45.  DoD personnel are generally serving in

10  "support roles that relieve DHS personnel of non-law enforcement duties," such as "logistics,

11  planning, and intelligence analysis" and "monitoring and detection support" through "operating

12  mobile surveillance cameras units or providing aerial reconnaissance."  *Id.* at 42.  DHS stated that

13  the proposed border barrier projects that DHS recommended to DoD would "give a distinct and

14  enduring advantage to [U.S. Border Patrol] as a force multiplier," and would "likely reduce DHS's

15  reliance on DoD for force protection, surveillance support, engineering support, air support,

16  logistical support, and strategic communications assistance."  *Id.* at 43 (quotation omitted).  In

17  sum, the Chairman of the Joint Chiefs of Staff and DHS summarized that the projects would

18  "allow DoD to provide support to DHS more efficiently and effectively."  *See id.* at 48; *see also*

19  *id.* at 59–71.

20          The administrative record therefore illustrates that the border barrier construction projects

21  are intended to benefit DHS and its subagencies, including CBP and U.S. Border Patrol ("USBP").

22  The record explains that physical barriers, such as those proposed, may "[i]mprove CBP's

23  detection, identification, classification, and response capabilities," AR at 4; "[r]educe

24  vulnerabilities in key border areas and the time it takes for Border Patrol agents to apprehend

25  illegal migrants," *id.*; "reduce the challenges to CBP," *id.* at 61; "serve to channel illegal

26  immigrants towards locations that are operationally advantageous to DHS," *id.*; "reduce the

27  enforcement footprint and compress USBP operations," *id.* at 43; "enable CBP agents to focus less

28  on the rugged terrain," *id.* at 69; and as noted above, "give a distinct and enduring advantage to

United States District Court
Northern District of California

USBP as a force multiplier," *id.* at 43; *see also id.* at 121–24.  As DoD representatives have forthrightly explained, funding under Section 2808 would "all go to adding significantly new capabilities to DHS's ability to prevent illegal entry."  *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 210-2, Ex. 17 at 5.

That the border barrier projects would benefit DHS is unsurprising, as Congress empowered that agency to "[s]ecur[e] the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States."  6 U.S.C. § 202; *see also* 8 U.S.C. §§ 1103(a)(5) (charging the Secretary of Homeland Security with "the power and duty to control and guard the boundaries and borders of the United States").  But this is a *civilian* agency, and not part of the armed forces.  The commission of these responsibilities to DHS is no secret: the entire reason for the longest shutdown of the Federal government in history was that the President sought over $5 billion in appropriations to *DHS* for these exact projects, and Congress exercised its constitutional prerogative to decline to authorize that spending.  Put another way, the entire dispute in this case arises from the Executive's efforts to find other ways to help DHS do what Congress directly said it would not authorize when it rejected the Executive's DHS budget request.

Defendants suggest that the assistance to DHS is merely a byproduct of helping DoD.  *See, e.g.*, *California*, No. 19-cv-00872-HSG, Dkt. No. 249 at 10.  Yet the administrative record suggests that the proposed projects may actually *reduce* DHS's need for DoD support.  *See, e.g.*, AR at 4 (noting that the projects "could ultimately reduce the demand for DoD support at the southern border over time").  As the President put it, "[i]f we had a wall, we don't need the military because we'd have a wall."  *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 210-2, Ex. 13 at 5.  Defendants do not explain how the projects are necessary to support the use of the armed forces while simultaneously obviating the need for those forces.  This appears to defy the purpose of Section 2808, which specifically refers to construction that is necessary to support the use of the armed forces, not to construction that the armed forces will not use once constructed.  Again, Defendants' argument proves too much.  Under their theory, any construction could be converted into military construction—and funded through Section 2808—simply by sending armed forces

temporarily to provide logistical support to a civilian agency during construction. But Congress, and not Defendants, holds the power of the purse. The Court declines to interpret Section 2808 to provide the Secretary of Defense with almost limitless authority to use billions of dollars of its appropriations to build projects for the benefit of DHS, even when Congress specifically declined to give DHS itself the funds to build those projects. *See, e.g.*, *Util. Air Regulatory Grp.*, 573 U.S. at 324 ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." (quotation omitted)).

The administrative record also fails to establish that the border barrier construction projects are "*necessary* to support [] use of the armed forces." *See* 10 U.S.C. § 2808(a) (emphasis added). The Oxford English Dictionary defines "necessary" as "[i]ndispensable, vital, essential." *See Necessary*, OXFORD ENGLISH DICTIONARY ONLINE (last visited Nov. 20, 2019); *accord* MERRIAM-WEBSTER ONLINE DICTIONARY (defining "necessary" as "absolutely needed: required") (last visited Nov. 20, 2019). Yet Defendants simply contend that the projects will "allow DoD to provide support to DHS more efficiently and effectively." *See* AR at 48. Even accepting this conclusion as true, promoting efficiency and efficacy is not tantamount to necessity, given the nature of the construction at issue. And the Court declines Defendants' invitation to blur this distinction. There is simply nothing in the record before the Court indicating that the eleven border barrier projects—however helpful—are necessary to support the use of the armed forces.

The Court does not lightly reach the conclusion that the record does not support Defendants' claim of necessity here. The undersigned deeply respects the work of the United States armed forces, and understands and is grateful for the innumerable sacrifices made by military women and men, and their families, in service of our country. *See California*, No. 19-cv-00872-HSG, Dkt. No. 232 (IAVA Brief) at 9 ("Service members are used to discomfort. They signed up to endure hardships so that the rest of American society could live freely and comfortably. . . . But they should never be asked to work in unnecessarily unsafe or harmful conditions, or to wait even longer for basic facilities that are already long overdue."). And the Court has no doubt that Congress shares this respect and gratitude. Were this case about constructing hangars for storage of aircraft used in "aerial reconnaissance," or building a control

1    center for "operating mobile surveillance camera units," AR at 42, the circumstances likely would

2    be very different.

3         But the Court cannot blind itself to the plain reality presented in this case:  the border

4    barrier projects Defendants now assert are "necessary to support the use of the armed forces" are

5    the very same projects Defendants sought—and failed—to build under DHS's civilian authority,

6    because Congress would not appropriate the requested funds.  Even where review is "deferential,"

7    courts "are 'not required to exhibit a naiveté from which ordinary citizens are free.'"  *See Dep't of*

8    *Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (quoting *United States v. Stanchich*, 550

9    F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)); *see also Karnoski v. Trump*, 926 F.3d 1180, 1202

10   (9th Cir. 2019) ("Of course, deference does not mean abdication.") (quotation omitted).  DoD

11   officials have forthrightly acknowledged that the border barrier projects are intended to fulfill the

12   President's priorities.  During a congressional hearing on the reprogramming of funds for border

13   barrier construction, Acting U.S. Secretary of Defense Shanahan explained that "given a legal

14   order from the commander in chief, we are executing on that order."  *See* John Wagner, Paul

15   Sonne, and Dan Lamothe, *Pentagon announces $1 billion transfer for border barriers, angering*

16   *Democrats*, Wash. Post (March 26, 2019), https://tinyurl.com/y2njmvsk.  Similarly, when asked

17   during the hearing about prioritizing the border wall over military readiness and modernization,

18   U.S. Army Secretary Esper said "I'm saying that the Department of Defense made decisions based

19   on what the president set as priorities, and we are following through.  We are executing."  *Id.*

20        The parties do not suggest that additional factfinding would buttress or clarify the rationale

21   or need for the projects.  The Court therefore finds that the projects are not necessary to support

22   the use of the armed forces.  As the Supreme Court has explained, "[r]egardless of how serious the

23   problem an administrative agency seeks to address, . . . it may not exercise its authority in a

24   manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA*

25   *v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (quotation omitted).

26   Accordingly, taking into account the totality of the record, the Court finds that Defendants have

27   not satisfied the mandatory conditions set by Congress in Section 2808, and that they thus are not

28   authorized to redirect military construction funds to the eleven border barrier projects they have

United States District Court
Northern District of California

1   identified.

2        **C.    APA**

3        State Plaintiffs further contend that Defendants' conduct is reviewable as unlawful under

4   the APA.  Plaintiffs first suggest that by failing to comply with the statutory conditions in Section

5   2808, Defendants have acted "in excess of statutory jurisdiction, authority, or limitations, or short

6   of statutory right."  *See* 5 U.S.C. § 706(2)(C).  Such arguments, however, collapse into the same

7   analysis of Section 2808 that the Court detailed in Section III.B above.  *See Sierra Club*, 929 at

8   689–92.  The Ninth Circuit acknowledged when analyzing Section 8005 that "Plaintiffs either

9   have an equitable cause of action to enjoin a constitutional violation, or they can proceed on their

10  constitutional claims under the Administrative Procedure Act, or both."  *Id.* at 676–77.  However,

11  the analysis—whether under the Constitution or the APA—remains the same.  *Id.*[13]

12       State Plaintiffs also make a second and distinct claim that Defendants have violated the

13  APA's prohibition on arbitrary and capricious agency action.  *See California*, No. 19-cv-00872-

14  HSG, Dkt. No. 220 at 13–15.  Plaintiffs argue that in identifying and reallocating funds from 128

15  existing military construction projects, Defendants did not "address any of the harms to public

16  health and safety" that would result from defunding those projects.  *Id.* at 13.  The Court finds this

17  argument meritless.  "The scope of review under the 'arbitrary and capricious' standard is narrow

18  and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of*

19  *U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Rather, "the agency must

20  examine the relevant data and articulate a satisfactory explanation for its action including a

21  rational connection between the facts found and the choice made."  *Id.* (quotation omitted).  Here,

22  the administrative record provides such an explanation, indicating that Defendants identified

23  projects for defunding to "provide [DoD] time to work with [Congress] to determine opportunities

24  to restore funds for these important military construction projects . . . ."  *California*, No. 19-cv-

25

26  _____

27  [13] Although Sierra Club Plaintiffs do not raise an independent claim under the APA, they note, as
    the Ninth Circuit has recognized, that the Court may consider their claim challenging the use of
    military construction funds either as an equitable action to enjoin unconstitutional conduct or
28  under the APA as final agency action that violates the Constitution.  *See Sierra Club*, No. 19-cv-
    00892-HSG, Dkt. No. 210 at 21–22 (citing *Sierra Club*, 929 at 676–77).

United States District Court
Northern District of California

00872-HSG, Dkt. No. 206-2, Ex. 2 at 2.  For the same reasons discussed above, it is not the Court's task to decide whether it finds the substance of Defendants' rationale for defunding or delaying these projects persuasive or wise, and State Plaintiffs' disagreement with that rationale does not make the decision arbitrary and capricious.

### D.     National Environmental Policy Act

Plaintiffs also seek a declaratory judgment deeming unlawful Defendants' failure to comply with NEPA before undertaking the proposed military construction projects under Section 2808.[14]  NEPA is intended "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man."  42 U.S.C. § 4321.  Under NEPA, federal agencies must assess the environmental impact of agency actions that "significantly affect[ ] the quality of the human environment."  *Id.* § 4332(C).  Where an agency's project "might significantly affect environmental quality," NEPA compels preparation of an Environmental Impact Statement ("EIS").  *See WildEarth Guardians v. Provencio*, 923 F.3d 655, 669 (9th Cir. 2019).  Plaintiffs contend that Defendants were required to prepare an EIS for the proposed border barrier construction projects, but failed to do so here.

In response, Defendants point to the language of Section 2808, which by its terms, authorizes "the Secretary of Defense, without regard to any other provision of law, [to] undertake military construction projects . . . ."  10 U.S.C. § 2808.  The Secretary of Defense mirrored this language in directing the Secretary of the Army "to expeditiously undertake the eleven border

---

[14] State Plaintiffs also attempt to expand their NEPA cause of action to include the land transfer from the Department of the Interior for the proposed border barrier construction projects, but their complaint does not assert such a claim.  *See California*, No. 19-cv-00872-HSG, Dkt. No. 47 at ¶¶ 392–99.  Rather, their NEPA claim explicitly states that "Defendant DHS is in violation of NEPA and the APA because it failed to prepare an [Environmental Impact Statement] concerning border wall development projects that will have adverse effects on the environment . . . ."  *Id.* at ¶ 397.  Even reading the complaint liberally, the operative complaint does not "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (holding district court did not err in finding plaintiff failed to provide adequate notice of her claims where she presented specific factual grounds for those claims for first time on summary judgment) (quotation omitted).  The Court may not now grant summary judgment as to a claim that State Plaintiffs never asserted until their motion for summary judgment, when they never sought leave to amend the complaint.  *See Wasco Prod., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." (quotation omitted)).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    barrier military construction projects," and "to do so without regard to any other provision of law

2    that may impede the expeditious construction of such projects in response to the national

3    emergency." *See California*, No. 19-cv-00872-HSG, Dkt. No. 206-1, Ex. 1 at 1.  The Court finds

4    that the language in Section 2808 is clear on its face, and permits the Secretary of Defense, if

5    properly acting within his authority under Section 2808, to undertake military construction

6    projects without regard to NEPA.

7         Plaintiffs attempt to restrict this "notwithstanding" language by divorcing Defendants'

8    ability to re-prioritize military construction projects from their ability to actually construct those

9    projects.  Plaintiffs urge that only the former power to "restructur[e] construction priorities" may

10   be undertaken "without regard to any other provision of law."  *See, e.g.*, *Sierra Club*, No. 19-cv-

11   00892-HSG, Dkt. No. 210 at 19–20.  The Court finds no evidence for this reading, as the statute

12   permits the Secretary to "undertake military construction projects," not just to prioritize them.

13        Plaintiffs next contend that the Court should still read the "notwithstanding" language

14   narrowly because had Congress intended to waive NEPA's requirements, the statute would have

15   included language that the projects be undertaken "without delay" or "expeditiously."  *Id.* at 20.

16   However, there are no magic words constraining Congress' ability to empower Defendants to

17   proceed without consideration of NEPA or other laws.  Rather, the Court must "tak[e] into account

18   the whole of the statutory context in which [the notwithstanding clause] appears."  *See United*

19   *States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007).  Here, Plaintiffs' argument is belied by the

20   statutory prerequisite that there be a declaration of war or a national emergency before Section

21   2808 may be used for military construction.  Such a condition, by its nature, normally would

22   require speed.  The Court finds it unreasonable to conclude that in the face of war or a national

23   emergency, Congress would require Defendants to engage in the time-intensive EIS process prior

24   to undertaking projects "necessary to support [] use of the armed forces."  *See* 10 U.S.C. § 2808.

25   Plaintiffs' concern that Section 2808 would "empower[] the Secretary of Defense to build almost

26   anything, anywhere," *see Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 210 at 21, ignores the

27   conditions discussed in Section III.B.ii above.  Section 2808 has limits.  It may only be invoked in

28   the event of war or a national emergency, and the Secretary of Defense still must establish that the

proposal is a military construction project necessary to support the use of the armed forces.

This does not, however, end the inquiry.  To be sure, had Defendants acted within their authority under Section 2808 in proposing the eleven border barrier construction projects, the Court finds that their conduct likely would not violate NEPA.  But the Court has already found that Defendants have not properly invoked Section 2808, so that the "without regard to any other provision of law" language is not triggered.  Put another way, the question of whether Defendants are required to comply with NEPA with respect to the eleven projects is derivative of the parties' Section 2808 arguments.  The Court does not understand Defendants to suggest that any authority other than Section 2808 excuses them from complying with NEPA as to these projects.  The Court thus need not reach whether a proper invocation of Section 2808 could theoretically still require compliance with NEPA under different circumstances.[15]

### E.   Injunctive Relief

Having found that Defendants' intended use of military construction funds under Section 2808 is unlawful, the Court next considers Plaintiffs' request for injunctive relief.  It is a well-established principle of equity that a permanent injunction is appropriate when:  (1) a plaintiff will "suffer[ ] an irreparable injury" absent an injunction; (2) available remedies at law are "inadequate;" (3) the "balance of hardships" between the parties supports an equitable remedy; and (4) the public interest is "not disserved."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Defendants do not challenge whether the available remedies at law are inadequate.  *See, e.g.*, *Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 236 at 28–34.  The Court thus addresses the remaining factors.

### i.   Irreparable Injury

The State Plaintiffs identify several theories of irreparable injury that will occur in the absence of an injunction, including environmental and financial harm, as well as harm to their

---

[15] State Plaintiffs appear to seek reconsideration of the Court's prior order regarding whether Defendants violated NEPA for purposes of Section 8005 and 10 U.S.C. § 284.  *See California*, No. 19-cv-00872-HSG, Dkt. No. 220, at 5, 19–20, & n.3.  State Plaintiffs acknowledge that they do so to preserve this issue for appeal.  *Id.* at 5, n.3.  The Court declines to reconsider its prior order given Plaintiffs have failed to provide any new law or factual evidence warranting further analysis.

United States District Court
Northern District of California

United States District Court
Northern District of California

ability to enforce state laws concerning the protection of environmental and natural resources. The Sierra Club Plaintiffs, in turn, identify aesthetic and recreational harm, as well as organizational harm to their missions in diverting resources to respond to Defendants' proposed projects. The Court recognizes that these injuries are distinct, and first addresses the Sierra Club Plaintiffs' alleged injuries. Because, as explained more fully below, the Court finds that Sierra Club Plaintiffs have established that a permanent injunction is warranted as to all eleven proposed projects, the Court denies State Plaintiffs' duplicative request for a permanent injunction as moot.

### a. Aesthetic and Recreational Harm

Sierra Club Plaintiffs contend that absent a permanent injunction Defendants' conduct will irreparably harm their members' aesthetic and recreational interests as the construction "will impede [their] ability to enjoy, work, and create in the wilderness areas they have used for years along the U.S.-Mexico border." *See Sierra Club*, 19-cv-00892-HSG, Dkt. No. 210 at 26. As this Court has previously noted, "it is well-established in the Ninth Circuit that an organization can demonstrate irreparable harm by showing that the challenged action will injure its members' enjoyment of public land. *See id.*, Dkt. No. 144 at 49 (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). And here, Plaintiffs provide declarations from their members detailing how Defendants' eleven proposed border barrier construction projects will harm their ability to recreate in and otherwise enjoy public land along the border. *See, e.g.*, *id.*, Dkt. No. 210-1, Exs. 1–19.

In response, Defendants attempt to minimize Plaintiffs' injuries by arguing that many of the challenged construction projects are surrounded by private land or are in areas previously disturbed by at least some border barrier construction. *See id.*, Dkt. Nos. 236 at 28–31, 236-6, Ex. 6. Defendants further suggest that any access limitations imposed by the new construction would be de minimis, especially as to the two projects on the Barry M. Goldwater Range, where only a third of the miles scheduled for construction are accessible to the public. *See id.*, Dkt. No. 236 at 30. Defendants conclude that Plaintiffs' asserted harm is thus little more than their subjective opinion about whether a border wall would be unsightly. *Id.* The Court is not persuaded.

As an initial matter, the Ninth Circuit has "never required a plaintiff to show that he has a

right of access to the site on which the challenged activity is occurring, or that he has an absolute right to enjoy the aesthetic or recreational activities that form the basis of his concrete interest." *Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001). In *Cantrell*, for example, the Ninth Circuit credited birdwatchers' allegations that they would suffer harm from the defendant's construction, which would hinder them from viewing birds and nests on a naval station from publicly accessible locations. Such an approach is sensible as "an area can be observed and enjoyed from adjacent land," such that plaintiffs may still suffer injury to their aesthetic and recreational interests even when not physically *on* the affected land. *See id.* Here too, Plaintiffs have explained that the proposed projects may be seen from miles away, and affect their recreational and aesthetic interests, even when they are not standing directly on the areas proposed for construction. *See, e.g.*, *Sierra Club*, 19-cv-00892-HSG, Dkt. No. 210-1, Ex. 4; *id.*, Ex. 9.

Defendants' reliance on *Center for Food Safety v. Vilsack* does not undermine the significance of Plaintiffs' injury. Defendants point to a sentence in a footnote that states "a plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it." 636 F.3d 1166, 1171, n.6 (9th Cir. 2011). This point is true as far as it goes, but the plaintiffs in *Vilsack* had only raised possible concerns about genetic contamination, not a likelihood of injury. *Id.* at 1173. In *Vilsack*, the plaintiffs suggested that the defendants' genetically modified sugar beets could cross-pollinate with their crops, causing injury. *See id.* at 1172. The Ninth Circuit explained that the undisputed evidence, however, indicated that the defendants' plants were "biologically incapable of flowering or cross-pollinating" in a way that could affect the plaintiffs' plants. *Id.* at 1173. Because the alleged harm was a biological impossibility, the Ninth Circuit found that there was no likelihood of irreparable injury warranting an injunction.

Here, in contrast, Plaintiffs have detailed the harm that would result if the border barrier construction projects continue. Defendants' argument in response is that the land for the challenged projects "is already heavily disturbed with border infrastructure" as much of the land occupies existing "law enforcement corridors." *Sierra Club*, 19-cv-00892-HSG, Dkt. No. 236 at 28. But as the Court has previously explained, Defendants' proposal would significantly alter the

existing landscape, and even the proposed changes to the existing infrastructure are substantial. *See id.*, Dkt. No. 144 at 50.

The Court is also not persuaded that the preexistence of some construction means Plaintiffs here cannot suffer an injury from additional construction. Defendants do not cite a case that warrants such a sweeping limitation. In *Gallatin Wildlife Association v. U.S. Forest Services*, the plaintiffs sought to enjoin sheep grazing that had occurred for the past 150 years. *See* No. cv 15-27-BU-BMM, 2015 WL 4528611, at *4 (D. Mont. July 27, 2015). The court found that the plaintiffs had "failed to demonstrate that allowing the domestic grazing to occur this year will cause any new harm to the landscape that has not already occurred in the past 150 years." *Id.* That the sheep had grazed in the area before was not itself decisive; instead, the court considered the nature and scale of their continued and additive effect on the land at issue. And in *Center for Biological Diversity v. Hays*, the court found that the plaintiffs had not established irreparable injury where the land at issue could not be used for recreational purposes at all due to the scale of preexisting dead trees that threatened the safety of visitors. No. 2:15-cv-01627-TLN-CMK, 2015 WL 5916739, at *1, *10 (E.D. Cal. Oct. 8, 2015). The plaintiff's interest in studying these trees was thus irrelevant as he could not access them regardless of the defendant's conduct. *Id.*

In sum, the Court finds that the funding and construction of these border barrier projects, if indeed barred by law, cannot be easily remedied after the fact. To the contrary, as the Ninth Circuit has acknowledged, "[t]he harm here, as with many instances of this kind of harm, is irreparable for the purposes of the preliminary injunction analysis." *See League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014). Accordingly, the Court finds that Sierra Club Plaintiffs have established irreparable injury to their aesthetic and recreational interests in the absence of a permanent injunction.

### b.  Organizational Harm

Sierra Club Plaintiffs further contend that Defendants' conduct has irreparably harmed the missions and activities of the Southern Border Communities Coalition ("SBCC") and its member organizations, which include the Texas Civil Rights Project ("TCRP"), Southwest Environmental Center ("SWEC"), and American Friends Service Committee ("AFSC"). Each has had to divert

1    resources to combat the impact of the proposed construction.

2          The Supreme Court has recognized that an organization may suffer harm if the challenged

3    conduct frustrates its activities and drains its resources.  *See, e.g.*, *Havens Realty Corp. v.*

4    *Coleman*, 455 U.S. 363, 377–79 (1982).  In *Havens Reality*, a nonprofit corporation challenged the

5    defendants' alleged "racial steering" practices, in which real estate brokers encouraged racial

6    segregation by directing members of racial or ethnic  groups to buildings or neighborhoods

7    occupied primarily by members of the same race of ethnic group.  *Id.* at 367, & n.1.  The

8    organization's "purpose was to make equal opportunity in housing a reality . . . ."  *Id.* at 368

9    (quotation omitted).  The Supreme Court explained that the organization's need to divert resources

10   "to identify and counteract" the defendants' discriminatory practices "constitute[d] far more than

11   simply a setback to the organization's abstract social interests" in equal access to housing.  *See id.*

12   at 379–80.  Similarly, in *National Council of La Raza v. Cegavske*, the Ninth Circuit further

13   recognized that an organization may establish concrete harm if the defendant's conduct changes

14   "business as usual" for the organization, such that resources spent to counter a defendant's

15   conduct "would have [been] spent on some other aspect of their organizational purpose . . . or any

16   other activity that advances their goals."  800 F.3d 1032, 1040 (9th Cir. 2015) (quotation omitted).

17   In *Cegavske*, the Ninth Circuit acknowledged that had the state complied with the National Voter

18   Registration Act, the organization could have spent its resources elsewhere, such as increasing its

19   voter education efforts, rather than on voter registration drives in communities where the

20   defendant should have offered voter registration opportunities.  *Id.*; *accord Fair Hous. Council of*

21   *San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012).

22         That is precisely what Plaintiffs have established here, as Defendants' conduct has

23   significantly altered "business as usual" for the Plaintiff organizations, and will continue to do so

24   without a permanent injunction:

25              • SBCC's "principal goals are to protect human rights, dignity, and safety" in the

26                border regions of the United States.  *Sierra Club*, No. 19-cv-00892-HSG, Dkt.

27                No. 210-1, Ex. 7 at 41–46.  SBCC has spent considerable time and resources

28                advocating against appropriations for border barrier construction and in urging

United States District Court
Northern District of California

40

1    Congress to terminate the national emergency.  As a result, SBCC has diverted

2    time and resources away from its "other initiatives, including Border Patrol

3    accountability, community engagement on local health and education issues,

4    and public education about immigration policies more broadly."  *Id.* at 45.

5    • TCRP has diverted resources to protect Texas landowners in Laredo who are at

6      risk of having their non-public property condemned for the border barrier

7      construction projects, *id.*, Ex. 6 at 35–39.  They have staged events to educate

8      communities about these projects and their rights, are working to create a

9      network of advocates for this work.  Because of this work, TCRP has had to

10     divert time and resources away from their other projects to protect border

11     communities outside of Laredo.

12   • SWEC's mission is to "reverse the accelerating loss of plants and animals

13     worldwide through protection and restoration of native wildlife and their

14     habitats in the southwest."  *Id.*, Ex. 3 at 16–17.  Though based in New Mexico,

15     its restoration and education work extends into Eastern Arizona and West

16     Texas.  However, in light of the proposed border barrier projects, SWEC has

17     significantly reduced its restoration work to divert resources to monitor

18     construction and educate members and the public about the proposed

19     construction and its likely impact.

20   • AFSC works with migrant communities in San Diego and El Centro to

21     document abuses by law enforcement and collaborate with community groups

22     to address local issues.  *Id.*, Ex. 13 at 74–75.  However, if the border barrier

23     projects in these areas proceed, they will have to decrease the time and

24     resources they spend on their other services, including know-your-rights

25     trainings and leadership development courses, so they can monitor the

26     construction and provide outreach resources to the affected communities.

27   Defendants counter that Plaintiffs' missions as public advocacy groups have not been

28 injured, and more critically still, that Plaintiffs have not established any nexus between their injury

41

and Defendants' conduct.  Defendants first contend that the organizations may continue their advocacy work in the face of the border barrier projects, but as the Ninth Circuit recognized in *Cegavske*, it is enough that these organizations "would have spent [resources] on some other aspect of their organizational purpose . . . or any other activity that advances their goals," in the absence of the border barrier construction projects.  *See* 800 F.3d at 1040.  Here, the Plaintiff organizations have spent resources creating new education, outreach, and monitoring programs related to the construction projects, rather than on other activities related to their respective missions.  Defendants' suggestion that there is no nexus between Plaintiffs' harm and Defendants' conduct is similarly unavailing.  The organizations work in and with border communities to protect and restore the environment, as is the case with SWEC, and promote the safety of border communities, as is the case with SBCC, TCRP, and AFSC.  But because the organizations believe the border barrier projects impede these respective missions, they have altered "business as usual" to combat these projects and educate others about them.  Defendants' blanket conclusion that the border barrier construction projects "in no way impede or disrupt their day-to-day activities," *Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 247 at 24, simply is not supported by the record.  The Court finds that Sierra Club Plaintiffs have thus established irreparable injury to their organizational missions in the absence of a permanent injunction.

### i.   Balance of Equities and Public Interest

The parties all acknowledge that when the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge.  *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  And in these cases, the parties' asserted injuries collapse into the equities they assert.

According to Defendants, these factors tilt in their favor, because they have "compelling interests in safety and in the integrity of our borders," and "in ensuring that [the country's] military forces are properly supported and have the necessary resources to ensure mission success."  *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. No. 236 at 33.  As the Court has previously acknowledged, "the public has a 'weighty' interest 'in efficient administration of the immigration laws at the border.'"  *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779

United States District Court
Northern District of California

1   (9th Cir. 2018) (quoting *Landon v. Plasencia*, 459 U.S. 21, 34 (1982)).

2       Yet Defendants' argument again fails to recognize that Congress has already engaged in

3   the difficult balancing of Defendants' proffered interests and the need for border barrier

4   construction in passing the CAA.  *See* CAA, § 230(a)(1), 133 Stat. 13.  Defendants have not

5   pointed to any factual developments that were not before Congress and that may have altered its

6   judgment to appropriate just $1.375 billion in funding for limited border barrier construction.  The

7   Court appreciates the complexity of the policy judgments at hand, and further understands that

8   Defendants may strongly disagree with Congress' determination.  But the Court has found that

9   Defendants do not have the statutory authority under Section 2808 to redirect military construction

10  funds for the planned border barrier construction.  And as such, Defendants have not identified a

11  mechanism by which they may override Congress' appropriations judgment.  As the Court

12  explained in its orders related to Section 8005, "Defendants' position on these factors boils down

13  to an argument that the Court should not enjoin conduct found to be unlawful because the ends

14  justify the means.  No case supports this principle."  *See Sierra Club*, 19-cv-00892-HSG, Dkt. No.

15  185 at 8.  The Court finds that "the public [] has an interest in ensuring that statutes enacted by

16  their representatives are not imperiled by executive fiat," *E. Bay Sanctuary Covenant*, 932 F3d at

17  779, and that these constitutional separation of powers principles outweigh Defendants' concerns

18  about the efficiency of DHS.  Accordingly, the Court follows the Ninth Circuit's reasoning that

19  the public interest "is best served by respecting the Constitution's assignment of the power of the

20  purse to Congress, and by deferring to Congress's understanding of the public interest as reflected

21  in its repeated denial of more funding for border barrier construction."  *Sierra Club*, 929 F.3d at

22  677.

23      In his concurrence in the landmark 1952 case of *Youngstown Sheet and Tube Co. v.*

24  *Sawyer*, which addressed the scope of executive power during a time of war on the Korean

25  Peninsula, Justice Frankfurter articulated a principle that remains as important today as it was

26  then:

27          It is one thing to draw an intention of Congress from general language
            and to say that Congress would have explicitly written what is
            inferred, where Congress has not addressed itself to a specific

28          situation.  It is quite impossible, however, when Congress did

United States District Court
Northern District of California

United States District Court
Northern District of California

> specifically address itself to a problem, as Congress did to that of seizure [of steel mills by the President], to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld.  To find authority so explicitly withheld is not merely to disregard in a particular instance the clear will of Congress. It is to disrespect the whole legislative process and the constitutional division of authority between President and Congress.

343 U.S. 579, 610 (Frankfurter, J., concurring).

After a lengthy legislative process, Congress specifically declined to provide the funding sought by the Executive for the border barrier construction at issue in this case.  The Executive has made plain its determination to nonetheless proceed with the construction by any means necessary, notwithstanding Congress' contrary exercise of its constitutionally-absolute power of the purse. As Justice Frankfurter explained long ago, that position both disregards the clear will of Congress and disrespects the whole legislative process and the separation of powers enshrined in the Constitution.  Because the Court finds Defendants' proposed use of funds under Section 2808 unlawful, the Court finds that the balance of hardships and public interest favor Plaintiffs, and counsel in favor of a permanent injunction.[16]

## IV.    STAY PENDING APPEAL

Federal Rule of Civil Procedure 62(c) authorizes a district court to stay enforcement of a permanent injunction pending appeal.  *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  "A stay is not a matter of right, even if irreparable injury might otherwise result."  *Nken v. Holder*, 556 U.S. 418, 427 (2009) (quotation omitted).  Rather, the decision to grant or deny a stay is committed to the district court's discretion.  *Id.*  In determining whether to issue a stay, a court examines several factors including:  (1) whether the applicant has made a strong showing that he is likely to succeed on the merits of the appeal; (2) whether the applicant will be irreparably injured absent a stay; (3) whether a stay will substantially injure the non-moving party; and (4) where the public interest lies.  *See Leiva-Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011).

---

[16] The Court further notes that on December 10, 2019, the United States District Court for the Western District of Texas also entered an order permanently enjoining "agency head Defendants Mark T. Esper, Chad F. Wilf, Todd, T. Semonite, David Bernhardt, and Steven T. Mnuchin . . . from using § 2808 funds beyond the $1.375 billion in the 2019 Consolidated Appropriations Act for border wall construction."  *See El Paso County v. Trump*, No. 3:19-cv-0066-DB (W.D. Tex.), Dkt. No. 136 at 21.

Although the Court has considered similar factors as part of its permanent injunction analysis above, the Supreme Court's stay of this Court's prior injunction order appears to reflect the conclusion of a majority of that Court that the challenged construction should be permitted to proceed pending resolution of the merits.  Accordingly, the Court finds in its discretion that the lengthy history of this action; the prior appellate record; and the pending appeal before the Ninth Circuit on the merits of Plaintiffs' Section 8005 claim, which will address several of the threshold legal and factual issues raised in this order, warrant a stay of the permanent injunction pending appeal.  Plaintiffs may, of course, petition the Ninth Circuit to lift this stay.

## V.    CERTIFICATION FOR APPEAL

Given the parties' express request to certify for appeal the Court's prior orders regarding Section 8005, the Court also considers whether certification is appropriate here.  Appellate courts generally only have jurisdiction to hear appeals from final orders.  *See* 28 U.S.C. § 1291.  Federal Rule of Civil Procedure 54(b) allows for a narrow exception to this final judgment rule, permitting courts to "direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."  Entry of judgment under Rule 54(b) thus requires:  (1) a final judgment; and (2) a determination that there is no just reason for delay of entry.  *See Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 574 (9th Cir. 2018) (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7–8 (1980)).  The Court finds both requirements satisfied here.

### A.    Finality of Judgment

A final judgment is "a decision upon a cognizable claim for relief" that is "an ultimate disposition of an individual claim entered in the course of a multiple claims action."  *Curtiss-Wright Corp.*, 446 U.S. at 7.  The Court finds this requirement satisfied because the Court's award of partial summary judgment in this order is "an ultimate disposition" of Plaintiffs' claims related to Defendants' purported reliance on Section 2808 for border barrier construction.

### B.    No Just Reason for Delay

As the Ninth Circuit has explained, "[j]udgments under Rule 54(b) must be reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and of

United States District Court
Northern District of California

United States District Court
Northern District of California

1    overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early

2    and separate judgment as to some claims or parties." *Morrison-Knudsen Co. v. Archer*, 655 F.2d

3    962, 965 (9th Cir. 1981).  Accordingly, an explanation of findings "should include a determination

4    whether, upon any review of the judgment entered under the rule, the appellate court will be

5    required to address legal or factual issues that are similar to those contained in the claims still

6    pending before the trial court." *Id.* at 965.  "The greater the overlap the greater the chance that

7    [the Court of Appeals] will have to revisit the same facts—spun only slightly differently—in a

8    successive appeal." *Wood v. GCC Bend, LLC*, 422 F.3d 873, 882 (9th Cir. 2005).  "[P]lainly,

9    sound judicial administration does not require that Rule 54(b) requests be granted routinely." *Id.*

10   at 879 (quotation omitted).

11          As with its partial summary judgment order related to Section 8005, the Court finds there

12   is no just reason for delay under the circumstances.  Whether Defendants' actions comport with

13   the statutory requirements of Section 2808 and whether Defendants' actions comport with the

14   remaining statutory requirements related to the outstanding claims are distinct inquiries, largely

15   based on distinct law.  The Court therefore finds that "sound judicial administration" is best served

16   by the Court certifying this judgment for appeal, in light of the undisputedly significant interests at

17   stake in this case.  *See Wood*, 422 F.3d at 879.

18   **VI.    CONCLUSION**

19          For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART**

20   Plaintiffs' motions for partial summary judgment and **DENIES** Defendants' motions for partial

21   summary judgment.  Specifically, the Court **GRANTS** Plaintiffs' request for declaratory judgment

22   that Defendants' intended use of military construction funds under Section 2808 for the eleven

23   border barrier construction projects that the Secretary of Defense identified as Yuma Project 2;

24   Yuma Project 10/27; Yuma Project 3; Yuma Project 6; San Diego Project 4; San Diego Project 11;

25   El Paso Project 2; El Paso Project 8; Laredo Project 5; Laredo Project 7; El Centro Project 5; and

26   El Centro Project 9, is unlawful.  *See Sierra Club*, No. 19-cv-00892-HSG, Dkt. Nos. 201, 201-1,

27   & Ex. 1.  The Court **DENIES** Plaintiffs' request for declaratory judgment and injunctive relief

28   concerning Defendants' (1) invocation of Section 2808 beyond these projects; (2) reliance on

Section 2808 to excuse them from complying with NEPA as to the eleven proposed projects; and (3) decision to defer outstanding military construction projects.

The terms of the permanent injunction are as follows:  Defendants Mark T. Esper, in his official capacity as Secretary of Defense; and Chad F. Wolf, in his official capacity as Acting Secretary of Homeland Security (collectively, "Defendants"), and all persons acting under their direction, are permanently enjoined from using military construction funds appropriated for other purposes to build a border wall in the areas Defendants have identified as Yuma Project 2; Yuma Project 10/27; Yuma Project 3; Yuma Project 6; San Diego Project 4; San Diego Project 11; El Paso Project 2; El Paso Project 8; Laredo Project 5; Laredo Project 7; El Centro Project 5; and El Centro Project 9.  Nevertheless, as discussed in Section IV above, the Court exercises its discretion to **STAY** the permanent injunction pending appeal.

The Clerk is directed to enter final judgment in favor of Plaintiffs and against Defendants with respect to Defendants' purported reliance on Section 2808 to fund border barrier construction.  This judgment will be certified for immediate appeal pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED.**

Dated:  12/11/2019

_____

HAYWOOD S. GILLIAM, JR.
United States District Judge

47